**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **IN RE: MOTOR FUEL TEMPERATURE** | ) | |
| **SALES PRACTICES LITIGATION** | ) | **MDL No. 1840** |
| | ) | |
| **(This Document Relates to All Cases)** | ) | **Case No. 07-MD-1840-KHV/JPO** |
| | ) | |
| _____ | ) | |

**<u>MEMORANDUM IN SUPPORT OF JOINT MOTION TO DISMISS</u>**

October 22, 2007

# TABLE OF CONTENTS

**Page**

NATURE OF THE MATTER BEFORE THE COURT ............................................................. 1

STATEMENT OF THE FACTS ............................................................................................... 2

I.      BACKGROUND ........................................................................................................... 2

        A.      Weights-and-Measures Regulation ................................................................. 2

        B.      The Long-Running Regulatory Debate over Retail Temperature
                Adjustment ........................................................................................................ 5

        C.      Taxation of Motor Fuel .................................................................................... 7

II.     THE CONSOLIDATED COMPLAINT ...................................................................... 7

QUESTION PRESENTED ...................................................................................................... 8

ARGUMENT ........................................................................................................................... 8

I.      THE STATES REQUIRE DEFENDANTS TO DISPENSE MOTOR FUEL IN
        UNIFORM VOLUMETRIC UNITS OF EXACTLY 231 CUBIC INCHES. .................... 8

II.     DEFENDANTS' SALES PRACTICES COMPLY WITH CONSUMER
        PROTECTION LAWS AND BREACH NO CONTRACTUAL OBLIGATIONS. .......... 11

        A.      Plaintiffs' Consumer Protection and Breach of Contract Claims Fail
                Because Defendants Accurately Represent What They Are Selling – a Unit
                of 231 Cubic Inches in Accordance with the Ordinary, Legally Prescribed
                Meaning of "Gallon." ...................................................................................... 12

        B.      Plaintiffs' Consumer Protection Claims Fail Because Defendants Do Not
                Omit, Suppress, or Conceal Material Facts. .................................................... 15

        C.      Plaintiffs' Consumer Protection Claims Fail Because Defendants'
                Challenged Practices Have Been Endorsed by State Weights-and-
                Measures Regimes as Fair and Proper. ........................................................... 19

III.    PLAINTIFFS' WARRANTY CLAIMS FAIL BECAUSE SELLING BY THE
        GALLON DOES NOT WARRANT THAT EVERY UNIT SOLD WILL HAVE
        IDENTICAL ENERGY CONTENT. .......................................................................... 22

IV.     PLAINTIFFS' OTHER CAUSES OF ACTION FAIL TO STATE A CLAIM. ................ 24

A.      Plaintiffs' Miscellaneous Challenges to Defendants' Sales Practices Are
        Legally Deficient. ...................................................................................................24

B.      Plaintiffs' Tax Claims Should Be Dismissed. ........................................................26

CONCLUSION.............................................................................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Air Transportation Excise Tax Litig.*,
  37 F. Supp. 2d 1133 (D. Minn. 1999)................................................................28, 29, 30

*Atlantic Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541 (1st Cir. 1993) ...................15

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................................8, 26

*Bolam v. Mobil Oil Corp.*, 893 F.2d 311 (11th Cir. 1990) ..................................................9

*Canales Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719 (E.D. La. 2002) ......................3

*Doug Grant, Inc. v. Greater Bay Casino Corp.*, 3 F. Supp. 2d 518 (D.N.J. 1998) ...........21

*Gurley v. Rhoden*, 421 U.S. 200 (1975)..............................................................................28

*Hanley v. Donoghue*, 116 U.S. 1 (1885)..............................................................................3

*Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753 (7th Cir. 2007) .....................................19

*Hopkins v. BP Oil, Inc.*, 81 F.3d 1070 (11th Cir. 1996) ....................................................14

*LMB, Inc. v. Lard Oil Co.*, 1998 WL 777825 (E.D. La. Oct. 22, 1998).......................18, 22

*Lockett v. Prudential Ins. Co. of Am.*, 870 F. Supp. 735 (W.D. Tex. 1994)......................24

*Louie v. McCormick & Schmick Restaurant Corp.*,
  460 F. Supp. 2d 1153 (C.D. Cal. 2006) .........................................................................3

*MacDermid v. Discover Fin. Servs.*, 488 F.3d 721 (6th Cir. 2007)...................................21

*In re Mexico Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001)...................................16

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ....................22

*Mitchell v. King*, 537 F.2d 385 (10th Cir. 1976)..................................................................8

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ............................................20

**STATE CASES**

*Al-Sal Oil Company Inc. v. State Bd. of Equalization*,
   232 Cal. App. 3d 969 (1991) ........................................28

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454 (Cal. 1994) .................25

*Arneson v. W.H. Barber Co.*, 297 N.W. 335 (Minn. 1941) ...............................27

*Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165 (Tex. 1987) ........................24

*Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*,
   160 S.W.3d 874 (Tenn. Ct. App. 2004) ......................................16

*Chancellor v. Gateway Lincoln-Mercury, Inc.*,
   502 S.E.2d 799 (Ga. Ct. App. 1998) ........................................21

*Chelsea Plaza Homes, Inc. v. Moore*, 226 Kan. 430, 601 P.2d 1100 (Kan. 1979) ............20

*Chern v. Bank of Am.*, 544 P.2d 1310 (Cal. 1976) ...........................................14

*Daugherty v. Am. Honda Motor Co., Inc.*,
   144 Cal. App. 4th 824 (Cal. Ct. App. 2006) ................................18

*Dismuke v. City of Sikeston*, 614 S.W.2d 765 (Mo. Ct. App. 1981) .................................20

*Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*,
   960 S.W.2d 41 (Tex. 1998) ................................................24

*Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000) .......................................25

*Frantz v. Cantrell*, 711 N.E.2d 856 (Ind. Ct. App. 1999) .................................15

*Hale Bros. v. Milliken*, 90 P. 365 (Cal. Ct. App. 1907) .....................................13

*InMed Diagnostic Services, L.L.C. v. MedQuest Assocs., Inc.*,
   594 S.E.2d 552 (S.C. Ct. App. 2004) .......................................22

*McCann v. Lucky Money, Inc.*, 129 Cal. App. 4th 1382 (Cal. Ct. App. 2005) ............16, 22

*Mieske v. Bartell Drug Co.*, 593 P.2d 1308 (Wash. 1979) .................................15

*Musil v. Hendrich*, 6 Kan. App. 2d 196, 627 P.2d 367 (Kan. App. 1981).........................23

*Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437 (Tex. Ct. App. 2006) .....................25

*Pitney-Bowes v. California*, 108 Cal. App. 3d 307 (Cal. Ct. App. 1980)..........................19

*Signal Oil & Gas Co. v. State Bd. of Equalization*,
    49 Cal. App. 3d 550 (Cal. Ct. App. 1975) ..................................................27

*Valdez v. New Mexico*, 54 P.3d 71 (N.M. 2002)..................................................22

## STATUTES

15 Okla. Stat. Ann. § 754(2) ...............................................................21

15 U.S.C. § 272.........................................................................................2, 3

15 U.S.C. § 2822......................................................................................17

2007 Cal. Legis. Serv. Ch. 398 (A.B. 868).........................................................5

Ariz. Rev. Stat. § 41-2082 ...............................................................................9

Ariz. Rev. Stat. § 41-2062 .............................................................................13

Cal. Bus. & Prof. Code § 12300 ...................................................................13

Cal. Bus. & Prof. Code § 12500.5 ..................................................................4

D.C. Code Ann. § 37-201.18 .........................................................................12

Fla. Stat. § 501.212 .......................................................................................22

Ind. Code § 24-6-3-1.........................................................................................3

Kan. Stat. Ann. § 83-204 ..............................................................................13

La. Rev. Stat. Ann. 3:4606.............................................................................13

N.C. Gen. Stat. § 81A-1 ................................................................................19

N.C. Gen. Stat. § 81A-3 ................................................................................12

Tenn. Code  Ann. § 47-18-11 ........................................................................21

Tenn. Code Ann. § 47-26-908 .......................................................................19

U.C.C. § 2-314.................................................................................................23

U.C.C. § 2-316 ...............................................................................................23

## REGULATIONS

33 Fed. Reg. 10755-56 (July 27, 1968) ...........................................................12

Ariz. Admin. Code R20-2-203 .........................................................................4

Kan. Admin. Regs. 99-25-9 ........................................................................17, 24

Mo. Code Regs. Ann. tit. 2, § 90-30.040 ........................................................17

Nev. Admin. Code § 581.011 ...........................................................................13

## OTHER AUTHORITY

American Society for Testing and Materials Standard D 1250 .........................14

American Society for Testing and Materials Standard D 4814 .........................23

U.S. Environmental Protection Agency Office of Mobile Sources,
      *Fuel Economy Impact Analysis of RFG*, EPA 420-F-95-003 (August 1995)........16, 17

Handbook 44, *Specifications, Tolerances and Other Technical Requirements for
      Weighing and Measuring Devices* (2007)............................................ *passim*

Handbook 130, *Uniform Laws and Regulations in the Area of Legal Metrology
      and Engine Fuel Quality* (2006) ......................................................... *passim*

NBS Special Publication 407, *Report of the 59th National Conference on Weights
      and Measures 1974* (1975) ......................................................................5, 6

NIST Special Publication 958, *A Century of Excellence in Measurements,
      Standards, and Technology* (David Lide, ed. 2001) ...................................3, 4

NIST Special Publication 1053, *Report of the 91st National Conference on
      Weights and Measures* (2006) .....................................................................6

NCWM Press Release, "National Conference on Weights and Measures Votes on
      Automatic Temperature Compensation of Retail Motor Fuel at Annual
      Meeting" (July 12, 2007) ..............................................................................6

Report of National Conference on Weights and Measures ATC Steering
      Committee Meeting, August 27-29, 2007................................................6, 7

Op. Att'y Gen. Conn., 1977 WL 36323 (Oct. 21, 1977) ....................................................11

Op. Att'y Gen. Mass. No. 9, 1982 WL 188378 (Feb. 11, 1982) .......................................11

Op. Att'y Gen. Tex. No. O-1025 (Sept. 25, 1939) .........................................................10

Webster's Ninth New Collegiate Dictionary (1985) .......................................................13

**NATURE OF THE MATTER BEFORE THE COURT**

For nearly a century, American motorists have purchased gasoline and diesel fuel in equal volumetric units of 231 cubic inches at the price per gallon displayed on the face of the retail dispenser.  According to the consolidated complaint, this long-standing sales practice gives rise to claims under state consumer protection laws, contract and warranty principles, and a variety of related state law theories.  These claims rest on a single premise – namely, that defendants are "shortchang[ing]" their retail customers by depriving them of the benefit of an "accepted industry standard," the so-called "U.S. petroleum gallon," that is used in other areas of the petroleum business.  Compl. ¶¶ 1, 3, 19, 20.  Under that alleged standard, a "gallon" is defined as 231 cubic inches at 60° F, and – because the volume of motor fuel expands as its temperature increases – sales of motor fuel that is warmer or cooler than the 60° F benchmark are measured in correspondingly larger or smaller units.  *Id.* ¶¶ 16, 17.

Because the complaint's basic premise is fatally flawed, none of its claims can be sustained.  Defendants are not free to pick and choose the measures they use in selling motor fuel to retail customers.  Defendants' retail sales practices are governed by state law, not trade practice or industry standards.  The states uniformly require retailers to sell by the gallon or liter, and they define those units of measure solely in volumetric terms, without reference to temperature.  Under existing state law, defendants cannot vary the size of the units that they sell to their retail customers.  The existence of an industry standard allegedly used in other areas of the petroleum business is therefore irrelevant to the transactions at issue in this litigation.

In addition, other statutory provisions – along with judicial decisions and dictionaries – define the term "gallon" to mean a fixed volume of 231 cubic inches and provide that the volumetric definition establishes the meaning of "gallon" in contracts and other commercial transactions.  In accordance with those statutes, when defendants advertise a per-gallon price,

they are offering to sell motor fuel in units of that prescribed size.  And plaintiffs receive a

uniform 231-cubic-inch unit of motor fuel for each gallon they purchase at the retail dispenser.

Plaintiffs therefore get what they pay for.

In sum, offering to sell motor fuel on a per-gallon basis and then dispensing volumetric

units of 231 cubic inches, as a matter of law, is not deceptive, fraudulent, or unfair, or

inconsistent with defendants' contractual obligations.  Accordingly, the consolidated complaint

should be dismissed in its entirety.

## STATEMENT OF THE FACTS

### I.   BACKGROUND

#### A.   Weights-and-Measures Regulation

Each of the states has adopted statutes and regulations establishing the weights and

measures to be used in consumer transactions such as retail motor fuel sales.[1]  Each state has an

agency that enforces these weights-and-measures laws by, among other things, inspecting

commercial weighing-and-measuring devices to ensure their compliance with state law and by

installing anti-tampering seals that certify the devices to be "correct."  App. at 1-10.  The states

punish weights-and-measures violations through the imposition of civil and (in some instances)

criminal penalties.  App. at 65-86.

Congress has directed the National Institute of Standards and Technology ("NIST"), an

agency within the U.S. Department of Commerce, "to develop, maintain, and retain custody of

the national standards of measurement, and provide the means and methods for making

measurements consistent with those standards."  15 U.S.C. § 272(b)(2).  NIST "cooperate[s] with

---

[1] The Appendix to the Memorandum in Support of Joint Motion to Dismiss (App.) includes the statutes and regulations that support the description in the text of the weights-and-measures regimes for each of the jurisdictions whose laws are at issue in this litigation.

the States in securing uniformity in weights and measures laws and methods of inspection," 15

U.S.C. § 272(c)(4), through its support of the National Conference on Weights and Measures

("NCWM"), a congress of state and local weights-and-measures officials and other interested

parties. *See* Joan Koenig, *Uniformity in Weights and Measures Laws and Regulations*, *in A*

*Century of Excellence in Measurements, Standards, and Technology*, NIST Special Pub. 958, at

368 (David Lide ed. 2001).[2]  There "are now over 3,000 NCWM members representing state and

local weights and measures jurisdictions, the Federal Government, industry, consumers, and

other countries." *Id.*

     The NCWM develops, for potential adoption by the states, model laws and regulations

governing the form, function, and use of commercial weighing-and-measuring devices.  NIST

publishes the model laws and regulations in Handbook 130, *Uniform Laws and Regulations in*

*the Areas of Legal Metrology and Engine Fuel Quality* (2006).[3]  The NCWM also develops

uniform specifications, tolerances, and technical requirements for commercial

weighing-and-measuring devices, which NIST publishes in Handbook 44, *Specifications,*

*Tolerances, and Other Technical Requirements for Weighing and Measuring Devices* (2007).[4]

---

   [2] Available at http://nvl.nist.gov/pub/nistpubs/sp958-lide/cntsp958.htm.

   [3] Available at http://ts.nist.gov/WeightsAndMeasures/h130-06.cfm.

   [4] Available at http://ts.nist.gov/WeightsAndMeasures/h44-07.cfm.  Because the states
have incorporated NIST Handbooks 44 and 130 into their state codes, they constitute state law
and thus are noticeable by the courts.  *Hanley v. Donoghue*, 116 U.S. 1, 6 (1885).  In addition,
the reports of the NCWM "serve as a legislative history of the requirements in the model laws"
and are consulted by state officials "to identify the intent of the requirements."  Koenig*, supra*, at
368.  Like any legislative history, the reports are matters of public record not subject to
reasonable dispute, and therefore are judicially noticeable.  *See Louie v. McCormick & Schmick*
*Restaurant Corp.*, 460 F. Supp. 2d 1153, 1155 n.4 (C.D. Cal. 2006) (courts may take notice of
"legislative history of state statutes" and "the records of state administrative agencies").  This
Court also is "authorized to take judicial notice of official government publications," including

Handbook 44 requires that retail dispensers deliver motor fuel in liquid gallons or liters, specifying that such "[d]eliveries shall be indicated . . . in liters or gallons and decimal subdivisions or fractional equivalents thereof." Handbook 44, *supra*, § 3.30 ¶ S.1.2.1, at 3-3. It defines a gallon solely in volumetric terms as "231 cubic inches (exactly)," without regard to temperature. *Id.* App. C (General Tables of Units of Measurement), at C-16; *see also id.* at C-3, C-9. Nothing in Handbook 44 contemplates the use of devices at the retail level that would vary the volume of the units dispensed to reflect fuel temperature variations. By contrast, Handbook 44 does address the use of such devices at the wholesale level. *See id.* § 3.30 ¶ S.2.7.1, at 3-10 (A wholesale "device may be equipped with an automatic means for adjusting the indication and registration of the measured volume of product to the volume at 15° C (60° F.)."). Every state whose laws are at issue in this litigation has adopted Handbook 44, specifically incorporating it into their state codes and giving it the force of law. *See* App. at 18-27; Handbook 130, *supra*, at 10-13 (chart listing states that have adopted Handbook 44).

The NCWM also evaluates and certifies commercial weighing-and-measuring devices, including retail motor fuel dispensers, through its National Type Evaluation Program (NTEP). Koenig, *supra,* at 368. California independently operates a similar program, called the California Type Evaluation Program (CTEP). *See* Cal. Bus. & Prof. Code § 12500.5. Retailers are prohibited from using any type of motor fuel dispenser that has not been certified by NTEP (or, in California, CTEP).[5] *See* App. at 28-39.

---

those from NIST and other governmental agencies such as the Environmental Protection Agency. *Canales Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 734 n.24 (E.D. La. 2002).

[5] Arizona accepts either an NTEP or CTEP certification. Ariz. Admin. Code R20-2-203.

To date, the NTEP program has not certified any type of retail motor fuel dispenser that adjusts for fuel temperature.[6]  Before this litigation began, CTEP similarly had not certified any stand-alone dispenser capable of adjusting for fuel temperature, and it has never certified, either before or after the filing of these cases, any retrofit equipment that could be used to enable the many thousands of dispensers currently operating in the field to adjust for fuel temperature.[7]  Nor has California repealed or otherwise revised its adoption of Handbook 44's volumetric definition of a retail gallon, which continues to preclude the dispensing of variable-volume units at retail.[8]

###### B.        The Long-Running Regulatory Debate over Retail Temperature Adjustment

As the consolidated complaint acknowledges, the effect of temperature on motor fuel is not a new issue, but in fact "'is as old as the hills.'"  Compl. ¶ 49 (quoting NCWM official).  In 1974, industry members and state regulators discussed a proposal to amend the rules to permit retailers to adjust for fuel temperature, but the NCWM committee responsible for Handbook 44 rejected it because of the concern that permitting the sale of variable-size units at the retail level would create "confusion in the marketplace."  NBS Special Publication 407, *Report of the 59th*

---

[6] NTEP certificates are available at http://www.ncwm.net/ntep/index.cfm?fuseaction=search.

[7] On January 19, 2007, CTEP certified a Gilbarco retail fuel dispenser having temperature-adjustment capability, see http://www.cdfa.ca.gov/dms/programs/ctep/CTEPApprovals/PDF2007/5510a-07.pdf (certificate 5510(a)-07, May 17, 2007, superseding certificate 5510-07, January 19, 2007).   The complete list of CTEP certificates in force may be found at http://www.cdfa.ca.gov/dms/programs/ctep/CTEPApprovals/caApprovals.pdf.

[8] In California, the only relevant legislative activity has been the enactment of a statute requiring the Department of Food and Agriculture, in collaboration with the California Energy Commission and the Air Resources Board, to complete in 2008 a "comprehensive study and cost benefit analysis" of specified fuel temperature-adjustment issues, including the possibility in the future of  "[r]equiring the installation of temperature correction or compensation equipment at the pump."  2007 Cal. Legis. Serv. Ch. 398 (A.B. 868) (West).

*National Conference on Weights and Measures 1974*, at 236 (1975).[9]  The committee explained:

"[I]t is the object of weights and measures administration to provide and maintain uniform

standard units," and retail permitting temperature adjustment "would in effect provide two

different units:  (1) 231 cubic inches per gallon at any temperature, and (2) 231 cubic inches at

60 degrees."  *Id.*  The full NCWM also rejected any change in the existing rules.  *Id.* at 166-98.

      Over the years, the NCWM has continued to reject proposals that would either mandate

or simply permit the sale of temperature-adjusted motor fuel at the retail level.  Doubts remain

about whether the practice has any potential benefits that would justify the costs of moving to a

new temperature-adjusted regime.  *See* NIST Special Publication 1053, *Report of the 91st*

*National Conference on Weights and Measures*, at L&R-6 (2006) ("Many jurisdictions believe

that the imposition of a mandatory requirement is too burdensome on the industry, requiring

upgrades and possibly the replacement of many meters without adequate justification.").[10]

      The issue nevertheless remains on the NCWM's active agenda.  At its most recent annual

meeting, the NCWM voted not to adopt provisions that would permit automatic temperature

compensation at retail.  Instead, the NCWM decided to convene a "steering committee" of

"national experts" to study the issue.  NCWM Press Release, "National Conference on Weights

and Measures Votes on Automatic Temperature Compensation of Retail Motor Fuel at Annual

Meeting" (July 12, 2007).[11]  The Steering Committee has met and issued an initial report, which

notes that retail temperature adjustment "is a complicated issue."  Report of ATC Steering

---

[9] Available at http://ts.nist.gov/WeightsAndMeasures/Annuals/Reports/1974.pdf.

[10] Available at
http://ts.nist.gov/WeightsAndMeasures/upload/06_Annual_SP1053w_all_cvrs.pdf.

[11] Available at http://www.ncwm.net/events/annual2007/press_release.pdf.

Committee Meeting, August 27-29, 2007, at 8.[12]  The report includes 31 "Questions to ponder,"

including "Will consumers really see a benefit in the consistency provided by net [*i.e.*,

temperature-adjusted] sales?"; "Will the benefit to consumers justify the cost?"; and "Will states

redefine the gallon as 231 cubic inches at 60° F in all corresponding legislation?"  *Id.* at 10.

### C.    Taxation of Motor Fuel

All tax jurisdictions at issue in this case impose comprehensive regulations on how and

when fuel excise taxes are measured, collected, and remitted to the government, none of which

take into consideration the temperature of the fuel when it is sold at retail.  Plaintiffs make no

allegation that defendants have failed to comply with any of these regulations.

## II.    THE CONSOLIDATED COMPLAINT

The consolidated complaint alleges that defendants have deceived consumers by failing

(a) to sell variable-volume, temperature-adjusted units based on a 60° F industry standard, (b) to

tell consumers that motor fuel is sold by volume rather than by reference to the "U.S. petroleum

gallon," and (c) to disclose that fuel sold at a temperature higher than 60° F has less energy

content than fuel sold at that temperature.[13]  Those allegations, the complaint asserts, give rise to

claims of breach of contract and warranty and of violations of state consumer protection laws, as

well as to other state-law causes of action.  The complaint further alleges that defendants were

unjustly enriched by over-collecting excise taxes from plaintiffs.  In its prayer for relief, the

complaint generically seeks damages, fees, and equitable relief.  Some of the individual counts,

---

[12] Available at http://www.ncwm.net/doc/ATC_Meeting_Report_8_07.doc.

[13] The consolidated complaint contains allegations related to Puerto Rico, but the original complaints contained no claims involving Puerto Rico.  Plaintiffs' counsel has advised that the inclusion of Puerto Rico was a mistake.

however, also demand more specific relief, such as an injunction requiring the installation of automatic temperature compensation devices at retail stations. *See, e.g.*, Compl. ¶¶ 198, 402.

## QUESTION PRESENTED

Given (a) the states' pervasive regulation of motor fuel sales, including the requirements that retailers sell in uniform volumetric units and pay taxes at the wholesale level, and (b) the delivery by defendants of what they promised – units of 231 cubic inches at an all-inclusive per-gallon price – does the consolidated complaint state a claim on which relief can be granted?

## ARGUMENT

A complaint should be dismissed if it fails to articulate "enough factual matter" to establish "plausible grounds" for a finding of unlawful conduct. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007); *see also Mitchell v. King*, 537 F.2d 385, 386 (10th Cir. 1976) (noting that a motion to dismiss "admits all well-pleaded facts in the complaint as distinguished from conclusory allegations"). The complaint here should be dismissed because it pleads no facts that could support a finding of wrongdoing.

## I.     THE STATES REQUIRE DEFENDANTS TO DISPENSE MOTOR FUEL IN UNIFORM VOLUMETRIC UNITS OF EXACTLY 231 CUBIC INCHES.

A fundamental premise of the consolidated complaint is that plaintiffs are entitled to receive motor fuel in units that vary in size depending on the temperature of the fuel. Defendants, however, are barred from varying the size of the units in which they dispense motor fuel at the retail level. Handbook 44, adopted in every state at issue here, requires retailers to dispense motor fuel in gallons that by definition always must equal "231 cubic inches (exactly)." *See supra,* at 4.

Three additional features of Handbook 44 confirm that a gallon is a fixed measure of volume that controls retail sales of motor fuel. First, the definition of unit of measure in

Appendix B of Handbook 44 makes it clear that a gallon refers to a defined volumetric space without reference to temperature.  Appendix B states:  "A unit is a special quantity in terms of which other quantities are expressed.  In general, a unit is fixed by definition and is *independent of such physical conditions as temperature*."  Handbook 44, *supra*, App. B § 2, "Units and Systems of Measurement" (emphasis added).  The Appendix expressly notes that a "gallon" is an example of a unit of measurement, thereby confirming that it has a fixed definition (*i.e.*, 231 cubic inches) that is "independent of . . . temperature."  *Id.*

Second, the structure of Handbook 44 is consistent with the conclusion that, in the absence of an express provision to the contrary, a gallon is a fixed volumetric space of 231 cubic inches.  *See Bolam v. Mobil Oil Corp.*, 893 F.2d 311, 314 (11th Cir. 1990).  In the case of wholesale motor fuel transactions, as well as retail and wholesale sales of liquefied petroleum gas (LPG or propane), Handbook 44 contains different sets of rules that expressly permit the sale of temperature-adjusted volumetric units and that establish corresponding procedures for marking, using, and testing devices used in those transactions.  Handbook 44, *supra*, § 3.30 ¶ S.2.7.1 (a wholesale device "may be equipped with an automatic means for adjusting the indication and registration of the measured volume of product to the comparable volume at 15° C (60° F)"); *id.* § 3.32 ¶¶ N.4.1.1, U.R.2.4 (LPG sales).  Handbook 44 contains no similar provisions for the sale of motor fuel at retail.[14]

_____

[14] On a related note, some states have statutes specifying when temperature adjustment for wholesale transactions of motor fuel is required.  *See, e.g.*, Ariz. Rev. Stat. § 41-2082; *see* App. at 47-49.  Thus, when state legislatures want to require the sale of variable-volume units for particular purposes, they know how to craft statutory language to do so.  They never have done so for retail sales, thereby confirming that motor fuel is to be dispensed at retail in volumetric units of 231 cubic inches.

Third, Handbook 44 requires retail dispensers to display, on the dispensers themselves, the price per "gallon" of motor fuel being sold – *i.e.*, the price of each 231-cubic-inch unit. *Id.* § 3.30, ¶¶ S.1.2.1, S.1.6.4.1(a); *see also* NCWM Policy, Interpretations, and Guidelines § 2.6.2 ¶ 1(a), *in* Handbook 130 at 233 ("It is required that dispensers be designed to clearly show all required quantity and price information on the face(s) of a motor-fuel dispenser in accordance with Handbook 44."); *cf. id.* (noting that "[a]ll street, roadside, and similar advertising signs displaying product price should provide price per gallon information.").  This requirement of per-gallon price display is consistent with retailers' obligation to dispense motor fuel in 231-cubic-inch units because it equates the dispensing unit with the pricing unit, thereby enhancing consumers' ability to calculate the total price.  Plaintiffs would have this Court override or simply ignore this integrated regulatory scheme.

The exacting nature of weights-and-measures laws means that this is not an area in which defendants can freelance.  As an opinion of the Texas Attorney General illustrates, even minor deviations from the existing rules are prohibited.  The Texas Attorney General advised that it would be improper to use a retail dispenser that measured motor fuel in tenths of a gallon because that was not one of the units of measure specified in the then-existing federal and state laws and regulations.  *See* Op. Att'y Gen. Tex. No. O-1025 (Sept. 25, 1939).[15]  No consideration was given to whether such a dispenser would have had a substantive effect – either positive or negative – on retail transactions.  Rather, the Attorney General reasoned, because a tenth of a gallon had not been expressly identified as a permissible unit in the weights-and-measures laws and regulations, the use of a dispenser that measured on that basis was barred.

---

[15] Available at http://www.oag.state.tx.us/opinions/O/O1025.pdf.

Indeed, if a retailer were to dispense temperature-adjusted gallons, it would risk civil and/or criminal penalties for violating state weights-and-measures laws.  *See* App. at 65-86.  That is the lesson of the opinions of two additional state attorneys general rendered on the analogous issue of whether deliveries of home heating oil to consumers could be made on a temperature-adjusted basis.  The Connecticut Attorney General was the first to address this question.  Noting that Handbook 44 "permits automatic temperature compensators to be equipped on wholesale devices only," the Attorney General reasoned that the absence of any comparable provision for retail devices meant that the volumetric definition controlled and that temperature adjustment at the retail level was forbidden.  Op. Att'y Gen. Conn., 1977 WL 36323 (Oct. 21, 1977).  The Massachusetts Attorney General reached the same conclusion, finding no authority to depart from the "legislatively prescribed" liquid gallon, which "is 231 cubic inches, whether at thirty degrees or at eighty degrees."  Op. Att'y Gen. Mass. No. 9, 1982 WL 188378 (Feb. 11, 1982).

## II.  DEFENDANTS' SALES PRACTICES COMPLY WITH CONSUMER PROTECTION LAWS AND BREACH NO CONTRACTUAL OBLIGATIONS.

The principal claim in the complaints as originally filed was that defendants should modify the size of the gallons they dispense to account for fuel temperature.  In the consolidated complaint, plaintiffs have included additional allegations that suggest that defendants' failure to adjust their *prices* to account for temperature variations is actionable.  Plaintiffs' volume- and price-adjustment alternatives are nothing more than two sides of the same coin, and neither gives rise to a claim for relief under state consumer protection statutes or principles of contract law.  Defendants have not misrepresented or omitted any material information about what they are selling.  As a matter of law, defendants dispense what they say they are selling and what consumers are paying for – uniform units of 231 cubic inches in accordance with the plain

meaning and applicable statutory definition of a gallon.  Accordingly, defendants have complied

with state consumer protection laws and satisfied their contractual obligations.

> **A.      Plaintiffs' Consumer Protection and Breach of Contract Claims Fail Because Defendants Accurately Represent What They Are Selling – a Unit of 231 Cubic Inches in Accordance with the Ordinary, Legally Prescribed Meaning of "Gallon."**

Plaintiffs argue that, because defendants provide no express definition of "gallon" in their

agreements with consumers, the word "gallon" must refer to a "standard U.S. petroleum gallon"

of 231 cubic inches at 60° F.  *See, e.g.*, Compl. ¶¶ 127-29.  There is no merit to this argument.

As a matter of state law, the word "gallon" in commercial transactions refers to a uniform

volumetric unit of 231 cubic inches.  Accordingly, defendants make no misrepresentation and

breach no contract when they offer to sell "gallons" on a price-per-gallon basis and then deliver

fixed units of 231 cubic inches at the prices advertised.

Part I explained that the states at issue here require that commercial weighing-and-

measuring devices conform to the requirements of Handbook 44.  Similarly, these states have

adopted uniform systems of weights and measures to govern commerce in general, which

incorporate or otherwise recognize the U.S. system of weights and measures for commercial

transactions, including the units of measurement defined by the federal government and

published by NIST.  *See* App. at 11-17.[16]  Among the weights-and-measures definitions so

adopted by these states is the volumetric-only definition of "gallon."[17]

---

[16] Some of the states at issue not only have incorporated by reference the federal definition of liquid gallon but also have enacted statutes expressly adopting that same volumetric definition.  *See, e.g.*, D.C. Code Ann. § 37-201.18; N.C. Gen. Stat. § 81A-3.

[17] NIST defines a liquid gallon, as the term is "used in normal commerce in the United States," to mean a volume of 231 cubic inches, unadjusted for temperature.  33 Fed. Reg. 10755-56 (July 27, 1968).

By statute, the states at issue provide that these officially adopted definitions shall apply to weights-and-measures terms used in any "contracts, sales, or purchases . . . for anything to be sold or delivered or done by weight or measure within this state," including retail motor fuel sales.  Kan. Stat. Ann. § 83-204; *see also* Ariz. Rev. Stat. § 41-2062 (The NIST-published "definitions of basic units of weights and measures . . . shall govern weighing and measuring equipment and transactions within the state."); Cal. Bus. & Prof. Code § 12300 ("Contracts made within this State for work to be done or for anything to be sold or delivered by weight or measure shall be construed according to the common standards, or according to the weights and measures of the metric system authorized by Congress, as the contract provides."); App. at 11-17.[18]

By supplying specific definitions of units of measure to govern contracts and transactions, the states protect buyers and sellers and eliminate confusion or deception in the use of such terms.  The statutes thereby preclude plaintiffs' claim that "gallon" lacks meaning; that it is deceptive, fraudulent, or unfair to use "gallon" to refer to volumetric-only units; or that defendants breach contracts when they sell fuel in "gallons" according to the legal definition of 231 cubic inches.  *See Hale Bros. v. Milliken,* 90 P. 365, 370 (Cal. Ct. App. 1907) ("We think the rule of construction of such contracts ought to be, as contemplated by the Legislature [in the predecessor to Cal. Bus. & Prof. Code § 12300], that they are to be conclusively presumed to have been made in reference to the [weights-and-measures] statute.").

These laws and regulations are consistent with the plain and ordinary meaning of the word "gallon" found in every major English dictionary.  *See* Webster's Ninth New Collegiate

---

[18] In the few states that do not have express provisions to this effect, the applicability of the traditional, federal system necessarily follows from other weights-and-measures laws.  *See* Ind. Code § 24-6-3-1 (tracing state standards to federal standards); La. Rev. Stat. Ann. 3:4606 (same); Nev. Admin. Code § 581.011 (adopting Handbook 44).

Dictionary 503 (1985) ("gallon" is "a unit of liquid capacity equal to 231 cubic inches or four quarts."). When a merchant uses words that have a plain and ordinary meaning, consumers are presumed to understand those words by that meaning in the absence of a different agreed-upon definition. *See Chern v. Bank of Am.*, 544 P.2d 1310, 1316 (Cal. 1976) (bank deceived consumer by using "per annum" to refer to a 360-day year – an industry usage of the term – because consumers would naturally give "per annum" its common meaning and understand it to refer to a calendar year). The courts have rejected attempts, like this one, to inject ambiguity into the meaning of the word "gallon" in sales of motor fuel, affirming without hesitation that the term has a purely volumetric meaning. *See, e.g.*, *Hopkins v. BP Oil, Inc.*, 81 F.3d 1070, 1074 (11th Cir. 1996) (district court should not have submitted question of meaning of the word "gallon" to jury because, as a matter of law, "'Gallon' refers to a gross [*i.e.*, volumetric] gallon of gasoline.").

Defendants' alleged "trade practice" of using temperature-adjusted gallons, based on the purported 60° F benchmark, at non-retail levels of the petroleum business does not alter this conclusion. Compl. ¶¶ 18-20.[19] In this highly regulated area, defendants' retail sales practices are governed by state laws and regulations, not by an alleged "trade practice." For that reason, the petroleum industry's alleged use of a 60° F benchmark in other contexts is irrelevant to the propriety of defendants' retail sales practices.

---

[19] The plaintiffs cite American Society of Testing and Materials ("ASTM") D 1250 as evidence that there is an "industry standard" that "defines a standard gallon unit of petroleum as 231 cubic inches at 60 degrees Fahrenheit ('U.S. petroleum gallon')." Compl. ¶ 16. But, on its face, ASTM D 1250 does not establish an industry standard for the meaning of "gallon." Rather, it is a technical tool that provides a methodology "by which volume measurements taken at any temperature and pressure . . . can be corrected to an equivalent volume at base/standard conditions, normally 15°C, 60°F or 20°C, by use of a volume correction factor (VCF)." ASTM D 1250-07 at 1. (ASTM D 1250 has been incorporated into federal laws, *see* Compl. ¶18, but copies of it must be purchased directly from ASTM at http://www.astm.org.)

In any event, trade usage or practice controls the meaning of words used in a transaction only when both parties are engaged in the same trade – that is, the trade in which that usage or practice occurs. *See Atlantic Track & Turnout Co. v. Perini Corp.*, 989 F.2d 541, 543 (1st Cir. 1993). Here, however, plaintiffs are truck drivers and other everyday consumers who have purchased motor fuel at retail; they are not non-retail commercial suppliers engaged in large-volume transactions where the temperature-adjusted meaning of "gallon" is allegedly used. Thus, the oil industry's purported "standard U.S. petroleum gallon" is not relevant to the transactions at issue here. *See Frantz v. Cantrell*, 711 N.E.2d 856, 860 (Ind. Ct. App. 1999) (holding that usage of trade within roofing industry could not be imputed to transaction with ordinary homeowner); *Mieske v. Bartell Drug Co.*, 593 P.2d 1308, 1313 (Wash. 1979) (trade practice among film processors dealing with one another has no bearing on dealings between film processors and their customers).

### B. Plaintiffs' Consumer Protection Claims Fail Because Defendants Do Not Omit, Suppress, or Conceal Material Facts.

Plaintiffs' consumer protection claims allege that defendants further deceive them by "[c]oncealing, suppressing and omitting" several facts related to the purported 60° F benchmark.[20] *See, e.g.*, Compl. ¶¶ 191(d)-(f). These allegations fail to state a claim under consumer protection laws.

---

[20] The complaint also alleges that defendants have failed to disclose that the word "gallon" "is not a standard unit of measure." *See, e.g.*, Compl. ¶ 191(g). As explained above, however, the word "gallon" *is* a standard unit of measure that refers to a volume of 231 cubic inches without regard to temperature or other physical conditions. Given this clear definition, defendants have no obligation to clarify further the meaning of "gallon." The complaint's tax-related nondisclosure claims, *see, e.g.*, Compl. ¶ 191(i)-(k), also fail as a matter of law, for the reasons discussed in Part IV(B), *infra*.

Defendants have no duty to disclose any facts related to the alleged 60° F benchmark because, as noted above, that purported industry standard has no legal relevance to retail motor fuel sales. Instead, the delivery of motor fuel at the retail level is controlled by the purely volumetric requirements of Handbook 44. This is hardly unusual; practices at the retail and non-retail levels often diverge dramatically based on the substantial differences between these levels of trade. Accordingly, when companies communicate with consumers using terms that have plain and legally prescribed meanings, as defendants have here, they have no further duty to disclose alleged deviations from (or even the existence of) industry standards that are different from and inconsistent with standards used at the retail level. *See McCann v. Lucky Money, Inc.*, 129 Cal. App. 4th 1382, 1396 (Cal. Ct. App. 2005) ("'Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars.'" (quoting *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001))); *Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*, 160 S.W.3d 874 (Tenn. Ct. App. 2004) (under the Tennessee Consumer Protection Act, car dealer had no duty to disclose to consumers that it added a mark-up when it brokered financing on their behalf).

Moreover, to the extent that defendants have any disclosure duties regarding the energy content or other qualities of the motor fuel they sell, the scope of those duties is defined by the considered judgments of the legislators and regulators who devise and administer the pervasive regulatory scheme governing retail motor fuel sales and related disclosures. That scheme requires retailers to disclose some – but by no means all – of the characteristics of motor fuel, even though gasoline energy content "varies widely from batch to batch and station to station" and is affected by many factors having nothing to do with temperature. U.S. Environmental Protection Agency, Office of Mobile Sources, *Fuel Economy Impact Analysis of RFG*, EPA 420-

F-95-003, Washington, D.C., August 1995.[21]  For example, as the cited EPA report notes, gasoline is blended differently in the summer and in the winter, and summer gasoline generally contains about 1.7% more energy than winter gasoline.  *Id.*  Similarly, reformulated (reduced emissions) gasoline, required in some areas by the Clean Air Act and by state laws, contains 1% to 3% less energy than conventional gasoline, depending on the season.  *Id.*  Energy content also varies among different blends of reformulated gasoline based on the amount and type of oxygenate used.  *Id.*  For example, the use of ethanol, now required to comply with the federal renewable fuels mandate, significantly reduces the energy content of motor fuel.  *Id.*

Notwithstanding the many factors affecting energy content and other fuel qualities, state and federal regulations impose only limited disclosure obligations.  For example, a retailer must indicate the fuel's anti-knock index and disclose the type of oxygenate it contains.  *See, e.g.*, Uniform Engine Fuels, Petroleum Products, and Automotive Lubricants Regulation §§ 2.2, 3.2.1, 3.2.6, *in* Handbook 130 at 159, 161 (regulating terms used for grades of fuel and requiring disclosure of antiknock ratings and of oxygenate content); Kan. Admin. Regs. 99-25-9 (adopting Handbook 130 rules while expressly declining to adopt provision that would require retailers to disclose oxygenates); Mo. Code Regs. Ann. tit. 2, § 90-30.040(4) (dispensers must indicate product name, grade, and antiknock rating); App. at 56-64; *see also* 15 U.S.C. § 2822(c) (retailers must display automotive fuel rating at point of sale).  By contrast, regulators do not require retailers to disclose directly the energy content of motor fuel or any of the myriad other factors that affect energy content, such as seasonal formulation or temperature.  This policy judgment is a sensible one.  Given the complexity and variability of the factors that contribute to the energy content of motor fuel, disclosing to consumers every possible factor, such as the

---

[21] Available at http://www.epa.gov/otaq/rfgecon.htm.

chemical makeup of each gallon, would impose a potentially open-ended obligation and risk overloading consumers with confusing technical information. Here, defendants describe what they are selling – a gallon of gasoline that complies with the broad array of fuel composition and quality requirements – and they deliver precisely that at the price per gallon displayed on the pump. There is no duty to say more.[22] *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 838 (Cal. Ct. App. 2006) (Honda had no further duty to disclose the possibility of engine failure when it had expressly warranted that the engine would last a certain length of time); *LMB, Inc. v. Lard Oil Co.,* 1998 WL 777825, at *4 (E.D. La. Oct. 22, 1998) ("failure to disclose a perfectly legitimate business practice cannot support a claim for fraud").

Finally, plaintiffs' specific claims of concealment and suppression fail because – as the consolidated complaint alleges, and the public record supports – the allegedly concealed information has long been in the public domain. *See* Compl. ¶ 4 ("This impact of temperature upon fuel is not new – it was recognized as early as 1923 by the National Conference on Weights and Measures, an association including representatives from government and the oil industry."); *id.* ("'[T]he principle of volume change is as old as the hills.'"). The NCWM meetings are attended regularly by state weights-and-measures officials and consumer groups, and extensive descriptions of the discussions have been reproduced or summarized in public reports. *See*

_____

[22] This pervasive regulatory scheme also means that facts related to the alleged 60° F benchmark are not material in the retail context. Regardless of defendants' industry practices in the non-retail context – *i.e.*, whether they used a 60° F benchmark, a 100° F benchmark, or no benchmark at all – they have no bearing on what defendants are required to deliver under applicable state and federal laws and regulations at the retail level: 231-cubic-inch units of motor fuel that comply with all relevant quality and compositional standards. Thus, any facts about defendants' non-retail practices would provide no information relevant to the heavily regulated product that consumers in fact receive. In addition, by implementing fuel quality and compositional standards as well as disclosure requirements, state and federal regulators have made a judgment about which facts are and are not material. Plaintiffs have made no allegations that would justify replacing this policy judgment with a judicial rule.

*supra,* at 5-7.  This record of open discussion belies plaintiffs' claims of concealment or

suppression.  *Cf. Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 759 (7th Cir. 2007) ("The

securities laws do not require firms to 'disclose' information that is already in the public

domain.").

**C.    Plaintiffs' Consumer Protection Claims Fail Because Defendants' Challenged Practices Have Been Endorsed by State Weights-and-Measures Regimes as Fair and Proper.**

As discussed above, state weights-and-measures laws require retailers to dispense 231-

cubic-inch gallons, and state regulators have approved as "correct" retail dispensers that operate

on that basis.  *See supra,* at 2.  The states also dictate what information retailers must disclose

about various fuel quality characteristics.  *See supra,* at 16-17.  The states do not require,

however, that retailers explain that their dispensers measure the gallons they dispense by volume

without reference to temperature.  These weights-and-measures laws thus approve both

delivering motor fuel by volume and advertising the sale by posting a single price per gallon.

This approval is important for two reasons.  First, these weights-and-measures laws are

highly specific consumer protection laws.[23]  Their purpose is to "protect consumers from unfair

dealings where the person who sells tangible goods weighs the goods and collects a charge based

on the weight of the goods sold."  *Pitney-Bowes v. California*, 108 Cal. App. 3d 307, 321 (Cal.

Ct. App. 1980).  By approving the use of retail volumetric dispensers and by authorizing retailers

to use such devices without explaining that they do not adjust for fuel temperature variations,

---

[23] *See, e.g.*, N.C. Gen. Stat. § 81A-1 (the weights-and-measures program established "[i]n order to protect the purchasers or sellers of any commodity…"); Tenn. Code Ann. § 47-26-908 ("weights and measures agency charged with . . . [p]reventing unfair or deceptive dealing by weight or measure . . . [and with] protecting the consumer").  In a similar vein, the technical specifications adopted by the NCWM seek to "eliminate . . . the perpetration of fraud."  *See* Introduction, *in* Handbook 44, *supra*, at 1.

state regulators have endorsed sale by the uniform-volume gallon as a fair and legitimate way of selling motor fuel to retail consumers.

The general law of consumer protection should be interpreted to avoid a conflict with these regulatory judgments. In applying generalized rules, such as a broad prohibition against deceptive or unfair practices, courts should look to more specific rules that share a common purpose in order to determine how the general law applies to particular facts: "it is a commonplace of statutory construction that the specific governs the general . . . ." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992); *see also Chelsea Plaza Homes, Inc. v. Moore,* 226 Kan. 430, 432, 601 P.2d 1100, 1102-03 (Kan. 1979) ("It is a cardinal rule of law that statutes complete in themselves, relating to a specific thing, take precedence over general statutes or over other statutes which deal only incidentally with the same question . . . ."); *Dismuke v. City of Sikeston,* 614 S.W.2d 765, 766 (Mo. Ct. App. 1981) ("[a] specific statute prevails over a general one"). State weights-and-measures regulations protect consumers from deception and unfair practices by requiring volumetric sales of motor fuel at per gallon prices and by overseeing retailers' operations and communications with consumers to ensure that they deliver uniform units of 231 cubic inches at the per-gallon price displayed on the dispenser. Generalized consumer protection statutes should not be construed to forbid what these specific regulations require.

Second, even aside from the need to interpret general consumer protection statutes in light of specific weights-and-measures requirements, the doctrine of "specific authorization" exempts defendants' conduct from liability. This doctrine takes two forms. One holds that consumer protection actions cannot be brought against an entity in a field that is already subject to its own regulatory scheme. The other holds that consumer protection law does not apply to a

particular practice if it has been specifically permitted elsewhere in the law.  Under either form of the doctrine, plaintiffs' claims fail.

The laws of some states apply the doctrine by explicitly foreclosing the application of consumer protection laws to an area that is comprehensively regulated.  For example, the Oklahoma Consumer Protection Act holds that "[n]othing in this act shall apply to . . . [a]ctions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body."  15 Okla. Stat. Ann. § 754(2).  Similarly, in New Jersey, a practice is not subject to challenge under general consumer protection law where there is a "real possibility" that a conflict would arise with "the directives of the regulatory schemes of other administrative bodies."  *Doug Grant, Inc. v. Greater Bay Casino Corp.*, 3 F. Supp. 2d 518, 536 (D.N.J. 1998); *see also Chancellor v. Gateway Lincoln-Mercury, Inc.*, 502 S.E.2d 799, 805 (Ga. Ct. App. 1998) (Georgia's unfair competition law (the Fair Business Practices Act) has "a restricted application only to the unregulated consumer marketplace" and does "not apply in regulated areas of activity, because regulatory agencies provide protection or the ability to protect against the known evils in the area of the agency's expertise.").  Thus, the weights-and-measures regulatory regimes in such states as Oklahoma, New Jersey, and Georgia bar plaintiffs' claims under the consumer protection laws of those states.

Many of the other states at issue apply the doctrine of specific authorization by recognizing a "safe harbor" for practices specifically permitted by the state legislature or regulatory bodies.  *See, e.g.*, *MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 732-33 (6th Cir. 2007) (Tennessee consumer protection law inapplicable to "[a]cts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies or officers" acting under state or federal authority (quoting Tenn. Code

Ann. § 47-18-11(a)(1))); *McCann*, 129 Cal. App. 4th at 1395 ("'The fact that California's

comprehensive regulation of Defendants' practices does not label the challenged practices unfair

is a further defense to such a claim.'") (quoting *In re Mexico Money Transfer Litig.*, 164 F. Supp.

2d 1002, 1026 (N.D. Ill. 2000)); *Lard Oil Co.*, 1998 WL 777825, at *4 (holding that it was

"unlikely that the Louisiana legislature would permit" Lard to make non-temperature adjusted

"sales under the bulk sales law, yet punish [Lard] for unfair competition for committing the very

same practice"); *InMed Diagnostic Services, L.L.C. v. MedQuest Associates, Inc.*, 594 S.E.2d

552, 555 (S.C. Ct. App. 2004); *Valdez v. New Mexico*, 54 P.3d 71, 75-76 (N.M. 2002); Fla. Stat.

§ 501.212(1).  As discussed in Part I, Handbook 44 (adopted by every state) makes clear that the

only approved way to offer and deliver motor fuel at retail is by volume, priced and measured in

gallons and without regard to temperature.

## III.    PLAINTIFFS' WARRANTY CLAIMS FAIL BECAUSE SELLING BY THE GALLON DOES NOT WARRANT THAT EVERY UNIT SOLD WILL HAVE IDENTICAL ENERGY CONTENT.

In addition to its breach of contract claims, the consolidated complaint alleges that, by

selling motor fuel at a unit price, defendants implicitly warranted "that every gallon of motor fuel

sold and purchased would not vary and would contain the same amount of motor fuel."  Compl.

¶ 126.  The evident contention is that each gallon sold should have exactly the same energy

content.  But, as explained above, the unit at issue here – the gallon – is a standard term that

expresses volumetric dimensions only.  It says nothing – explicitly or implicitly – about energy

content.  In any event, plaintiffs' implied warranty claim also fails because the Uniform

Commercial Code ("UCC"), which governs the scope of the warranties created by the sale of

fungible goods, allows a greater degree of variability than the complaint suggests.  The plaintiffs

concede that the UCC governs the sales at issue.  Compl. ¶ 143.

The UCC understandably contemplates that perfect uniformity among fungible goods is neither possible nor necessary.  Under the UCC, when a merchant sells fungible goods, it implicitly warrants only that they will be of "fair average quality within the description" such that they will "[p]ass without objection in the trade under the contract description."  U.C.C. § 2-314(2)(a); *see also id.* § 2-314 cmt. 7; *Musil v. Hendrich*, 6 Kan. App.2d 196, 203, 627 P.2d 367, 373-74 (Kan. Ct. App. 1981) (no violation of implied warranty where feeder pigs were of ordinary size and weight).  Thus, a merchant does not warrant that every one of the goods will be exactly the same.  Here, defendants only warranted that they would provide motor fuel priced by the "gallon," and they complied with that obligation.

The complaint also generically alleges that defendants have breached the implied warranties recognized by the UCC.  Compl. ¶ 149.  Motor fuel has been sold in volumetric gallons in this country, with the small changes in energy content that can result from temperature variations, for over a century.  That practice is the accepted norm.  That this behavior has gone unchallenged for so long means that no new warranties can now be discovered in the contract. *See* U.C.C. § 2-316(3)(c) ("[A]n implied warranty may also be excluded or modified by course of dealing or course of performance or usage of trade.").

Moreover, defendants complied with their obligation to provide merchantable goods of "fair average quality within the product description."  Here, state and federal laws and regulations govern the composition of motor fuel and accordingly establish the limits of "fair average quality."[24]  Refiners blend gasoline under a complex industry standard known as ASTM D 4814, and all gasoline sold to retail consumers must meet this standard.  *See* Uniform Engine Fuels, Petroleum Products, and Automotive Lubricants Regulation § 2.1.1, *in* Handbook 130,

_____

[24] The consolidated complaint contains no contrary definition of "fair average quality."

*supra,* at 158; Kan. Admin. Regs. 99-25-9(c) (adopting this standard); *see* App. at 50-55.  As

noted above, however, within this standard motor fuel energy content varies by several

percentage points depending on the particular fuel blend used and on a number of other factors

having nothing to do with temperature.  *See supra,* at 16-17.

In sum, there can be no breach of warranty where defendants provide consumers with

what is promised:  231-cubic-inch units of motor fuel that conform to the compositional

requirements of federal and state law.

## IV.    PLAINTIFFS' OTHER CAUSES OF ACTION FAIL TO STATE A CLAIM.

### A.    Plaintiffs' Miscellaneous Challenges to Defendants' Sales Practices Are Legally Deficient.

*Fraudulent and Negligent Misrepresentation.*  Plaintiffs' common-law claims of

misrepresentation fail for the same reasons that their consumer protection and breach of contract

claims fail.  As explained above, none of the defendants' statements are untrue or misleading,

and defendants did not conceal material facts from consumers.

*Breach of Duty of Good Faith and Fair Dealing.*  Plaintiffs' good faith and fair dealing

claims also fall with their consumer protection claims.  Courts have held that, where conduct

does not violate consumer protection laws, it cannot transgress a duty of good faith and fair

dealing.  *See, e.g.*, *Lockett v. Prudential Ins. Co. of Am.*, 870 F. Supp. 735, 741 (W.D. Tex. 1994)

(duty of good faith and fair dealing tracks consumer protection laws).[25]

---

[25] Texas law does not recognize an independent duty of good faith and fair dealing between parties in the absence of "a special relationship between the parties governed or created by a contract."  *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987). "There is no general duty of good faith and fair dealing in ordinary, arms-length commercial transactions" like the retail sales at issue here.  *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.,* 960 S.W.2d 41, 52 (Tex. 1998).

*Unjust Enrichment and Conversion.*  Plaintiffs' unjust enrichment and conversion claims are all premised on the allegation that defendants are liable for "refusing to sell motor fuel to Plaintiffs and Class members on a temperature compensated basis." Compl. ¶ 159; *see also id.* ¶ 101.  These claims fail because, for the reasons given above, defendants are precluded from selling temperature-adjusted gallons.  Moreover, plaintiffs acknowledge that the motor fuel sales at issue are governed by contract, and quasi-contractual claims normally may not be brought when a contract governs a transaction.  *See, e.g.*, *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

*Civil Conspiracy.*  Plaintiffs allege that defendants engaged in a civil conspiracy to defraud consumers by selling motor fuel "on a non-temperature compensated basis, and by refusing to implement automatic temperature compensation technology." Compl. ¶ 177.  These allegations do not support a claim of civil conspiracy.

Civil conspiracy is not an independent cause of action; rather, liability requires proof of an underlying legal wrong.  *See Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 869 P.2d 454, 457 (Cal. 1994); *Paschal v. Great W. Drilling, Ltd.*, 215 S.W.3d 437, 450 (Tex. Ct. App. 2006).  For the reasons given above, defendants have done nothing wrong by delivering volumetric gallons of motor fuel to consumers – indeed, under prevailing laws and regulations, defendants could not have done otherwise.  Thus, no civil conspiracy claim can be based on defendants' current dispensing practices.  Nor can such a claim be premised on the defendants' alleged refusal to adopt automatic temperature compensation technology.  Because defendants are already complying with all relevant laws and regulations, including consumer protection statutes, they are under no legal obligation to change their practices.

In addition to the above, plaintiffs have failed to state a claim that defendants conspired "to exert undue pressure and influence upon various manufacturers and other proponents of temperature compensation at the retail level."  Compl. ¶ 179.  Under the Supreme Court's recent *Twombly* decision, a conspiracy claim must be dismissed unless it raises "enough factual material (taken as true) to suggest that an [illegal] agreement was made."  127 S. Ct. at 1965.  An allegation of otherwise legal behavior is insufficient to support a bare assertion of conspiracy.  *Id.* at 1965-66 ("[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. . . .  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").  Here, plaintiffs allege only a single, vague fact in support of their claim of a conspiracy to pressure manufacturers.  Compl. ¶ 57.  The consolidated complaint does not make any factual allegations that defendants themselves – as opposed to non-party trade associations – came to an agreement about the treatment of dispenser manufacturers.  And, even assuming for argument's sake that actions of trade associations can be imputed to the defendants, the complaint nowhere explains how the trade associations' alleged behavior is illegal.  Accordingly, under *Twombly*, the complaint's conspiracy claim must be dismissed.

**B.      Plaintiffs' Tax Claims Should Be Dismissed.**

Plaintiffs do not contend that defendants have violated any laws regulating the payment of taxes from motor fuel sales.  Instead, using the federal fuel tax as their model, plaintiffs allege that the relevant tax jurisdictions require the assessment of excise taxes at the wholesale level and remittance of the tax by the wholesaler to the taxing authority.  Compl. ¶¶ 66, 69 & n.5.  They further allege that defendants pay less in taxes to the government than they collect as "reimbursement" of those taxes from consumers. *Id.*  ¶¶ 67, 68.  Specifically, plaintiffs assert that

wholesalers pay taxes to the government on temperature-adjusted gallons, but when retailers pass on the "economic burden" of these taxes to the consumers through sales of non-temperature-adjusted gallons, the retailers are "reimbursed" for more taxes than were previously paid. *Id.* ¶¶ 69-72. These allegations do not support any claim for relief on any of the theories advanced by plaintiffs.

First, the weights-and-measures and tax authorities in the jurisdictions at issue have established comprehensive rules for how motor fuel is dispensed and taxes are measured and paid to the government. As defendants have established above, all of the jurisdictions at issue in this consolidated action require that the fuel sold at retail be dispensed in volumetric gallons without reference to temperature. There is no allegation that defendants have violated the weights-and-measures or tax rules or could have invented their own system of fuel dispensing and tax collection.

Plaintiffs acknowledge that the effect of temperature on motor fuel has long been understood and publicly discussed. *See, e.g.*, *id.* ¶¶ 4, 13-15, 22. The tax authorities too have long understood that temperature fluctuation may have an impact on fuel volume. *See, e.g.*, *Signal Oil & Gas Co. v. State Bd. of Equalization*, 49 Cal. App. 3d 550, 552 (Cal. Ct. App. 1975) (recognizing the "volatile nature of gasoline, with its properties of expansion and contraction"); *Arneson v. W.H. Barber Co.*, 297 N.W. 335, 339 (Minn. 1941) (noting that "temperature changes produce variations in the volume"). In fact, at least one jurisdiction has experimented with altering its tax system to "remedy" the alleged "defect" in the system that forms the basis of all of plaintiffs' tax-related claims. It concluded that the efficiencies of the existing system outweigh any purported countervailing benefits of a different regime designed to capture the tax "gains" purportedly enjoyed by retailers. Accordingly, that jurisdiction reverted back to the

current system, which requires the measurement, collection, and remittance of the fuel tax solely at the wholesale level.[26] Here, again, plaintiffs are asking this Court to impose a system of regulations that regulators and legislators have considered but decided not to implement.

Whether or not a state tax regime should grapple with temperature fluctuations is an issue for legislators, not courts. *Al-Sal Oil Company Inc. v. State Board of Equalization*, 232 Cal. App. 3d 969 (1991), addressed this issue directly. In *Al-Sal, a* retailer sought a tax refund of gasoline taxes from the California State Board of Equalization, which the Board denied. The court rejected the Board's argument that the retailer would be unjustly enriched if it were able to pay its fuel taxes on a temperature-adjusted basis, but collect taxes from customers on non-temperature-adjusted fuel, because the legislature had set up that system. To the extent that a change to the tax system was warranted, such a change lay "not with [the] court but with the Legislature." *Id.* at 988-90.

Second, plaintiffs' tax-related claims fail because their allegations, taken at face value, fail to identify any alleged inequity in defendants' business practices. It is beyond question that consumers pay the retailer an advertised total price for the fuel, with taxes included. *See, e.g.*, *Gurley v. Rhoden*, 421 U.S. 200 (1975) (retail customer pays a total price, which is made up of various costs of production and other components, including previously paid fuel taxes). Based on that principle, the court in *In re Air Transportation Excise Tax Litig.*, 37 F. Supp. 2d 1133 (D.

---

[26] In 1992, the Florida Legislature enacted House Bill 833 to amend Fla. Stat. § 206.41(2)(B). The amendment required retailers to pay additional taxes to the government to the extent that their gross sales exceeded the net gallons on which taxes had been collected. *See* Final Bill Analysis & Economic Impact Statement for CS/HB 833. However, in 1995, the legislature passed House Bill 1639, which eliminated Section 206.41(2)(B)'s requirement that retailers remit to the government gains, if any, that may have been made on the difference between gallons taxed at net at wholesale, and gallons sold at gross at retail. *See* Final Bill Analysis & Economic Impact Statement (June 20, 1995).

Minn. 1999), rejected the argument that plaintiffs advance here.  In that case, plaintiffs were FedEx customers who shipped packages during a period that a federal excise tax on the transportation of property by air had expired.  Nevertheless, FedEx's airbill continued to represent that it had calculated its rates with the amount of this tax included.  Indeed the FedEx airbill was quite explicit as to taxes when it stated:  "[O]ur basic rate includes a federal tax required by Internal Revenue Code Section 4271."  *Id.* at 1141.  The airbill was not corrected after the tax expired, and consumers continued to be informed that part of the amount they paid to FedEx was to reimburse FedEx for taxes FedEx pre-paid to the government.

Plaintiffs claimed that FedEx wrongfully enjoyed a windfall by failing to lower its prices and continuing to collect from plaintiffs the same amount that it collected prior to the expiration of the tax.  The court rejected plaintiffs' contract and conversion claims stating:

> Once the tax did expire – a matter of public record to anyone who cared – the language became mere surplusage. *The customer still agreed to pay the stated rate, no matter what its makeup*, and the erroneous notice had no bearing on the decision.  Plaintiffs' contention that FedEx breached the contract by 'collecting the excise tax' thus fails as a matter of law, *whether FedEx was really collecting a tax or not. . . .*

> Plaintiffs cite no case, and this Court cannot find one, that has allowed a contracting party to recover, in conversion, an amount paid to the other party, where the only alleged basis for recovery is that the payor later believes that the price he agreed upon was too high . . . [I]f Plaintiffs' conversion claim is valid here, then any party to a transaction who later believes he paid too much money would have a claim of conversion.

*Id.* at 1142 (emphasis added).  The case was dismissed in its entirety.

Plaintiffs concede that, like the rate set by FedEx, the prices charged in retail motor fuel transactions are all-inclusive.  Compl. ¶ 69.  Under *In re Air Transportation*, the components of the fuel price, whether called taxes, costs, or profit, are not material.  And, as that case instructs, even where the tax rate is identified, as plaintiffs here also claim with regard to the fuel tax

decals on some retail fuel pumps (*id.* ¶ 69), "[t]he customer still agreed to pay the stated" overall price, "no matter what its makeup." 37 F. Supp. 2d at 1142. Because plaintiffs agreed to the total price of the fuel sold, they may not now complain about the retailers' determination of that price. *Id.*

## CONCLUSION

The consolidated complaint should be dismissed.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD, LLP

  /s/   Donald B. Craven
Donald B. Craven
James P. Tuite
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 887-4000
Fax:    (202) 887-4288
dcraven@akingump.com
jtuite@akingump.com

*Counsel to Valero Marketing and Supply Company*

On Behalf of the Defendants Listed on Exhibit A

October 22, 2007

# MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### EXHIBIT A – MOVING DEFENDANTS

7-Eleven, Inc.
Abel Oil Company
Abercrombie Oil Company, Inc.
Albertson's, LLC
Alimentation Couche-Tard, Inc.
Allsup's Convenience Stores, Inc.
Ambest, Inc.
Ayers Oil Co.
Beroth Oil Company
Big River Oil Company
BP America Inc.
BP Corporation North America Inc.
BP Products North America Inc.
BP West Coast Products LLC
Campbell Oil Company
Carolina Energies, Inc.
Casey's General Stores, Inc.
Chevron USA, Inc.
Circle K Stores Inc.
Citgo Petroleum Corporation
Coastal Mart of Oklahoma, Inc.
Coastal Mart, Inc.
ConocoPhillips Company
Commercial Oil Company
Costco Wholesale Corporation
Diamond Shamrock Stations, Inc,
E.J. Pope & Son, Inc.
Equilon Enterprises LLC
Exxon Mobil Corp.
E-Z Mart Stores, Inc.
Fast Track, Inc.
Flying J Inc.
Gas-Mart USA, Inc.
Getty Petroleum Marketing Inc.
Giant Industries, Inc.
Giant Stop-n-Go of New Mexico, Inc.
Hess Corporation
Hess Oil Company
Huffman Oil Company
Hy-Vee, Inc.
Kentucky Flying J

Kum & Go, L.C.
Ligon Oil Co., Inc.
Love's Travel Stops and Country Stores, Inc.
Mac's Convenience Stores, LLC
M.M. Fowler, Inc.
Marathon Oil Company
Marathon Petroleum Company LLC
McNeill Oil Company, Inc.
MFA Oil Company, Inc.
Midwest Petroleum Company
Miltenberg Oil Co., Inc.
Mini Mart, Inc. d/b/a Loaf 'N Jug
Mobil Oil, Guam, Inc.
Motiva Enterprises LLC
Murphy Oil Corporation
Murphy Oil USA, Inc.
National Petroleum Products Inc.
PAK-A-SAK, Inc.
Petro Stopping Centers, L.P.
Petroleum World, Inc.
Petromark, Inc.
Phillips 66 Company
Pilot Travel Centers LLC
Presto Convenience Stores LLC
Quality Oil Company, Inc.
Quick Fuel, Inc.
QuikTrip Corporation
RaceTrac Petroleum, Inc.
Rapid Robert's, Inc.
Ray Thomas Petroleum Company, Inc.
Shell Oil Company
Shell Oil Products Company LLC
Sheetz, Inc.
Sinclair Oil and Gas Company
Sinclair Oil Corporation
Sinclair Petroleum Company
South Central Oil Company, Inc.
Southwest Convenience Stores, LLC
Speedway Petroleum Corporation
Speedway SuperAmerica LLC

Star Fuel Marts, L.L.C.
Sunoco Corporation
Sunoco Inc.
Supervalu Inc.
TA Operating LLC
Tesoro Refining and Marketing Company
Texaco Inc.
Texaco Refining and Marketing
The Circle K Corporation
The Kroger Co.
The Pantry, Inc.
Thoele, Inc.
Thorntons Inc.
Toot' N Totum Food Stores, L.P.
Total Petrochemicals USA, Inc.
TravelCenters of America LLC
TravelCenters of America Holding Co. LLC
United El Segundo, Inc.
United Energy, Inc.
USA Petroleum Corporation
Valero Energy Corporation
Valero Marketing and Supply Company
Wallis Oil Company
Wal-Mart Stores, Inc. (dba Sam's Club)
Warrenton Oil Company
Wawa, Inc.
WilcoHess LLC
World Oil Corp.
Worsley Companies, Inc.