**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE | ) |
| SALES PRACTICES LITIGATION | ) |
| | ) **MDL No: 1840** |
| (This Document Relates to All Cases) | ) |
| | ) **No:07-md-1840-KHV JPO** |
| | ) |

**PLAINTIFFS' JOINT RESPONSE IN OPPOSITION TO**
**DEFENDANTS' JOINT MOTION TO DISMISS**

Robert A. Horn
HORN AYLWARD & BANDY, LC
2600 Grand Boulevard, Suite 500
Kansas City, MO 64105
Telephone 816-421-0700
Facsimile 816-421-0899
rhorn@hab-law.com

Thomas V. Girardi
GIRARDI AND KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017-1904
Telephone: 213-977-0211
Facsimile: 213-481-1554
tgirardi@girardikeese.com

George A. Zelcs
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com

*Lead Counsel for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

NATURE OF THE CASE ................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

QUESTION PRESENTED ................................................................................................. 7

STANDARD OF REVIEW OF DEFENDANTS' MOTION TO DISMISS ........................... 7

ARGUMENT ..................................................................................................................... 8

    A.    **Applicable Law Does Not Prohibit Temperature-Adjusted Sales** ................... 8

        1.  *Handbook 44 Does Not Prohibit Temperature Compensation* .............................. 9

        2.  *Handbook 130 Does Not Prohibit Temperature Compensation* .......................... 10

        3.  *Numerous Authorities Directly Contradict Defendants' Flawed Readings of Handbooks 44 and 130* ...................................................................................... 13

        4.  *A Variable-Volume Gallon Is Not The Issue* ........................................................ 14

    B.    **Plaintiffs Allege Facts Sufficient to Establish Each of the Asserted Claims** . 15

        1.  *State Consumer Protection Laws* ........................................................................ 15

            a.  *Defendants' Sale of Hot Fuel Violates Consumer Protection Law by Misleading Consumers About the Content and Price of Hot Fuel* ................ 16

            b.  *The Silence of Weights and Measures Laws as to Temperature Does Not Sanction or Provide a Safe Harbor for Defendants' Deception* .................... 18

        2.  *Breach of Duty of Good Faith and Fair Dealing* ................................................. 21

            a.  *Plaintiffs' Claim For Breach Of The Duty Of Good Faith And Fair Dealing Is Independent Of Plaintiffs' Consumer Fraud Claim* ...................................... 21

        3.  *Breach of Contract* .............................................................................................. 22

            a.  *Defendants Wrongly Assert That Plaintiffs Get What They Pay For* ........... 23

            b.  *Defendants' Reliance on* Hopkins *Is Misplaced* ........................................... 25

        4.  *Breach of Express and Implied Warranties* ........................................................ 25

5.   *Fraud/Misrepresentation* ....................................................................................... 29

6.   *Civil Conspiracy* ................................................................................................... 30

7.   *Claims for Unjust Enrichment* ............................................................................. 31

8.   *Tax Overpayment for Reimbursement* .................................................................. 34

     a.   *Plaintiffs Are Not Seeking to Change The Taxing Structure of the Government.* ...................................................................................................... 34

     b.   *Questioning the price consumers pay* ............................................................ 35

**CONCLUSION** .................................................................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Al Sal Oil Co. v. State Bd. Of Equalization*, 232 Cal.App.3d 969 (Cal. App. 1991) ................... 35

*Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) ............................................... 32

*Aron v. U-Haul Co. of Calif.*, 143 Cal.App.4th 796 (Cal.App. 2007) ........................... 19

*Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 127 S.Ct. 1955 (2007) ..................................... 30, 31

*Biomet Inc. v. TACT Med. Instruments, Inc.*,
    2005 U.S. Dist. Lexis 44737, Case No. 3:01cv895 (N.D. Ind. 2005) ....................................... 21

*Cel-Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co.*, 973 P.2d 527 (Cal. 1999). ......... 16, 19

*Chancellor v. Gateway Lincoln-Mercury, Inc.,* 502 S.E.2d 799 (Ga. App. 1998) ...................... 19

*Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190 (N.Y. App. 1987). ................. 33

*Daugherty v. American Honda Motor*, 144 Cal.App.4th 824 (2006) ........................................... 16

*Ebasco Services, Inc. v. General Electric Co.,*460 F. Supp. 163 (E.D. Pa. 1978) ....................... 27

*El Paso Natural Gas Co. v. Minco Oil & Gas Inc.,* 8 S.W.3d 309 (Tex. 1999) ........................... 22

*Fortune Prod. Co. v. Conoco, Inc.,* 52 S.W.3d 671 (Tex. 2000) .................................................. 34

*Fusion, Inc. v. Nebraska Aluminum Castings, Inc.*, 934 F.Supp. 1270 (D.Kan. 1996) ............... 33

*Golden v. Daiwa Corp.*,
    2000 U.S. Dist. Lexis 2660, Civ. 3:96-CV-0776-L (N.D. Tex., 2000) ............................. 21, 22

*Gonzalez v. Pepsico*, 489 F.Supp.2d. 1233 (D.Kan. 2007) ....................................................... 8, 27

*Grillasca v. Amerada Hess Corp.,*
    No. 8: 05-1736-T-17TGW, 2006 U.S. Dist. LEXIS 82814 (M.D. Fla. Nov. 14, 2006) .......... 20

*Haynes Trane Service Agency, Inc. v. American Standard*,
    51 Fed.Appx. 786 (10th Cir. 2002) ........................................................................................ 32

*Hopkins v. BP Oil*, 81 F.3d 1070 (11th Cir. 1996) ............................................................... 17, 25

*In re Air Transp. Excise Tax Litig.*, 37 F.Supp.2d 1133 (D. Minn. 1999) .................................... 36

*Independent Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165 (3d Cir. 1997) ..... 32

*InMed Diagnostic Services, L.L.C. v. MedQuest Assocs., Inc.,* 358 S.C. 270 (S.C. App. 2004) . 18

*Iqbal v. Hasty*, 490 F.3d 143 (2d Cir. 2007) ........................................................................ 30, 31

*Kologel Co. v. Down in the Village, Inc.*, 539 F.Supp. 727 (S.D.N.Y. 1982) ........................... 28

*Krumme v. Mercury Ins. Co.,* 123 Cal.App.4th 924 (2004) ....................................................... 19

*Latman v. Costa Cruise Lines*, 758 So.2d 699 (Fla. App. 2000) ......................................... 17, 37

*LMB v. Lard Oil Co.,* 1998 U.S.Dist. LEXIS 16933 (E.D.La. 1998) ........................................ 19

*Lockett v. Prudential Ins. Co. of Am.*, 870 F.Supp. 735 (W.D. Tex. 1994) .............................. 22

*MacDermid v. Discover Fin. Servs.,* 488 F.3d 721 (6th Cir. 2007) ........................................... 19

*McCann v. Lucky Money, Inc.*, 129 Cal.App.4th 1282 (Cal. App. 2005) ................................... 17

*McKell v. Washington Mut., Inc.* 142 Cal.App.4th 1457 (2006) ................................................ 15

*Mikulski v. Centerior Energy Corp.,* 2007 WL 2372301 (6th Cir. 2007) .................................. 36

*Mulford v. Altria Group, Inc.*, 506 F.Supp.2d 733 (D.N.M. 2007) ........................................... 19

*Musil v. Hendrich,* 627 P.2d 367 (Kan. App. 1981) ................................................................... 29

*Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772 (9th Cir. 1980) ........................... 27

*Olympia Hotels Corp. v. Johnson Wax Dev Corp.*, 908 F.2d 1363 (7th Cir. 1990) .................... 32

*Orica New Zealand Ltd. v. Searles Valley Minerals Operations, Inc.*,
    No. 04-2310, 2005 WL 387659 (D. Kan. Feb. 17, 2005) .................................................... 33

*People v. Dollar Rent-A-Car Sys., Inc.,* 211 Cal.App.3d 119 (1989) ........................................ 15

*Robbins v. Wilkie*, 300 F.3d 1208 (10th Cir. 2002) ...................................................................... 8

*Siegel v. Shell Oil Co.*, 480 F.Supp.2d 1034 (N.D.Ill. 2007) ............................................... 33, 36

*Sun Oil Co. of Penn. v. Robina Shipping, Inc.*, C.A. No. 80-4862,
    1982 U.S. Dist. Lexis 17866 (E.D.Pa. 1982) ...................................................................... 28

*Sutton v. Utah State School for the Deaf & Blind*, 173 F.3d 1226 (10th Cir. 1999) ..................... 8

*Via Christi Medical Center v. Blue Cross/Blue Shield*, 361 F.Supp.2d 1280 (D.Kan. 2005) ........ 8

*Weft, Inc. v. G.C. Inv. Assocs.*, 630 F.Supp. 1138 (E.D.N.C.1986) .......................................... 32

*Wilner v. Sunset Life Ins. Co.*, 78 Cal.App.4th 952 (2000) ....................................................... 18

*Wilson v. Marquette Elecs., Inc.*, 630 F.2d 575 (8th Cir. 1980) ................................................. 27

*X-It Prods, LLC v. Walter Kidde Portable Equip., Inc.*, 227 F.Supp.2d 494 (E.D.Va.2002) ....... 32

**Statutes**

Alabama Deceptive Trade Practices Act, Alabama Code § 8-19 et seq. ...................................... 15

Arizona Consumer Fraud Act, Arizona Rev. Stat. § 44-1521 et seq. .......................................... 15

Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 et seq. ............................ 15

California Business and Professions Code §13413 ............................................................... 15, 16

California Business and Professions Code §17200 .................................................................... 15

California Business and Professions Code §17500 .................................................................... 15

Federal Rule of Civil Procedure 12 .......................................................................................... 7

Federal Rule of Civil Procedure 8 ...................................................................................... 32, 33

Florida Deceptive and Unfair Trade Practices Act., Fla. Stat. § 501.201 et seq. ........................ 15

Georgia Deceptive Trade Practices Act, O.C.G.A. § 10-1-372 .................................................. 15

Guam Deceptive Trade Practices-Consumer Protection Act, 5 Guam Code Ann. § 32101 et seq.
............................................................................................................................................ 15

Indiana Deceptive Consumer Sales Act, I.C. 24-5-0.5-2 ........................................................... 15

Kansas Consumer Protection Act, K.S.A. § 50-623 et seq. ....................................................... 15

Kentucky Consumer Protection Act, K.R.S. § 367.110 et seq. ................................................... 15

Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. § 51:1401 et seq. ... 15

Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 et seq. ..................... 16

Missouri Merchandising Practices Act, R.S.Mo. § 407.010 et seq, ........................................... 16

Nevada Deceptive Trade Practices Act, N.R.S. Chapter 598 ..................................................... 16

New Jersey Consumer Fraud Act, N.J. Stat. § 56:8-1 et seq. ..................................................... 16

New Mexico Consumer Protection Act, N.M. Code 1978 § 57-12-10 et seq. ............................. 16

North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1 et seq. ......... 16

Oklahoma Consumer Protection Act, Okla. Stat. tit. 15 § 753(5) .............................................. 16

Oregon Unfair Trade Practices Act, O.R.S. § 646.610 et seq. ................................................... 16

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. C.S.A. § 201-1 ..... 15

Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101 et seq................................ 16

Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Business and Commercial
    Code § 17.41 et seq.............................................................................................................. 16

Utah Consumer Sales Practices Act, Utah Code tit. 13, chap. 11................................................ 16

Virginia Consumer Protection Act of 1977, Va. Code Ann. § 59.1-196 et seq............................ 16

## Other Authorities

BLACK'S LAW DICTIONARY 675 (6th ed. 1990)............................................................................ 23

BLACK'S LAW DICTIONARY 694 (6th ed. 1990)............................................................................ 23

Uniform Commercial Code §1-201(b)(18) .................................................................................. 23

Uniform Commercial Code §1-303 ....................................................................................... 24, 27

Uniform Commercial Code §1-303 cmt. 4 .................................................................................. 27

Uniform Commercial Code §1-304 .............................................................................................. 21

Uniform Commercial Code §2-316 cmt. 6 .................................................................................. 27

I.    **NATURE OF THE CASE**

Every day, consumers across the United States fill up their vehicles with motor fuel.  In making those purchases, consumers pay for a "gallon" of fuel at a particular price.  The price-per-gallon formula has been commonplace since the advent of the Automobile Age.  That formula creates the perception of a standardized measure, so that all participants in a motor fuel transaction think they know what is being transacted.  Gasoline, diesel, and other motor fuels, however, are liquids with physical characteristics that cause expansion when subjected to heat, and contraction when subjected to cold.   Although a "gallon" has long been defined as a liquid measured at 231 cubic inches, the physical properties of motor fuel are such that the same amount of fuel (in terms of the actual hydrocarbon molecules) will fill a smaller physical space when contracted by cold and a larger physical space when heated up.  As a result, some adjustment for this variation is necessary to obtain a standardized measurement.

The oil industry has long recognized that basic scientific truth.  In wholesale transactions, a gallon of fuel is defined as consisting of 231 cubic inches of fuel *at 60 degrees Fahrenheit*. Thus, when an oil company sells thousands of gallons of fuel to a retailer in a bulk shipment, a special device measures the temperature of the fuel to ensure that the expansion of the product during hot weather does not inure to the retailer's detriment.  Moreover, in Canada, where the ambient temperature of fuel is typically less than 60 degrees F., the oil industry places temperature adjustment devices on retail pumps so that consumers are not able to benefit by purchasing more, colder fuel for the same price per gallon.  Yet, in the United States, where *hotter* fuel causes consumers to purchase *less* fuel for the same price per gallon, Defendants have resisted efforts to adjust the price of fuel to account for temperatures above 60 degrees F. at the retail level.

1

This lawsuit seeks to redress damages arising from the oil industry's hypocrisy. American consumers do not get the benefit of the very same calculation the oil industry conducts at the *wholesale* level – and at all distribution levels in Canada – when making purchases of motor fuel at retail gas stations.  With prices now exceeding $3.00 per gallon in many places around the country, the American consumer sustains a real and detrimental harm with every purchase of fuel at a temperature in excess of 60 degrees F.  Cost estimates suggest that American consumers are currently being cheated out of an estimated $3 billion per year from the discrepancies created by sales of hot fuel.  The problem of hot fuel sales will only grow more significant with the combination of warming trends causing hotter weather in the United States and a tightening supply of oil leading to higher prices for fuel.  As the Consolidated Amended Complaint (CAC) alleges, Defendants violate state statutory and common law by their failure to adjust sales of motor fuel for temperature.

In their Motion to Dismiss and supporting Memorandum, ("Memorandum") Defendants principally assert that they are "required" by state law to sell motor fuel at the retail level without adjusting for temperature and, consequently, that Plaintiffs' claims fail as a matter of law.[1] Defendants' argument has no merit.  No state involved in this litigation *precludes* a retailer from adjusting the price of a gallon to account for temperature changes in the fuel – and, indeed, one of the purported authorities on which Defendants rely specifically allows it.  Although a gallon is defined as 231 cubic inches, that definition does not protect Defendants from their knowing and willful sales of hot gas at temperatures that cause consumers to obtain less fuel for the price charged.  Nor does Defendants' delivery of a volumetric gallon absolve Defendants from their

---

[1] Memorandum at 1.  This mantra is repeated throughout the Defendants' Motion, in one permutation or another. *See, e.g.*, Memorandum at 25 ("Defendants are precluded from selling temperature adjusted gallons"); pg. 8 ("Defendants are barred from varying the size of the units in which they dispense motor fuel at the retail level."); pg. 5 ("Handbook 44 . . . continues to preclude the dispensing of variable-volume units at retail.").

duty to disclose the fact that warmer gas means less fuel.  Plaintiffs' detailed allegations are plainly sufficient to state a claim upon which relief can be granted under the federal rules. Accordingly, this Court should deny Defendants' Motion.

## II.   STATEMENT OF FACTS

This case is about the amount of motor fuel Plaintiffs receive at retail sales in the United States.  Plaintiffs allege that they purchase motor fuel based on Defendants' representation that each gallon of motor fuel contains a standard amount of fuel for a specific price. (CAC ¶ 123-24) The critical term in the sales agreements at issue is "price per gallon."  This term has an obvious and objective meaning:  for a specific amount of money, a consumer gets a gallon of gas that has the same amount of fuel as any other like gallon of fuel sold to other consumers in other locations. (CAC ¶¶ 6, 123-24)  However, each gallon of motor fuel as it is currently sold to consumers in the United States does *not* contain a standard amount of fuel. (CAC ¶ 3)  That is because motor fuel expands when it is heated – a process known as "thermal expansion." (CAC ¶¶ 22-26)

The science of "thermal expansion" is undisputed.   All matter changes size as its temperature changes.  The degree of change is comparatively small in solids, more pronounced in liquids, and greatest in gases.  When the temperature of matter increases, the average distance between molecules increases, and this leads to expansion – an increase in the volume of the matter.[2] *Id.* When matter is measured in terms of volume instead of by mass, what is actually measured is the amount of space the matter occupies rather than the amount of the matter.  In

---

[2] Here, it is important to distinguish between mass and volume.  Volume is the amount of space matter occupies.  Mass is the amount of matter in an object.  *See, e.g.*, http://www.merriam.com/dictionary/mass (mass [2, noun] **1c :** "the property of a body that is a measure of its inertia and that is commonly taken as a measure of the amount of material it contains and causes it to have weight in a gravitational field"); http://www.merriam.com/dictionary/volume  (volume [1, noun] **3 :** "the amount of space occupied by a three-dimensional object as measured in cubic units (as quarts or liters) **:** cubic capacity").

some instances the volume of matter can be used as a reliable proxy for the amount of the matter being measured.  But because the volume of the matter can fluctuate even as its mass remains constant, measurement by volume is not a reliable proxy for measuring the amount of the matter.

Motor fuel cannot be measured reliably by volume alone because of the significant thermal expansion it undergoes with changes in temperature. (CAC ¶¶ 3, 17, 26, 39)  Gasoline expands and contracts one full percent for every 15° F. change in temperature.  Diesel fuel expands and contracts 0.6% for every 15° F. change in temperature.  By contrast, liquid water expands less than 1% from near freezing (just above 32° F.) to near boiling (just below 212° F.) — a spread of nearly 180º F.)  Thus, if a closed container holding one gallon (*i.e.*, 231 cubic inches) of gasoline at 60° F. is cooled to 45° F., the volume of space the gasoline occupies inside the container will shrink to 229.61 cubic inches – a decline of roughly 0.6 percent.  Conversely, if the gasoline is warmed, the volume of space it occupies inside the container will expand and, at 105° F., it will occupy a space of 235.158 cubic inches – an increase of some 1.8 percent.  The expansion and contraction of the gas in this hypothetical closed container takes place even though the fuel's mass and energy content remain constant.  Although the volume occupied by the fuel will vary by its temperature, that same batch of gasoline in the container will *always* weigh 6.216 pounds, and it will *always* contain 117,234 net BTU's of energy, irrespective of volume fluctuation. (CAC ¶¶ 22-26)

Plaintiffs' allegations follow directly from the science of thermal expansion.  Defendants do not adjust the amount of fuel to account for the expansion of motor fuel when making retail sales in the United States, but they do make such adjustments when they distribute motor fuel among themselves in wholesale transactions. (CAC ¶¶ 3, 6, 16, 19-20)  At the wholesale level, Defendants distribute gasoline in a standard unit, the U.S. Petroleum Gallon, by applying the so-

called D1250 standard of the American Society of Testing and Material ("ASTM").[3] (CAC ¶¶ 16, 18-19)  The D1250 standard defines a gallon as 231 cubic inches of volume at a standard temperature of 60 degrees F. and is designed to "provide a methodology 'by which volume measurements taken at any temperature and pressure … can be corrected to an equivalent volume at base/standard conditions.'" Memorandum at 14, n.19 *citing* ASTM D1250-07 at 1. For wholesale transactions, Defendants have thereby created and used a standard unit that allows motor fuel to be bought and sold in a fungible fashion that does not vary by the temperature of the fuel at the time of measurement.[4] (CAC ¶¶ 3, 6, 16, 19-20)

Yet Defendants refuse to use the U.S. Petroleum Gallon and the D1250 standard as a benchmark in the United States at the retail level in order to increase their profits at consumers' expense. (CAC ¶¶ 3, 6)  Plaintiffs allege that the average temperature of motor fuel sold in the states and territories relevant to this litigation is more than 70 degrees F. (CAC ¶ 7).  This hot motor fuel contains less fuel per gallon than motor fuel that is sold at cooler temperatures.  (CAC ¶¶ 6, 59-61)  Defendants advertise motor fuel at a price-per-gallon that suggests fungible, equivalent units but instead deliver the fuel to consumers in strictly volumetric 231-cubic-inch units or "gallons" that are not fungible, equivalent units given the expansion and contraction of motor fuel when it is hot or cold. (CAC ¶¶ 123-24, 129-34)  As a result, when Plaintiffs pay for this hot motor fuel they receive less than they bargained for at the time of their purchase.  *Id.* When Defendants fill a 231-cubic-inch space with hot fuel and deliver that fuel without adjusting

---

[3] Memorandum at 14, n.19.
[4]  Defendants argue ASTM D1250 is not an "industry standard", only a "methodology" used by the petroleum industry to correct volume measurements taken at disparate temperatures. This is a factual question and a distinction without difference. Defendants' use of standards like ASTM D1250 reveals two important facts. First, temperature, not just volume, is material to accurately determine the energy content of fuel that changes hands in any fuel transaction; and second, Defendants understand the impact of temperature upon energy because they adjust for temperature in their own transactions.

for temperature differences, consumers receive less fuel than gas delivered at 60 degrees F. (CAC ¶ 132)

That is not the case in Canada, and the reasons are telling.  Defendants have voluntarily installed equipment in Canada that automatically adjusts for the temperature of motor fuel so that a standard amount of fuel is dispensed at the pump. (CAC ¶¶ 45-46) The average temperature of motor fuel in Canada is less than 60 degrees F. (CAC ¶ 44) If no temperature adjustment equipment had been installed in Canada, the petroleum industry and Defendants would be losing money on sales of motor fuel because Canadian consumers would be receiving more fuel per standard unit due to contraction of the cooler motor fuel. (CAC ¶ 45)

Defendants also collect more money in motor fuel tax from Plaintiffs than Defendants remit to state or federal governments. (CAC ¶¶ 65-75)  Taxes are imposed on the sale of motor fuel on a per gallon basis – *i.e.*, taxes are paid based on volume. (CAC ¶ 65) Defendants pay these taxes directly at the wholesale level.  (CAC ¶ 66)  Defendants in turn purport to collect reimbursement for these taxes from consumers at the retail level. *Id.* Plaintiffs allege that Defendants pay the tax on the basis of temperature-adjusted gallons and collect reimbursement from Plaintiffs on motor fuel sales that are not adjusted for temperature or price. (CAC ¶¶ 69-72) Because motor fuel sold to consumers is on average greater than 60 degrees F., Defendants collect more money from Plaintiffs under the guise of tax reimbursement than they remit to tax authorities. (CAC ¶¶ 72-75)

Plaintiffs allege that they have been injured by Defendants in three basic ways:

> *First*, Defendants injured Plaintiffs by representing that a gallon of gas sold at retail is a standard good sold for a standard price, when it is not.

*Second*, Defendants injured Plaintiffs by failing to adjust the price or the temperature of motor fuel so that a standard gallon was delivered to Plaintiffs.

*Third*, Defendants charged Plaintiffs more in tax than Plaintiffs were obligated to pay in tax by charging Plaintiffs tax on motor fuel that was not adjusted for temperature or price at the pump.

Plaintiffs' Consolidated Amended Complaint ("CAC") sets forth detailed factual allegations of Defendants' misrepresentations, omissions, fraud, and unjust enrichment based on clearly articulated legal theories. Plaintiffs have alleged facts sufficient to establish the elements of the each of the claims asserted. Accordingly, Defendants' Motion to Dismiss should be denied.

## III.   QUESTION PRESENTED

    A.    Whether Plaintiffs' factual allegations state claims for injuries caused by:

        1.    Defendants' representation that for a specific price a consumer will receive a standard amount of motor fuel, typically a gallon of motor fuel;

        2.    Defendants' practice of failing to adjust for the temperature of motor fuel so that each gallon contains a standard amount of fuel;

        3.    Defendants' practice of failing to adjust the price of motor fuel so that each gallon is priced based on a standard amount of fuel;

        4.    Defendants' practice of collecting tax on the retail sale of motor fuel from Plaintiffs in excess of the tax Defendants' actually remit to government.

    B.    Whether Plaintiffs' claims fail as a matter of law because state law immunizes Defendants for the injuries caused to Plaintiffs by A(1)-(4).

## IV.   STANDARD OF REVIEW OF DEFENDANTS' MOTION TO DISMISS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) should only be granted "[w]hen the plaintiff can prove no set of facts in support of the claims that would entitle

plaintiff to relief."[5]  "The court's function on a Rule 12(b)(6) motion is not to weigh potential

evidence that the parties might present at trial, but to assess whether the plaintiff's complaint

alone is legally sufficient to state a claim for which relief may be granted."[6]  Plaintiffs' CAC

combines claims from more than 40 lawsuits in 28 states and territories, asserting dozens of

separate causes of action.  The CAC contains more than 75 paragraphs of factual allegations, all

of which must be assumed as true for purposes of the Defendants' Rule 12(b)(6) motion.[7]

## V.  **ARGUMENT**

### A.    **Applicable Law Does Not Prohibit Temperature-Adjusted Sales**

The fulcrum of Defendants' Motion is that all states *require* motor fuel to be sold in

volumetric gallons of 231 cubic inches that are unadjusted for temperature.  Defendants purport

to derive that requirement from standards set by the National Conference on Weights &

Measures, Inc. ("NCWM"), as adopted by state statutes and regulations.  In particular,

Defendants cite to Handbooks 44 and 130, two model standards developed by NCWM (a non-

profit corporation) and published by NIST that Defendants assert prohibit temperature-adjusted

fuel sales.  Because states supposedly require retail sales in the way Defendants claim to conduct

those sales, Defendants assert they cannot be liable under Plaintiffs' causes of action.

Defendants' argument is deeply flawed.  As an initial matter, the Mission Statement of

the NCWM is to promote "a healthy business and consumer climate through **fair and equitable**

---

[5]*Via Christi Medical Center v. Blue Cross/Blue Shield*, 361 F.Supp.2d 1280 (D.Kan. 2005) (citing *Roman v. Cessna Aircraft Co.*, 55 F.3d 542, 543 (10th Cir. 1995)).
[6]*Sutton v. Utah State School for the Deaf & Blind*, 173 F.3d 1226 (10th Cir. 1999) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991)).
[7]*Robbins v. Wilkie*, 300 F.3d 1208, 1210-1211 (10th Cir. 2002); *See also, Gonzalez v. Pepsico*, 489 F.Supp.2d. 1233, 1238 (D.Kan. 2007).

**weights and measures standards.**"[8]  Although Defendants claim to agree with that statement,

they then utilize a standard that ensures fairness and equity for all levels of motor fuel sales –

except at the very end, when the consumer buys at the retail level.[9]  This failure to adjust for

temperature variations is neither fair nor equitable.  Moreover, Handbooks 44 and 130 have no

legal effect until adopted by a governmental entity, and not all of the states where Plaintiffs have

brought their claims have even adopted the Handbooks.[10]

More fundamentally, none of the authorities that Defendants cite, including Handbooks

44 and 130, *preclude* them from accounting for the temperature of motor fuel at the point of a

retail sale to consumers or modifying their sales practices to adjust for temperature.  Because

Defendants misread the relevant authorities, virtually all of Defendants' arguments quickly

unravel.

    1.    <u>*Handbook 44 Does Not Prohibit Temperature Compensation*</u>

---

[8]Available at http://www.ncwm.net/about/index.cfm?fuseaction=mission. [emphasis added]; *See also*, President's Address, National Conference on Weights and Measures, July 11, 2006 ("Determining the accurate weight or volume of an object is fundamental to ensuring fair commerce.").

[9] In fact, the very source of the authorities upon which Defendants rely has openly acknowledged that temperature compensated fuel sales are, "the most equitable way fuel can be sold without the buyer or seller gaining a competitive advantage." *See, e.g.*, 2006 Interim Report of the NCWM Laws & Regulations Committee, pg. 4, available at http://ts.nist.gov/WeightsAndMeasures/upload/10-LR-06-Pub16-FINAL.pdf.

[10]Despite Defendants' contention that all states have adopted Handbooks 44 and 130 in their entirety, many states involved in this litigation have chosen not to adopt NCWM standards when it comes to engine fuel laws and regulations.  For example, 19 of the 25 states involved in this litigation have a Uniform Engine Fuel Law in place that *is not* based on Handbook 130's Uniform Engine Fuel Law, or any other NCWM standard.  Two other states in this litigation – Pennsylvania and Texas – do not even have Uniform Engine Fuel Laws in place.  Similarly, 19 of the 25 states involved in this litigation have Uniform Engine Fuel Regulations in place that *are not* based on Handbook 130's Uniform Engine Fuel Regulation, and two others – New Jersey and Pennsylvania – do not have Uniform Engine Fuel Regulations in effect. *See*, NIST Handbook 130 (2006), pgs. 10-13, available at http://ts.nist.gov/WeightsAndMeasures/h130-06.cfm.  Thus, it is not as simple as the Defendants suggest, and the NCWM model standards do not have the force and effect of law in all of the affected states.

Handbook 44 provides a set of specifications, tolerances, and technical requirements with which weighing and measuring devices must comply.[11]  In particular, Handbook 44 mandates that "[d]eliveries [from a retail motor fuel device] shall be indicated and recorded, if the device is equipped to record, in liters or gallons and decimal subdivisions or fractional equivalents thereof."[12]  Thus, Handbook 44 requires fuel to be *delivered* in gallons, precluding the Defendants from selling motor fuel in alternative volumetric units such as drams or ounces.

Defendants stretch Handbook 44 beyond all recognition by arguing that its provisions regarding fuel delivery extend to – and, indeed, pervasively regulate – retail fuel sales practices, including pricing methodology.  In fact, Handbook 44 does not even mention sales practices, and it is likewise silent on the issue of motor fuel pricing.  Because Handbook 44 neither condones nor prohibits an adjustment in price or disclosure of the consequences to the consumer of purchasing hot fuel, there is no credible basis for Defendants' argument that Handbook 44 somehow precludes Plaintiffs' state-law claims.[13]  Tellingly, Defendants cite no authority – judicial or otherwise – construing Handbook 44 to impose any of the regulatory constraints that Defendants mistakenly advance.[14]

## 2.    *Handbook 130 Does Not Prohibit Temperature Compensation*

---

[11]*See, e.g.*, NIST Handbook 44, § 1.10, pg. 1-1.

[12]*See, e.g.*, NIST Handbook 44, § 3.30, pg. 3-3.

[13]*Cf.* (A review of Handbook 44 does not reveal any provision that applies to such issues).

[14]Although Defendants cite a few attorney general opinions in support, they are inapplicable.  The only opinion from a state involved in this case, Texas, is from 1939 and stands for the notion that under the laws of Texas in effect 68 years ago (the statute was repealed decades ago by Acts 1981, 67th Leg., p. 1487, ch. 388, § 4(1), eff. Sept. 1, 1981) you could only sell gasoline in measurements of one gallon or parts thereof divisible by two (i.e., half-gallon, quart, pint, etc.).  Two of the cases are from jurisdictions not involved in this litigation, Massachusetts and Connecticut, and involve home heating oil.  The Connecticut Attorney General opinion has to be considered in context.  In Connecticut, overall fuel temperatures are below 60° Fahrenheit and thus, temperature-adjusted retail sales would be detrimental to consumers for the same reason such sales are detrimental to consumers in Canada.  This explains the motivation for fuel retailers to seek approval of such sales in that case, and the Connecticut Attorney General's opinion to protect consumers from such sales practices.  The Attorney General of Massachusetts opinion actually supports the Plaintiffs' position in that it states at footnote 7 that fuel pricing adjustments based on temperature differentials are permissible.

Defendants' reliance on Handbook 130 fares no better.  Handbook 130 provides a set of uniform laws and regulations relating to weights and measures that is designed to achieve "standardization in weights and measures laws and regulations among the various States . . . permit fair competition  . . . and provide uniform and sufficient protection to all consumers in commercial weights and measures practices."[15]  Rather than prohibiting temperature-adjusted fuel sales, Handbook 130 specifically states:

> For the purpose of administering and giving effect to the provisions of this Act, **the specification and test method standards set forth in the most recent edition of the Annual Book of ASTM standards and supplements thereto, and revisions thereof, are adopted** except as amended or modified as required by the Director to comply with Federal and State laws.[16]

Importantly, the ASTM standards include the D1250 provision that Defendants themselves apply in making temperature adjustments in fuel sales at the wholesale level.  Thus, by adopting the ASTM standards, Handbook 130 in fact authorizes the very conduct that Defendants claim it prohibits.

Moreover, Handbook 130 confers discretion on retail fuel sellers to engage in precisely the same sales practices that Defendants claim it prohibits.  The "Interpretations and Guidelines" section of Handbook 130 specifically recognizes that the decision by a retail seller of motor fuel to charge "different prices for the same product depending upon (outside factors such as manner of payment, other purchases, etc.) is a management decision of the merchandiser."[17]  Under the plain language of Handbook 130, Defendants retain full discretion to adjust pricing methodology to account for temperature-based variations in the volume of the motor fuel they sell.  Here

---

[15]NIST Handbook 130, pg. 1, available at http://ts.nist.gov/WeightsAndMeasures/upload/06-H130-Complete-Final123.pdf.

[16] *See* Handbook 130, Section C. Uniform Engine Fuels, Petroleum Products, and Automotive Lubricants Inspection Law, Subsection 4. Administration, Adoption of Standards, and Rules, pg. 45 (2006).

[17] *Id*. at pg. 236, ¶ 2.6.4.  This fact is also recognized by the general knowledge that some retailers charge different prices in varying circumstances, such as whether the fuel purchase is with cash or credit.

again, Handbook 130 does not, as Defendants contend, prohibit a merchant from adjusting unit price based upon temperature.  To the contrary, it specifically authorizes such sales practices.[18]

Defendants assert (at 16) that Handbook 130 prohibits temperature-adjusted fuel sales because it requires Defendants "to disclose some – but by no means all – of the characteristics of motor fuel."  In Defendants' view, because Handbook 130 only requires Defendants to disclose oxygenate and antiknock ratings, Defendants are not only free, but indeed required, to sell hot fuel without adjustment for temperature and without disclosing material facts about such hot fuel to unsuspecting consumers.[19]  That contention has no merit.  Absent from Handbook 130 is any requirement related to motor fuel pricing methodology that prohibits a merchant from adjusting unit price based upon temperature.  Nothing in the plain language or purpose of the Handbooks even remotely supports Defendants' assertion.

---

[18] As Defendants correctly note at pg. 10 of their Motion, Handbook 130 provides some "Interpretations and Guidelines" that relate to retail motor fuel sales, such as the "Guideline" of displaying price per gallon on street signs and displaying the octane rating on dispensers and criteria related to retail motor fuel sales.  However, those "Interpretations and Guidelines" are as far-ranging as they are subjective, including such items as the suggested sales method for sea shells (pg. 227) and the suggested composition of "Jambalaya with Meat" (at least 25% meat on a cooked basis) (pg. 216).  Not surprisingly, the "Interpretations and Guidelines" of Handbook 130 do not appear to be incorporated by the states into law.  *Id.* at pg. 10-13 (chart noting status of individual states' adoption of Handbook 130, devoid of reference to the "Interpretations and Guidelines").  Nevertheless, to the extent relied upon by Defendants, these "Interpretations and Guidelines" actually support Plaintiffs' position.

[19] It should be a given that the general public is unaware of the effects temperature has on the value of motor fuel.  *See, e.g.,* President's Address, National Conference on Weights and Measures, July 11, 2006 ("Reliable, accurate measurements are the vital ingredients . . . **especially in transactions that lack transparency, such as the sale of fuel**.")(emphasis added).

3.       *Numerous Authorities Directly Contradict Defendants' Flawed Readings of Handbooks 44 and 130*

Plaintiffs' position regarding Handbooks 44 and 130 also finds substantial support among relevant weights-and-measures authorities.  The NCWM has acknowledged, that unless a state specifically prohibits temperature corrected retail sales, such sales are not prohibited simply by virtue of Handbooks 44 and 130.  In 2007, for example, the Report of the Laws and Regulations Committee of the NCWM,[20] which is responsible for development and modifications to Handbook 130, concluded that, "unless prohibited by state law, temperature compensation at retail dispensers is already legal in most states."[21]  NCWM has also noted the "lack of standards" and "lack of specific guidance" in Handbooks 44 and 130, and has further observed that jurisdictions have not interpreted the Handbooks as prohibiting non-wholesale temperature compensated sales.[22]

In 2007, NIST reached a similar conclusion.  That governmental office prepared and sent to the weights and measures officials in all fifty states a survey related to the current status of the law on temperature correction.[23]  The survey asked, "Is Temperature Compensation Permitted on . . . Engine Fuel Dispensers-Other (e.g., retail service stations)."[24]  In all but a handful of states

---

[20] Defendants characterize such documents from the NCWM as "legislative history" and thus, "noticeable". Memorandum at 3, fn. 4.

[21] 2007 Interim Report, pg. 4, ¶ 1, available at http://ts.nist.gov/WeightsAndMeasures/upload/10_LR_07_Pub16_FINAL.pdf.

[22] *See, e.g.*, 2000 Report of the NCWM Laws and Regulations Committee, Item 232-5, pg. 10.  Plaintiffs suggest that if discovery proceeds in this matter, it will indicate that the Maine Attorney General's Office interpreted Handbook 44 in 2000 as not prohibiting temperature compensation on non-wholesale sales (i.e., items such as vehicle-tank meters and retail service station pumps).  Consequently, the Maine legislature enacted new laws in 2001 to narrow the parameters in which temperature-adjusted sales can occur.

[23] A copy of the NIST survey is available at the website of the Automatic Temperature Compensation Committee of the NCWM, at:

http://www.ncwm.net/events/atc2007/item6_temp_comp_summary_congress.doc.

[24] *Id*. at 1.

13

the weights and measures officials[25] indicated that temperature compensated retail motor fuel sales are permitted,[26] despite the fact that these same states have adopted Handbook 44.[27]  The interpretations of state law by the very state officials who are administering those standards conclusively rebut Defendants' assertion that they are "required" to sell motor fuel to consumers without adjusting for temperature.

4.     *A Variable-Volume "Gallon" Is Not The Issue*

In addition to mischaracterizing the NCWM standards in Handbooks 44 and 130, and the legal basis on which those standards apply to the oil industry and consumers, Defendants erroneously argue that Plaintiffs seek a measurement at the retail pump that violates the definition of a "gallon" set forth in Handbook 44. Memorandum at 8.  Plaintiffs allege that Defendants should temperature adjust retail motor fuel sales just as the Defendants currently temperature-adjust non-retail motor fuel sales.  The CAC does not seek to re-define the volumetric standard for a "gallon."  Notably, Defendants' Motion virtually ignores an obvious remedy – price adjustment.  That omission is telling, because the NCWM, which wrote Handbooks 44 and 130, takes the position that such temperature-adjusted retail sales are already permitted by controlling law in the states covered by the CAC.  No conflict exists, therefore, between the relief sought by Plaintiffs and the requirement that motor fuel sales be accomplished in "gallons."  In any event, given the complete absence of controlling legal authority presented by Defendants, at most they assert a dispute of fact over whether such temperature-adjusted sales may be accomplished through existing technology.   Such factual disputes are beyond the purview of a Rule 12(b)(6) motion.

---

[25] *Id.* at 16.
[26] *Id.* at 1-15.
[27] A summary of the states who have adopted Handbook 44 is published by NIST and can be found at: http://ts.nist.gov/WeightsAndMeasures/upload/stlaw.pdf.

**B.      Plaintiffs Allege Facts Sufficient to Establish Each of the Asserted Claims**

Because Defendants are not precluded from selling motor fuel at retail on a temperature-corrected basis, the applicable laws and regulations do not insulate Defendants from liability, and Plaintiffs have adequately stated their claims.  At this stage, therefore, Plaintiffs need only to allege facts sufficient to establish each of the elements of the claims for which relief is sought. Plaintiffs easily make out this showing as to each claim asserted.

1.      *State Consumer Protection Laws*

State consumer protection statutes forbid representations that "may be accurate on some level, but will nonetheless tend to mislead or deceive . . . .  A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, *such as by failure to disclose other relevant information, is actionable under the [Unfair Competition Law].*"[28]  Those laws address unfair and deceptive business practices such as those used by Defendants to sell hot fuel.[29]  Section 17200 of the California Business and Professions Code forbids unfair

---

[28] *McKell v. Washington Mutual, Inc.* 142 Cal. App. 4th 1457, 1471 (2006) (emphasis added; citations omitted); *see also People v. Dollar Rent-A-Car Systems, Inc.,* 211 Cal. App. 3d 119 (1989) (Defendants prepared invoices for customers whose rental cars were damaged while in their possession, showing the "retail cost" for the repairs to the cars, but did not inform customers that they had paid a discounted price for parts and repairs and were charging them more than the actual cost of the repairs, which left customers with the erroneous impression that defendants were passing on the actual repair charges. The court therefore concluded that "[d]efendants' practice of charging its customers a higher 'retail repair rate' without explanation or substantiation is a deceptive business practice which falls within the protection of [the UCL]," *id.* at 129, because customers would not reasonably understand that they were being charged a sum "considerably in excess of defendants' actual repair costs," *id.* at 130).

[29] *See* Fla. Stat. § 501.201 et seq.  (Section 501.204 bars "unfair or deceptive acts or practices in the conduct of <u>any</u> trade or commerce"); 73 Pa. C.S.A. § 201-1 et seq. (Section 201-2(4)(xxi) bars "engaging in any…fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding").  *See also* Alabama Code § 8-19 et seq. (Alabama Deceptive Trade Practices Act) Arizona Rev. Stat. § 44-1521 et seq. (Arizona Consumer Fraud Act); Ark. Code Ann. § 4-88-101 et seq. (Arkansas Deceptive Trade Practices Act); California Business and Professions Code §§ 13413, 17200, 17500; O.C.G.A. § 10-1-372 (Georgia Deceptive Trade Practices Act); 5 Guam Code Ann. § 32101 et seq. (Guam Deceptive Trade Practices-Consumer Protection Act); I.C. 24-5-0.5-2 (Indiana Deceptive Consumer Sales Act); K.S.A. § 50-623 et seq. (Kansas Consumer Protection Act); K.R.S. § 367.110 et seq. (Kentucky Consumer Protection Act); LSA-R.S. § 51:1401 et seq. (Louisiana Unfair Trade Practices and Consumer Protection Law); Md. Code Ann., Com. Law § 13-101 et seq. (Maryland Consumer

competition, defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." The broad scope of consumer protection laws provides "a wide standard to guide courts of equity … given the creative nature of the scheming mind…."[30] As the disjunctive language of consumer protection used in statutes like §17200 (*e.g.*, "unlawful, unfair, *or* fraudulent") makes clear, "a practice may be deemed unfair even if not specifically proscribed by some other law."[31] In short, a practice may be "prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa."[32]

<blockquote>

a.      Defendants' Sale of Hot Fuel Violates Consumer Protection Law
by Misleading Consumers About the Content and Price of Hot Fuel

</blockquote>

Plaintiffs' allegations are plainly sufficient to state a valid claim under the above standards. Plaintiffs assert that Defendants mislead consumers by describing fuel sales in "gallons" but failing to make temperature adjustments to the amount of fuel actually delivered.[33] Selling motor fuel at a certain "price per gallon" conveys to consumers that the gallons they

---

Protection Act); R.S.Mo. § 407.010 et seq, (Missouri Merchandising Practices Act); N.R.S. Chapter 598 (Nevada Deceptive Trade Practices Act); N.J. Stat. § 56:8-1 et seq. (New Jersey Consumer Fraud Act); N.M. Code 1978 § 57-12-10 et seq. (New Mexico Consumer Protection Act); N.C. Gen. Stat. § 75-1 et seq. (North Carolina Unfair and Deceptive Trade Practices Act); Okla. Stat. tit. 15 § 753(5) and (11) (Oklahoma Consumer Protection Act); O.R.S. § 646.610 et seq. (Oregon Unfair Trade Practices Act); Tenn. Code Ann. § 47-18-101 et seq. (Tennessee Consumer Protection Act); Tex. Business and Commercial Code § 17.41 et seq. (Texas Deceptive Trade Practices – Consumer Protection Act); Utah Code tit. 13, chap. 11 (Utah Consumer Sales Practices Act); Va. Code Ann. § 59.1-196 et seq. (Virginia Consumer Protection Act of 1977).

[30] *Cel-Tech Commc'ns Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 181 (Cal. 1999).

[31] *Id.* at 180.

[32] *Id.* (citations omitted). In addition to general consumer protection statutes like Section 17200, many states also have statutes that expressly forbid unfair or misleading advertisements that fail to provide Motorists with enough information to make informed choices about fuel. *See, e.g.,* Nev. Rev. Stat. § 590.050 (unlawful to make untrue or misleading statement about performance characteristics of motor vehicle fuel); California Business and Professions Code §13413 (unlawful to make deceptive or misleading representations regarding quality or price of a petroleum product).

[33] Defendants' creation of consumer expectations by offering gasoline for sale at a certain price per gallon rebuts their claim that they have no duty to disclose the impact of hot fuel and their collection of excess taxes on hot fuel. Memorandum at 18. *See Daugherty v. American Honda Motor*, 144 Cal. App.4th 824, 838 (2006) ("'[i]n order to be deceived, members of the public must have had an expectation or an assumption about" the matter in question") (alteration in original) (citation omitted).

purchase are comparable, even though temperature causes significant variances in the quantity of fuel actually obtained.[34]  As Plaintiffs allege, it is a fundamental commercial principle that a "price per a standard unit" means that each such standard unit of the commodity will be the same quantity or amount of the good as any other, all else being equal.  CAC ¶ 27-28.  Defendants violate this principle – and mislead consumers – when they sell motor fuel that has not been adjusted for temperature and without disclosing the temperature of the fuel or the effect that temperature has on the amount of fuel actually delivered.  It is impossible for Plaintiffs to make an informed decision about where to purchase motor fuel without such information.[35]  Taken together – and accepted as true, as this Court must – these allegations plainly state valid claims for affirmative misrepresentations, actionable concealment of material information and misleading advertising.[36]

---

[34] *Hopkins v. BP Oil*, 81 F.3d 1070 (11th Cir. 1996), thus provides no comfort to Defendants.  *See* Memorandum at 14.  In *Hopkins,* the gasoline retailers understood exactly what they were receiving – "gross" gallons, not adjusted for temperature.  *Id.* at 1072 n.2.  In addition, the retailers were given invoices that both indicated the number of "gross" gallons they received and gave them the information they needed to calculate the number of temperature-compensated gallons they received.  *Id. Hopkins* has no bearing on the issues here, where Defendants sell gasoline at a certain price per gallon to consumers who have no basis to expect that the "gallon" Defendants sell varies in energy content from sale to sale.

[35] For example, Gas Station A sells 90° gas for $2.98/gallon.  Gas Station B sells 60° gas (the same fuel as Gas Station A) for $3.00/gallon.  Motorist X buys gas from A to fill up his car (20 gal. tank/25 mpg) believing he saved money $.40(.02 x 20 gallons), but will actually have to buy $.79 more gas to go the same distance.  Yet because Motorist X is not provided this information when he purchases fuel from Defendants, it is impossible for Motorist X to make accurate price, quantity or quality comparisons.  Thus, the claims here are readily distinguishable from those in *McCann v. Lucky Money, Inc.*, 129 Cal.App.4th 1282 (Cal. App. 2005) (Memorandum at 16).  There, as the court emphasized, the consumer could readily ascertain the material information, the omission of which was challenged as an unfair business practice.

[36] Plaintiffs also allege that Defendants' unfair collection of taxes violates consumer protection law. *See Latman v. Costa Cruise Lines*, 758 So.2d 699, 703 (Fla. App. 2000) ("Suppose that a company systematically overcharges its customers on sales tax. The hypothetical company pays the state the sales tax that it owes, and then keeps the overcharge for itself. We would not hesitate to say that an intentional overcharge of sales tax, which is kept by the company itself, is an unfair and deceptive trade practice and that the consumer must be repaid."). Because this aspect of Defendants' unfair trade practices is addressed elsewhere within this opposition, these claims are not discussed here.

Any factual disagreement about this claim cannot be the basis for a dismissal under Rule 12(b)(6).  Indeed, Defendants do not – and cannot – deny its key allegations that: a) hot temperature has a significant detrimental effect on motor fuel (CAC ¶¶ 22-26); b) Defendants neither disclose nor adjust for this effect in retail sales to Plaintiffs (CAC ¶¶ 60-64); and c) Defendants collect state and federal taxes from Plaintiffs on hot fuel in excess of the amounts Defendants actually pay (CAC ¶¶ 65-75).  At the very least, Plaintiffs' allegations raise questions of fact that require "consideration and weighing of evidence from both sides."[37]

> b. *The Silence of Weights and Measures Laws as to Temperature Does Not Sanction or Provide a Safe Harbor for Defendants' Deception*

Defendants also assert that Plaintiffs' consumer protection claims cannot lie because state law *requires* the sale of hot fuel without disclosure or adjustment for temperature.[38]  As previously noted, those assertions have no merit because neither the plain language nor purpose of the supposed authorities on which Defendants rely – including Handbooks 44 and 130 – prohibits temperature-adjusted sales or sanctions Defendants' concealment of material information.

Nor do such authorities provide a "safe harbor" under the doctrine of specific authorization.  Under the state consumer protection laws raised by Plaintiffs, challenged conduct is exempted from the reach of consumer protection laws only if that conduct is required by or affirmatively permitted under other statutes or regulations.  For instance, in *InMed Diagnostic Services, L.L.C. v. MedQuest Associates, Inc.,* 358 S.C. 270 (S.C. App. 2004), a case on which Defendants rely, the court emphasized that:

---

[37] *See Wilner v. Sunset Life Ins. Co.*, 78 Cal.App.4th 952, 965 (2000)  ("The test of whether a business practice is unfair 'involves an examination of that practice's impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.") (citation omitted).
[38] *See* Memorandum at 19.

> The purpose of the exemption [from the Unfair Trade Practices Act] is to insure that a business is not subjected to a lawsuit under the Act when it does something required by law, or does something that would otherwise be a violation of the Act, but which is allowed under other statutes or regulations.  It is intended to avoid conflict between laws, not to exclude from the Act's coverage every activity that is authorized or regulated by another statute or agency.  Virtually every activity is regulated to some degree.  The defendant's interpretation of the exemption would deprive consumers of a meaningful remedy in many situations.

*Id.* at 276 (internal citation omitted); *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 20 Cal. 4th 163, 183 (Cal. 1999) ("To forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct.  There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful.") [39] A safe harbor requires an express statement by the legislature that the challenged conduct is either required or permitted.  *See Krumme v. Mercury Ins. Co.,* 123 Cal. App. 4th 924 (1st App. Dist. 2004) (elaborate statutory and administrative process governing insurance ratemaking did not bar suit challenging undisclosed brokers fees); *see also, Aron v. U-Haul Co. of Calif.*, 143 Cal.App.4th 796, 804 (Cal.App. 2007) ("safe harbor found in legislation must *clearly* bar the action or permit the challenged conduct") (emphasis added).

Accordingly, the safe harbor determination requires a close examination of both the claim asserted and the allegedly conflicting statute.   Only where the claim is based on conduct actually addressed in the statute is the claim barred.  *See, e.g., Mulford v. Altria Group, Inc*., 506 F.Supp.2d 733 (D.N.M. 2007) (unfair practices claim based on advertisement of cigarettes as "lights" and "lowered tar and nicotine," without accompanying tar and nicotine content in

---

[39] Cases cited by Defendants are to the same effect:  *MacDermid v. Discover Financial Services,* 488 F.3d 721 (6th Cir. 2007) (challenge to credit card application practice barred because "expressly permitted by [state and federal statutes]"); *Chancellor v. Gateway Lincoln-Mercury, Inc.,* 502 S.E.2d 799 (Ga. App. 1998) (defendants "expressly excluded from coverage by the Act").  *LMB v. Lard Oil Co.,* 1998 U.S.Dist. LEXIS 16933 (E.D.La. 1998), may be inconsistent with this principle but even if it is, has no bearing on the issues here.  The court relied on a Louisiana statute that expressly addressed the pricing of motor fuel, though not in the transactions at issue in the case (i.e., retail sales).  Handbook 44 does not address the pricing or advertising issues Plaintiffs have raised.

milligrams of the cigarettes not preempted by FCC regulations that permit use of the terms, because FCC has not authorized use of the terms in the absence of accompanying tar and nicotine content information).

Contrary to Defendants' submission (at 16), Defendants cannot derive a "safe harbor" out of Handbook 44 or Handbook 130.  Handbook 44 regulates fuel deliveries, but says nothing about either the pricing of motor fuel or the disclosure that should be made about the effect of temperature on a gallon of fuel.[40]  Courts have rejected previous efforts by the industry to conflate similar distinctions.  *See, e.g., Grillasca v. Amerada Hess Corp.,* No. 8: 05-1736-T-17TGW, 2006 U.S. Dist. LEXIS 82814 *8-11 (M.D. Fla. Nov. 14, 2006) (federal regulations regarding disclosures to account holders regarding information relative to electronic fund transfers (EFTs) do not bar suit under Florida Deceptive and Unfair Trade Practices Act for retailers' failure to notify customers of "holds" on their account when gasoline purchase is made using EFTs).  Handbooks 44 and 130, therefore, simply cannot bear the weight Defendants place on them.

---

[40] The state statutes cited by Defendants (see Motion to Dismiss at 13) are similarly limited.  For instance, Section 83-204 of Kansas Statutes Annotated provides that all sales done by weight or measure shall be construed in terms of the weights and measures defined in the statute.  That statute simply says that a gallon is what Handbook 44 says it is: 231 cubic inches by volume. It says nothing about the pricing of fuel or about information that should be provided to consumers.

2.      *Breach of Duty of Good Faith and Fair Dealing*

a.      *Plaintiffs' Claim For Breach Of The Duty Of Good Faith And Fair Dealing Is Independent Of Plaintiffs' Consumer Fraud Claim*

Plaintiffs' good faith and fair dealing claim likewise survives Defendants' Motion because the claim is based on detailed allegations that Defendants failed to live up to their duties to deliver temperature and price adjusted fuel to consumers.  Defendants do not challenge the sufficiency of Plaintiffs' allegations in establishing that Defendants failed to observe reasonable commercial standards in their sale of motor fuel to Plaintiffs, or that Plaintiffs have fully performed their obligations in connection with those sales.

Defendants instead challenge Plaintiffs' good faith and fair dealing claim by arguing that the claim rises and falls with Plaintiffs' consumer fraud claims.[41]  *See* Memorandum at 24. ("Where conduct does not violate consumer protection laws, it cannot transgress a duty of good faith and fair dealing.").  This cannot be the basis for dismissal here.  As noted above, Plaintiffs plainly assert valid claims under state consumer protection laws.

Moreover, Plaintiffs' good faith and fair dealing claims are grounded in common law and statutorily imposed UCC duties that stand apart from duties imposed by consumer protection laws.  *See Golden v. Daiwa Corp.*, 2000 U.S. Dist. Lexis 2660 * 9, Civ. 3:96-CV-0776-L (N.D. Tex., 2000) (common law good faith and fair dealing claim exists if there is a special relationship between the parties, such as a relationship of superior knowledge or bargaining power).; UCC 1-304 ("Every contract within this Act imposes an obligation of good faith in its performance or enforcement").  These duties do not necessarily turn on findings of fraud.  *Biomet Inc. v. TACT Med. Instruments, Inc.*, 2005 U.S. Dist. Lexis 44737, *18-19, Case No. 3:01cv895 (N.D. Ind. 2005), (the "duty of good faith and fair dealing require[s] parties not to take 'opportunistic

---

[41] If Plaintiffs' Consumer fraud claims survive the Motion to Dismiss, then Defendants have produced no argument that Plaintiffs' duty of good faith and fair dealing claims should be dismissed.

advantage' of ambiguities and silences" for the purpose of depriving another party of the benefits of a contract), *aff'd sub nom. Biomet Orthopedics, Inc. v. TACT Med. Instruments, Inc.*, 454 F.3d 653 (7th Cir. 2006). Thus, Plaintiffs' good faith and fair dealing claim is to be judged on its own terms, not by reference to claims brought under state consumer protection statutes.

Nor does Defendants' argument find support in the lone case Defendants cite. In *Lockett v. Prudential Ins. Co. of America*, 870 F. Supp. 735, 740 (W.D. Tex. 1994), the court refused to reverse its earlier dismissal of the plaintiff's claims against an insurer under Texas consumer protection and insurance statutes, because the same facts that led the court to find that the insurer had not breached its duty of good faith and fair dealing in refusing to settle on the plaintiff's policy also undermined the plaintiff's statutory claims. The court's decision in *Lockett* was both fact-specific and firmly rooted in the insurance context, not in a retail sale of motor fuel. Nowhere did the court hold, as Defendants imply, that the elements of a common law claim for breach of the duty of good faith and fair dealing are identical to those required under state consumer protection and insurance laws. Thus, Defendants' entire argument for dismissing Plaintiffs' good faith and fair dealing claim is based on a single inapposite case.[42]

### 3.    *Breach of Contract*

Plaintiffs allege that Defendants violate basic contract principles by failing to live up to the consumers' bargained-for exchange. Because the market for motor fuel purports to be a fungible commodity market, and because those fungible commodities are sold in variable

---

[42] Defendants attempt to provide additional support for their Motion to Dismiss with the argument that Texas does not recognize a good faith and fair dealing claim in consumer transactions. This argument is incorrect. Texas does recognize a common law claim based good faith and fair dealing claim when "special circumstances" such as superior knowledge or superior bargaining power are present, as Plaintiffs have alleged they are in this case. *Golden v. Daiwa Corp.*, 2000 U.S. Dist. Lexis 2660 * 9, Civ. 3:96-CV-0776-L (N.D. Tex., March 2000). Texas law recognizes a UCC good faith and fair dealing claim relating to performance of a contract. *El Paso Natural Gas Co. v Minco Oil & Gas Inc.,* 8 S.W.3d 309, 313 (Tex. 1999).

quantities, a standard unit of measure is essential.[43]   That fundamental and universal precept of commercial transactions is rooted in the Uniform Commercial Code, which defines "fungible good" as "goods of which any unit, by nature or usage of trade, *is the equivalent of any other like unit* …." UCC § 1-201(b)(18) (emphasis added).[44]   By failing to provide a truly fungible commodity, Defendants breach their contract with consumers by not delivering a standardized amount of fuel in the "gallon-per-price" transaction they enter into with Plaintiffs.  For that reason, Defendants are liable under state law breach of contract principles.

          a.      *Defendants Wrongly Assert That Plaintiffs "get what they pay for"*

Defendants' main challenge to Plaintiffs' breach of contract claim is their insistence that consumers "get what they pay for" because consumer fuel transactions – as well as weights and measures laws – obligate sellers to deliver "a uniform 231-cubic-inch unit of motor fuel for each gallon … purchase[d]," even if each such "gallon" delivers variable amounts of gasoline depending upon its temperature.  Memorandum at 2.  As noted previously, however, Defendants cite no authority – whether in Handbooks 44 or 130, or elsewhere – that requires Defendants to deliver fuel on a volumetric basis without adjustment for temperature.

---

[43] *See* CAC ¶ 116 ("Trading at a specified price per standard unit of measure is indispensable to a functional market for fungible commodities sold in variable quantities.").  The CAC further makes this point at length:

> For instance, the practice enables merchants to standardize their product pricing, enabling them to deliver equal amounts of a commodity at uniform prices and to compare their own prices with those of their competitors. The practice similarly enables buyers to compare pricing of various merchants, as well as to gauge from transaction to transaction whether they are paying more, less or the same for the commodity. For these reasons, the expression of a sale of a commodity in terms of a specified price per standard unit of measure has come to mean or imply that such units are fungible (*i.e.*, freely interchangeable).

CAC ¶¶ 117-119.

[44] *See also* BLACK'S LAW DICTIONARY 675, 694(6th ed. 1990) at entries for "fungible" and for "goods" (**fungible goods**. Goods that are interchangeable with one another; goods that, by nature or trade usage, are the equivalent of any other like unit, such as coffee or grain. UCC § 1-201(b)(18)) (**fungible**, *adj.* Regarded as commercially interchangeable with other property of the same kind <corn and wheat are fungible goods, whereas land is not>. -- **fungible,** *n.*).

More fundamentally, Defendants' argument fails to address the actual terms of the sales contract at issue.  Defendants' exclusive focus on the definition of a "gallon" misses the central allegation of the CAC:  that the disputed term in the sales contracts at issue is not merely the word "gallon," but rather the "price-per-gallon."  Sellers advertise fuel at a specified price-per-gallon, and consumers manifest their assent to that price-per-gallon term by pumping fuel.  When the price of a fungible commodity is expressed in terms of a uniform unit of measure such as a "gallon," the expression of that term connotes a standard unit of the commodity, such that one unit is the equivalent of any other like unit.  (CAC ¶¶ 112-119).  This standardized measure is consistent with consumers' expectations, beliefs, and, more importantly, with the reasonable meaning of the price-per-gallon term.

Finally, Defendants cannot seriously deny that they possess the knowledge and intent that consumers will understand the price-per-gallon term to mean that "gallons" of like fuel contain equal quantities of fuel.  Defendants' aggressive competition on price in retail fuel markets is one indicator of such a state of mind.  One can also draw inferences about Defendants' knowledge and intent because the industry applies a consistent and uniform measure – the U.S. petroleum gallon – to its own wholesale transactions.  The industry's use of a standardized "gallon" is important because the "gap-filling" provisions of the UCC (*See* UCC § 2-305) permit this trade usage to give meaning to the parties' price-per-gallon term in retail fuel sales.  UCC §1-303(d) ("usage of trade ... is relevant in ascertaining the meaning of the parties' agreement, may give particular meaning to specific terms of the agreement, and may supplement or qualify the terms of the agreement"); and §1-303(c) ("A 'usage of trade' is any practice or method of dealing having such regularity of observance in a place, vocation, or trade as to justify an expectation

that it will be observed with respect to the transaction in question. The existence and scope of such a usage must be proved as facts.").

> b.      Defendants' Reliance on Hopkins Is Misplaced

Defendants' sole remaining argument takes the form of a passing citation to *Hopkins v. BP Oil, Inc.*, 81 F.3d 1070, 1074 (11th Cir. 1996), for the proposition that "courts have rejected attempts, like this one, to inject ambiguity into the meaning of the word 'gallon' in sales of motor fuel, affirming without hesitation that the term has a purely volumetric meaning." Mem. to Dismiss at 14.  As noted previously at note 35, however, *Hopkins* is wholly inapposite.

Unlike the present case, *Hopkins* did not involve a claim that the parties had agreed to deliver fungible, equivalent units, or that one party to the transaction had concealed the temperature, and thus the true energy content, of the fuel being sold.  Indeed, *Hopkins* did not involve consumer sales at all.  Rather, the parties in *Hopkins* were retail dealers involved in wholesale fuel transactions pursuant to written contracts, each of whom "testified that he understood he was receiving gross gallons of gasoline from BP, just as he had from Gulf." *Id.* at 1072.  The record further established that the invoices that memorialized each sale showed the gasoline's temperature, leaving no mystery about the number of temperature-compensated gallons delivered.  *Id.* at 1072 & n.2.  Under these circumstances, the *Hopkins* court rightly rejected the efforts by the plaintiff-retailers to import state weights and measures regulations into the plain, bargained-for terms of the contract.  It was only in this very different context – and the presence of a written contract that completely undermined the plaintiffs' claims – that the Eleventh Circuit declined to define a gallon other than that agreed to by the parties.

> 4.      *Breach of Express and Implied Warranties*

Plaintiffs allege that Defendants breached express and implied warranties by failing to make temperature adjustments when selling motor fuel to Plaintiffs.  In particular, Plaintiffs

allege that Defendants expressly warranted that they would deliver a gallon – a standard, fungible unit that would not vary in terms of price or fuel content due to variations in temperature.   Plaintiffs further allege that Defendants also made an implied warranty that they would deliver a standard, fungible gallon of motor fuel that was merchantable and of even kind, quality and quantity.

Defendants do not dispute that Plaintiffs' allegations are sufficient to establish several of the elements of their warranty claims, including: that Defendants are merchants; that Plaintiffs relied on Defendants' superior skill and knowledge to deliver the appropriate good: and that Plaintiffs' reliance on Defendants' knowledge and skill caused Plaintiffs significant injury. Defendants also concede that Article 2 of the UCC provides a common framework that unites the warranty claims involved in each of the separate transactions at issue in this case. Memorandum at 22-23.  Finally, Defendants concede (at 22-23) that they made an express or implied warranty and that this warranty meant that a gallon is a "standard," "fungible" unit of measure.

Defendants instead seek dismissal of Plaintiffs' warranty claims by raising a competing set of factual allegations that are not properly considered on a motion to dismiss.   Thus, Defendants assert (at 22) that a gallon is "a standard term that expresses volumetric dimensions only" and "says nothing…about energy content."   Defendants further contend (at 23) that they only warranted that they would provide motor fuel "priced by the 'gallon.'"   Finally, Defendants claim (at 23) that a volumetric-only conception of "gallon" is "the accepted norm" – akin to a usage of trade[45] – in the United States.   Defendants have not presented the Court with a legal

---

[45] Defendants suggest that the practice of failing to price or temperature adjust at the pump might be a "course of dealing" or "course of performance."  This cannot be the case. The way Americans have purchased gasoline "[f]or nearly a century" is neither a "course of dealing" nor "course of performance." Plaintiffs have alleged that the overwhelming majority of consumers until recently never had any idea that they were buying gasoline in non-standard gallons containing varying amounts of gasoline per gallon.

argument.   Rather, they have submitted a jumble of competing factual arguments that cannot form the basis for dismissal under Rule 12(b)(6).   *See Gonzalez*, 489 F. Supp. 2d at 1238. ("The Court accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences from those facts in favor of plaintiffs.").

Even if Defendants' competing factual claims were properly under consideration by this Court, they do not undermine Plaintiffs' warranty claims.  Simply because a practice is, in Defendants' wording, as "old as the hills" does not make it an accepted "norm."   *See Ebasco Services, Inc. v. General Electric Co.,*460 F. Supp. 163, 211 (E.D. Pa. 1978*)* (noting that the UCC explicitly rejected the argument that "custom" or "ancient" usage can supply evidence of a trade usage); UCC § 1-303 cmt. 4 ("The ancient English tests of 'custom' are abandoned [as evidence of usage of trade].").  Moreover, consumers, such as Plaintiffs, are not held to trade usages for trades in which they do not participate as members of the trade. *Wilson v. Marquette Electronics, Inc.*, 630 F.2d 575, 583 (8th Cir. 1980) (trade usage not binding on buyer who was not member of industry and who was unaware of practice); *see also* UCC §2-316 cmt. 6 (implied warranties may be modified or excluded in "common factual situations in which the circumstances surrounding the transaction are in themselves sufficient to call the buyer's attention to the fact that no implied warranties are made.").

Defendants offer a final argument (at 23):  even if they fail to provide a "standard" volumetric gallon, the UCC "contemplates" that "perfect uniformity" is not necessary to satisfy Defendants' warranty.  Here, too, Defendants' argument is fatally flawed because Defendants fail to acknowledge well-settled case law that holds that significant variations in product quantity or quality create a jury question relating to the merchantability of a product.  Clearly the

---

CAC ¶¶ 58-64. A course of performance or course of dealing explicitly requires "knowledge of the nature of the performance and opportunity for objection to it …." UCC Art. 2 §1-303(a)(2).

expansion of motor fuel by 1% for every 15 degrees Fahrenheit is not a "small" variation that is

merchantable.[46]  Were that the case, Defendants would not use temperature and price adjustment

in wholesale transactions.  *Gonzalez*, 489 F. Supp. 2d at 1247 (allegation by class of consumers

that soda drink manufactures breached an implied warranty of merchantability under the UCC

due to the probability that their drink products contain a small amount of benzene is a question

"of degree which is not properly resolved on the motion to dismiss"); *see also Sun Oil Co. of

Penn. v. M/T "Mercedes Maria"*, C.A. No. 80-4862, 1982 U.S. Dist. Lexis 17866 * 14-15

(E.D.Pa. 1982) (UCC provides "appropriate standard" for ruling that evidence of a trade usage

that held a variance of 0.5% in crude oil quantity was a significant enough variance to be used to

"give meaning to and qualif[y]" the terms of the parties' contract).

    More importantly, Defendants' contention that the UCC does not contemplate "perfect

uniformity" cannot undermine Plaintiffs' express warranty claim.  Express warranties under the

UCC are exact.  They represent the bargained for exchange between the parties.  Allegations of

implied terms, such as a usage of trade, may not be raised to contradict an express warranty and

are excluded from the case.  *See, e.g.*, *Kologel Co. v. Down in the Village, Inc.*, 539 F.Supp. 727

(S.D.N.Y. 1982) (when "usage and the express terms of a contract are in direct opposition,

'express terms control … usage of trade'").  The portion of the UCC that Defendants cite for the

---

[46] Defendants make the irrelevant assertion that an industry standard, ASTM D4814, requires the production of motor fuel that vary in energy content "by several percentage points depending on the particular fuel blend used  and on the number of other factors having nothing to do with temperature." (Memorandum at 24.)  This argument is a red-herring.  Plaintiffs' warranty claims are not based on "other factors having nothing to do with temperature."  Instead, Plaintiffs have made detailed factual allegations about the effect of temperature on sale of standard, fungible gallon of motor fuel, all else being equal at the point and time of the sale.

vague proposition that the UCC "contemplates" variances in express warranties, UCC 2-314, deals squarely with implied warranties, not express warranties.[47] (Mot. at 23.)

       5.    *Fraud/Misrepresentation*

The CAC alleges facts sufficient to establish each of the elements of fraudulent misrepresentation.[48] Plaintiffs' allegations are plainly sufficient to establish that Defendants knowingly made false or misleading representations. The CAC painstakingly details the industry's adoption of temperature-adjusted sales, both at the wholesale level in the United States and at all distribution levels, both wholesale and retail, in Canada.[49]

Plaintiffs' allegations are also plainly sufficient to establish that Defendants' representations concerned material facts. If consumers were given notice, they could compare prices by retail stations that offered temperature-adjusted sales, or take into account the absence of temperature adjustment as a basis for choosing a different gas station. Furthermore, if the fluctuation of quantity in motor fuel arising from temperature change was not a material fact, there would be no need for the industry to adopt temperature compensated sales, whether at the wholesale level, or in Canada.[50]

Rather than address any of these points head-on, Defendants (at 24) vaguely point instead to the "same reasons" articulated in response to Plaintiffs' consumer protection and breach of contract claims. Because Plaintiffs' CAC pleads facts sufficient to establish both of those other

---

[47] Defendants cited in support of the argument that the UCC "contemplates" that uniformity in an express warranty is acceptable, *Musil v. Hendrich,* 627 P.2d 367, 373-74 (Kan. Ct. App. 1981). *Musil* is an implied warranty case that involved variation in hogs bought and sold between parties who were part of the same agriculture trade. The court explicitly noted that the parties were sophisticated tradesmen who understood that the hogs might vary prior to entering into the contract. *Musil* is simply irrelevant to the instant case that involves consumers who are not part of the same trade as the Defendants—consumers who are unaware of Defendants' failure to temperature and price adjust motor fuel.
[48] *See, e.g.*, Consolidated Amended Complaint ("CAC") (Doc. No. 186), ¶¶ 22-26, 170, 191.
[49] CAC ¶¶ 19-20.
[50] Recent activities by the Defendants further demonstrate the ease and feasibility of providing notice of these material facts to consumers. CAC ¶¶ 61-64.

claims as well, Plaintiffs' fraud and misrepresentation claims cannot be dismissed on the pleadings.

>    6.    *Civil Conspiracy*

The CAC alleges that Defendants have acted together to thwart changes in the regulations and to deter the implementation of temperature compensation devices in this country, while voluntarily agreeing to the same in Canada. CAC ¶¶ 25-57.   In particular, Plaintiffs allege that Defendants conspired, both together and with third parties such as the California Petroleum Marketers Association, to exert pressure on manufacturers of automatic temperature compensation equipment and other proponents of temperature compensation at the retail level to further their unlawful course of conduct.  CAC ¶¶ 56-57.  More specific still, Plaintiffs allege that Defendants, through certain trade organizations, "advised" Gilbarco Veeder-Root – the first and only manufacturer of automatic temperature compensating retail dispensing equipment to seek and receive a Certificate of Use to sell its equipment in the United States – that they would stop doing business with Gilbarco if it refused to abandon its legitimate right to sell automatic temperature compensating retail dispensing equipment pursuant to a valid Certificate of Use issued by the State of California.  These facts are plainly sufficient to state a claim for civil conspiracy.

Defendants assert that the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. __, 127 S.Ct. 1955 (2007), necessitates that this count be dismissed. Defendants' reliance on *Twombly* is misplaced.  First, *Twombly* cannot be read as having created a new, more "heightened fact standard" under Rule 8(a) for conspiracy claims.  *Twombly*, 127 S.Ct. at 1964-1966; *see also Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007).  The Supreme Court stated that it was not abolishing the liberal pleading standard of Rule 8(a)(2) even for

conspiracy claims and was instead merely clarifying that Rule 8(a) requires allegations of facts "sufficiently suggestive" of a conspiracy that is facially "plausible." *Twombly*, 127 S.Ct. at 1965-6, n.5 and 1974 n.5; *Iqbal* 490 F.3d at 156 (citing *Twombly* at 1966 and 1974 n. 5). This plausibility standard, the Court went on to note, does "not impose a *probability* requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 127 S.Ct. at 1965. (emphasis added).

The CAC plainly meets the *Twombly* plausibility standard. Plaintiffs' factual allegations contain specific details regarding both a conspiracy to exert pressure on manufacturers of automatic temperature compensation equipment, and also a conspiracy to render ineffective a valid Certificate of Use issued by the State of California. CAC ¶ 57. By contrast, the plaintiffs in *Twombly* could point to no details of the alleged conspiracy other than parallel actions by companies that were most easily explained, in the Court's estimation, as "routine market conduct." *Id*. at 1971. Compared to the vague intimations of collusion in *Twombly*, Plaintiffs' allegations regarding the Defendants' efforts to exert pressure on certain equipment manufacturers are more than sufficient to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 127 S.Ct. at 1965. Accordingly, Plaintiffs have stated a valid claim for civil conspiracy.

### 7. *Claims for Unjust Enrichment*

The CAC also plainly alleges facts sufficient to state a claim for unjust enrichment. Indeed, the Defendants do not dispute that the CAC alleges facts that support each required element. The only remaining issue Defendants dispute is whether their conduct is inequitable. But that is a question for the ultimate trier of fact, not a question of law to be decided at this stage of the proceeding.

Rather than challenge the legal pleadings based on the facts as alleged, Defendants raise two arguments. Defendants' first argument (at 25) merely repeats their erroneous assertion that Plaintiffs' unjust enrichment claims fail because Defendants are legally prohibited from selling temperature-adjusted gallons. As explained previously, however, Handbook 44 regulates fuel deliveries and is silent about the price that Defendants can charge or the disclosures that Defendants must make regarding the effect of temperature on motor fuel. Moreover, Handbook 130 specifically adopts the ASTM standards, including D1250's provisions regarding temperature adjustment, and applies them to the retail context. Neither provision prohibits temperature adjustment and, indeed, Handbook 130 specifically allows it.

Defendants' second argument (at 25) – that Plaintiffs cannot maintain both an unjust enrichment claim and a breach-of-contract claim – fares no better. Federal Rule of Civil Procedure 8(e)(2) specifically allows a party to assert claims in the alternative, regardless of their legal consistency. *See*, *e.g.*, *Independent Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165 (3d Cir. 1997); *Haynes Trane Service Agency, Inc. v. American Standard*, 51 Fed.Appx. 786 (10th Cir. 2002) (reversing a trial court's dismissal of an alternatively-pleaded unjust enrichment claim). Defendants' argument has no merit where, as here, the case remains at the *pleading* stage.[51]

---

[51] What Defendants are attempting to invoke, is the doctrine of election of remedies, "which refers to situations where an individual pursues remedies that are legally or factually inconsistent. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 49 (1974). The doctrine of election of remedies does not apply to the assertion of inconsistent claims. The doctrine is meant to prevent double recovery based on the same wrong. *See, e.g.*, *X-It Prods, LLC v. Walter Kidde Portable Equip., Inc.*, 227 F.Supp.2d 494, 524 (E.D.Va.2002) ("The doctrine is remedial in nature and does no more than prevent double recovery."). In other words, a plaintiff may not receive **judgment** on two inconsistent claims, but must elect a remedy at the time of trial to avoid duplicative recovery. *See, e.g.*, *Weft, Inc. v. G.C. Inv. Assocs.*, 630 F.Supp. 1138, 1144 (E.D.N.C.1986) ("Although plaintiffs may not obtain a duplicative recovery, there is no requirement that they elect one remedy over another prior to final judgment."). At the *pleading* stage, however, Federal Rule of Civil Procedure 8(e)(2) has completely abolished the doctrine of election of remedies. *Olympia Hotels Corp. v. Johnson Wax Dey Corp.*, 908 F.2d 1363, 1371 (7th Cir. 1990). Thus, a

Defendants' argument also fails because it conflates the situation in this case with the well-settled rule that a claim for unjust enrichment does not lie in the presence of an express written contract.[52]  Here, by contrast, Defendants deny (at 12-15) the existence of an express contract.

Several of the defendants made the same erroneous argument in *Siegel v. Shell Oil Company*, 480 F.Supp.2d 1034 (N.D.Ill. 2007).  In *Seigel*, a group of consumers brought a putative class action against various oil companies alleging unjust enrichment, statutory consumer fraud violations, and civil conspiracy for artificially inflating price and demand for gasoline, and artificially depressing supply.  *Id.* at 1036-37.  Defendants moved to dismiss, arguing that because the gasoline purchases at issue amounted to contracts, plaintiffs could not simultaneously assert a claim for unjust enrichment.  *Id*. at 1046.  The *Siegel* court rejected the defendants' attempt to invoke the rule, holding that the purchases were "consumer sales transactions, without written agreement" and so did not amount to express written contracts.  The court further noted that the Illinois Commercial Code, which is similar to the Uniform Commercial Code adopted in nearly every state, expressly states that principles of equity, which include unjust enrichment, supplement its provisions.  *Id.* (footnote 9 citing section 1-103 of the Uniform Commercial Code).   The court denied the motion to dismiss.

---

plaintiff's assertion of these two claims at the pleading stage does not run afoul of the doctrine of election of remedies and, in fact, is specifically permitted by Fed.R.Civ.P. 8.

[52] *See, e.g., Fusion, Inc. v. Nebraska Aluminum Castings, Inc.*, 934 F.Supp. 1270, 1275 (D.Kan. 1996) (in applying Kansas law, court noted that Kansas courts, "have concluded that quantum meruit and restitution are not available theories of recovery when a valid, written contract addressing the issue exists"); *See also, Orica New Zealand Ltd. v. Searles Valley Minerals Operations, Inc.*, No. 04-2310, 2005 WL 387659, at *3 (D. Kan. Feb. 17, 2005) (*citing Fusion* in dismissing an unjust enrichment claim where the parties stipulated to the terms of a ten-page written agreement).  Moreover, courts have found that a claim for unjust enrichment can lie even in the presence of an express written contract where the terms of that contract do not address the issue in dispute.  *See, e.g., Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 516 N.E.2d 190, 193 (N.Y. App. 1987).  Thus, were this court to find that the parties' contract does not address the meaning of "gallon" – or otherwise leaves that term ambiguous – this court could, taking Plaintiffs' allegations as true, find that the contract's terms fall outside the present dispute.  Plaintiffs would thus state a valid claim for unjust enrichment.

Defendants' reliance on *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000), suffers from this same misconception.  In that case, the court held that "[w]hen the existence of or the terms of a contract are in doubt, and there is a claim for unjust enrichment, it is *incumbent on the party disputing that claim to secure findings* from the trial court that an express contract exists that covers the subject matter of the dispute." *Id.* at 685. (emphasis added).  Here, however, this Court is not making findings of fact necessary to establish the existence of a written contract, and Defendants' motion specifically denies the existence of such a contract. *Fortune* is inapposite on both counts.

8.   <u>*Tax Overpayment for "Reimbursement"*</u>

Plaintiffs' allegation of tax overpayment is straightforward.  Retailers who pay taxes at the wholesale level when they purchase motor fuel do so on the basis of gallons that have been adjusted for temperature.  When those same retailers then sell hot gas to consumers and pass along the tax on a per gallon basis, they extract a greater amount in taxes in reimbursement than they actually pay to the government.  CAC ¶¶ 67-69.  Defendants not only receive from consumers an amount per gallon equal to the federal motor fuel tax previously owed and paid to the government, but also charge consumers an additional amount per gallon under the guise of reimbursement for the cost of the federal motor fuel tax on the excess gallons.  CAC ¶¶ 70-75.

Defendants offer several arguments to dismiss Plaintiffs' claim, but none have any merit.

a.   *Plaintiffs are Not Seeking to Change the Taxing Structure of the Government*

Defendants wrongly assert that Plaintiffs seek to "impose a system of regulations that regulators and legislators have considered but decided not to implement." (at 28).  Rather, Plaintiffs challenge Defendants' practice of overcharging consumers under the guise of reimbursement for taxes paid upstream in the distribution chain.  Plaintiffs do not seek a change

34

in the federal and state system of assessment and collection of motor fuel excise taxes.  Plaintiffs

seek redress for Defendants' practice of unjustly enriching themselves by charging for

reimbursement of the motor fuel tax on a per gallon basis.

Defendants invoke *Al Sal Oil Company, Inc. v. State Bd. Of Equalization*, 232 Cal. App.

3d 969 (Cal. App. 1991), but that case is inapplicable here.  In that case, the court addressed a

dispute in the context of a state tax refund suit between a gasoline retailer and the California

Board of Equalization regarding whether the retailer was liable to the Board for the excess

gallonage tax[53] applicable to licensed distributors under California law.  *Id.* at 972.  The court

undertook an extensive analysis of the meaning of "distribute" and "redistribute" under

California law to hold that Al Sal Oil was not liable to the State for the excess gallonage tax on

its sales of straight gasoline at retail.  *Id.* at 976-988.

Defendants cite *Al Sal Oil* out of context with respect to the need of the California

Legislature to fix its own statute regarding collection of taxes from distributors.  When the court

stated "the resolution of this problem lies not with this court but with the legislature" it was

addressing the problem of whether Al Sal Oil could reap this windfall vis-à-vis the Board and not

the unjust enrichment it received from consumers.  Because California law did not require Al Sal

Oil to pay this money to the State as a tax, the court stated that the issue was best left to the

Legislature to resolve.  Here, by contrast, the injunctive and monetary remedies sought by

Plaintiffs would simply give Plaintiffs damages for Defendants' overcharging them for taxes

paid.

   b.  *Questioning the price consumers pay*

---

[53] The "excess gallonage tax" is a tax on the excess volume of gasoline created when the gasoline exceeds 60 degrees Fahrenheit and only applies if the distributor "redistributes" the gasoline, but not on the gasoline sold at retail.  *Al Sal Oil Company, Inc.* at 973-974.  In other words, California had this mechanism in place to capture the distribution of a volume of fuel in excess of the tax-paid volume at initial distribution.

Defendants also cite *In re Air Transportation Excise Tax Litigation*, 37 F. Supp.2d 1133 (D. Minn. 1999) – a case that supports Plaintiffs.  The court there addressed whether consumers could recover amounts paid to Federal Express as taxes, when at the time the consumers paid such amounts, the taxes had expired by statute.  *Id.* at 1134-1135.  After rejecting arguments that plaintiffs' claims were preempted by both the Internal Revenue Code[54] and the Airline Deregulation Act, the court addressed the consumers' claims under Minnesota law.  *Id.* at 1136-1141.[55]  The court ruled on the facts of that case that FedEx could continue to collect taxes under its written express contract from the plaintiffs once the tax had expired.  "Once the tax did expire – a matter of public record to anyone who cared – the language because mere surplusage."  *Id.* at 1142.

While Plaintiffs pay the overall stated price of the motor fuel as advertised on the Defendants' dispensing pumps, they assume that amounts charged as reimbursement for taxes are not only for legitimate taxes, but especially where the tax is still in effect (unlike *In re Air Transportation*), the amounts charged as taxes are calculated correctly.  Defendants do not have the right to operate under the guise of legitimacy and authority of the government to drive the price of motor fuel higher.  "We would not hesitate to say an intentional overcharge of sales tax, which is kept by the company itself, is an unfair and deceptive trade practice and that the consumer must be repaid.  That is so even though the consumers were willing to pay the price

---

[54] *See also Mikulski v. Centerior Energy Corporation,* 2007 WL 2372301 (6th Cir. 2007) ("The mere fact that the plaintiffs' damages are calculated in terms of overpaid income taxes does not necessitate the conclusion that the plaintiffs' claim must actually be one for a federal tax refund.")

[55] Consumers in *In re Air Transportation Litigation* also advanced equitable claims, which were dismissed by the court.  To the extent Defendants herein intend to rely on this case for opinions for which Defendants have not cited it in their Motion to Dismiss, Plaintiffs would request the opportunity to brief such issues, as none of the other rulings made by the court in *In re Air Transportation* are dispositive of the instant case.  *See, e.g., Siegel v. Shell Oil Company*, 480 F.Supp.2d 1034 (N.D.Ill. 2007).

charged…nor would it make a difference that the consumers paid no attention to the sales tax amount." *Latman v. Costa Cruise Lines*, 758 So.2d 699, 703 (Fla. Ct. App. 2000).

## VI.    **CONCLUSION**

No state laws or regulations prohibit Defendants from adjusting their prices to account for temperature variations in the fuel they sell.  Defendants' failure to disclose material facts related to the temperature effects of motor fuel is actionable on numerous grounds, given their knowledge of the effects of temperature on quantity and their excess charges for the fuel they sell.   Because the needless spending by consumers of billions of dollars per year due to non-temperature adjusted motor fuel states a range of valid legal the claims in Plaintiffs' Consolidated Amended Complaint, Defendants' Motion to Dismiss should be denied.

Respectfully submitted,

_s/ Robert A. Horn_
Robert A. Horn       KS Bar No. 70254
HORN AYLWARD & BANDY, LC
2600 Grand Boulevard, Suite 500
Kansas City, MO 64105
Telephone 816-421-0700
Facsimile 816-421-0899
rhorn@hab-law.com

_s/ Thomas V. Girardi_
Thomas V. Girardi  CA Bar No. 36603
GIRARDI AND KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017-1904
Telephone: 213-977-0211
Facsimile: 213-481-1554
tgirardi@girardikeese.com

_s/ George A. Zelcs_
George A. Zelcs   IL Bar No. 3123738
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com

LEAD COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all person registered for ECF as of that date.

_/s/ Robert A. Horn_