**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **IN RE: MOTOR FUEL TEMPERATURE** | ) | |
| **SALES PRACTICES LITIGATION** | ) | **MDL No. 1840** |
| | ) | |
| **(This Document Relates to All Cases)** | ) | **Case No. 07-MD-1840-KHV/JPO** |
| | ) | |
| _____ | ) | |

**<u>REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION TO DISMISS</u>**

December 12, 2007

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................3

I.     DEFENDANTS' RETAIL SALES PRACTICE OF DELIVERING EQUAL
VOLUMETRIC UNITS, UNADJUSTED FOR TEMPERATURE, IS
REQUIRED BY STATE WEIGHTS-AND-MEASURES LAWS. ...................................3

II.    BY OFFERING TO SELL MOTOR FUEL ON A "PRICE PER GALLON"
BASIS, A RETAILER PROMISES TO DELIVER A UNIT OF 231 CUBIC
INCHES FOR A SPECIFIED PRICE. ..............................................................................7

     A.     The Express Meaning of "Price Per Gallon" Refutes Plaintiffs' Theory. ..............8

     B.     "Price Per Gallon" Does Not Imply the Exact Energy Equivalence of All
Gallons Sold..........................................................................................................10

     C.     Defendants Have No Duty to Disclose the Information Requested by
Plaintiffs................................................................................................................12

III.    PLAINTIFFS' OTHER ARGUMENTS IN SUPPORT OF THEIR CLAIMS
ALSO FAIL. ....................................................................................................................14

     A.     Consumer Protection............................................................................................15

     B.     Contract and Warranty .........................................................................................17

     C.     Fraud/Misrepresentation.......................................................................................19

     D.     Unjust Enrichment ...............................................................................................19

     E.     Breach of Good Faith and Fair Dealing ..............................................................20

     F.     Civil Conspiracy ..................................................................................................22

     G.     Tax ........................................................................................................................22

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*America's Favorite Chicken Co. v. Cajun Enterprises, Inc.*, 130 F.3d 180 (5th Cir. 1997) ........ 20

*Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ................................................. 22

*Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361 (S.D. Fla. 2007)........................... 20

*Briehl v. Gen. Motors Corp.*, 172 F.3d 623 (8th Cir. 1999) ........................................... 11

*Burger King Corp. v. Weaver*, 169 F.3d 1310 (11th Cir. 1999) ..................................... 21

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604 (3d Cir. 1995) .......................... 21

*Ebasco Servs., Inc. v. Gen. Elec. Co.*, 460 F. Supp. 163 (E.D. Pa. 1978) ............................. 18

*Forest Park II v. Hadley*, 336 F.3d 724 (8th Cir. 2003) ............................................... 4

*Gonzales v. Pepsico, Inc.*, 489 F. Supp. 2d 1233 (D. Kan. 2007) ........................................ 4, 11

*Grillasca v. Amerada Hess Corp.*, No. 8: 05-1736-T-17TGW, 2006 U.S. Dist. LEXIS 82814
(M.D. Fla. Nov. 14, 2006) ......................................................................... 16

*Gurley Oil Co. v. Miss. Tax Comm'n*, 421 U.S. 200 (1975)........................................... 23

*Hopkins v. BP Oil*, 81 F.3d 1070 (11th Cir. 1996) ..................................................... 9

*Hotchkiss v. Nat'l City Bank*, 200 F. 287 (S.D.N.Y. 1911) ............................................. 17

*In re Air Transportation*, 37 F. Supp. 2d 1133 (D. Minn. 2005)....................................... 24

*In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ............................. 14

*In re Mex. Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001)....................................... 24

*Iron Mountain Security Storage Corp. v. Am. Specialty Foods, Inc.*, 457 F. Supp. 1158 (E.D. Pa.
1978) ............................................................................................ 21

*LMB, Inc. v. Lard Oil Co.*, No. Civ.A. 97-3817, 1998 WL 777825 (E.D. La. Oct. 22, 1998)..... 13

*MacDermid v. Discover Fin. Servs.*, 488 F.3d 721 (6th Cir. 2007)...................................... 16

*Midwest Grain Prods., Inc. v. EnviroFuels Mktg., Inc.*, 948 F. Supp. 976 (D. Kan. 1996) ......... 20

*Miranda Alvarado v. Gonzales*, 449 F.3d 915 (9th Cir. 2006)......................................... 4

*Ritchie Enters. v. Honeywell Bull, Inc.*, 730 F. Supp. 1041 (D. Kan. 1990) ............................. 21

*Schoonover v. West Am. Ins. Co.*, 665 F. Supp. 511 (S.D. Miss. 1987) ................................. 21

*Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034 (N.D. Ill. 2007)........................................ 20

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ....................................................... 4

*Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91 (3d Cir. 1991)................................ 11

*Wilson v. Marquette Elecs., Inc.*, 630 F.2d 575 (8th Cir. 1980) ...................................... 19

## STATE CASES

*Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796 (Cal. Ct. App. 2006)...................................... 13

*Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (Cal. Ct. App. 2006)........................ 12

*Cel-Tech Commc'ns Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527 (Cal. 1999)............................. 13

*Chancellor v. Gateway Lincoln-Mercury, Inc.*, 502 S.E.2d 799 (Ga. Ct. App. 1998) ................ 15

*Country Corner Food & Drug, Inc. v. First State Bank & Trust Co.*, 966 S.W.2d 894 (Ark. 1998) ................................................................................................................................................................ 21

*Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824 (Cal. Ct. App. 2006) ............. 12

*E.L.G. Enters. Corp. v. Gulf Oil Co.*, No. 79-13756, 2001 WL 35923652 (Pa. Ct. Com. Pl. Jun. 4, 2001) .................................................................................................................................................... 14

*El Paso Natural Gas Co. v. Minco Oil & Gas Inc.*, 8 S.W.3d 309 (Tex. 1999).......................... 21

*Ennes v. H & R Block E. Tax Servs., Inc.*, No. 3:01CV-447-H, 2002 WL 226345 (W.D. Ky. Jan. 11, 2002) .................................................................................................................................................. 21

*Formosa Plastics v. Presidio Eng'rs and Contractors*, 960 S.W.2d 41 (Tex. 1998).................. 21

*Freeman & Mills, Inc. v. Belcher Oil Co.*, 900 P.2d 669 (Cal. 1995) ........................................... 21

*Gov't St. Lumber Co. v. AmSouth Bank, N.A.*, 553 So.2d 68 (Ala. 1989) .................................... 21

*Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 259 Kan. 166, 910 P.2d 839 (1996)...... 19

*Heaven v. Rite Aid Corp.*, No. 0596, 2000 WL 33711049 (Pa. Ct. Com. Pl. Oct. 27, 2000)....... 23

*Krumme v. Mercury Ins. Co.*, 123 Cal. App. 4th 924 (Cal. Ct. App. 2004) .................................. 13

*Latman v. Costa Cruise Lines*, 758 So.2d 699 (Fla. Ct. App. 2000) ............................................. 23

*Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723 (Cal. Ct. App. 2000) ........................................ 19

*Martin Oil Serv., Inc. v. Dep't of Revenue*, 273 N.E.2d 823 (Ill. 1971) ....................................... 23

*McCann v. Lucky Money, Inc.*, 129 Cal. App. 4th 1382 (Cal. Ct. App. 2005)............................. 14

*McKell v. Wash. Mut. Inc.,* 142 Cal. App. 4th 1457 (Cal. Ct. App. 2006) .................................... 12

*Mount Vernon Props., LLC v. Branch Banking & Trust Co.*, 907 A.2d 373 (Md. Ct. Spec. App. 2006) ....................................................................................................................................................... 20

*People v. Dollar Rent-A-Car Sys., Inc.*, 211 Cal. App. 3d 119 (Cal. Ct. App. 1989).................. 12

*Rodgers v. Tecumseh Bank*, 756 P.2d 1223 (Okla. 1988).............................................................. 21

## RULES

FED. R. CIV. P. 8 ........................................................................................................................................ 22

## OTHER AUTHORITIES

2 THE LAW OF TORTS § 453 ...................................................................................................................... 22

23 RICHARD A. LORD, WILLISTON ON CONTRACTS (4th ed. 2002) ................................................... 23

66 AM. JUR. 2D *Restitution and Implied Contracts* § 24 .............................................. 21

Handbook 130, *Uniform Laws and Regulations in the Area of Legal Metrology and Engine Fuel Quality* (2006)........................................................................................... 3, 5, 11

Handbook 44, *Specifications, Tolerances, and Other Technical Requirements for Weighing and Measuring Devices* (2007) ............................................................... passim

UCC § 1-303 ................................................................................................ 18, 19

UCC § 1-304 ....................................................................................................... 23

UCC § 2-314 ....................................................................................................... 10

## INTRODUCTION

The original complaints in these consolidated cases accuse the defendants of wrongfully refusing to install devices that would automatically change the volume of each unit dispensed to account for motor fuel temperature variations.  Such devices, the complaints assert, are needed because a gallon is not a "standard unit of measure" unless it is corrected for temperature.  In their Memorandum in Support of Joint Motion to Dismiss ("Mem."), defendants demonstrated conclusively that the weights-and-measures laws of every state at issue require retailers to dispense motor fuel in fixed volumetric units without regard to temperature.  Plaintiffs now concede this point, acknowledging that "Handbook 44 requires fuel to be *delivered* in gallons" and that a "'gallon' has long been defined as a liquid measured at 231 cubic inches."  Joint Response in Opposition to Defendants' Joint Motion to Dismiss ("Resp.") at 1, 10 (emphasis in original).

In an effort to salvage their case, plaintiffs shift direction and argue for an alternative "remedy."  *Id.* at 14.  According to plaintiffs, retailers need not "violate[] the definition of a 'gallon' set forth in Handbook 44" to compensate for temperature.  *Id.*  Rather, plaintiffs argue, retailers can adjust for temperature by varying their *prices*.  *Id.*  But plaintiffs are no more entitled to price adjustments than to variable-volume gallons.  Defendants' retail sales practices entail no legal wrong that needs to be remedied – whether by changing the size of the gallons dispensed or by adjusting the price charged for those gallons.

Far from involving any wrongdoing, defendants' practices comply with the state-law requirement that motor fuel be dispensed in equal volumetric units of 231 cubic inches.  Even apart from that legal requirement, plaintiffs have failed to state any claim because defendants do not deceive consumers or breach contractual and warranty obligations when they deliver equal

volumetric units at the retail dispenser in accordance with the plain and statutorily prescribed meaning of "gallon" at the price specified on the dispenser. *See* Mem. at 12-15.

Plaintiffs' primary response is that, by advertising motor fuel at a "price per gallon," defendants offer to deliver something different from the volumetric definition of a "gallon." Resp. at 1, 17, 24. But the meaning of the word "gallon" does not somehow change when used in connection with a specified price. Consistent with Handbook 44 and with statutory, judicial, and dictionary definitions of "gallon," defendants offer to sell motor fuel at the retail level in equal volumetric units of 231 cubic inches, not in pounds, BTUs, or "hydrocarbon molecules," as plaintiffs variously suggest.

Plaintiffs' disclosure arguments fare no better. Because defendants deliver gallons in accordance with the plain and statutory meaning of that unit of measure, they have no duty to disclose information beyond what is required by the regulators. Simply put, because there is nothing deceptive in what defendants do or say, plaintiffs' demand that defendants do or say something different fails to state a claim.

Plaintiffs recognize that the purely volumetric measurement system at the retail level has been in effect "since the advent of the Automobile Age" (Resp. at 1) and concede that it complies with the legislative judgments embodied in state weights-and-measures laws. Plaintiffs nevertheless make the unprecedented claim that this long-standing and heavily regulated system is illegal because it does not adequately account for temperature variations. This same complaint has already been made by some to the National Conference of Weights and Measures ("NCWM"). But the regulators who oversee retail motor fuel sales have repeatedly declined to amend the existing system of weights and measures to permit or require adjustment of the size of the units dispensed to compensate for temperature variations. Through this lawsuit, plaintiffs

attempt to make an end run around this legislative process by asking this Court to find that the

measurement system specified by the NCWM and required by law for decades in every state at

issue here somehow constitutes a fraud on consumers.  Plaintiffs' effort to circumvent the

NCWM and legislative processes should be rejected.

**ARGUMENT**

I.     **DEFENDANTS' RETAIL SALES PRACTICE OF DELIVERING EQUAL
       VOLUMETRIC UNITS, UNADJUSTED FOR TEMPERATURE, IS REQUIRED
       BY STATE WEIGHTS-AND-MEASURES LAWS.**

Defendants are required by state law to sell motor fuel by a standard gallon unit, which

has a fixed volumetric definition (231 cubic inches) that is independent of temperature.  *See*

Mem. at 4, 8-10.  Plaintiffs make only a perfunctory effort to refute that showing.  For example,

rather than addressing whether Handbook 44 requires the dispensing of purely volumetric units

at retail, plaintiffs rebut an argument that defendants did not make – *i.e.*, that a different NCWM

handbook, Handbook 130, prohibits dispensing temperature-adjusted gallons.  Resp. at 10-12.  In

another *non sequitur*, plaintiffs challenge the proposition that all states have adopted Handbook

44 by citing states that have declined to adopt portions of Handbook 130.  *See* Resp. at 9 n.10.

Plaintiffs bury in a footnote:  (a) the legal opinion of the Texas attorney general

illustrating that state weights-and-measures laws are enforced strictly and literally, and (b) the

legal opinions of the Connecticut and Massachusetts attorneys general ruling that Handbook 44

prohibits the sale of temperature-adjusted gallons of home heating oil.  *Id.* at 10 n.14.  Plaintiffs

seek to dismiss the Texas opinion based solely on its age and the Connecticut and Massachusetts

opinions based solely on their being from cold-weather states.  Plaintiffs, however, say not a

word about the substance of the opinions, apparently unable to refute the analyses and legal principles on which they rest.[1]

Notwithstanding the terms of Handbook 44 and the attorney general opinions, plaintiffs suggest that temperature compensation is already permitted based on the results of a recent informal survey and a statement by the authors of an NCWM committee's Interim Report.  Resp. at 13-14.[2]  These materials are not official administrative interpretations by either state weights-and-measures agencies or the NCWM and reflect none of the thorough consideration, careful reasoning, or other indicia of reliability that might "give [them] power to persuade."  *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see Miranda Alvarado v. Gonzales*, 449 F.3d 915, 924 n.6 (9th Cir. 2006) (no deference given to immigration judge decision because it failed to exhibit the requisite "thoroughness" of consideration and to sufficiently explain "the validity of its reasoning") (quoting *Skidmore*, 323 U.S. at 140); *Forest Park II v. Hadley*, 336 F.3d 724, 732 n.6 (8th Cir. 2003) (deference inappropriate for ruling that was not the product of agency rulemaking procedures).

Neither the survey responses nor the Interim Report explains how temperature-adjusted retail sales can be reconciled with the current requirements of Handbook 44.  Furthermore, the survey responses are inconsistent, with several states, including states at issue in this litigation, acknowledging that retail temperature compensation is not permitted.  *See, e.g.*, States Survey on

---

[1] Plaintiffs note that footnote 7 of the Massachusetts opinion "supports [their] position" that "fuel pricing adjustments based on temperature differentials are permissible."  Resp. at 10 n.14.  But the purported *permissibility* of varying prices is not the issue.  Even if it were true that retailers could adjust their prices based on temperature variations, nothing in the law requires them to do so.  *See infra*, Parts II-III.

[2] Defendants object on hearsay grounds to plaintiffs' reliance on the survey responses.

ATC, at 3 (Indiana), 12-13 (Tennessee), 13 (Virginia).[3]  And the authors of the Interim Report are members of the Committee that is "responsible for . . . Handbook 130" (Resp. at 13), but it is Handbook 44, not Handbook 130, that prescribes the delivery of fixed volumetric units unadjusted for temperature.  The Interim Report authors are not authoritative sources on the proper interpretation of Handbook 44.  Finally, plaintiffs do not explain why, if retail temperature compensation is already allowed, the NCWM wasted three days this past July conducting proceedings in which they debated the issue, voted against the adoption of provisions permitting automatic temperature compensation at retail, and decided, instead, to convene a committee of experts to study the issue further.  *See* Mem. at 6-7.

In the end, plaintiffs do not seriously dispute that motor fuel must be sold in fixed volumetric units.  They concede, as they must, that retailers are required to deliver motor fuel to their customers in gallons (Resp. at 10), and that "gallon" is defined to mean a volume of 231 cubic inches.  Resp. at 1, 2, 14, 20 n.40.  In light of that concession, plaintiffs retreat to an alternative argument, repeatedly asserting that nothing in the weights-and-measures laws prohibits or precludes price adjustments to compensate for fuel that is warmer than 60° F.  *See* Resp. at 2, 9, 10, 11, 12, 14, 20.  Plaintiffs never explain what they mean by a "price adjustment" or how such adjustments could be accomplished without confusing consumers.  But, even putting aside those issues, plaintiffs' assertion that adjusting prices would be a permissible "remedy" in no way establishes a basis for imposing liability.  Resp. at 14.

As a threshold matter, plaintiffs' price-adjustment alternative represents an abandonment of the basic theory of the original lawsuits.  The initially filed case in this multi-district litigation

---

[3] Available at
http://www.ncwm.net/events/atc2007/item6_temp_comp_summary_congress.doc

focused on the alleged lack of definition of the term "gallon" in retail motor fuel sales and claimed that selling fuel without "volume adjustment" violates consumer protection laws. *See* Am. Compl. ¶¶ 139, 145, 153, 160, 169, 177, 182, 196, 207, 214, 219, 226, 233, 243, *Rushing v. Alon USA, Inc.*, No. 06-7621 (N.D. Cal. Mar. 4, 2007). Plaintiffs there sought damages only "incidental" to their equitable remedy: mandatory installation of volume-adjustment devices. *Id.* In the consolidated amended complaint, the core allegations continue to focus on the meaning of "gallon" and defendants' failure to use volume-adjusting devices. *See, e.g.*, Compl. ¶ 28 ("Defendants continue to use the non-standard non-temperature-compensated definition of a 'gallon' in their measurement of the motor fuel delivered at the retail level."), ¶ 198 (the Court should "require [that] Defendants . . . install temperature correcting equipment on the retail motor fuel dispensing devices" and declare that "selling motor fuel in nonstandard gallons or at temperatures above 60 degrees Fahrenheit without temperature adjustment violates" state consumer protection laws).

In any event, plaintiffs' new price-adjustment remedy is insufficient to establish defendants' liability because plaintiffs must first show that they are *entitled* to receive motor fuel at prices standardized around some particular temperature. Plaintiffs have made no such showing of entitlement to prices standardized at 60° F, a temperature that they repeatedly invoke. *See, e.g.*, Resp. at 2 ("[T]he American consumer sustains a real and detrimental harm with every purchase of fuel at a temperature in excess of 60 degrees F."). This alleged benchmark has never been part of any of defendants' representations to consumers (*i.e.*, defendants never promised to cool or heat the fuel to maintain that temperature); plaintiffs themselves allege that consumers had no awareness of the 60-degree standard, *see, e.g.*, Compl. ¶ 164(d); no statute or regulation has ever applied this standard to retail sales of motor fuel; and defendants' alleged "trade usage"

of this standard at wholesale is irrelevant because "trade usage or practice" is germane "only when both parties are engaged in the same trade," Mem. at 15 (citing cases).  Plaintiffs cannot claim that consumers have any entitlement to an industry standard that has no legal application to retail sales, that they have never used, that they were never promised, and of which they were unaware.

More broadly, plaintiffs have not shown that they are entitled to price adjustment around *any* temperature because their argument at most shows that defendants are *permitted* to change their prices.  The question here, however, is whether a price adjustment is *required*.  Plaintiffs concede that there is "aggressive competition on price in retail fuel markets" and that competition sets the price for each gallon of fuel.  Resp. at 24.  Thus, in order to state a claim based on this pricing theory, plaintiffs would need to identify some legal duty that defendants have violated.  But plaintiffs have failed to plead facts that would support a finding that any such duty exists or violation has occurred, and therefore no price adjustment (or, for that matter, volume adjustment) can be required.

II.   **BY OFFERING TO SELL MOTOR FUEL ON A "PRICE PER GALLON" BASIS, A RETAILER PROMISES TO DELIVER A UNIT OF 231 CUBIC INCHES FOR A SPECIFIED PRICE.**

The linchpin of plaintiffs' various theories is their "central allegation" that "the disputed term" at issue in retail motor fuel sales "is not merely the word 'gallon,' but rather the 'price-per-gallon.'"[4]  Resp. at 24.  According to plaintiffs, that phrase does not simply mean that "for a

---

[4] At certain points, plaintiffs appear to assume that defendants' primary (and almost exclusive) defense is the legally mandated nature of volumetric motor fuel dispensing at the retail level under Handbook 44.  *See, e.g.*, Resp. at 23 (stating that defendants' "main challenge" to the complaint's contract claims is that "consumers 'get what they pay for' because consumer fuel transactions – as well as weights and measures laws – obligate sellers to deliver 'a uniform 231-cubic-inch gallon'").  Plaintiffs' characterization of defendants' position is too narrow.  In fact, defendants have articulated an independent set of arguments based on the plain and

7

specific amount of money, a consumer gets a gallon of gas"; it also means that each gallon sold "has the same amount of fuel [*i.e.*, an equal amount of energy] as any other like gallon of fuel sold to other consumers in other locations." Resp. at 3. From this premise, plaintiffs reason that defendants "misled" consumers by giving them gallons of motor fuel whose energy content varies with temperature, and that, as a consequence, defendants had a duty to disclose to consumers the effects of temperature on motor fuel. *Id.* But the phrase "price per gallon" does not explicitly or implicitly represent to consumers that every gallon sold will have exactly the same energy content. Because plaintiffs' "central allegation" has no merit, all of their claims that rely on it – including consumer protection, contract and warranty, unjust enrichment, breach of duty of good faith and fair dealing, conversion, money had and received, and civil conspiracy, as well as their tax-related claims – fail as a matter of law.

**A.  The Express Meaning of "Price Per Gallon" Refutes Plaintiffs' Theory.**

The phrase "price per gallon" has only one meaning:  an exact price for a specific volume of liquid.  It does not expressly represent that every unit being sold will be identical in mass or energy content.  Plaintiffs' attempt to assert otherwise contradicts their concession that "a 'gallon' has long been defined as a liquid measured at 231 cubic inches." Resp. at 1.

State laws, judicial decisions, and plain meaning all support a definition of "gallon" that denotes a purely volumetric unit.  *See* Mem. at 12-14; *see also* Resp. at 20 n.40 (conceding that the state laws cited by defendants, Mem. at 13, "simply say[] that a gallon is what Handbook 44

---

statutorily prescribed meaning of the terms of the bargain struck at the retail dispenser. *See* Mem. at 12-19. Defendants' compliance with the terms of that bargain rebuts plaintiffs' claims quite apart from whether state weights-and-measures laws prohibit defendants from dispensing temperature-adjusted units.

says it is:  231 cubic inches by volume").[5]  Given this concession, plaintiffs' "price per gallon

principle" boils down to the following claim:  although the word "gallon" refers to a purely

volumetric unit of 231 cubic inches, the phrase "price per gallon" somehow transforms this fixed

unit into a temperature-adjusted unit that may or may not be 231 cubic inches.

Plaintiffs cite no authority or precedent for this self-contradictory argument.  Nor could

they.  Their attempt to separate "gallon" and "price per gallon" ignores the inextricable linkage

of those terms.  "Price per gallon" expresses an equivalent exchange of a "price" for a "gallon."

That is, when consumers see an offer for, say, "$3 per gallon," they reasonably can expect that, if

they pay $3, they will receive a "gallon," *i.e.*, 231 cubic inches; and, equivalently, if they pump a

"gallon," *i.e.*, 231 cubic inches, they will pay $3.  Under plaintiffs' theory, however, consumers

who pay $3 will receive an amount of motor fuel that may be more or less than 231 cubic inches,

and those who pump 231 cubic inches may pay more or less than $3, depending on the

temperature of the fuel.  This result is inconsistent with the plain meaning of retailers' promise of

an equivalent exchange.[6]

---

[5] Plaintiffs attempt to distinguish *Hopkins v. BP Oil*, 81 F.3d 1070 (11th Cir. 1996) (*per curiam*), but they do so by citing various facts that had no bearing on the proposition for which defendants cited *Hopkins*.  *See* Resp. at 17 n.34.  In that case, the plaintiffs alleged that the word "gallon" in the parties' contract was ambiguous and that a jury should have decided its meaning. 81 F.3d at 1074.  The court rejected this argument, holding that the word "gallon" "is not ambiguous.  'Gallon' refers to a gross gallon of gasoline [*i.e.*, 231 cubic inches]."  *Id.*  In reaching this conclusion, the court relied solely on the plain meaning of the word "gallon," not on the facts that plaintiffs invoke here.

[6] One implication of this analysis is that retailers could not automatically adjust the price of a volumetric gallon of fuel according to the fuel's temperature, such as through a device analogous to the volume-adjusting devices allegedly used in Canada.  Because (as plaintiffs allege) temperature fluctuates, such adjustment would result in consumers being charged higher or lower prices than the advertised price that they were promised for a fixed, 231-cubic-inch gallon.  Besides violating the plain terms of the retail bargain, automatic price adjustment also would run afoul of Handbook 44's strict regulation of price displays at the retail pump.  *See, e.g.,* Handbook 44, *Specifications, Tolerances, and Other Technical Requirements for Weighing and*

Plaintiffs' theory also fails to explain how consumers can make sense of the "price per gallon" and "total gallons dispensed" figures that they receive at the retail pump. According to plaintiffs, these figures use the word "gallon" in two different ways: "price per gallon" refers to the "price per temperature-compensated gallon," while "total gallons dispensed" refers to "volumetric-only gallons." This argument should be rejected. The word gallon has the same meaning whether used alone or in the phrase "price per gallon" because this common meaning "equates the dispensing unit with the pricing unit, thereby enhancing consumers' ability to calculate the total price." Mem. at 10.

### B.      "Price Per Gallon" Does Not Imply the Exact Energy Equivalence of All Gallons Sold.

Plaintiffs' "implied" representation arguments fail for the same reasons. A seller does not implicitly promise exact energy equivalence by selling motor fuel for a unit price. Mem. at 22-24. Under UCC § 2-314, sale by unit price implicitly represents only that the goods sold are of "fair average quality *within the description*," such that they "[p]ass without objection in the trade *under the contract description*." Mem. at 23 (quoting UCC § 2-314) (emphasis added).

The "contract description" here is for a gallon of motor fuel at a specified price. Plaintiffs do not deny that retailers deliver "gallons" (*i.e.*, 231-cubic-inch units) at the "price" specified on the dispenser. Nor do they contest that the "motor fuel" so dispensed complies with all applicable rules and standards, including the fuel quality standard of ASTM D 4814, and is thus deemed merchantable by state regulators. *See* Uniform Engine Fuels, Petroleum Products, and Automotive Lubricants Regulation §§ 1.5, 1.15, 1.23, 1.45, *in* Handbook 130, *Uniform Laws*

_____

*Measuring Devices* § 3.30, S.1.6.4.1(a) (2007) (requiring that fuel dispensing device "display on each face the unit price at which the device is set to compute or dispense"), *available at* http://ts.nist.gov/WeightsAndMeasures/h44-07.cfm; *id.* at S.1.6.4.1(b) (requiring the display of unit price "prior to the delivery of the product"); *id.* at S.1.6.5.4 (precluding any change to the unit price of fuel "during the delivery of the product").

*and Regulations in the Area of Legal Metrology and Engine Fuel Quality* (2006)[7] (noting that motor fuel that meets the fuel quality specifications of § 2 is "suitable for use"); *see also Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 107 (3d Cir. 1991) (denying implied warranty claim because, *inter alia*, the goods in question "were built to industry-standard specifications"). Because retailers accurately measure each gallon dispensed, and because the motor fuel dispensed meets comprehensive regulatory standards, retailers satisfy their promise to deliver 231 cubic inches of motor fuel that is suitable for its intended use.

Plaintiffs argue erroneously that this Court's decision in *Gonzales v. Pepsico, Inc.*, 489 F. Supp. 2d 1233 (D. Kan. 2007), stands for the proposition that merchantability is always a jury question. But plaintiffs overlook the fact that the Court let the claim in *Gonzales* go forward only after it had made a threshold determination that the presence of benzene in a beverage was "a cognizable defect" as a *legal* matter. *Compare id.* at 1247, *with Briehl v. Gen. Motors Corp.*, 172 F.3d 623, 628 (8th Cir. 1999) (12(b)(6) dismissal was proper because plaintiffs "failed to allege any manifest defect"). In *Gonzales*, the plaintiffs' complaint could rely on the Food and Drug Administration's regulatory determination that high concentrations of benzene caused cancer and other illnesses. 489 F. Supp. 2d at 1238. Here, by contrast, plaintiffs have not alleged a "cognizable defect." Unlike in *Gonzales*, regulators have expressly *approved* of retail motor fuel sales that do not take temperature into account, notwithstanding their recognition that fuel temperature fluctuations will occur and that those fluctuations will affect the energy content of a gallon. *See* Mem. at 8-10.

---

[7] Available at http://ts.nist.gov/WeightsAndMeasures/h130-06.cfm.

### C.   Defendants Have No Duty to Disclose the Information Requested by Plaintiffs.

The energy content of motor fuel may vary due to a large number of factors aside from temperature. Mem. at 16. Despite comprehensive regulation, retailers have never been required to disclose every factor that might influence energy content because the law does not impose limitless disclosure obligations. Rather, in order for plaintiffs to state a claim based on nondisclosure, they must first identify a duty to disclose. *See Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 838 (Cal. Ct. App. 2006) ("We cannot agree that a failure to disclose a fact one has no affirmative duty to disclose is 'likely to deceive' anyone within the meaning of the UCL."). Plaintiffs have failed to do so here. [8]

Plaintiffs base their failure-to-disclose claim on their view that consumers are misled by the offer of motor fuel at a "price per gallon," and that retailers have a duty to correct that misimpression. *See* Resp. at 16 n.33 (arguing that retailers create "consumer expectations [of uniform energy content] by offering gasoline for sale at a certain price per gallon"). But, as explained above, "price per gallon" sales do not express or imply strict uniformity of energy content. As a result, such sales do not "mislead" consumers as plaintiffs claim, and retailers therefore have no resulting duty to "disclos[e] the temperature of the fuel or the effect temperature has on the amount of fuel actually delivered." Resp. at 17; *see Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255, 1275 (Cal. Ct. App. 2006) ("In order to be deceived [by a nondisclosure], members of the public must have had an expectation or an assumption about" the product.).

---

[8] Plaintiffs' inability to establish an affirmative misrepresentation distinguishes this case from *People v. Dollar Rent-A-Car Sys., Inc.*, 211 Cal. App. 3d 119 (Cal. Ct. App. 1989), and *McKell v. Wash. Mut. Inc.,* 142 Cal. App. 4th 1457 (Cal. Ct. App. 2006), two consumer protection cases that both involved express misrepresentations. *See* Resp. at 15 n.28.

Plaintiffs suggest no other basis for retailers' duty to disclose.  Indeed, plaintiffs do not respond to defendants' argument that "the pervasive regulatory scheme governing retail motor fuel sales and related disclosures . . . requires retailers to disclose some – but by no means all – of the characteristics of motor fuel" and thus completely defines defendants' disclosure obligations.  Mem. at 16.  Retailers' compliance with mandatory state and federal regulations inevitably results in motor fuel whose energy content "varies widely from batch to batch and station to station."  Mem. at 16-17 (quoting EPA report).  Despite regulators' knowledge of – and, indeed, responsibility for – these variations, they have required disclosure of only a limited number of facts, such as the anti-knock index and the oxygenate content, even though many factors can affect energy content.  *Id.* at 17.  Disclosure of information relating to the effect of temperature on motor fuel has never been required, even though, as plaintiffs acknowledge, regulators have long been aware of that effect.  Compl. ¶ 49.[9]

This legislative and regulatory judgment provides a further defense to plaintiffs' claim that defendants faced a duty to disclose under the common law or consumer protection statutes.  A number of courts have recognized such a defense.  For example, in a factually similar case, *LMB, Inc. v. Lard Oil Co.*, No. Civ.A. 97-3817, 1998 WL 777825 (E.D. La. Oct. 22, 1998), a gas station owner sued a motor fuel wholesaler for unfair trade practices, fraud, and breach of

---

[9] In fact, state regulators and legislatures have long declined to adopt *any* of the remedies that plaintiffs demand, despite repeatedly and specifically considering those remedies.  Mem. at 5-7.  Thus, this is not a case where the regulatory and statutory scheme simply fails to address the practice at issue.  *Compare Cel-Tech Commc'ns Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544-45 (Cal. 1999) (noting that there is no specific authorization for an activity "if the Legislature did not consider that activity in those circumstances"); *Aron v. U-Haul Co. of Cal.*, 143 Cal. App. 4th 796, 803-04 (Cal. Ct. App. 2006) (finding no specific authorization because complaint addressed truck rentals but statute applied only to passenger vehicles); *Krumme v. Mercury Ins. Co.*, 123 Cal. App. 4th 924, 941 (Cal. Ct. App. 2004) (finding no specific authorization because statute did not address the conduct complained of).

contract.  The station owner alleged that the wholesaler had failed to disclose that it was billing on a volumetric rather than temperature-compensated basis.  *Id.* at *1.  The court dismissed the claim, finding that the wholesaler's practice was "not unlawful" under state laws and regulations, and that accordingly the plaintiff's "other claims likewise must fail" because "failure to disclose a perfectly legitimate business practice" cannot be a basis for consumer fraud or breach of contract.  *Id.* at *4.  Similarly, in *McCann v. Lucky Money, Inc.*, 129 Cal. App. 4th 1382 (Cal. Ct. App. 2005), the plaintiffs complained that the defendants, who conducted foreign currency exchanges, had violated California's consumer protection laws by failing to disclose the wholesale rate at which they purchased foreign currency.  *Id.* at 1391.  The court dismissed this claim, finding that "[t]he fact that California's comprehensive regulation of Defendants' practices does not label the challenged practices unfair is a further defense to any such claim." *Id.* at 1395 (quoting *In re Mex. Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1026 (N.D. Ill. 2000); *see also E.L.G. Enters. Corp. v. Gulf Oil Co.*, No. 79-13756, 2001 WL 35923652 (Pa. Ct. Com. Pl. Jun. 4, 2001) (noting that, "as a matter of law," the defendant motor fuel wholesaler "had no legal obligation under the statutes, regulations, or case law to bill on a temperature corrected basis").  As in those cases, the legislative and regulatory approval of defendants' retail practices here precludes plaintiffs' nondisclosure claims.

## III.   PLAINTIFFS' OTHER ARGUMENTS IN SUPPORT OF THEIR CLAIMS ALSO FAIL.

As noted above, nearly all plaintiffs' claims rest on their flawed "price per gallon" argument.  Because selling motor fuel by the gallon is not a promise to deliver gallons with identical energy content, plaintiffs' claims fail.  Moreover, as explained below, plaintiffs' subsidiary arguments in support of their various claims are also deficient.

A.     **Consumer Protection**.  The general consumer protection laws on which plaintiffs rely must be interpreted in light of, and consistent with, more specific weights-and-measures laws.  Mem. at 19-20.  Plaintiffs do not challenge that fundamental proposition.  Nor do they challenge defendants' actual compliance with the more specific consumer protection measures embodied in state weights-and-measures laws.  Plaintiffs' consumer protection claims therefore should be dismissed.  *See id.* at 19 n.23, 20.

Aside from the flawed "price per gallon" argument, *see* Resp. at 16-18, plaintiffs' only argument in support of their consumer protection claims is a challenge to the specific authorization doctrine.  As an initial matter, plaintiffs fail to respond to one variant of that doctrine on which defendants relied in their opening brief – namely, that "consumer protection actions cannot be brought against an entity in a field that is already subject to its own regulatory scheme."  Mem. at 20.  Thus, plaintiffs have not contested defendants' exemption from liability in the states that apply this variant.  *See id.* at 21 (identifying relevant states).[10]

Plaintiffs also have not rebutted the application of the specific authorization doctrine in the other states.  Plaintiffs acknowledge that retailers cannot be liable under those states' laws if their practices are "affirmatively permitted under other statutes or regulations."  Resp. at 18.  Plaintiffs concede that comprehensive state laws "regulate[] fuel deliveries," *id.* at 20, and clearly define the meaning of the word "gallon" as used in retail sales, *id.* at 20 n.40.  It therefore follows that retailers' delivery of volumetric gallons *and* their representation of those deliveries

---

[10] Plaintiffs suggest that a case from one of those states, *Chancellor v. Gateway Lincoln-Mercury, Inc.*, 502 S.E.2d 799 (Ga. Ct. App. 1998), is distinguishable because state law "expressly excluded" the defendants from liability.  Resp. at 19 n.39.  But that case's consumer protection holding clearly did not rely on any such express exclusion.  Well before the court mentioned the statutory exclusion, it had already held that "this area of finance charges, disclosure, and truth in lending falls outside the [Fair Business Practices Act], except where expressly covered," because it was a "regulated area[] of activity."  502 S.E.2d at 45.

in "gallons" are specifically authorized.  Plaintiffs' only response is that state weights-and-measures laws "say[] nothing about either the pricing of motor fuel or the disclosure that should be made about the effect of temperature on a gallon of fuel." *Id.* at 20.  But, as explained above, plaintiffs' pricing theory is insufficient to establish defendants' liability in the absence of some other underlying wrong, and, contrary to plaintiffs' assertion, state laws *do* expressly govern retailers' disclosure obligations and *do not* require them to disclose the temperature of, or the effect of temperature on, their fuel.  *See supra*, Parts I, II(C); *see also MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 733 (6th Cir. 2007) (holding that credit card company's application process was exempt because "nothing on the face of [the] complaint suggests that [the process] ran afoul of the state and federal laws governing such transactions").[11]

Finally, plaintiffs suggest that the permissibility of automatic temperature adjustment in Canada and the use of temperature adjustment in the United States at non-retail levels of trade support their claims under state consumer protection laws.  But plaintiffs' comparison to Canada

_____

[11] Plaintiffs' citation of *Grillasca v. Amerada Hess Corp.*, No. 8: 05-1736-T-17TGW, 2006 U.S. Dist. LEXIS 82814 (M.D. Fla. Nov. 14, 2006), does not support their position here. *See* Resp. at 20.  In that case, customers who purchased motor fuel with debit cards discovered afterward that the retailer had placed "holds" on their checking accounts in amounts "significantly greater than the prices advertised for the gasoline that was purchased – as much as seven and one half times the purchase price."  2006 U.S. Dist. LEXIS 82814, at *4.  The court's denial of the retailer's motion to dismiss is inapposite here for two reasons.  First, the case did not involve specific authorization; instead, the retailer raised federal preemption, a wholly different defense. *Id.* at *5-*9.  Second, even assuming that the court's preemption analysis is relevant, its reasoning is distinguishable.  In *Grillasca*, the federal regulation identified by the retailer only authorized electronic fund transfers between the customers and their financial institutions; it did not address the retailers' "holds" or their disclosure obligations. *Id.* at *6-*7.  Here, by contrast, the weights-and-measures regulations govern the precise conduct at issue in this case:  retail deliveries of motor fuel, including any associated disclosures.

Far from helping plaintiffs' arguments, *Grillasca* in fact supports defendants' position here.  The *Grillasca* court found that the retail sale of motor fuel on a "price per gallon" basis represented only that customers would "pay for the exact cost of the gasoline they purchased pursuant to the amount reflected on the gasoline pumps," *id.* at *13 – the precise argument that defendants make in this case. *see supra*, Part II.

cannot support their consumer protection (or other) claims because the relevant legal and regulatory framework in that country is different and reflects distinct legislative judgments, regulatory goals, and retail practices.  Moreover, defendants' practices at non-retail levels of trade cannot support plaintiffs' consumer protection claims.  Defendants' obligations to consumers are not determined by their non-retail practices – where, in contrast to retail sales, the law actually permits temperature compensation – but instead by the comprehensive and highly specific state laws and regulations identified by defendants.  Mem. at 12-14, 16.

    **B.**    **Contract and Warranty.**  Plaintiffs assert that defendants impermissibly have raised "a competing set of factual allegations" to rebut plaintiffs' contract and warranty claims.  Resp. at 26.  But the only such allegations that they identify involve the meaning of the word "gallon" and the scope of defendants' warranties.  *Id.* at 26-27.  These are not factual allegations, but rather legal principles about the meaning of a gallon and the legal effect of the transactions at issue, and they must be resolved in defendants' favor.  *See supra*, Part II.[12]

    Plaintiffs incorrectly contend that the course of dealing between the parties – here, the century-long practice of volumetric sales – does not eliminate any warranties about energy content that might otherwise be inferred.  The meaning of a contract under a course of dealing is established by an objective measure:  what an objective observer would "fairly . . . regard[]" the parties to have agreed to.  UCC § 1-303(b).  The premise of the damages claim here is that

---

[12] Contrary to plaintiffs' assertion, whether defendants "intended for consumers to expect 'equal quantities of fuel'" is not the issue.  Resp. at 24.  American contract law assesses the meaning of contracts objectively; subjective intent is irrelevant.  *See, e.g.*, *Hotchkiss v. Nat'l City Bank*, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, J.) (contract interpretation has nothing to do with the personal, or individual, intent of the parties).  Plaintiffs are also wrong in suggesting that UCC § 2-305's "gap-filling" provision is applicable here.  Resp. at 24.  That section by its terms applies when the parties to a contract elect to leave a price term of a contract blank, which is obviously not the case here.

plaintiffs are repeat customers who have been substantially injured in the course of their dealings with defendants.  But any objective observer would fairly regard that very course of dealing to eliminate any warranty as to precise energy content, because neither party had ever indicated that precise energy content was a term in the contract.  *Id.*  In response to the argument, plaintiffs contend only that the longstanding practice of selling volumetrically "cannot" be a course of dealing because consumers do not know that energy content varies.  Resp. at 26 n.45.  But a course of dealing is an objective measure that is established without regard to the knowledge of the parties.  *See* UCC § 1-303(b).[13]

Finally, plaintiffs dispute that the long practice of volumetric sales established a "usage of trade" at retail that does not include a warranty of equivalent energy.  *See* Mem. at 23.  For almost a century, retailers have offered and consumers have bought motor fuel at a fixed price per gallon.  It cannot reasonably be disputed that within this trade both buyers and sellers have long treated the contract as fully performed when the fuel has been dispensed and the money paid, and that energy content is not treated as part of the bargain.  This common and repeated practice eliminates any notion of an implied warranty, as plaintiffs seek to impute in this case.

Plaintiffs cite *Ebasco Services, Inc. v. General Electric Co.*, 460 F. Supp. 163, 211 (E.D. Pa. 1978), for the proposition that "custom" does not prove usage of trade.  *See* Resp. at 27.  But that citation is misleading.  It is true that the common law test of "custom," which was a term of art, has been supplanted by the UCC's usage-of-trade analysis.  But the UCC actually makes

---

[13] Plaintiffs erroneously cite the knowledge requirement of UCC § 1-303(a)(2) as if that provision defines both course of performance and course of dealing.  *See* Resp. at 25 n.45. Knowledge by the parties of the particular means of performance is an aspect of determining whether a course of performance has been established that governs the parties' ongoing obligations while a contract is being performed.  *See* UCC § 1-303(a)(2).  The doctrine of course of dealing, however, uses an objective measure and does not inquire into actual knowledge.  *See* UCC § 1-303(b).

customary behavior *more* relevant than it would have been at common law, not less – as *Ebasco* itself clearly held.  And *Wilson v. Marquette Electronics, Inc.*, 630 F.2d 575 (8th Cir. 1980), does not stand for the broad proposition that consumers are never participants in a consumer retail trade.  In *Wilson*, the plaintiffs were occasional buyers, and the court ruled that the manufacturers' own intentions about what was being sold did not control over the UCC's standard implied warranties.  Here, however, any plaintiff with a real alleged claim of injury is a repeat consumer of motor fuel, thereby making him or her a participant in the retail gasoline trade.

      **C.**    **Fraud/Misrepresentation.**  Plaintiffs' fraudulent and negligent misrepresentation claims fail for the same reasons as their consumer protection claims because essentially the same allegations support both classes of claims.  Mem. at 24; *see, e.g.*, Compl. ¶ 191 (alleging that defendants violated Alabama consumer protection law because they "ma[de] false, misleading and deceptive representations").

      **D.**    **Unjust Enrichment.**  Although expressed slightly differently from jurisdiction to jurisdiction, the elements of an unjust enrichment claim are essentially the same:  the "receipt of a benefit and unjust retention of the benefit at the expense of another."  *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (Cal. Ct. App. 2000); *see also Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 259 Kan. 166, 178, 910 P.2d 839, 847 (1996) (the obligation upon which unjust enrichment "is based is created and imposed by law to prevent unjust enrichment at the expense of another").  For the reasons described above, defendants commit no wrong in selling motor fuel at a unit price, and so they do not retain any benefit unjustly.  *Id.* (finding no action for unjust enrichment in the absence of misrepresentation or fraud).

Moreover, as defendants have already noted, "an action for unjust enrichment cannot lie in the face of an express contract." *See* 66 AM. JUR. 2D *Restitution and Implied Contracts* § 24 ("There cannot be an express and implied contract for the same thing existing at the same time."); *see also Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1369 (S.D. Fla. 2007); *Midwest Grain Prods., Inc. v. EnviroFuels Mktg., Inc.*, 948 F. Supp. 976, 980 (D. Kan. 1996). Plaintiffs assert that there is a contract here.[14] *See* Resp. at 22. Their unjust enrichment claim therefore fails.[15]

    **E.    Breach of Good Faith and Fair Dealing.** Contrary to plaintiffs' assertions, retailers have no "dut[y] to deliver temperature and price adjusted fuel to consumers" arising out of any common law or UCC obligation to deal fairly and in good faith with consumers.[16] Resp. at 21. Under the common law of torts, a duty of good faith and fair dealing arises from a "special relationship" between the parties. *See* 2 THE LAW OF TORTS § 453, at 1290 (West

---

[14] Plaintiffs argue in their brief that they are merely pleading in the alternative. But as a legal matter there is a sales contract here, and plaintiffs never contend otherwise.

[15] *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034 (N.D. Ill. 2007), is not to the contrary. In *Siegel*, the only surviving portions of plaintiffs' complaint were allegations that the price consumers paid at the pump for motor fuel was artificially inflated due to defendants' alleged power to manipulate the supply of fuel, including by "maintaining low inventory levels" and "decreas[ing] production" at various points. *Id.* at 1044. Accordingly, in *Siegel*, plaintiffs' surviving allegations were based on allegations that defendants could affect price through their position in the supply chain, not on their failure to comply with the terms of their contracts with consumers. The court concluded that there was no express contract that governed "the parties[] relationship" at issue; that is, plaintiffs' theory was not covered by any express term of the contract. *Id.* at 1046. Here, by contrast, plaintiffs' theory directly implicates the contract terms at issue: defendants promised "motor fuel" at a "price" per "gallon," but plaintiffs seek to modify one of those terms (*e.g.,* through volume or price adjustment) to account for temperature variations.

[16] Plaintiffs' good-faith-and-fair-dealing claims under the laws of Maryland and Louisiana fail outright, and no further analysis is needed. *See Mount Vernon Props., LLC v. Branch Banking & Trust Co.*, 907 A.2d 373, 381 (Md. Ct. Spec. App. 2006) (finding that no such cause of action exists in Maryland); *America's Favorite Chicken Co. v. Cajun Enterprises, Inc.*, 130 F.3d 180, 182 (5th Cir. 1997) (noting that in Louisiana, plaintiff must allege intentionally malicious conduct).

2001).[17]  Ordinary arms-length commercial transactions do not create a special relationship.  *See,*

*e.g.*, *Iron Mountain Security Storage Corp. v. Am. Specialty Foods, Inc.*, 457 F. Supp. 1158,

1169 (E.D. Pa. 1978); *Ritchie Enters. v. Honeywell Bull, Inc.*, 730 F. Supp. 1041, 1052 (D. Kan.

1990); *Formosa Plastics v. Presidio Eng'rs and Contractors*, 960 S.W.2d 41, 52 (Tex. 1998).

Defendants have only an ordinary commercial relationship with plaintiffs, so no action lies in

tort.

Plaintiffs' contract-based claims fare no better.  A plaintiff generally must establish

breach of an independent, expressed contractual obligation (which the plaintiffs here have not

done) in order to claim a breach of good faith and fair dealing.  *See, e.g.*, *Burger King Corp. v.*

*Weaver*, 169 F.3d 1310, 1318 (11th Cir. 1999); *Schoonover v. West Am. Ins. Co.*, 665 F. Supp.

511, 516 (S.D. Miss. 1987); 23 RICHARD A. LORD, WILLISTON ON CONTRACTS § 63:22, at 516

(4th ed. 2002).  And while parties to a contract have a duty to deal in good faith, UCC § 1-304

"does not support an independent cause of action for failure to perform or enforce in good faith."

UCC § 1-304 cmt. 1; *see, e.g.*, *Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604,

618 (3d Cir. 1995); *Gov't St. Lumber Co.*, 553 So. 2d at 72.[18]  Plaintiffs cite no case, and

---

[17] Several states have an even more limited rule.  *See Freeman & Mills, Inc. v. Belcher Oil Co.*, 900 P.2d 669 (Cal. 1995); *Rodgers v. Tecumseh Bank*, 756 P.2d 1223, 1227 (Okla. 1988); *Ennes v. H & R Block Eastern Tax Services, Inc.*, No. 3:01CV-447-H, 2002 WL 226345, at *3 (W.D. Ky. Jan. 11, 2002); *Gov't St. Lumber Co. v. AmSouth Bank, N.A.*, 553 So.2d 68, 72 (Ala. 1989); *Country Corner Food & Drug, Inc. v. First State Bank & Trust Co.*, 966 S.W.2d 894 (Ark. 1998).

[18] Plaintiffs' erroneously assert that *El Paso Natural Gas Co. v. Minco Oil & Gas Inc.*, 8 S.W.3d 309 (Tex. 1999), established a UCC good-faith-and-fair-dealing cause of action in Texas.  *See* Resp. at 22 n.42.  The plaintiffs there sued for breach of contract, not breach of the good-faith duty.  To determine whether certain releases were enforceable, the court considered whether the duty to act in good faith in *performing* a contract applied to the *formation* of a contract.  The court held that the duty did not apply to formation.  Nowhere did the court suggest that the good-faith requirement created a cause of action in Texas.  To the contrary, the Texas Supreme Court has recognized that "[t]he vast majority of courts that have considered this

defendants have found none, in which a court has allowed a claim for the breach of a duty of good faith and fair dealing to proceed where the alleged "breach" of those duties would require changing the express terms of the transaction. Plaintiffs' claims under this theory must be dismissed.

**F.    Civil Conspiracy.** Plaintiffs offer no response to defendants' argument that a civil conspiracy claim "requires proof of an underlying legal wrong," which is here lacking. Mem. at 25. Plaintiffs' civil conspiracy claim therefore falls with their other claims.

The civil conspiracy claim also fails under *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955 (2007). Plaintiffs assert that their factual allegations of a civil conspiracy are sufficient because they "contain specific details regarding . . . a conspiracy to exert pressure on manufacturers of automatic temperature compensation equipment" and to "render ineffective a valid Certificate of Use issued by the State of California." Resp. at 31 (citing Compl. ¶ 57). But these allegations are not enough. Plaintiffs allege a vast, industry-wide conspiracy "to thwart changes in the regulations and to deter the implementation of temperature compensation devices in this country," Resp. at 30 (citing Compl. ¶¶ 25-57) – all based upon a single, post-complaint "example" (Compl. ¶ 57) of alleged joint activity by trade associations of which some of the defendants are allegedly members. This single factual allegation, coupled with plaintiffs' vague and conclusory assertions of other concerted activity, hardly has "enough heft" to "sho[w] that the pleader is entitled to relief." *Twombly*, 126 S. Ct. at 1966 (quoting FED. R. CIV. P. 8(a)(2)).

**G.    Tax.** Plaintiffs acknowledge that consumers pay an all-inclusive price for fuel that includes the cost of previously paid fuel taxes. Compl. ¶ 69. They nevertheless argue that

---

question agree that Uniform Commercial Code section 1.203 does not state an independent cause of action." *N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606 n.2 (Tex. 1998) (citing cases).

defendants unjustly enrich themselves by charging consumers more as "reimbursement" of excise taxes than defendants had previously paid.  Resp. at 34-35.

Plaintiffs do not dispute that retailers acting independently have discretion to charge whatever price for their fuel they deem appropriate, and they admit that the retail price of fuel is subject to "aggressive competition on price in retail fuel markets."  Resp. at 24.  Plaintiffs also correctly note that the fuel tax system requires that fuel taxes be paid before the retailer sells fuel to the retail consumer.  Resp. at 34; Compl. ¶ 69.  The cost of these previously paid fuel taxes, along with the many other costs paid by retailers (*e.g.*, shipping, rent, materials and overhead), are all part of the cost of doing business.  A retailer may recover these costs through sales to consumers, but it is inaccurate to say that a consumer is thereby "reimbursing" a seller.  As the Supreme Court has recognized, unlike a sales tax, which is added on top of an advertised price, the cost of the previously paid fuel tax is as inseparable from the total price of the fuel as the "other costs [the retailer] incurs in bringing his product to market."  *See Gurley Oil Co. v. Miss. Tax Comm'n*, 421 U.S. 200, 211 (1975) (quoting *Martin Oil Serv., Inc. v. Dep't of Revenue*, 273 N.E.2d 823, 828 (Ill. 1971)).

Plaintiffs' reliance on *Latman v. Costa Cruise Lines*, 758 So.2d 699 (Fla. Ct. App. 2000) (Resp. at 17 n.36, 36-37), is misplaced.  *Latman* arose in the context of a motion for class certification and did not deal with taxes at all, but "port charges"; the language quoted by plaintiffs is dicta.  *See Heaven v. Rite Aid Corp.*, No. 0596, 2000 WL 33711049 (Pa. Ct. Com. Pl. Oct. 27, 2000) (criticizing *Latman*'s discussion of sales taxes as dicta and distinguishing it as not involving taxes at all but port charges).  More important, that dicta involved the overcharge of *sales* taxes, which are added to the price of the goods sold at retail and are not included in the total price of the goods sold, as fuel taxes are.

Although they agree that consumers pay an all-inclusive price for fuel, plaintiffs carve out a single component of cost – the fuel excise tax – that is just one of many costs paid by retailers that contribute to the total price.  They then allege that they are "reimbursing" defendants for more than the amount of the tax paid by retailers.  This argument fails, however, because plaintiffs cannot challenge defendants' internal calculations of cost when the basis for the retail transaction to which they agreed was a "total price."  As the court in *In re Air Transportation* held, even where an expired tax was expressly included in the price and was not paid to the government, once the customer agreed to pay the total price, the consumer did so "no matter what its makeup."  37 F. Supp. 2d 1133, 1142 (D. Minn. 2005).[19]  Thus, plaintiffs' argument that consumers paid too much for fuel, even though they accepted and paid the total price, will not sustain their allegations as a viable cause of action.  The *total price*, not its components, is the basis for retail transactions.  *Id.*; *see also In re Mex. Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001) (retailer was not required to disclose internal costs and not required to pass along wholesale rates to customers).  Plaintiffs' tax-related claims therefore fail.

---

[19] Plaintiffs attempt to distinguish *In re Air Transportation* by arguing that the tax charged in that case no longer existed.  Resp. at 36.  In this case, by contrast, plaintiffs acknowledge the continued existence of a fuel tax but allege that defendants miscalculated it.  But this distinction only illustrates the weakness of plaintiffs' position here.  The plaintiffs in *In re Air Transportation* claimed an overcharge of the *entire* tax, whereas plaintiffs here only allege an overcharge of a *portion* of the fuel excise tax.  Since the plaintiffs could not state an overcharge claim in *In re Air Transportation*, it follows that they cannot state one here.

## CONCLUSION

The consolidated amended complaint and the underlying complaints should be dismissed.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD, LLP

  /s/  Donald B. Craven
Donald B. Craven
James P. Tuite
1333 New Hampshire Avenue, N.W.
Washington, D.C.  20036
Phone: (202) 887-4000
Fax:    (202) 887-4288
dcraven@akingump.com
jtuite@akingump.com

Patrick J. Whalen
Spencer Fane Britt & Browne LLP
1000 Walnut, Suite 1400
Kansas City, MO  64106-2140
Phone: (816) 292-8237
Fax:    (816) 474-3216
pwhalen@spencerfane.com


*Counsel to Valero Marketing and Supply Company*

On Behalf of the Defendants Listed on Exhibit A

December 12, 2007

**REPLY MEMORANDUM IN SUPPORT OF JOINT MOTION TO DISMISS**

EXHIBIT A – MOVING DEFENDANTS

7-Eleven, Inc. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Abel Oil Company (by William F. Ford, Lathrop & Gage)
Abercrombie Oil Company, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
Albertson's, LLC (by J. Walter Sinclair, Stoel Rives LLP)
Alimentation Couche-Tard, Inc. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Allsup's Convenience Stores, Inc. (by Phil Krehbiel)
Ambest, Inc. (by Charles W. German, Rouse Hendricks German May P.C.)
Ayers Oil Co. (by William F. Ford, Lathrop & Gage)
Beroth Oil Company (by Keith H. Johnson, Poyner & Spruill LLP)
Big River Oil Company (by William F. Ford, Lathrop & Gage)
BP America Inc. (by Sean Morris, Arnold & Porter)
BP Corporation North America Inc. (by Sean Morris, Arnold & Porter)
BP Products North America Inc. (by Sean Morris, Arnold & Porter)
BP West Coast Products LLC (by Sean Morris, Arnold & Porter)
Campbell Oil Company (by Keith H. Johnson, Poyner & Spruill LLP)
Carolina Energies, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
Casey's General Stores, Inc. (by Martin M. Loring, Blackwell Sanders, LLP)
Chevron USA Inc. (by Ernest J. Getto, Darius Ogloza, Latham & Watkins)
Circle K Stores Inc. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Citgo Petroleum Corporation (by Nathan P. Eimer, Eimer Stahl Klevorn & Solberg LLP)
Coastal Mart of Oklahoma, Inc. (by M. Benjamin Singletary, Gable & Gotwals)
Coastal Mart, Inc. (by M. Benjamin Singletary, Gable & Gotwals)
Commercial Oil Company (by Kevin Williams, Bell, Davis & Pitt, P.A.)
ConocoPhillips Company (by Daniel S. Mason, Joseph W. Bell, Zelle, Hofmann, Voelbel, Mason & Gette LLP)
Costco Wholesale Corporation (by David F. McDowell, Morrison & Foerster LLP)
Dakota Leasing Co. (by John A. Nicholas, The Law Office of Hensley & Nicholas, L.L.C.)
Diamond Shamrock Stations, Inc. (by Donald B. Craven, James P. Tuite, Akin Gump Strauss Hauer & Feld LLP)
E.J. Pope & Son, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
Equilon Enterprises LLC (by John R. Foote, Thelen Reid Brown Raysman & Steiner LLP)
Exxon Mobil Corporation (by David J. Lender, Weil, Gotshal & Manges LLP)
E-Z Mart Stores, Inc. (by John J. Griffin, Jr., Crowe & Dunlevy, P.C.)
Fast Track, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
Flying J Inc. (by Frederick Brown, Gibson, Dunn & Crutcher LLP)
Fort Smith Petroleum Equipment, Inc. (by Don Smith, Smith, Maurras, Cohen, Redd & Horan, PLC)
Gas-Mart USA, Inc. (by Michael B. Lowe, Payne & Jones)
Getty Petroleum Marketing Inc. (by Barry Kazan, Epstein Becker & Green)
Giant Industries, Inc. (by Andrew G. Schultz, Rodey, Dickason, Sloan, Akin & Robb, P.A.)
Giant Stop-n-Go of New Mexico, Inc. (by Andrew G. Schultz, Rodey, Dickason, Sloan, Akin & Robb, P.A.)

Hess Corporation (by Brian J. Molloy, Wilentz, Goldman & Spitzer)
Huffman Oil Company (by Keith H. Johnson, Poyner & Spruill LLP)
Hy-Vee, Inc. (by Jeffrey A. Kennard, Scharnhorst Ast & Kennard, P.C.)
Kentucky Flying J (by Frederick Brown, Gibson, Dunn & Crutcher LLP)
Kum & Go, L.C. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Love's Travel Stops and Country Stores, Inc. (by John J. Griffin, Jr., Crowe & Dunlevy, P.C.)
Mac's Convenience Stores, LLC (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
M.M. Fowler, Inc. (by Richard M. Hutson II, Hutson Law Office, P.A.)
Marathon Oil Company (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Marathon Petroleum Company LLC (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
McNeill Oil Company, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
MFA Oil company, Inc. (by William F. Ford, Lathrop & Gage)
Midwest Petroleum Company (by William F. Ford, Lathrop & Gage)
Miltenberg Oil Co., Inc. (by William F. Ford, Lathrop & Gage)
Mini Mart, Inc. d/b/a Loaf 'N Jug (by Kirk F. Sniff, Strasburger & Price, LLP)
Mobil Oil Guam, Inc. (by David J. Lender, Weil, Gotshal & Manges LLP)
Motiva Enterprises LLC (by John R. Foote, Thelen Reid Brown Raysman & Steiner LLP)
Murphy Oil Corporation (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Murphy Oil USA, Inc. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
National Petroleum Products Inc. (by William F. Ford, Lathrop & Gage)
PAK-A-SAK, Inc. (by Mark D. White, Sprouse Shrader Smith P.C.)
Petro Stopping Centers, L.P. (by Jeffrey B. Storer, Ropes & Gray LLP)
Petroleum World, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
Phillips 66 Company (by Daniel S. Mason, Joseph W. Bell, Zelle, Hofmann, Voelbel, Mason & Gette LLP)
Pilot Travel Centers LLC (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Quality Oil Company, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
Quick Fuel, Inc. (by Howard A. Pollack, Godfrey & Kahn, S.C.)
QuikTrip Corporation (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
RaceTrac Petroleum, Inc. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Rapid Robert's, Inc. (by William F. Ford, Lathrop & Gage)
Ray Thomas Petroleum Company, Inc. (by Charles M. Viser, James McElroy & Diehl, P.A.)
Sam's East, Inc. (Naomi G. Beer, Greenberg Traurig, LLP)
Shell Guam Inc. (by John R. Foote, Thelen Reid Brown Raysman & Steiner LLP)
Shell Oil Company (by John R. Foote, Thelen Reid Brown Raysman & Steiner LLP)
Shell Oil Products Company LLC (by John R. Foote, Thelen Reid Brown Raysman & Steiner LLP)
Sheetz, Inc. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Sinclair Oil and Gas Company (by William F. Ford, Lathrop & Gage)
Sinclair Oil Corporation (by William F. Ford, Lathrop & Gage)
Sinclair Petroleum Company (by William F. Ford, Lathrop & Gage)
South Central Oil Company, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
South Pacific Petroleum Corporation (by Douglas W. Stern, Fulbright & Jaworski L.L.P.)
Southwest Convenience Stores, LLC (by Robert J. Clary, Owens, Clary & Aiken, L.L.P.)
Speedway Petroleum Corporation (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Speedway SuperAmerica LLC (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Star Fuel Marts, L.L.C. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)

Sunoco Corporation (by Ezra D. Rosenberg, Dechert LLP)
Sunoco Inc. (by Ezra D. Rosenberg, Dechert LLP)
Supervalu Inc. (by J. Walter Sinclair, Stoel Rives LLP)
TA Operating LLC (by Jeffrey B. Storer, Ropes & Gray LLP)
Tesoro Refining and Marketing Company (by Craig J. de Recat, Manatt, Phelps & Phillips, LLP)
Texaco Inc. (by Ernest J. Getto, Darius Ogloza, Latham & Watkins)
Texaco Refining and Marketing (by Ernest J. Getto, Darius Ogloza, Latham & Watkins)
The Circle K Corporation (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
The Kroger Co. (by Kirk F. Sniff, Strasburger & Price, LLP)
The Pantry, Inc. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
Thoele, Inc. (by William F. Ford, Lathrop & Gage)
Thorntons Inc. (by Donald J. Kelly, Wyatt, Tarrant & Combs, LLP)
Toot' N Totum Food Stores, L.P. (by Mark D. White, Sprouse Shrader Smith P.C.)
Total Petrochemicals USA, Inc. (by William B. Allison, Allison & Shoemaker L.L.P.)
TravelCenters of America LLC (by Jeffrey B. Storer, Ropes & Gray LLP)
TravelCenters of America Holding Co. LLC (by Jeffrey B. Storer, Ropes & Gray LLP)
United El Segundo, Inc. (by Mark B. Gilmartin, Law Office of Mark B. Gilmartin)
United Energy, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)
USA Petroleum Corporation (by Craig J. de Recat, Manatt, Phelps & Phillips, LLP)
Valero Energy Corporation (by Donald B. Craven, James P. Tuite, Akin Gump Strauss Hauer &
Feld LLP)
Valero Marketing and Supply Company ( by Donald B. Craven, James P. Tuite, Akin Gump Strauss
Hauer & Feld LLP)
Wallis Oil Company (by William F. Ford, Lathrop & Gage)
Wal-Mart Stores, Inc. (dba Sam's Club) (by Naomi G. Beer, Greenberg Traurig, LLP)
Warrenton Oil Company (by William F. Ford, Lathrop & Gage)
Wawa, Inc. (by Tristan L. Duncan, Shook, Hardy & Bacon L.L.P.)
WilcoHess LLC (by Brian J. Molloy, Wilentz, Goldman & Spitzer)
World Oil Corp. (by Mark B. Gilmartin, Law Office of Mark B. Gilmartin)
Worsley Companies, Inc. (by Keith H. Johnson, Poyner & Spruill LLP)