## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IN RE: MOTOR FUEL TEMPERATURE )
SALES PRACTICES LITIGATION )
                                 )       **MDL No. 1840**

(This Document Relates to All Cases) )       **Case No. 07-MD-1840-KHV**
                                 )
_____)

## MEMORANDUM AND ORDER NUNC PRO TUNC

Plaintiffs assert putative class action claims for damages and injunctive relief against various motor fuel retailers in Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, the District of Columbia and Guam ("the Region").[1] Plaintiffs claim that because defendants sell motor fuel for a specified price per gallon without disclosing or adjusting for temperature expansion, they are liable under various state law theories including breach of contract, breach of warranty, fraud and consumer protection. Following a transfer order of the Judicial Panel on Multidistrict Litigation under 28 U.S.C. § 1407, the Court has jurisdiction over consolidated pretrial proceedings in these actions. See Doc. #1 filed June 22, 2007. This matter comes before the Court on defendants' Joint Motion To Dismiss (Doc. #196) filed October 22, 2007. For reasons stated below, the Court overrules defendants' motion.

## I.    Legal Standards

On August 30, 2007, the Court ordered that plaintiffs file a consolidated amended complaint as an MDL administrative and procedural tool designed to narrow the predominant legal issues

---

[1]    Plaintiffs assert claims individually and on behalf of similarly situated persons and entities who purchased gasoline or diesel fuel ("motor fuel" or "fuel") at temperatures greater than 60 degrees Fahrenheit from one or more defendants in the Region.

common to the underlying cases. <u>See</u> <u>Scheduling Order No. 1</u> (Doc. #134) at 4.[2]  In ruling on

defendants' motion to dismiss for failure to state a claim under Rule 12(b)(6), Fed. R. Civ. P., the

Court assumes as true all well pleaded facts in that complaint and views them in a light most

favorable to plaintiffs. <u>See</u> <u>Zinermon v. Burch</u>, 494 U.S. 113, 118 (1990); <u>Swanson v. Bixler</u>, 750

F.2d 810, 813 (10th Cir. 1984). Rule 12(b)(6) does not require detailed factual allegations, but the

complaint must set forth the grounds of plaintiffs' entitlement to relief through more than labels,

conclusions and a formulaic recitation of the elements of a cause of action. <u>See</u> <u>Bell Atlantic Corp.</u>

<u>v. Twombly</u>, __ U.S. __, 127 S. Ct. 1955, 1964-65 (2007).  In other words, plaintiffs must allege

facts sufficient to state a claim which is plausible – rather than merely conceivable – on its face. <u>See</u>

<u>id.</u> The Court makes all reasonable inferences in favor of plaintiffs. <u>See</u> <u>Zinermon</u>, 494 U.S. at 118;

<u>see also</u> Rule 8(a), Fed. R. Civ. P.; <u>Lafoy v. HMO Colo.</u>, 988 F.2d 97, 98 (10th Cir. 1993).  The

Court, however, need not accept as true those allegations which state only legal conclusions. <u>See</u>

<u>Hall v. Bellmon</u>, 935 F.2d 1106, 1110 (10th Cir. 1991).  In reviewing the sufficiency of plaintiffs'

complaint, the issue is not whether plaintiffs will prevail, but whether they are entitled to offer

evidence to support their claims. <u>See</u> <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>overruled on</u>

<u>other grounds by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982).  Although plaintiffs need not precisely

state each element of their claims, they must plead minimal factual allegations on those material

elements which they must prove. <u>See</u> <u>Hall</u>, 935 F.2d at 1110.

**II.     Facts**

The <u>Consolidated Amended Complaint</u> ("CAC") (Doc. #186) filed October 8, 2007, alleges

---

[2]      The consolidated amended complaint does not supercede any pleading in the
constituent cases in the MDL proceeding. <u>See</u> <u>id.</u>

the following facts which the Court accepts as true for purposes of this order:

Motor fuel expands when heated. Therefore, a given volume of motor fuel at a warmer temperature has less mass and less energy than the same motor fuel at a cooler temperature. CAC ¶ 3. In 1923, the National Conference on Weights and Measures ("NCWM"), an association which includes representatives from government and the oil industry, recognized that due to temperature expansion, motor fuel purchased solely based on volume was subject to unpredictability and inconsistency depending on fuel temperature at the time of the sale. CAC ¶ 13. The industry decided to standardize sales of motor fuel based on temperature and created what is now known as ASTM-IP D-1250 ("D-1250"). D-1250 defines a standard gallon unit of petroleum as 231 cubic inches at 60 degrees Fahrenheit ("U.S. petroleum gallon").[3] CAC ¶¶ 14-16. The U.S. petroleum industry uses D-1250 to adjust petroleum sales based on temperature at every stage of the process except at retail. CAC ¶¶ 19-20.

At retail, defendants sell a gallon of motor fuel based solely on volume (i.e. 231 cubic inches) without regard to temperature. Defendants advertise and sell the fuel at a specified price per gallon without expressly defining the term "gallon." CAC ¶ 38. Consumers purchase motor fuel under the belief that they get what they pay for in terms of intended use of the fuel, not simply to acquire a particular volume of fuel. CAC ¶ 27. The average fuel temperature for the Region is

---

[3]      To apply D-1250 to petroleum sales, one adjusts the total sales price to reflect the temperature of the product in relation to the 60 degrees Fahrenheit standard. CAC ¶ 16. For example, if a retailer purchases 10,000 gallons of motor fuel from a wholesaler at a time when the fuel temperature is 90 degrees Fahrenheit, the retailer will pay the wholesaler for the volumetric amount when the fuel is measured at 60 degrees Fahrenheit – i.e. 2,310,000 cubic inches (231 cubic inches x 10,000 gallons). Without temperature adjustment, the retailer would pay for the expanded volume of 10,000 gallons of motor fuel measured at 90 degrees Fahrenheit – i.e. 2,357,800 cubic inches (235.78 cubic inches – the volume of a U.S. petroleum gallon measured at 90 degrees – x 10,000 gallons). CAC ¶ 17.

greater than 70 degrees Fahrenheit.  Thus, consumers in the Region often purchase motor fuel at temperatures above 60 degrees Fahrenheit and unknowingly receive less fuel (i.e. fewer molecules and less mass) than if they purchased the fuel at (or adjusted to) the 60 degrees Fahrenheit industry standard.  CAC ¶¶ 3, 6, 39.  Therefore, these consumers commonly receive less motor fuel than what they pay for.  Plaintiffs pay billions of extra dollars every year because retailers deliver fuel which is – on average – at least 10 degrees higher than the industry standard without making any correction in price and/or volume.  CAC ¶ 7.

By selling "hot" fuel without adjusting price or volume for temperature, defendants generate hidden profits in the form of excess reimbursement for taxes paid on wholesale purchases.  CAC ¶ 9.  At the wholesale level, defendants pay federal and state motor vehicle fuel taxes based on standardized, temperature-adjusted gallons, i.e. U.S. petroleum gallons.  CAC ¶¶ 9, 66-67.  As part of the price per gallon of motor fuel, defendants pass along to consumers the cost of these taxes.  CAC ¶ 69.  In so doing, defendants seek reimbursement from customers to recoup the cost of fuel taxes which they previously paid.  CAC ¶ 69.  Some retailers affirmatively state in labels attached to retail pumps that the posted price for a gallon of motor fuel includes a certain amount allocated to fuel taxes.  CAC ¶ 69.  Because defendants sell retail motor fuel at an average temperature greater than 60 degrees Fahrenheit without adjusting for temperature, they sell more gallons of fuel than they have purchased.  CAC ¶ 9.  On these extra gallons, defendants claim and receive reimbursement from plaintiffs for motor fuel taxes which they did not actually pay.  CAC ¶¶ 9, 71-72.

Temperature compensation equipment is available to defendants, so they are able to adjust the overall price for motor fuel based on a standardized gallon at 60 degrees Fahrenheit.  CAC ¶¶ 40-41.  In Canada, where temperature compensated retail sales are in the industry's economic

interest, defendants have actively sought and facilitated the use of temperature compensation equipment at the retail level. CAC ¶¶ 42-43. In the United States, where temperature compensated retail sales are not in the industry's economic interest, the industry has opposed efforts to require installation of temperature compensation equipment at retail pumps. CAC ¶ 48.

In the 1970s, the petroleum industry justified its refusal to sell temperature compensated fuel with flawed survey information which purported to demonstrate that the average temperature of motor fuel sold throughout the United States was 56 degrees Fahrenheit and that the effect of temperature expansion was therefore in the consumers' favor. CAC ¶¶ 51-52. In 1979, however, the American Petroleum Institute ("API") conceded that its prior statements were wrong and that the overall average temperature of motor fuel in the United States exceeded 60 degrees Fahrenheit. CAC ¶ 53.

The industry has continued to resist selling temperature-adjusted fuel by pointing to alleged costs in implementing temperature compensation technology. CAC ¶ 54. In this effort, defendants have propounded flawed data and information to the public and government. CAC ¶ 55. In the 1970s, defendants estimated total replacement costs in excess of $6 billion to install temperature-adjusted equipment at each retail motor fuel pump. Today, industry officials have reduced the estimate to $2.2 billion. CAC ¶ 55.

As members of various trade organizations, defendants have pressured manufacturers of automatic temperature compensation equipment to not sell such equipment in the United States. CAC ¶¶ 56-57.

Defendants do not disclose to consumers that they do not sell motor fuel in accordance with the industry standard gallon of 231 cubic inches at 60 degrees Fahrenheit. CAC ¶ 60. After

plaintiffs filed these lawsuits, some defendants placed notices at pumps informing consumers that fuel is dispensed by the gallon (231 cubic inches) and that fuel temperature affects the energy content of each gallon dispensed.   The notices do not inform customers of the actual fuel temperature or make adjustments to the price of fuel.  CAC ¶¶ 61-64.

### III.    Plaintiffs' Claims

Plaintiffs assert the following claims.  As noted, for purposes of ruling on defendants' motion to dismiss, the Court accepts plaintiffs' factual assertions as true.

### A.    Unjust Enrichment (Counts I, II And III)

Plaintiffs assert that by charging consumers for federal and state motor fuel taxes in excess of amounts which defendants have actually paid (Counts I and II) and not adjusting for thermal expansion when they sell motor fuel which is warmer than 60 degrees Fahrenheit (Count III), defendants have been unjustly enriched.  See CAC ¶¶ 84-109.

### B.    Breach Of Contract (Count IV)

Plaintiffs allege that with each fuel purchase, plaintiffs and defendants mutually agreed that plaintiffs would pay a specified price per gallon and that defendants would deliver motor fuel measured in gallons.  CAC ¶ 123.  The agreements did not expressly define "gallon."  CAC ¶ 127. Plaintiffs understood that each "gallon" of motor fuel would be fungible, i.e. that one unit of the same kind or grade of motor fuel would be freely interchangeable with any other unit of the same kind or grade, so that every gallon of motor fuel would contain the same amount of motor fuel. CAC ¶ 126.  Because a "gallon" defined volumetrically is not a standard unit of measure, such a "gallon" was not a "gallon" within the meaning of the parties' agreements.  CAC ¶ 128.  Rather, the parties implicitly agreed to the sale of motor fuel at a specified price per industry standard gallon

6

(defined as that amount of motor fuel which occupies 231 cubic inches at 60 degrees Fahrenheit).

CAC ¶ 129. When the motor fuel temperature was greater than 60 degrees Fahrenheit, defendants

delivered less motor fuel than that for which the parties agreed and therefore breached the parties'

agreements. CAC ¶ 132.

### C.     Breach Of Duty Of Good Faith And Fair Dealing (Count V)

Plaintiffs allege that defendants breached their duties to act in good faith and observe

reasonable commercial standards by (1) not selling motor fuel on a temperature-compensated basis;

(2) not disclosing their failure to do so; and (3) seeking reimbursement of fuel taxes in greater

amounts than that which they had actually paid. See CAC ¶¶ 136-40.

### D.     Breach Of Express And Implied Warranties (Count VI)

Plaintiffs allege that defendants breached express and implied warranties under Sections 2-

313 and 2-314 of the Uniform Commercial Code ("UCC"). Specifically, plaintiffs claim that

defendants agreed to sell by the gallon motor fuel which consisted of certain energy producing

characteristics, including a particular uniform quantity of fuel. CAC ¶ 145. Plaintiffs assert that

defendants impliedly warranted that the fuel was merchantable; that it would pass without objection

under the contract description; that it was of even kind, quality and quantity within each unit and

among all units; and that it conformed to the promises, affirmations and descriptions at the pump

site. CAC ¶ 146. Plaintiffs claim that defendants knew or should have known that plaintiffs were

relying on their skill, judgment and/or superior knowledge to select or furnish motor fuel which did

not contain decreasing quantities of fuel and energy content per volumetric unit when sold at

temperatures in excess of 60 degrees Fahrenheit. CAC ¶ 147. Plaintiffs contends that defendants

breached said warranties by selling motor fuel which did not conform to the qualities, quantities and

7

characteristics warranted.  CAC ¶ 149.

**E.     Money Had And Received And Conversion (Counts VII and VIII)**

Plaintiffs assert that by obtaining excess reimbursement of purported fuel taxes and refusing

to sell motor fuel on a temperature-compensated basis, defendants have unlawfully and inequitably

obtained possession of and control over excess money which rightfully belongs to plaintiffs.  See

CAC ¶¶ 151-62.

**F.     Fraudulent And Negligent Misrepresentation (Counts IX and X)**

Plaintiffs allege that defendants knowingly, recklessly and/or negligently made the following

misrepresentations and/or omissions which were material and influenced plaintiffs' decision to

purchase motor fuel from defendants:

(1) advertising motor fuel prices in terms of the standard unit of a gallon, while delivering

non-standard gallons of motor fuel measured volumetrically without reference to temperature;

(2) not disclosing that they delivered motor fuel in excess of 60 degrees Fahrenheit;

(3) not disclosing that the standard U.S. Petroleum Gallon in the motor fuel industry is 231

cubic inches at 60 degrees Fahrenheit;

(4) not disclosing that the amount of motor fuel sold varies materially according to

temperature;

(5) not disclosing that because of thermal expansion, each volumetric gallon of motor fuel

which is sold at retail at a temperature above 60 degrees Fahrenheit provides lower product

performance than that of a standard U.S. Petroleum Gallon which defendants purchase at wholesale;

and

(6) not disclosing that they paid less fuel taxes than the amounts for which they sought

8

reimbursement from plaintiffs.

CAC ¶¶ 163-74.

In addition, plaintiffs allege that defendants knowingly and/or recklessly made the following material misrepresentations and/or omissions:

(1) delivering motor fuel in excess of 60 degrees Fahrenheit in non-standardized units, while concealing and remaining intentionally silent as to the consequences of the absence of temperature compensation;

(2) not disclosing that they received more money under the guise of federal and state fuel tax reimbursement than that which was necessary to reimburse them for what they actually paid; and

(3) not disclosing that their use of the term "gallon" in the retail sale of motor fuel is not a standard unit of measure.

CAC ¶¶ 164(a), (f) and (h).

Plaintiffs also allege that defendants negligently did not disclose that each volumetric gallon of motor fuel sold at retail in excess of 60 degrees Fahrenheit contains less fuel than the standard U.S. Petroleum Gallon.  CAC ¶ 170(d).

### G.    Civil Conspiracy (Count XI)

Plaintiffs allege that defendants knew that selling "hot" motor fuel in volumetric gallons was deceptive, unconscionable, not in good faith, a breach of contract and contrary to the accepted petroleum industry practice of measuring and selling motor fuel using a temperature-corrected, standardized gallon measurement, and that defendants agreed to unlawfully deprive plaintiffs of rights and property by selling motor fuel on a non-temperature compensated basis and by refusing to implement automatic temperature compensation technology.  CAC ¶¶ 176-77.  Plaintiffs contend

that in furtherance of the conspiracy, defendants acted in concert with each other and third parties to exert undue pressure and influence upon various manufacturers and other proponents of temperature compensation at the retail level.  CAC ¶ 179.

### H.    Fraudulent Concealment (Count XII)

Plaintiffs contend that defendants publicly represented that they were remitting certain monies from every gallon of motor fuel to federal, state and local governments for fuel taxes and that such sums were a requisite and fixed component of the price of such fuel, when in fact they retained a significant portion of such monies as excess reimbursement for the actual amount of taxes paid.  CAC ¶ 182.  Plaintiffs allege that defendants knowingly omitted information regarding the method in which they paid such taxes and did not disclose that they actually profited from the so-called fuel taxes collected from plaintiffs.  CAC ¶ 183.

### I.    State Law Consumer Protection Claims (Counts XIII to XXXIX)

Plaintiffs assert claims under various consumer protections statutes in Alabama, Arizona, Arkansas, California, Florida, Georgia, Guam, Indiana, Kansas, Kentucky, Louisiana, Maryland, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, Tennessee, Texas, Utah and Virginia.[4]  The specific allegations for each claim vary somewhat.

---

[4]    Specifically, plaintiffs assert claims under the following statutes: the Alabama Deceptive Trade Practices Act, Ala. Code § 8-19-1 et seq. (Count XIII); the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1521 et seq. (Count XIV); the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 et seq. (Count XV); the California unfair competition law, Cal. Bus. & Prof. Code § 17200 et seq. (Count XVI); the California Consumer Legal Remedies Act, Cal. Civ. Code § 1750 et seq.  (Count XVII); the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 et seq., and Section 526.01 (Count XVIII); the Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370 et seq. (Count XIX); the Guam Deceptive Trade Practices – Consumer Protection Act, 5 Guam Code Ann. tit. 5, § 32101 et seq. (Count XX); the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 et seq. (Count XXI); the Kansas Consumer Protection Act, Kan. Stat. Ann. § 50-623 et seq. (Count XXII); the Kentucky Consumer Protection
(continued...)

Plaintiffs generally allege, however, that with regard to the advertisement, marketing and sale of hot

motor fuel, defendants have engaged in the following deceptive, fraudulent and misleading acts:

(a) selling motor fuel in excess of 60 degrees Fahrenheit on a non-temperature compensated

basis;

(b) representing motor fuel unit prices in terms of a standard unit gallon when in fact they

delivered non-standard gallons of motor fuel measured volumetrically without reference to

temperature;

©) delivering less motor fuel than they agreed to deliver when motor fuel temperature

exceeded 60 degrees Fahrenheit;

(d) not disclosing that they deliver motor fuel in excess of 60 degrees Fahrenheit;

(e) not disclosing that the standard U.S. petroleum gallon in the U.S. domestic petroleum

industry is 231 cubic inches at 60 degrees Fahrenheit;

---

[4](...continued)
Act, Ky. Rev. Stat. Ann. § 367.110 et seq. (Count XXIII); the Louisiana Unfair Trade Practices and
Consumer Protection Law, La. Rev. Stat. Ann. § 51:1401 et seq. (Count XXIV); the Maryland
Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 et seq. (Count XXV); the Missouri
Merchandising Practices Act, Mo. Rev. Stat. § 407.010 et seq. (Count XXVI); the Nevada Deceptive
Trade Practices Act, Nev. Rev. Stat. § 598.0903 et seq. (Count XXVII); the New Jersey Consumer
Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq. (Count XXVIII); the New Mexico Unfair Practices Act,
N.M. Stat. § 57-12-1 et seq. (Count XXIX); the North Carolina Unfair and Deceptive Trade
Practices Act, N.C. Gen. Stat. § 75-1.1 et seq. (Count XXX); the Oklahoma Consumer Protection
Act, 15 Okla. Stat. tit. 15, § 751 et seq. (Count XXXI); Okla. Stat. tit. 52 § 391 (Count XXXII); the
Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605 et seq. (Count XXXIII); the
Pennsylvania Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann tit. 73 § 201-1
(Count XXXIV); the Tennessee Consumer Protection Act of 1977, Tenn. Code Ann. § 47-18-101
et seq. (Count XXXV); the Texas Deceptive Trade Practices – Consumer Protection Act, Tex. Bus.
& Com. Code Ann. § 17.41 (Count XXXVI); the Utah Consumer Sales Practices Act, Utah Code
Ann. § 13-11-1 et seq. (Count XXXVII); the Utah Truth In Advertising Act, Utah Code Ann. § 13-
11a-1 et seq. (Count XXXVIII); and the Virginia Consumer Protection Act of 1977, Va. Code Ann.
§ 59.1-196 et seq. (Count XXXIX).  Plaintiffs do not assert consumer protection claims under
Delaware, District of Columbia, Mississippi or South Carolina law.

(f) not disclosing that each volumetric gallon of motor fuel sold at a temperature above 60° Fahrenheit contains less fuel than plaintiffs would receive if defendants sold such fuel on a temperature compensated basis;

(g) not disclosing that the term "gallon" used by defendants in the sale of motor fuel is not a standard unit of measure;

(h) representing that certain amounts of every non-temperature compensated gallon of motor fuel sold constituted reimbursement for amounts remitted to governments as fuel taxes and that such sums were a requisite and fixed component of the price of such gallons, when defendants in fact retained those amounts as mere profit/windfall;

(i) not disclosing that when defendants sold motor fuel which was warmer than 60 degrees Fahrenheit, defendants paid less fuel taxes than they charged from plaintiffs;

(j) not disclosing that defendants received more money from plaintiffs under the guise of fuel taxes than was needed to reimburse them for amounts actually paid to federal and state governments; and

(k) not disclosing that federal and state governments were not receiving nor owed the specified tax per gallon for every gallon of motor fuel sold to plaintiffs, but that instead defendants were retaining a portion of that specified tax per gallon as profit.

See, e.g., CAC ¶ 191.

Plaintiffs contend that they relied on defendants' deceptive acts and that defendants took advantage of plaintiffs' lack of knowledge, ability, experience or capacity to a grossly unfair degree. See, e.g., CAC ¶¶ 193-94. Plaintiffs further assert that defendants' acts have impaired competition in the retail motor fuel market and prevented plaintiffs from making fully informed decisions about

fuel which they purchase.  Plaintiffs have sustained damages because they received less motor fuel

than they were entitled to receive and for which they paid.  <u>See, e.g.</u>, CAC ¶¶ 196-97.

## IV.    Analysis

As outlined above, plaintiffs assert claims under various state law theories of unjust

enrichment, breach of contract, breach of duty of good faith and fair dealing, breach of implied and

express warranties, money had and received, conversion, fraudulent and negligent misrepresentation,

civil conspiracy, fraudulent concealment and consumer protection.  Defendants seek dismissal of

plaintiffs' claims under Rule 12(b)(6).  In support of their motion, defendants assert that (1) all

claims must fail as a matter of law because state regulation requires defendants to dispense motor

fuel in uniform gallons of exactly 231 cubic inches; (2) the consumer protection and breach of

contract claims fail as a matter of law because defendants accurately represent what they sell; (3)

the consumer protection claims fail as a matter of because defendants do not omit, suppress or

conceal material facts; (4) the consumer protection claims fail as a matter of law because state

weights-and-measures regimes have endorsed defendants' practices as fair and proper; (5) the

implied warranty claims fail as a matter of law because defendants did not warrant that each unit of

motor fuel would have identical energy content; (6) the fraud and negligent misrepresentation claims

fail as a matter of law because defendants did not make untrue or misleading statements or conceal

material facts; (7) the breach of duty of good faith and fair dealing claims fail as a matter of law

because the alleged conduct does not violate consumer protection laws; (8) the unjust enrichment

and conversion claims fail as a matter of law because state law prohibits defendants from selling

temperature-adjusted gallons and because plaintiffs cannot bring quasi-contractual claims when the

transaction is governed by contract; (9) the civil conspiracy claims fail as a matter of law because

13

plaintiffs cannot prove an underlying wrong and because plaintiffs do not allege facts sufficient to support conspiracy; and (10) any claims based on tax overpayments fail as a matter of law because defendants have not violated any law and plaintiffs do not allege any inequity in defendants' practice.  Defendants frame these arguments in general terms, and do not identify the elements of each cause of action or discuss whether the laws of each jurisdiction are the same.  The Court will likewise address these arguments in general terms and will not construct legal arguments or theories on behalf of defendants.  See, e.g., Moore v. Bd. of County Comm'rs of Leavenworth, 470 F. Supp.2d 1237, 1250 (D. Kan. 2007).

A.    **Whether All Claims Fail As A Matter Of Law Because State Regulation Requires Defendants To Dispense Motor Fuel In Uniform Gallons Of 231 Cubic Inches**

Defendants assert that all claims fail as a matter of law because state regulation requires them to sell motor fuel in uniform volumetric gallons of exactly 231 cubic inches, without regard to temperature, and that plaintiffs are not legally entitled to buy motor fuel in units which are adjusted for temperature.

As a preliminary matter, defendants do not explain how their argument – even if true – would dispose of all claims.  For example, plaintiffs claim that defendants unjustly charged excess reimbursements for motor fuel taxes and fraudulently failed to disclose that they were selling warm fuel which contained less energy than cold fuel.  Defendants do not explain how state law – even if it requires them to sell fuel in uniform volumetric gallons – would preclude these claims.  Moreover, defendants do not address plaintiffs' contention that they should adjust the *price* (not volume) of motor fuel to account for temperature.  At oral argument, defense counsel conceded that it might be permissible under state law to adjust the retail price of motor fuel based on temperature.

14

Thus, on its face, defendants' argument does not reach – let alone dispose of – plaintiffs' claims.

Moreover, on this record, defendants have not shown as a matter of law that state regulation actually prohibits them from adjusting the size of a gallon of motor fuel to account for thermal expansion. Defendants rely on the *Specifications, Tolerances, And Other Technical Requirements For Weighing And Measuring Devices* published by the National Institute of Standards and Technology ("NIST") in Handbook 44.[5] Defendants contend that Handbook 44 requires them to sell motor fuel by the gallon, which must equal 231 cubic inches exactly.[6] On this record, however, defendants have not shown as a matter of law that Handbook 44 prohibits them from adjusting the volume of motor fuel sold based on temperature.

Handbook 44 sets forth requirements for various measuring devices including scales, weights, milk meters, vehicle tanks, dry measures, fabric-measuring devices, odometers and grain moisture meters. Section 3.30 covers liquid-measuring devices and wholesale devices used for the measurement and delivery of agri-chemical liquids.[7] It provides that in general, liquid-measuring

---

[5]     According to its website, the NIST is a non-regulatory federal agency within the United States Department of Commerce with a mission "to promote U.S. innovation and industrial competitiveness by advancing measurement science, standards, and technology in ways that enhance economic security and improve our qualify of life." General Information, http://www.nist.gov/public_affairs/general2.htm (last visited Feb. 21, 2008).

[6]     Defendants contend that each jurisdiction involved in this case has adopted Handbook 44. See Defendants' Memorandum (Doc. #197) at 4 and Appendix thereto at 18-27. Defendants' Appendix does not indicate whether the District of Columbia has adopted Handbook 44. See id. at 18-19. Nevertheless, for purposes of this discussion, the Court will assume without deciding that each jurisdiction has adopted Handbook 44.

[7]     Section 3.30 does not apply to meters mounted on vehicle tanks, devices used for dispensing liquefied petroleum gases or other liquids which do not remain in a liquid state at atmospheric pressures and temperatures, water meters, devices used solely for dispensing a product in connection with operations in which the amount dispensed does not affect customer charges, or mass flow meters. See id. ¶ A.2 at 3-3.

devices shall be equipped with a primary indicating element and may be equipped a primary recording unit.  See id. ¶ S.1.1 at 3-3.  With regard to units of measurement, Section 3.30 provides that a liquid-measuring device "shall indicate, and record if the device is equipped to record, its deliveries in liters, gallons, quarts, pints, fluid ounces, or binary-submultiples or decimal subdivisions of the liter or gallon."  See id. ¶ 1.1.2 at 3-3.  The section contains a separate paragraph which deals specifically with retail motor fuel devices.  That paragraph states that "[d]eliveries shall be indicated and recorded, if the device is equipped to record, in liters or gallons and decimal subdivisions or fractional equivalents thereof."  Id. ¶ S.1.2.1 at 3-3.[8]  Appendix C of Handbook 44 sets forth general tables of units of measurement and provides that a gallon equals 231 cubic inches. See id. at C-3.

Defendants assert that Handbook 44 requires that they sell motor fuel in gallon units of exactly 231 cubic inches which cannot vary based on temperature.  As discussed above, Handbook 44 requires that retail motor fuel devices indicate deliveries in liters or gallons and states that a gallon  equals 231 cubic inches.  These provisions apparently require that retail devices deliver motor fuel in liters or gallons and decimal subdivisions or fractional equivalents thereof, as opposed to other units such as quarts, pints or fluid ounces.  Handbook 44 defines a gallon as 231 cubic inches, but it does not expressly prohibit a retailer from adjusting the size or price of a gallon to equal 231 cubic inches at a standardized temperature.  Defendants point to Appendix B, which states that *in general* a unit is fixed by definition and is independent of physical conditions such as

---

[8]       Section 3.30 contains a similar paragraph with regard to agri-chemical liquid devices. See id. ¶ S.1.2.2.1 at 3-3.

16

temperature.[9]  This provision may lend support to defendants' position, but it does not demonstrate as a matter of law that the jurisdictions involved in this case prohibit defendants from adjusting the size a gallon of fuel to 231 cubic inches at a standardized temperature.

Defendants contend that because Handbook 44 addresses temperature compensation for wholesale devices, it prohibits temperature compensation on retail devices.[10]  Defendants, however, have not shown as a matter of law that the handbook's silence proves their contention.  Defendants cite no provision of Handbook 44 – or other authority from the 28 jurisdictions – which prohibits

---

[9]  Appendix B of Handbook 44 discusses the origin, development and present status of units and systems of measurement.  It states that it is "essential" for one to keep in mind the distinction between the terms "units" and "standards."  Appendix B explains that a unit is "a special quantity in terms of which other quantities are expressed.  In general a unit is fixed by definition and is independent of such physical conditions as temperature.  Examples: the meter, the liter, the gram, the yard, the pound, the gallon."  See id. at B-1.  A standard, on the other hand, is "a physical realization or representation of a unit.  In general, it is not entirely independent of physical conditions, and it is a representation of the unit only under specified conditions.  For example a meter standard has a length of one meter when at some definite temperature and supported in a certain manner.  If supported in a different manner, it might have to be at a different temperature to have a length of one meter."  See id.

[10]  Under specifications, with regard to "wholesale devices equipped with automatic temperature compensators," Section 3.30 provides that "[a] device may be equipped with an automatic means for adjusting the indication and registration of the measured volume of product to the volume at [60 degrees Fahrenheit]."  Handbook 44, Section 3.30 ¶ S.2.7.1 at 3-10.  Under user requirements, Section 3.30 provides that if a wholesale device is equipped with a mechanical automatic temperature compensator, it shall be connected, operable and in use at all times and a written invoice based on a reading of the device shall show that the volume delivered has been adjusted to the volume at 60 degrees Fahrenheit and shall also indicate information regarding the gravity, temperature and gross reading of the product.  See id. ¶ UR.3.6.1 at 3-18.  For non-automatic temperature compensation at wholesale, Section 3.30 provides that if the volume of the product delivered is adjusted to the volume at 60 degrees Fahrenheit, the product temperature shall be taken during the delivery in the liquid chamber of the meter, the meter inlet or discharge line adjacent to the meter, or the compartment of the receiving vehicle at the time it is loaded, and the accompanying invoice shall indicate that the volume has been adjusted for temperature variation and shall state the product temperature used in making the adjustment.  See id. ¶ UR.3.6.2 at 3-18.  It further provides that "[w]hen fuel is bought or sold on an automatic or nonautomatic temperature-compensated basis, it shall be bought or sold using this method over at least a consecutive 12-month period, unless otherwise agreed to by both the buyer and seller in writing."  Id. ¶ UR.3.6.3 at 3-19.

17

them from adjusting the size of a gallon of retail motor fuel based on a standardized temperature. Defendants cite three attorney general opinions. Only one – Texas – is a jurisdiction involved in this case. In 1939, the Texas attorney general opined that it was improper to use a retail dispenser which measured motor fuel in tenths of a gallon because that unit was not expressly identified as a permissible unit in then-existing weights-and-measures laws and regulations. See Op. Tex. Att'y Gen. No. O-1025 (Sept. 25, 1939). Defendants contend that this opinion illustrates that even minor deviations from weights-and-measures rules are prohibited. In Texas, it may. Even so, it does not demonstrate that Handbook 44 prohibits defendants from compensating for temperature in retail sales of motor fuel.

Defendants also cite attorney general opinions from Connecticut and Massachusetts. Both opinions address the legality of temperature compensation in retail delivery of home heating oil. The Connecticut attorney general opined that Handbook 44 permits automatic temperature compensators only on wholesale devices and not on retail devices. See Op. Conn. Att'y Gen., 1977 WL 36323 (Oct. 21, 1977). The Massachusetts attorney general found that a Massachusetts statute which required retailers to deliver home heating oil in gallons did not allow them to vary the size of a gallon based on temperature. See Op. Mass. Att'y Gen. No. 9, 1982 WL 188378, at *3 (Feb. 11, 1982). The Massachusetts attorney general noted, however, that nothing prohibited the dealers from adjusting the *price* of heating oil according to temperature. See id. at *3 n.7. The opinions from Connecticut and Massachusetts are from cold weather jurisdictions (where temperature compensation is not in consumers' favor) which are not part of this lawsuit. The opinions may constitute persuasive authority in support of defendants' position, see Allen v. Kline, 507 F. Supp.2d 1150, 1161 n.5 (D. Kan. 2007), but they are not so persuasive to establish as a matter of law that the

18

28 jurisdictions involved in this case would rule that Handbook 44 prohibits defendants from compensating for temperature in retail sales of motor fuel.[11]

Plaintiffs point out that in a recent report to the National Conference on Weights and Measures, the Committee on Laws and Regulations concluded that "unless prohibited by state law, temperature compensation at retail dispensers is already legal in most states." Nat'l Conference on Weights & Measures, 2007 Interim Report of Comm. on Laws & Regulations 4, http://ts.nist.gov/WeightsAndMeasures/upload/10_LR_07_Pub16_FINAL.pdf (last visited Feb. 21, 2008). Also, in 2007, the NIST surveyed weights-and-measures officials in all 50 states regarding the legality of temperature correction on retail sales of motor fuel. The vast majority responded that temperature compensated retail motor fuel sales are currently permitted at retail service stations. See http://www.ncwm.net/events/atc2007/item6_temp_comp_summary_congress.doc.

Such evidence is not properly before the Court on a motion to dismiss and does not compel a conclusion that temperature compensation is in fact legal. On this record, however, defendants have not shown as a matter of law that state regulation in any of the 28 jurisdictions precludes plaintiffs' claims.

**B.      Whether The Consumer Protection And Breach Of Contract Claims Fail As A Matter Of Law Because Defendants Accurately Represent What They Sell**

Defendants assert that plaintiffs' consumer protection and breach of contract claims fail as a matter of law because defendants accurately represent that they are selling a "gallon," i.e. 231 cubic inches, of motor fuel. Specifically, defendants argue that because the 28 jurisdictions have

---

[11]      Indeed, defendants' own memorandum indicates that the State of California has approved a retail fuel dispenser which has temperature-adjustment capability and that Arizona would also allow the dispenser. See Defendants' Memorandum (Doc. #197) at 4-5. While such evidence is not properly before the Court on a motion to dismiss, it undercuts defendants' position that Handbook 44 prohibits retail temperature compensation as a matter of law.

adopted official weights-and-measures terms which define a gallon as a unit of liquid capacity equal to 231 cubic inches, state statutes supply meaning to the term "gallon" in the parties' agreements and preclude plaintiffs' claims that the term lacks meaning or is deceptive or unfair.

Defendants do not explain how their argument applies to plaintiffs' specific claims for relief. Regarding breach of contract, plaintiffs assert two theories.  First, they claim that under agreements to purchase motor fuel for a specified price per gallon, plaintiffs understood that a "gallon" of fuel would be fungible, i.e. that each gallon would not vary and would contain the same amount of energy.  See CAC ¶¶ 123-26.  Plaintiffs claim that defendants breached these agreements by delivering less fuel than agreed when the temperature was greater than 60 degrees Fahrenheit.  See CAC ¶¶ 131-33.  Defendants do not explain how their argument – that the term "gallon" unambiguously means 231 cubic inches – would preclude this claim.  Plaintiffs second theory is that the agreements did not define the term "gallon" and that the parties implicitly agreed that the term meant the industry standard gallon, i.e. 231 cubic inches at 60 degrees Fahrenheit, and that defendants breached the agreements by delivering less fuel than agreed when the temperature was greater than 60 degrees Fahrenheit.  CAC ¶¶ 127-29, 131-33.  Defendants argument apparently addresses the second theory, i.e. that the parties could not have implicitly agreed to the industry standard gallon because the term "gallon" unambiguously means 231 cubic inches, whatever the temperature.

Defendants cite statutes from the 28 jurisdictions which for the most part incorporate NIST weights and measures into state law.  See Appendix to Defendants' Memorandum (Doc. #197) at 11-17.[12]  The statutes vary somewhat with respect to wording.  Many declare that NIST weights and

---

[12]     The Appendix entry for Nevada indicates that the legislature has given the state sealer (continued...)

measures equivalents shall govern weighing and measuring equipment and transactions in the state.

See id. (Arizona, Arkansas, Delaware, Florida, Georgia, Guam, Kentucky, Maryland, Mississippi, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Utah and Virginia).  Others merely recognize the U.S. standards and/or declare that U.S. standards shall be used for commercial purposes within the state.  See id. (Alabama, Indiana, Kansas, Missouri, Oklahoma, Texas and Utah).  In addition, several statutes provide that parties to a contract can agree otherwise.  See, e.g., Ala. Code § 8-16-4 (contracts construed according to U.S. standards unless parties stipulate to contrary); Kan .Stat. Ann. § 83-204 (same except where parties have agreed otherwise); Tex. Agric. Code Ann. § 13.021©) (same except as otherwise provided by express contract).  This authority does not demonstrate as a matter of law that the 28 jurisdictions would dismiss plaintiffs' breach of contract claims.

Defendants contend that under Hopkins v. BP Oil, Inc., 81 F.3d 1070 (11th Cir. 1996), the term "gallon" is unambiguous and refers to a gross volumetric gallon of gasoline.  In Hopkins, gasoline dealers claimed that their suppliers breached contracts which required them under Alabama law to bill for gasoline based on temperature-adjusted gallons as opposed to gross gallons.  The contracts did not define the term "gallon," but each dealer testified that he understood that he was receiving gross gallons from the suppliers.  See id. at 1072.  In addition, the invoices showed the number of gross gallons delivered as well as information regarding the gasoline's temperature and gravity, from which one could determine the amount of temperature-adjusted gallons delivered.  See id.  A jury found in favor of plaintiffs.  On appeal, the suppliers claimed that the trial court should

---

[12](...continued)
of weights and measures authority to adopt weights-and-measures standards, but it does not reveal whether the state sealer has done so.  See id. at 14.

not have allowed the jury to determine the contractual meaning of the term "gallon." The Eleventh Circuit agreed, finding that the term was unambiguous and referred to gross gallons. See id. at 1074. The Eleventh Circuit did not explain the basis for its decision. To the extent the Eleventh Circuit may have relied on dealers' testimony that they knew they were receiving gross gallons, and the invoices which clearly showed that they received gross gallons, its holding does not support defendants' position that plaintiffs' claim is deficient as a matter of law.

Defendants contend that plaintiffs cannot rely on the oil industry's trade usage because plaintiffs are not engaged in the trade. The authority which they cite, however, does not demonstrate that plaintiffs have failed to state a claim as a matter of law. Defendants cite Atlantic Track & Turnout Co. v. Perini Corp., 989 F.2d 541 (1st Cir. 1993), Frantz v. Cantrell, 711 N.E.2d 856 (Ind. Ct. App. 1999), and Mieske v. Bartell Drug Co., 593 P.2d 1308 (Wash. 1979). Those cases indicate that trade usage can supplement the terms of a contract if the evidence shows, as a factual matter, that both parties knew or should have known of the usage. See Atl. Track, 989 F.2d at 543; Frantz, 711 N.E.2d at 860; Mieske, 593 P.2d at 1313. Plaintiffs claim that the parties implicitly agreed that the term "gallon" meant a U.S. standard industry gallon. In ruling on defendants' motion to dismiss, the Court must accept this allegation as true. On this record, defendants have not shown as a matter of law that plaintiffs cannot prevail on their breach of contract claims.

Defendants do not explain how their argument applies to plaintiffs' consumer protection claims. They apparently assert that because the term "gallon" is unambiguous and means 231 cubic inches, the sale of hot motor fuel is not misleading so long as defendants delivered 231 cubic inches. The Court disagrees. Plaintiffs claim that defendants engaged in deceptive practices by selling hot motor fuel without disclosing or adjusting the price for the effects of thermal expansion and without

22

disclosing that they were collecting excess money as reimbursements for motor fuel taxes.  In ruling on defendants' motion to dismiss, the Court must accept these allegations as true.   Even if defendants are correct that the term "gallon" unambiguously means 231 cubic inches, they have not shown as a matter of law that the alleged practices were not deceptive.  On this record, defendants have not shown that as a matter of law plaintiffs cannot prevail on their consumer protection claims.

### C.      Whether The Consumer Protection Claims Fail As A Matter Of Law Because Defendants Do Not Omit, Suppress Or Conceal Material Facts

Defendants contend that plaintiffs' consumer protection claims fail as a matter of law because defendants do not have a duty to disclose the industry's use of the U.S. petroleum gallon. Relying on Handbook 44, defendants contend that the meaning of "gallon" is plain and legally prescribed, so the existence of a different industry standard is irrelevant.  Defendants' argument misses the point.  Plaintiffs claim that defendants engaged in deceptive sales practices by not disclosing or adjusting the price of motor fuel to account for the effects of thermal expansion, and by charging excess reimbursements for motor fuel taxes.  In ruling on defendants' motion to dismiss, the Court must accept plaintiffs' factual allegations as true.  If defendants' practices are deceptive – as plaintiffs allege – defendants may have a duty to disclose such information to avoid liability under consumer protection statutes.  See, e.g., Williamson v. Amrani, 283 Kan. 227, 246, 152 P.3d 60, 73 (2007) (party has duty to disclose material facts if party knows other party is entering transaction under mistake as to facts and because of parties' relationship, customs in trade or other objective circumstances other party would reasonably expect disclosure of such facts); Smith v. Gen. Motors Corp., 979 S.W.2d 127, 129 (Ky. Ct. App. 1998) (duty to disclose may arise from fiduciary relationship, from partial disclosure of information or from particular circumstances such as where one party to contract has superior knowledge and is relied upon to disclose same).

Defendants assert that state regulations define their disclosure duties. Specifically, defendants argue that despite the fact that many factors affect energy content and other fuel qualities, state and federal regulations impose only limited disclosure obligations on motor fuel retailers. See Defendants' Memorandum (Doc. #197) at 16-17. As an initial matter, a determination of state and federal disclosure requirements is beyond the scope of the record before the Court. Moreover, defendants cite no legal authority to support their conclusion that because regulations require them to make certain disclosures, their failure to make other disclosures is not deceptive as a matter of law.

Defendants assert that plaintiffs cannot show that they concealed or suppressed material information regarding thermal expansion of motor fuel because such information has long been in the public domain. In support of this argument, defendants cite Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 759 (7th Cir. 2007), which held that securities laws do not require firms to disclose information which is already in the public domain. See Defendants' Memorandum (Doc. #197) at 19. Defendants have not shown that securities laws apply here, and the record does not establish that information about the thermal expansion of motor fuel has long been in the public domain. Plaintiffs allege that when they purchased warm fuel they did not know that they received less energy – or that they reimbursed defendants for excess motor fuel taxes. In ruling on defendants' motion to dismiss, the Court must accept these factual allegations as true. On this record, defendants have not shown as a matter of law that they did not omit, suppress or conceal material facts.

**D.      Whether The Consumer Protection Claims Fail As A Matter Of Law Because State Weights-And-Measures Regimes Endorse Defendants' Practices As Fair And Proper**

Defendants argue that plaintiffs' consumer protections claims fail as a matter of law because

state law requires them to sell fuel by the gallon without regard to temperature. Defendants assert that the Court should not construe state consumer protection statutes to forbid the same conduct which state regulations require. See Defendants' Memorandum (Doc. #197) at 19-20. As discussed above, defendants have not shown as a matter of law that state laws or regulations *require* them to sell motor fuel by the gallon without regard to temperature. Moreover, it appears that no state law or regulation prohibits defendants from disclosing and/or adjusting the price of motor fuel to account for the effects of temperature.

Defendants contend that plaintiffs' consumer protections claims fail as a matter of law because state regulators endorse the practice of selling retail motor fuel by the gallon without regard to temperature. Specifically, defendants assert that state regulators have approved retail dispensers which dispense 231 cubic-inch gallons of motor fuel and do not require them to explain that fuel is dispensed by the gallon without regard to temperature. These factual contentions, however, are beyond the scope of the record currently before the Court. Moreover, even accepting the factual contentions as true, defendants have not shown as a matter of law that the jurisdictions involved in this lawsuit would preclude plaintiffs' consumer protection claims.

Defendants argue that in Oklahoma, New Jersey, Georgia, Tennessee, California, Louisiana and New Mexico, plaintiffs' consumer protection claims fail as a matter of law because they concern an area of regulatory activity and/or because state law or regulation specifically permits the challenged practice.[13] On this record, however, defendants have not shown as a matter of law that the laws of these jurisdictions would preclude plaintiffs' claims.

---

[13]    Defendants also assert an exemption under South Carolina law. See Defendants' Memorandum (Doc. #197) at 21, but the consolidated amended complaint does not assert a consumer protection claim under South Carolina law.

### 1.      Oklahoma

The Oklahoma Consumer Protection Act ("OCPA") contains the following exception:

> Nothing in this act shall apply to . . . actions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body or officer acting under statutory authority of this state or the United States . . . .

Okla. Stat. tit. 15, § 754(2).

To determine whether the exemption applies, the Court must compare the purposes of the OCPA and the allegedly conflicting regulatory scheme.  See Williams v. CSC Credit Servs., Inc., No. 07-CV-0255-CVE-FHM, 2007 WL 1959219, at *3 (N.D. Okla. June 29, 2007).  If plaintiffs' claim falls within the scope of the regulatory scheme, it is exempt from coverage under the OCPA. See id. at *3 (claim regarding defendant's refusal to remove inaccurate credit report fell squarely within scope of fair credit reporting act); see also Estate of Hicks v. Urban East, Inc., 92 P.3d 88, 95 (Okla. 2004) (claim regarding misrepresentation of nursing home standard of care and treatment fell within scope of nursing home regulation); Brice v. AT&T Commc'ns, Inc., 32 P.3d 885, 887 (Okla. Civ. App. 2001) (telephone billing rate dispute fell within jurisdiction of Corporation Commission).

Defendants provide no discussion or analysis of any Oklahoma regulatory scheme which allegedly conflicts with the purposes of the OCPA.[14]  On this record, defendants have not shown as

_____

[14]      Defendants cite state statutes which (1) establish state agencies for weights and measures; (2) recognize and incorporate into state law a system of weights and measures; (3) incorporate the requirements of Handbook 44; (4) require evaluation or approval of weighing and measuring devices; (5) authorize field inspections by state weights-and-measures officials; (6) direct the use of temperature compensation at wholesale; (7) prescribe standards for describing motor fuels; and (8) provide criminal and civil enforcement of state weights-and-measures laws. See Appendix to Defendants' Memorandum (Doc. #197).  Defendants, however, offer no analysis of the Oklahoma weights-and-measures regulatory scheme or how it may conflict with the purposes of the OCPA.

a matter of law that the OCPA exemption applies to plaintiff claims.

### 2.   New Jersey

The New Jersey Supreme Court has recognized an exception under the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 et seq., where a "real possibility" of conflict exists regarding regulatory jurisdiction over the alleged practice. See Lemelledo v. Beneficial Mgmt. Corp. of Am., 696 A.2d 546, 552-53 (N.J. 1997). To find such an exception, the Court must be convinced "that the other source or sources of regulation deal specifically, concretely, and pervasively with the particular activity, implying a legislative intent not to subject parties to multiple regulations that, as applied, will work at cross-purposes." Id. at 554. Under this jurisprudence, the Court must assume that the NJCFA applies to the alleged practice "even in the face of other existing sources of regulation." Id. at 553-54. In order to overcome the presumption that the NJCFA applies, defendants must show that "a direct and unavoidable conflict exists between application of the [NJCFA] and the other regulatory scheme or schemes." Id. at 554 (existence of other statutory schemes to regulate financial institution's loan packing did not limit scope of NJCFA); see also Doug Grant, Inc. v. Greate Bay Casino Corp., 3 F. Supp.2d 518, 535-37 (D.N.J. 1998) (NJCFA claims exempted where state regulators explicitly authorized challenged practices).

Defendants provide no discussion or analysis of a regulatory scheme in New Jersey which directly conflicts with plaintiffs' claims under the NJCFA. On this record, defendants have not shown as a matter of law that New Jersey courts would not allow plaintiffs' consumer protection claims.

### 3.   Georgia

Defendants assert that the Georgia Fair Business Practices Act of 1975 ("GFBPA"),

Ga. Code Ann. § 10-1-390 <u>et seq.</u>, does not apply to areas of regulated activity.  <u>See</u> Defendants' Memorandum (Doc. #197) at 21 (citing <u>Chancellor v. Gateway Lincoln-Mercury, Inc.</u>, 502 S.E.2d 799 (Ga. Ct. App. 1998)).   Plaintiffs, however, assert their claim under the Georgia Uniform Deceptive Trade Practices Act ("GUDTPA"), Ga. Code Ann. § 10-1-370 <u>et seq.</u>  <u>See</u> CAC ¶¶ 238-45.  Defendants cite no authority which suggests that the GFBPA exception applies to GUDTPA claims.  Moreover, even if the GFBPA exception did apply, defendants have not shown a matter of law that it would exempt plaintiffs' claims.   The GFBPA exemption applies to actions or transactions which are "specifically authorized" under laws administered by or rules and regulations promulgated by any state or federal regulatory agency.  Ga. Code Ann. § 10-1-396(1).  Defendants have not shown as a matter of law that any state or federal agency has specifically authorized them to sell motor fuel by the gallon  without compensating for temperature.

**4.      Tennessee**

The Tennessee Consumer Protection Act of 1977 ("TCPA") exempts "[a]cts or transactions required or specifically authorized under the laws administered by, or rules and regulations promulgated by, any regulatory bodies or officers acting under authority of [Tennessee] or the United States."  Tenn. Code Ann. § 47-18-111(a)(1).  As discussed above, on this record defendants have not shown as a matter of law that state or federal regulatory law requires or specifically authorizes them to sell motor fuel by the gallon without regard to temperature.

**5.      California**

Defendants assert that California courts recognize a "safe harbor" for practices which the state legislature or regulatory bodies specifically permit.  <u>See</u> Defendants' Memorandum (Doc. #197) at 21-22 (citing <u>McCann v. Lucky Money, Inc.</u>, 129 Cal. App.4th 1382, 1395 (2005)).

As an initial matter, the case law which defendants cite applies to claims asserted under the California unfair competition law ("CUCL"), Cal. Bus. & Prof. Code § 17200 et seq. Plaintiffs also assert claims under the California Consumer Legal Remedies Act ("CCLRA"), Cal. Civ. Code § 1750 et seq. (Count XVII).  Defendants have not shown that a "safe harbor" exists under the CCLRA.

In Cal-Tech Communications, Inc. v. Los Angeles Cellular Telephone Company, 973 P.2d 527 (Cal. 1999), the California Supreme Court found that if the legislature has permitted certain conduct or considered a situation and concluded that no action should lie, courts may not use the CUCL to override that determination.  See id. at 541.  Specifically, the California Supreme Court found that a plaintiff may not "plead around" a legislative barrier to relief by re-casting the claim as one for unfair competition.  The court explained as follows:

> The rule does not, however, prohibit an action under the unfair competition law merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the unfair competition law, another provision must actually "bar" the action or clearly permit the conduct. There is a difference between (1) not making an activity unlawful, and (2) making that activity lawful. . . . Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision

Id. at 541-42.[15]

On this record, defendants have not shown as a matter of law that the California legislature

---

[15]     The case which defendants cite, McCann v. Lucky Money, Inc., 129 Cal. App.4th 1382 (2005), involved an unfair competition claim against a foreign exchange company for not disclosing the wholesale exchange rate. The California Court of Appeals affirmed the lower court's ruling that the complaint failed to state facts sufficient to state a cause of action. See id. at 1391. In so doing, the McCann court cited Cal-Tech to support its conclusion that the fact that the state's comprehensive regulatory scheme did not label the practice unfair constituted a defense to the claim. See id. at 1395.

has barred them from selling temperature-compensated fuel or clearly permitted them to sell motor fuel by the gallon without compensating for temperature. Accordingly, defendants have not shown as a matter of law that plaintiffs cannot prevail on their CUCL claims.

### 6. Louisiana

Defendants contend that they are exempt from plaintiffs' claims under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPCPL"), La. Rev. Stat. Ann. § 51:1401 et seq. (Count XXIV). In support of their argument, defendants cite LMB, Inc. v. Lard Oil Co., No. 97-3817, 1998 WL 777825 (E.D. La. 1998). In that case, a gas station operator challenged its wholesale distributor's practice of re-selling gasoline based on "gross gallons" (i.e. non-temperature adjusted gallons) when it purchased gasoline based on based on "net gallons" (i.e. temperature adjusted gallons). Plaintiff claimed, inter alia, that defendant's practice violated the LUTPCPL and the Louisiana bulk petroleum sales law, La. Rev. Stat. Ann. § 51:831(B)(1), which requires refiners to make petroleum bulk sales to retailers and petroleum jobbers based on net gallons. The court found that under the bulk sales law definitions, defendant constituted a "jobber" (i.e. a distributor or wholesaler who is the middleman between the refiner and retail dealer) and not a "refiner" (i.e. a person engaged in the refining of crude oil to produce motor fuel). See LMB, 1998 WL 777825, at *3. Because plaintiff was not a refiner, the court concluded that the bulk petroleum sales law did not prohibit it from making gross gallon sales. See id. at 3-4. The court further found that because defendant's practice did not violate the bulk petroleum sales law, plaintiff failed to state a claim under the LUTPCPL. See id. at 4. In so finding, the court reasoned that "it seems unlikely that the Louisiana legislature would permit a petroleum jobber to make gross gallons sales under the bulk sales law, yet punish the jobber for unfair competition for committing the very same practice." Id.

(quotations omitted).  The <u>LMB</u> court, however, did not cite any authority from Louisiana (or anywhere else) to support its conclusion that an exception to the LUTPCPL exists and/or to define the parameters of any such exemption.  Thus, on this record, the Court cannot discern how Louisiana courts might handle the matter.  Moreover, defendants have not shown as a matter of law that the Louisiana legislature permits retail sales of motor fuel without temperature compensation.  On this record, the Court will not dismiss plaintiffs' LUTPCPL claims.

### 7.    New Mexico

Defendants contend that under <u>Valdez v. State of New Mexico</u>, 54 P.3d 71 (N.M. 2002), they are entitled to a safe harbor from plaintiffs' claims under the New Mexico Unfair Trade Practices Act ("NMUTPA"), N.M. Stat. § 57-12-1 <u>et seq.</u>  <u>See</u> <u>Defendants' Memorandum</u> (Doc. #197) at 22.  In <u>Valdez</u>, the New Mexico Supreme Court found that plaintiffs' claims regarding excessive collect telephone charges were exempt from the NMUTPA because the state public regulation commission had authorized the subject rates.  54 P.3d at 75-76.  In reaching its conclusion, the <u>Valdez</u> court relied on Section 57-12-7 of the NMUTPA, which provides as follows:

> Nothing in [this Act] shall apply to actions or transactions expressly permitted under laws administered by a regulatory body of New Mexico or the United States, but all actions or transactions forbidden by the regulatory body, and about which the regulatory body remains silent, are subject to the [Act].

N.M. Stat. § 57-12-7.

Here, defendants have not shown as a matter of law that state or federal law or regulation expressly permits the challenged actions.  Accordingly, defendants have not shown that the NMUTPA exemption applies to plaintiffs' claims.  On this record, defendants have not shown that any state would preclude plaintiffs' consumer protection claims as a matter of law.

**E.      Whether The Implied Warranty Claims Fail As A Matter Of Law Because Defendants Did Not Warrant Identical Energy Content With Each Unit Sold**

Plaintiffs assert claims for breach of express and implied warranties under Sections 2-313[16] and 2-314,[17] respectively, of the UCC.[18]  Defendants argue that plaintiffs cannot prevail on their "warranty" claims.  Defendants' Memorandum (Doc. #197) at 22-24.  Defendants, however, do not differentiate between the express and implied warranty claims.  Based on context, it appears that defendants' arguments address only the implied warranty claims.  See id.[19]  To state a claim for

---

[16]      Under Section 2-313(2)(a), "[a]ny affirmation of fact or promise made by the seller which relates to the goods and becomes part of basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  UCC § 2-313(2)(a).

[17]      Section 2-314 provides, in part, as follows:

(1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. * * *
(2) Goods to be merchantable must be at least such as:
       (a) pass without objection in the trade under the contract description;
       (b) in the case of fungible goods, are of fair average quality within the description;
       ©) are fit for the ordinary purposes for which goods of that description are used;
       (d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; * * *

UCC § 2-314.  Section 2-314 states the minimum standards for the implied warranty of merchantability but does not otherwise define the warranty.  See 3 Lary Lawrence, Anderson on the Uniform Commercial Code § 2-314:78, at 309 (3d ed. 2002).  It provides only a minimum level of quality and is not an assurance that the buyer's expectations will be fulfilled.  See id.

[18]      The parties agree that Article 2 applies.  See UCC § 2-102.

[19]      Plaintiffs' express warranty claims clearly involve factual issues which the Court cannot resolve on a motion to dismiss.  Generally, whether defendants made statements which constitute an express warranty involves a question of fact.  See, e.g., Colgan Air, Inc. v. Raytheon Aircraft Co., 507 F.3d 270, 279 (4th Cir. 2007); Downie v. Abex Corp., 741 F.2d 1235, 1239-40 (10th Cir. 1984); Piper Mfrs. Co. v. Rescuers, Inc., 60 F. Supp.2d 869, 882-83 (N.D. Ind. 1999).
(continued...)

breach of implied warranty of merchantability, plaintiffs must allege that (1) the goods were subject to the implied warranty of merchantability, (2) the goods did not comply with the warranty in that the goods were defective, (3) the defect existed at the time of sale and (4) the defect caused injury to plaintiffs. See, e.g., Vanderwerf v. SmithKlineBeecham Corp., 414 F. Supp.2d 1023, 1026 (D. Kan. 2006); McDonald Bros., Inc. v. Tinder Wholesale, LLC, 395 F. Supp.2d 255, 265 (M.D.N.C. 2005).[20]  Plaintiffs may prove breach of implied warranty of merchantability with circumstantial evidence concerning their reasonable expectations as to the function of the product. See Black v. Don Schmid Motor, Inc., 232 Kan. 458, 467, 657 P.2d 517, 525 (1983).

Here, plaintiffs allege that (1) defendants impliedly warranted that motor fuel was of even kind, quality and quantity within each gallon sold; (2) defendants breached that warranty by delivering fuel at temperatures in excess of 60 degrees Fahrenheit which contained decreasing quantities of fuel and energy content; and (3) plaintiffs suffered pecuniary damages as a result thereof. See CAC ¶¶ 146-50. Accepting as true plaintiffs' factual contentions, these allegations sufficiently state a claim for breach of implied warranty.

Defendants assert that they only warranted to provide motor fuel priced by gallon and that they complied with that obligation. Specifically, defendants argue that (1) the term "gallon" is a

---

[19](...continued)
In ruling on defendants' motion to dismiss, the Court must accept as true plaintiffs' factual contention that defendants agreed to sell motor fuel which consisted of certain energy producing characteristics which included a particular uniform quantity of fuel which would not vary with temperature, and that defendants breached that warranty by delivering warm fuel which contained decreasing quantities of fuel and energy content. Defendants have not shown as a matter of law that plaintiffs cannot prevail on this claim.

[20]      Defendants do not cite the elements of a claim for breach of implied warranty of merchantability or state whether the laws of the 28 jurisdictions differ in this regard. The Court has not independently researched the laws of the 28 jurisdictions on this issue or tried to construct arguments to support defendants' motion.

volumetric unit which conveys nothing explicitly or implicitly about energy content and, therefore, defendants could not have warranted that every gallon sold would contain the same amount of energy content; and (2) Section 2-314 requires only that the goods be of "fair and average quality within the description" – not that every good be exactly the same – and defendants did not impliedly warrant that each gallon of fuel would be exactly same.  These arguments involve factual matters outside the complaint, i.e. whether defendants did or did not imply that each gallon of motor fuel would contain an equal amount of energy content.  As previously discussed, in ruling on defendants' motion to dismiss, the Court must accept as true plaintiffs' allegation that defendants implied such a warranty.

Defendants argue that because motor fuel has been sold by the gallon in the United States for 100 years, it is the accepted norm and no new warranty can be discovered now.  Even if the Court could take judicial notice of the way gasoline has been sold for 100 years, defendants have not shown as a matter of law that this fact would preclude plaintiffs's implied warranty claim as a matter of law.

Defendants contend that because they complied with state and federal law regarding composition of motor fuel, they delivered motor fuel of "fair average quality within the description." As previously discussed, in ruling on defendants' motion to dismiss, the Court must accept plaintiffs' factual allegations as true.  Plaintiffs allege that defendants impliedly warranted that motor fuel was of even kind, quality and quantity within each gallon and that defendants breached that warranty by delivering warm fuel which contained decreasing quantities of fuel and energy content.  On this record, defendants have not shown as a matter of law that plaintiffs cannot prevail on this claim.

**F.      Whether The Fraud And Negligent Misrepresentation Claims Fail As A Matter Of Law**

Defendants assert that plaintiffs cannot prevail on their fraudulent and negligent misrepresentation claims because defendants did not make untrue or misleading statements and did not conceal material facts from consumers.  In support of this argument, defendants offer no analysis and cite no legal authority.  See Defendants' Memorandum (Doc. #197) at 24.[21]  The Court will not construct legal arguments or theories on defendants' behalf.  See Moore, 470 F. Supp.2d at 1250. On this record, defendants have not shown as a matter of law that plaintiffs cannot prevail on their fraudulent and negligent misrepresentation claims.

**G.      Whether The Breach Of Duty Of Good Faith And Fair Dealing Claim Fails As A Matter Of Law**

Defendants contend that plaintiffs cannot prevail on their breach of good faith and fair dealing claim because their consumer protection claims fail as a matter of law.  As discussed above, defendants have not shown as a matter of law that plaintiffs cannot prevail on the consumer protection claims.  The Court therefore does not reach this argument.

**H.      Whether The Unjust Enrichment And Conversion Claims Fail As A Matter Of Law**

Defendants contend that as a matter of law plaintiffs cannot prevail on the unjust enrichment and conversion claims because state law precludes defendants from selling temperature-adjusted gallons of motor fuel.  As discussed above, defendants have not shown as a matter of law that state law forbids them from selling temperature-adjusted gallons.  Moreover, defendants do not explain

---

[21]      Defendants state generally that the misrepresentation claims fail for the same reasons as the consumer protection and breach of contract claims.  See id.  As discussed above, defendants have not shown as a matter of law that plaintiffs cannot prevail on the consumer protection and breach of contract claims.  Moreover, even if they had, defendants have not shown that the same analysis would apply to the misrepresentations claim.

how their argument would preclude plaintiffs' claims regarding price adjustment and excess tax reimbursements.

Defendants assert that as a matter of law plaintiffs cannot prevail on the unjust enrichment and conversion claims because plaintiffs cannot bring quasi-contractual claims when the transaction is governed by contract.  In support of this argument, defendants cite Fortune Production Co. v. Conoco, Inc., 52 S.W.3d 671 (Tex. 2000).  In that case, the Texas Supreme Court found that generally, one cannot recover under an unjust enrichment theory where an express contract covers the same subject matter.  See id. at 683-84.  The court, however, recognized that in the absence of an express written contract, whether the parties had an express agreement covering the subject matter is question of fact.  See id. at 685.[22]  At this stage in the proceedings, plaintiffs may plead inconsistent claims for relief.  See Fed. R. Civ. P. (8)(d)(3);[23] see also Olympia Hotels Corp. v. Johnson Wax Dev. Corp., 908 F.2d 1363, 1371 (7th Cir. 1990); John Morrell & Co. v. Halbur, 476

---

[22]     In Fortune Prod., plaintiffs sold natural gas to defendants and claimed that defendants were unjustly enriched by not paying for field liquids, i.e. condensation of gas which formed during transportation.  Defendant asserted by way of affirmative defense that plaintiffs could not recover for unjust enrichment because an express contract governed the matter in dispute.  The trial court submitted the unjust enrichment claim to the jury, which found in favor of plaintiff.  The Texas Supreme Court found that where two written contracts unambiguously covered the matter in dispute, the trial court should not have submitted the issue to the jury and should have found as a matter of law that the contracts precluded the unjust enrichment claims.  See id. at 683-85.  One plaintiff, however, did not have a written contract with defendant.  As to that plaintiff the Texas Supreme Court noted that the record was unclear whether the parties' agreements covered the entire stream of gas or only distinct components of the gas stream.  It further noted that because the existence of or terms of the contracts were unclear, defendant had a duty to secure findings from the trial court that an express contract existed which covered the subject matter in dispute.  See id. at 685.  Because defendant did not do so, the Texas Supreme Court upheld the jury verdict as to the plaintiff who did not have a written contract with defendant.

[23]     Rule 8(d)(3) states that "[a] party may state as many separate claims or defenses as it has, regardless of consistency."

F. Supp.2d 1061, 1078 (N.D. Iowa 2007); <u>Duncan v. Paragon Pub., Inc.</u>, No. IP01-0505-C-T/K, 2001 WL 1388009, at *2 (S.D. Ind. 2001). On this record, defendants have not shown as a matter of law that plaintiffs do not state claims for unjust enrichment and conversion.

## I.      Whether The Civil Conspiracy Claims Fail As A Matter Of Law

Defendants contend that plaintiffs do not allege facts sufficient to support civil conspiracy. To state a claim for civil conspiracy, plaintiffs must allege (1) two or more persons; (2) an object to accomplish; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) proximate damages. <u>See, e.g.</u>, <u>Meyer Land & Cattle Co. v. Lincoln County Conservation Dist.</u>, 29 Kan. App.2d 746, 753, 31 P.3d 970, 976 (2001) (citing <u>Stoldt v. City of Toronto</u>, 234 Kan. 957, 967, 678 P.2d 153, 161 (1984)). The claim must be based on a valid, actionable underlying tort. <u>See id.</u>; <u>see also</u> <u>Paschal v. Great W. Drilling, Ltd.</u>, 215 S.W.3d 437, 450 (Tex. App. 2006); <u>Applied Equip. Corp. v. Litton Saudi Arabia Ltd.</u>, 869 P.2d 454, 478 (Cal. 1994).[24]

Defendants assert that plaintiffs do not allege facts sufficient to support an inference that they committed an underlying wrongful act. Plaintiffs clearly allege, however, that defendants committed various underlying unlawful acts including unjust enrichment, breach of contract, breach of duty of good faith and fair dealing, breach of implied and express warranties, money had and received, conversion, fraudulent and negligent misrepresentation, civil conspiracy, fraudulent concealment and violation of consumer protection laws. As discussed above, defendants have not shown as a matter of law that plaintiffs cannot prevail on any of these claims. On this record, defendants have

_____

[24]      Defendants offer no analysis regarding the elements of civil conspiracy claim or whether they are the same under laws of the 28 jurisdictions at issue. Again, the Court has not independently researched this issue or attempted to construct arguments for defendants.

not shown as a matter of law that plaintiffs have not alleged an underlying wrong which is sufficient to support their civil conspiracy claim.

Defendants assert that plaintiffs allege only parallel conduct, which is not sufficient to support a claim of conspiracy.  In support of this argument, defendants cite Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955 (2007).  In that case, the United States Supreme Court found that in deciding a Rule 12(b)(6) motion to dismiss, the Court must determine whether the complaint alleges "enough facts to state a claim for relief that is plausible on its face."  Id. at 1969.  In Twombly, plaintiffs sued local telephone exchange carriers for antitrust conspiracy under the Sherman Act.  Plaintiffs alleged that defendants did not compete with one another and engaged in parallel conduct which was unfavorable to competition.  Plaintiffs did not independently allege an actual agreement among defendants.  See id. at 1970.  The Supreme Court found that while parallel business behavior would be admissible circumstantial evidence from which a fact finder could infer an agreement, it could not conclusively establish an agreement and could not in itself constitute a Sherman Act violation.  See id. at 1964.  The Supreme Court concluded that plaintiffs' allegation of parallel conduct, without more, was equally consistent with unilateral competitive business strategy and even taken as true, did not contain enough factual matter to suggest a plausible claim of conspiracy.  See id. at 1971-73.[25]

Defendants contend that under Twombly, plaintiffs' civil conspiracy claim is not plausible.  Specifically, defendants assert that plaintiffs allege only a single vague fact in support of their claim of a conspiracy to pressure manufacturers, and that plaintiffs do not allege that defendants

---

[25]        The Twombly court stated that it was not requiring a heightened fact pleading of specifics, but only enough facts to state a claim to relief which was plausible on its face.  See id. at 1974.

themselves – as opposed to non-party trade associations – came to an agreement regarding the treatment of dispenser manufacturers.  <u>See</u> <u>Defendants' Memorandum</u> (Doc. #197) at 26.  As an initial matter, defendants' argument addresses only part of plaintiffs' civil conspiracy claim, <u>i.e.</u> that defendants conspired to exert undue pressure and influence upon various manufacturers and other proponents of temperature compensation at the retail level.  It does not address plaintiffs' claim that defendants conspired to sell motor fuel on a non-temperature compensated basis.  Moreover, taken as a whole, plaintiffs allege facts sufficient to state a plausible claim of conspiracy.  Plaintiffs allege that defendants agreed to an unlawful course of action to unlawfully deprive plaintiffs of rights and property by selling motor fuel on a non-temperature compensated basis and by refusing to implement automatic temperature compensation technology.  <u>See</u> CAC ¶ 177.  Plaintiffs allege that in furtherance of the unlawful agreement, defendants conspired and acted in concert, both amongst themselves and with third parties (such as non-party trade associations) to exert undue pressure and influence upon various manufacturers and other proponents of temperature compensation at the retail level.  CAC ¶ 179.  Plaintiffs allege that as members of various trade associations, defendants have pressured manufacturers to not sell automatic temperature compensation equipment and retrofit kits in the United States.  <u>See</u> CAC ¶¶ 56-57.  Unlike <u>Twombly</u>, plaintiffs here do not allege parallel behavior with no actual agreement among defendants.  On this record, defendants have not shown as a matter of law that plaintiffs have not stated a claim for civil conspiracy.

**J.      Whether Claims Based On Excess Tax Reimbursements Fail As A Matter Of Law**

Defendants contend that as a matter of law, plaintiffs cannot prevail on any claims regarding the alleged collection of excess tax reimbursements because plaintiffs do not allege that defendants violated weights-and-measures laws or tax laws.  <u>See</u> <u>Defendants' Memorandum</u> (Doc. #197) at

27.[26] Defendants, however, have not shown that violation of such laws is an essential element which plaintiffs must allege in order to state their claims for relief.

Defendants assert that plaintiffs cannot prevail on excess tax reimbursement claims because the effect of temperature on motor fuel has long been understood and publicly discussed. See id. Defendants, however, do not explain how the Court can consider this purported fact or how it would preclude plaintiffs' claims that defendants wrongfully collected excess monies for reimbursement of motor fuel taxes.

Defendants contend that whether a state tax regime should grapple with temperature fluctuation is an issue for the legislature. See id. at 28. Plaintiffs, however, do not seek to change the way states collect motor fuel taxes.

Defendants assert that plaintiffs do not identify any inequity in defendants' practice. See id. As an initial matter, defendants have not shown that plaintiffs must allege inequitable conduct in order to state these claims for relief. Moreover, defendants have not shown as a matter of law that the alleged conduct is equitable. Plaintiffs allege that defendants represented that they were remitting specified monies of every actual gallon of motor fuel sold to federal, state and local governments as fuel taxes and that such sums were a requisite and fixed component of the price of fuel when, in fact, defendants retained a significant portion of such monies as excess reimbursement. See CAC ¶ 182. Accepting these facts as true, a reasonable jury could conclude that defendants' conduct was inequitable.

Defendants contend that because they collect motor fuel tax reimbursements as part of the

---

[26]     Defendants do not identify which of plaintiffs' claims are based on excess tax reimbursements or the elements of any such claims under the 28 jurisdictions involved in this case. The Court will not undertake this exercise on defendants' behalf.

total price of fuel, the Court should dismiss plaintiffs' tax reimbursement claims under In re Air Transportation Excise Tax Litig., 37 F. Supp.2d 1133 (D. Minn. 1999).  In that case, customers sued Federal Express Corporation ("FedEx") because it continued to charge the same shipping rates and did not lower its rates when the federal excise tax on transportation expired.  The FedEx air bill stated that "our basic rate includes a federal tax . . . on the air transportation portion of this service."  In addition, the FedEx service guide stated that "all rates . . . include the excise tax required by the federal government on the transportation of property by air."  Id. at 1141.  Plaintiffs claimed that these statements created a contract which required FedEx to reduce its rates once the federal excise tax expired, and that FedEx breached that obligation by not reducing its rates.  The court granted summary judgment in favor of defendants.  In so doing, the court found that under Minnesota law, FedEx's statements did not create contractual obligations but merely notified customers that FedEx assumed responsibility for any applicable federal tax on the air portion of the shipment.  See id. at 1141-42.

Defendants assert that under In re Air Transp., the Court should dismiss plaintiffs' claims regarding excess tax reimbursements.  In re Air Transp., however, was decided under Minnesota law (not one of the jurisdictions at issue here) and is not binding on this Court.  In addition, In re Air Transp. was decided on summary judgment, i.e. the court found that the evidence presented no genuine issue of material fact which precluded judgment as a matter of law.  See Fed. R. Civ. P. 56©).  Here, defendants seek dismissal under Rule 12(b)(6), which requires the Court to accept as true all well pleaded facts in plaintiffs' complaint and view them in a light most favorable to plaintiffs.  See, e.g., Swanson, 750 F.2d at 813.  Moreover, the facts appear distinguishable.  In In re Air Transp., FedEx did not specify the amount of excise tax which it collected, but merely stated

that the total cost included amounts for any excise taxes. <u>See</u> <u>In re Air Transp.</u>, 37 F. Supp.2d at

1142 (citing <u>Strategic Risk Mgmt., Inc. v. Federal Exp. Corp.</u>, 665 N.Y.S.2d 799, 802 (N.Y. Sup.

Ct. 1997)). Here, plaintiffs allege that defendants affirmatively represented that the posted price for

a gallon of fuel included a specific amount of reimbursement for motor fuel taxes and that such sums

were a requisite and fixed component of the price per gallon. <u>See, e.g.</u>, CAC ¶¶ 69, 191. Also,

plaintiffs assert claims for fraud, misrepresentation and consumer protection which were not present

in the other case. On this record, defendants have not shown as a matter of law that plaintiffs cannot

prevail on any claims based on the alleged collection of excess tax reimbursements.

**IT IS THEREFORE ORDERED** that defendants' <u>Joint Motion To Dismiss</u> (Doc. #196)

filed October 22, 2007 be and hereby is **OVERRULED.**

Pursuant to the Court's <u>Scheduling Order No. 1</u> (Doc. #134), on or before **March 3, 2008,**

the parties shall meet and confer pursuant to Rule 26(f), Fed. R. Civ. P., and submit their discovery

and case management planning report via e-mail to Magistrate Judge James P. O'Hara. The stay

on formal discovery is hereby lifted, effective immediately after the parties conduct their Rule 26(f)

meeting.

Dated this 21st day of February, 2008 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge