IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE: MOTOR FUEL TEMPERATURE    )
SALES PRACTICES LITIGATION       )
                                 )
                                 )
                                 )        Case No. 07-MD-1840-KHV
This Order Relates to All Cases  )

## ORDER

In this multidistrict litigation, plaintiffs claim that defendants are liable under various

state law theories because defendants sell motor fuel for a specified price per gallon without

disclosing or adjusting for temperature expansion.   The parties are well versed in the

background of this case, and the court will not repeat it here.  Currently before the court is

plaintiffs' motion to compel certain defendants to provide full and complete responses to

plaintiffs' second set of interrogatories and first set of document requests (**doc. 665**).

Plaintiffs seek an order overruling defendants' objections to providing information about

defendants' activities that occurred before 2001 and about defendants' activities and

operations in Canada.[1]  Having reviewed the motion and the briefs filed by the parties (*see*

docs. 698, 716, and 766), the court is ready to rule.

---

[1]Plaintiffs' motion also sought to compel discovery about events that occurred after
the filing of the first so-called "hot fuel" lawsuit in December 2006.  The parties now agree,
however, that the dispute over such information has been resolved, except to the extent that
defendants object to producing a log of privileged documents generated after the filing of
litigation.  Defendants' objections to a post-litigation privilege log will be addressed by the
court in its order ruling on defendants' motion for a protective order (doc. 678).

## I.  Pre–2001 Activity

Twelve of plaintiffs' document requests[2] and ten of plaintiffs' interrogatories[3] seek information about defendants' activities "for the time period 1970 to the present."[4]  Plaintiffs contend that such information is important because, "[i]n many ways, the 1970s are the starting point of this litigation."[5]  In 1974, the National Conference on Weights & Measures began considering the issue of temperature adjustments in the retail sale of motor fuel. Defendants contributed to industry studies about the average temperature of fuel in the United States and advocated against temperature adjustment.  In the 1980s, a number of class action lawsuits were filed by gas station owners against oil companies, based on the oil companies' refusal to sell temperature-adjusted motor fuel at the wholesale level.  Plaintiffs assert that during that time period, defendants created documents acknowledging that when the temperature is above sixty degrees Fahrenheit, selling motor fuel that has not been

---

[2] Document Request Nos. 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, and 29.

[3] Interrogatory Nos. 29, 30, 31, 32, 33, 38, 50, 51, 58, and 63.

[4] For example, Document Request No. 24 reads: "Produce DOCUMENTS for the time period 1970 to the present RELATING TO any decision made by YOU or persons acting on YOUR behalf, to install or implement or oppose TEMPERATURE ADJUSTMENT for retail sales of MOTOR FUEL."  Interrogatory No. 29 reads:

> IDENTIFY each person, committee, group, or entity that has, with YOUR authority or on YOUR behalf, studied, recommended, approved, rejected, decided or acted upon the concept of installing ATC Equipment on DISPENSING PUMPS at any STATION that YOU own, operate, FRANCHISE, LICENSE, lease, or use in the REGION for the time period 1970 to the present.

[5] Plaintiffs' Motion to Compel Discovery and Memorandum in Support at 10.

temperature-adjusted unjustly enriches the seller.   Then in the 1990s, the Canadian government considered, and eventually passed, legislation permitting the installation of automatic temperature compensation ("ATC") equipment at retail gas stations.   Plaintiffs contend that defendants' actions (independently and through trade organizations) in response to the Canadian legislation are relevant to this case.   Likewise, plaintiffs suggest that the responses of defendants to a 1996 proposed change to a United States Internal Revenue Service rule governing the election of using gross gallons or net gallons to calculate the amount of motor fuel excise tax due are important to issues in this case.

Defendants[6] have objected to plaintiffs' requests for information about activities that occurred before the liability period of this lawsuit—January 1, 2001—on the ground that fully responding to the requests and interrogatories is unduly burdensome.[7]   As the parties

---

[6] Plaintiffs allege that the following defendants object to plaintiffs' requests in this area: 7-Eleven, Inc.; Albertsons/Supervalu; BP Products North America, Inc.; BP West Coast Products, LLC; Casey's General Stores, Inc.; Chevron Corporation; Circle K Corporation; Citgo Petroleum Corporation; ConocoPhillips; Costco Wholesale Corp.; Equilon Enterprises, LLC d/b/a Shell Oil Products US; Exxon Mobil; E-Z Mart Stores, Inc.; Flying J, Inc.; G & M Oil Company; Getty Petroleum Marketing, Inc.; Hess; Kum & Go; Loves Travel Stops; Mac's Convenience Stores, LLC; Marathon Petroleum Company;  MFA Oil Company; Mobil Guam; Motiva Enterprises, LLC; Murphy Oil; Petro Stopping Centers; Pilot Travel Centers; Quik Trip; Racetrac; Sheetz, Inc.; Shell Guam, Inc.; Sinclair Oil Corporation; Speedway SuperAmerica; Sunoco, Inc. (R&M); TA Operating, LLC; Tesoro; The Pantry, Inc.; Thornton's Inc.; TravelCenters of America, LLC; Travel Centers of America Holding Company, LLC; United El Segundo, Inc.; United Oil; USA Petroleum Corporation/Dansk; Valero Energy Corporation; Valero Marketing & Supply Company; Wal-Mart/Sam's Club; WaWa, Inc.; Wilco Hess; World Oil Corporation.

[7] While defendants state that they are also objecting on the ground that the requests and interrogatories are overly broad, defendants' arguments and cited caselaw only address the ground of undue burden.  Defendants' non-briefed objections are deemed waived.  *See* *Philips v. Calhoun*, 956 F.2d 949, 953–54 (10th Cir. 1992) (holding that a position that "has

objecting to discovery, defendants have "the burden to show facts justifying their objection by demonstrating that the time or expense involved in responding to requested discovery is unduly burdensome."[8] This imposes an obligation on defendants "to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure required to produce the requested documents."[9]  The court will then balance the burden on the interrogated party against the benefit to the discovering party of having the information.[10] Discovery will be allowed unless the hardship imposed on the interrogated party is unreasonable compared to the benefits to be secured from the discovery.[11]

---

not been even minimally supported by legal argument or authority" is forfeited); *Sonnino v. Univ. of Kan. Hosp. Auth.*, 221 F.R.D. 661, 670–71 (D. Kan. 2004) (holding that discovery objections that are not supported in a response to a motion to compel are waived because "[t]he Court is then left without any basis to determine whether the objections are valid and applicable").  Additionally, defendants raised relevancy objections in their discovery responses (arguing that the court limited the scope of these consolidated lawsuits to occurrences after January 1, 2001), but withdrew their relevancy objections in their memorandum in opposition to plaintiffs' motion to compel discovery.  *See* Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel Discovery at 3 (stating that defendants "are not withholding information or documents . . . solely on the ground that the information or documents pre-date 2001").  Finally, defendants mention in passing that the preservation order (doc. 240) states that parties have no obligation to preserve records created on or before December 1, 2000.  The court gives this observation no heed, as the first page of the preservation order states: "This Order does not address, limit, or determine the relevance, discoverability, or admission into evidence of any Record . . . regardless of whether the Record is required to be preserved pursuant to the terms of this Order."

[8] *Horizon Holdings, Inc. v. Genmar Holdings, Inc.*, 209 F.R.D. 208, 213 (D. Kan. 2002) (citing *Snowden v. Connaught Lab., Inc.*, 137 F.R.D. 325, 322 (D. Kan. 1991)).

[9] *Id.*

[10] *McBride v. Medicalodges, Inc.*, 2008 WL 1958350, at *4 (D. Kan. May 2, 2008).

[11] *Id.  See also* Fed. R. Civ. P. 26(b)(2)(C)(iii).

All defendants now have agreed to give plaintiffs responsive, non-privileged, pre-2001 documents uncovered in defendants' searches of their active files, but some defendants have resisted searching for such documents in their archived files.  For example, Equilon Enterprises, LLC, Motiva Enterprises, LLC, and Shell Guam, Inc. (collectively, "the Shell defendants"), assert that a search of archived files for responsive documents "would be extremely burdensome and yield no substantial additional information."[12]  The certified records manager for the Shell defendants states that boxes of archived documents are indexed by category code and that a search of these codes identified 48,721 boxes containing records potentially relevant to plaintiffs' requests.[13]  The cost to retrieve these boxes from storage facilities is estimated at $197,000 ($4.05 a box) and that does not include the cost for searching for documents within each box.[14]

Similarly, Conoco Philips ("COP") states that "searching old archived files going back more than 30 years would be unduly burdensome."[15]  Of its archived files, COP has identified 6,750 boxes that are most likely to contain responsive documents.[16]  COP claims

---

[12] Declaration of Sandra B. Gallini at ¶ 6.

[13] Declaration of Debra M. Mestemaker at ¶ 11.

[14] *Id.*

[15] Declaration of Julia Ford at ¶ 3.

[16] COP has apparently identified these boxes despite its representation that because COP was comprised of three independent companies before 2002, "[t]here are few people at COP today who are knowledgeable about the legacy systems and locations of data for the three heritage companies."  *Id.* at ¶ 6.

the documents are located in at least three different locations and that "[w]hile most have an index that is searchable, the indices generally do not identify individual documents."[17] Thus, according to COP, searching the 6,750 boxes would require 5,063 person-hours at a cost of approximately $253,150. An additional cost would be incurred for retrieving the boxes from storage. COP further notes that it consists of several previously independent entities, each with its own email system. COP states that it has no archived backup of these email systems.

BP Products, BP North America, Inc., and BP West Coast Products, LLC, (collectively, "the BP defendants") present a declaration stating that they have used the search terms agreed upon in this case to search archived paper documents located at off-site storage facilities.[18] The BP defendants represent that the search produced a list of approximately 180 boxes, which are currently being reviewed for responsive documents. The BP defendants claim that a more burdensome task for them would be to search archived email systems. The current BP entities consist of merged, formerly independent entities, each with one or more archived email systems that are difficult to access and search. For example, BP West Coast Products, LLC operates the business formerly known as Atlantic Richfield Company ("ARCO"). Between 1986 and 1996, ARCO used an email system called PROFs. According to the BP West Coast representative, "[m]uch of the data from the PROFs system was lost, purged, or is no longer available," and to the extent the data is

---

[17] *Id.* at ¶ 5.

[18] Declaration of Eddie T. Field at ¶ 7.

available, "BP would have to hire, at a substantial cost, a third-party vendor to facilitate review of this data."[19] Between 1996 and 2000, ARCO began using the Lotus Notes email system, but companywide back-up tapes were only kept for sixty days. While back-up tapes were made for individual ARCO office locations, the catalogue of these tapes (numbering in the thousands) is not searchable and would have to be individually reviewed.

The declarations submitted by defendants[20] do not convince the court that the burden of producing the requested pre-2001 information outweighs the benefit that the information will provide plaintiffs. "The mere fact that compliance with an inspection order will cause great labor and expense or even considerable hardship and possibility of injury to the business of the party from whom discovery is sought does not of itself require denial of the motion."[21] Moreover, "[t]he fact that an unwieldy record keeping system would require heavy expenditures of time and effort to produce requested documents, is not a sufficient

---

[19] *Id.* at ¶ 9.

[20] Plaintiffs argue that *each* defendant objecting to discovery on the basis of undue burden was required to submit a supporting declaration. Defendants state that submitting declarations from a representative sample of defendants complies with Judge Vratil's August 29, 2007, Order (doc. 131). The Order, however, only addressed the appointment of lead counsel for plaintiffs and ruled that counsel for *plaintiffs* who disagree with lead counsel may present arguments only if the arguments are not repetitive. As the Order is silent with respect to the burdens imposed on individual defendants, defendants' reliance on it is clearly misplaced. In any event, the issue need not be resolved, as the purportedly representative declarations that were submitted by defendants do not sustain their collective objections based on undue burden.

[21] *Snowden*, 137 F.R.D. at 332–33 (quoting 8 Charles Allen Wright & Arthur Miller, Federal Practice and Procedure § 2214 (1970)).

reason to prevent disclosure of otherwise discoverable material."[22]   The court therefore overrules defendants' objections to producing responsive *paper* documents created before 2001.  Boxes that potentially contain such responsive documents shall be made available as they are maintained in the ordinary course of business, at each defendant's expense, to plaintiffs' counsel.[23]   To the extent plaintiffs wish to search the thousands of boxes of documents, plaintiffs may do so at their own expense.  If plaintiffs select a document for copying, the defendant that owns the document will be permitted to first review the document for responsiveness, privilege, and any other objection.  The initial disclosure of documents herein ordered does not waive any objection for privilege.  If, after reviewing defendants' pre-2001 paper documents, plaintiffs identify a specific pre-2001 email or other electronically stored information ("ESI") believed to be relevant to this lawsuit, then plaintiffs may seek discovery of that specific ESI.

---

[22] *Id.* at 333.

[23] It appears that Exxon Mobil Corporation ("Exxon") may have withdrawn its undue-burden objections.  The declaration of Exxon's representative is a bit unclear on this point. On the one hand, the declaration states that Exxon is searching the archived records of record custodians who have indicated they have potentially relevant documents and that Exxon will produce responsive, non-privileged documents resulting from this search.  On the other hand, the declaration states that Exxon has over one million boxes of archived records and searching them would "result in tremendous expense."  Declaration of Alexander Ng at 7. To the extent that Exxon continues to object to plaintiffs' discovery requests on the ground that a search for documents generated before 2001 is burdensome, the court overrules the objection because Exxon has not provided a detailed explanation about the time, money and procedure required to produce the requested documents.  *See Horizon Holdings Inc.*, 209 F.R.D. at 213.

## II.  Activity in Canada

Two of plaintiffs' document requests[24] and seven of plaintiffs' interrogatories[25] seek information and documents concerning defendants' activities in Canada.  As noted above, in the 1990s Canada changed its law to permit the sale of temperature-adjusted retail motor fuel with the use of ATC equipment.  Because the average temperature in Canada is below sixty degrees Fahrenheit, selling temperature-adjusted motor fuel using ATC equipment benefitted motor fuel retailers.  Plaintiffs contend that defendants' responses to the Canadian legislation—regarding both the legislative process and the implementation of the passed law—are important to this lawsuit.  Defendants[26] objected to plaintiffs' discovery requests relating to the enactment and implementation of the Canadian ATC legislation on the grounds that the discovery sought is irrelevant, overly broad, and unduly burdensome.

### A.  Relevancy

---

[24] Document Request Nos. 26 and 28.

[25] Interrogatory Nos. 31, 34, 35, 36, 37, 38, and 39.

[26] Plaintiffs allege the following defendants object to plaintiffs' requests in this area: 7-Eleven, Inc.; Albertsons/Supervalu; BP Products North America, Inc.; BP West Coast Products, LLC; Casey's General Stores, Inc.; Chevron Corporation; Circle K Corporation; Costco Wholesale Corp.; Equilon Enterprises, LLC d/b/a Shell Oil Products US; E-Z Mart Stores, Inc.; Flying J, Inc.; G & M Oil Company; Hess; Kum & Go; Loves Travel Stops; Mac's Convenience Stores, LLC; Marathon Petroleum Company; MFA Oil Company; Motiva Enterprises, LLC; Murphy Oil; Petro Stopping Centers; Pilot Travel Centers; Quik Trip; Racetrac; Sheetz, Inc.; Shell Guam, Inc.; Sinclair Oil Corporation; Speedway SuperAmerica; TA Operating, LLC; Tesoro; The Pantry, Inc.; Thornton's Inc.; TravelCenters of America, LLC; Travel Centers of America Holding Company, LLC; USA Petroleum Corporation/Dansk; Valero Energy Corporation; Valero Marketing & Supply Company; WaWa, Inc.

As mentioned just above, defendants first challenge plaintiffs' discovery requests in this area for relevancy.  Under Fed. R. Civ. P. 26(b)(1), discovery may be obtained "regarding any non-privileged matter that is relevant to any party's claim or defense." Relevancy is broadly construed for pretrial discovery purposes.  "A party does not have to prove a prima facie case to justify a request which appears reasonably calculated to lead to the discovery of admissible evidence."[27]  At least as a general proposition, then, "[a] request for discovery should be allowed unless it is clear that the information sought can have no possible bearing on the claim or defense of a party."[28]

> When the discovery sought appears relevant, the party resisting the discovery has the burden to establish the lack of relevance by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure.[29]

The question of relevancy "is to be more loosely construed at the discovery stage than at the trial."[30]

Defendants assert that plaintiffs' motion to compel should be denied as to information

---

[27] *Mackey v. IBM*, 167 F.R.D. 186, 193 (D. Kan. 1996).

[28] *Sheldon v. Vermonty*, 204 F.R.D. 679, 689–90 (D. Kan. 2001) (internal quotations and citations omitted).

[29] *Hammond v. Lowe's Home Ctrs., Inc.*, 216 F.R.D. 666, 670 (D. Kan. 2003) (citations omitted).

[30] 8 Charles Allen Wright & Arthur Miller, Federal Practice and Procedure § 2008, at 99 (2d ed. 1994).

and documents related to defendants' implementation of the Canadian law permitting the use

of ATC equipment (Document Request No. 26 and Interrogatory Nos. 34, 35, 36, and 37)[31]

because the foreign documents and information sought are not relevant.  The court disagrees.

Under the presumption in favor of disclosure, the court easily finds the requested documents

and information relevant to the claims and defenses in this case.  As noted by plaintiffs, this

discovery has a possible bearing on: (1) defendants' defense that temperature-adjusted sales

are impossible or impractical, (2) plaintiffs' claim that defendants are unjustly enriched by

selling non-temperature-adjusted fuel in warm climates and temperature-adjusted fuel in cold

climates, (3) plaintiffs' claim that defendants' practice of selling non-temperature-adjusted

fuel is unfair, unlawful, deceptive, and fraudulent under state consumer protection laws, (4)

---

[31] For example, Document Request No. 26 reads: "Produce DOCUMENTS for the time period 1970 to the present RELATING TO the use of ATC EQUIPMENT on DISPENSING PUMPS at STATIONS in Canada."  In a similar vein, Interrogatory No. 34 reads:

IDENTIFY each Station owned or operated by YOU, or one of YOUR corporate affiliates or subsidiaries, in Canada, at which MOTOR FUEL is currently being sold using ATC EQUIPMENT, and for each STATION state:

a)   The name of the entity that owns or operates each STATION;

b)   The date upon which the STATION began selling MOTOR FUEL on a TEMPERATURE ADJUSTED basis;

c)   Whether it was necessary to replace existing DISPENSING PUMPS at the STATION in order to begin selling MOTOR FUEL on a TEMPERATURE ADJUSTED basis;

d)   The cost incurred to install DISPENSING PUMPS or ATC EQUIPMENT at the STATION that allow for TEMPERATURE ADJUSTED MOTOR FUEL sales, including itemization of the cost of materials and the cost of labor;

e)   The manufacturer of the DISPENSING PUMP or ATC EQUIPMENT installed at the STATION; and

f)   The BRAND or trade name under which MOTOR FUEL is sold at each STATION.

defendants' argument that installation of ATC equipment is cost-prohibitive, (5) defendants' argument that the installation of ATC equipment provides little or no value to consumers, (6) defendants' argument that the installation of ATC equipment will result in consumer confusion, and (7) defendants' argument that the installation of ATC equipment does not provide a consistent value in fuel purchased.

Without explanation, defendants noticeably do not even attempt to meet their burden of establishing a lack of relevance "by demonstrating that the requested discovery (1) does not come within the broad scope of relevance as defined under Fed. R. Civ. P. 26(b)(1), or (2) is of such marginal relevance that the potential harm occasioned by discovery would outweigh the ordinary presumption in favor of broad disclosure."[32]   Rather, defendants mistakenly (and without citing legal authority) contend that the burden was on *plaintiffs* to justify the discovery requests.  To the extent that plaintiffs had a minimal initial burden to demonstrate that the information requested was possibly relevant, the court is satisfied that this burden was met.[33]  Defendants' relevancy objections to discovery seeking information about defendants' use of ATC equipment in Canada are overruled.

Defendants next assert that plaintiffs' motion to compel should be denied as to information and documents concerning the legislative, regulatory, and political process that led to Canada's passage of the ATC legislation (Document Request No. 28 and Interrogatory

---

[32] *Hammond*, 216 F.R.D. at 670 (citations omitted).

[33] *See Mackey*, 167 F.R.D. at 193 ("A party does not have to prove a prima facie case to justify a request which appears reasonably calculated to lead to the discovery of admissible evidence.").

Nos. 31, 38, and 39)[34] because such documents and information are not relevant.
Specifically, defendants note that plaintiffs do not make any claims based on fuel purchased
in Canada and surmise that plaintiffs are seeking this information "to use in pursuit of a
legislative and regulatory agenda in the United States."[35]  Plaintiffs respond that defendants'
membership in Canadian trade associations and involvement in the legislative process that
allowed ATC in Canada (1) has a bearing on plaintiffs' claim that defendants' practice of
selling non-temperature-adjusted fuel is unfair and deceptive under state consumer protection
laws, (2) has a bearing on defendants' defense that temperature-adjusted sales are impossible
or impractical, and (3) may reveal the identity of fact witnesses or provide impeachment
material at trial.

The court agrees that—at least at this pretrial stage—information about the legislative,
regulatory, and political process that led to the passage of Canada's ATC law could possibly
have a bearing on the claims and defenses in this case.  Defendants' relevancy objection to
discovery seeking this information is overruled.

---

[34] For example, Document Request No. 28 reads: "Produce DOCUMENTS reflecting
YOUR membership or activity in any Canadian petroleum trade association from 1970 to the
present date."  Interrogatory No. 31 reads:
> For the time period 1970 to the present, IDENTIFY all COMMUNICATIONS
> between YOU, including all persons and entities acting on YOUR behalf, and
> any other person or entity, in which YOU have discussed any proposed or
> enacted legislation or regulation regarding TEMPERATURE ADJUSTMENT
> of MOTOR FUEL sales, at the wholesale or retail level, in the United States
> or Canada.

[35] Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel Discovery
at 17.

B.  Overbreadth

Defendants next object to plaintiffs' discovery seeking information related to defendants' implementation of the Canadian ATC law (Document Request No. 26 and Interrogatory Nos. 34, 35, 36, and 37) on the ground that the discovery requests are overly broad.

First, defendants argue that Document Request No. 26 is overly broad on its face because it seeks documents "RELATING TO the use of ATC EQUIPMENT on DISPENSING PUMPS at STATIONS in Canada."[36]  Rule 34(b)(1)(A) to the Federal Rules of Civil Procedure requires document requests to "describe with reasonable particularity each item or category of items to be inspected."  A document request that uses an omnibus term such as "relating to," "pertaining to," or "concerning" may be overly broad on its face "if it is couched in such broad language as to make arduous the task of deciding which of numerous documents may conceivably fall within its scope."[37]  For example, a request seeking documents "relating to" a broad range of items may require "the respondent either to guess or move through mental gymnastics . . . to determine which of many pieces of paper may conceivably contain some detail, either obvious or hidden, within the scope of the request."[38]  "When, however, the omnibus phrase modifies a sufficiently specific type of

---

[36] Document Request No. 26 is replicated in its entirety at *supra* note 31.

[37] *Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 658 (D. Kan. 2006) (internal quotations omitted) (citing *Cardenas v. Dorel Juvenile Group, Inc.*, 232 F.R.D. 377, 382 (D. Kan. 2005)).

[38] *Id.*

information, document, or event, rather than large or general categories of information or documents, the request will not be deemed objectionable on its face."[39]

Defendants argue that Document Request No. 26 is so broad that it provides them no basis to determine what documents are responsive. To illustrate, they note that Document Request No. 26 could be read to demand copies of maintenance records for each ATC dispenser in Canada and documents pertaining to regulatory inspections.

The court overrules defendants' overbreadth objection to Document Request No. 26. The phrase "relating to" in this request modifies a sufficiently specific type of information—information about defendants' use of ATC equipment on dispensing pumps at stations in Canada. The court finds defendants' speculation about the realm of documents that could possibly be responsive to Document Request No. 26 to be a bit far fetched. To the extent that Document Request No. 26 addresses issues identified in the Second Consolidated Amended Complaint or Answer thereto, it should be responded to. The court cannot imagine that maintenance or inspection records would fall into this category (but if plaintiffs disagree, they should notify the court).

Defendants next argue that Interrogatory Nos. 34, 35, 36, and 37 are overly broad as

---

[39] *Id.; Cf. Aikens v. Deluxe Fin. Servs., Inc.*, 217 F.R.D. 533, 538 (D. Kan. 2003) (holding a request overbroad and unduly burdensome on its face where it sought all documents "regarding" or "relating to" the lawsuit, eleven plaintiffs, and all of the EEOC charges in the lawsuit); *Pulsecard, Inc. v. Discover Card Servs., Inc.*, No. 94-2304-EEO, 1996 WL 397567, at *9–10 (D. Kan. July 11, 1996) (holding a request facially overbroad where it requested "all documents concerning plaintiff").

applied.[40]   Specifically, defendants state that (1) "Plaintiffs cannot conceivably demonstrate that any portion of their case hinges on the precise dates on which each of hundreds of Canadian stations first sold motor fuel on a temperature compensated basis," and (2) "Plaintiffs do not need to know whether ATC equipment was added or dispensers were replaced on a station-by-station basis, how much one station paid for its equipment, or the identity of the individual manufacturer from whom the equipment was purchased."[41]

"[A] party resisting discovery on the basis that a request is overly broad has the burden to support its objection . . . ."[42]   This burden required defendants to provide an "affidavit or specific supporting information" to substantiate their objections.[43]   Defendants have not filed an affidavit or otherwise attempted to demonstrate that they are "not able to readily identify the documents requested" or "that it would be unduly difficult to determine which documents fall within the scope of the request."[44]   Accordingly, defendants' objections based on overbreadth are overruled.[45]

---

[40] For an example of the type of information requested in this group of interrogatories, see the text of Interrogatory No. 34, set out verbatim in *supra* note 31.

[41] Defendants' Memorandum in Opposition to Plaintiffs' Motion to Compel Discovery at 19.

[42] *General Elec. Capital Corp. v. Lear Corp.*, 215 F.R.D. 637, 641 (D. Kan. 2003).

[43] *Moss v. Blue Cross & Blue Shield of Kan., Inc.*, 241 F.R.D. 683, 689 (D. Kan. 2007) (citation and internal quotations omitted).

[44] *General Elec. Capital Corp.*, 215 F.R.D. at 641.

[45] Defendants have filed two affidavits discussing the burden of responding to this line of inquiry on a station-by-station basis.  These affidavits, however, speak to defendants' next argument regarding undue burden, and the court will consider them in conjunction with that

C.     Undue Burden

Finally, defendants argue that responding to plaintiffs' discovery requests seeking station-specific details of defendants' operations in Canada (Document Request No. 26 and Interrogatory Nos. 34, 35, 36, and 37) would be unduly burdensome.  As discussed in Section I of this order, when considering an undue burden claim the court must balance the burden on the interrogated party against the benefit to the discovering party of having the information.[46]  The court will allow discovery unless the burden or expense involved in complying with the discovery is unreasonable compared to its likely benefit, "considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."[47]

Defendants assert that the time, effort, and expense of producing station-level information are staggering and that the importance of the information is slight.  In support of their argument, defendants submit the declaration of Ann Spiegel, counsel for the Shell defendants.  Ms. Spiegel states that the Shell defendants do not regularly maintain any information or documents relating to the retail sale of motor fuel in Canada.[48]  Thus, to respond to plaintiffs' requests regarding the use of ATC equipment at Canadian service stations, the Shell defendants would need to obtain information and documents from Shell

_____

argument.

[46] *McBride*, 2008 WL 1958350, at *4.

[47] Fed. R. Civ. P. 26(b)(2)(C)(iii).

[48] Declaration of Ann Spiegel at ¶ 5.

Canada Limited ("SCL"), a Shell subsidiary but not a party to this litigation.  Ms. Spiegel indicates that information older than five years is not kept in SCL's central database and would have to be gathered from approximately 750 individual service stations.[49]  She estimates that, at "two hours per station, SCL would need 1,400 hours or 35 weeks to review its station files."[50]  The Shell defendants estimate the cost for this review to be $140,000.[51]  With regard to the cost of installing ATC equipment, the Shell defendants state that SCL accounted for the expense on a project basis, not a per-station basis.[52]  Finally, the Shell defendants state that SCL does not record data that reflects the temperature of motor fuel sold.[53]  Defendants also submit the declaration of Jose Rios, a representative for 7-Eleven, Inc., in support of their undue burden argument.  Mr. Rios states that data about the daily temperature in the motor fuel tanks is only available at individual 7-Eleven service stations in Canada, of which there are 246.[54]  Mr. Rios estimates that it "would take well over 300

---

[49] Ms. Spiegel's declaration also discusses the burden that would accompany the gathering of information from independently owned service stations to which SCL *sold* motor fuel, but plaintiffs' discovery requests are limited to stations *owned, operated, franchised, or licensed* by a defendant, affiliate, or subsidiary.  There is no indication that the independently owned service stations to which SCL sells motor fuels fall under any of these categories.

[50] *Id.* at ¶ 9.

[51] *Id.*

[52] *Id.* at ¶ 10.

[53] *Id.*

[54] Declaration of Jose Rios at ¶ 3.

man hours" to gather this information.[55] Mr. Rios also notes, generally, that "it would be a very time consuming task" to search for responsive electronic information that may be stored on the individual databases of the 246 stores.[56]

The Shell defendants make a persuasive argument that reviewing documents located at 750 different service stations in response to Document Request No. 26 and Interrogatory Nos. 34, 35, 36, and 37 would be unduly burdensome.  The court finds that information gathered from ten representative service stations should sufficiently address the issues in this lawsuit.  The court orders the Shell defendants to review the files of ten SCL-owned service stations and respond to plaintiffs' discovery in this subject area.  To the extent that information does not exist regarding the per-station cost of installing ATC equipment, the Shell defendants shall provide plaintiffs project-level cost information.  Finally, if data does not exist regarding the temperature of motor fuel sold at SCL-owned stations, then obviously the Shell defendants have no duty to provide such information.

The court is also persuaded that it would be unduly burdensome for 7-Eleven to gather data about the daily temperature in its motor fuel tanks from 246 separate Canadian service stations.  The court orders 7-Eleven to gather this data from ten Canadian service stations and respond to plaintiffs' discovery accordingly.  Mr. Rios's declaration does not satisfy the court, however, that it would be unduly burdensome for 7-Eleven to search individual station

---

[55] *Id.* at ¶ 4.

[56] *Id.* at ¶ 5.

databases for information responsive to plaintiffs' discovery.[57]  The court therefore orders 7-Eleven to search these databases and respond to plaintiffs' discovery.

The undue-burden objections of all other defendants to plaintiffs' discovery seeking information about defendants' operations in Canada are overruled.  As demonstrated by the factually divergent declarations submitted by the Shell defendants and 7-Eleven, this is an area of discovery in which the burden on one defendant is not likely representative of the burden on other defendants.  Thus, without providing detail about the nature of the burden required to respond to the discovery, the remaining defendants have failed to support their objections.[58]

### III.   Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.       Plaintiffs' motion to compel (**doc. 665**) is granted, except as to the limits placed on Canadian, station-specific, discovery, as discussed in Section II.C of this order.

2.       The parties shall comply with this order by **May 8, 2009**.

Dated this 3rd day of April, 2009, at Kansas City, Kansas.

---

[57] *See Horizon Holdings, Inc.*, 209 F.R.D. at 213 (citing *Snowden*, 137 F.R.D. at 322) (ruling that the party opposing discovery has an obligation "to provide sufficient detail and explanation about the nature of the burden in terms of time, money and procedure required to produce the requested documents").

[58] *See id.*

 s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge