IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE ) | |
| SALES PRACTICES LITIGATION ) | |
| ) | |
| ) | |
| ) | Case No. 07-MD-1840-KHV |
| This Order Relates to All Cases ) | |

## <u>MEMORANDUM AND ORDER</u>

In this multidistrict litigation, plaintiffs claim defendants are liable under various state

law theories because defendants sell motor fuel for a specified price per gallon without

disclosing or adjusting for temperature expansion.  Currently before the undersigned U.S.

Magistrate Judge, James P. O'Hara, are three related discovery motions that raise First

Amendment issues: (1) plaintiffs' motion **(doc. 668)** to compel defendants to respond to

plaintiffs' discovery requests related to defendants' communications with trade associations,

weights and measures organizations, and governmental agencies; (2) plaintiffs' motion **(doc.**

**738)** to compel the Petroleum Marketers and Convenience Store Association of Kansas

(PMCA-KS), a trade association, to fully respond to plaintiffs' subpoena to produce

documents; and (3) defendants' motion **(doc. 999)** to quash subpoenas that plaintiffs served

on five other trade associations.

Defendants, acting both in their individual capacities and as members of the trade

associations served with subpoenas, objected to plaintiffs' discovery requests and subpoenas

on the ground that the information sought is privileged pursuant to the First Amendment right

of free association.  On May 13, 2009, the court heard oral arguments from the parties and from one of the involved trade associations, The National Association of Truck Stop Operators (NATSO), on the complex First Amendment issues raised in the motions.  Having carefully considered the parties' thorough written submissions and helpful oral arguments, the court is ready to rule.

## I.  Background

On June 24, 2008, plaintiffs served their second set of interrogatories and first set of requests for production of documents on defendants.  A number of these discovery requests sought information about defendants' communications with trade associations, weights and measures associations, and state or federal agencies.[1]  In response to these discovery

---

[1]For example, Interrogatory No. 30 asks:
During the time period 1970 to the present, have YOU, or any other person or entity on YOUR behalf, ever communicated regarding the subject of TEMPERATURE ADJUSTMENT in retail sales of MOTOR FUEL, or the implementation, or potential implementation, of ATC EQUIPMENT on DISPENSING PUMPS at STATIONS, with:
  a)      Any other Defendant in this action;
  b)      Any RETAILER;
  c)      Any REFINER, DISTRIBUTOR, jobber, or other wholesaler, producer or manufacturer of petroleum products;
  d)      The America Petroleum Institute, Canadian Petroleum Institute, Petroleum Equipment Institute or any other trade association or lobbying organization;
  e)      Any WEIGHTS AND MEASURES ASSOCIATIONS, entities or independent consultants;
  f)      Any agency or representative of the United States government; or
  g)      Any agency or representative of any state government.
If your answer to any of the foregoing subparts is "yes," please IDENTIFY each such COMMUNICATION.

requests, defendants objected, in whole or in part, on the ground that the information sought

was subject to a First Amendment privilege.[2]

On September 19, 2008, plaintiffs served a subpoena on PMCA-KS, requesting that

it produce thirty-six categories of documents.[3]  PMCA-KS did not object to the subpoena

---

And Request for Production of Documents No. 18 states:

> Produce DOCUMENTS for the time period 1970 to the present that YOU, or any other person acting on YOUR behalf, have prepared for, delivered to, or received from any state or federal legislator, any member of his or her staff, or any representative, agent, or person acting on behalf of the legislator RELATING TO the following:
>
> A.   TEMPERATURE ADJUSTMENT in retail sales of MOTOR FUEL; or
> B.   HOT FUEL; or
> C.   ATC EQUIPMENT; or
> D.   Amendment, modification, regulation, monitoring, enforcement or adoption by governmental entities of WEIGHTS AND MEASURES ASSOCIATIONS' policies or standards related to sales of MOTOR FUEL; or
> E.   NIST Handbook 44 or NIST Handbook 130, or suggested modifications thereto.

[2]Plaintiffs' initial briefings reported that defendants objected under two separate First Amendment doctrines: the right to free association and the right to petition the government (the so-called *Noerr-Pennington* doctrine").  Defendants have clarified, however, that they are not asserting discovery objections directly under the right to petition the government, but rather, contend that the right to petition the government factors into the analysis attending the right to free association.  *See, e.g.,* Defendants' Response to Plaintiffs' Supplemental Memorandum (doc. 1077) at 4–5.  The potential overlap of the two privileges are discussed below at pages 17–19.

[3]For example, plaintiffs sought:

> 1.   DOCUMENTS sufficient to identify YOUR business and/or organizational structure, including but not limited to any committees, Board of Directors, employees and officers.
> . . .
> 3.   A complete list of YOUR members, associates and strategic partners (with dates of membership), including membership by any Defendant, each year from 1970 to the present.

requests and arranged a date on which to produce responsive documents.  However, two hours before the document production was scheduled to begin, counsel for some defendants expressed concern to plaintiffs' counsel that some of the documents were privileged under the First Amendment.  Plaintiffs allowed defense counsel to review the documents that PMCA-KS was offering for production.  The parties agreed that documents defendants deemed privileged would be sequestered until defendants' objections were resolved. Defendants prepared a privilege log, asserting First Amendment privilege over about three-fourths of the documents produced by PMCA-KS.

Between October 16, 2008, and March 27, 2009, plaintiffs served subpoenas on five other third-party trade associations (collectively, "the trade associations"),[4] requesting production of forty-two categories of documents similar to those sought from PMCA-KS.[5]

Plaintiffs now seek an order from the court compelling defendants to fully respond to plaintiffs' discovery requests and to produce PMCA-KS documents over which defendants

_____

. . .

8.   DOCUMENTS RELATING TO statements made by YOU or positions taken by YOU regarding the use of ATC EQUIPMENT for retail sales of MOTOR Fuel in the United States.

. . .

11.  DOCUMENTS RELATING TO YOUR lobbying or legislative efforts regarding the use of ATC EQUIPMENT for retail sales of MOTOR FUEL in the United States.

[4]NATSO, the California Independent Oil Marketers Association (CIOMA), the Petroleum Marketers Association of America (PMAA), the Association for Convenience and Petroleum Retailing (NACS), and the Society of Independent Gasoline Marketers of America (SIGMA) were served with substantively identical subpoenas.

[5]*See supra* note 3.

have asserted a First Amendment privilege.[6]  Defendants seek an order quashing the subpoenas served on the trade associations because the subpoenas are unduly burdensome and seek documents that are related to core associational activities.

## II.  Defendants' Standing to Object on Behalf of Trade Associations

As an initial matter, the court must determine whether defendants have standing to assert privilege objections on behalf of PMCA-KS and the trade associations.  Members of a trade association have standing to assert the First Amendment rights held by the association.[7]  Defense counsel represent that various defendants are members of PMCA-KS and the trade associations.  Moreover, PMCA-KS has filed a brief (doc. 987) joining defendants' briefing related to plaintiffs' motion to compel (doc. 738), and the trade associations have filed briefs (docs. 1003, 1016, 1020, & 1032) joining defendants' briefing related to defendants' motion to quash (doc. 999).  On this record, the court holds that

---

[6]The court questions whether plaintiffs' attorneys actually have satisfied their duty to meet and confer with defense counsel before filing the motion to compel discovery from PMCA-KS.  *See* D. Kan. Rule 37.2.  But given the very strongly held views as expressed by both sides in the extensive briefing on this matter, the court is convinced that any further discussion among counsel would not resolve the dispute.  The court therefore elects to proceed to a discussion of the merits of this matter.  *See White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, No. 07-2319, 2009 WL 722056, at *2 (D. Kan. Mar. 18, 2009); *Strasburg-Jarvis, Inc. v. Radiant Sys., Inc.*, No. 06-2552, 2009 WL 129361, at *2 (D. Kan. Jan. 20, 2009).  The court respectfully reminds the parties that they must strictly adhere to their Rule 37.2 duties in the future.

[7]*Heartland Surgical Specialty Hosp., LLC, v. Midwest Div., Inc.*, No. 05-2164, 2007 WL 950282, at *21 (D. Kan. Mar. 26, 2007) (*Heartland II*); *cf. McCormick v. City of Lawrence, Kan.*, No. 02-2135, 2005 WL 1606595, at *8 (D. Kan. July 8, 2005) (holding that plaintiff had no standing to assert associational rights because plaintiff did not claim to represent an organization).

defendants have standing to assert the privileges at issue in the instant motions.

### III.  The First Amendment Protection of Free Association

The First Amendment protects "a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion."[8]  In the seminal case of *NAACP v. Alabama*, the Supreme Court recognized that the First Amendment right to associate creates a qualified privilege from disclosing information in discovery that would chill exercise of that right.[9] The Court noted,

> Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association, as this Court has more than once recognized by remarking upon the close nexus between the freedoms of speech and assembly. . . . Of course, it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.[10]

When a party refuses to produce information on the ground the information is protected by the associational privilege, "'district courts have generally employed a burden-shifting

---

[8]*Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984).

[9]357 U.S. 449 (1958)*; see also Grandbouche v. Clancy*, 825 F.2d 1463, 1465–66 (10th Cir. 1987) (holding that trial court must consider a claim of First Amendment privilege concerning discovery requests).  The qualified privilege is narrow, however, and cannot be used to block all general discovery requests.  *See McCormick*, 2005 WL 1606595, at *8; *Anderson v. Hale*, No. 00-2021, 2001 WL 503045, at *7 (N.D. Ill. May 10, 2001); *Wilkinson v. FBI*, 111 F.R.D. 432, 436 (C.D. Cal. 1986).

[10]*NAACP v. Alabama*, 357 U.S. at 460.

analysis.'"[11] First, the party asserting the privilege must make a prima facie showing that the privilege applies.[12]  Second, if the party asserting the privilege meets its burden, then the burden shifts to the party seeking disclosure to demonstrate its interests in obtaining the information outweigh the other party's interests in not disclosing the information.[13]

### A.  Prima Facie Showing that the Privilege Applies

Defendants, as the parties asserting First Amendment protection over the documents at issue, have the initial burden to make out a prima facie showing of privilege.  Defendants must show that disclosure of the documents would arguably chill freedom of association, i.e., that it would likely affect the ability of the trade associations to advocate the associations' beliefs by inducing members to withdraw from the associations, or dissuading others from joining the associations, because of fear that exposure of their beliefs would subject them to economic reprisal or other public hostility.[14]  Courts have applied a presumption of privilege to information that goes to the core of a group's associational activities, finding that disclosure of such information would very likely chill freedom of association.[15]  Defendants

---

[11]*McCormick*, 2005 WL 1606595, at *7 (quoting *Wyoming v. USDA*, 239 F. Supp. 2d 1219, 1236 (D. Wyo. 2002), *vacated as moot*, 414 F.3d 1207, 1213–14 (10th Cir. 2005)).

[12]*Id.*

[13]*Id.*

[14]*NAACP v. Alabama*, 357 U.S. at 462–63; *Heartland Surgical Specialty Hosp., LLC, v. Midwest Div., Inc.*, No. 05-2164, 2007 WL 852521, at *3 (D. Kan. Mar. 16, 2007) (*Heartland I*).

[15]*Heartland I*, 2007 WL 852521, at *5; *Wyoming*, 239 F. Supp. 2d at 1237.

argue that plaintiffs' discovery requests and trade association subpoenas seek three types of core associational information that should be presumed privileged: (1) membership lists of trade associations (including lists of all trade associations in which each defendant has been a member), (2) financial contributor lists of trade associations, and (3) information related to the past political activities of defendants, including documents related to the lobbying and legislative affairs of the trade associations of which defendants are members.

To the extent that plaintiffs' propounded discovery and subpoenas seek confidential membership lists and financial contributor lists of trade associations, the court easily finds this information goes to the core of the associations' activities and is prima facie privileged. Since *NAACP v. Alabama*, a number of courts have recognized this confidential associational information is presumed privileged,[16] such that the party seeking protection will be deemed to have satisfied its prima facie burden.[17]   To the extent, however, that defendants seek protection of associational membership lists or financial contributor lists that have been publicly disclosed, the court finds that a chilling effect caused by additional disclosure cannot be presumed, nor has it been proved by defendants.   Thus, such publicly available

---

[16]*See NAACP v. Alabama*, 357 U.S. at 466 (anonymous membership lists); *Wyoming*, 239 F. Supp. 2d at 1237 (membership lists, volunteer lists, financial contributor lists, and past political activity of members); *Anderson*, 2001 WL 503045, at *3, 5 (anonymous membership lists); *Wilkinson*, 111 F.R.D. at 436–37 (names of members and financial contributors).

[17]Plaintiffs acknowledge that caselaw supports a finding that this type of information is entitled to a presumption of privilege.  Plaintiffs' Opposition to Defendants' Motion to Quash and for Protective Order (doc. 1023) at 7–8.

information may not be withheld based on a First Amendment privilege.[18]

The meat of the parties' arguments on the pending motions addresses the third category of documents over which defendants have asserted a First Amendment privilege —information related to the trade associations' legislative affairs and lobbying efforts. While some courts have espoused a general recognition that the "past political activities" of associations and their members are core associational activities entitled to a presumption of privilege,[19] caselaw provides little guidance on the type of information that might fit under the past-political-activity umbrella. Of course, even if the requested information is not presumed privileged, defendants may still satisfy their prima facie burden by demonstrating that disclosure of the information would chill the associations' First Amendment rights.[20]

The court determines that confidential communications concerning the associations' legislative affairs and lobbying efforts on the matter of automatic temperature compensation (ATC) for retail motor fuel is prima facie privileged. The court finds U.S. Magistrate Judge Donald W. Bostwick's opinion in *Heartland I* instructive in reaching this decision. In *Heartland I*, which was decided in the context of antitrust litigation, the plaintiff sought to compel production of documents from the Kansas Hospital Association (KHA), a non-party

---

[18]Defendants, on behalf of the trade associations, also move to quash the subpoenas on burdensomeness grounds. The court will address this separate issue below.

[19]*See Wyoming*, 239 F. Supp. 2d at 1237; *Int'l Action Ctr. v. United States*, 207 F.R.D. 1, 3 (D.D.C. 2002).

[20]*Wyoming*, 239 F. Supp. 2d at 1238; *McCormick*, 2005 WL 1606595, at *9; *Anderson*, 2001 WL 503045, at *6; *Heartland I*, 2007 WL 852521 at 3.

association of which certain defendant hospitals were members, related to KHA's lobbying on issues concerning specialty hospitals.  Applying *NAACP v. Alabama* and its progeny, Judge Bostwick determined that KHA had met its prima facie burden of showing that production of such material would have a chilling effect.  Judge Bostwick determined that requiring production of "'evaluations of possible legislation and legislative strategy' is the type of action that would appear to interfere with KHA's internal organization and with its lobbying activities, and therefore have a 'chilling effect' on the organization and its members."[21]

The court finds the reasoning in *Heartland I* applies equally well in this case.  As in *Heartland I*, the trade associations' internal communications and evaluations about advocacy of their members' positions on contested political issues, as well as their actual lobbying on such issues, "would appear to be a type of political or economic association that would . . . be protected by the First Amendment privilege."[22]  It is undisputed that a primary purpose of each of the trade associations is to advocate on behalf of its collective members.  In other

---

[21]*Heartland I*, 2007 WL 852521, at *4 (citations omitted).

[22]*Id.* at *3; *see also Pleasant v. Lovell*, 876 F.2d 787, 795 (10th Cir. 1989) (noting that the First Amendment would protect political "advocacy" by an association and its members, and that the right to associate may be infringed by "interfering with the internal workings of the group"); *cf. DeGregory v. Attorney Gen. of N.H.*, 383 U.S. 825, 828–29 (1966) (holding that individual investigated for subversive activities could refuse to disclose political associations, meetings attended, and *views and ideas expressed at such meetings* because the "realm of political and associational privacy protected by the First Amendment" was not overcome by a compelling state interest); *Wyoming v. USDA*, 208 F.R.D. 449, 454 (D.D.C. 2002) (holding that a non-party association's "internal communications and strategic communications on policy issues with other environmental advocacy groups" were subject to the associational privilege).

words, the members of the trade associations have joined together "to pursue their collective effort to foster beliefs which they admittedly have the right to advocate."[23]   If the trade associations were forced to disclose confidential communications exchanged in conjunction with pursuing their right to advocate, there is a reasonable probability[24] that such disclosure would interfere with the core of the associations' activities by inducing members to withdraw from the associations, or dissuading others from joining the associations, because of fear that exposure of their beliefs would subject them to economic reprisal or other public hostility.[25]

The court is not persuaded, as suggested by plaintiffs, that this likely harm could be eliminated by protecting the identities of the associations' members.  Current or potential members of an association could reasonably fear that exposure of their beliefs expressed in private legislative strategy sessions or lobbying could subject them, as members of the motor

---

[23]*NAACP v. Alabama*, 357 U.S. at 463.

[24]The court notes that a concrete showing of infringement upon associational rights is not necessary for the privilege to apply.  *See id.* at 462 (ruling that the production of documents sought was "likely to affect adversely" the association's ability to retain members or gain new members, and that it "entail[ed] the likelihood" of a substantial restraint on free association); *Anderson*, 2001 WL 503045, at *3 ("[T]he movant need only show that 'there is some probability that disclosure will lead to reprisal or harassment.'" (quoting *Black Panther Party v. Smith*, 661 F.2d 1243, 1267–68 (D.C. Cir. 1981)); *Austl./E. U.S.A. Shipping Conference v. United States*, 537 F. Supp. 807, 811 (D.D.C. 1982) ("A factual showing of actual chilling effect is not a necessity for a decision forbidding disclosure. . . ."), *vacated as moot*, 1986 WL 1165605 (D.C. Cir. Aug. 27, 1986).

[25]*See NAACP v. Alabama*, 357 U.S. at 462–63; *Heartland I*, 2007 WL 852521, at *4–5.

fuel industry as a whole, to economic reprisal or public hostility.[26]  Moreover, it is undisputed the trade associations—and defendants as members—are engaged in current congressional debates over temperature-adjusted retail sale of motor fuel.  Disclosure of the associations' evaluations of possible lobbying and legislative strategy certainly could be used by plaintiffs to gain an unfair advantage over defendants in the political arena.  The court therefore concludes that defendants have met their burden of showing the production of trade association strategic lobbying documents and evaluations of legislation would have a chilling effect.

In addition to documents containing information that would disclose the trade associations' internal evaluation of lobbying strategies, positions on legislation, and actual lobbying, however, defendants have withheld documents with a much more tenuous connection to the "past political activities" of the associations and their members.  For example, defendants have objected to providing information about *any* communication that they have had with trade associations regarding the subject of temperature adjustment in retail sales of motor fuel.  Defendants also assert a privilege over documents shared among multiple trade associations.[27]  Likewise, as defense counsel stated at the May 13, 2009, oral

---

[26]Indeed, as plaintiffs note, "Plaintiffs have alleged that the industry as a whole, or certain segments of the industry, have agreed to oppose temperature compensation at the retail level in the United States."  Plaintiffs' Motion to Compel Discovery (doc. 668) at 4.

[27]When information is shared among trade associations, its highly confidential nature is tarnished.  The further information gets from the heart of an association the less it is connected to the association's core associational activities.  Moreover, the association's willingness to share the information diminishes the possibility that the information is of the type that would put the association at risk of losing members if the information were

argument, defendants contend that *all* internal communications of trade associations, regardless of whether the communications relate to lobbying or legislative strategies, are subject to the associational privilege.[28]  The court wishes to make clear that defendants have met their prima facie burden only with respect to the associations' internal evaluations of lobbying and legislation, strategic planning related to advocacy of their members' positions, and actual lobbying on behalf of members.  Any other communications to, from, or within trade associations are not deemed protected under the First Amendment associational privilege.

In summary, defendants have satisfied their burden of showing that confidential membership and financial contributor lists of trade associations, as well as internal information related to trade associations' legislative affairs and lobbying efforts, are prima facie privileged under the First Amendment right of free association.  The burden thus shifts to plaintiffs "to show how the balancing of factors weighs in support of compelling disclosure of the information covered by the First Amendment privilege."[29]

### B.  The Balancing Test

At the second step of the burden-shifting analysis, plaintiffs have the opportunity to prove that their interests in obtaining the information outweigh defendants' interests in not

_____

disclosed.  Recognizing such shared information as protected would expand too far the privilege designed to protect the rights of *individuals* to associate.

[28]These examples are intended to be illustrative, not limiting.

[29]*Heartland I*, 2007 WL 852521, at *5.

disclosing the information.  In conducting this balancing of interests, the court must consider

the following factors: "(1) the relevance of the evidence; (2) the necessity of receiving the

information sought; (3) whether the information is available from other sources; and (4) the

nature of the information."[30]

Under the first factor, the relevancy standard for purposes of First Amendment

analysis is more exacting than the general relevancy standard for discovery under Fed. R.

Civ. P. 26(b)(1).  "The Tenth Circuit has described this as 'certain relevance,' which means

that the information must go to the 'heart of the matter.'"[31]

The second factor, necessity of the information, "is correlated to its relevance; that is,

the more relevant the information, the greater the need for disclosure."[32]  "However, where

the danger to associational activity is great, the district court is more likely to uphold a claim

of privilege, notwithstanding the inquiring party's need."[33]

Finally, if the privileged information is sought from an association that is not a party

to the lawsuit, that fact "weighs against compelling disclosure."[34]  After examining the four

---

[30]*Grandbouche*, 825 F.2d at 1466.

[31]*Wyoming*, 239 F. Supp. 2d at 1241 (quoting *Grandbouche*, 825 F.2d at 1467); *see also Heartland I*, 2007 WL 852521, at *6.  For this reason, plaintiffs are misguided when they rely on the court's finding in its April 3, 2009, Order (doc. 982, at 10–13) that information in defendants' possession related to the legislative, regulatory, and political process that led to the passage of Canada's ATC law was relevant *under a Rule 26(b)(1) analysis.*

[32]*Wyoming*, 239 F. Supp. 2d at 1242.

[33]*Id.*

[34]*Heartland I*, 2007 WL 852521, at *6.

above-described factors, the court must "decide whether the privilege must be overborne by the need for the requested information."[35]

As an initial matter, the court rules that the trade associations need not respond to the subpoenas issued by plaintiffs. As noted, the fact that the trade associations are not parties in this case weighs against compelling disclosure by them. The trade associations have presented cogent evidence that the burden of responding to the subpoenas (as currently written) would severely interfere with their abilities to advocate on behalf of their members—a key First Amendment right. The undue burden that would be suffered by the trade associations is discussed in detail in Section IV below.

With respect to privileged information responsive to the discovery requests served on defendants, plaintiffs assert that the balance of the factors tips in their favor because the information "goes to the heart of the matter," i.e., to defendants' affirmative defenses about the availability, feasibility, and legality of temperature compensation; and to plaintiffs' conspiracy claims. The court will apply the balancing test to each of the three types of information sought by plaintiffs.

First, as to the identities of the trade associations' anonymous members, plaintiffs argue that the membership lists go to the heart of their conspiracy claims. Plaintiffs state that they need to establish through discovery those defendants that joined trade associations through which and by which they conspired to block the implementation, availability, and use of ATC at retail. Plaintiffs assert that this information is only available from defendants

---

[35]*Grandbouche*, 825 F.2d at 1466–67.

and the trade associations.  Plaintiffs further assert that, because there is no indication defendants would be harmed if their identities are revealed, plaintiffs' need outweighs defendants' interest in privacy.

Confidential membership lists go to the core of the First Amendment right to associate, and this factor weighs heavily against their disclosure.  Although the court acknowledges that plaintiffs' conspiracy claims require plaintiffs to show that two or more defendants came to a meeting of the minds and acted in concert, this is a factor that is not in dispute.  Defense counsel stated at the oral argument that "[t]here's no question" that defendants joined together in trade associations to advocate against ATC and suggested that a stipulation to this effect could be reached.[36]  Plaintiffs' need for the actual membership lists therefore appears very minimal.  The court finds that the privilege attendant to the confidential membership lists of the trade associations is not outweighed by plaintiffs' need for that information.

Second, as to documents concerning the trade associations' financial supporters, plaintiffs have not attempted to show that the balance tips in favor of disclosing this highly privileged information.  The court finds the privilege is not outweighed by the need for the requested information.  Such documents are properly withheld by defendants.

Third, with respect to the associations' internal lobbying information and legislative evaluations, plaintiffs argue the information is relevant and necessary because it (1) goes directly to plaintiffs' civil conspiracy claims that defendants entered into an agreement to

---

[36]Transcript of May 13, 2009, Oral Argument at 39–42.

oppose the implementation of ATC in the United States,[37] and (2) refutes defendants' affirmative defenses that ATC was not feasible and was illegal because it identifies what defendants knew or did not know at particular points in time.  Plaintiffs state that the information sought may provide them with "a way to challenge" deposition statements by defendants "that they were unaware of temperature correction issues at the retail level."[38] Plaintiffs also maintain that the information may show that defendants used the trade associations to create the very situations in which defendants claim it was "impractical" or "impossible" to use ATC at the retail level.  Under the third factor, plaintiffs assert that the lobbying information can only be obtained from defendants or from the trade associations. And under the fourth factor, plaintiffs assert that the nature of the information is such that it addresses contentions that defendants have put "in issue" with their affirmative defenses.

In response, defendants argue that, under the *Noerr-Pennington* doctrine,[39] plaintiffs

---

[37]Plaintiffs note that their civil conspiracy claims, in addition to being based on defendants' joint lobbying efforts, are based on pressure that defendants (acting in concert) exerted on manufacturers.  Defendants respond that information related to how the trade associations may have pressured manufacturers could be obtained from other sources (the manufacturers themselves).  The court need not deviate into a discussion of such information in performing the instant balancing analysis, however, because the court cannot conceive of how such information would be subject to the First Amendment associational privilege protecting the past *political* activity of the associations as recognized in this order.

[38]Plaintiffs' Reply in Support of Motion to Compel at 24.

[39]The "*Noerr-Pennington* doctrine" refers to the recognition in *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965), that the First Amendment right to petition the government protects parties that lobby the government by immunizing them from antitrust liability based on their lobbying efforts.  Although the parties use the term "*Noerr-Pennington* doctrine," the Tenth Circuit has stated that the preferred nomenclature outside of the antitrust context is "the right to petition the government."  *Cardtoons, L.C. v. Major*

will be unable to use information about defendants' lobbying activities to impose liability on defendants for a civil conspiracy, making the information neither relevant nor necessary. Defendants further assert that their affirmative defenses do not relate to the technical feasibility of ATC equipment, but rather to the fact that the applicable weight-and-measure standards prohibited defendants from installing ATC equipment, and that their lobbying strategies are irrelevant to what the law actually permitted.[40]  With respect to the third balancing factor, defendants contend that the state of a defendant's knowledge regarding the retail sale of temperature adjusted fuel can be learned by asking direct questions to this effect in interrogatories or at depositions.  Finally, defendants argue that the information sought goes to the core of the associations' activities and that the privileged nature of the information trumps plaintiffs' minimally relevant discovery request.

The court finds that plaintiffs have not met their burden of overcoming the First Amendment privilege attached to the associations' lobbying and legislative documents. Although the information might meet the minimal relevancy standards of Fed. R. Civ. P. 26(b)(1), it does not meet the heightened "certain relevance" and need standards applicable in this First Amendment context.  As noted above, there is no dispute in this case that

_League Baseball Players Assoc._, 208 F.3d 885, 889–90 (10th Cir. 2000) ("While we do not question the application of the right to petition outside of antitrust, it is a bit of a misnomer to refer to it as the _Noerr-Pennington_ doctrine . . . .").  To maintain consistency with the parties' oral and written arguments, the court will also use the term "_Noerr-Pennington_ doctrine," but with the understanding that the court is referring to the more specific right to petition applicable in non-antitrust actions.

[40]Defendants concede that ATC was technologically available and feasible.  _See_ Defendants' Response to Plaintiffs' Motion to Compel Discovery (doc. 687) at 20.

defendants joined together in trade associations to advocate against ATC.  If plaintiffs wish to challenge defendants' contentions about their knowledge of ATC issues at the retail level, plaintiffs can directly inquire through interrogatories.   Likewise, plaintiffs can obtain information about whether defendants helped create the very circumstances under which defendants claim it was  impractical, impossible, or illegal to use ATC at retail by examining the readily available public positions taken by the trade associations.  The nature of the information sought—showing the internal strategic processing done by associations as they prepare to advocate on behalf of their collective members—is highly privileged because it involves a core associational activity protected by the First Amendment.  Plaintiffs have not shown that they have a particular need in obtaining this information such that the First Amendment protection accorded it should be overborne.[41]

     In summary, the court holds that the First Amendment privilege of free association protects the following types of documents from disclosure: confidential membership lists of trade associations, confidential financial contributor lists of trade associations, and confidential internal trade association communications concerning  lobbying and legislation.

---

[41]The undersigned U.S. Magistrate Judge does not decide the issue of whether the *Noerr-Pennington* doctrine precludes liability under plaintiffs' civil conspiracy claims based on defendants' petitioning activity.   Under 28 U.S.C. § 636(b)(1), ultimately this is a dispositive matter appropriate for a U.S. District Judge to decide, and in any event its resolution is not necessary for the court's ruling today.  That is, the parties do not dispute that the *Noerr-Pennington* doctrine does not directly bar discovery, *see N.C. Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981) and *P&B Marina, Ltd. v. Logrande*, 136 F.R.D. 50, 61 (E.D.N.Y. 1991), and even without accepting defendants' contention that future application of the *Noerr-Pennington* doctrine decreases the relevance of the lobbying material (thus indirectly barring discovery), the court has found that plaintiffs did not meet their burden with respect to privileged lobbying material.

Therefore, plaintiffs' motion **(doc. 668)** to compel  defendants to respond to plaintiffs' discovery requests is denied in part and granted in part, as discussed more fully in this order. Likewise, plaintiffs' motion **(doc. 738)** to compel PMCA-KS to fully respond to plaintiffs' subpoena is denied in part and granted in part, as discussed more fully in this order.

## IV.  Undue Burdens on Trade Associations of Responding to the Subpoenas

As discussed above, the court has determined that confidential documents that go to the core of the trade associations' associational activities—whether in the possession of defendants or the trade associations themselves—are protected by the First Amendment and need not be disclosed to plaintiffs.  While this ruling protects from disclosure some of the documents in the possession of the trade associations that are potentially responsive to plaintiffs' subpoenas, it certainly does not protect all such documents.  Thus, the trade associations would still bear the burden of reviewing their records, determining which are responsive to the subpoenas, further determining which are privileged, and then producing the remaining documents.  Defendants, on behalf of the trade associations, have moved **(doc. 999)** to quash the subpoenas in their entirety arguing, among other things, that the subpoenas subject the trade associations to an undue burden.[42]

_____

[42]While the parties agree the court has jurisdiction to rule on defendants' motion to quash subpoenas that were issued by federal courts in other judicial districts, NACS and SIGMA argue the court lacks such jurisdiction (*see* doc. 1020).  After researching this issue, the court finds that, as the transferee court in this multi-district litigation, it does have jurisdiction to rule on the motion.  *See* 28 U.S.C. § 1407(b); *Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 444 F.3d 462, 468–69 (6th Cir. 2006) ("A judge presiding over an MDL case therefore can compel production by an extra-district nonparty; enforce, modify, or quash a subpoena directed to an extra-district nonparty; and hold an extra-district nonparty deponent in contempt, notwithstanding the nonparty's physical situs in a foreign district

Fed. R. Civ. P. 45 governs the issuance of subpoenas to non-parties.   Rule 45(c)(3)(A)(iv) states that a court "must quash or modify" a subpoena if it "subjects a person to undue burden." Non-parties responding to a Fed. R. Civ. P. 45 subpoena are generally offered heightened protection from discovery abuse.[43]   "Whether a subpoena imposes an undue burden upon a [non-party] is a case specific inquiry that turns on 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'"[44]  "Courts are required to balance the need for discovery against the burden imposed on the person ordered to produce documents, and the status of a person as a non-party is a factor that weighs against disclosure."[45]

The subpoenas that plaintiffs served on the trade associations very broadly reference forty-two categories of documents.  Defendants argue that responding to the subpoenas would impose an undue burden on the trade associations, which have limited staff and resources to conduct document review.  To illustrate, defendants submitted the declaration of Lisa Mullins,

where discovery is being conducted.").

[43]*Heartland Surgical Specialty Hosp., LLC v. Midwest Div., Inc.*, No. 05-2164, 2007 WL 2122437, at *4 (D. Kan. July 20, 2007) (*Heartland III*) (citing Fed. R. Civ. P. 45(c)(1) (requiring a party serving a subpoena to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena" and imposing mandatory sanctions if this directive is not followed) and *Hefley v. Textron, Inc.*, 713 F.2d 1487, 1497 n. 2 (10th Cir. 1983) (recognizing, in dicta, that "discovery from non-parties is often more inconvenient and expensive than it is from parties")).

[44]*Goodyear Tire & Rubber Co. v. Kirk's Tire & Auto Servicenter of Haverstraw, Inc.*, 211 F.R.D. 658, 662 (D. Kan. 2003) (citations omitted).

[45]*Id.* at 662–63.

NATSO's president and chief executive officer.  Ms. Mullins states that NATSO has only ten

employees,[46] many of whom are working more than seventy hours per week "to keep up with

the day-to-day challenges of new and changing proposed legislation and regulations at both

the federal and state levels that would significantly impact the industry."[47]  She contends that

"responding to the subpoena would require NATSO to divert more than 300 employee-hours

away from NATSO's core mission" and estimates the cost of responding would exceed

$575,000.[48]  NATSO's annual budget is a little more than $2,000,000.[49]  Thus, responding to

the subpoena would consume about a quarter of NATSO's budget for the year and hamper

the association's exercise of its First Amendment right to advocate on behalf of its members.

There is evidence in the record that the other trade associations would face similar burdens.[50]

        Many documents responsive to the subpoenas are privileged under the terms of this

order.  Many other responsive documents have been–or will be–produced by defendants,

parties in this case who are better positioned to respond to the requested discovery.  In

balancing all of these factors, the court finds that the need for discovery from the trade

---

[46]At the oral argument on the instant motions, Holly Alfano, NATSO's vice-president of government affairs, informed the court that NATSO's staff would soon be dropping to eight.

[47]Declaration of Lisa Mullins, Exhibit K to doc. 1000, at 2–3.

[48]*Id.* at 4.

[49]Transcript of May 13, 2009, Oral Argument at 109.

[50]*See* Declaration of Jay McKeeman, CIOMA's vice president of government relations & communications, Attachment 1 to doc. 1032; Declaration of Daniel F. Gilligan, PMAA's president and chief executive officer, Attachment 1 to doc. 1016.

associations is outweighed by the burden of reviewing and producing the documents. Defendants' motion to quash the subpoenas served on the trade associations is thus granted.[51] However, should plaintiffs wish to serve the trade associations with much narrower and targeted subpoenas for *specific* categories of documents (that the court has not deemed privileged), plaintiffs may do so by **July 10, 2009.**[52]

## V. Application of this Order and Production of Privilege Logs

Although the court has determined that certain categories of documents are protected from disclosure by the First Amendment, it is clear defendants are withholding documents that do not fall under the limited privilege recognized in this order.[53] The court is not satisfied with the current privilege logs prepared by defendants.[54] With respect to documents in the possession of defendants, many defendants have provided only categorical privilege logs that do not "describe the nature of the documents" being withheld and consequentially, do not

---

[51]Defendants also challenge the subpoenas on the ground that they target documents protected under the joint-defense privilege. Given the court's holding on undue burden, the court need not address this alternative ground for quashing the subpoenas.

[52]Plaintiffs have stated they "would be happy to" narrow the subpoenas to "minimize the burden" on trade associations. Plaintiffs' Supplemental Memorandum on First Amendment Issues (doc. 1072) at 6.

[53]For example, of the 861 pages of documents that PMCA-KS identified as responsive to plaintiffs' subpoena, defendants have asserted a First Amendment privilege over approximately 630 pages. At oral argument on these motions, defense counsel estimated that the privilege log created for those documents would be shortened by 40% to 50% if publicly disclosed documents were removed. As earlier indicated, the court has held that publicly disclosed documents are not subject to a First Amendment privilege.

[54] Fed. R. Civ. P. 26(b)(5)(A) requires the creation of a privilege log "[w]hen a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material."

permit plaintiffs to "assess the claim" of privilege.[55]  With respect to documents in the possession of PMCA-KS, defendants have produced a complete privilege log, but the privilege asserted is quite broad: "First Amendment Privilege (*Heartland*)."  In other words, the log does not identify how the withheld documents relate to "core associational activities," such as "confidential membership lists" or "lobbying strategy."  Moreover, as discussed earlier, the court has determined that the privilege for "past political activity" is much narrower than it has been construed by defendants in responding to plaintiffs' discovery.  The creation of new privilege logs is therefore in order.

Defendants are directed to perform a fresh review of responsive documents to determine which are truly privileged, using this order as a guide.  Documents previously withheld on the basis of "First Amendment privilege," which under the confines of this order are not privileged, shall be produced to plaintiffs by **June 26, 2009**.  Documents that defendants continue to assert a privilege over shall be listed in detailed (as opposed to categorical) privilege logs, which also shall be provided to plaintiffs by **June 26, 2009**.[56]  If plaintiffs thereafter wish to challenge the application of the First Amendment privilege to specific documents, the court will entertain *limited* motions for in camera review, provided such motions are filed by **July 10, 2009**.

---

[55]Fed. R. Civ. P. 26(b)(5)(A)(ii).

[56]The court observes, however, that as a practical matter defendants very well might determine there are no "smoking gun" documents responsive to plaintiffs' discovery requests, such that any benefit of withholding responsive documents is overcome by the expense and aggravation of having to produce corresponding privilege logs.  If such is the case, defendants shall produce all responsive documents by **June 26, 2009**.

## VI. Order

In consideration of the foregoing,

IT IS HEREBY ORDERED:

1.      Plaintiffs' motion (**doc. 668**) to compel defendants to respond to plaintiffs' discovery requests is denied in part and granted in part, as discussed above.

2.      Plaintiffs' motion (**doc. 738**) to compel PMCA-KS to fully respond to plaintiffs' subpoena is denied in part and granted in part, as discussed above.

3.      Defendants' motion (**doc. 999**) to quash subpoenas that plaintiffs served on five trade associations is granted.

4.      Defendants shall produce non-privileged documents (including PMCA-KS documents) responsive to plaintiffs' discovery requests by **June 26, 2009**.  Defendants shall produce detailed privilege logs describing the nature of documents over which they continue to assert a privilege by **June 26, 2009**.

5.      Plaintiffs may file motions for in camera review of documents withheld as privileged by **July 10, 2009**.

6.      Plaintiffs may serve trade associations with subpoenas targeting specific categories of documents (that the court has not deemed privileged) by **July 10, 2009.**

Dated this 28th day of May, 2009, at Kansas City, Kansas.

  s/ James P. O'Hara
James P. O'Hara
U.S. Magistrate Judge