## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE SALES PRACTICES LITIGATION | ) MDL No: 1840<br>) No. 07-md-1840-KHV-JPO<br>) |
| This Document Relates To: | ) |
| | ) |
| PHYLLIS LERNER, ET AL., | ) No. 2:07-CV-02405 |
| | ) [*Transferred from USDC* |
| | ) *Central District of California* |
| Plaintiffs, | ) *Case No. 07 CV -07-01216 GHK-FMDX]* |
| | ) |
| vs. | ) |
| | ) |
| COSTCO WHOLESALE CORPORATION, ET AL. | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

## LERNER CALIFORNIA PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND MEMORANDUM IN SUPPORT

## I.    **INTRODUCTION**

Plaintiffs Phyllis Lerner, Robert Hicks, Ronald Bartley, Steven Rubin, Alex Zalkin, Max

Candiotty, Ronna Posen and Barbara Cumbo ("Plaintiffs") purchased retail motor fuel between

January 1, 2001 and the present from one or more of these Defendants: Chevron USA, Inc., G&M

Oil Company, Inc., G&M Oil Co. LLC, United El Segundo, Inc., Dansk Investment Group LLC

f/k/a U.S.A. Petroleum Corporation and World Oil Corporation (collectively, "Defendants").[1,2]

Plaintiffs seek to represent a proposed Class for defined as:

> All individuals and entities that, at any time between February 22, 2003 and the
> present, purchased motor fuel at retail at a temperature greater than 60 degrees
> Fahrenheit, in the State of California, from a gas station owned, operated or
> controlled by one or more of the Defendants. [3]

Plaintiffs further propose a Southern California Subclass for the California Class, pursuant

Fed.R. Civ. P. 23(b)(2) and (3),  defined as:

> All residents of Los Angeles, Orange, San Diego, Riverside, San Bernardino and
> Imperial Counties that purchased motor fuel in those counties between May 1 and
> October 31 of the years defined in the California Class from a gas station owned,
> operated or controlled by one or more of the Defendants.

All Plaintiffs are residents of the Subclass geographic area, purchased motor fuel from one

or more of the above defendants in the Subclass geographic area, and also are Southern California

Subclass Plaintiffs.

Though as this motion sets forth, the California Class as set forth is ascertainable, the

Southern California Subclass offers an additional set of ascertainability standards for individual

claims as it is confined to those who ***reside and purchase*** fuel in counties and in months in which

---

[1]  *Lerner v. Costco Wholesale Corporation, et al* was filed February 22, 2007 in the United States District Court for the
Central District of California, case No. CV 07-01216, one of several cases filed in District Courts in California.
[2] Costco Wholesale Corporation, a named defendant, is now subject to a separate motion to certify a settlement class,
and therefore not included in this motion.
[3] Class and Subclass definitions are subject to this limitation:  "Specifically excluded from the class and subclass are: (a)
federal judges who have presided over this case; (b) persons employed by Defendants, (c) affiliates of Defendants and
(d) government agencies and entities."

motor fuel is consistently sold above 60 degrees Fahrenheit). Ample data supports that conclusion, and all putative Subclass members can easily determine whether they are members, on the basis of residence.

If the Court determines that the proposed Class or Subclass varies with respect to any other cause of action set forth below, Class Plaintiffs respectfully request the Court subclassify the Class members pursuant to Rule 23(c).

The California Class and Southern California Subclass claims arise from these common facts: Defendants neither temperature correct their retail motor fuel sales, nor disclose that fuel is sold on an unadjusted basis. As a result, the Plaintiffs paid more that they should have paid when they purchased hot fuel from Defendants. The California Class and Southern California Subclasss allege that thousands of other individuals and entities have suffered the same harm for the same reasons and seek injunctive and declaratory relief, monetary damages and restitution from Defendants.

Plaintiffs respectfully request that the Court certify this case as a class action, and the Plaintiffs' claims for class treatment:

(1)     pursuant to Fed.R. Civ. P. 23(b)(2), because Defendants have acted and refused to act on grounds that generally apply to the whole class and whole Subclass, such that final injunctive and declaratory relief is appropriate; and

(2)     pursuant to Fed.R. Civ. P. 23(b)(3), because the Plaintiffs also seek monetary damages and restitution, common legal and factual issues underlying the claims of the Plaintiffs predominate over those few issues which may affect the individual Class or Subclass members differently, and, because class litigation is the most efficient mechanism through which to litigate these claims.

II.    **QUESTION PRESENTED**

Should the Court certify this case as a class action for purposes of the claims alleged by the

Plaintiffs pursuant to Fed. R. Civ. P. 23(b)(2), 23(b)(3) or both?

III.    **STATEMENT OF THE CASE**

A.    **FACTS COMMON TO THE CLASS MEMBERS' CLAIMS**

The Plaintiffs purchased motor fuel from Defendants within the state, at temperatures above

60 degrees Fahrenheit, a fact shared with the Class and Subclass members.  Motor fuel expands

with heat. Therefore, a given volume of motor fuel at a warmer temperature has less mass and

energy than the same motor fuel at a cooler temperature. *Lerner Complaint*,("*Complaint*")  ¶¶ 41-

43, *and see* California Energy Commission "Fuel Delivery Temperature Study" at p. 5 ("*CEC*").[4]

The National Conference on Weights and Measures ("NCWM"), an association with

representatives from government and the oil industry, has recognized that due to temperature

expansion, motor fuel purchased solely on a volume basis was subject to unpredictability and

inconsistency depending on fuel temperature at the time of the sale. To remedy inequities among its

own members, the industry standardized sales of motor fuel based on temperature by creating a

temperature-correction standard known as ASTM-IP D-1250 ("D-1250"). *CEC* at pp. 5, 37. D-1250

defines a standard gallon unit of petroleum as 231 cubic inches at 60 degrees Fahrenheit ("U.S.

petroleum gallon").[5]  *Id.* p. 6, *Complaint,* ¶¶ 49-50. The U.S. petroleum industry uses D-1250 to

adjust petroleum sales based on temperature at every stage of the process except at retail. *CEC* at p.

7, *Complaint,* ¶¶ 51-52.

---

[4] Source:  www.energy.ca.gov/2009publications/CEC-600-2009-002/CEC-600-2009-002-CMF.PDF.  The cited CEC
report contains two elements: 1) straightforward temperature, demographic, consumer price increase, and sales data, all
of which are purely factual and for which we cite the report; and 2) analytical conclusions and opinions, such as the
estimated cost of installing ATC equipment, which is not solely data, and which analytical conclusions plaintiffs
contest.

No California retailer sells motor fuel on a temperature adjusted basis. *CEC* at p. 8. Class members buy motor fuel for the energy it provides, not simply to acquire a particular volume of fuel. *Complaint* ¶ 55. Because the average motor fuel temperature in California is greater than 60 degrees Fahrenheit, consumers in California often receive less fuel (*i.e.* fewer molecules and less mass) than if they purchased the fuel at (or adjusted to) the 60 degrees Fahrenheit industry standard. *CEC* at pp. 21-22, 26, *Complaint* ¶¶ 56-57. Therefore, these consumers commonly receive less motor fuel and less energy than they pay for.

Defendants also charge consumers excess reimbursement for taxes paid by Defendants on wholesale motor fuel purchases. *Complaint* ¶¶ 69-77. At wholesale, Defendants pay federal and state motor fuel taxes based on standardized, temperature-adjusted gallons, *i.e.* U.S. petroleum gallons. *Complaint* ¶ 70, 73. When the Defendants sell fuel at retail, they pass along to the consumers the cost of these taxes. In so doing, Defendants charge consumers reimbursement to recoup fuel taxes paid by them. *Complaint* ¶¶ 69-71, *and see* Declaration of Dr. Safir, ¶¶ 21-22. Because Defendants sell retail motor fuel at an average temperature greater than 60 degrees Fahrenheit without adjusting for temperature, they sell more gallons of fuel than they purchased. *Complaint* ¶ 73. On these extra gallons, defendants claim and receive reimbursement from plaintiffs for motor fuel taxes which they did not actually pay. *Complaint* ¶¶ 74-77, Safir Declaration, ¶ 22.

Temperature compensation technology is available; Defendants use it to adjust volumes on wholesale purchases. *CEC* at p. 7. *Complaint* ¶ 51. Defendants are capable of adjusting the price for motor fuel based on a standardized gallon at 60 degrees. *CEC* at pp. 14 -16, *Complaint* ¶¶ 58-60. Defendants have embraced temperature compensation in climates where it is in their interests to do so, but in the United States, temperature compensated retail sales are not in the industry's economic

---

[5] Mathematical equations and correction factor tables are used to convert "gross gallons" at ambient temperature to "net gallons" at 60 degrees Fahrenheit. *CEC*, p. 6. Thus, a retailer purchasing 10,000 gallons at a fuel temperature of 90

interest because the average retail temperature of motor fuel is greater than 60 degrees. By 1979, the American Petroleum Institute ("API") had conceded that the overall average temperature of motor fuel in the United States exceeded 60 degrees Fahrenheit.[6]

Consumers consider information about fuel economy and performance in their purchasing choices. *CEC* at p. 2, *Complaint* ¶¶ 78–80. Defendants' practices obscure the true energy content of fuel, so consumers cannot know whether they are getting what they pay for.

### B.   CALIFORNIA CONSUMERS AND CALIFORNIA FUEL CONSUMPTION

California is one of the most populous states in the United States, and its citizens drive 329 billion miles annually.[7] As of 2008, California boasted over 23 million registered drivers,[8] and over 21,957,000 registered automobiles, 5,347,000 non-commercial trucks, and hundreds of thousands of motorcycles and other vehicles.[9]   Enormous volumes of fuel are consumed in California; 2006 statistics peg that number at  383,178,000 barrels.[10]   Californian represents 11.2% of the entire United States' motor gasoline consumption.[11] Californians buy millions of gallons of expanded fuel – energy they pay for but don't receive.

### C.   THE CLASS MEMBERS' CLAIMS AND LEGAL THEORIES

#### 1.   California's Unfair Competition Law

The Plaintiffs assert claims under California's Unfair Competition Law, California *Bus. & Prof. Code* §§ 17200 *et seq* (the "UCL"). These claims arise as a result of Defendants' unlawful,

---

degrees Fahrenheit pays for the lesser volume calculated at 60 degrees Fahrenheit.
[6] Symposium on Temperature Compensated Volume in the Sale of Petroleum Products, National Bureau of Standards, Publication 79-1776, Transcript, page 96.
[7] Source:  Auto. Ass'n. So. Cal., https://www.aaa-calif.com/corpinfo/transportation.aspx ,
http://www.bts.gov/publications/state_transportation_statistics/state_transportation_statistics_2007/excel/table_05_03.x
ls, reporting 327,478,000,000 highway miles driven by Californians in 2006.
[8] Source:  CA. Dept. of Motor Veh. http://www.dmv.ca.gov/about/profile/official.pdf , last visited May 10, 2009.
[9] *Id.*
[10] Source:  U.S. Dept. of Energy, Energy Information Administration,
http://www.eia.doe.gov/emeu/states/sep_use/total/pdf/use_ca.pdf , last visited May 10, 2009.
[11] Source:  U. S. Dept. of Energy, Energy Information Administration State Energy Profiles, available at
http://tonto.cia.doc.gov/state/state_energy_profiles.cfm?sid=CA, last visited May 5, 2009.

unfair or fraudulent business act or practice or unfair, deceptive, untrue or misleading advertising in the sale of motor fuel.  Because Defendants fail to disclose the basis on which they sell motor fuel, class members cannot make fully informed decisions about fuel purchases.  The Class and Subclass alike have been harmed because they received less motor fuel than they were entitled to receive and for which they paid.  *Complaint* ¶¶ 91-94 *and see* Declaration of Dr. Safir ¶ 30.

### 2. Breach of Duty of Good Faith and Fair Dealing

The Plaintiffs allege that defendants breached their duties to act in good faith and observe reasonable commercial standards of fair dealing by selling motor fuel on an un-compensated basis. *Complaint* ¶¶ 121-126.  This is equally true for both the Class and the Subclass.

### 3. Unjust Enrichment

The Plaintiffs assert that by not adjusting for thermal expansion when they sell motor fuel which is warmer than 60 degrees Fahrenheit, Defendants have been unjustly enriched.  *Complaint* ¶¶ 135-138. In the Southern California Subclass, for example, each member of the class has been harmed because for every purchase, each bought hot, expanded fuel.

### 4. Civil Conspiracy

Plaintiffs allege that Defendants knew that selling "hot" motor fuel in volumetric gallons was deceptive, unconscionable, not in good faith and contrary to the accepted petroleum industry practice of measuring and selling motor fuel using a temperature-corrected, standardized measurement.  Plaintiffs also allege that some Defendants agreed to unlawfully deprive plaintiffs of rights and property by selling motor fuel on a non-temperature compensated basis, and that in furtherance of the conspiracy, some Defendants acted in concert with each other and third parties to

exert undue pressure and influence upon various manufacturers and other proponents of temperature compensation at the retail level. *Complaint*, ¶¶129-131.[12]

### D.     THE CLASS REPRESENTATIVES

Each Plaintiff is a worthy representative who understands and recognizes the responsibilities of a class representative.  All are also residents of the Southern California counties comprising the Southern California Subclass, and all purchased there.

They are:  **Ronald Bartley,** a customer of Chevron USA, G&M Oil Company, Inc., G&M Oil Co. LLC (together, "G&M"), and World Oil Corporation; **Robert Hicks,** a customer of Dansk Investment Group ("Dansk"); **Ronna Posen,** a World Oil customer; **Steve Rubin,** a  Chevron USA and G&M customer; **Barbara Cumbo**, a Dansk customer; **Phyllis Lerner**, a World Oil and Dansk customer; **Max Candiotty**, a United El Segundo customer; and **Alex Zalkin**, was a customer of Chevron USA.[13]

## IV.     <u>LEGAL STANDARDS FOR CLASS CERTIFICATION</u>

One or more members of a class may maintain an action as representatives if they satisfy their burden of proving that their proposed class action satisfies the requirements of Federal Rule of Civil Procedure 23(a), and the action falls within at least one of the categories specified in Rule 23(b). *See Sibley v. Sprint Nextel Corp.*, 254 F.R.D. 662, 670 (D. Kan. 2008)(Hon. K. Vratil).

Class certification is committed to the broad discretion of the trial court, which must perform a "rigorous analysis" of Rule 23's requirements. *See Sibley*, 254 F.R.D. at 669 (citing *Shook v. El Paso County*, 386 F.3d 963, 967 (10th Cir. 2004) (*Shook I*) and *Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 155 (1982).  "Class relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and they 'turn on questions of law applicable

---

[12] To the extent the *Complaint* asserts other claims, they are not now the basis of this motion, as plaintiffs' intend to conform their claims to those asserted in the Second Consolidated Amended Complaint.

in the same manner to each member of the class.'" *Gen. Tel.*, 457 U.S. at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). Proceeding as a class preserves resources of both court and parties by enabling litigation of issues common to class members. *Id.*

When addressing the requirements of Rule 23, the Court lacks authority to conduct a preliminary inquiry into the merits of the Plaintiffs' lawsuit. *See Shook v. Board of County Commissioners of County of El Paso*, 543 F.3d 597 at 612 (10th Cir. 2008) (*Shook II*) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, (1974)); *see also Sibley*, 254 F.R.D. at 670. For purposes of determining whether class certification is appropriate, a district court "must generally accept the substantive, non-conclusory allegations of the complaint as true." *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009). As explained by the 10th Circuit,

> while a district court may not evaluate the *strength* of a cause of action at the class certification stage, it must consider, without passing judgment on whether plaintiffs will prevail on the merits, whether remedying the harm alleged can be done on a class-wide basis in conformity with Rule 23(b)(2).

*Shook II*, 543 F.3d at 612 (citing cases); *see also Sibley*, 254 F.R.D. at 670. This Court has remarked: "Courts should err on the side of class certification because they have broad discretion to later redefine (or even decertify) the class if necessary." *Id.*

## V.   PROPOSED CLASS DEFINITION

The Plaintiffs move for class certification on their claims of violations of California's UCL, breach of the duty of good faith, unjust enrichment, and civil conspiracy pursuant to Fed.R.Civ.P. 23(b)(2) and (b)(3). An order certifying a class action must define the class and the class claims. Fed. R. Civ. P. 23(c)(1)(B); *Sibley*, 254 F.R.D. at 670. The Plaintiffs propose the following definition for the ***California Class***:

---

[13] Interrogatory responses by plaintiffs particularizing purchase history and deposition excerpts are included in the California Appendix of Exhibits.

> All individuals and entities that, at any time between February 22, 2003 and the present, purchased motor fuel at retail at a temperature greater than 60 degrees Fahrenheit, in the State of California, from a gas station owned, operated or controlled by one or more of the Defendants.

Plaintiffs also propose a ***Southern California Subclass*** pursuant Fed. R. Civ. P. 23(b)(2) and 23(b)(3):

> All residents of Los Angeles, Orange, San Diego, Riverside, San Bernardino and Imperial Counties that purchased motor fuel in those counties between May 1 and October 31 of the years defined in the California Class from a gas station owned, operated or controlled by one or more of the Defendants.

As set out below, the California Class meets all the requirements of Rule 23.

In addition, the proposed Southern California Subclass identifies an extremely cohesive group in terms of commonality, typicality, predominance and other prudential factors favoring class certification, and is a true subclass. The Southern California Subclass members reside in and bought motor fuel in those hot counties during hot months, so for those consumers, every purchase was a purchase of hot fuel.  Relief, whether injunctive or monetary, benefits every Subclass member, without concerns of antagonism among the subclass members.  The Subclass is readily identifiable without resort to external data; every member knows his or her county of residence, and the Subclass suffered well-characterized damages.  The Class Plaintiffs are all members of the Southern California Subclass.

To the extent the Court determines that the proposed class varies with respect to any other cause of action set forth below, Plaintiffs respectfully request the Court subclassify the Class members pursuant to Rule 23(c).

## VI.   **LEGAL ANALYSIS AND APPLICATION**

### A.   **RULE 23(a) REQUIREMENTS ARE SATISFIED**

A party seeking class certification must satisfy the four requirements of Fed. R. Civ. P. 23(a). *Trevizo v. Adams*, 455 F.3d 1155, 1162 (10th Cir. 2006); *Reed*, 849 F.2d at 1309. Pursuant to Rule 23(a), members of a class may sue as representative parties on behalf of all members if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

#### 1.   **Numerosity**

Certification is proper where the putative class is so numerous that joinder is "impracticable." Fed. R. Civ. P. 23(a)(1); *Sibley*, 254 F.R.D.at 671-72.   No set formula prevails; rather, the determination is made on a case-by-case basis. *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978), *cited in Trevizo*, 455 F.3d at 1162. The number of class members involved may be established by evidence that provides some ascertainable number or otherwise by reasonable estimate. *Rex*, 585 F.2d at 436.

The proposed class includes all individuals and entities that purchased hot fuel from Defendants in California between February 22, 2003 and the present. Although the precise number of class members is not yet known, registered California drivers number over 23 million. *See* n. 7, *supra*.   The Southern California Subclass involves California's most populous counties, with millions of residents. It follows that the number of members of the proposed class and subclass are sufficiently large to make joinder impracticable, satisfying the Rule 23 numerosity requirement.[14]

---

[14] *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 612-13 (D. Kan. 1995) (good faith estimate of hundreds of class members sufficient to satisfy numerosity requirement); *Olenhouse*, 136 F.R.D. at 679  (good faith estimate of at least 50 members sufficient size to maintain class action); See also, *McCuin v. Sec'y of Health & Human Servs.*, 817 F.2d 161, 167 (1st Cir.1987)(court "may draw reasonable inferences from the facts presented to find the requisite numerosity").

## 2.  Commonality

"The threshold for commonality is not high, and does not require that class members share every factual and legal predicate." *Thompson v. Jiffy Lube Int'l, Inc.*, 2008 WL 2762187, at *13 (D. Kan. July 16, 2008) (internal citation omitted).  Rather, Rule 23(a)(2) requires only a single question of law or fact that is common to the class. *J.B. ex rel Hart v. Valdez*, 186 F.3d 1280, 1288 (10th Cir, 1999). If the putative class shares but one discrete legal question, a common question of law exists. *Id.* at 1289. Where a claim asserts the application of a common policy or practice, factual differences among the individual claims will not defeat commonality. *Id.* at 1288. Similarly, it is irrelevant that the amount of damages among individual class members may differ, because it is the action and policies of Defendants with respect to the class as a whole that are challenged. *Olenhouse v. Commodity Credit Corp.*, 136 F.R.D. 672, 680 (D. Kan. 1991).  In short, the Rule 23(a) requirement of commonality is a low bar, and courts have generally given it a "permissive application." 7A Wright, Miller & Kane, *Federal Practice and Procedure* ("Wright & Miller") § 1763, at 221 (3rd ed. 2005).

Factual and legal issues common to all proposed Class and Subclass members include:

- Whether Defendants buy their motor fuel on a temperature compensated basis, but sell motor fuel to the Class and Subclass members on a non-temperature compensated basis;

- whether Defendants sell motor fuel at retail to the Class and Subclass members at temperatures above 60 degrees Fahrenheit;

- whether, for the Southern California Subclass, Defendants sell motor fuel at retail in Los Angeles, Orange, San Diego, Riverside, San Bernardino and Imperial Counties during the months of May through October at temperatures always above 60° Fahrenheit;

- whether Defendants are aware that motor fuel above 60° Fahrenheit is of lesser value than the same motor fuel at and below 60° Fahrenheit;

- whether Defendants' practice of selling motor fuel in retail sales to Class and Subclass members by a non-standard, non-temperature-adjusted "gallon" is an unfair, fraudulent, deceptive or unlawful practice;

- whether Defendants have been unjustly enriched from the sale of non-temperature adjusted motor fuel to Class and Subclass members, and/or by seeking excessive reimbursement from their customers to recoup their costs for fuel taxes paid;

- whether Defendants have breached the duty of good faith and fair dealing in the motor fuel sales to Class and Subclass members;

- whether Defendants have conspired in the acts and omissions set forth herein, including efforts to resist attempts to require temperature adjusted retail motor fuel sales and implement automatic temperature compensation technology on retail motor fuel pumps;

- whether Defendants' practice of selling motor fuel in retail sales transactions by a non-standard, non-temperature-adjusted "gallon," without full disclosure, should be enjoined; and

- whether Defendants should be required to make Class and Subclass members whole for any harm caused by the Defendants' practice of measuring motor fuel delivered in retail sales transactions by a nonstandard, non-temperature-adjusted "gallon" and, if so, in what amount.

These claims are susceptible of class-wide proof because they arise from a common pattern and practice by Defendants. The "commonality" element of Rule 23(a) is satisfied.

### 3.  Typicality

"Typicality" requires that representative plaintiffs possess the same interests and suffer the same injuries as the proposed class members. *Sibley*, 254 F.R.D. at 674. This requirement, however, does not demand that claims of representative plaintiffs be identical to those of the class. *Id.* (citing *Adamson v. Bowen*, 855 F.2d 668 (10th Cir. 1988)). Rather, the inquiry is whether the claims of the representative plaintiffs are "significantly antagonistic" to the claims of the proposed class. *Id.*; *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. 609, 613 (D. Kan. 1995).

Like commonality, typicality turns on plaintiffs' claims. *Sibley,* 254 F.R.D. at 674.  A plaintiff's claim may differ factually from those of class members, and yet be typical if arising from the same event, practice or course of conduct giving rise to the claims of other class members, and if based on the same legal theory.  *Zapata v. IBP, Inc.,* 167 F.R.D. 147, 160 (D. Kan. 1996); *see also,* Conte & Newberg, *Newberg on Class Actions,* ("*Newberg*") at § 18:9 (4th ed. 2002)

("[T]ypicality refers to the nature of the claim or defense, and not to the specific facts from which it arose or the relief sought.").[15]

The Class Plaintiffs' interests are closely aligned with those of the putative Class Members and the Southern California Subclass alike. As "hot fuel" purchasers and residents of the Subclass Counties and the State, there is no antagonism. All Class Plaintiffs base their claims on the same core factual pattern and legal theories – the sale of motor fuel which has not been temperature adjusted. The claims of the Class Plaintiffs and class members arise from the same course of conduct by Defendants, and are based on the same legal theories. And, the Class Plaintiffs and class members suffered the same type of harm and damages. That shared experience fully satisfies the typicality requirement of Rule 23(a)(3).

### 4. Adequacy

Rule 23(a)(4) requires that the representative parties fairly and adequately protect the interests of the class. Two elements animate the adequacy of representation inquiry: whether conflict exists among class members with respect to their interests; and whether counsel is qualified to conduct the litigation as a class. *Sibley*, 254 F.R.D. at 674. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002); *Olenhouse*, 136 F.R.D. at 680.

The Plaintiffs seek to certify claims identical to those of the Class members, all uniformly premised on California law. Similarly, the Plaintiffs are members of the Class they seek to represent, and have no interests that are antagonistic to the class members.

The Plaintiffs propose that Thomas V. Girardi and Larry Sackey be appointed as counsel for the California Class and Southern California Subclass ("California Class and Subclass Counsel"). Both have demonstrated that they are well-versed in the relevant legal principles, have already

---

[15] *See also Chang v. United States*, 217 F.R.D. 262, 269 (D.D.C. 2003) ("Traditional commonality refers to the group characteristics of the class as a whole, while typicality refers to individual characteristics of the named plaintiff . . .").

invested significant time and resources into investigating and prosecuting these claims, and are well-qualified to conduct this class action, and will fairly and adequately protect the interests of all Class members.

## B.     RULE 23(b) REQUIREMENTS ARE SATISFIED

A party seeking class certification must also satisfy at least one of the requirements of Rule 23(b). *Sibley*, 254 F.R.D. at 675; *Olenhouse*, 136 F.R.D. 679.  The Class Plaintiffs have satisfied the requirements of ***both*** Rule 23(b)(2) and Rule 23(b)(3).

### 1.     Rule 23(b)(2)

Certification of a class pursuant to Rule 23(b)(2) is warranted when a defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.  The Tenth Circuit has explained that Rule 23(b)(2) requires that the "defendants' actions or inactions must be based on grounds generally applicable to all class members" and that  "final injunctive relief be appropriate for *the class as a whole.*"  *Shook II*, 543 F.3d 604 .  These requirements ensure that the injunctive and declaratory relief is specifically tailored to the Class and the acts at issue.  *Id.*

#### a.     Defendants' Acts Are Uniform

Plaintiffs have alleged that Defendants "acted or refused to act on grounds generally applicable to the class."  Defendants' practices—selling motor fuel on an unadjusted basis and charging as "taxes" amounts not actually remitted to the government—have all been applied "in a consistent manner" and as "part of a pattern of activity."  Wright & Miller, § 1775, at 449.

A wide-spread pattern or practice satisfies the (b)(2) requirement for actions "on grounds generally applicable to the class." *Id.*; *see Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir. 1988) (certification of a (b)(2) class is appropriate where plaintiffs complain about a pattern or practice that "appl[ies] equally to all cases pending within the class"); *Gelb v. AT&T*, 150 F.R.D. 76, 77

(S.D.N.Y. 1993) (certifying a Rule 23(b)(2) class in advertising market fraud "intended to affect the similarly situated cardholders and is part of a pattern of activity directed not at one particular individual, but at the universe of cardholders").

Plaintiffs allege that Defendants have acted and have refused to act on grounds generally applicable to the Class and Subclass in the following particulars:

a. Defendants uniformly sell motor fuel in California without temperature adjustment, *see CEC*, p. 8;

b. Defendants' uniformly measure motor fuel for retail sales transactions by a non-standard, non-temperature-adjusted "gallon," affecting the California Class and the Southern California Subclass;

c. Defendants' are unjustly enriched from the sale of non-temperature adjusted motor fuel in a manner that affects both the California Class, and the Southern California Subclass;

d. Defendants' collection of excessive reimbursement from their customers to recoup their costs for fuel taxes paid is undertaken by them in a manner that is applicable to the California Class and Southern California Subclass;

e. Defendants have breached the implied duty of good faith and fair dealing in their motor fuel sales to the California Class as a whole;

f. Defendants unfair, deceptive, and misleading activities in connection with their retail motor fuel sales in violation of the California's UCL, as to the California Class affects the California Class as a whole;

g. Certain Defendants have conspired in the acts and omissions set forth herein, including efforts to resist attempts to require temperature adjusted retail motor fuel sales and implement automatic temperature compensation technology on retail motor fuel pumps, impacting the California Class and the Southern California Subclass.

These claims look to the wrongful actions of the Defendants and not any one Class member's individual injuries. Defendants have "acted or refused to act on grounds generally applicable to the class" and thus, this element of Rule 23(b)(2) is satisfied.

**b.      Final Injunctive or Declaratory Relief is Appropriate**

Class-wide injunctive and/or declaratory relief is particularly appropriate here, given the uniformity of Defendants' acts and omissions.   Indeed, Rule 23(b)(2) was designed to address situations where an injunction awarded in an individual lawsuit would necessitate the same form of relief as an injunction awarded on a class-wide basis.   In other words, an injunction compelling a defendant to make truthful disclosures about temperature would do so in a manner that would benefit the class as a whole.   As Judge Easterbrook framed the issue in *Allen v. International Truck and Engine Corp*., 358 F.3d 469, 417 (7th Cir. 2004), "[t]he need for, if not inevitability of, class-wide treatment when injunctive relief is at stake is what Rule 23(b)(2) is about."

Plaintiffs' common law and statutory claims provide for injunctive and declaratory relief.[16] California's UCL authorizes such relief – best administered on a class-wide basis, in a single lawsuit.   *See* Cal. *Bus. & Prof. Code* § 17203: (claimants "may pursue representative claims or relief on behalf of others" for violations of the UCL, including false advertising).

Plaintiffs allege a consistent course of conduct with resulting harm to them and the Class and Subclass members alike, because all are exposed to deceptive and unfair marketing.   Each class member is affected by Defendants' practices which result in windfall profits to Defendants.   Consequently, such conduct is actionable under California's UCL, *Bus. & Prof. Code* §§17200 *et seq.,* which prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." Its "purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Kasky v. Nike, Inc*., 27 Cal.4th 939, 949 (2002). Since it has a broad remedial goal, the UCL naturally defines "unfair competition" in broad terms.

---

[16] Plaintiffs discuss remedial aspects of substantive California law as, according to the Manual for Complex Litigation (4th ed.2004) "[i]n diversity cases, the law of the transferor district follows the case to the transferee district. " § 20.132.

This term, California' Supreme Court reaffirmed California's commitment to consumer protection in a landmark decision, *In re Tobacco II Cases,* 2009 WL 1362556 (2009):

> "[C]onsumer class actions and representative UCL actions serve important roles in the enforcement of consumers' rights. [They] make it economically feasible to sue when individual claims are too small to justify the expense of litigation, and thereby encourage attorneys to undertake private enforcement actions. . . . This court has repeatedly recognized the importance of these private enforcement efforts."

*Id.* at *6, (citations omitted.)   UCL class actions enforce substantive law by aggregating many individual claims into a single one. *Id.* While a class representative must meet UCL standing requirements, absent class members need not, because defendant's conduct and the public right to be protected from it is the UCL's focus. *Id.* at *12.   Since injunctive relief operates "*in futuro*" individualized standing requirements defeat the policy objective, as would a requirement of individualized reliance.[17]   Deceptive sales practices are thus redressed by the UCL.

When fuel is sold on a basis different than that on which the retailer bought it, and when unadjusted sales produce neither accurate nor consistent fuel measurements, consumers cannot know the real energy content of their purchases.   Defendants' failure to either temperature adjust or define "gallon" are omissions likely to mislead class members that they are buying a standardized gallon when they are not.   *See Comm. on Children's Television, Inc. v. General Foods Corp.,* 35 Cal.3d 197 211 (1983) (it is only necessary to show that members of the public are likely to be deceived.) *And see Kasky, supra,* 27 Cal.4[th] at 951, (even true statements that have the capacity to mislead violate the UCL); *Williams v. Gerber Food Prods. Co*., 552 F.3d 934, 938 (9th Cir. 2008)

The "unfair" prong of the UCL is broadly construed because consumers are vulnerable and do not have the resources to protect themselves from sharp practices.   *Progressive West Ins. Co. v. Yolo County Sup. Ct.*, 135 Cal.App.4th 263, 286 (2005).   Unfair practices are "immoral, unethical,

oppressive, unscrupulous or substantially injurious to consumers." *Id.*.[18] Defendants' pattern of profiteering on a temperature differential fits the "unfair" pattern that deprives consumers of important information and unjustly enriches the defendants.

Remedies available under the UCL are equitable and include injunction: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. . . . ." *Bus. & Prof. Code* § 17203.

Defendants' continuing violations of the UCL are efficiently addressed on a class wide basis through the following:

- enjoining and/or declaring unlawful the practice of selling non-temperature compensated motor fuel in California;

- enjoining and/or declaring unlawful the failure to disclose the temperature of motor fuel sold at retail in California;

- enjoining and/or declaring unlawful the failure to disclose what the price of a gallon of motor fuel would be if adjusted to the equivalent of a Standard U.S. Petroleum gallon;

- enjoining and/or declaring unlawful Defendants' over-collection of money under the guise of fuel excise tax reimbursement; and

- enjoining and/or declaring unlawful Defendants' use of coercive pressure and undue influence on ATC pump manufacturers attempting to sell ATC devices for retail motor fuel sales.

Nothing about this relief need be tailored or individualized, either for the Class or Subclass. Injunctive relief on a class-wide basis is superior to individualized injunctive remedies and therefore, weighs in favor of certifying the class pursuant to Rule 23(b)(2).

---

[17] California's robust consumer protection laws are strikingly similar to those in Kansas. Both prohibit unfair or deceptive acts or practices. Compare Cal. *Bus. & Prof. Code* §§17200, *et seq.* to Kansas Stat. Ann. §50-634(a), *and see Wang v. Massey Chevrolet*, 97 Cal.App.4th 856, 870-71 (2002); *William v. Ewan,* 230 Kan. 262, 267 (1981).

[18] The Court in *In re Tobacco II* took pains to confine discussion to business practices alleged to be "fraudulent" and left untouched and unchanged the body of law defining an "unfair" practice, as "[t]here are doubtless many types of unfair business practices in which the concept of reliance, as discussed here, has no application." *Id.* at n. 17.

Rule 23(b)(2) class certification of the Southern California Subclass is especially fitting. Defendants' practices have a profound impact there, where retail fuel sales during those months are at temperatures well above 60 degrees Fahrenheit. *See CEC* at pp. 102-3, describing survey data.

### c. Certification Pursuant to Rule 23(b)(2) is Appropriate Even Though the Plaintiffs Seek Monetary Relief

Plaintiffs seek monetary relief along with injunctive relief.; that is no bar to certification under Rule 23(b)(2). Actions are routinely certified under Rule 23(b)(2) when, as here, the action is *primarily* one for equitable relief. *See, e.g.*, *Monreal v. Potter*, 367 F.3d 1224, 1236 (10th Cir. 2004).

The focus of this lawsuit is on Defendants' wrongful actions and their concerted refusal to disclose and to temperature-adjust motor fuel. Although the Class members are entitled to restitution as a result of Defendants' conduct, that remedy is incidental to injunctive relief also requested. Relief depends not on the merits of each individual claim, but on Defendants' improper gains. The claims thus do not introduce "new and substantial legal or factual issues, nor entail complex individualized determinations." *See Robinson . Metro-North Commuter R.R. Co.,* 267 F.3d 147, 163 (2nd Cir. 2001) (citing *Allison v. Citgo Petroleum Corporation*, 151 F.3d 402 at 415(5th Cir. 1998)). Indeed, Defendants have consistently asserted that "plaintiffs have not – in fact-suffered any harm at all."[19] As this Court has previously noted in certifying a class pursuant to Rule 23(b)(2), such a contention "cuts directly against (an) assertion that (a) lawsuit is primarily about money damages."[20]

Courts in this District have certified classes pursuant to Rule 23(b)(2), even when "significant" monetary relief was also sought. In *In re Universal Service Fund Telephone Billing Practices Litigation*, MDL 1468 ("*USF*"), Judge Lungstrum certified a Rule 23(b)(2) class though

---

[19] *See* Defendants' Preliminary Statement of the Case, pg. 9.

the **alleged damages exceeded $2.5 billion**.[21]   The *USF* Court noted that  injunctive relief would

prevent future damage to the class from an unlawful overcharge price-fixing conspiracy, and that

without such relief, the amount "of such overcharges during the next decade would likely exceed

the value of the plaintiffs' current damage claims." *USF*, 219 F.R.D. at 681.  Thus:

> Any injunctive relief that might ultimately be awarded could prove to be highly
> significant. (citations omitted).  Class certification is not the appropriate stage to
> decide the merits of this argument.  If, however, plaintiffs are able to prove at trial
> that they are entitled to the sought-after injunctive relief, the court is unpersuaded
> that monetary relief would be the predominant form of relief.

*Id.*  The *USF* Court certified the case under both Rule 23(b)(2) and 23(b)(3),[22] noting the "Tenth

Circuit's mandate that 'if there is error to be made, let it be in favor and not against the maintenance

of a class action.'" *Id.* at 681 (quoting *Esplin v. Hirschi*, 402 F.2d 94, 99 (10th Cir. 1968) *cert.*

*denied*, 394 U.S. 928 (1969)).

The instant case is on all fours with the scenario present in *USF*.  The Plaintiffs' claims for

past monetary relief, while significant, are far outweighed by their potential future losses if

Defendants' wrongful conduct is not enjoined.  As the cost of motor fuel rises, the expansion

differential grows too, ensuring more and greater damage going forward, if the conduct is not

enjoined.  Certification of the Class pursuant to Rule 23(b)(2) is appropriate.

## 2.   Rule 23(b)(3) Certification is Appropriate

Certification is justified for the California Class and Southern California Subclass pursuant

to Rule 23(b)(3), because questions of law or fact common to class members predominate over any

questions affecting only individual members.  A class action is superior to other available methods

---

[20]  *Schreiber v. NCAA*, 167 F.R.D. 169, 176 (D.Kan. 1996).
[21]   *See USF*,  219 F.R.D. 661 (D. Kan. 2004)("Plaintiffs damages…total…$2,711,400,000 on plaintiffs' price fixing claims…", Final Pretrial Order, D.E. 822); *see also In re Nasdaq Market-Makers Antitrust Litig*., 169 F.R.D. 493, 517 (S.D.N.Y. 1996) (approving of **$1.025 billion** dollar settlement in antitrust class action pursuant to Rule 23(b)(2) and (b)(3), and rejecting defendants' argument that large damage claims preclude 23(b)(2) certification).
[22]  *See also In re Catfish Antitrust Litig.*, 826 F.Supp. 1019, 1046 (N.D. Miss. 1993) (certifying a class under both Rule 23b(2) and Rule 23(b)(3) and noting that "trends in Rule 23(b)(2) utilization appear to favor a broader application of equitable relief certification" even where damages are also sought).

for fairly and efficiently adjudicating the controversy. The claims are well-manageable, as a viable methodology for valuing the claims is in place. As is described in the declaration of Dr. Safir, that methodology is securely grounded in the methods of economics.

Class treatment of the California Class claims for monetary relief is particularly fitting, as California law expressly contemplates class prosecution of claims for aggregate damages along with equitable remedies. Whether termed "damages" or "restitution" or even "disgorgement," these California remedies are designed to be pursued by class action.

***Southern California Subclass:*** The Southern California Subclass, in particular warrants certification under Rule 23(b)(3), as it is a cohesive, well-defined and ascertainable class made up only of warm county residents who bought hot fuel in hot months. *See CEC* at pp. 102-3, and Safir Declaration describing temperature data sources. Because all suffered like harm, there are no antagonism concerns. Damages for this Subclass are particularly calculable both geographically and individually; upon notice, Subclass members will readily know who they are, and can quantify their individual claims. Prudential concerns of both predominance and superiority are thus well-addressed.

***California Class:*** By definition, the larger California Class, too, is comprised of individuals who purchased fuel at temperatures above 60 degrees Fahrenheit. Every member Class bought and paid for expanded fuel, and every member has suffered harm. That some, but not all, come forward to collect is no impediment to management or to certification as the class is adequately ascertainable and distribution of awards is manageable. For them, California law also supplies ample tools, including the fluid recovery mechanism, to account for variations in the quality of individual proof, and this case fits that well-settled mold. The requirements of Fed. R. Civ. P. 23(b)(3) are satisfied.

California courts pioneered the "fluid recovery" approach in class actions, and it routinely employed there as a useful tool to distribute recoveries when individual class members do not make

claims for a part of the recovery – often the case where each individual's recovery is small.  *See,*

*State of California v. Levi Strauss & Co.*, 41 Cal.3d 460, 471-472 (1986):

> The propriety of fluid recovery in a particular case depends upon its usefulness in fulfilling the purposes of the underlying cause of action. (*Bruno v. Superior Court* (1981) 127 Cal.App.3d 120, 129 [hereafter *Bruno*], citing *Simer v. Rios* (7th Cir. 1981) 661 F.2d 655, 676; *Blue Chip Stamps v. Superior Court* (1976) 18 Cal.3d 381, 389 (conc. opn. of Tobriner, J.).) Fluid recovery may be essential to ensure that the policies of disgorgement or deterrence are realized. ( *Simer v. Rios, supra,* 661 F.2d at p. 676.) Without fluid recovery, defendants may be permitted to retain ill gotten gains simply because their conduct harmed large numbers of people in small amounts instead of small numbers of people in large amounts.

There are many ways to implement a fluid recovery, including claimant fund sharing and price rollbacks designed to provide direct monetary relief to class members.  *Id.* at pp. 472-479.  *See, too, Six (6) Mexican Workers v. Arizona Citrus Growers,* 904 F.2d 1301 (9th Cir. 1990) (certification proper despite issues of individual damages, and approving fluid recovery to distribute unclaimed settlement funds.)   The transferor District Court will have tools at its command to abate concerns about efficiency and to manage the class action, particularly at the damages and settlement phases. These factors cut across all the discrete inquiries relevant to Fed. R. Civ. P. 23(b)(3).

The Southern California Subclass suffers from no "ascertainability" or management problems because its definition is so finite.  Every member was a resident of one of the hot counties and purchased fuel in that county during the designated timeframe.[23]  Every putative member will be able to determine his or her status and entitlement to individual restitution.

## a.   Predominance

### i.   Common Liability Evidence Predominates

Rule 23(b)(3) predominance turns on whether the claims stem from "a common nucleus of facts" or "a common course of conduct." *Esplin*, 402 F.2d at 98; *Heartland Communications, Inc. v.*

---

[23] *See CEC* "Fuel Delivery Temperature Study," March 2009 pp. 102-3, surveying data.,

*Sprint Corp.*, 161 F.R.D. 111, 117 (D. Kan. 1995).[24] Thus, the Rule 23(b)(3) predominance inquiry "tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623 (1997); *Sibley*, 254 F.R.D. at 675. "Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws . . ." *Amchem*, 521 U.S. at 625.

The predominance inquiry focuses on the manner of evidence needed to prove plaintiff's claims, and "[t]he nature of the evidence that will suffice to resolve a question determines whether the question is common or individual." *In re Urethane Antitrust Litigation*, 237 F.R.D. 440 (D. Kan. 2006) (internal quotations and citations omitted) (certifying an antitrust class action). As another Court recently observed in certifying an unjust enrichment class:

> Significantly, the common issues need only be predominant, not dispositive of the litigation. There is no definitive test for determining whether common issues predominate, however, in general, **predominance is met when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position.**

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D. 349, 359 (D.D.C. 2007) (internal quotations and citations omitted) (emphasis added). The predominance inquiry thus examines the elements that must be proven for each claim to be certified, and whether such claims are susceptible to common proof from common evidence.

### *Unjust enrichment*

California has adopted the Restatement approach to unjust enrichment. As the California Supreme Court explained in *Ghirardo v. Antonioloi*, 14 Cal.4th 39, 51 (1996):

> Under the law of restitution, an individual may be required to make restitution if he is unjustly enriched at the expense of another. (Rest., Restitution, § 1, p.12.) A person is enriched if he receives a benefit at another's expense. (*Id.*, com. a, p. 12.).

---

[24] There is "considerable overlap" between the commonality inquiry of Rule 23(a)(2) and the predominance inquiry of 23(b)(3). *Heartland Communications, Inc.*, 161 F.R.D. at117-118.

The term "benefit" "denotes any form of advantage." (*Id.*, com. b, p. 12.)  Thus, a benefit is conferred not only when one adds to the property of another, but also when one saves the other from expense or loss.

The elements of the claim are (1) a benefit conferred upon the defendant, (2) the defendant's appreciation or knowledge of the benefit, and (3) retention of the benefit under such circumstances as to make the retention inequitable. *United States for Use & Benefit of Walton Tech., Inc. v. Westar Eng'g. Inc.,* 290 F.3d 1199, 1204 (9th Cir. 2002).[25]   Because the focus of unjust enrichment is on the benefit conferred and defendant's conduct, unjust enrichment claims based on a defendant's common practices are particularly suited to certification.

As noted in *Westways World Travel, Inc. v. AMR Corp*.:

Plaintiffs have alleged that Defendants acted in a virtually uniform manner toward all Class members with respect to the alleged scheme to force Plaintiffs and the other Class members to pay for alleged tariff violations by passengers who purchased tickets for air travel from the members of the travel agent class. Where the SAC alleges a "common course of conduct" of misrepresentations, omissions, and other wrongdoing that allegedly affected all the class members in the same manner, common questions predominate.

218 F.R.D. 223, 239 (C.D. Cal. 2003), *and see Nordberg v. Trilegiant Corp.*, 445 F.Supp. 2d 1082 (N.D. Cal. 2006)  (certifying unjust enrichment class).

Common proof provides the answer to the unjust  enrichment questions: (1) Did Defendants purchase motor fuel on a temperature compensated basis? (2) Did Defendants sell motor fuel to California Class members on a non-temperature compensated basis? and, (3) Did Defendants thereby receive a benefit that would be inequitable to retain?  The Southern California Subclass in particular shares these questions as all fuel sold to them was "hot" fuel.

Other courts have certified unjust enrichment classes, finding that common issues of fact and law predominate over individual issues.  *See, e.g., Garcia v. Tyson Foods, Inc.*, 255 F.R.D. 678 (D. Kan. Feb. 12, 2009) (certifying Rule 23(b)(3) class on unjust enrichment claim under Kansas

law).[26]   The unifying theme cases is that, when the doctrine of unjust enrichment concerns a

defendants' common practice or behavior, the inequity of such practice can be established on a

class-wide basis without the need to prove fraud, reliance or any other individualized element.

### California UCL

California UCL claims are proven on common evidence of defendants' conduct and those

claims are appropriate for class certification, without individualized proof of reliance.   *In re*

*Tobacco II Cases, supra, Bank of the West v. Sup. Ct*., 2 Cal.4th 1254, 1267 (1992), *Comm. on*

*Children's Television, Inc.*, 35 Cal.3d 197, 198; *Mass. Mut. Life Ins. Co. v. Sup. Ct.*, 97 Cal.App.4th

1282, 1289-95 (2002) (certifying UCL claims arising out of deceptive sales practices).   Relief

includes "restitutionary disgorgement" of a defendant's wrongful profits—shown on common

evidence—and a fluid recovery fund is possible.)   *Juarez v. Arcadia Financial, Ltd*., 152

Cal.App.4th 889, 914-915 (2007).   The availability of such flexible remedies demonstrates the

UCL's goal to create an effective remedy.

Restitution of wrongly-gotten gains is proven on the same data set for everyone, and proven

with particular force for the Southern California Subclass, as southern California retailers' gains

from sales of hot fuel are readily susceptible to proof.   Dr. Safir's damage model can do so.

### Duty of good faith and fair dealing

California has adopted Restatement Second of Contracts §205:   "Every contract imposes

upon each party a duty of good faith and fair dealing in its performance and its enforcement."

---

[25] This standard is essentially identical to that in Kansas. *See Holtorf v. Singh*, 2009 WL 981914, 4 (Kan. App. 2009).

[26]   *See also, In re Abbott Laboratories Norvir Anti-Trust Litig*., 2007 WL 1689899 *9-10 (N.D. Cal. 2007) (certifying unjust enrichment class); *Schumacher*, 221 F.R.D. at 617 (holding common issues predominated and certifying South Dakota unjust enrichment class of meat purchasers); *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 116 (D.D.C. 2007) (certifying unjust enrichment settlement class); *Slapikas v. First American Title Ins. Co*., 250 F.R.D. 232 (W.D.Pa. 2008) ("A determination whether an overcharge by First American is 'unjust' is common to all putative class members and appropriate for class treatment."); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 46-47 (E.D.N.Y. 2008); *Powers v. Lycoming Engines*, 245 F.R.D. 226, 239 (E.D.Pa. 2007); *Vista Healthplan, Inc*., 246 F.R.D. at 359.

To prevail on a California claim of breach of the duty of good faith and fair dealing, Plaintiffs must prove: 1) that plaintiff and defendant entered into a contract ; 2) that plaintiff did all, or substantially all of the significant things that the contract required or was excused from doing those things; 3) that all conditions required for defendant's performance had occurred; 4) that defendant unfairly interfered with plaintiff's right to receive the benefits of the contract; and 5) that plaintiff was harmed. *See* Cal. Civ. Jury Instr., CACI No. 325.  California courts have certified classes for breach of duty of good faith and fair dealing.  *Acree v. G.M.A.C.,* 92 Cal.App.4[th] 385 (2001) (practice of force-placement of insurance violates covenant and reasonable expectations.)

Each of the five listed elements of the claim are readily susceptible to common proof as the agreements and defendants' conduct in connection with the agreements are virtually unchanged from consumer to consumer.  Again, common proof predominates.

Civil conspiracy

In California, the elements of an action for civil conspiracy are (1) formation and operation of the conspiracy and (2) damage resulting to plaintiff (3) from a wrongful act done in furtherance of the common design. *Doctors' Co. v. Superior Court,* 49 Cal.3d 39, 44 (1989).  A civil conspiracy may be implied.  *See,* Cal. Civ. Jury Instr. CACI 3600.  A conspiracy may be inferred from the circumstances, including the relationships between the parties and the interests of the alleged co-conspirators.  It is *not* required that a plaintiff demonstrate that a defendant personally committed a wrongful act, or even that a defendant knew all of the details, or all the other conspirators.  *Id.*

Questions concerning the existence, scope and effect of conspiracies to present common questions of fact and law.[27]  *See, e.g. Westways World Travel,* 218 F.R.D. 239 – 240, approving class in which allegations of conspiracy to extort were asserted.

---

[27]  *See Schreiber*, 167 F.R.D. at 173 ("'Antitrust price-fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.'") (quoting *Cumberland Farms,*

Common issues relevant to this claim include: (1) Did two or more Defendants agree or to exert pressure on ATC pump manufacturers? (2) Did Defendants take affirmative steps to prevent introduction of ATC technology? (3) Were Class members damaged as a result of such conduct?

### Common Evidence Applies To All of These Claims

The predominance requirement of Rule 23(b)(3) is satisfied with respect to all causes of action set forth above because a common nucleus of operative facts is at the heart of this dispute: Defendants have uniformly suppressed facts as to all consumers and their retail motor fuel sales constitute an unjust, unfair or deceptive practice. Common facts include:

- Defendants measure gallons on a temperature adjusted basis to conform with the industry standard of 60° Fahrenheit when buying and selling gas at the wholesale level;

- Defendants sell motor fuel to California consumers at temperatures above 60 degrees Fahrenheit and do not adjust the price of fuel to account for the expansion of motor fuel at temperatures greater than sixty degrees;

- Defendants are aware that hot fuel has less energy value than the same volume of motor fuel that has been temperature compensated to the industry standard;

- Consumers who purchase motor fuel at temperatures in excess of 60 degrees Fahrenheit receive less fuel as a result of Defendants' failure to adjust for thermal expansion of motor fuel;

- Defendants increase profits by selling to California Consumers fuel at temperatures greater than 60 degrees;

- Defendants have concealed, suppressed and failed to disclose that Defendants deliver to Plaintiffs and Class members motor fuel in excess of 60 degrees Fahrenheit;

- Defendants have concealed, suppressed and failed to disclose that the standard U.S. petroleum gallon in the U.S. domestic petroleum industry, including within and among Defendants, is 231 cubic inches at 60 degrees Fahrenheit;

---

*Inc. v. Browning-Ferris Indus., Inc.*, 120 F.R.D. 642, 646 (E.D.Pa. 1988)); *In re Universal Service Fund Telephone Billing Practices Litigation,* 219 F.R.D. at 673 ("[The existence of a conspiracy] will necessarily focus on the conduct of defendants and MCI, not on the individual conduct of class members."); *In re Flat Glass Antitrust Lit.,* 191 F.R.D. 472, 484 (W.D.Pa.1999) (conspiracy is susceptible to generalized proof because the focus is on defendants' actions); *Playmobil Antitrust Lit.,* 35 F.Supp.2d at 245 (existence of conspiracy would be proven by evidence common to the class); *In re Catfish Antitrust Lit.,* 826 F.Supp. at 1039 (proof of conspiracy would be "pertinent and common to all plaintiffs").

- Defendants have concealed, suppressed and failed to disclose that the term "gallon" used by Defendants in the sale of motor fuel to Plaintiffs and Class members is not a standard unit of measure;

- Defendants have concealed, suppressed and failed to disclose that each volumetric gallon of motor fuel sold to Plaintiffs and the Class at a temperature above 60 degrees Fahrenheit contains a lesser amount of fuel than Plaintiffs and Class members would have received if Defendants sold such motor fuel on a temperature compensated basis;

- Defendants have concealed, suppressed and failed to disclose that when motor fuel Defendants sold to Plaintiffs and the Class exceeded 60 degrees Fahrenheit, Defendants paid *less* federal and state fuel tax to their suppliers or appropriate governmental entities than they charged to and received from Plaintiffs and the Class; and

- Defendants combined, agreed and came to a meeting of the minds on an unlawful course of action to unlawfully deprive Class Plaintiffs and class members of such rights and property, by selling motor fuel to Plaintiffs and Class members on a non-temperature compensated basis; acting to prevent introduction of automatic temperature compensation technology to the retail market; acting to influence private, standard-setting organizations related to the use of automatic temperature compensation technology.

Although not exhaustive, this list demonstrates the common nature of the evidence that Class and Subclass will seek to introduce in order to prove their claims on a class-wide basis. Each Class and Subclass member was treated alike by Defendants and affected in the same way by the same problem: Defendants' failed and refused to adjust the price or volume of their retail motor fuel sales to compensate for the effect of temperature. Because Defendants have systematically sold fuel on a non-temperature compensated basis, and because the facts necessary to prove the claims are focused on these systematic practices, these claims are susceptible to common proof that predominates over any individual questions.[28]

---

[28] The instant case is akin to a series of lawsuits that have been certified by the District of Kansas where the Court found that <u>systematic and uniform</u> practices/conduct by a defendant gave rise to a core nucleus of common facts that predominated for purposes of Rule 23(b)(3) analysis, regardless of the possibility of individual damage questions. *See, e.g., Sibley*, 254 F.R.D. 662 ("Specifically, the critical issues for trial are whether Sprint's accounting methods systematically under reported commissions").

ii.     Damage Issues Are Neither Individualized, Nor Predominant

Next, the predominance requirement is also satisfied as to the Class members' damages claims.  The declaration of Plaintiffs' expert witness, economist Dr. Andrew Safir, demonstrates that the Class members have economically meaningful damage claims based on a reasonable economic theory and that class wide damages can be calculated in an economically reasonable manner, supported by accurate and reliable statistical information.  Safir Report ¶¶ 7, 11-30.  Dr. Safir describes several ways that can be used to calculate the aggregate amounts by which each defendant overcharged class members as a result of defendants' failure to temperature adjust sales of motor fuel.  Safir Report ¶¶ 23-30.  Each of these methodologies utilizes  information in Defendants' possession and does not depend on individualized proof regarding the amount of each class member's claim, (although individual calculations are possible.) Safir Report ¶¶ 8, 23-30.

The Southern California Subclass claims can be calculated and allocated with particular precision as every member of that Subclass will be able to identify himself or herself and the qualifying purchases, as they are in "hot months" in "hot counties."  This allows them to present individualized claims on a finite and well-defined basis, and a method for calculating those claims is available.  *Id.* at ¶ 25.   Thus, extensive resort to alternative distribution mechanisms will be unnecessary, the Subclass is especially manageable.

Expert testimony is appropriately relied upon for the calculation of class-wide damages to satisfy Rule 23(b)(3)'s predominance requirements. *In re Aluminum Phosphide Antitrust Litigation*, 160 F.R.D. at 615 (citing cases: "Plaintiffs contend that a methodology exists by which they will prove damages on a class-wide basis. Whether damages actually will be proven on a class-wide basis remains to be seen. Nevertheless, the fact that individual proof as to the amount of damages may be necessary does not preclude class certification."); *see also Town of New Castle v. Yonkers Contracting Co.,* 131 F.R.D. 38, 42 (S.D.N.Y.1990) (same); *In re Wirebound Boxes,* 128 F.R.D.,

268, 272 (D. Minn. 1989) (same); *Fisher Bros. v. Mueller Brass Co.,* 102 F.R.D. 570, 579 (E.D. Pa. 1984) (same)).

Other Courts in this District agree that the proper test of plaintiff's damage methodology at the class certification level is simply whether plaintiff has submitted a plausible method:

> Ultimately, it is not the court's task at this procedural juncture to resolve on the merits the issue of whether plaintiffs have in fact established that they suffered injury as a result of the alleged conspiracy by weighing the conflicting expert reports or engaging in statistical dueling of the experts. (citation omitted) Rather, at this procedural juncture the court must remain focused on "whether plaintiff's expert evidence is **sufficient to demonstrate** common questions of fact warranting certification of the proposed class, **not whether the evidence will ultimately be persuasive**."

*In re Urethane Antitrust Litigation*, 237 F.R.D. at 451 (emphasis supplied, citing *In re Visa Check/MasterMoney Antitrust Litigation*, 280 F.3d 124, 135(2nd Cir. 2001)); see also *In re Universal Service Fund Telephone Billing Practices Litigation*, 219 F.R.D. at 676 ("At the class certification stage, the court's task is not to determine whether his opinion will ultimately be persuasive, but rather to evaluate whether his declaration is **sufficient to demonstrate** common questions of fact warranting class certification.")(emphasis added).[29]

Defendants cannot fault Dr. Safir's damage model for lack of individual motor fuel transaction/purchase information, as the case has not progressed to that stage in discovery.  The parties have agreed to defer the voluminous, individual transaction discovery, useful for individualized proof of damages is required.  Individualized discovery follows a ruling on the issue of class certification.  As indicated in the Parties' Joint Party Planning Report:

> Plaintiff intends to focus the scope of initial discovery (following the short standing-related period referenced above) primarily to issues of liability and overall damages,

---

[29] *See also*, *In re Linerboard,* 305 F.3d at 152 (Plaintiffs need only make a "threshold showing" related to damage methodology and impact); *In re Bulk (Extruded) Graphite Prods. Antitrust Litig.,* Case No. 02-6030, 2006 WL 891362, at *10 (D.N.J. Apr.4, 2006) (emphasis added); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,* Case No. 02-1486, 2006 WL 1530166, at *9 (N.D.Cal. June 5, 2006) (Plaintiffs need only advance a "plausible methodology" to demonstrate that damages can be proven on a class-wide basis).

and postpone voluminous ESI discovery related to individual transactions/purchases until after a ruling on Plaintiffs' motion(s) for class certification.

This common-sense solution was carried through to the Court's Scheduling Order No. 2 (D.E. 388) which noted at pgs. 6-7:

> The court specifically notes that, to assuage defendants' concerns regarding simultaneous class certification and merit-related discovery, plaintiffs have stated that as a practical matter they intend to focus their initial discovery efforts primarily on issues of liability and overall damages, with voluminous discovery of electronically stored information (ESI) related to individual transactions/purchases being postponed until *after* the court has ruled on plaintiffs' motion for class certification.[30]

Thus, to the extent individual transaction/purchase information is lacking, it is by the design of the parties and order of this Court.   Indeed, the Court has noted that to the extent Plaintiffs attempt to obtain such information, it would entertain a protective order in that regard. *See* Scheduling Order No. 2, fn 5.  The request for certification should not be prejudiced by an argument that Dr. Safir's methodology is lacking with respect to individual transaction/purchase information.

Moreover, individual differences among the transactions, such as differing volumes or prices do not undermine commonality of the class members' claims, and do not defeat certification. *See, e.g.*, *Sibley*, 254 F.R.D. at 673; *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. at 613 (citing *In re Catfish Antitrust Litig.*, 826 F.Supp. 1019 (N.D. Miss. 1993)).  Plaintiffs challenge Defendants' policies as to the class as a whole, so differences among individual damage claims are irrelevant to that inquiry. *See Sibley,* 254 F.R.D. at 673; *Olenhouse*, 136 F.R.D. at 680.

An individualized damage component, if present, does not frustrate certification of either class, nor do variances compel a finding that individual issues predominate.  See, *In re Aluminum Phosphide Antitrust Litig.*, 160 F.R.D. at 614-15  ("While it is possible that the amount of each plaintiff's damages will require individualized proof, the Court does not believe that individual

---

[30]  Scheduling Order No. 2 (D.E. 388), pgs. 6-7.

issues will predominate with regard to proving fact of injury."); *Urethane II, Polyether Polyol*, 251 F.R.D. 629, 639 (D. Kan. 2008) ("The possibility that individual issues may predominate on the issue of damages, however, does not defeat class certification by making this aspect of the case unmanageable."); *In re Urethane Antitrust Litigation*, 237 F.R.D. at 451 ("even if individualized issues predominate the issue of damages, the court believes that common questions nonetheless predominate in this case because common questions will govern the more difficult, threshold liability issues of proving an antitrust violation and impact.")[31]   This is also the rule in the transferor district, *see Negrete v. Allianz Life Ins. Co of N.A.*, 238 F.R.D. 482, 494 (C.D. Cal. 2006) ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).", quoting *Smilow v. Southwestern Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003)).   "The amount of damages is invariably an individual question and does not defeat class action treatment." *Blackie v. Barack*, 524 F.2d 891, 905 (9th Cir. 1975), *and see In re Rubber Chems. Anti. Litig.*, 232 F.R.D. 346, 354 (N.D. Cal. 2005).

"Individual damage issues should not, except in extraordinary situations, have any adverse effect on the propriety of aggregate class judgments as a proper means for determining the defendant's liability to the class." *Newberg*, § 10:2 (4th ed. 2002).   This is fair because "aggregate proof of the defendant's monetary liability promotes the deterrence objectives of the substantive laws underlying the class actions and promotes the economic and judicial access for small claims objectives of Rule 23." *Newberg* § 10.5.

Dr. Safir's analysis is sufficient to prove <u>some</u> damage to each class member.   Further inquiry "beyond this minimum point goes only to the amount and not the fact of damage." *In re*

---

[31]   *See also, In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 535 (6th Cir.2008) (the 'fact of damages' was a question common to the class even if the amount of damages sustained by each individual class member varied); *In re Carbon Black Antitrust Litig.*, 2005 WL 102966, at *20 (D.Mass.2005) ("Even if the damage assessments end up being too individualized to resolve as a class, that does not warrant denial of the plaintiffs' motion at this stage.").

*Universal Service Fund Telephone Billing Practices Litigation*, 219 F.R.D. at 676 (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 fn. 9 (1969)).

### b.    Superiority

The second prong of a Rule 23(b)(3) certification analysis is that of superiority.  The matters pertinent to this analysis include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Here, all of these factors weigh in favor of certifying this action.

### i.    The Class Members' Interests in Individually Controlling the Prosecution or Defense of Separate Actions

The superiority requirement that insures that no other available method of handling the claims has greater practical advantages. *Sibley*, 254 F.R.D. at 676 (citing *In re Universal Serv. Fund Tele. Billing Practices Litig.*, 219 F.R.D. at  679.

As stated by the Supreme Court in *Deposit Guaranty National Bank v. Roper*:

> The aggregation of individual claims in the context of a class wide suit is an evolutionary response to the existence of the injuries unremedied by the regulatory action of government.  Where it is not economically feasible to obtain relief within the traditional framework of multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.

445 U.S. 326, 339 (1980).

A class action is not only superior, it is the only practical means by which claims against Defendants can be litigated. As one court noted:

> In a large and impersonal society, class actions are often the last barricade of consumer protection…. To consumerists, the consumer class action is an inviting procedural device to cope with frauds causing small damages to large groups.  The slight loss to the individual, when aggregated in the coffers of the wrongdoer, results in gains which are both handsome and tempting.  The alternatives to the class action

> -- private suits or governmental actions -- have been so often found wanting in controlling consumer frauds that not even the ardent critics of class actions seriously contend that they are truly effective.  The consumer class action, when brought by those who have no other avenue of legal redress, provides restitution to the injured, and deterrence of the wrongdoer.

*Eshaghi v. Hanley Dawson Cadillac*, 574 N.E.2d 760, 766 (Ill. App. 1991);

The Southern California Subclass alone consists of hundreds of thousands, perhaps millions of potential class members, most of whom have suffered a small economic loss. Therefore, "'[f]ew individuals could even contemplate proceeding with this litigation in any context other than through their participation in a class action, given the expense and burden that such litigation would entail[,]' particularly when many of the putative plaintiffs have suffered economic loss of *de minimis* value."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 245 F.R.D. 147, 172 (S.D. N.Y.2007) (quoting *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 303 (S.D. N.Y. 2003)).

The challenge presented by small individual claims is precisely the problem the class mechanism is intended to address.  As the Supreme Court has explained, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.  A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor."  *Amchem*, 521 U.S. at 617.  These concerns carry special weight in consumer class actions.  As noted by Professors Wright, Miller and Kane:

> Typically the individual claims are for small amounts, which means that the injured parties would not be able to bear the significant litigation expenses involved in suing a large corporation on an individual basis.  These financial barriers may be overcome by permitting the suit to be brought by one or more consumers on behalf of others who are similarly situated."  Even if requiring class members to bring individual lawsuits was not economically prohibitive, it would waste judicial resources and limit access to the courts.

7B Wright & Miller, § 1778, at 59 (2nd ed.1986).

If a class is not certified, absent class members will be denied any realistic chance of recovery. Denial of class certification will effectively prevent class members from having the merits of their claims heard by any tribunal. *See In re Copley Pharmaceutical, Inc.,* 158 F.R.D. 485, 492 (D. Wyo. 1994), *quoting Weeks v. Bareco Oil Co.,* 125 F.2d 84, 90 (7th Cir. 1941) ("To permit the defendants to contest liability with each claimant in a single, separate suit, would, in many cases give defendants an advantage which would be almost equivalent to closing the door of justice to small claimants. This is what we think the class suit practice was to prevent.").

Because Defendants have concealed their scheme,[32] most putative class members would not know that they were injured. A class action is superior to other modes of adjudication because "it would increase the public's awareness of the suit and thereby increase the number of individuals able to vindicate their rights." *Norflet v. John Hancock Life Ins. Co.,* 2007 WL 2668936, at *10 (D. Conn. Sept. 6, 2007*); see also In re Nassau County Strip Search Cases,* 461 F.3d 219, 230 (2d Cir. 2006) (superiority requirements met because "without class notification, most putative class members will not even know that they suffered a violation of their constitutional rights").

      ii.      *The Extent and Nature of Any Litigation Concerning the Controversy Already Begun by or Against Class Members*

The Plaintiffs are aware of the cases consolidated in this multidistrict proceeding, *see* SCAC, and one other State Court proceeding pending in California, involving Chevron U.S.A. That case would not undermine this comprehensive action.

      iii.      *The Desirability or Undesirability of Concentrating the Litigation of the Claims in the Particular Forum*

Concentrating this litigation in a single forum is desirable because it "simplifies and streamlines the litigation process." *Nassau County,* 461 F.3d at 230. A class action provides

---

[32] Of note, after these lawsuits were filed some Defendants have started placing warning labels on their motor fuel retail pumps that inform consumers that the motor fuel being purchased is not temperature-compensated.

economies and efficiencies for all parties. *See Dupler v. Costco Wholesale Corp.,* 249 F.R.D. 29, 47 (E.D.N.Y. 2008). To the extent any doubts about certification exist, "the interests of justice require that . . . any error, if there is to be one, should be committed in favor of allowing the class action." *Esplin*, 402 F.2d 101; *Heartland Communications, Inc.,* 161 F.R.D. at 118.

*iv.    The Likely Difficulties in Managing a Class Action*

Plaintiffs anticipate no unusual difficulty in managing this action as a class action. Most of the elements of the claims, including damages, are established through Defendants' own documents and expert testimony. The fact that the class is large does not militate against a finding of manageability since the same procedural processes (in terms of notice, opt out requirements, etc.) apply, regardless of whether the class is 1,000 members or 1,000,000 members.

The Southern California Subclass is particularly efficient from that standpoint, as it is readily ascertainable. Notice to residents of the six counties can be manageably designed and executed, and the ministerial aspects of claim calculation and allocation are finite and readily solved issues.

The Class and Subclass are large but a large class increases the efficiency of the case. *See, e.g.*, *Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004), *cert. denied,* 543 U.S. 1051 (2005)( "The more claimants there are, the more likely a class action is to yield substantial economies in litigation."). Denial of class certification based on lack of manageability "should be the exception rather than the rule." *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d at 140.

The law to be applied by the transferor court includes flexible fluid recovery remedies, muting the specter of individualized damage issues in the California Class; the Court is armed with tools to manage an aggregate damage or restitution recovery. *State of California v. Levi Strauss & Co.*, *supra,* 41 Cal.3d 460, 471-472. Lingering individualized damage issues for that Class, which are not anticipated in the Southern California Subclass, may be addressed within the Court's broad

discretionary authority under Rule 23 to craft a plan that addresses manageability concerns. Rule 23(c) authorizes the Court to certify claims or issues in whole or part in order to carry out the remedial nature of Rule 23. Potential remedies include bifurcation of liability and damage issues or partial certification. These tools ensure that the class action device is in every true and realistic sense "superior" to its alternatives, and the requirements of Rule 23(b)(3) are satisfied.

## VII.   PLAINTIFFS' PROPOSED PROCEDURE FOR DEVELOPMENT OF A NOTICE PLAN IS APPROPRIATE

Plaintiffs propose that they prepare a proposed notice and notice plan for the Court's approval, allowing Defendants to object or suggest changes. Plaintiffs propose that the parties file the proposed notice and notice plan with the Court within ten days of an order granting certification pursuant to Rule 23(b)(3).

## VIII.   APPOINTMENT OF CLASS COUNSEL IS WARRANTED

The Class and Subclass Plaintiffs respectfully request that the Court appoint the undersigned counsel as counsel for the California Class and Southern California Subclass. Messrs. Girardi and Sackey have the requisite experience, qualities and resources to serve as Class Counsel, and are well-versed in the legal principles and facts governing these claims, and will commit all necessary resources towards representing both Classes. They will zealously prosecute the claims of the California Class, and will fairly and adequately represent the interests of the California Class and Southern California Subclass. *See* Declarations of Thomas V. Girardi and Larry Sackey.

## IX.   CONCLUSION

Plaintiffs have satisfied the requirements of Rule 23(a), and 23(b)(2) and (3), and have demonstrated that a class action is the most efficient, practicable means of litigating this case. Plaintiffs respectfully request that the Court grant the Class and Subclass motion and certify this action as a class action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3).

Respectfully submitted this 1st day of June, 2009.

*S/ THOMAS V. GIRARDI*

By:_____

THOMAS V. GIRARDI
HOWARD B. MILLER
GRAHAM B. LIPPSMITH
GIRARDI & KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017-1904
Telephone: 213-977-0211
Facsimile: 213-481-1554
tgirardi@girardikeese.com
Attorneys for Plaintiffs

LARRY A. SACKEY
LAW OFFICES OF LARRY A. SACKEY
11500 W. Olympic Blvd. Suite 550
Los Angeles, California 90064
Telephone: 310-575-4444
Facsimile: 310-575-4520
Attorneys for Plaintiffs

ROBERT A. HORN
HORN AYLWARD & BANDY, LC
2600 Grand Boulevard, Suite 500
Kansas City,MO  64108
Telephone: 816-421-0700
Facsimile: 816-421-0899
rhorn@hab-law.com
Attorneys for Plaintiffs