# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: MOTOR FUEL TEMPERATURE | ) | |
| SALES PRACTICES LITIGATION | ) | |
| | ) | MDL No: 1840 |
| (This Document Relates to All Cases) | ) | |
| | ) | No: 07-md-1840-KHV-JPO |

## OBJECTION TO PROPOSED SETTLEMENT

COME NOW Amy Alkon and Nicolas S. Martin ("Objectors"), members of the putative class, to object to the proposed settlement between Plaintiffs and Defendant Costco Wholesale Corp. ("Costco") and hereby give notice that they intend to appear at the Fairness Hearing through their counsel, Theodore H. Frank.

In further support hereof, Objectors provide the following memorandum and authorities.

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................3

I.      The Objectors And The Center For Class Action Fairness .................................4

II.     The Settlement Is Unfair, Inadequate, and Unreasonable. .................................5

        A.      The Injunctive Relief is Economically Worthless And Will Harm Class Members
                Who Must Subsidize The Cost Of Settlement. ......................................................8

        B.      The Settlement Does Not Compensate For Alleged Past Wrongdoing, And
                Functions More Like A Promotional Tool For The Defendant. ..........................10

        C.      Former Costco Members And Non-Conversion State Customers Receive No
                Access To Injunctive Relief Although Their Rights Are Extinguished. ...............12

        D.      Some Class Members Receive More Gas From Volumetric Gallons Than They
                Would With Automatic Temperature Compensation ("ATC") "Gallons."............14

        E.      Injunctive Relief Is Distant And Illusory For Many Class Members. ...................16

III.    Class Counsel Have Breached Their Fiduciary Duty To The Class.................................18

IV.     The Settlement is Impermissibly Self-Dealing. ................................................................21

V.      To Date, Notice Is Insufficient Under Rule 23 Because It Fails To Set Forth The Basis
        For Requested Attorneys' Fees. .....................................................................................24

        CONCLUSION...............................................................................................................25

        PROOF OF SERVICE....................................................................................................27

## INTRODUCTION

Class members Amy Alkon and Nicolas S. Martin object to the proposed settlement and hereby give notice that they intend to appear at the Fairness Hearing through their counsel, Theodore H. Frank.

 "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004).

This case provides a stark example of the potential conflict between class counsel and class members. The plaintiffs and their attorneys, engaged in an expansive suit against over 100 defendants, have settled with one defendant and have thereby assured themselves fees. For unnamed class members, the settlement agreement provides no compensation for what plaintiffs alleged was nearly a decade of fraud.

Disturbingly, the Settlement Agreement proposes to compensate the class by requiring economically worthless injunctive relief that would actually *hurt* consumers.

Furthermore, the proposed settlement aims to bind absent class members who cannot possibly receive any real or imagined benefits from the injunctive relief. These class members are an unrepresented subclass, and compromise of their claims in exchange for no possible relief in neither fair nor reasonable.

Finally, Putative Class Counsel and named plaintiffs have breached their fiduciary obligations to the class. Plaintiffs' counsel has secured attorneys' fees for themselves without the possibility of reversion to a common fund, and, in violation of Fed. R. Civ. Proc. 23(h), it has not

provided notice to the class on the basis of their fee request.  Named plaintiffs, meanwhile, have agreed to accept $2,500 for themselves, while shutting out unknown thousands of other class members.

For these reasons, the Court should reject the settlement.

## I.      The Objectors And The Center For Class Action Fairness

Amy Alkon and Nicolas S. Martin are members of the class.  Ms. Alkon (171 Pier Ave #280, Santa Monica, California 90405, (310) 306-6160) is a resident of California.  Mr. Martin (7916 Meadowbrook Drive, Indianapolis, IN 46240-2659, (317) 255-5425) is a resident of Indiana.  Their signatures are available upon request.  Both Ms. Alkon and Mr. Martin purchased gas from Costco on numerous occasions in the years prior to April 22, 2009.  The average daytime temperature in Los Angeles is hotter than 60° F year-round, so Ms. Alkon has almost certainly purchased gasoline above that temperature.   The average daytime temperature in Indianapolis is hotter than 60° F from mid-April to October, so Mr. Martin has almost certainly purchased gasoline above that temperature.

For the purposes of settlement, the class is defined as "All residents of the States at Issue [including California and Indiana] who, between January 1, 2001 and the date of this Agreement [April 22, 2009], purchased motor fuel from Costco at a temperature above 60 degrees Fahrenheit . . ."  Agreement § 2.1.  Therefore, both Ms. Alkon and Mr. Martin have standing to object under Fed. R. Civ. Proc. 23(e)(5) and the Court's Order of August 18, 2009 (Docket No. 1273).

Ms. Alkon and Mr. Martin have retained The Center for Class Action Fairness to represent them.  The Center, founded by legal academic and attorney Theodore H. Frank in 2009,

is a non-profit public-interest law firm that represents consumers *pro bono*.  It is a subsidiary of the 501(c)(3), DonorsTrust.

A number of "professional objectors" are for-profit attorneys that attempt to or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees; thus, some courts presume that the objector's legal arguments are not made in good faith.  But this is not the business model of The Center for Class Action Fairness.  While the Center focuses on bringing objections to unfair class action settlements, it makes no effort to engage in *quid pro quo* settlements to extort attorneys, and has never settled an objection.  The Center analyzes complaints from consumers aggrieved by class action settlement notices to determine whether a settlement is objectionable under the law because it favors attorneys over class members.  The Center's litigation on behalf of consumers has been covered by *Forbes* and the *National Law Journal*, among others.

The Center's president, Theodore H. Frank, is a graduate of the University of Chicago Law School, which he attended on a Public Service Scholarship.  Mr. Frank is an elected member of the American Law Institute, and has written and spoken across the country about class action law and the principal-agent problems in class action settlements, including being quoted in the *New York Times*, *Wall Street Journal*, *Chicago Tribune*, and a number of legal journals on the subject.

## II.     The Settlement Is Unfair, Inadequate, and Unreasonable.

Under the proposed settlement, none of the unnamed class members receive any compensation.  Although the Recitals purport that the Settlement Agreement offers the class "Injunctive and Other Relief," the only relief provided to unnamed class members is injunctive.

Specifically, Costco has made qualified promises to equip its gas pumps with automatic temperature compensation in several states where it operates.   *See* Agreement § 4, "Consideration."

Automatic temperature compensation ("ATC") is meant to counteract the natural expansion and contraction of gasoline at high and low temperatures.   Since the dawn of the motor age, retail fuel has been sold in the United States volumetrically—gas pumps dispense gallons that correspond to 431 cubic inches in volume.   Like most liquids, motor fuels expand and contract in hot and cold temperatures.   Gasoline expands about 1% for every 15° F increase in temperature. Therefore, gas sold volumetrically at 75° F has about 1% less value than gas sold at 60° F—the same volume of hotter gas contains slightly fewer molecules and less energy.   Automatic temperature compensation ("ATC") is meant to sell fuel in standardized "gallons" defined as the equivalent amount of fuel contained in a volumetric gallon at a specific temperature, in this case, 60° F.   Therefore, ATC pumps would dispense about 1% more volume per gallon when the gas sold is 75° F.   Similarly, ATC pumps would dispense about 1% *less* fuel when the gas is at 45° F.[1]

According to the proposed settlement, Costco agrees to install ATC equipment in fourteen "Conversion States."[2]   Costco will install equipment gradually over a five-year period—but *only* if Class Counsel can obtain regulatory approval to do so, and *only* if Costco can secure the equipment affordably without disrupting its business.   *See* Agreement § 4.4–4.6.   In seven other

---

[1] As the Court noted, automatic temperature compensation ("ATC") might also be accomplished by adjusting price instead of volume.   *See* Transcript of Proceedings January 11, 2008, Docket No. 271 at 75-76.   The ease of converting the price of gas to compensate for temperature demonstrates how trivial it would be for retailers to "unwind" ATC by adjusting the posted price of fuel.

[2] The fourteen  "Conversion States" are: Alabama, Arizona, California, Florida, Georgia, Kentucky, Nevada, New Mexico, North Carolina, South Carolina, Tennessee, Texas, Utah, and Virginia.   *See* Agreement § 4.2.

states,[3] Costco must attempt to install ATC equipment at retail if it begins "purchasing motor fuel on a temperature adjusted basis" at wholesale in that state.  Agreement § 4.3.  Additionally, five named plaintiffs will request incentive fees of $2,500 each.  *Id.* § 7.4.

Plaintiffs' counsel has claimed "that, in consideration of all factors, the Settlement is beneficial to the Class Members and in their best interests at this stage of the Litigation." (Docket No. 1015 at 16).  To date, Putative Class Counsel has not articulated *why* they believe the settlement is fair.  Objectors contend that it is unfair, inadequate, and unreasonable.

Several facts militate against finding the proposed settlement fair:

*First* and foremost, the injunctive relief is worthless and actually harms class members.

*Second*, the settlement does not compensate class members for alleged past wrongdoing and instead acts like a promotional tool for the defendant.

*Third*, many class members will not even have access to the dubious injunctive relief because they live in the wrong state or are no longer Costco members.

*Fourth*, the injunctive relief relies on the incorrect assumption that all class members will receive more volume from temperature compensated fuel.  In fact some will actually receive *less* volume after new equipment is installed.  The remaining class members will receive "more" fuel, but Costco, which is operating in a competitive marketplace, will almost certainly adjust its prices accordingly to charge consumers for any additional benefit.

Finally, the alleged injunctive relief is distant and illusory—especially when compared to the attorneys' fees, which will be paid promptly in cash.

Such settlement does not merit approval, much less $10 million in attorneys' fee awards.

---

[3] The seven non-Conversion States are: Indiana, Kansas, Maryland, Missouri, New Jersey, Oregon, and Pennsylvania.  *See* Agreement § 4.2.

A.      **The Injunctive Relief is Economically Worthless And Will Harm Class Members Who Must Subsidize The Cost Of Settlement.**

The proposed injunction is at best economically worthless because Costco can freely adjust the posted price of fuel to counteract any temperature correction. In the fast-moving market for the retail price of fuel, there's no reason to suppose that automatic temperature compensation will translate into *any* benefit to consumers, and the parties have provided no evidence to the contrary.

By analogy, imagine that a farmer agreed to sell customers thirteen eggs in a carton as a "dozen." Superficially, this might seem like a bonus for consumers—every "dozen" would come with an extra egg. But the agreement is worthless when the farmer can simply raise the price of the newly-redefined "dozen" by one-twelfth. Similarly, nothing in the agreement prevents Costco from raising their per-unit costs to maintain its current profit margins.

Precisely for this reason, regulatory agencies have concluded that automatic temperature compensation ("ATC") would yield no economic benefit to consumers. The National Conference of Weights and Measures ("NCWM"), a group composed of state and local weights and measures officials, has rejected the use of ATC at retail. At its July 2009 National Conference, an NCWM committee withdrew two proposals that would have allowed or mandated ATC at retail. In reaching its decision, the committee reviewed reports, studies, and received public comments where an "overwhelming majority" were opposed to the measures. NCWM, *Addendum Sheet to the Interim Report of the Laws and Regulations Committee* (Docket No. 1343-18 at 3). The primary reasons for withdrawing the proposals "were conference consensus against ATC, economic cost factors, ***lack of benefit to consumers***, absence of uniformity in the marketplace,

---

and the additional cost to Weights and Measures officials and service companies." *Id* (emphasis added). As part of its reasoning, the NCWM cited a thorough study by the state of California.

California regulators undertook a year-long cost-benefit analysis and concluded that automatic temperature compensation ("ATC") would result in no economic benefit, and that ATC would actually *harm* consumers because they would bear the costs of new equipment. In October 2007, the California legislature directed the California Energy Commission ("CEC"), in partnership with two other agencies, to complete a "comprehensive survey and cost benefit analysis" of temperature correction, including the utility of "[r]equiring the installation of temperature correction or compensation equipment at the pump." Cal. Bus. & Prof. Code. § 13630. On March 11, 2009—20 days after the Settlement Agreement was signed—the five CEC Commissioners unanimously adopted its final 147-page report. The commission found that the "cost-benefit analysis concludes that the results are *negative or a net cost to society* under all the options examined." *Fuel Delivery Temperature Study* ("CEC Report")[4] at 1 (emphasis added). "It is also unlikely that there are any plausible circumstances consumers could receive a small net benefit with installed ATC devices at California's retail stations." *Id.*

The commission found that switching to ATC at retail would not result in savings, although the average size of "gallons" dispensed would increase. This is because "retail station owners will in fact raise their fuel prices to compensate for selling fewer units, all other things being equal." *Id.* at 105-6. Because gas retailers will adjust prices to maintain their profitability, "this potential benefit to consumers perceived by some stakeholders is not expected to

---

[4] Cal. Energy Comm'n, *Fuel Delivery Temperature Study*, No. CEC-600-2009-002-CMF. Available online at http://www.energy.ca.gov/ transportation/fuel_delivery_temperature_study/documents/index.html

---

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

materialize." *Id.* at 71.  The installation of ATC at Costco is therefore economically worthless to the class.

Although the proposed settlement provides no benefit, class members who buy fuel from Costco will be forced to bear the costs of ATC.  The CEC estimated the initial costs of installing ATC equipment at about $9,707–11,761 per station.  *Id.* at 58.  However, the costs would not be born by the retailers, but would instead be passed on to consumers; "the balance of evidence points to complete or near-complete pass-through of ATC-related costs from retail station owners to consumers."  *Id.* at 106.  Therefore, class members who continue to buy fuel from Costco will end up footing the bill for their own supposed injunctive relief.

The proposed settlement is even worse than the CEC report estimates because class members will be forced to absorb the costs of the settlement itself, including attorneys' fees.  Self-dealing settlements like those of Putative Class Counsel raise the costs to Costco of selling fuel, and raise prices to class members like Objectors without concomitant benefits.  If attorneys' fees are awarded in a suit that makes consumers worse off, it creates the incentive for other attorneys to engage in socially wasteful class-action litigation that injures consumers.

The proposed settlement makes Costco members worse off than if the suit had never been brought, and such a settlement cannot imaginably be fair to the class, much less one entitling attorneys to fees.

**B.**   **The Settlement Does Not Compensate For Alleged Past Wrongdoing, And Functions More Like A Promotional Tool For The Defendant.**

Seen in its best light, the proposed injunction only prevents Costco from allegedly defrauding some—not all—class members *going forward*.  The injunctive relief cannot properly

---

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

be credited as relief for *past* damages, because Costco and other defendants were alleged to unjustly enrich themselves with "billions of dollars by the mere fact that the temperature of the fuel sold by Defendants is above 60 degrees Fahrenheit."  Second Consolidated Amended Complaint (Docket No. 520-1 at ¶ 8).  By the proposed settlement, Costco may eventually stop selling fuel above 60° F in some states, but installing automatic temperature compensation only prevents alleged fraud in the future—it does not pay back any alleged fraud in the past.

In fact, the injunction does an exceptionally poor job of preventing the alleged ongoing "fraud."  Costco may continue selling uncompensated fuel above 60° F in the seven non-Conversion States where members are nevertheless bound by the settlement (see Section II.C), and the practice will only be curbed in Conversion States slowly, if at all (see Section II.E).  Class members lucky enough to have access to injunctive relief must continue dealing with Costco—paying membership fees and purchasing gas—simply to have the chance of avoiding alleged ongoing fraud.

Because class members must deal with Costco in order to receive their dubious benefits, the settlement acts more like a promotion for Costco than meaningful class recovery for the thousands of customers allegedly defrauded since 2001.  Indeed, Costco has bargained for favorable publicity which Putative Class Counsel determined has "significant value to Costco."  Agreement § 12.  In their stipulated joint press release, plaintiffs' counsel heaps generous praise on the defendant, although plaintiffs have alleged that Costco defrauded thousands of consumers over the last eight years.  They write, "Thomas V. Girardi, one of the lead lawyers in the class action case stated that 'Costco is the leader – in fairness – in these troubled economic times.'" (Docket No. 1015-6).  In the press release, a Costco vice president explains the business rationale for installing ATC equipment: "We have entered into this agreement as part of our commitment to

---

servicing our members, believing that some of our members may appreciate the additional transparency associated with selling gasoline in this fashion, not because . . . our prior dealings . . . have been unlawful or deficient." *Id.*   Indeed, the California Energy Commission concluded that some filling stations might seek a competitive edge by adopting ATC. "It is also highly probable that a permissive ATC retailer would realize the potential for increased numbers of customers that could be attracted assuming other retail stations within their immediate sphere of competition do not also have ATC fuel dispensers."  CEC Report, *supra* note 4, at 86.

Insofar that the proposed settlement is a marketing program for Costco, it does not justifying releasing the claims of the class.  *See In re General Motors Corp.*, 55 F.3d at 807 (overturning approval of settlement that would have provide $1000 coupons on the purchase of a new GM truck, which the court found to be "a sophisticated GM marketing program."); *cf. also Rosenbaum v. MacAllister*, 64 F.3d 1439, 1447 (10th Cir. 1995) (discounting purported settlement benefits for calculating attorneys' fees where "class members had to pay the defendant corporation 97% of the market price for additional shares in order to realize any benefit.").

## C.   Former Costco Members And Non-Conversion State Customers Receive No Access To Injunctive Relief Although Their Rights Are Extinguished.

The settlement agreement fails to provide even dubious injunctive relief to class members who are no longer members of Costco's warehouse club.  Costco, unlike most gas retailers, only sells gasoline to paid current members.  Before customers may purchase any gas, they must swipe their current Costco membership card through the pump.  Former Costco members, including many members of the proposed settlement class, are no longer allowed to purchase gas at Costco.  Therefore, these class members cannot receive any real or imagined benefit from the settlement

because they cannot even access the automatic temperature compensation ("ATC") pumps to be installed as injunctive relief.

Each year, many Costco warehouse club members choose not to renew their membership, including individuals and entities that are part of the proposed class. Costco reports that 87% of existing members renew their membership each year by paying an annual fee of at least $40.[5] But some members let their membership lapse; these class members who purchased qualifying fuel in 2008 are today ineligible to buy fuel from Costco. Presumably an even smaller percentage from 2001 are still members of Costco. For these class members, ATC fuel pumps will only become available if they jump through the hoops to renew their membership.

Injunctive relief is also illusory for many *current* Costco members who are bound by the settlement. Costco does not make any immediate commitment to install automatic temperature compensation ("ATC") pumps in seven of the states covered by the settlement. In these non-Conversion States, Costco must *only* install ATC pumps if it begins "purchasing motor fuel on a temperature adjusted basis." Agreement § 4.3. The plaintiffs allege that all class members have suffered from similar consumer fraud, and all class members will be bound by the settlement, but members residing in the seven non-Conversion States have vastly inferior injunctive relief.

Therefore, former Costco members and class members in the seven non-Conversion States will have their legal rights extinguished through the proposed settlement, although they will not have access to any type of relief—not even the dubious relief of ATC pump access.

Courts generally are wary of settlement agreements where some class members are treated differently than others. *See*, *e.g.*, *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods.*

---

[5] *See* Costco, *FY 2009 Annual Report* at 10-11, available online at http://phx.corporate-ir.net/phoenix.zhtml?c=83830&p=irol-reportsannual.

*Liability Litig.*, 55 F.3d 768, 808 (3rd Cir. 1995) ("One sign that a settlement may not be fair is that some segments of the class are treated differently from others."). While differential treatment of class members may be appropriate where "the settlement terms are rationally based on legitimate considerations," this does not appear to be the case here, where the plaintiffs have alleged that *every* sale of gasoline above 60° F is fraudulent. *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 131 (S.D.N.Y. 1997), *quoting In re "Agent Orange" Product Liability Litig.*, 611 F. Supp. 1396, 1411 (E.D.N.Y. 1985). *See also Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F. Supp. 292, 300-01 (M.D. Pa. 1995) ("[W]hile disparate treatment of class members may be justified by a demonstration that the favored class members have different claims or greater damages . . . no such demonstration has been made here.").

The vast majority of the class was effectively unrepresented, so the proposed settlement is inherently indefensible given the disparate treatment of class members with identical claims that plaintiffs claim merit class certification. *See In re Joint Eastern and Southern Dist. Asbestos Litig.*, 982 F.2d 721, 741-43 (2d Cir. 1992) (decertifying class under Rule 23(a)(4) because of conflicts of interest between different segments of class), *modified on reh'g on other grounds sub nom. In re Findley*, 993 F.2d 7 (2d Cir. 1993); *see also Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 786 (7th Cir. 2004) (rejecting settlement where subclass was shut out without any lower-court finding that underlying claim of subclass was meritless).

## D.    Some Class Members Receive More Gas From Volumetric Gallons Than They Would With Automatic Temperature Compensation ("ATC") "Gallons."

This Court cannot assume that class members would receive more fuel from ATC gallons than volumetric gallons.  Even the warmest states have cold pockets, and even the warmest

---

locales have cold spells.  Therefore this Court cannot assume that the implementation of ATC would even superficially benefit all members of the class—an unrepresented subclass will be superficially harmed by smaller ATC gallons, adding insult to their injury.

Fuel temperatures in some locations average less than 60° F.  For example, data gatherd by the National Institute of Standards and Technology  ("NIST") suggests that 59.9° F is the average year-round filling station fuel tank temperature in Indiana.[6]  Objector Nicolas Martin resides in Indiana, so he might actually receive *less* gas per "gallon" if Costco is required by this agreement to dispense ATC "gallons" in his state.

During the winter, class members even in warm states are likely to buy gas at temperatures below than 60° F, and at those times they will receive less from ATC pumps.  For example, the *average* monthly temperature for filling station fuel tank gasoline can drop as low as 44.6° F in Utah according to data gathered by the NIST.[7]  Class members living in this Conversion State will receive over 1% less than a volumetric gallon when they buy gasoline in such cold months.  Class members who purchase most of their fuel in winter—perhaps snow plow operators—will tend to receive less volume per "gallon" if the proposed settlement is approved.

Like all Costco customers, class members who frequently buy gas at low temperatures will be injured by indirectly footing the bill for attorneys' fees and an economically worthless

---

[6] *See* National Conference of Weights and Measures, *State Charts for Temperature of Gasoline In Filling Station Holding Tanks* at 14 ("*State Charts*").  Available online at:
http://www.ncwm.net/sites/default/files/atc%20archive/07_ATC_Average_Temp_Charts.pdf

[7] See *State Charts*, *supra*, at 6.

technology.[8]  Class members who tend to buy cooler fuel receive additional insult by subsidizing a

technology that gives them *less* fuel per "gallon."

**E.     Injunctive Relief Is Distant And Illusory For Many Class Members.**

According to the Settlement Agreement, automatic temperature compensation ("ATC")

need not be phased in for many years after the Effective Date—if at all.  Meanwhile, the parties

have stipulated that payment to Putative Class Counsel is due "fifteen days after the Effective

Date."  Agreement § 7.3.  The first benchmark does not occur until two years after the effective

date, and the strictest possible requirement on this date is that 10% of the pumps in Conversion

States be equipped with automatic temperature compensation.  *See* Agreement § 4.4.1.  By this

date, many more class members will no longer be members of Costco, and they will be unable to

take advantage of any real or imagined benefits from ATC.

For some, injunctive relief may not materialize at all.  ATC pumps are not currently used

for retail sales anywhere in the United States,[9] and some settlement states apparently prohibit the

---

[8] In economic reality, dispensing smaller ATC "gallons" has no more effect than dispensing larger
gallons—Costco will simply adjust the posted price, and costs from the settlement will be passed
on to consumers.  *See* Section II.A.  However, if one credits plaintiffs' counsel and assumes that
smaller "gallons" translate into increased costs for customers, then cold-weather fuel purchasers
are an unrepresented subclass uniquely harmed by the settlement, which is an independent
ground for finding the settlement unfair.  *See* Section II.C; *see also Pickett v. Iowa Beef
Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (class certification is improper when the class
definition included some members "who claim harm from the very same acts from which other
members of the class have benefitted.").

[9] Hawaii has adjusted the volume of retail gasoline to compensate for the expansion of fuel from
60° F to 80° F, such that a "gallon" from a Hawaiian gasoline pump equals 233.8 cubic inches
rather than 231 cubic inches.  This "temperature correction" does not adjust based on the
temperature of gas actually dispensed—it is a fixed redefinition of a retail gallon.  *See* CEC
Report, *supra* note 4, at 14.

---

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

use of ATC at retail.[10]   The settlement agreement contemplates these obstacles, and it allows Costco to avoid installing ATC equipment altogether in several circumstances: (1) when it is unaffordable, (2) when threatens to disrupt the business in a state, or (3) when Class Counsel cannot obtain approval for installing ATC equipment.

Lack of affordable ATC equipment explicitly excuses Costco from liability under the Settlement Agreement:

> Costco shall not be liable for failure to perform any obligation set forth in this Agreement . . . if such failure results from the actions or omissions of a third party or other cause beyond Costco's control . . . for example, if Costco is unable to procure sufficient and affordable . . . ATC equipment . . .

Agreement ¶ 4.5.  The parties have submitted no evidence suggesting that ATC equipment will be affordable and available in sufficient quantities.  If such equipment is in fact not available, Costco may not be obligated to perform any act under the Settlement Agreement whatsoever.

The agreement also allows Costco to walk away from the Settlement Agreement in a state if the rollout of automatic temperature compensation ("ATC") threatens business in that state:

> Supply Disruption.  If Costco, as a direct of indirect result of the Settlement agreement (***determined solely in the good faith subjective judgment of Costco***), loses a commercially material amount of its current motor fuel supply and/or experiences commercially material increases in the price of motor fuel in a Conversion State, the Agreement shall, at Costco's election, be rescinded, cancelled, and annulled as applied to that state [if ATC has been operating at the majority of locations in that state for less than one year]. . . .

Agreement § 4.8 (emphasis added).

Finally, the agreement makes Putative Class Counsel solely responsible for clearing regulatory approval on behalf of Costco:

---

[10] For example, Virginia's Department of Agriculture and Consumer Services reported in a 2007 survey to the National Conference on Weight and Measures that "For . . . service station dispensers temperature compensation is not permitted."  *See State Survey on ATC* at 13 http://www.ncwm.net/sites/default/files/atc%20archive/07_ATC_States_Survey.pdf

> If . . . there is any regulatory approval required as a matter of law, . . . Class Counsel agree to take all reasonable steps to seek such regulatory approval required by law from each of the Conversion States so that Costco can fully comply with the obligations of this Settlement Agreement.

Settlement § 4.6.  If regulatory approval is denied in any state, then "the Retail Stations in that state will be excluded."  *Id*.  This division of labor is peculiar because neither Costco nor Class Counsel will have any incentive to fight for approval of automatic temperature compensation ("ATC").  Costco would prefer that Class Counsel not jump through regulatory hoops because non-approval excuses Costco from installing ATC in the state.  Class Counsel, meanwhile, have no apparent incentive to devote time to this potentially protracted task because their fee is secured just 15 days after the Effective Date.

Therefore, the real or imagined benefits of automatic temperature compensation ("ATC") are not assured by approval of the proposed settlement.  Instead, ATC will be implemented slowly, and *only if* a number of conditions are fulfilled.  Equipment must be "sufficient and affordable" and Costco must not suffer disruptions.  Finally, the installation of ATC depends the diligence of Putative Class Counsel to seek regulatory approval for Costco after their fee is already assured.

## III.     Class Counsel Have Breached Their Fiduciary Duty To The Class.

This Court has a "supervisory duty over class counsel while the class is still open . . . the district court must constantly scrutinize class counsel to determine if counsel is adequately protecting the interests of the class."  *McNeil v. Guthrie*, 945 F.2d 1163, 1167 (10th Cir. 1991).  *Accord  Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992) ("Both the class representative and the courts have a duty to protect the interests of absent class members.").  "Because class actions are rife with potential conflicts of interest between class counsel and class members, district

---

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). *See also In Re Integra Realty Res.*, 262 F.3d 1089, 1112 (10th Cir. 2001) ("the court remains under a continuing duty to monitor the adequacy of representation to ensure that class counsel provides zealous, competent representation through the proceedings and to address conflicts of interests if they develop.").

Where a court is confronted with a settlement-only class certification, the court must look to factors "designed to protect absentees." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). As this Court noted, "a higher degree of scrutiny applies when determining the fairness of a settlement which is negotiated prior to class certification. *See D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)." Memorandum and Order of August 18, 2009 (Docket No. 1273 at 5). *See also Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003).

"The trial judge in a common fund case must act as a fiduciary for the beneficiaries of the fund. . . . Attorneys' fees necessarily reduce the amount that the common fund beneficiaries recover." *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988).

Here, defendants have agreed to pay attorneys' fees, indicating that this was money that they were willing to pay to settle the case—but if the Court reduces the plaintiffs' fee request in any way, the money reverts to the defendants rather than to the class. While this can be used as a rhetorical argument against denying the fee request (and was used as a rhetorical argument in the detailed notice to the class (Docket No. 1015-5, ¶ 9)), it runs afoul of the fiduciary duty of class counsel to the entire class, under Rule 23(g)(4) to "fairly and adequately represent the interests of

---

the class." "Separate" attorneys' fees should be treated as bargained recovery from the defendants that parties have earmarked exclusively for the benefit of plaintiffs' counsel.

Therefore the attorneys' fees must be scrutinized when evaluating whether the settlement is fair, reasonable, and adequate. "There is no exception in Rule 23(e) for fee provisions contained in proposed class action settlement agreements. Thus, to avoid abdicating its responsibility to review the agreement for the protection of the class, a district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003). Provisions for attorneys' fees are contained in the settlement agreement, so this Court has a responsibility to review them. There is good reason for this: "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Id*. at 964.

"That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award." *Id*. A "defendant is interested only in disposing of the total claim asserted against it." *Id*. "The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source." *In re General Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 820-21 (3rd Cir. 1995). "[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case." *Id*. at 821. "[I]n essence the entire

settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal." *Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996).

Because the class counsel, by failing to negotiate for reversion to the class of any denied fee request, have put their own interests ahead of the class' interests, the settlement cannot be deemed adequate.

## IV.    The Settlement is Impermissibly Self-Dealing.

"It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent." *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10th Cir. 1974).

Though plaintiffs purport to represent and seek to bind thousands of absent class members, they have recovered cash for only for themselves and their attorneys.  This insubstantial relief is striking because plaintiffs claimed that damages were on the order of "billions of dollars." Second Consolidated Amended Complaint (Docket No. 520-1 at ¶ 8).  In other words, plaintiffs brought a multi-billion dollar lawsuit that they are settling for zero dollars, a 0% success rate.[11] Meanwhile, the representative class members receive $2,500 and their attorneys may request fees as high as $10 million.

In *Murray v. GMAC*, 434 F.3d 948, 952 (7th Cir. 2006), the Seventh Circuit held that a similar settlement was "untenabl[y]" beyond the pale of approval:

> We treated the disproportion—$2,000 one class member, nothing for the rest—as proof that the class device had been used to obtain leverage for one person's benefit.

---

[11] Costco "sold more than $5 billion worth of gasoline in fiscal 2009."  Costco, *FY 2009 Annual Report* at 4, *supra* note 5.  This represents approximately 1% of the nation retail fuel market, so Costco's share of the "billions of dollars" of damages that plaintiffs alleged would be in the tens of millions of dollars.

[citations omitted]  Here the proposed award is $3,000 to the representative while other class members are frozen out. . . .

Such a settlement is untenable.  We don't mean by this that all class members must receive $100; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty. [citation omitted]  But if the reason other class members get relief worth about 1% of the minimum statutory award is that the suit has only a 1% chance of success, then how could Murray personally accept 300% of the statutory maximum?  And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny?  If, however, the chance of success is materially greater than 1%, as the proposed payment to Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

This settlement is even worse than the settlement criticized in *Murray* as "untenable."  In *Murray*, one class representative received $3,000, three times maximum possible statutory damages; here, there are five class representatives seeking $2,500 over an injury that optimistically amounts to a few dozen dollars.  In *Murray*, the 1.2 million unnamed class members were entitled to split a fund of $947,000; here, an unknown number of millions of class members ended up with $0 in relief for their alleged past injuries.  Here, the "success" of plaintiffs is an abysmal failure, greater than the failure criticized in Murray, and representative plaintiffs are seeking $2,500 in direct rewards after winning zero for all other class members.

The settlement proposed by Plaintiffs is substantially worse than other settlements rejected by the Seventh and Ninth Circuits under Rule 23(e): the unnamed class members recover less, and the attorneys are asking for millions of dollars more.  Compare this case with *Murray,* 434 F.3d at 952 ("untenable"); *Mirfasihi,* 356 F.3d 781; *Crawford v. Equifax Payment Services, Inc.*, 201 F.3d 877 (7th Cir. 2000) ("substantively troubling"); *Molski*, 318 F.3d at 956 ("unfair, inadequate, and unreasonable"):

|  | *Murray* | *Mirfasihi* | *Crawford* | *Molski* | *Costco* |
|---|---|---|---|---|---|
| **Unnamed class recovery** | Up to $947,000 | Between $243,000 and $2.64 million | $0 | $0 | $0 |
| **Rep. plaintiff payments** | $3,000 | $250 | $2,000 | $5,000 | $2,500 |
| **Attorney fees** | ~$400,000 | $750,000 | $78,000 | $50,000 | $10,000,000 |
| **Approved?** | Rejected on appeal as "untenable" and remanded on other grounds. | Reversed as abuse of discretion. | Reversed as abuse of discretion. | Reversed as abuse of discretion. | ? |

There are two possibilities. The Putative Class Attorneys have brought either (1) a meritorious case that is being settled for an infinitesimal fraction of the case's real value in a "sellout" of the attorneys' and class representatives' fiduciary duties to the class, or (2) a meritless lawsuit where the "class device had been used to obtain leverage for one person's benefit." *Murray*, 434 F.3d at 952.

In the first instance, it is obvious that the settlement is not fair, not adequate, and not reasonable. If, on the other hand, the plaintiffs have brought an extortionate meritless case, this is no reason to approve a settlement that brings no benefit to the class:

> From the perspective of the class, the worst-case scenario may be realized if following this denial of final settlement approval the case were to fail on dispositive motion. But in that event, class would end up essentially in the same situation it would be if final settlement approval were approved: with nothing.

*In re TD Ameritrade Accountholder Litigation*, No. 07-CV-2852 (N.D. Cal. Oct. 23, 2009) (attached as Exhibit 1).   In either instance, the Putative Class Attorneys' actions should be deterred, rather than rewarded; the court should not award attorneys' fees. If Rule 23(e)(2) is to have any teeth whatsoever, this settlement must be rejected.

**V.      To Date, Notice Is Insufficient Under Rule 23 Because It Fails To Set Forth The Basis For Requested Attorneys' Fees.**

Class members are entitled to the "best notice practicable under the circumstances." Fed. R. Civ. Proc. 23(c)(2)(B).   The notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *cf. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 174-175 (1974).

Though class counsel are requesting up to $10 million in fees, class members are given no information on what basis class counsel are making their claim.   Individual notice sent to class members does not even mention the $10 million fee request.[12]   (Docket No. 1278-1).

For example, if the parties expect that class members will credibly receive $100 million in benefits, then the resulting 10% contingency fee is eminently fair.[13]   But if the parties anticipate modest or non-existent benefits, then the settlement structure was clearly designed to benefit the attorneys at the expense of the class.   But for the conflict of interest between class counsel and their clients, the defendants could have agreed to a better settlement for the class by offering the class refunds for purchasing allegedly overpriced gasoline.   Defendants could pay the same total amount for a superior settlement if class counsel had agreed to a reduction in their attorneys' fees.

Nothing in the notice—or even in the docket—provides any sense of what the expected benefits to the entire class are to be, though this amount surely figured into the defendants'

---

[12] Instead, individual notice directed class members to a website where they could then learn that up to $10 million in fees will be requested.  *See* http://www.costco.com/fuelsettlement.pdf (settlement website).

[13] Although Putative Class Counsel has heretofore provided no explanation for its fee request, the Objectors believe that the injunctive relief amounts to no recovery and in fact harms the class. *See* Sections II.A & II.B, *supra*.

calculations in agreeing this particular settlement.  This information was not provided to the class or to the Court, in violation of Rule 23(c)(2)(B).  If "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000).  But the class has been kept in the dark whether this has happened—though one can certainly draw an inference that the parties are embarrassed by the number by their failure to trumpet it to the Court in support of the settlement, much less disclose it at all.

Fed. R. Civ. Proc. 23(h)(1), added as part of the 2003 amendments to the Federal Rules, directly addresses this issue.  Notice of a motion for attorneys' fees must be "directed to class members in a reasonable manner."  "For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e). . . . In setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion."  Notes of Advisory Committee on 2003 Amendments to Rule 23(h)(1).  But the objections are due tomorrow, and no such full fee motion has been made.  New notice is needed that (1) provides the full grounds of the basis of the fee request, and (2) the parties' best estimate of the value to the class of the settlement, and the factual basis for that estimate.

## CONCLUSION

There are three independent reasons to reject the settlement:

*First*, according to research by expert regulatory agencies, the proposed injunctive relief actually harms the class by saddling them with costs for an economically useless technology.

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

*Second*, the proposed settlement impermissibly discriminates between identically situated members of the class with equally valid legal claims.  As such, it would be an abuse of discretion to adjudge the settlement fair or reasonable.

*Finally,* Putative Class Counsel have breached their fiduciary obligations to the class by releasing a deficient notice, failing to disclose the scope of class recovery, and by agreeing to a reversion of a denied fee request to the defendants instead of a common fund.  This Court should reject the settlement as failing to comply with the requirements of Rule 23(a)(4) and Rule 23(e).

Dated:  March 1, 2010

Respectfully submitted,

/s/Theodore H. Frank
Theodore H. Frank (D.C. Bar No. 450318)
CENTER FOR CLASS ACTION FAIRNESS
1718 M Street NW
No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tedfrank@gmail.com

Attorney for Objectors
Amy Alkon and Nicolas Martin

**PROOF OF SERVICE**

I declare that:

I am employed in the state of Illinois.  I am over the age of 18 years and not party to the within action; my office address is 312 N. May Street, Suite 100, Chicago, Illinois 60607.

On March 1, 2010, I served the attached:

OBJECTION TO PROPOSED SETTLEMENT

  X    By First-Class Mail in that I caused such envelope(s) to be delivered via certified First-Class Mail, return receipt requested to the addressee(s) designated.

| | |
|---|---|
| Robert A. Horn<br>HORN AYLWARD BANDY<br>2600 Grand Boulevard, Suite 1100<br>Kansas City, MO 64108 | David F. McDowell<br>MORRISON & FOERSTER LLP<br>555 West Fifth Street, 35th Floor<br>Los Angeles, CA 90013-1024 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 1, 2010.

/s/ M. Frank Bednarz
M. Frank Bednarz

---

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840