## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE SALES PRACTICES LITIGATION<br><br>(This Document Relates to All Cases) | )<br>)<br>) **MDL No: 1840**<br>)<br>) **No: 07-md-1840-KHV-JPO** |

---

## PLAINTIFFS' RESPONSE TO OBJECTIONS TO PROPOSED CLASS ACTION SETTLEMENT

COME NOW Plaintiffs Zachary Wilson, Joan Korleski, James Graham, Phyllis Lerner and Herb Glazer (hereinafter collectively referred to as the "Class Plaintiffs"), and for their response to objections filed in relation to the class action settlement between Class Plaintiffs and Costco, submit the following:

### I.   OVERVIEW OF OBJECTIONS

Of the 10,134,738 class members who received direct notice of this Settlement, only 29 filed an objection (a 0.0003% objection rate).[1] Pursuant to 28 U.S.C. § 1715, direct notice of this Settlement[2] was also given to the United States Attorney General and the attorneys general and weights and measures officials in each state at issue, *viz.*:

- Eric H. Holder, Jr., Attorney General of the United States;
- Dustin McDaniel, Attorney General of Arkansas;
- Edmund G. Brown, Jr., Attorney General of California;

---

[1] To call this an infinitesimal number of objections in the class action context would be an understatement. *See, e.g., TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 458, 462 (2d Cir. 1982)(approving settlement despite objections of approximately 56% of class); *Parker v. Anderson*, 667 F.2d 1204, 1207, 1207 (5th Cir. 1982) (approving approval of class action settlement over objections of all but one of eleven named plaintiffs); *Cotton v. Hinton*, 559 F.2d 1326, 1333 (5th Cir. 1977) (approving settlement over objections of counsel purporting to represent almost 50% of class); *Bryan v. Pittsburgh Plate Glass Co.*, 494 F.2d 799, 803-04 (3d Cir. 1974) (approving class settlement even though more than 20% of class objected); *Taifa v. Bayh*, 846 F. Supp. 723, 728 (N.D. Ind. 1994) (approving class settlement despite objections from more than 10% of class); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999) (approving settlement where objectors represented fewer than 4% of class).

[2] A copy of the CAFA Notice, including the service list, is attached hereto as Exhibit 1.

- Joseph R. Biden, III, Attorney General of Delaware;
- Thurbert E. Baker, Attorney General of Georgia;
- Stephen N. Six, Attorney General of Kansas;
- Troy King, Attorney General of Alabama;
- Terry Goddard, Attorney General of Arizona;
- Peter Nickles, Attorney General of the District of Columbia;
- Bill McCollum, Attorney General of Florida;
- Greg Zoeller, Attorney General of Indiana;
- Jack Conway Attorney General of Kentucky;
- James D. Caldwell, Attorney General of Louisiana;
- Jim Hood, Attorney General of Mississippi;
- Catherine Cortez Masto, Attorney General of Nevada;
- Gary King, Attorney General of New Mexico;
- W.A. Drew Edmondson, Attorney General of Oklahoma;
- Tom Corbett, Attorney General of Pennsylvania;
- Douglas F. Gansler, Attorney General of Maryland;
- Chris Koster, Attorney General of Missouri;
- Anne Milgram, Attorney General of New Jersey;
- Roy Cooper, Attorney General of North Carolina;
- John Kroger, Attorney General of Oregon;
- Henry McMaster, Attorney General of South Carolina;
- Robert E. Cooper, Jr., Attorney General of Tennessee;
- Mark Shurtleff, Attorney General of Utah;
- Greg Abbott, Attorney General of Texas;
- Bill Mims, Attorney General of Virginia;
- Steadman Hollis, Director, Alabama Dept. of Agriculture & Industry;
- Gene Palma, Interim Director, Arizona Dept. of Weights & Measures;
- Jeffrey X. Mason, Supervisor, DC Government Weights & Measures;
- Maxwell Gray, Chief, Florida Dept. of Agriculture & Consumer Services;
- Lawrence J. Stump, Director, Indiana Weights & Measures;
- Tim Tyson, Director, Kansas Department of Agriculture, Weights & Measures Division;
- Tom Pugh, Director, Arkansas Bureau of Standards;
- Edmund Williams, Director, California Div. of Measurement Standards;
- Steve W. Connors, Administrator, Delaware Department of Agriculture;
- Richard Lewis, Director, Georgia Department of Agriculture;
- Lanny Arnold, Director, Kentucky Department of Agriculture;
- Todd Thompson, Director, Louisiana Dept. of Agriculture and Forestry;
- Richard W. Wotthlie, Chief, Maryland Department of Agriculture;
- Richard Benton, DVM, Director, Mississippi Dept. of Agriculture & Commerce;
- Louis E. Greenleaf, State Superintendent, New Jersey Weights & Measures;
- Russ Wyckoff, Administrator, Oregon Department of Agriculture;
- Carol P. Fulmer, Director, South Carolina Department of Agriculture;
- Joe Benavides, Regulatory Branch Chief, Texas Department of Agriculture;

- Ronald G. Hayes, Director, Missouri Department of Agriculture;
- Stephen Benjamin, Director, North Carolina Department of Agriculture;
- Joe Gomez, Division Director, New Mexico Department of Agriculture;
- Sancho Dickinson, Director, Oklahoma Dept. of Agriculture, Food & Forestry;
- John Dillabaugh, Director, Bureau of Ride & Measurement Standards;
- Robert G. Williams, Administrator, Tennessee Department of Agriculture;
- Brett Gurney, Program Manager, Utah Department of Agriculture & Food;
- Dale Saunders, Program Superintendent, Virginia Product & Industry Standards;

Not one of these attorneys general or weights and measures officials filed an objection to this Settlement.

Of the few objections filed by class members, some merely reflect a difference in business judgment as to the adequacy of the settlement or illustrate the difficulty of understanding the complexities of this case and of class action litigation generally. The majority of objections, however, were filed by serial objectors who, historically, seek compensation for objecting or who have objections to class actions and the tort system of justice in general. The objectors assert a mix of irrelevant and mutually exclusive arguments, such as "the case is frivolous, warranting no recovery" or "the case is meritorious, warranting more recovery." However well-intentioned or misguided, none of the objections justify the disapproval of this Settlement, a sentiment expressed by noted class action expert Professor Robert Klonoff.[3]

The fact that there were only minimal objections from class members in this <u>direct</u> class notice program is significant and weighs heavily in favor of approving the Settlement.[4] As Judge Lungstrum recently observed in granting final approval of a class settlement in *Williams v. Sprint*, "[w]hile the number of objectors is 'not controlling,' a relatively small number of objectors can be taken as 'some indication that the class members as a group did not think the

---

[3] *See* Declaration of Professor Robert Klonoff ("Klonoff Decl."), attached hereto as Exhibit 2 and incorporated herein by reference.
[4] *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007).

settlement was unfair.'"[5]  Judge Lungstrum's logic applies with particular force here, where the objection rate is a mere fraction of the objection rate found to be unpersuasive in *Williams*.[6]

## II.    APPLICABLE LEGAL STANDARDS

Pursuant to Fed.R.Civ.P. 23(e)(2), a class action settlement must be "fair, reasonable, and adequate."[7]  The Tenth Circuit has outlined four factors that must be considered in assessing whether a proposed class settlement is fair, reasonable and adequate:

(1)    whether the proposed settlement was fairly and honestly negotiated;
(2)    whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
(3)    whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
(4)    the judgment of the parties that the settlement is fair and reasonable.[8]

When a settlement is reached by experienced counsel after negotiations in an adversarial setting, there is an initial presumption that the settlement is fair and reasonable.[9]  Indeed, counsels' judgment as to the fairness of the agreement is entitled to "substantial weight"[10] and the court "should not substitute its business judgment for that of counsel absent evidence of fraud or overreaching."[11]

---

[5]  *Williams v. Sprint/United Management Company*, 2006 WL 3256840, at *1 (D.Kan. Nov. 9, 2006) (*citing Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) and *Kincade v. General Tire & Rubber Co.*, 635 F.2d 501, 506 n.4 (5th Cir. 1981)).

[6]  Of the 1,697 class members in *Williams*, only two objected, resulting in a 0.11% objection rate. *See* Order of Final Approval of Settlement, *Williams*, 2006 WL 326840 at *1.  The objection rate in this case is 0.0003%--far less than the extremely low 0.11% rate in *Williams*.

[7]  *Jones v. Nuclear Pharmacy, Inc.*, 741 F.2d 322, 324 (10th Cir.1984). *See also Gottlieb v. Wiles*, 11 F.3d 1004 (10th Cir. 1993).

[8]  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002); *Gottlieb*, 11 F.3d at 1014.

[9]  *Marcus v. State of Kansas, Dept. of Revenue*, 209 F.Supp.2d 1179, 1182 (D.Kan. 2002).  *See also, Trief v. Dun & Bradstreet Corp.*, 840 F.Supp. 277, 281 (S.D.N.Y. 1993) ("[A]bsent evidence of fraud or overreaching, courts consistently have refused to act as Monday morning quarterbacks in evaluating the judgment of counsel.").

[10]  *Law v. National Collegiate Athletic Ass'n*, 108 F.Supp.2d 1193, 1196 (D.Kan. 2000).

[11]  *Seiffer v. Topsy's International, Inc.*, 70 F.R.D. 622, 626 (D.Kan. 1976).

This Court's decision to approve the Settlement should also be influenced by the strong federal policy of encouraging settlement of civil litigation.[12] Settlement is especially favored in class actions because it minimizes litigation expenses and reduces the strain on judicial resources.[13] Here, these maxims clearly support granting final approval over the objections.

## III.    LEGAL ANALYSIS OF OBJECTIONS

###    A.    *The Opt-Out Remedy Is A Procedural Safeguard*

Before analyzing specific objections below, it should be emphasized that Federal Rule 23's opt-out mechanism is specifically designed to avoid such an analysis because it provides dissatisfied class members with the opportunity to remove themselves from the lawsuit and preserve their claims. As a court in an analogous case observed, "this is how Rule 23 works;"[14] class members who agree with the settlement can stay in, and class members "who find the settlement unattractive can protect their own interests by opting out of the class."[15] That more than 3,000 class members exercised their right to opt-out of this Settlement reveals two things: (1) at least some portion of the class clearly understood the notice and chose not to participate in this Settlement for whatever reason; and (2) the vast majority of the class—**over 99.99%**—agreed to be bound by this Settlement.[16]

---

[12] *See Stanspec Corp. v. Jelco, Inc.*, 464 F.2d 1184, 1186 (10th Cir. 1972). *See also Sears v. Atchison, Topeka, Santa Fe R.R. Co.*, 749 F.2d 1451, 1455 (10th Cir.1984), *cert. denied*, 471 U.S. 1099 (1985).

[13] *Cotton*, 559 F.2d at 1331 (5th Cir.1977)("Particularly in class action suits, there is an overriding public interest in favor of settlement."); *In re Dept. Of Energy Stripper Well Exemption Lit.*, 653 F.Supp. 108, 115 (D.Kan. 1986)("It is in the interests of the courts and the parties that there should be an end to litigation and the law favors the peaceful settlement of controversies.").

[14] *Hanlon v. Chrysler Corporation*, 150 F.3d 1011, 1025-1026 (9th Cir. 1998).

[15] Manual for Complex Litigation (4th ed.), § 21.643, at 328. As discussed below, Costco has waived any requirement that class members who wish to opt-out of the Settlement must first produce a fuel purchase receipt, mooting any objections that the opt-out mechanism is too onerous.

[16] *See, e.g., DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995) (determining that "[t]he fact that only a handful of class members objected to the settlement similarly weighs, in its favor"); *Bell Atl. Corp. v. Bolger*, 2 F.3d 1304, 1313-14 & n.15 (3d Cir. 1993) (recognizing class silence can be considered consent to settlement); *Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-19 (3d Cir. 1990) (holding that objections by even 10% of class "strongly favors settlement"); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974) (noting silence of majority of class may be attributed to agreement to proposed settlement); *In re Cardizem CD Antitrust Litig.*, 218

Given the availability of the opt-out remedy, dissatisfaction with the Settlement by only a handful of individual and serial objectors should not prevent final approval of a settlement to which the overwhelming majority of class members do not object.

B.      *Analysis Of Specific Objections*

Many of the objections raised by objectors go directly to the <u>merits</u> of this litigation, not the terms of the proposed Settlement, and are therefore improper and should be disregarded.[17] The issue for the Court is whether the Settlement is fair and reasonable under the standards articulated by the Tenth Circuit, not which side has the stronger position on the merits.  As discussed below, none of the objections raised undermine the inherent fairness and reasonableness of the proposed Settlement, much less justify its disapproval.

1.      *Objection: The Injunctive Relief Provided by the Settlement is "Worthless" and Would Harm Consumers*

Some Objectors[18] argue that not only does Automatic Temperature Compensation ("ATC") have no value, it would actually harm consumers.  For whatever motivation, these Objectors have simply adopted *in toto* the position taken by Defendants in this litigation.  In doing so, Objectors ignore the substantial record that has been developed on this issue and the fact that this issue is hotly contested by expert economists on both sides.[19]

---

F.R.D. 508, 527 (E.D. Mich. 2003) (noting small number of objections received may be viewed as, indicative of adequacy of settlement); *In re Holocaust Victim Assets Litig.*, No. 96-C4849, 2000 U.S. Dist. LEXIS 20817, at *7, 8 (E.D.N.Y. Nov. 22, 2000) (recognizing "overwhelming majority of the Settlement Class members--more than 99 percent--did not submit any comment regarding the Proposed Plan and presumably had no objection"); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 332 (W.D. Pa. 1997) (concluding silence in class action settlement context can be construed as assent).

[17] "[T]he settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.1982). *See also In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 330, 350 (N.D.Ohio 2001) (same).

[18] *See, e.g.*, Objections of Alkon and Martin, Doc. No. 1578.

[19] This failure is particularly disturbing in light of the fact that the Objectors fail to even acknowledge that this issue is subject to debate.

Objectors (just like the Defendants, whose position they adopt) argue that "findings" of the California Energy Commission ("CEC") demonstrate that the benefits of ATC do not outweigh its cost. However, although it suffers from many shortcomings,[20] one thing the CEC's Report[21] did not do was to draw the absolute conclusion that Defendants and Objectors proclaim (i.e., that costs outweigh benefits). To the contrary, the CEC called for further study to quantify the intangible, but important, benefits of

- "fairness, accuracy, and consistency"—concepts that were recognized but "not included in this analysis;"[22] and
- "[t]he value of increased price transparency associated with ATC,"[23]—a benefit that the CEC admitted was deserving of evaluation through further research on the fuel temperature variation between adjacent retail stations.

Indeed, the CEC acknowledged that the benefit of price transparency is worthy and valuable:

Energy Commission staff acknowledges that having no knowledge of fuel temperature at the time of a transaction creates a problem because retail fuel consumers cannot adequately compare the benefits or value of fuel prices advertised by two competing retail stations. If consumers seek the lowest priced fuel and if temperature variation is not taken into account in the advertised price per gallon, a consumer could potentially buy a higher priced gallon when they

---

[20] One troubling aspect of the CEC Report that has never been resolved is the fact that the genesis for much of the flawed economic analysis in the Report appears to lie with the opinions of Robert H. Topel, an economist described by CEC staff as "the person expressing WSPA's (the Western States Petroleum Association) econometric interpretation of the ATC issue for the California market". Mr. Topel appears to have met privately with CEC staff in August, 2008 prior to formulation of the CEC's final Report and provided a "presentation" that has never been made public. Although CEC staff inquired about doing a critical review and an independent assessment of Topel's data and conclusions after the presentation by Topel and oil industry litigation counsel, documents produced by the CEC, (in response to a FOI request), evidence that no such review or assessment was performed.  At the March 11, 2009 CEC hearing, CEC Chairman Douglas admitted that although an independent outside evaluation of Topel's conclusions was considered, it was not done because the Commission was behind two months in providing its report to the legislature. Thus, it is difficult to take the CEC Report at face value when its economic underpinnings have been concealed from any sort of adversarial analysis, and were admittedly not vetted by an independent outside source. See, internal documents obtained from the CEC by a FOIA request from consumer advocate group Consumer WatchDog attached hereto as Exhibit 3; See also, letter from Consumer WatchDog to the CEC dated March 10, 2009, attached hereto as Exhibit 4 (describing issues related to the CEC Report and findings from documents obtained through FOIA request to CEC).
[21] California Energy Commission FUEL DELIVERY TEMPERATURE STUDY Commission Report, March 2009, CEC-600-2009-002-CMF ("CEC Report") (attached to certain Defendants' Motion to Dismiss, Doc. No. 1244 as Exhibit E-1).
[22] CEC Report at 3.
[23] Id. at 4.

could have received a better value if they had knowledge of the net price of that gallon.[24]

Thus, the CEC recommended "that the Legislature also consider whether the possible value of increased fairness, accuracy, and consistency of fuel measurement, in addition to the benefits quantified in the cost-benefit analysis, justify mandating ATC at California retail stations."[25]

The salutary result of such transparency is this:

Any uncertainty regarding whether or not temperature influences had been factored into the advertised per-gallon price would be removed and the consumers [sic] selection of the lowest priced fuel would consistently result in an actual savings to the consumer.[26]

The CEC Report also quantified the enormity of the effect of ATC in terms of gallons and dollars:

If ATC had been installed at retail gasoline stations during the one-year study period, the quantity of net gasoline gallons sold would have been approximately 15.5 billion or about 117 million gallons less compared to status quo (no ATC at retail outlets) because the fuel was warmer (71.1 degrees Fahrenheit) than the 60 degree Fahrenheit reference standard.

Under the ATC scenario, the quantity of net diesel fuel gallons sold would have been approximately 3.037 billion or about 19 million gallons less compared to the status quo (no ATC at retail) of 3.056 billion because the fuel was also warmer (72.9 degrees Fahrenheit) than the 60 degree Fahrenheit reference standard."[27]

[T]he decreased quantities of gasoline gallons were valued at about $ 376.4 million and diesel fuel at about $61.1 million.[28]

The CEC erred, however, in concluding that the costs of retrofitting pumps with ATC equipment would be entirely passed through to consumers and that retail motor fuel prices would

---

[24] *Id.* at 71.
[25] *Id.* at 3.
[26] *Id.* at 72. As the CEC also observed, ATC technology is available, and the Gilbarco Model Nxx series pump was approved in 2007 for use in California, with electronic ATC capability. *Id.* at n. 87. Accordingly, the approximately 85 Costco stations in California could be among the first converted under the Settlement.
[27] *Id.* at 2.
[28] *Id.* at 71.

adjust upwards to compensate for bigger gallons. The CEC merely accepted industry

representations that costs would be passed through and prices would be raised,[29] even though

reliable economic and scientific models demonstrate that competitive forces demand no such

outcome.[30] Indeed, the industry's adoption of temperature compensation for wholesale

transactions demonstrates the value of temperature compensation--the factors present at

wholesale are true at retail as well.[31]

     Assuming *arguendo* that the costs to retrofit pumps are passed on to consumers, the CEC

calculated that the cost of retrofitting is slight (amounting to just fractions of a cent per

gallon)[32]—an amount that is dwarfed by the consumer cost of hot fuel, a percentage amounting

to several cents per gallon, depending on the temperature and per-gallon price.  The retrofit costs

would be recaptured quickly[33] (if at all), while the benefits of ATC would be reaped by

consumers for years.  Moreover, in the absence of perfect and instantaneous price adjustment,

---

[29]  The CEC analysis and Report is also suspect because the record suggests, regrettably, that far more than the analysis by CEC staff was involved.  CEC Commissioner James Boyd, who chaired the Report assignment, is the husband of Catherine Reheis-Boyd, a registered lobbyist and the Executive Vice President and Chief Operating Officer of the Western States Petroleum Association ("WSPA").  WSPA's membership includes many of the named Defendants in this case, such as BP, Exxon, Valero, Tesoro, Chevron and ConocoPhillips, who obviously had direct interest in the outcome of the CEC Report.  Incredibly, not only did Commissioner Boyd decline to recuse himself, notwithstanding the obvious conflicts of interest, but documents obtained through FOI requests have shown that Commissioner Boyd had a significant hand in some of the anti-ATC language and conclusions in the CEC Report.  *See* Exhibit 3, 4; *See also* WSPA member list available at: http://www.wspa.org/member-list.aspx.

[30]  Indeed, documents produced by Defendants in this litigation demonstrate directly contradict the notion that ATC costs necessarily will be passed on to consumers.  *See* ███████████████████ , attached as Exhibit 36 to Pls.' Resp. in Opp'n. to Def. Marathon Petroleum Company, LLC's Mot. for Summ. Judg. ("Doc. No. 1371") (marked HIGHLY CONFIDENTIAL (██████████████████████████████████████████████████████████████████████████████████████████████████████ ).

[31]  These viewpoints are fully addressed in the expert reports of Dr. Andrew Safir in connection with the class certification motions.  *See* Exhibit A to Doc. No. 1122 (filed under seal); Exhibit 1 to Doc. No. 1475.

[32]  CEC Report at 2.

[33]  The CEC overlooked any federal and state tax advantages to retailers investing in new pumps, and those effects are not inconsiderable; some examples include asset depreciation deductions, and alternative energy tax credits, interest deductions, and the like.  Nor did the CEC value tax savings to consumers for any per-gallon fees or taxes that might be assessed in California or elsewhere.

consumers will benefit, incrementally, at every sale.[34]  Objectors' reliance on the CEC Report for

its argument that ATC would harm consumers is simply misplaced.

Objectors' reliance on a 2009 National Conference of Weights and Measures ("NCWM")

report as to the value of ATC to consumers is also misplaced.[35]  At the July 2009 Annual

Meeting of the NCWM, there were two proposals before the Laws & Regulations Committee:

mandate ATC at retail or recognize permissive ATC at retail.[36]  The Committee voted to remove

the two items from consideration by the full NCWM.[37]  Contrary to the Objectors' assertion, the

full NCWM did not decide the ATC issue on the **merits**; indeed, the NWCM did not vote on the

substantive issues at all.[38]  Objectors' attempt to recast **public** comments as a "finding" by the

NCWM that ATC is "economically worthless" is misleading and unavailing.[39]

Moreover, Objectors' argument that the Settlement's injunctive relief is worthless and

will be subsidized by class members directly conflicts with their assertions elsewhere concerning

Costco's past wrongdoing.  Specifically, Objectors argue that the Settlement is insufficient

because Costco is not paying class members for their past damage claims.[40]  But, had Class

Counsel negotiated damages for past harm as part of the settlement, under Objectors' flawed

---

[34] No one truly disputes that the competitive market is imperfect; the disagreement is about how rapidly and how completely retailers react.  Lagging response is inevitable and a boon to consumers.  Sales volume maintenance, market share and other market factors override a retailer's desire to retain a constant profit margin in the real world, as described in the expert submissions.

[35] See Objection of Alkon and Martin (Doc. No. 1578) at 8.

[36] See Excerpts from the 2009 Interim Report of the NCWM Laws and Regulations Committee at 12 (setting both the permissive and mandatory ATC proposals on the agenda for the 2009 NCWM Annual Meeting and "recommending adoption of one of the proposals,"), attached as Exhibit 23 to Doc. No. 1371.

[37] See Addendum Sheets to the 2009 NCWM Laws and Regulations Committee, attached as Exhibit 24 to Doc. No. 1371.

[38] See Voting Record of the 2009 NCWM Annual Meeting (noting that Items 232-1 and 232-2 were "withdrawn by committee" and noting no record under "Voice Vote"), attached as Exhibit 25 to Doc. No. 1371.

[39] The "overwhelming majority" referenced in the NCWM report, and cited by Objectors, were **public** comments (i.e., anyone that wanted to attend the meeting), not the opinions of voting NCWM members.  Oil industry trade associations actively seek to "pack the house" at these meetings with anti-ATC spokespeople, which explains why the majority of the **public** comments were opposed to ATC. See Exhibit 5 (████████████████████████████); Exhibit 6 (████████████████████████████), attached hereto.

logic, that would have also harmed class members because they would be subsidizing the very award they are receiving. This is, perhaps, the weakest component of Objectors' argument. Indeed, under their analysis, any time a company is sued for consumer protection violations, regardless of how meritorious the case may be or how egregious the conduct at issue is, that suit would detrimentally impact the same consumers because any litigation costs and awards the company incurs related to the litigation will inevitably be passed on to consumers. Thus, were, Class Counsel to proceed to verdict against Costco and obtain a substantial verdict for the class for past damages, Objectors must agree that under their logic, that verdict would be <u>harmful</u> for Costco's customers. Common sense dictates that this conclusion is preposterous.

In reality, this Settlement strikes a balance between the many extreme positions articulated by Objectors. Class members will enjoy both financial and informational benefits from this landmark settlement. All will enjoy increased fairness, accuracy, and consistency of fuel measurement, and transparency in pricing, which will allow them to make more informed decisions.

2.    *Objection: The Settlement Provides No Recovery For Past Damages*

Some Objectors[41] also argue that the Settlement "does not compensate for alleged past wrongdoing" and that it is simply a "promotional tool" for Costco. However, these arguments ignore the significant value that the Settlement's injunctive relief provides to class members.

Whether a proposed settlement is reasonable "is not susceptible of a mathematical equation yielding a particularized sum."[42] The adequacy of the amount offered must be judged "not in comparison with the best possible recovery in the best of all possible worlds, but rather in

---

[40] *See* Objection of Alkon and Martin at 10-11.
[41] *See* Objections of Alkon and Martin. *See also* Objection of Szpak, attached hereto as Exhibit 7. Although Class Counsel received Ms. Szpak's objection, it does not appear to have been docketed.
[42] *In re Michael Milken Sec. Litig.*, 150 F.R.D. 57, 66 (S.D.N.Y. 1993) (citation omitted).

light of the strengths and weaknesses of the plaintiff [s'] case."[43] "The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved."[44]

Here, the primary benefit to the class is the future injunctive relief in the form of temperature-corrected retail motor fuel sales. Based on Costco's own data, the effect of selling non-temperature-adjusted gasoline results in a net cost to consumers of more than $20 million dollars per year. Although class members' past damage claims only extend back a few years under the applicable statutes of limitation, the benefit of future temperature-corrected sales is not limited in duration and will continue to increase in actual value as fuel prices increase.

Illogically, although Objectors Alkon and Martin (among others) criticize the Settlement's failure to compensate class members for past damages, they also argue that the claims asserted by Plaintiffs are frivolous. These are mutually-exclusive positions. If the claims truly are frivolous, a notion offensive to the undersigned counsel, who have been vigorously litigating this case for four years, then claims for past damages are also worthless.[45]

Objectors' inconsistent arguments aside, the fact that a settlement does not afford every conceivable remedy to class members does not render it inadequate or warrant its disapproval.[46] Here, the value conferred on class members by the Settlement's injunctive relief is substantial and enduring, rendering the Settlement more than adequate.

---

[43] *In re Agent Orange Prod. Liab. Litig.*, 597 F.Supp. 740, 762 (E.D.N.Y. 1984).

[44] *Grinnell*, 495 F.2d at 455.

[45] *See Grinnell*, 495 F.2d at 455. Some Objectors also maintain that the Settlement does not redress claims that Defendants reaped windfall profits by over-collecting state and federal excise taxes from consumers. *See* Doc. No. 1581. Plaintiffs' tax claims are simply a variation on their argument that Defendants were unjustly enriched by purchasing fuel on a net-gallon basis but selling to consumers on a gross-gallon basis; therefore, the discussion above concerning past damages applies with equal force to the tax claims. The implementation of ATC will correct this inequity on a going forward basis because Costco will both pay taxes on its fuel purchases on a net-gallon basis and then collect those taxes from consumers on a net-gallon basis.

[46] *See Grinnell*, 495 F.2d at 455.

3.    *Objection: Former Costco Members and Members in Non-Conversion States do*
*not Benefit from the Settlement*

Objectors are simply incorrect when they conclude that the proposed Settlement produces

only illusory benefits for former Costco members.[47]   To the contrary, the Settlement provides

tangible benefits to former Costco members, just as it provides benefits to current members.

Under the Settlement terms, both current and former members stand to benefit from the

increased transparency and economic fairness that ATC-equipped motor fuel pumps afford

consumers.  The Settlement's prospective benefits are very real and clearly consistent with the

forms of relief that courts repeatedly have cited in approving complex class action settlements.

Unlike cases where specific segments of a class will have no opportunity to benefit from

a settlement's injunctive relief (such as in the case of former employees), nothing prevents, or

even dissuades, a former Costco member from immediately renewing his or her membership to

take advantage of the Settlement benefits.[48]   That former Costco members must affirmatively

renew their memberships does not render the settlement unfair or unreasonable or inadequate.[49]

Current and former Costco members have an equal opportunity to benefit from the relief by

renewing their annual memberships; the fact that some class members may forego the relief by

---

[47] Objectors simply assume that all of Costco's non-renewals are former Class Members that receive no value under
this Settlement.  They make no effort to quantify how many of these non-renewals are attributable to other
circumstances that defeat their argument (i.e., member mortality, non-sequential memberships, household
consolidation, etc.).  Nor have Objectors shown that former members were motor fuel purchasers at Costco stations.
Costco operated fewer stations early in the class period than it does today.  For example, Costco operated only 177
in 2002, but that number had grown to 323 in 2009.  *Compare* 2002 Annual Report, 6 (available at
http://media.corporate-ir.net/media_files/irol/83/83830/reports/121002_Costco_%20FinalARAsprinted.pdf) *with*
2009 Annual Report at 10 (available at http://phx.corporate-
ir.net/External.File?item=UGFyZW50SUQ9MjQ1ODV8Q2hpbGRJRD0tMXxUeXBlPTM=&t=1)
[48] As Objectors point out, the vast majority of Costco members choose to renew their memberships each year. *See*
Objections of Alkon and Martin at 13.
[49] *See DeHoyos,* 240 F.R.D. at 315 (approving class settlement and noting, in response to an objection that the
injunctive relief did not benefit former policyholders, that "all class members have the opportunity to benefit from
the injunctive relief .... Both current and former policyholders have the opportunity at renewal of their policies to
either continue with or return to Allstate.  If a policyholder returns to Allstate, he or she will have the benefit of the
[settlement's injunctive relief].").

not renewing clearly does not bar approval of the settlement.[50]   Indeed, the Objectors' argument

could be shaped to fit **any** case involving injunctive relief.  For example, broad remedial

injunctive relief has been the subject of numerous class settlements, including those that required

class members to continue future business interaction with the defendant in order to reap

settlement benefits.[51]  In each of these cases, Objectors' argument could have been made but, in

each case, the courts found the settlements fair and reasonable.

    Importantly, there is no actual disparity in the value of the proposed Settlement between

current Costco members and former members who choose to renew their memberships.[52]

Rather, the Settlement creates transparency and valuable economic benefits that are available to

both current and former Costco members.   But, even to the extent that the Settlement's benefits

marginally differ between current and former Costco members, as Objectors recognize, "there is

no rule that settlements benefit all class members equally' ... as long as the settlement terms are

'rationally based on legitimate considerations."[53]   "[T]he fact that the ultimate remedial interests

of the individual class members might differ in their particulars is no bar to certification. ... To

the extent some members will choose not to benefit from the available relief ... does not create

---

[50] *Id.* at 316 ("To the extent some [class] members will choose not to benefit from the available relief, this does not create an impermissible conflict.") (citations omitted).  *See also In re Sprint Corp. ERISA Litig.*, 443 F.Supp.2d 1249, 1259 (D. Kan. 2006) (overruling objections based on an alleged disparity in settlement value to current and former employees and noting that, although some class members may not use planning services afforded by settlement, "this relief is available to them and creates some value for them.").

[51] *See DeHoyos v. Allstate Corp.*, 240 F.R.D. 269 (W.D. Tex. 2007); *Williams v. National Security Insurance Company*, 237 FRD 685 (M.D. Al. 2006).

[52] *See In re Ikon Office Solutions, Inc. Securities Litig.* 209 F.R.D. 94, 102 -103 (E.D. Pa. 2002) (finding no "objectionable disparity of treatment or conflicts of interest between former and current Plan participants" and distinguishing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 800-01, where settlement afforded one group "significantly less value than" another group).  As in *Ikon*, the relief provided to current Costco members is in no way adverse to former members. *In re Ikon Office Solutions, Inc. Securities Litig.*, 209 F.R.D. at 102-103.

[53] *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 131 (S.D.N.Y. 1997) (citations omitted).  *See also In re Metlife Demutualization Litig.*, 00-CV-2258, 2010 U.S. Dist. LEXIS 12413, at * 110-111, 132-133 (E.D.N.Y. Feb. 12, 2010) (approving settlement class over objections that there was a conflict between interests of current and former policyholders) (citations omitted).

an impermissible conflict."[54]   Here, the Settlement affords the same benefit to current and former

Costco members should they choose to avail themselves of such.

That only a handful of former Costco club members objected to, or opted out of, the

settlement[55] is indicative of their assent to the settlement, particularly given the broad reach of

the Notice.[56]   Since former Costco members are presumed to know what is in their best interest,

the small percentage of them who either objected or opted out strongly suggests that the vast

majority of them (more than 99.997%) disagree with the Objectors' characterization of the

Settlement benefits as merely illusory.[57]

As for class members in Non-Conversion States (i.e., those states in which ATC will not

be installed unless Costco begins purchasing motor fuel on a temperature-adjusted (net)-gallon

basis), they are already receiving the voluntary injunctive relief prompted by this litigation.[58]

Costco is now providing notice to consumers that while the energy content of motor fuel

fluctuates with temperature, the fuel sold at Costco does not take that factor into account:

---

[54] *DeHoyos*, 240 F.R.D. at 315-316 (citations omitted).
[55] Of the twenty-nine objectors, only 2 specifically identified themselves as former Costco members. Interestingly, these individuals chose to object to this settlement and risk being bound by any final judgment, rather than opt-out and pursue the claims they argues are basically extinguished by this Settlement for no consideration.
[56] *See id.* at 293 (collecting cases and noting that "[i]n light of the undisputed reach of the nationwide notice, the minimal level of opposition from absent class members weighs in favor of approving the settlement").
[57] *See Austin v. Penn. Dept. of Corrections*, 876 F.Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").
[58] It should also be noted that the vast majority of Costco stations at issue are in Conversion states—187, as compared to 33 stations in Non-Conversion states.  And, in California alone, there are 87 Costco stations. *See* http://www.costcoconnection.com/connection/gas_stations/#pg1 last visited March 16, 2010).



In the Non-Conversion states, given the relative cooler temperatures, Costco does not buy its fuel on a temperature-corrected (net) basis.[59] According to the position taken by other Defendants in this litigation, the fact that Costco does not purchase fuel on a net-gallon basis relieves it of any liability, and renders Plaintiffs' claims worthless, in those states.[60] Although Plaintiffs disagree with that analysis, this dispute only highlights one of the many reasons this Settlement is fair and reasonable.

Finally, the Settlement requires that should Costco begin buying its fuel on a net basis in those states, Costco will install ATC pumps—a future, protective benefit for Non-Conversion State class members.

4.      *Objection:  Class Members Who Buy Cold Fuel Are Harmed By ATC*

Objectors also erroneously argue that class members who buy fuel at temperatures below 60 degrees will be harmed by purchasing fuel from an ATC-equipped pump.

---

[59]  For example, the average fuel temperature noted by National Institute of Standards and Technology for the state of Indiana, where Objector Nicolas Martin resides, is below 60° F. *See* NIST, National Conference of Weights and

First, Objectors' argument is only applicable to the states in which ATC will be installed, i.e., the Conversion States. The parties took this issue into account in structuring the Settlement in that, states that have annual average temperatures at or near 60°F are, for the most part, the Non-Conversion States. In those states, ATC pumps will not be installed *unless* Costco begins purchasing motor fuel on a temperature-corrected basis.[61]

In Conversion States, there is no requirement that class members purchase fuel from Costco. To the extent a class member believes there are transient periods when buying a temperature-corrected gallon from Costco may result in a net loss, they can simply fill-up at any other gas station that day (since every other retailer sells motor fuel on a gross gallon basis). To the extent Objectors allege that some class members live in "pockets" where cold fuel is sold— an argument based on pure speculation, not empirical evidence—those hypothetical class members can simply opt-out of this Settlement, or buy their fuel from some other retailer. Thus, the hypothetical snow-plow operators referenced by Objectors Alkon and Martin can simply buy fuel from another source in the winter. However, even they will benefit from the fact that the Settlement produces transparency and makes their choices meaningful and useful.[62]

Rather than detract from the Settlement, the various hypotheticals raised by Objectors only highlight why this Settlement is fair and reasonable: the value of motor fuel sold fluctuates with temperature, and consumers have no way to make an apples-to-apples comparison.[63] In hot

---

Measures Committee Reports for the 94th Annual Meeting July 12-16, 2009, NCWM Publication 16, at 73, available at http://ts.nist.gov/WeightsAndMeasures/Publications/upload/Pub16-09-FULFINAL.pdf.
[60] *See, e.g.,* Defs.' Resp. in Opp'n. to Mot. to Certify Kansas Class, Doc. # 1321, at 37-38.
[61] For example, Objector Martin is a resident of the state of Indiana. Costco will not install ATC pumps in Indiana unless its fuel purchasing methodology in that state changes.
[62] Costco only sells gasoline. If the hypothetical snow plow is a commercial machine, it would most likely use diesel fuel, which could not be purchased from Costco anyway.
[63] *See* Excerpts from the Deposition of the ███████████████████████, at 170:10-172:25, attached as Exhibit 28 to Doc. No. 1371.

states, this value "delta" can fluctuate substantially. ATC corrects this problem and provides

transparency to an otherwise opaque transaction.

     5.       *Objection: Injunctive Relief Is Distant And Illusory*

     Objectors cite the potential illegality, unavailability or prohibitive cost of ATC pumps,

and potential fuel supply disruption to Costco as evidence that future injunctive relief is unlikely

for the Class and argue that the ATC pump phase-in schedule renders the Settlement's benefits

illusory for some class members.

     First, the notion that future injunctive relief is illusory because ATC pumps are illegal

ignores a key fact: pursuant to the specific requirements of 28 U.S.C. § 1715, specific notice of

this Settlement was sent to the weights and measures officials in **each State at issue**, including

Virginia,[64] as well as to the attorney general of each state at issue, and the United States Attorney

General.[65] If the relief afforded by the Settlement were truly violative of any state laws, the

governmental officials in those states could have stated as much.[66] They have not. Accordingly,

there is simply no legitimate, rational reason to believe that ATC is illegal.[67] The Objectors'

speculation about what <u>might</u> happen does not compel a different conclusion.

     Indeed, Governmental acquiescence to installation of ATC is not a surprise. As Plaintiffs

have briefed extensively elsewhere, Handbook 44 allows an individual state weights and

---

[64] *See* Exhibit 1 hereto (CAFA Notice).
[65] Objectors refer only to Virginia to support their argument that some of the settlement states prohibit ATC. *See* Objection of Alkon and Martin, at n. 10. Notably, however, the CAFA Notice was sent to Mr. Dale Saunders, Program Superintendent for the Virginia Product and Industry Standards Office. Mr. Saunders filed no objection to the relief contemplated by this Settlement. The Notice was also sent to Mr. Bill Mims, the Attorney General for Virginia; he also filed no objection to this Settlement.
[66] Objections or intervention in class action settlements by state officials is not unknown. *See, e.g.,* Order, *In re TD Ameritrade Accountholder Litig.*, No. C 07-2852, (N.D. Cal. Oct. 23, 2009), attached to Brief of Objectors Alkon and Martin as Exhibit 1, at 3 (discussing objections filed by the Texas Attorney General). Thus, such officials clearly know how to object and intervene. The fact that they did not do so in this case is telling.
[67] The importance of the CAFA Notice should not be understated; failure to adhere to the notice requirement is grounds for a class member to assert that they are not bound by a settlement. *See* 28 U.S.C. § 1715(e)(1).

measures program to use the <u>existing provisions</u> to inspect and certify their own ATC pump.[68]

This was confirmed by Richard Suiter, former Weights and Measures Coordinator for the

National Institute of Standards and Technology ("NIST") and an editor of the 2008 edition of

Handbook 44.[69]  In fact, some states, like California, have already approved ATC pumps, [70] and

other states will recognize the ATC pumps approved by California.[71]  Even if there remained a

question regarding the legality of implementing ATC, it was permanently put to rest last year

when the NCWM committee responsible for drafting and updating Handbook 44 specifically

confirmed Plaintiffs' position:

> The Committee also acknowledged that the General Code paragraph G-A.3.
> Special and Unclassified Equipment coupled with relevant provisions in **existing
> code paragraphs can be used by jurisdictions to address equipment with
> ATC features....**[72]

There is simply no support for Objectors' argument that the injunctive relief provided by

this Settlement is illusory because Handbook 44 renders ATC equipment "illegal."[73]

Further, there is no indication from Costco that it believes ATC is illegal.  The Settlement

Agreement specifically required that, after preliminary approval of the Settlement, Costco would

provide Class Counsel with any information in its possession regarding whether ATC is illegal.[74]

No such information has been provided.

---

[68]  *See* NIST Handbook 44 § 1.10, at 1-1, attached as Exhibit G to Def. Marathon Petroleum Company, LLC's Mot. for Summ. Judg. (Doc. No. 1255).
[69]  *See* Suiter Deposition, at 205:6-19, attached as Exhibit 8 to Doc. No. 1371.  As former NIST Coordinator Richard Suiter testified, ATC is not prohibited by Handbook 44 or by Handbook 130. *See id.* at 221-25.
[70]  *See* CEC Report at n. 87.
[71]  *See* Arizona Reg. R20-2-203.
[72]  *See* Excerpts of 2009 Interim Report of the Specifications & Tolerance Committee of the NCWM,  at 56-57, attached hereto as Exhibit 8.
[73]  This also effectively eviscerates arguments in the Motion for Summary Judgment filed by Defendant Marathon Petroleum Company (Doc. No. 1255), which are premised on the misguided position that "Retail Motor Fuel Dispensers Are Governed By Handbook 44's Section 3.30, Not The General Code." *See* Marathon Petroleum Company, LLC's Reply in Supp. of Mot. for Summ. Judg. (Doc. No. 1421) at 21-23.
[74]  *See* Settlement Agreement, ¶ 4.6.

Moreover, that Costco needs time to install ATC pumps is no reason to find the Settlement inadequate, unfair or unreasonable. There are over 187 Costco locations in the fourteen Conversion States.[75] Converting the fuel pumps at each of those stations is no small undertaking, and allowing a in is eminently reasonable.[76]

Objectors argue that Class Counsel will have "no apparent incentive" to push for implementation of ATC pumps under the Settlement. Aside from overlooking the obvious (Class Counsel's duty to the class, both before and after the Settlement), Objectors fail to realize that Plaintiffs have a vested interest in the installation of ATC. Costco is only one of many Defendants in this litigation and its implementation of a more fair and transparent method of retail sale is likely to have residual effects on the retail motor fuel market in general. In addition, Class Counsel are also motivated to ensure Costco adheres to the Settlement. As set forth below, the requested attorney fee is not being sought as an upfront, lump sum, but rather, Class Counsel's requested fee is staged.[77]

Costco also has an interest in ensuring this Settlement is carried through to conclusion. The Agreement itself requires that Costco use its "best efforts" and not act to "void" this Settlement. Costco has already spent considerable time and expense on this Settlement, including provision of more than 10,000,000 notices to the Class. Furthermore, the Settlement Agreement provides this Court with continuing jurisdiction to enforce this Settlement (before and after Final Approval)[78] and obligates Costco to report its compliance regarding the status of

---

[75] See supra note 58.
[76] Moreover, demanding that Costco install ATC pumps at every store in every state simultaneously could even theoretically run afoul of the equipment availability contingency that Objectors Alkon and Martin found unreasonable. See Objection of Alkon and Martin at 16-18.
[77] See infra Section III(B)(7).
[78] See Settlement Agreement, at ¶ 8.1.

ATC implementation.[79]  Any notion that Costco's commitment to the Settlement will end at Final Approval defies the express terms of the Settlement.

Grasping at straws, Objectors point to various clauses of the Agreement that allow Costco an "out" under certain circumstances.  But those provisions do not render the Settlement unfair or unreasonable; to the contrary, they ensure its practicality.  For example, while ATC equipment must be "sufficient and affordable," there is no support for the notion that ATC equipment is unavailable.  One of the largest retail fuel pump manufacturers has already obtained approval of an ATC pump in California and Arizona.[80]  Another major pump manufacturer has assured the oil industry that if there is a movement towards ATC, "█████████████████████████ ████████████████████████████████████████████████████████████████ ████████."[81]  Other manufacturers already have pumps and retrofit kits available[82] and simply need to seek and obtain approval in the states at issue.  Objectors have not even attempted to provide (nor would they be able to provide) factual support for their insinuations that ATC pumps or retrofit systems are unaffordable or unavailable.  In fact, Costco has already examined the cost of ATC pumps and has confirmed to Class Counsel that the cost is not an issue.

Objectors also misconstrue the "supply disruption" clause of the Settlement.[83]  Costco does not refine petroleum and produce its own fuel; rather, it purchases fuel from other entities, some of which are Defendants in this litigation.  Given the concerted resistance to retail ATC by the petroleum industry,[84] it should be no surprise that Costco insisted on this provision in fear of possible retaliation by its suppliers.  Under the Supply Disruption clause, if Costco's ability to

---

[79] *Id.* at ¶ 8.2.
[80] *See, e.g.,* CEC Report, at n. 87.
[81] *See* ██████████ letter, attached as Exhibit 17 to Doc. No. 1371.
[82] Other pump manufacturers currently market and sell ATC-equipped motor fuel pumps in Canada. *See* Excerpts from Kraus website, attached hereto as Exhibit 9.
[83] *See* Settlement Agreement at ¶ 4.8.

purchase fuel at the wholesale level in one of the states at issue is materially and detrimentally impacted because of this Settlement, Costco can "rescind, cancel and annul" the Settlement as to that state *if* ATC has not been installed and operating on its pumps in that state for at least one year.[85]  In other words, if a supply interruption occurs in a state in which ATC pumps have not been installed for at least one year, the class members have not been detrimentally impacted because the Settlement is rescinded, and they still have their claims against Costco.  If Costco experiences a supply disruption in a state where ATC pumps have been up and running for more than a year, Costco cannot avail itself of this clause.  Either way, this clause does not detrimentally impact class members.

6. *Objection:  Class Counsel Breached Their Duty To The Class Because Any Unpaid Fee Reverts To Costco, The Requested Attorney Fee Is Excessive, And Notice Of The Proposed Attorney Fee Is Insufficient Under Rule 23(h)(1)*

Some Objectors contend that Class Counsel breached their duty to the Class because they did not negotiate a Settlement provision that allowed any unpaid amount from the attorney fee "fund" to revert to the Class.  However, these Objectors misread or mischaracterize the Settlement Agreement: Costco has not agreed to pay Class Counsel anything; hence, there is no attorney fee fund.  The only agreement between the parties related to attorney fees is specifically set forth in Section 7 of the Settlement Agreement, which states:

7.1 **Application.**  Class Counsel may apply to the District Court for an award of fees and costs in this Action (the "Fee Application").  Costco agrees to pay any fees and costs awarded by the Court and such payment shall not reduce any of Costco's obligations to the Settlement Class pursuant to this Agreement.

7.2 **Notice.**  The Notice shall inform members of the Class that Class Counsel will request an award of fees and costs to be determined by the District Court.

7.3 **Timing.**  The Parties agree that any amount awarded by the Court for Class

---

[84]  Plaintiffs have elsewhere documented the threatened boycotts and innuendo about bodily harm related to this issue. *See* Pls.' Resp. in Opp'n to Def. Marathon's Mot. for Summ. Judg. (Doc. No. 1371) at n. 69.
[85]  Settlement Agreement at ¶ 4.8.

> Counsel's fees and costs shall be payable by Costco within fifteen days after the Effective Date. (emphasis added).

Thus, the only terms related to attorney fees are: (1) Costco agrees Class Counsel has the right to request a fee (¶ 7.1); (2) Costco agrees to pay any fee awarded by the Court without reducing any benefits to the Class (¶ 7.1); and (3) any amount awarded by the Court for fees and costs will be paid by Costco within fifteen days after the Effective Date (¶ 7.3).  Although Class Counsel have agreed to limit any fee request to a certain amount,[86] Costco has not agreed to pay that amount.  Indeed, Costco has not agreed to pay Class Counsel any amount and, most likely, will oppose any fee request submitted by Class Counsel.  Thus, because this will be a contested fee application with Costco paying only whatever amount the Court may award, there is no established attorney fee fund, and there is simply nothing to "revert" to the Class.  To be clear, any Court-ordered attorney fee award is not an amount that would have gone to the Class under the Settlement and yet, the Class receives the injunctive benefits irrespective of whether Class Counsel are paid.  This scenario is thus a far-cry from the common benefit cash fund settlements (where many of these same serial Objectors routinely appear), when the attorney fee is taken directly from the monetary fund that will be distributed to the Class.

Several Objectors argue that there was inadequate notice given of Class Counsel's request for an attorney fee under Fed.R.Civ.P. 23(h)(1).  However, the Detailed Notice contained the following statement, which plainly apprises class members that Class Counsel will seek attorneys' fees:

---

[86] *See* Detailed Notice, Section 9 (attorney fee and costs application will not exceed $10 million).

> Class Counsel will ask the Court for attorneys' fees and expenses not to exceed ten million dollars. The Court will determine the fees and expenses to be paid, and they will be paid by Costco. Costco is also paying the costs of notifying the class members of the proposed settlement and of administering the proposed settlement process. The Court may award the five class representatives in this case an incentive fee of $2,500 each for the time and effort they have put into this case on behalf of the Class. Any award to these class representatives of an incentive fee will be deducted from the award made to Class Counsel.

Many Objectors erroneously argue that Class Counsel will be paid shortly after Final Approval, while the Class will not receive a benefit for many years.  Class Counsel's application for an attorney fee will request the Court award Class Counsel an attorney fee as follows:

- 50% of the fee award and any award for costs to be paid within fifteen days after the Effective Date (as defined in the Settlement Agreement);

- The remaining 50% to be paid on the yearly benchmarks contemplated by the Settlement related to Costco's installation of ATC equipment.[87]

Thus, this is not a situation, as the Objectors suggest, where Class Counsel are paid up-front and the Class has to wait to receive a benefit.  A large portion of any fees awarded will not be paid for years and will be tied to the yearly schedule set forth in the Settlement Agreement. As Objectors Alkon and Martin point out, Class Counsel will bear the burden going forward of resolving any issues related to regulatory approval of Costco's ATC implementation, as well as other work that will be necessary in monitoring Costco's compliance with the Settlement.

Finally, although some Objectors argue that Class Counsel's proposed fee request is excessive, other Objectors recognize that the fee request may be "eminently fair" if the benefits to the Class are substantial.[88]  Here, the benefits to the class are indisputable.  Costco has provided data that shows hot fuel sales by Costco in the 14 Conversion States has averaged over

---

[87] *See* Settlement Agreement at ¶ 4.4.
[88] *See* Objections of Alkon and Martin at 24 ("[I]f the parties expect that class members will credibly receive $100 million in benefits, then the resulting 10% contingency is eminently fair.").

$20 million a year for the past three years. Converting to ATC at the Costco locations in these states will eliminate these hot fuel sales and will result in real and substantial value for the class for years to come. This beneficial outcome is the result of Class Counsel's hard work and diligent efforts in the face of concerted and rigorous opposition from the retail motor fuel industry.

It bears noting that very few objectors—indeed, less than 0.001% of class members—voiced concerns with the requested attorney fee. The fact that very few class members have objected to the settlement or opted out should be viewed as indicative of their assent to all aspects of the Settlement, including Class Counsel's requested fee.[89]

7.    *Objection: The Opt-Out Procedure is Unfair and Burdensome Because it Requires Class Members to Produce a Receipt*

Some Objectors argue that the Settlement's opt-out mechanism is unfair and burdensome because class members must provide a fuel sales receipt along with their opt-out request. First, even if it did have validity (which it does not), Objector's argument in this regard is moot. The receipt requirement was waived shortly after the Class Notice was disseminated,[90] and Costco has agreed to honor any opt-outs that were sent without a receipt.

Second, even if the receipt requirement had been enforced, this Court previously approved the Class Notice without objection to the requirement that a receipt be submitted by class members in order to opt-out. Specifically, on August 13, 2009, this Court granted preliminary approval to the Settlement and ordered that notice be sent to the Class.[91] In its August 13th Order, the Court took no issue with the proposed Detailed Notice. However, the

---

[89] *See DeHoyos*, 240 F.R.D. at 293 (*citing Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999)).

[90] *See* Excerpt from Costco Hot Fuel Settlement website, attached hereto as Exhibit 10 (noting, "IF YOU CHOOSE TO OPT OUT OF THE SETTLEMENT, **A RECEIPT IS NO LONGER REQUIRED**")(emphasis in original).

[91] The class notice program contemplated by the parties' Settlement consisted of two steps: First, each Class Member would receive a short form notice ("Class Notice") via regular mail, which would comply with Rule 23(c)(2)(B) and Rule 23(e)(3). Second, the Class Notice would direct Class Members to a dedicated web site where Class Members could obtain a more detailed notice ("Detailed Notice")(attached as Exhibit D to the Settlement Agreement) that contains additional information about the Settlement and this litigation.

Court requested that the parties submit a revised proposed Class Notice to cure certain deficiencies noted by the Court.[92]  On August 27, 2009, this Court approved the revised Class Notice submitted by the parties, finding that it "contains the criteria set forth in Rule 23(c)(2)(B) and a fair description of the settlement pursuant to Rule 23(e)(3).[93]  Neither the Court or anyone else, raised an issue with the Class Notice or the provision of the Settlement (now waived) that required Class Members seeking to opt-out to provide a fuel receipt.

8.      *Objection: Any Alleged Harm From Costco's Failure To Use ATC Is Inconsequential*

Some Objectors contend that the harm caused by gross (i.e., non-temperature corrected) motor fuel sales is inconsequential.  But the facts, and industry statements, show otherwise.  Some oil companies market their products by urging consumers to "get the most out of **every drop**"[94] and urge efficiency-boosting habits designed to improve fuel efficiency by the smallest of percentages.[95]  Likewise, automobile manufacturers tout EPA mileage numbers to sell their cars.  Consumers are keenly aware of the significant benefit from increasing the value of motor fuel in even minute amounts.  A recent trade association survey concluded that the most important factor in consumer fuel purchasing is price, and consumers "will significantly change their purchasing behavior to save as little as one cent per gallon."[96]  Here, the differences are far more than a penny a gallon.  In the states involved in this Settlement, fuel temperatures have been recorded over 120° F.[97]  In a non-temperature corrected purchase, a consumer buying one gallon of 120° F. gasoline with a posted price of $3.50 would pay just that, $3.50.  However, if

---

[92]  *See* Order, Doc. # 1273 at 16-19.
[93]  *See* Order, Doc. # 1284 at 2.
[94]  *See* excerpts from Shell website, attached hereto as Exhibit 11(emphasis added).
[95]  *See id.*
[96]  *See* National Association of Convenience Stores website, available at http://www.nacsonline.com/NACS/Resources/campaigns/GasPrices_2008/Pages/TopEconomicConcern.aspx.
[97]  *See* Confidential temperature data of ██████████████████████████████, attached hereto as Exhibit 12.

that pump were equipped with ATC, the same consumer would pay only $3.36.  While that 14¢

is insubstantial in and of itself, that value is extremely significant when extrapolated by the

magnitude of overall fuel sales.  There is no basis to conclude that the effect of not using ATC is

inconsequential.

9.      *Objection:  Costco Already Posts Notice On Its Gas Pumps That It Sells Fuel By The Gross Gallon*

Several Objectors argue that Costco already places placards on its gasoline pumps that

inform consumers that Costco does not temperature correct motor fuel sales.  Thus, argue the

objectors, Class members are not being deceived, and Costco is not acting unfairly.[98]  These

Objectors fail to realize that the placards were installed *after* the first "hot fuel" lawsuits were

filed against Costco and other Defendants and that those stickers are a product of this litigation.[99]

Thus, to the extent Objectors contend that Costco is acting "fairly" by providing injunctive relief

in the form of notifying consumers that they are not purchasing temperature-corrected gasoline,

that relief is the direct result of Plaintiffs' actions.

10.      *Objection:  The Named Class Representatives Have Not Earned An Incentive Award*

Several Objectors contend that the named Class Plaintiffs are not entitled to the $2,500

incentive awards provided by the Settlement,[100] but this argument is without merit.  First, class

representative incentive awards are well-recognized.  Second, the named Class Plaintiffs have all

devoted substantial time and expense to this case, including meeting with counsel, answering

discovery, gathering documents, and taking time from work or other endeavors to give a

deposition.  To suggest these individuals are not entitled to $2,500 (a relatively low amount for a

class representative incentive award) for their contribution to this case is shortsighted and unfair.

---

[98]  *See* Objection of Dacus and Sondra Grant, Doc. # 1300.
[99]  *See* Costco's Resp. to Pls.' Second Set of Interrogatories, No. 49, attached hereto as Exhibit 13.

27

11.      *Objection: Class Members Cannot Determine Whether They Are In The Class*

At least one Objector maintains, without any elaboration or supporting argument, that the class definition in the Notice "provides no information or mechanism by which a class member can determine whether he or she is part of the class" because consumers do not know for certain that they purchased motor fuel above 60 degrees. [101]  Although it is not clear (and the Parties should not be expected to speculate as to basis for the objection), this argument presumably relates to class members' ability to determine whether to object or to opt out.[102]

As discussed above, on August 27, 2009, this Court approved the Class Notice, including the opt-out requirements, submitted by the parties, finding that the proposed notice "contains the criteria set forth in Rule 23(c)(2)(B) and a fair description of the settlement pursuant to Rule 23(e)(3).[103]  Neither the Court, nor anyone else, raised concerns about the opt-out mechanism.

The fact that some portion of the class did opt out or object undermines Objector's argument because it demonstrates that class members understood the Notice and could make reasonable assumptions about their membership in the class.   Indeed, Objectors Alkon and Martin represented in their brief that they "almost certainly purchased gasoline above [60 degrees]" in light of the average temperature in their respective geographic locations.  Other class members are capable of making similar determinations, and any current or former Costco member who believed he or she might be a class member could, out of abundance of caution, opt

---

[100]  *See* Settlement Agreement at ¶ 7.4.
[101]  *See* Objection of Chilimidos (Doc. No. 1579) at 2.
[102]  Because the relief afforded by the Settlement can be available to any consumer who makes future motor fuel purchases from Costco in the states at issue, it is not necessary for an individual to prove his or her membership in the class in order to obtain the Settlement's benefits.
[103]  *See* Order (Doc. No. 1284) at 2.

out of the Settlement if he or she does not want to be bound by its terms.  The opt-out

mechanism does not require proof of motor fuel purchases over 60 degrees.[104]

12.        *Objection:  The claims are frivolous and no recovery is warranted*

Several Objectors suggest this lawsuit is "frivolous" because it is "common knowledge"

that motor fuel changes based upon temperature, and therefore, no recovery is warranted.  They

also argue that gross fuel sales cause no harm to consumers and ATC sales are "worthless."

These objections are contrary to the facts of this case: gross motor fuels sales lack

transparency, while temperature-compensated sales maximize transparency and fairness.  It is

undisputed that the higher the temperature of the motor fuel that occupies a volumetric gallon

(231 cubic inches), the less energy it will contain, the fewer miles it will propel a car and the less

value it has.[105]  However, the temperature of motor fuel sold to consumers can be completely

different on the same day at stations just across the street from each other, at the various pumps

located at a single station, and even during the course of a single fill up.  In other words, it is

possible for a consumer to get 90° gas from a station and pay $3.00 per gallon and 15 minutes

later, at the same station, another consumer will get gas significantly colder and still pay $3.00

per gallon.[106]

The vast majority of consumers are unaware of that fact.  Even the Defendants'

executives and employees believed all motor fuel was the same until this litigation[107] and had

---

[104] As a practical matter, because of the geographic regions in which they are located, any Costco member in the states at issue who purchased motor fuel from Costco could reasonably assume he or she is a member of the class because, at least during some portion of the year, the average ambient temperature is above 60 degrees.  Ambient temperature is a good indicator of dispensed fuel temperature.  *See* Exhibit 1 to Pls.' Resp. to Mot. to Exclude Testimony of Andrew Safir. (Doc. No. 1475-1), Affidavit of Dr. Andrew Safir ¶¶ 64-68.
[105] *See* Deposition of O'Brien at 18-22, attached as Exhibit A to Omnibus. App. to Plaintiffs' Reply Briefs in Support of Class Certification ("Doc. No. 1503"); *see* Deposition of Defendants' expert Harri Kytomaa, at 112, attached as Exhibit B to Doc. No. 1503.
[106] *See* Deposition of Kytomaa, at 100-106, attached as Exhibit B to Doc. No. 1503.
[107] *See* Deposition of ███████████████████ at 113-114, attached as Exhibit 19 to Doc. No. 1371; *see also* Deposition of ████████████████, at 70-73; Deposition of ██████████

"no idea" how much of a role temperature variations have with respect to the energy content and quality of fuel.[108] This lack of transparency was recognized by the Director of NIST in 2006 when he stated: "Every commercial transaction has an element of trust. Trust cultivated over time breeds confidence. Reliable, accurate measurements are the vital ingredients of both, but **especially in transactions that lack transparency, such as the sale of fuel.**"[109] In fact, ███████ ███████████ admitted that consumers cannot make an "apples to apples" comparison of motor fuel without knowledge of the fuel's temperature,[110] which the industry refuses to provide.

The same conclusion is held by many weights and measures officials, such as the San Diego County Director of Weights and Measures, who has noted that, "Automatic temperature compensation would result in the same "gallon" being sold at retail as it is at wholesale so that buyer and seller are both dealing in "net gallons." The obvious benefit for consumers is improved retail price transparency."[111]

ATC and temperature-compensated sales are hardly "worthless;" to the contrary, it is beyond credible dispute that temperature correction is the most fair and equitable method of selling motor fuel. This fact has been repeatedly recognized by weights and measures officials and Defendants alike:

---



Deposition of the ███████, at 90-91; Deposition of the █████████████, at 118; Deposition of the ███████████, at 36-37; Deposition of ███████████████, at 357-359; Deposition of ███████████████, at 100-101 (Taken in the action *Klein vs. Chevron* in the Superior Court of California, Case No. BC367812) (By agreement of the parties, all discovery in the *Klein* action is applicable in this litigation); Deposition of ███████████, at 32; Deposition of ███████████████, at 118-119, collectively attached as Exhibit 26 to Doc. No.1371.

[108] *See* Excerpts from the ███████████████, at 90:18-91:8, attached as Exhibit 27 to Doc. No. 1371.
[109] *See* Address of NIST Director, July 11, 2006, at 3 (emphasis added), attached as Exhibit 12 to Doc. No. 1371.
[110] *See* Excerpts from the Deposition of the ███████████████, at 170:10-172:25 attached as Exhibit 28 to Doc. No. 1371.
[111] *See* Exhibit 64 to Doc. No. 1371; *see also* Exhibits 44 and 54 to Doc. No. 1371.

- Temperature compensation ensures that "███████████████████████████████ ,"[112]
;

- Temperature compensation is the "most equitable way to sell products;"[113]

- Temperature compensation "would provide transparency in unit price v. volume;"[114]

- Temperature compensation "is a superior method of measurement;[115]

- "If ATC were mandated for use at retail stations, consumers would be able to more accurately and fairly compare prices because variations in temperature would be corrected by the ATC equipment."[116]

- Temperature compensation "the most equitable way fuel can be sold without the buyer or seller gaining a competitive advantage;"[117]

- "Selling fuel adjusted to the volume at 15 C (60 F) throughout the distribution system is the most equitable way fuel can be sold without the buyer or seller gaining a competitive advantage.  Allowing a distributor to buy product at wholesale by gross volume and sell it at retail by net volume is not equitable;"[118]

- Temperature compensation is the "most equitable way" to sell motor fuel at retail;[119]

- "Determining the accurate weight or volume of an object is fundamental to ensuring fair commerce."[120]

Defendants know this.[121]  Motor fuel retailers sued many of the major oil companies in

the 1970s and 1980s to compel temperature-corrected motor fuel sales at the wholesale level.[122]

---

[112] *See* Bates No. ███████████, at 2, ¶ 9 (produced by the ████████████), attached as Exhibit 29 to Doc. No. 1371.  Interestingly, this document also makes the statement ATC helps ensure that "██████████████████████ at ¶ 16.

[113] *See* 2001 Report of the NCWM L&R Committee, at 7 (noting recommendation from the Northeastern Weights and Measures Association with respect to vehicle tank meters), attached as Exhibit 31 to Doc. No. 1371.

[114] *See* NCWM's ATC Steering Committee January, 2008 Progress Report, at 31, attached as Exhibit 32 to Doc. No. 1371.

[115] *Id.*

[116] CEC Report at 12.

[117] *See* 2006 Interim Report of the NCWM Laws & Regulations Committee, at 4, attached as Exhibit 6 to Doc. No. 1371.

[118] *See* NCWM L&R Committee's 2005 Final Report at 6-7, attached as Exhibit C to certain Defendants' Motion to Dismiss on Political Question Grounds (Doc. # 1244).

[119] *See* Exh. Z to Def. Marathon Petroleum Company, LLC's Mot. for Summ. Judg. (Doc. No. 1255) at 2.

[120] *See* Exhibit 12 to Doc. No. 1371 at 4.

[121] So does the federal government, elements of which recognize the propriety of temperature-corrected motor fuel sales and require it in many transactions.  For example, the United States Treasury Department, through its Bureau of Customs, requires imported petroleum products to be declared in terms of a "standard "gallon defined as 231

Substantiation that temperature correction is the most equitable method of sale is also found by looking at the converse: the inequity of gross gallon sales:



- "███████████████████████████████████████████████████"[123]

- Because the southern United States is "██████████████████████████████████████████████ ██████████████" as a result of buying temperature adjusted gallons but selling non-temperature adjusted gallons, and these "████████████████████"[124]

- Implementation of ATC equipment would impact "██████████████████████ ████████████"[125]

- The company "████████████████████████████"[126]

Clearly, the oil industry recognizes that buying net and selling gross in hot climates yields undisclosed and inequitable profits.[127] It defies logic, and the facts of this case, for Objectors to argue ATC, which would eliminate this inequity, is "worthless."

*C.    Patent Deficiencies In Certain Objections Are Dispositive*

---

cubic inches at 60° Fahrenheit, and admonishes all importers to utilize the industry's recognized temperature-correction table (D-1250) for such purposes. *See* U.S. Treasury Department Regulation 19 CFR § 151.41. Temperature correction has also been adopted by the Federal Trade Commission as a mandatory standard relating to packaged petroleum products. *See* F.T.C. Regulation, 16 C.F.R. § 500.8(B). NCWM has also implemented model rules and regulations requiring that packaged petroleum products be temperature-corrected. NIST Publication 1020-2 states that with respect to packaged petroleum products, "[A]ll declarations of quantity shall permit price and quantity comparisons . . . (and) declarations of quantity associated with a liquid measure shall express the volume at the required reference temperature" which, for petroleum products, is "15°C (60°F)." *See* NIST Publication 1020-2, at 2-3, attached as Exhibit 33 to Doc. No. 1371.

[122] In fact, some fuel retailers appear to have sought specific legislation in an attempt to mandate such sales at the wholesale level, attributing the "majors" refusal to temperature correct as "greed." *See* Exhibit 65 to Doc. No. 1371 (regarding legislation introduced in the Texas Legislature in 1981).

[123] *See* Document Bates No. ████████████, attached as Exhibit 34 to Doc. No. 1371.

[124] *See* Document Bates No. ████████████████████, attached as Exhibit 35 to Doc. No. 1371.

[125] *See* Document Bates No. ████████████, attached as Exhibit 36 to Doc. No. 1371.

[126] *See* Document Bates No. ████████████, attached as Exhibit 35 to Doc. No. 1371; Testimony of ████████, at 139:1-141:10, attached as Exhibit 37 to Doc. No. 1371.

[127] This inequity is only further compounded by the industry's selective implementation of ATC. In cold areas, like Canada, it appears that fuel retailers may have used ATC to sell smaller units without a corresponding drop in price. *See* Document Bates Nos. ████████████████, attached as Exhibit 38 to Doc. No. 1371. This conduct has been estimated to cost Canadian consumers more than $100 million per year in Ontario alone (which the Canadian government deemed "an absolute transfer of wealth from consumers to the oil companies"). *See* 1998 Report of the Liberal Committee On Gasoline Pricing in Canada, at 51, attached as Exhibit 10 to Doc. No. 1371.

Aside from substantive deficiencies, certain objections are also invalid due to obvious patent defects. The Court-approved Detailed Notice contained the following statement:

> If you're a Class Member, you can object to the proposed settlement if you don't think the proposed settlement is fair, reasonable or adequate. You can give reasons why you think the Court should not approve it. The Court will consider your views. To object, you must send a letter stating that you object to the proposed settlement. Be sure to include (1) the name of this lawsuit, In re Motor Fuel Sales Practices Litigation; (2) your full name, current address and telephone number; (3) the reasons you object to the proposed settlement; and (4) your signature.

Objections not meeting these minimal requirements are defective and should not be considered. Inasmuch, the documents filed by Class Member Ronald Schroeder (Doc. # 1352) and Class Member Chuck Balkon (Doc. # 1402) appear to be opt-outs, rather than an objections, and should be disregarded for purposes of evaluating the Settlement. The document filed by Class Members Sid and Sue Hasler (Doc. # 1401) fails to provide the required contact information, or signature. The document filed by Class Members Malcom and Edythe Newbourne (Doc. # 1431) should be stricken or disregarded because it seems to be simply a letter providing the Court with a newspaper article, not an objection or opt-out request.

Objectors Amy Alkon and Nicolas Martin similarly failed to comply with the requirements of the Detailed Notice by not signing their objection. While Plaintiffs would not expect all requirements to be met by lay objectors, the deficiency of Alkon and Martin is curious given that they are represented by a serial objector attorney, Theodore H. Frank, Esq. of the so-called "Center for Class Action Fairness" ("CCAF"). Mr. Frank appears to be opposed to all consumer litigation, from the Ford Pinto litigation to civil rights actions.[128] Mr. Frank's prior

---

[128] In testimony before the Senate Republican Conference on March 16, 2009 (available at http://www.aei.org/docLib/Frank%20testimony.pdf), Mr. Frank indicates his belief that litigation related to the Ford Pinto did nothing to improve product safety (p.10), employment protection statutes like Title VII may be "counterproductive" and a drain on the economy (p.5) and similar comments on other types of tort litigation.

anti-litigation history does not detract from his clients' right to voice their opposition to this

Settlement, but he should know and meet the requirements.  He has a history of objections to

class actions, which while having their place in the overall discourse over the advisability of

class actions in general, detracts from the sincerity of the objection to this Settlement in which he

has little or no factual information to evaluate.[129]

## IV.   CONCLUSION

The essence of any settlement is compromise; compromise "between the maximum

possible recovery and the inherent risks of litigation. The test is whether the settlement is

adequate and reasonable and not whether a better settlement is conceivable."[130]  Some Objectors

argue the Class is entitled to more.  Some Objectors argue the Class is entitled to less.  This

Settlement strikes a balance between both extremes.  In the final analysis, this Settlement is fair,

adequate and reasonable and no argument advanced by the Objectors compels a different

conclusion.

---

[129]  Although Attorney Frank, a self-styled "academic", disclaims the title "professional objector," there is no doubt that his claim to fame is his effort to derail class settlements.  In the later part of 2009, Mr. Frank established the CCAF, which he refers to as a "guerilla operation" dedicated almost exclusively to challenging class actions. *See* http://legalpad.typepad.com/my_weblog/2009/09/class-action-avenger-discusses-coupon-crusades.html.
[130]  *In re Warfarin Sodium Antitrust Litig.,* 212 F.R.D. 231, 258 (D.Del.2002) (citation omitted); *see also E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir.1985); *Wilkerson v. Martin Marietta Corp.,* 171 F.R.D. 273, 282-3 (D.Colo.1997).

Respectfully submitted this 19th day of March, 2010.

Respectfully submitted,

_s/ Robert A. Horn_
Robert A. Horn      KS Bar No. 70254
HORN AYLWARD & BANDY, LC
2600 Grand Boulevard, Suite 1100
Kansas City, MO 64108
Telephone 816-421-0700
Facsimile 816-421-0899
rhorn@hab-law.com

_s/ Thomas V. Girardi_
Thomas V. Girardi  CA Bar No. 36603
GIRARDI AND KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017-1904
Telephone: 213-977-0211
Facsimile: 213-481-1554
tgirardi@girardikeese.com

LEAD COUNSEL FOR PLAINTIFFS

_s/ Thomas V. Bender_
Thomas V. Bender     Ks. Bar #22860
WALTERS BENDER STROHBEHN
       & VAUGHAN, P.C.
2500 City Center Square
1100 Main Street
P.O. Box 26188
Kansas City, MO 64196
(816) 421-6620
(816) 421-4747 (Facsimile)
tbender@wbsvlaw.com

LIAISON COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2010, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all person registered for ECF as of that date.

On this date a true and correct copy of the foregoing document was sent via electronic mail to the following:

Sid & Sue Hasler
sshasler@verizon.net

Thedore Frank
Attorney for Objector Amy Alkon and Nicolas Martin
tedfrank@gmail.com

Kenneth Nelson
Attorney for Objector Kenner
kennelson@mclaw.com,

N. Albert Bacharach, Jr.
Attorney for Objector Putnam
N.A.Bacharach@att.net,

Frank H. Tomlinson
Attorney for Objector McKerley
htomlinson@bellsouth.net,

Paul S. Rothstein
Attorney for Objector Anderson
psr@rothsteinforjustice.com,

Edward W. Cochran
Attorney for Objector Zuravin
edwardcochran@wowway.com,

Darrel Palmer, LLM
Attorney for Objector Waldvogel
darrell.palmer@palmerlegalteam.com

On this date a true and correct copy of the foregoing document was sent via U.S. Mail, with proper postage prepaid, addressed as follows:

Gary Hendrix
803 N. Arizona Blvd.
Coolidge, AZ 85128

R. Duke Dougherty
P.O. Box4293
Topeka, KS 66604

Dacus and Sondra Grant
1442 Swiftwater Circle
McDonough, GA 30252

Brian Rush
3500 N. Hayden Rd. #705
Scottsdale, AZ 85251

Bruce R. Hudson
4723 Lakewood Blvd
Naples, FL 34112

Jeffery Schroeder
32072 Via Tonada
San Juan Capistrano, CA 92675

Ronald Schroeder
8729 Kings Hill Dr.
Cottonwood Heights, UT

Jeff Weinstein
Weinstein Law Firm
518 East Tyler Street
Athens, TX  75751

Bill & Nancy Wood
28007 Oakhaven Lane
Menifee, CA 92584

Malcom & Edythe Newbourne
PO Box 2322
Marco Island, FL 34146

Daniel Perry
1520 Stone Rim Loop
Buda, Texas 78610

Diane Olbert
1906 Raleigh Avenue
Austin, TX 78703

Chuck & Tessa Balkon
140 Lodge Hall Rd.
Nolensville, TN 37135

_/s/ Joseph A. Kronawitter_____