**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

|  |  |  |
|---|---|---|
| | ) | |
| IN RE: MOTOR FUEL TEMPERATURE | ) | **MDL No. 1840** |
| SALES PRACTICES LITIGATION | ) | **Case No. 07-MD-1840-KHV** |
| | ) | |
| This document relates to: | ) | |
| | ) | |
| *Wilson v. Ampride Inc., et al.*, | ) | |
| 06-CV-02582-KHV-JPO | ) | |
| _____ | ) | |

**DEFENDANT CITGO PETROLEUM CORPORATION'S
<u>MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...........................................................................iii

NATURE OF THE MATTER BEFORE THE COURT ...................................1

STATEMENT OF FACTS ...........................................................................2

QUESTION PRESENTED ...........................................................................7

LEGAL STANDARD ...................................................................................8

ARGUMENT.................................................................................................8

I.   THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER
     CITGO EXERCISED SUFFICIENT CONTROL OVER RETAIL PRICING,
     ADVERTISING AND MOTOR FUEL DISPENSING PRACTICES TO RENDER
     IT LIABLE – IT DID NOT ...................................................................9

     A.  CITGO Does Not Control Retail Pricing..................................11

     B.  CITGO Does Not Control Retail Advertising...........................12

     C.  CITGO Does Not Control Retail Motor Fuel Dispensing Practices........13

     D.  CITGO's General Standards for the Use of Its Brand Do Not
         Make It Liable for Retail Practices Over Which It Has No Control........13

II.  BECAUSE CITGO DOES NOT CONTROL RETAIL PRICING, ADVERTISING
     OR MOTOR FUEL DISPENSING PRACTICES, SUMMARY JUDGMENT
     SHOULD BE GRANTED IN CITGO'S FAVOR ON COUNTS II, III AND IV ...........15

     A.  It Is Undisputed That CITGO Has No Sales Transactions with
         Retail Consumers and Therefore Owes No Duty of Good Faith and
         Fair Dealing ...........................................................................15

     B.  It Is Undisputed That CITGO Has No Control Over the
         Activities That Allegedly Harmed Plaintiffs and Therefore
         It Cannot Be Liable under the Kansas Consumer Protection Act............16

     C.  It Is Undisputed That Retail Consumers Confer No Direct Benefit
         on CITGO by Making Purchases at Retail, and Therefore CITGO
         Cannot Be Liable under a Theory of Unjust Enrichment ......................18

III. Plaintiffs Have Admitted That CITGO Did Not Participate in
    the Alleged Conspiracy, and Therefore Summary Judgment
    Should Be Granted in CITGO's Favor on Count I ...............................20

CONCLUSION ..............................................................................................................20

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adams v. Am. Guar. and Liab. Ins. Co.,*
   233 F.3d 1242 (10th Cir. 2000) ........................................................ 8

*Apple v. Standard Oil*,
   307 F. Supp. 107 (N.D. Cal. 1969) ................................................... 10

*Arguello v. Conoco, Inc.*,
   207 F.3d 803 (5th Cir. 2000) ........................................................... 14

*B. P. Oil Corp. v. Mabe*,
   370 A.2d 554 (Md. 1977) ................................................................. 11

*Baker Const. Co., Inc. v. City of Burlington*,
   2009 WL 3350747, 683 S.E.2d 790 (Table) (N. C. Ct. App. 2009) ........................................ 19

*BP Exploration & Oil, Inc. v. Jones*,
   558 S.E.2d 398 (Ga. Ct. App. 2001) .......................................... 12, 13

*Chevron, U.S.A., Inc. v. Lesch*,
   570 A.2d 840 (Md. 1990) ................................................................. 11

*Cislaw v. Southland Corp.*,
   6 Cal. Rptr. 2d 386 (Cal. Ct. App. 1992) ........................................ 12

*Ciup v. Chevron USA, Inc.*,
   928 P.2d 263 (N.M. 1996) .......................................................... 10, 14

*Coffey v. Fort Wayne Pools, Inc.*,
   24 F. Supp. 2d 671 (N.D. Tex. 1998) ............................................... 14

*Conaway v. Smith*,
   853 F.2d 789 (10th Cir. 1988) ........................................................... 8

*Dillon v. Riffel-Kuhlmann*,
   574 F. Supp. 2d 1221 (D. Kan. 2008) ................................................ 8

*Falls v. Scott*,
   815 P.2d 1104 (Kan. 1991) ............................................................... 10

*Freeman v. Suddle Ents., Inc.*,
   179 F. Supp. 2d 1351 (M.D. Ala. 2001) ........................................... 14

*Glad v. Thomas County Nat. Bank*,
    No. 87-1299-C, 1991 WL 201186 (D. Kan. Sept. 10, 1991)................................................... 16

*In re Bayou Hedge Funds Investment Litig.*,
    472 F. Supp. 2d 528 (S.D.N.Y. 2007)...................................................................................... 19

*In re Relafen Antitrust Litig.*,
    225 F.R.D. 14 (D. Mass. 2004)................................................................................................ 19

*Levine v. Standard Oil Co., Inc.*,
    163 So. 2d 750 (Miss. 1964).................................................................................... 10, 14, 15

*Mobil Oil Corp. v. Bransford*,
    648 So. 2d 119 (Fla. 1995)...................................................................................................... 10

*Murphy v. Holiday Inns, Inc.*,
    219 S.E.2d 874 (Va. 1975)...................................................................................................... 12

*Neff v. Am. Dairy Queen Corp.*,
    58 F.3d 1063 (5th Cir. 1995) .................................................................................................. 14

*Porter v. Merck & Co., Inc.*,
    No. 04-CV-586, 2005 WL 3719630 (Kan. Dist. Ct. Aug. 19, 2005)........................................ 17

*Raines v. Shoney's, Inc.*,
    909 F. Supp. 1070 (E.D. Tenn. 1995) .................................................................................... 12

*Rivers v. Amato*,
    No. CIV. A. CV-00-131, 2001 WL 1736498 (Me. Super. Ct. June 22, 2001) ......................... 19

*Smith-Hoy v. AMC Property Evaluations, Inc.*,
    862 N.Y.S.2d 513 (N.Y. Sup. Ct. App. Div. 2008) ................................................................. 16

*Skeet v. Sears, Roebuck & Co.*,
    137 F.R.D. 347 (D. Kan. 1991)............................................................................................... 17

*Spires v. Hospital Corp. of America*,
    289 Fed. Appx. 269, 270 (10th Cir. 2008) (unpublished)........................................................ 19

*St. Petersburg v. Dayco Prods., Inc.*,
    No. 06-20953-CIV, 2008 WL 5428172 (S.D. Fla. Dec. 30, 2008)........................................... 19

*T.R. Inc. of Ashland v. Brandon*,
    87 P.3d 331 (Kan. Ct. App. 2004) .......................................................................................... 18

*Texaco, Inc. v. Youngbey*,
    440 S.E.2d 533 (Ga. Ct. App. 1994) ........................................................................ 10

*Thompson v. Jiffy Lube Int'l*,
    No. 05-1203, 2006 U.S. Dist. Lexis 39113 (D. Kan. June 13, 2006) ............................ 8, 9, 11

*Waste Connections of Kansas, Inc. v. Ritchie Corp.*,
    228 P.3d 429 (Kan. Ct. App. 2010) ........................................................................ 15

*Weiss v. Chevron USA, Inc.*
    251 Cal. Rptr. 727 (Cal. Ct. App. 1988) ................................................................. 10

*Wood v. Shell Oil Co.*,
    495 So. 2d 1034 (Ala. 1986) .......................................................................... 12, 14

## Other Authorities

K.S.A. 50-623 ........................................................................................................ 17

K.S.A. 50-624 ........................................................................................................ 17

K.S.A. 50-626 ........................................................................................................ 17

K.S.A. 50-634 ........................................................................................................ 17

## Rules

Fed. R. Civ. P. 56 ..................................................................................................... 8

## NATURE OF THE MATTER BEFORE THE COURT

Pursuant to the Court's November 17, 2010 order, CITGO Petroleum Corporation ("CITGO") moves for summary judgment against plaintiffs and the class certified pursuant to Rule 23(b)(2) in the one Kansas case in which it is a defendant: *Wilson v. Ampride Inc., et al.*[1] Like the other complaints in this multidistrict litigation, the claims of the named plaintiffs and the class they represent (collectively, "plaintiffs") center on the fact that retail motor fuel stations in the United States measure "Motor Fuel delivered in retail sales transactions by a non-standard, non-temperature adjusted 'gallon'" (Compl. ¶ 66) as opposed to a so-called "Standard Gallon." Plaintiffs' alleged harm has to do only with the price of retail motor fuel and the quantity dispensed, because consumers at retail supposedly "anticipat[e] that a 'gallon' of Motor Fuel sold when the temperature is 60 degrees Fahrenheit contains the same amount of energy as a 'gallon' of Motor Fuel sold when the temperature is above 60 degrees Fahrenheit." (Compl. ¶ 49.) Put simply, plaintiffs claim that "[w]hen the Defendants sell Motor Fuel to the Plaintiffs and the Class that exceeds 60 degrees Fahrenheit, the Plaintiffs and the Class are suffering damages resulting from the loss of energy per 'gallon' of Motor Fuel due to the expansion of the Motor Fuel." (Compl. ¶ 51.)

The fundamental problem with plaintiffs' theory of liability is that CITGO does not price, advertise or dispense gasoline at retail – the actions that allegedly have caused harm to plaintiffs. CITGO is a refiner of gasoline that franchises its trade name and trade dress, pursuant to a Marketer Franchise Agreement ("MFA"), to wholesale purchasers of gasoline ("marketers").

---

[1] In its order, the Court stated that CITGO could "re-assert its earlier standing arguments as they *specifically* apply to the two Kansas cases."  Because CITGO is not named as a defendant in *American Fiber & Cabling, LLC, et al. v. BP Corp. N. Am. Inc, et al.*, 2:07-cv-02053, this motion addresses only the claims in the *Wilson* complaint.  In addition, CITGO interprets the Court's order as granting leave to re-brief, under Kansas law, only the limited arguments made in CITGO's earlier summary judgment briefing.  CITGO reserves the right to present additional arguments at the appropriate time.

These wholesale marketers generally resell the gasoline to retailers that they franchise, under rights granted to them in the MFA, as branded CITGO retail stations.   Some marketers may also own their own branded retail stations at which they resell gasoline to the public.

Recognizing the irremediable defect in pursuing claims against franchisors like CITGO, plaintiffs make only a single allegation regarding franchisor liability:  "the Defendants control the specification of the Motor Fuel dispensing devices at their franchisees' retail locations and prohibit their franchisees from installing such readily-available and technically feasible temperature compensation equipment."  (Compl. ¶ 54.)  As explained in detail below, CITGO does not own, operate, or control any retail stations selling its products in Kansas (or any other state).[2]  It does not control the specification of the Motor Fuel dispensing devices at its franchisees' locations or prohibit its franchisees from installing temperature compensation equipment.  Nor does CITGO dictate how retailers price their products, how motor fuel is dispensed at retail or whether retailers post signage or other disclosures regarding the relationship between temperature and the energy content of gasoline.  In light of these undisputed facts, summary judgment should be granted in CITGO's favor.

## STATEMENT OF FACTS

The following are material facts as to which no genuine issue exists:

1.      CITGO is a refiner of petroleum products, including gasoline and diesel fuel.  *See* Declaration of Alan Flagg ("Flagg Decl."), attached as Exhibit A, ¶ 2; Plaintiffs' Opp. to Defendant CITGO Petroleum Corporation's Motion For Summary Judgment [Dkt. No. 909] at ¶

---

[2] In fact, there have been no CITGO-branded stations in the State of Kansas since November 2007, as CITGO completely withdrew from Kansas at that time.  *See* Decl. of Alan Flagg in Support of CITGO's Oppositions to Plaintiffs' Motions for Class Certification [Dkt. No. 1321-17] at ¶ 13.

1 of Plaintiffs' Resp. to CITGO's Statement of Facts, (hereinafter "Plaintiffs' Resp. to CITGO's Facts").

2.      CITGO sells gasoline and diesel fuel only at wholesale to companies known as "marketers."  Flagg Decl. ¶ 3; Plaintiffs' Resp. to CITGO's Facts ¶ 2

3.      CITGO also licenses its trade name, trademarks, and trade dress to marketers. Flagg Decl. ¶ 3; Plaintiffs' Resp. to CITGO's Facts ¶ 3.

4.      CITGO does not own any retail gasoline stations.  Flagg Decl. ¶ 3; Tr. of 30(b)(6) Dep. of Alan Flagg ("Flagg Dep.") 24:22-25:2;[3] Plaintiffs' Resp. to CITGO's Facts ¶ 4.

5.      CITGO does not operate any retail gasoline stations.  Flagg Decl. ¶ 3; Flagg Dep. 25:3-25:6; Plaintiffs' Resp. to CITGO's Facts ¶ 5.

6.      CITGO does not lease any retail gasoline stations.  Flagg Decl. ¶ 3; Plaintiffs' Resp. to CITGO's Facts ¶ 6.

7.      CITGO sells its products at wholesale by entering into Marketer Franchise Agreements with marketers.  Flagg Decl. ¶ 3; Plaintiffs' Resp. to CITGO's Facts ¶ 7.

8.      These wholesale marketers are authorized by CITGO to market motor fuels under CITGO's trademarks, trade names and other brand identifications to retail dealers.  Flagg Decl. ¶ 3; Plaintiffs' Resp. to CITGO's Facts ¶ 8.

9.      These wholesale marketers are also authorized, under the MFA, to license their retail-dealer customers to sell motor fuel under the CITGO brand.   Flagg Decl. ¶ 3; Plaintiffs' Resp. to CITGO's Facts ¶ 9.

10.     CITGO does not contract with individual retail stations.  Flagg Decl. ¶ 3.

---

[3] Cited excerpts of the Flagg deposition transcript are attached as Exhibit B.

11.     Although some marketers may also own or operate retail stations, CITGO deals with the marketer as a wholesale distributor.  Flagg Dep. 26:6-21, 28:13-21, 30:2-19.

12.     CITGO does not have day-to-day interaction with retail stations.  Flagg Dep. 31:17-32:7.

13.     If issues relating to retail stations come to CITGO's attention, it directs those issues to the marketers, not the individual retail stations.  Flagg Dep. 31:17-32:7.

14.     CITGO's MFA explicitly states that the marketer "is an independent contractor operating an independent business and is not authorized to act as an agent . . . of CITGO." Flagg Decl. ¶ 3, Ex. 1 ¶ 17, Ex. 2 ¶ 19; Plaintiffs' Resp. to CITGO's Facts ¶ 14.

15.     The product that CITGO sells is measured at wholesale at the terminal truck rack, not at the retail station.  Flagg Decl. ¶ 5; Plaintiffs' Resp. to CITGO's Facts ¶ 15.

16.     The purchaser of the product from CITGO at wholesale determines whether its purchases from CITGO will be temperature adjusted, to the extent it is allowed by state law. Flagg Decl. ¶ 5; Flagg Decl. Ex. 1 ¶ 2, Ex. 2 ¶ 2; Plaintiffs' Resp. to CITGO's Facts ¶ 16.

17.     CITGO does not control retail pricing.  Flagg Decl. ¶¶ 6, 7; Plaintiffs' Resp. to CITGO's Facts ¶ 17.

18.     CITGO does not set the prices at which retailers sell motor fuel to the public. Flagg Decl. ¶¶ 6, 7; Plaintiffs' Resp. to CITGO's Facts ¶ 18.

19.     CITGO does not control retail motor fuel dispensing practices.  Flagg Decl. ¶¶ 6, 8.

20.     CITGO does not own the pumps at retail stations.  Flagg Dep. 247:1-18; Plaintiffs' Resp. to CITGO's Facts ¶ 20.

21.     CITGO does not control the manner in which retail stations selling its products dispense motor fuel.  Flagg Decl. ¶ 8.

22.     CITGO does not control the specifications of motor fuel dispensing devices at retail stations.  *Id.*

23.     CITGO does not prohibit its marketers from installing temperature adjustment equipment.  *Id.*

24.     CITGO does not prohibit retailers from installing temperature adjustment equipment.  *Id.*

25.     CITGO does not approve or reject fuel pumps used at retail stations.  *Id.*

26.     CITGO has no contractual right to approve or reject fuel pumps used at retail stations.  *Id.*

27.     CITGO's MFAs demonstrate that CITGO has no ability or right to dictate retail pricing decisions.  *See* Flagg Decl. Exs. 1 and 2 *generally*.[4]

28.     CITGO's MFAs demonstrate that CITGO has no ability or right to require any type of fuel dispensing equipment at retail stations.  *See* Flagg Decl. Exs. 1 and 2 *generally*.

29.     CITGO's MFAs demonstrate that CITGO has no ability or right to prohibit any type of fuel dispensing equipment at retail stations.  *See* Flagg Decl. Exs. 1 and 2 *generally*.

30.     CITGO's MFAs with its various marketers do not differ in any material way. Plaintiffs' Consol. Resp. to Defendant CITGO's First Set of Interrogatories ("Plaintiffs' Interrog. Resp."), attached as Exhibit C, at 3; Flagg Dep. 56:12-57:16, 59:8-14; Plaintiffs' Resp. to CITGO's Facts ¶ 30.

---

[4] Exhibits 1 and 2 to the Flagg Declaration are the two contracts that plaintiffs used as example contracts in their response to CITGO's discovery targeting the purported basis for their claims.  *See* Exhibit C, Plaintiffs' Interrog. Resp. at nn. 2, 3.

31.    CITGO does not control retail station advertising, other than the use of its trademark, trade dress and brand identification or to make available certain promotional materials that marketers or retailers may either use as provided or not use.  Flagg Decl. ¶ 6.

32.    Through its Image Standards, CITGO maintains certain guidelines for the use of its trademark, trade dress and brand identification.  Flagg Decl. ¶ 10; CITG 007654, CITG 007908, attached as Ex. 3 to Flagg Decl; Plaintiffs' Resp. to CITGO's Facts ¶ 32.

33.    CITGO's Image Standards do not prohibit retailers from making disclosures regarding temperature adjustment – or any other matter – on the items specifically described in the guidelines.  Flagg Decl. ¶ 10.

34.    CITGO's Image Standards do not prohibit retailers from making disclosures regarding temperature adjustment – or any other matter – elsewhere on their premises.  *Id.*

35.    Retailers can post other signage and advertising at retail stations aside from the items reflected in CITGO's Image Standards.  *Id.*; Flagg Dep. 213:17-21, 227:15-228:17; Plaintiffs' Resp. to CITGO's Facts ¶ 35.

36.    Retailers do post other signage and advertising at retail stations aside from the items reflected in CITGO's Image Standards.  Flagg Decl. ¶ 10; Flagg Dep. 213:17-21, 227:15-228:17; Plaintiffs' Resp. to CITGO's Facts ¶ 36.

37.     CITGO's Image Standards include signage containing "reader boards" into which retailers may insert their own messages.  Flagg Decl. ¶ 10; CITG 008016, attached as Ex. 3 to Flagg Decl.

38.    CITGO does not prevent retailers from making disclosures to the public regarding fuel temperature.  Flagg Decl. ¶ 10.

39.     CITGO does not prevent retailers from making disclosures to the public regarding temperature adjustment.  *Id.*

40.     CITGO does not have the right to prevent retailers from making disclosures to the public regarding fuel temperature.  *Id.*

41.     CITGO does not have the right to prevent retailers from making disclosures to the public regarding temperature adjustment.  *Id.*

42.     CITGO owns certain signage at retail stations that bears its trade dress.  *Id.* ¶ 9; Flagg Dep. 216:24-217:5; Plaintiffs' Resp. to CITGO's Facts ¶ 42.

43.     CITGO does not own all signage at retail stations.  Flagg Decl. ¶ 9; Flagg Dep. 225:25-226:14; Plaintiffs' Resp. to CITGO's Facts ¶ 43.

44.     CITGO does not have any relationship with customers that purchase gasoline at retail, contractual or otherwise.  Flagg Decl. ¶¶ 3-5; Flagg Dep. 24:22-25:6.

45.     Customers purchasing gasoline at retail stations do not pay CITGO for their purchases.  Flagg Decl. ¶ 4.

46.     CITGO did not participate in the conspiracy alleged in the plaintiffs' Second Consolidated Amended Complaint.  Flagg Decl. ¶ 11; Plaintiffs' Am. Consol. Resp. to Interrogs. 6 and 7 of Defs.' Consol. First Set of Interrogs. ("Plaintiffs' Am. Conspiracy Resp."), attached as Exhibit D, at 18-19, 47-49; Plaintiffs' Resp. to CITGO's Facts ¶ 44.

## QUESTION PRESENTED

Is CITGO entitled to summary judgment on all claims against it because it does not own or operate retail motor fuel stations or control retail pricing, advertising or motor fuel dispensing practices?

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). If the moving party does not bear the ultimate burden of persuasion, it may meet its burden of showing that no genuine issue of material fact exists by "pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adams v. Am. Guar. and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (internal quotations omitted). Plaintiffs cannot avoid summary judgment by relying "on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial." *Dillon v. Riffel-Kuhlmann,* 574 F. Supp. 2d 1221, 1222 (D. Kan. 2008) (quoting *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988)).

## ARGUMENT

This Court has clearly set out what plaintiffs must do to succeed on their claims against CITGO: "To recover against CITGO, plaintiffs must show that CITGO exercised sufficient control over retail pricing, advertising and/or motor fuel dispensing practices to make it directly and/or vicariously liable for the allegedly unlawful conduct of retail stations." Jan. 29, 2009 Order at 6 (citing *Thompson v. Jiffy Lube Int'l*, No. 05-1203, 2006 U.S. Dist. Lexis 39113, at *38-39 (D. Kan. June 13, 2006) (applying Kansas law)). Plaintiffs cannot make such a showing as there is no evidence that CITGO ever exercised such control. In fact, the only evidence is that it has not. CITGO does not own or select the pumps or dispensing equipment at retail stations, does not prohibit the use of temperature adjusting equipment, does not set the prices or units of measure for motor fuel sold at retail, and has no input into or control over whether independent

8

CITGO-branded retail stations disclose to consumers the temperature of the gasoline they sell or the effects of temperature on that gasoline.  Because plaintiffs cannot dispute these fundamental facts, and because the well-established and universally-accepted law on franchisor liability provides no liability under these facts, CITGO is entitled to summary judgment on all claims.

I.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER CITGO EXERCISED SUFFICIENT CONTROL OVER RETAIL PRICING, ADVERTISING AND MOTOR FUEL DISPENSING PRACTICES TO RENDER IT LIABLE – IT DID NOT.

Distilled to its essentials, plaintiffs complain that *retail* motor fuel sales should be adjusted for temperature differences in the fuel being sold.  CITGO, however, sold no fuel to retail consumers in Kansas or any other state, and has no relationship, contractual or otherwise, with the retail consumers that may have purchased its products from CITGO-branded retail stations.  *See* Flagg Decl. ¶¶ 3-5; Flagg Dep. 24:22-25:6.  Plaintiffs' purported injuries, if any, derive solely from the pricing, advertising, or motor fuel dispensing decisions of the independent businesses that own and operate the retail stations at which plaintiffs make fuel purchases.  CITGO has no input into these decisions and no contractual right to control them.  *See* Flagg Decl. ¶¶ 6-8.  This properly is a dispute between plaintiffs and the retail station owners and operators – not CITGO – as evidenced by longstanding and unequivocal authority.

Indeed, there is "widespread case law holding that a franchisor may be vicariously liable for the acts of its franchisees if the former controls the *particular instrumentality* that caused harm to the plaintiff."  *Thompson*, 2006 U.S. Dist. LEXIS 39113 at *38-39 (emphasis supplied).  As noted by the *Thompson* court, "[a]lthough no Kansas cases on point have been found, Kansas courts would almost certainly apply general agency principles – including respondeat superior – if it were shown that a franchisor had control or a right of control over the *daily operation* of the *specific aspect* of the franchisee's business that allegedly caused harm."  *Id.* at *42 (citing

Kansas case law on agency) (emphasis supplied). *See also id.* at *42 n.5 ("the court concludes Kansas would likely apply the control test applied by most states.").

Not surprisingly, it is universally accepted and indisputable that oil companies are not liable for the day-to-day operations of independent retail stations absent proof of control over those operations. *See, e.g.*, *Ciup v. Chevron USA, Inc.*, 928 P.2d 263, 267 (N.M. 1996) ("Plaintiffs have not proved that Chevron had any control over the gas station's daily operation"); *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 120 (Fla. 1995) (oil company not liable for conduct of independent station where it did not exercise control over conduct or management of business); *Weiss v. Chevron USA, Inc.*, 251 Cal. Rptr. 727, 730 (Cal. Ct. App. 1988) (oil company not liable where there was "no evidence of any connection between the cause of [plaintiff's] injuries and any aspect of the business over which Chevron did exert or could have exerted any control"); *Levine v. Standard Oil Co., Inc.*, 163 So. 2d 750, 751 (Miss. 1964) (oil company not liable where it "neither exercised nor retained control over the operation of the filling station"). It is equally well-settled that a franchised retail station's display of a franchisor's signage and other brand identification is insufficient to establish that the franchisor had any control over the station's operations. *See Bransford*, 648 So. 2d at 120 ("[i]n today's world, it is well understood that the mere use of franchise logos and related advertisements" does not indicate control over business decisions).[5] Nothing suggests that Kansas would depart from this well-established case law.[6]

---

[5] *See also Texaco, Inc. v. Youngbey*, 440 S.E.2d 533, 534 (Ga. Ct. App. 1994) (fact that an independently-owned station displayed signs bearing an oil company's trade name did not make the company liable for the torts of a station employee); *Apple v. Standard Oil*, 307 F. Supp. 107 (N.D. Cal. 1969) (mere fact that station sold oil company's gasoline and displayed its signs did not make it liable for injuries to station's customer).

[6] *Cf. Falls v. Scott*, 815 P.2d 1104, 1112 (Kan. 1991) ("An independent contractor is defined as one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work. The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work

10

Further, it is not enough for a defendant to merely exercise *some* control over the conduct of a putative agent.  The defendant must control the *conduct at issue* in order to be held liable for the alleged wrongdoing of a third party.  *Thompson*, 2006 U.S. Dist. LEXIS 39113, at *38-39 ("a franchisor may be vicariously liable for the acts of its franchisees if the former controls the *particular instrumentality* that caused harm to the plaintiff") (emphasis supplied).  Consistent with this Court's January 29, 2009 order, the overwhelming weight of authority rejects the existence of any agency relationship between oil companies and independent retailers unless there is a showing of control over the precise instrumentality of the alleged harm.  *See, e.g.*, *Chevron, U.S.A., Inc. v. Lesch*, 570 A.2d 840 (Md. 1990); *B. P. Oil Corp. v. Mabe*, 370 A.2d 554, 558-59 (Md. 1977) (collecting cases).  In this case, plaintiffs cannot make the required showing that "CITGO exercised sufficient control over retail pricing, advertising and/or motor fuel dispensing practices" to hold CITGO liable for the conduct of independent retail stations selling its products.  *See* Jan. 29, 2009 Order at 6.  In fact, it exercised none.

**A.  CITGO Does Not Control Retail Pricing.**

CITGO's MFAs plainly state that CITGO's marketers are "independent contractors operating independent businesses" and are expressly not CITGO's agents or employees.[7]  Flagg Decl. ¶ 3, Ex. 1 ¶ 17, Ex. 2 ¶ 19.  Significantly, there are no provisions that give CITGO any control over the prices at which retail motor fuel is sold or that bear upon retail pricing at all.  *See* Flagg Decl. Exs. 1 and 2 *generally*.  And there is no evidence to suggest that CITGO has gone outside of its agreement and done so.  In fact, the record evidence is clear and indisputable that CITGO does not set retail prices and does not otherwise control the prices at which retailers

---

is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of the right or authority to interfere or control, which renders one a servant rather than an independent contractor.").

sell motor fuel to the public.  Flagg Decl. ¶¶ 6, 7.  CITGO-branded retailers are free to price the products they sell in whatever manner they choose, and plaintiffs previously have recognized this fact.  Plaintiffs' Resp. to CITGO's Facts ¶¶ 17, 18.

### B. CITGO Does Not Control Retail Advertising.

CITGO does not control advertising at retail stations in any manner sufficient to give rise to liability for independent retailers' alleged conduct.  In their complaint, plaintiffs complain that "[u]nlike transactions within the petroleum industry on a wholesale and/or distribution basis, the Defendants advertise and market Motor Fuel to consumers for retail sale at a specified price per 'gallon', but do not expressly define a 'gallon'."  Compl. ¶ 48.  CITGO, however, does not sell motor fuel to retail consumers, nor does it advertise any price per "gallon" for retail motor fuel sales.  Flagg Decl. ¶¶ 4, 6.  All such decisions and advertising is within the sole discretion of the independent retail stations.  Flagg Decl. ¶¶ 6, 7.  As a franchisor, CITGO simply retains control over the proper display of its brand identification, trademark and trade dress through its "Image Standards."  *See* Flagg Decl. ¶¶6, 10; Flagg Decl. Ex. 3.  CITGO may, if not must, maintain standards to protect its brand and trade dress, without being rendered liable for the conduct of independent retailers.  *See, e.g.*, *Raines v. Shoney's, Inc.*, 909 F. Supp. 1070, 1078 (E.D. Tenn. 1995) ("The protection of its trademark and service mark is a necessary duty of a franchisor; to interfere with this duty would unfairly impose liability on the basis of a necessary duty.").[8]

---

[7] Notably, CITGO gives its marketers the choice, to the extent it is allowed by applicable law, of whether or not to purchase fuel from CITGO at wholesale on a temperature adjusted basis.  Flagg Decl. Ex. 1 ¶ 2, Ex. 2 ¶ 2.

[8] *See, e.g.*, *Wood v. Shell Oil Co.*, 495 So. 2d 1034, 1036 (Ala. 1986) (requiring conformity with oil company's "Appearance Guide" insufficient indicia of control to make franchisor liable for agent's conduct); *Murphy v. Holiday Inns, Inc.*, 219 S.E.2d 874, 877 (Va. 1975) ("Under the mandate of the [Lanham] Act, a trade mark owner must, in order to preserve his asset and protect the public against deceptive uses of the mark, regulate the activities of his licensee."); *BP Exploration & Oil, Inc. v. Jones*, 558 S.E.2d 398, 402 (Ga. Ct. App. 2001) (finding no agency despite service station manual establishing standards for signs, use of BP logo, graphics on buildings, billboards and promotional displays); *Cislaw v. Southland Corp.*, 6 Cal. Rptr. 2d 386, 393 (Cal. Ct. App. 1992) (franchisor "must be permitted to retain such control as is necessary to protect and maintain its trademark, trade name and good will" without creating an agency relationship).

CITGO's Image Standards also do not prohibit retailers from disclosing the definition of "gallon" or whether their retail sales are temperature adjusted – or any other matter – either on the items specifically described in the guidelines or elsewhere on their premises.  Retailers can, and do, post other signage (including their own brand identification, Flagg Dep. 227:15-228:17) and advertising at retail stations.  Flagg Decl. ¶ 10; Flagg Dep. 213:17-21.  Notably, CITGO's depicted signage also includes signs with "reader boards" into which retailers may insert their own messages.  *See* CITG 008016, Flagg Decl. Ex. 3.

### C.  CITGO Does Not Control Retail Motor Fuel Dispensing Practices.

CITGO does not have any input into or control over the manner in which fuel is dispensed at retail, including whether retailers use temperature adjusting equipment.  Flagg Decl. ¶¶ 6-8.  Although plaintiffs have previously, and incorrectly, stated in their discovery responses that CITGO's MFAs provide that all pumps at retail locations must be approved by CITGO, in fact, there is no such language in any of CITGO's MFAs.  *See* Flagg Decl. Exs. 1 and 2 *generally*.  CITGO does not have any contractual or other right to approve or reject fuel pumps at retail stations and CITGO has never prohibited use of temperature compensating equipment at its franchised stations.  Flagg Decl. ¶ 8.

### D.  CITGO's General Standards for the Use of Its Brand Do Not Make It Liable for Retail Practices Over Which It Has No Control.

Finally, it is well-settled that general standards and provisions of the type in CITGO's MFAs setting forth general conditions for the use of its brand "do not constitute the type of control necessary to support a finding of actual agency" and instead are a means of permitting CITGO "to achieve a certain level of quality and uniformity within its system."  *BP Exploration & Oil, Inc.*, 558 S.E.2d at 402 (standards for signage, use of logo, promotional displays and cleanliness insufficient to hold BP liable for retail station's conduct).  These general provisions –

including provisions (1) reserving CITGO's right to control the quality and branding of its products, (2) requiring that retail stations be kept clean and neat, (3) allowing CITGO to have access to stations during normal business hours, and (4) discussing advertising and marketing campaigns – are aimed at protecting the value of CITGO's brand name and trademark.  Many courts have found that these types of provisions, which permit an oil company to protect its brand, do not make it responsible for retail practices over which it has no control, particularly where its agreements disclaim any agency relationship.  *See, e.g.*, *Arguello v. Conoco, Inc.*, 207 F.3d 803, 807-08 (5th Cir. 2000) (where marketer agreement states that the store is an independent business, language in agreement offering guidelines to branded store does not establish participation in daily operations); *Ciup*, 928 P.2d at 267 ("protecting a trademark does not constitute sufficient control over the gas station's operation under existing case law"); *Wood*, 495 So. 2d at 1036-37 (oil company not liable where agreement expressly stated that station was independently operated, despite the fact that the agreement required adherence to general operating and appearance standards, approval of certain signage, and right of oil company to inspect books and records); *Levine*, 163 So. 2d at 751-52 (oil company not liable where there was no contractual right to control; institutional advertising is "consistent with good business practices and [is] common in the American community" and is "of little weight in determining the operator's legal status").[9]

---

[9] Courts have applied this standard to various types of claims, including those arising under federal law and consumer protection act claims.  *See Arguello*, 207 F.3d at 805 (claim for alleged racial discrimination of customers); *Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1068-69 (5th Cir. 1995) (franchisor's right to set standards for building and equipment maintenance insufficient to find it liable under ADA for retailer's alleged failure to make store accessible); *Freeman v. Suddle Enters., Inc.*, 179 F. Supp. 2d 1351, 1356 (M.D. Ala. 2001) (franchisor not liable for harassment under Title VII where it was not involved in franchisee's day-to-day employment actions); *Coffey v. Fort Wayne Pools, Inc.*, 24 F. Supp. 2d 671, 678-79, 681-82 (N.D. Tex. 1998) (use of manufacturer's logo and promotional materials insufficient to establish agency for breach of contract and consumer protection act claims).

There simply is no legal basis to hold CITGO liable for the retail practices of independent stations over which it has no control.  To hold otherwise would be an expansion of franchisor liability that courts have been unwilling to take.  Moreover, such an unprecedented position would "upset without any sound reason the foundations of innumerable business relationships." *Levine*, 163 So. 2d at 752.

II.   **BECAUSE CITGO DOES NOT CONTROL RETAIL PRICING, ADVERTISING OR MOTOR FUEL DISPENSING PRACTICES, SUMMARY JUDGMENT SHOULD BE GRANTED IN CITGO'S FAVOR ON COUNTS II, III AND IV.**

Because CITGO does not, and has no right to, control retail pricing, advertising or motor fuel dispensing practices,  it cannot be held liable for breach of the duty of good faith and fair dealing (Count II), the Kansas Consumer Protection Act (Count III), or quantum meruit or unjust enrichment (Count IV).  None of these causes of action provide a basis to recover from CITGO.

A.   **It Is Undisputed That CITGO Has No Sales Transactions or Agreements with Retail Consumers and Therefore Owes No Duty of Good Faith and Fair Dealing.**

Plaintiffs allege that they "entered into sales transactions and agreements with the Defendants" (Compl. ¶ 78) and that "Defendants had a duty to exercise, and act in, good faith and fair dealing in the performance of such sales transactions and agreements" (*id.* ¶ 80). "Kansas courts imply a duty of good faith and fair dealing in every *contract*," which requires that "*[p]arties* shall not intentionally and purposely do anything to prevent *the other party* from carrying out his or her part of the agreement or do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Waste Connections of Kansas, Inc. v. Ritchie Corp.*, 228 P.3d 429, 440 (Kan. Ct. App. 2010) (emphasis supplied).  Under Kansas law, "Plaintiff has the burden of proving each of the following elements to [his or her] good faith and fair dealing claim by a preponderance of the evidence:

1.      The plaintiff and defendant had an agreement, express or implied, [to perform];

2.      The defendant did not [perform];

3.      In failing to [perform], the defendant did not act with honesty in fact; and

4.      The plaintiff sustained damages as a result of the defendant's failure to

[perform]."

*Glad v. Thomas County Nat. Bank*, No. 87-1299-C, 1991 WL 201186, at *2 (D. Kan. Sept. 10,

1991) (repeating court's jury instruction from trial).

Plaintiffs' claim against CITGO fails for an obvious and fundamental reason:  CITGO is

not a party to the retail transactions between plaintiffs and CITGO's franchisees; that is,

plaintiffs do not create any "agreement" with CITGO when they purchase motor fuel at retail.

*See* Flagg Decl. ¶¶ 3-5; Flagg Dep. 24:22-25:6.  And, as explained above, plaintiffs cannot hold

CITGO vicariously liable for some alleged breach by a franchisee because CITGO does not

control franchisee operations.  *See*, *e.g.*, *Smith-Hoy v. AMC Property Evaluations, Inc.*, 862

N.Y.S.2d 513, 516 (N.Y. Sup. Ct. App. Div. 2008) (dismissing breach of contract claim brought

against franchisor alleging that franchisor was vicariously liable for actions of franchisee because

"[a]bsent proof of a principal/agency relationship or proof that a franchisor exercised a high

degree of control over its franchisee, there is no basis for holding a franchisor responsible for its

franchisee's misconduct").

**B.      It Is Undisputed That CITGO Has No Control Over the Activities That
        Allegedly Harmed Plaintiffs and Therefore It Cannot Be Liable Under the
        Kansas Consumer Protection Act.**

Plaintiffs allege that defendants engaged in a number of "deceptive acts and practices"

involving the pricing, advertising and dispensing of motor fuel at retail in violation of the KCPA.

Compl. ¶ 87.  In order to successfully bring an action under the KCPA, a plaintiff must show:

(1)     that he or she is a consumer, K.S.A. 50-634;

(2)     that the defendant is a supplier, K.S.A. 50-626;

(3)     that the defendant "engage[d] in any deceptive act or practice in connection with a consumer transaction," *id.*; and

(4)     the plaintiff was "aggrieved" by the alleged violation of the act, K.S.A. 50-634. *See Porter v. Merck & Co., Inc.*, No. 04-CV-586, 2005 WL 3719630, at *2 (Kan. Dist. Ct. Aug. 19, 2005) ("K.S.A. 50-634 grants to an aggrieved consumer the right to bring an action to obtain a declaratory judgment or injunction and may bring an action to recover damages and civil penalties.").

As explained above, CITGO does not "engage" in any of the allegedly "deceptive" conduct about which plaintiffs complain.  CITGO does not, either directly or by "controlling" the relevant conduct of independent retail stations, price the motor fuel sold to plaintiffs, advertise a price per gallon at the pump, or make decisions concerning how motor fuel at retail is dispensed.

Though CITGO may be a "supplier" as defined by the KCPA, the analysis does not change.  The statute defines supplier as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer."  K.S.A. 50-624(l). Regardless of whether CITGO is a supplier under the Act, plaintiffs still must satisfy the *third* element of their KCPA claim — that CITGO actually *engaged* in the alleged deceptive practices. *See*, *e.g.*, K.S.A. 50-626(a) ("No supplier *shall engage* …") (emphasis supplied); K.S.A. 50-623(b) ("This act shall be construed liberally to promote the following policies … to protect consumers from *suppliers who commit* deceptive and unconscionable practices" (emphasis supplied)); *Skeet v. Sears, Roebuck & Co.*, 137 F.R.D. 347, 350 (D. Kan. 1991) ("Under the KCPA, a plaintiff may bring a class action to recover actual damages caused by a *defendant's violation* of any of the express proscriptions contained in K.S.A. 50-626 or 50-627.") (emphasis supplied).  Nothing in the KCPA or interpreting case law suggests that liability may be imposed

on an upstream entity, such as a manufacturer, whenever a downstream reseller commits a

deceptive act while selling the upstream entity's product, where the upstream entity did not

actually commit or control the deceptive act.

      **C.**    **It Is Undisputed That Retail Consumers Confer No Direct Benefit on CITGO by Making Purchases at Retail, and Therefore CITGO Cannot Be Liable under a Theory of Unjust Enrichment.**

Plaintiffs allege that they "conferred a benefit upon the Defendants by purchasing the

Defendants [*sic*] Motor Fuel at the prevailing posted rate, when the Motor Fuel was dispensed at

a temperature greater than 60 degrees Fahrenheit."  Compl. ¶ 94.  Under Kansas law, an unjust

enrichment claim has three elements:  "(1) a benefit conferred upon the defendant by the

plaintiff; (2) an appreciation or knowledge of the benefit by the defendant; and (3) the

acceptance or retention by the defendant of the benefit under such circumstances as to make it

inequitable for the defendant to retain the benefit without payment of its value."  *T.R. Inc. of

Ashland v. Brandon*, 87 P.3d 331, 336 (Kan. Ct. App. 2004).  Plaintiffs' unjust enrichment claim,

like their breach of contract claim, fails because plaintiffs did not confer an actionable benefit on

CITGO through their retail purchases; any benefit was conferred on the independent, franchised

stations from which plaintiffs purchased their gasoline.

The entire thrust of plaintiffs' complaint is that current retail motor fuel sales practices

"benefit retailers" (Compl. ¶ 55) because retailers purchase temperature adjusted fuel at

wholesale but do not resell that same fuel on a temperature adjusted basis to retail consumers

(Compl. ¶ 47).  CITGO, however, does not engage in this practice.  In fact, CITGO's wholesale

customers choose whether they purchase from CITGO on a temperature adjusted basis (Flagg

Dec. ¶ 5), and CITGO has sold fuel to its Kansas wholesale customers on a non-temperature

adjusted basis (Decl. of Alan Flagg in Support of CITGO's Oppositions to Plaintiffs' Motions

for Class Certification [Dkt. No. 1321-17] at ¶ 5).  In other words, CITGO is indifferent to its branded retailers' purchase and resale choices because it is not benefitted by retailers' resale on a non-temperature adjusted basis.

To say that CITGO received some sort of attenuated, indirect benefit from plaintiffs' purchases does not salvage the claim.  A number of states have held that in order to succeed under an unjust enrichment theory, the plaintiff must have *directly* conferred a benefit on the defendant.[10]  Although no Kansas court has addressed the issue, the Tenth Circuit has indicated that under Kansas law, an indirect claim of unjust enrichment is untenable.  In *Spires v. Hospital Corp. of America*, plaintiffs brought an unjust enrichment claim against a parent corporation of the subsidiary hospitals where plaintiffs were allegedly injured by inadequate medical and nursing staffing levels.  289 Fed. Appx. 269, 270 (10th Cir. 2008) (unpublished).  The Tenth Circuit upheld the dismissal of plaintiffs' unjust enrichment claim because they "failed to allege that deceased family members had actually conferred a benefit on [the parent corporation]" and had "pointed to nothing in Kansas law that supports an indirect unjust enrichment claim against [the parent corporation] for payments made to subsidiary hospitals."  *Id.* at 273.  Here, the relationship between CITGO and the retail stations to which plaintiffs made payments is even more remote than that between the defendant parent corporation and its subsidiaries in *Spires*.  Because plaintiffs did not purchase motor fuel from CITGO, and therefore conferred no direct

---

[10] *St. Petersburg v. Dayco Prods., Inc.*, No. 06-20953-CIV, 2008 WL 5428172, at *8 (S.D. Fla. Dec. 30, 2008) (granting summary judgment because plaintiffs had *indirectly* purchased the defendants' products from a distributor and "had no dealing with" the defendants); *Rivers v. Amato*, No. CIV. A. CV-00-131, 2001 WL 1736498, at *4 (Me. Super. Ct. June 22, 2001) (granting summary judgment on Maine unjust enrichment claim where plaintiff did not allege that he "directly. . .conferred a benefit on [d]efendants"); *In re Bayou Hedge Funds Investment Litig.*, 472 F. Supp. 2d 528, 532 (S.D.N.Y. 2007) ("The benefit must be 'specific' and 'direct' in order to support an unjust enrichment claim."); *Baker Const. Co., Inc. v. City of Burlington*, 2009 WL 3350747 , at *6 (N.C. Ct. App. Oct. 20, 2009) ("[T]his Court has limited the scope of a claim of unjust enrichment such that the benefit conferred must be conferred directly from plaintiff to defendant, not through a third party."); *In re Relafen Antitrust Litig.*, 225 F.R.D. 14, 28 (D. Mass. 2004) ("Here, the benefits that [defendant]received were obtained most directly from wholesalers,

benefit upon it, summary judgment should be entered in CITGO's favor on plaintiffs' unjust enrichment claim.

### III. PLAINTIFFS HAVE ADMITTED THAT CITGO DID NOT PARTICIPATE IN THE ALLEGED CONSPIRACY, AND THEREFORE SUMMARY JUDGMENT SHOULD BE GRANTED IN CITGO'S FAVOR ON COUNT I.

Finally, plaintiffs' conspiracy claim provides no basis to keep CITGO in this litigation. In response to CITGO's statement of undisputed facts contained in CITGO's previously filed motion for summary judgment (CITGO's Statement of Facts [Dkt. No. 743] at ¶ 44), plaintiffs admitted that CITGO did not participate in the alleged conspiracy (Plaintiffs' Resp. to CITGO's Facts [Dkt. No. 909] ¶ 44).  Accordingly, there is no genuine issue of material fact with respect to plaintiffs' conspiracy claim, and summary judgment should be granted in CITGO's favor on that claim as well.

### CONCLUSION

For the foregoing reasons, CITGO respectfully requests that the Court grant summary judgment in its favor on all counts.

Respectfully submitted,

Dated:  December 17, 2010         __/s Nathan P. Eimer_____
Nathan P. Eimer
Vanessa G. Jacobsen
EIMER STAHL KLEVORN & SOLBERG LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Phone:  (312) 660-7600
Fax:  (312) 692-1718
neimer@eimerstahl.com
vjacobsen@eimerstahl.com

---

who, in turn, obtained benefits from end payors.  Because its precedent casts doubt on the end payors' unjust enrichment claims, North Dakota ought also be grouped with the excluded exemplar states.").

David E. Everson
STINSON MORRISON HECKER LLP
1201 Walnut Street, Suite 2900
Kansas City, MO  64106
Phone:  (816) 691-3108
Fax:  (816) 412-1131
devereson@stinson.com

Attorneys for Defendant
CITGO PETROLEUM CORPORATION

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on December 17, 2010, the foregoing was electronically filed using the ECF system, which will automatically send e-mail documentation of such filing to all persons registered for ECF as of that date and by email to plaintiffs' liaison counsel.


        ____/s Nathan P. Eimer_____