IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: MOTOR FUEL TEMPERATURE | ) | |
| SALES PRACTICES LITIGATION | ) | |
| | ) | MDL No: 1840 |
| (This Document Relates to All Cases) | ) | |
| | ) | No: 07-md-1840-KHV-JPO |

**DECLARATION OF DAVID R. HENDERSON**

David R. Henderson, under penalty of perjury, declares:

1.      This declaration is based upon my personal knowledge. If called as a witness, I can competently testify to the following.

**Professional Experience**

2.      I am an Associate Professor of Economics at the Naval Postgraduate School, a position I have held since 1986, a Research Fellow at the Hoover Institution, a Senior Fellow at the National Center for Policy Analysis, and a Contributing Editor to *Reason* magazine. I hold a Ph.D. in Economics from the University of California, Los Angeles. I also hold a Master's in Economics from University of California, Los Angeles, and a bachelor's degree in science from the University of Winnipeg.

3.      I have held a variety of other positions in universities, think tanks, and the federal government. I was an Assistant Professor in the Graduate School of Management at the University of Rochester from 1975 to 1979; a Senior Policy Analyst and Editor of *Policy Report* at the Cato Institute from 1979 to 1980; a Visiting Assistant Professor in the Department of Economics for the University of Santa Clara, 1980 to 1981; a Special Assistant to the Assistant

Secretary of Labor for Policy, Evaluation, and Research from 1981 to 1982; a Senior Economist

for the Council of Economic Advisers from 1982 to 1984. I was also the John M. Olin Visiting

Professor at the Washington University Center for the Study of American Business in 1994. I

have taught at the Economics Institute for Federal Judges at George Mason University School of

Law in 1996 to 1997 and 2002. I regularly wrote for *Fortune* magazine from 1984 to 2000.

4.      In my government, think-tank, and academic career, I have extensive experience,

*inter alia*, in constructing, analyzing, and using economic models. I have testified multiple times

before Congressional committees and U.S. Government agencies. I have also testified once in

litigation, for the plaintiffs in *Northbay Healthcare Group v. Kaiser Foundation Health Plan,

Inc.*, Case No. FCS 026967 (Solano County, Cal. Superior Ct.) in 2008 and 2009.

5.      I am the editor of *The Concise Encyclopedia of Economics* (2008) and *The

Fortune Encyclopedia of Economics* (1993), and have written multiple books, book chapters,

monographs, and peer-reviewed articles about economics and public policy. A CV, current as of

March 2009, is attached as Exhibit 1.

6.      The Center for Class Action Fairness has asked me to evaluate the March 26,

2010, affidavit of Dr. Andrew Safir, and the economic arguments made on behalf of the objectors

Amy Alkon and Nicolas Martin in Docket Nos. 1578, 1615, and 1645. I have also been asked to

evaluate whether the proposed injunctive relief is a benefit to the putative class of customers who

purchased gasoline at Costco. I have looked at those materials, as well as Docket Nos. 1596,

1598, 1663, 1707, and the modified proposed settlement 1769.1, which I understand is materially

identical to the one Dr. Safir evaluated.

## Lack of Benefit to the Class from the Settlement

7.      The main allegation of this litigation is that gasoline, like all liquids, expands with temperature; plaintiffs allege that there is consumer fraud when gasoline is purchased at a temperature higher than 60 degrees because the swellage reduces the number of fuel molecules in a gallon of gasoline.

8.      The proposed settlement requires Costco to phase in temperature-adjusted measurement of gallons at the pump. The class is defined as "All residents of the States at Issue who, between January 1, 2001 and the date of this Agreement [some time in 2011], who purchased motor fuel from Costco at a temperature above 60 degrees Fahrenheit . . ." Agreement § 2.1.

9.      Dr. Safir calculates that this adjustment will have an economic value to the class of over $105 million. But Dr. Safir's calculations are based on faulty premises and methodology. It is not the sort of modeling that an economist in a peer-reviewed publication would perform. Dr. Safir's analysis is not reliable.

10.     For example, Dr. Safir's calculation assumes that the purchasers of Costco gasoline in 2019 are identical to the class members who purchased gasoline between 2001 and 2011, and attributes all of those 2019 purchases to the class. But this is clearly not so: Costco will attract new customers between 2011 and 2019 who are not class members. Therefore, Dr. Safir's assumption is erroneous.  Dr. Safir provides no explanation or justification or analysis supporting this assumption underpinning his analysis.

11.     More important, Dr. Safir assumes that the benefit of an increase in the average size of a "gallon" will completely redound to consumers, and that Costco has no ability to pass on its increased costs—and increased value--with an increased price reflecting the larger size of a

Declaration of David R. Henderson
No. 07-md-1840

gallon. This is economically irrational. Costco is not stupid. If Costco is selling larger "gallons," there is no reason to think that it will not raise its price. Nothing in the settlement requires Costco to charge the same price for its gasoline, rather than raise it the few pennies necessary to reflect the temperature adjustment.

12.     Indeed, in paragraph 13 in his report, Dr. Safir assumes that Costco will pass along the "annual costs of converting the Costco's [sic] existing fuel dispensers to ATC devices." Dr. Safir provides no explanation or justification or analysis supporting his assumption that Costco will treat the additional costs of larger gallons differently than it will treat the additional costs of conversion. This is exactly backwards: if Costco is going to swallow a cost, it is more likely to be the fixed costs of conversion rather than the marginal cost of providing larger average gallons of gasoline.

13.     To correctly calculate the pass-through or lack of pass-through of higher marginal costs, an economist must evaluate the elasticity of demand for gasoline, the degree of market power the vendor has to mark up the price, and the cross-elasticity of demand versus other gasoline vendors. Dr. Safir performed none of these calculations and none of this analysis, and provides no explanation for this critical assumption underpinning his conclusion. Instead he just speculated that the pass-through rate for increased capital costs would be 100% while the pass-through rate for increased marginal costs would be 0%. Not only is this speculation, but also it is internally inconsistent.

14.     I am aware of the Court's statement that it "has no reason to believe that market pressures would allow" Costco to alter its prices in response to the settlement. Docket No. 1707 at 49. With all due respect to the Court, it is unreasonable to adopt a default position that, in a market economy, competitors will be unable to alter prices in response to changes in their

demands and costs.  A profit-maximizing company will *want* to alter their prices under these circumstances.  This is most clear in the case where a firm has market power, that is, the ability to raise its prices without losing all its customers.  But it is even true in the extreme and unlikely case of what economists call "perfect competition."  Perfect competition is a situation in which no firm has any power over prices and so each firm must take the price as given, that is, must be a "price-taker."  It would seem on its face that in such a situation, Costco would have no power to pass on increases its marginal costs.  But the change is not just on the cost side.  It is also on the demand side.  Even if customers regard other brands of gasoline as perfect substitutes for Costco gasoline (one of the necessary conditions for perfect competition), informed customers will not regard *one gallon* as a perfect substitute for another gallon.  Once a substantial fraction of customers learn that at a certain temperature, a gallon of Costco gasoline is worth more than a gallon of another gasoline, the amount they are willing to pay will rise by a few pennies.  And Costco will have an incentive to advertise the fact that at a certain temperature, customers will get more gasoline for a given gallon than its competitors are offering.  In that way, a substantial number of customers will become informed.  Finally, the burden rests on the proponents of the settlement to show why Costco would *not* change its prices in response to the settlement.  This is yet another area where Dr. Safir's analysis is completely lacking.

15.     To see why all gallons are not the same, consider a hypothetical example.  This example will demonstrate why Dr. Safir's calculations make no economic sense. Imagine a class action settlement that requires a seller of eggs to redefine a "dozen" as "eighteen" instead of "twelve." When the egg seller sells a "dozen eggs," it will raise its prices to reflect the fact that it is now selling eighteen eggs instead of twelve. But according to Dr. Safir's assumptions, the hypothetical class action settlement would force the egg seller to give away six eggs for free with

every sale of a dozen eggs—even though nothing in the settlement dictates the price that the egg seller offers. This is clearly false, and demonstrates why Dr. Safir's analysis is not reliable.

16.     Pages 4 and 5 of the Alkon Objectors' Response to the Plaintiffs' April 1 Briefing (Docket No. 1645) demonstrate why "fairness benefits" are not a benefit to the class as a whole.

17.     In the "fairness" example, customer A buys ten gallons of 60-degree gasoline at $2/gallon; Customer B shows up at the pump in the heat of the afternoon, and buys ten gallons of 90-degree gasoline at $2/gallon.  Customer B will get 2% less power from her "hot gas" due to swellage, despite paying the same price as Customer A.  But temperature adjustment will not mean that the dealer will be giving away free gasoline:

|  | Status quo | After ATC |
|---|---|---|
| Customer A, who buys gas at 60 degrees on average, pays | $30.00 for 10.0 gallons of gasoline, or $3.00/gallon. | $30.30 for 10.0 gallons of temperature-adjusted gasoline, or $3.03/gallon. |
| Customer B, who buys gas at 90 degrees on average, pays | $30.00 for 10.0 gallons of gas, which equals 9.8 gallons of temperature-adjusted gas, or an adjusted rate of $3.06/gallon. | $30.30 for 10.0 gallons of temperature-adjusted gasoline, or $3.03/gallon. |
| In total, Costco is selling | 19.8 gallons of temperature-adjusted gas for $60.00, or $3.03/adjusted gallon. | 20.0 gallons of temperature-adjusted gasoline for $60.60, or $3.03/gallon. |

18.     Because of rounding to the nearest penny, in this particular example, based on plaintiffs' oral argument, the two consumers are technically paying 0.01% less for gasoline.  This should not be construed as a benefit to the class: with different numbers in the example, rounding could have consumers paying 0.01% more.  On average, rounding will neither be a benefit nor a cost to consumers.

19.     The status quo, where Customer A pays less on average for her gasoline than Customer B does, is an example of what is called "cross-subsidization": a wealth transfer from one class plaintiff consumer to another class plaintiff consumer, rather than from defendant vendors to plaintiff consumers. Note that the cross-subsidization would occur even if Customer A's or Customer B's average-temperature purchase were below or above sixty degrees: so long as consumers purchase gas at different temperatures on average and there is no temperature adjustment, the consumers buying gas at higher temperatures will be implicitly subsidizing the consumers buying gas at lower temperatures.

20.     The only thing temperature adjustment will do in the "fairness" example is make Customer A worse off at the expense of Customer B. This is not a benefit to the class; it is a redistribution of consumer surplus within the class. Although some consumers will win, others will be worse off; in total, it will be a wash. The class as a whole receives no benefit.

21.     In Docket No. 1663, the plaintiffs claim that the term "cross-subsidization" applies only to the context of "price-fixing and anti-trust violation." This claim demonstrates the lack of economic understanding and reliability behind their arguments: cross-subsidization can apply in many microeconomic contexts without any allegation of price-fixing or antitrust violations. For example, in air travel, business travelers who buy their plane tickets at the last minute cross-subsidize vacation travelers who purchase cheaper tickets long in advance.  In grocery stores, consumers who take the time to cut coupons are cross-subsidized by those who do not.  In most American electricity markets, universal service requirements mean that urban consumers cross-subsidize rural consumers who are more expensive to service. Eliminating cross-subsidization may or may not be "fair," but there is no reason to think it benefits consumers as a whole, rather than some consumers at the expense of others.

Declaration of David R. Henderson
No. 07-md-1840

22.     I thus conclude that (a) Dr. Safir's expert report is not reliable, is based on speculative assumptions, and does not use the methodology that professional economists would use in analyzing the benefits of this settlement to the class; that (b) Dr. Safir's conclusion that the class would realize over $105 million in injunctive relief is based on erroneous premises; that (c) there is no evidence that ATC will benefit the class; and that (d) the supposed "fairness" aspect of ATC will serve only to eliminate some cross-subsidization among class members, is thus on average just as likely to adversely affect a class member as benefit a class member, and thus cannot be considered a benefit to the class as a whole.

Dated: Monterey, CA
February 17, 2011

_/s/ David R. Henderson_
David R. Henderson

Declaration of David R. Henderson
No. 07-md-1840

8