## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: MOTOR FUEL TEMPERATURE | ) | |
| SALES PRACTICES LITIGATION | ) | |
| | ) | **MDL No. 1840** |
| **[This Document Relates To All Cases.]** | ) | **Case No. 07-1840-KHV** |
| | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on <u>Defendants' Motion In Limine To Exclude Portions Of The Expert Report And Testimony Of Richard Suiter</u> (Doc. #2643) filed November 1, 2011. Under Rule 702, Fed. R. Evid., and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and its progeny, defendants move to exclude portions of the report and testimony of plaintiffs' expert, Richard Suiter.  For the following reasons, the Court sustains defendants' motion in part.

### Legal Standard

Federal Rule of Evidence 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Fed. R. Evid. 702, the Court has a "gate-keeping obligation" to determine the

admissibility of all expert testimony.  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)).  Expert testimony is admissible only if it is both relevant and reliable.  Id.  The touchstone of the Court's inquiry is whether the testimony helps the factfinder understand evidence or determine a fact in issue.  BioCore, Inc. v. Khosrowshahi, 183 F.R.D. 695, 699 (D. Kan. 1998).  Courts have broad discretion in deciding whether to admit expert testimony, but should resolve doubts in favor of admissibility.  Id.; Kieffer v. Weston Land, Inc., 90 F.3d 1496, 1499 (10th Cir. 1996); see Fed. R. Evid. 702 advisory committee's note; Daubert, 509 U.S. at 588-89.

The Court must determine at the outset whether an expert will testify to scientific, technical or other specialized knowledge that will help the trier of fact understand or determine a fact in issue. Daubert, 509 U.S. at 592-93; see Fed. R. Evid. 104(a), 702.  This requires a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and whether the expert can properly apply it to the facts in issue.  Daubert, 509 U.S. at 592-93; see Fed. R. Evid. 104(a), 702.  The purpose of this inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire, 526 U.S. at 152.  It is therefore important that the expert's opinion be testable, i.e. capable of being challenged in some objective sense, and not just a subjective opinion that cannot reasonably be assessed for reliability.  Fed. R. Evid. 702 advisory committee's note; see Kumho Tire, 526 U.S. at 149-53; Daubert, 509 U.S. at 590.

Experience alone – or experience combined with other knowledge, skill, training, or education – may provide a sufficient foundation for expert testimony.  Fed. R. Evid. 702 advisory

committee's notes.  Indeed, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  Id.  The Court's gate-keeping function, however, requires more than simply "taking the expert's word for it."  Id.  A witness relying solely or primarily on experience must give a sufficient explanation of how the experience leads to the conclusion reached.  Id.; see United States v. Fredette, 315 F.3d 1235, 1240 (10th Cir. 2003).

An expert may offer an opinion even if it "embraces an ultimate issue to be determined by the trier of fact."  Fed. R. Evid. 704.  But an expert may not simply tell the jury what result it should reach.  United States v. Simpson, 7 F.3d 186, 188 (10th Cir. 1993).  An expert witness's personal belief as to the weight of evidence would invade the province of the jury.  Lawrence v. Raymond Corp., No. 3:09 CV 1067, 2011 WL 3418324, at *4 (N.D. Ohio Aug. 4, 2011); Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp.2d 431, 435 (D. Del. 2004).  Expert opinions that address matters which are equally within the competence of the factfinder to understand and decide are not helpful to the factfinder and therefore inadmissible.  McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir. 1988) (citing Fed. R. Evid. 701-02); see Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994).

The Court's gatekeeping function is not meant to supplant "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . .  [as] the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596 (citation omitted).  As the proponents of expert testimony, plaintiffs bear the burden of establishing admissibility under Rule 702.  Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001).

**Background Information**

Richard Suiter worked in the field of weights and measures for over 37 years.  From 1970 to 1997, he worked for the Nebraska weights and measures program in a variety of positions including state laboratory metrologist, field inspector, program manager and assistant director. Declaration Of Richard Suiter, Exhibit 1 to Plaintiffs' Memorandum In Opposition To Defendants' Motion To Exclude Expert Report And Testimony Of Richard Suiter ("Plaintiffs' Opposition") (Doc. #3089) filed December 6, 2011 ¶ 1.  As state metrologist, Suiter performed laboratory metrology duties like maintaining calibration of Nebraska's primary standards, secondary standards and field inspection standards to ensure accuracy and traceability to the United States prototype standards of weights and measures.  Id.  As field inspector, Suiter tested commercial weighing and measuring devices for accuracy and technical correctness based on the appropriate regulatory requirements.  Id. ¶ 2.  As assistant director, he supervised and trained both the field inspection staff and the laboratory metrology staff.  Id. ¶ 3.

In the early 1980s, Suiter was elected to serve as chairman of the Northwestern Weights and Measures Association, which subsequently became the Central Weights and Measures Association. Id. ¶ 4.  In 1985, he was appointed to the Central Weights and Measures Association Specifications and Tolerances ("S&T") Committee for several years and served as committee chair several times. Id. ¶ 5.  This regional committee reviews proposals to clarify, amend or add technical regulations related to commercial weighing and measuring devices such as motor fuel dispensers.  Id.

In 1990, Suiter was appointed to a five-year term on the National Conference of Weights and Measures ("NCWM") S&T Committee.  He served as committee chairman in 1995.  Id. ¶ 6.  The NCWM S&T Committee oversaw issues related to the design, testing, tolerances and user

requirements for most weighing and measuring devices in commercial use in the United States, including liquid measuring devices.  Id. ¶ 6.  The requirements and standards adopted through the NCWM S&T Committee are published in the National Institute of Standards and Technology ("NIST") Handbook 44: Specifications, Tolerances, and Other Technical Requirements for Weighing and Measuring Devices.[1]  Id. ¶ 6.

---

[1]      NIST is an agency of the U.S. Department of Commerce.  Regarding its Office of Weights and Measures ("OWM"), the NIST website states as follows:

> The [OWM] promotes uniformity in U.S. weights and measures laws, regulations, and standards to achieve equity between buyers and sellers in the marketplace.  This enhances consumer confidence, enables U.S. businesses to compete fairly at home and abroad, and strengthens the U.S. economy.

> OWM partners with [NCWM], an organization of State and local weights and measures officials and representatives of business, industry, consumer groups, and Federal agencies, to develop U.S. standards in the form of uniform laws, regulations, and methods of practice.  OWM serves as the U.S. representative to the International Organization of Legal Metrology . . . to bring efficiency and cost savings to U.S. manufacturers and other stakeholders doing business overseas, through the promotion of harmonized international standards and regulatory practices.

> OWM ensures traceability of state weights and measures standards to the SI [International System of Units, commonly known as the metric system]; develops procedures for legal metrology tests and inspections, and conducts training for laboratory metrologists and weights and measures officials.  OWM provides guidance on the model weights and measures laws and regulations adopted by the NCWM and coordinates the development and publication of key NCWM publications.

http://www.nist.gov/pml/wmd/index.cfm (last visited Feb. 6, 2012).

Each year, NIST publishes Handbook 44 to provide technical requirements "to eliminate from use, weights and measures and weighing and measuring devices that give readings that are false, that are of such construction that they are faulty (that is, that are not reasonably permanent in their adjustment or will not repeat their indications correctly), or that facilitate the perpetration of fraud, without prejudice to apparatus that conforms as closely as practicable to the official standards."  NIST Handbook 44 (2012 ed.) at 1.

(continued...)

5

In 1993, Suiter became the first certified trainer for the National Training Program ("NTP")

of the NCWM.  Id. ¶ 7.   That certification recognized his ability to conduct training courses

sanctioned and/or developed by NCWM related to commercial weighing and measuring devices.

Id.

In 1995, Suiter was elected to the NCWM Executive Committee (now called the NCWM

Board of Directors) for three years.  Id. ¶ 8.

In 1997, Suiter joined the NIST's Office of Weights and Measures as weights and measures

_____

[1](...continued)
Handbook 44 explains the source of its information as follows:

The specifications, tolerances and other technical requirements in this handbook
comprise all of those adopted by [NCWM].  NCWM is supported by [NIST], which
provides its Executive Secretary and publishes some of its documents.  NIST also
develops technical publications for use by weights and measures agencies; these
publications may subsequently be endorsed or adopted by NCWM.

The [NCWM S&T Committee], acting at the request of the Conference or upon its
own initiative, prepares with the technical assistance of the [NIST], proposed
amendments or additions to the material adopted by NCWM . . . .  Such revisions,
amendments, or additions are then presented to NCWM as a whole, where they are
discussed by weights and measures officials and representatives of interested
manufacturers, industries, consumer groups, and others.  Eventually the proposals
of the Committee, which may have been amended from those originally presented,
are voted upon by the weights and measures officials . . . .  A national consensus is
required on all items adopted by the NCWM.  A specification, tolerance, or other
technical requirement is adopted when a majority of the states' representatives, and
other voting delegates favoring such adoption, vote for approval.

All of the specifications, tolerances, and other technical requirements given herein
are recommended by NCWM for official promulgation in and use by the states in
exercising their control of commercial weighing and measuring apparatus. A similar
recommendation is made with respect to the local jurisdictions within a state in the
absence of the promulgation of specifications, tolerances, and other technical
requirements at the state level.

Id.

6

coordinator. Id. ¶ 9. There, his responsibilities included serving as technical advisor to the National Type Evaluation Technical Committee Measuring Sector and Multiple Measuring Devices Work Group. Report Of Richard Suiter, Exhibit A to Defendant's Motion To Exclude Suiter (Doc. #2645) at 15. Suiter was responsible for technical training of the National Type Evaluation Program ("NTEP") laboratories in the area of liquid measuring devices. Id. He also provided guidance and training to laboratories and state and local weights and measures officials and served as technical advisor to the NCWM S&T Committee. Id. As technical advisor, he conducted research, analyzed technical issues and provided guidance to committee members. Id.

From 1997 until he retired in 2008, Suiter served as a primary technical advisor to several NCWM standing committees, ad hoc advisory committees that addressed device-specific issues and technical working groups. Declaration Of Richard Suiter ¶ 10. During this time, Suiter served as technical advisor to the NCWM S&T Committee and assumed the role of lead technical advisor in 2001. Id. ¶ 11. In this capacity, he provided extensive support to committee member deliberations, including drafting technical regulatory proposals, providing technical input regarding research and development and developing and providing analysis of the impact of proposed regulatory changes on the marketplace (buyers and sellers) and weights and measures field enforcement. Id.

Also, from 1998 to 2008, Suiter was an editor of Handbook 44. Id. ¶ 12. In that role, he worked extensively with technical regulatory codes and other sections of the Handbook that apply to all commercial weighing and measuring devices, including devices that use automatic temperature compensation ("ATC") and retail motor fuel dispensers ("RMFDs"). Id.

At NIST, Suiter consulted with the technical advisor to the NCWM Laws and Regulations ("L&R") Committee regarding issues that overlapped between the technical requirements of

Handbook 44 and method of sale requirements outlined in Handbook 130: Uniform Laws and Regulations in the Areas of Legal Metrology and Engine Fuel Quality.[2]  Id. ¶ 13.

At NIST, Suiter also served as an administrator of the NTEP.  Id. ¶ 14.  In that position, he was responsible for providing oversight and technical expertise, including training, to participating state NTEP laboratories and technical personnel.  Id. ¶ 14.  NTEP and participating state NTEP laboratories are responsible for conducting evaluations of prototype weighing and measuring devices submitted by manufacturers to ensure technical compliance with Handbook 44 prior to their

_____

[2]     NIST publishes Handbook 130, which compiles the latest uniform laws and regulations and related interpretations and guidelines adopted by NCWM.  See NIST Handbook 130 (2012 ed.) at iii.  Handbook 130 states that the purpose of the uniform laws and regulations is "to achieve, to the maximum extent possible, uniformity in weights and measures laws and regulations among the various states and local jurisdictions in order to facilitate trade between the states, permit fair competition among businesses, and provide uniform and sufficient protection to all consumers in commercial weights and measures practices."  Regarding the source of its uniform laws and regulations, Handbook 130 states, in part, as follows:

> The [NCWM L&R Committee] (the Committee), acting at the request of NCWM or upon its own initiative, prepares with the technical assistance of [NIST], proposed amendments or additions to the material adopted by NCWM . . . .  Such revisions, amendments, or additions are then presented to NCWM as a whole where they are discussed by weights and measures officials and representatives of interested manufacturers, industries, consumer groups, and others.  Eventually the proposals of the Committee, which may have been amended from those originally presented, are voted upon by the weights and measures officials, following the voting procedures in the NCWM Bylaws.  A national consensus is required on all items adopted by the NCWM.  A Uniform Law or Regulation is adopted when a majority of the states' representatives, and other voting delegates favoring such adoption, vote for approval.

> All of the Uniform Laws and Regulations given herein are recommended by NCWM for adoption by states when reviewing or amending their official laws and regulations in the areas covered.  A similar recommendation is made with regard to the local jurisdictions within a state in the absence of the promulgation of such laws and regulations at the state level.

NIST Handbook 130 (2012 ed.) at 1.

introduction into the marketplace.  Id.

When the NTEP was negotiating a mutual recognition agreement with Canada to provide a cooperative process in evaluating RMFDs, Suiter represented NIST (which at that time managed and administered NTEP) throughout the process.  Id. ¶ 17.  Among other responsibilities, this involved participating in the evaluation of an RMFD at the Canadian laboratory, which is now a participating and authorized NTEP laboratory.  Id.

In late 2006, when NCWM was considering whether to implement automatic temperature compensation ("ATC") for RMFDs, Suiter authored proposed changes to the Liquid Measuring Devices Code in Handbook 44 to enable the implementation and evaluation of ATC.  Id. ¶ 18. A number of proposed changes were aimed at providing transparency and equity for all parties to any transaction conducted using an RMFD with an active ATC feature.  Id.

In early 2007, the NCWM formed the ATC Steering Committee.  Id. ¶ 19.  The Director of NIST's weights and measures division selected Suiter to represent the NIST on the seven-member committee.  Id.  The Steering Committee was appointed to assist the NCWM S&T and L&R Committees in researching and evaluating the technical and practical considerations of implementing retail ATC for motor fuel dispensers.  Id.  Among other things, their work involved developing technical specifications and testing procedures that could be specifically proposed to NCWM.  Id.

In June of 2007, when the United States House of Representatives' Subcommittee on Domestic Policy held Congressional hearings to investigate the "hot fuel" situation at issue in this case, NIST appointed Suiter as its official spokesperson.  Suiter provided written and oral testimony to Congress alongside industry executives, consumer advocates, the current NCWM chairman and other invitees.  Id. ¶ 20.

9

During his career in weights and measures, Suiter authored many proposals for changes to Handbook 44 codes which have subsequently been adopted by the NCWM and incorporated into relevant model regulations.  Id. ¶ 23.  An underlying premise in all such proposals has been to create fairness and transparency in the marketplace, thereby providing equity to all parties to any transaction which involves using a commercial weighing or measuring device.  Id.  Equity in the marketplace is the motto of NCWM and the driving purpose of the weights and measures field.  Id.

During his time as technical advisor to the NCWM S&T Committee, Suiter worked alongside a co-technical advisor from Measurement Canada, the Canadian national weights and measures agency.  Id. ¶ 26.  Their goal was to harmonize the weights and measures technical requirements of their respective countries.  Id.  Ted Kingsbury was the Measurement Canada representative for much of that time.  Id.  Kingsbury also served as technical advisor to the NCWM ATC Steering Committee.  Id.  He and Suiter often discussed technical and practical issues related to the implementation of retail ATC in Canada, including inspection and testing, consumer acceptance and industry participation.  Id.

Despite his retirement, Suiter currently serves as a member of the NCWM Task Group on Retail Motor Fuel Dispenser Price Posting and Computing Capability, which is charged with reviewing and proposing changes to the Liquid Measuring Devices Code of Handbook 44 to address rapidly changing practices for marketing retail motor fuels, e.g. retailer loyalty card programs and other product discount programs, and to ensure full disclosure and transparency to the purchaser. Id. ¶ 27.  After more than a year of discussion, Suiter authored a proposal for changes to Handbook 44 that address several issues with which the committee was struggling.  Id.  The task group accepted the proposal with only minor changes and will present it to the entire NCWM for

consideration in 2012.  Id.

**Analysis**

In his expert report, Suiter presents the following opinions:

1.    The effect that thermal expansion has on petroleum products, including motor fuel, is recognized by the petroleum industry, as well as weights and measures officials, and is accounted for through temperature compensation.

2.    While the U.S. petroleum industry temperature compensates petroleum products in virtually all non-retail transactions, it has resisted and blocked efforts to temperature compensate retail motor fuel sales.

3.    The petroleum industry voluntarily uses ATC-equipped dispensers in Canada because temperature compensated retail sales work to their economic advantage in the colder climate.

4.    Retail motor fuel transactions must account for temperature in order to be consistent, transparent and fair to consumers.

5.    Use of available ATC equipment on RMFDs would be the most effective, most efficient and most practical means to properly account for the effects of temperature in retail motor fuel sales.

6.    There are alternative methods that the petroleum industry could adopt to provide greater consistency, transparency and fairness to consumers.

Report Of Richard Suiter, Exhibit A to Defendant's Motion To Exclude Suiter (Doc. #2645) at 2-12.

Defendants seek to exclude the second, third, fourth and sixth opinions on grounds that Suiter is not qualified to testify as an expert on those matters.  Specifically, regarding the second and third opinions, defendants assert that Suiter is not qualified to opine about the motives, conduct or profitability of the petroleum industry.  Regarding the fourth and sixth opinions, defendants assert that Suiter is not qualified to opine as to the consistency, transparency and fairness of methods of accounting for temperature of retail motor fuel.  Regarding the sixth opinion, defendants also assert that Suiter is not qualified to opine as to hypothetical alternatives to ATC at retail.  Defendants do

not challenge the first and fifth opinions.[3]

## I.   Opinion No. 2

Suiter's second opinion states as follows:

While the U.S. petroleum industry temperature compensates petroleum products in virtually all non-retail transactions, it has resisted and blocked efforts to temperature compensate retail motor fuel sales.

<u>Suiter Report</u> at 4.[4]

In a three-page explanation of this opinion, Suiter states, <u>inter alia</u>, the following: (1) the U.S. petroleum industry recognizes that temperature has a dramatic effect on the measurement of petroleum products and that most transactions above the retail level use standardized gallons, <u>i.e.</u> a U.S. petroleum gallon, defined as 231 cubic inches of fuel at 60 degrees Fahrenheit; (2) weights and measures officials have recognized the commercial inequity of not compensating petroleum sales for decades, but the petroleum industry has steadily resisted efforts to implement temperature compensation at the retail level because it was not to its economic advantage; (3) originally, the

---

[3]      Defendants state that they seek to exclude the fifth opinion but make no arguments that specifically address the substance of that opinion. <u>Compare</u> <u>Suiter Report</u> (Doc. #2645-2) at 10-12 <u>with</u> <u>Memorandum Of Law In Support Of Defendants' Motion In Limine To Exclude Portions Of The Expert Report And Testimony Of Richard Suiter</u> ("<u>Defendants' Memorandum</u>") (Doc. #2645) at 1, 8-9.  In one sentence of his three-page discussion the fifth opinion, Suiter states that using ATC in retail transactions "is a more consistent, transparent, and fair sales method."  To the extent defendants object to this sentence of the report, for reasons stated below with respect to defendants' objections to Suiter's fourth opinion, the Court finds that Suiter may testify from a weights and measures perspective as to the relative consistency and transparency of using ATC in retail motor fuel transactions, but not to relative fairness.

[4]      Plaintiffs plan to offer the second opinion to support (1) the third element of their consumer protection claims, <u>i.e.</u> that defendant engaged in a deceptive or unconscionable practice; (2) the second and third elements of their unjust enrichment claims, <u>i.e.</u> that defendant appreciated or knew of the benefit and accepted or retained the benefit under unjust circumstances; (3) all elements of their civil conspiracy claims; and (4) their claims for injunctive and declaratory relief. <u>See</u> <u>Plaintiffs' Designations Of Expert Testimony By Phase Of Trial</u> (Doc. #3299) filed January 31, 2012.

resistance was not limited to retail sales: a few decades ago independent motor fuel marketers sued major oil companies alleging that the failure to sell motor fuel at wholesale on a temperature-adjusted basis was an unfair trade practice; (4) documents from defendants regarding ATC devices in Canada recognize that temperature compensation at all levels of distribution makes the most commercial sense; (5) today's marketplace has changed such that underground storage tanks now have double and triple walls which effectively insulate the fuel from the effect of ground temperature, higher volume stations receive deliveries several times a week or sometimes daily, in many cases the temperature of fuel going into the tank is well above 60 degrees Fahrenheit and in the short time the fuel remains in the storage tank it has little chance to cool to a temperature near 60 degrees Fahrenheit; (6) the petroleum industry continues to resist reasonable and thoughtful attempts to amend NIST Handbooks 44 and 130 to better facilitate the use of RMFDs equipped with ATC; (7) Suiter has personally witnessed long lines of petroleum marketers and industry trade association lawyers and lobbyists fighting to block all efforts to make it easier for consumers to get a fair shake through use of retail ATC; (8) the industry has resisted ATC in the United States because it is more profitable to continue selling motor fuel on a purely volumetric basis; (9) internal documents from several defendants show that the industry benefits financially by maintaining the status quo at retail; (10) given the financial benefits to retailers in warm states, it is no surprise that they vigorously resist every attempt to implement ATC at retail.  Id. at 4-7.

Defendants assert that a monolithic "petroleum industry" does not exist – that "hundreds of competing companies . . . sell motor fuel at retail, each of which have their own operations, management, and opinions regarding ATC."  Defendants' Memorandum (Doc. #2645) at 5. Defendants cite no evidence to support their assertion.  Defendants' objection to Suiter's use of the

term "petroleum industry" goes to the weight of the evidence and is subject to cross-examination on that basis. It does not disqualify Suiter from testifying as an expert witness.

Defendants assert that Suiter cannot testify as an expert regarding the motivation of an undefined petroleum industry or the profitability of selling motor fuel at retail by a volumetric gallon. These objections do not challenge Suiter's testimony that the petroleum industry has resisted and blocked efforts to temperature compensate retail motor fuel sales.[5] Rather, they challenge only those portions of his opinion which state that profitability is the reason behind the industry's efforts in this regard.

An expert witness may not speculate as to the intent or motives of parties or others. See Ebonie S. ex rel. Mary S. v. Pueblo Sch. Dist. 60, 2011 WL 1755208, at *13 (D. Colo. May 5, 2011); In re Rezulin Prods. Liab. Litig., 309 F. Supp.2d 531, 546-47 (S.D.N.Y. 2004) (inferences about intent or motive of parties or others lie outside bounds of expert testimony). The question of intent is a classic jury question and not one for the experts. In re Diet Drugs, No. MDL 1203, 2000 WL 876900, at *9 (E.D. Pa. June 20, 2000). See also In Re Diet Drugs, No. MDL 1203, 2001 WL 454586, at *2 (E.D. Pa. Feb.1, 2001) (excluding expert testimony regarding "what the corporate intent of [defendant] and/or what beliefs of FDA officials were on matters upon which they spoke or acted"). Thus, Suiter may not speculate as to the motivation behind the petroleum industry's efforts to resist or block efforts to temperature compensate retail motor fuel sales. To the extent that he has personal knowledge of such motivation, however, through personal observation or

---

[5] For the first time in their reply brief, defendants assert that "Suiter's bald assertion that the 'petroleum industry' exerted pressure on weights and measures officials is beyond the confines of his subject area." See Reply Memorandum Of Law In Support Of Defendants' Motion In Limine To Exclude Portions Of The Expert Report And Testimony Of Richard Suiter ("Defendants' Reply") (Doc. #3156) filed December 30, 2011 at 5-6. The Court disagrees. This matter is clearly within the scope of his experience and other opinions.

communications with industry representatives, participants or lobbyists, among others, his testimony is fair game.[6]

With respect to the second opinion, Suiter's testimony is inadmissible to the extent that it merely speculates as to the motivation of the petroleum industry to resist or block efforts to temperature compensate retail motor fuel sales.

## II.    Opinion No. 3

Suiter's third opinion states as follows:

The petroleum industry voluntarily uses ATC-equipped dispensers in Canada because temperature compensated retail sales work to their economic advantage in the colder climate.

Suiter Report at 7.[7]

Defendants assert that Suiter cannot testify regarding the motivation behind petroleum

---

[6]    Defendants assert that Suiter has no personal knowledge and that his opinion is based solely on his review of documents selected by plaintiffs' counsel. See Defendants' Motion (Doc. #2645) at 6. In his report, Suiter states as follows: "In my own experience, I have personally witnessed the long lines of petroleum marketers and industry trade association lawyers and lobbyists fighting to block all efforts to make it easier for consumers to get a fair shake through the use of retail ATC." Suiter Report at 6. In a footnote to that statement, Suiter states as follows: "Documents produced by defendants also confirm the petroleum industry's attempts to exert pressure on weights and measures officials and dissuade pump manufacturers from bringing ATC-equipped RMFDs to market." Id. at 6 n.11. In support of their assertion that Suiter's opinion is based only on his review of documents picked by plaintiffs' counsel, defendants cite only the footnote and ignore the statement that Suiter has personally witnessed industry representatives, participants and lobbyists fighting to block ATC. The record does not support defendants' assertion that Suiter has no personal knowledge on the matter. Furthermore, defendants cite no authority for the proposition that experts may not review documents provided by counsel.

[7]    Plaintiffs plan to offer the third opinion to support (1) the third element of their consumer protection claims, i.e. that defendant engaged in a deceptive or unconscionable practice; (2) the second and third elements of their unjust enrichment claims, i.e. that defendant appreciated or knew of the benefit and accepted or retained the benefit under unjust circumstances; (3) the first four elements of their civil conspiracy claims, i.e. everything except injury; and (4) their claims for injunctive and declaratory relief. See Plaintiffs' Designations Of Expert Testimony By Phase Of Trial (Doc. #3299) filed January 31, 2012.

industry conduct in Canada.  For reasons stated above, the Court finds that Suiter may not speculate as to the motivation of the petroleum industry in Canada.  See Pueblo School Dist., 2011 WL 1755208, at *13; In re Rezulin Prods., 309 F. Supp.2d at 546-47.  To the extent that he has personal knowledge of such motivation, however, through personal observation or communications with industry representatives, participants or lobbyists, among others, his testimony is fair game.[8]

---

[8]      Defendants assert that Suiter has no personal knowledge and his opinion is based solely on documents selected by plaintiffs' counsel.  See Defendants' Motion (Doc. #2645) at 6-7. Regarding the basis for his opinion that the petroleum industry promoted ATC in Canada, Suiter testified as follows:

| | |
|---|---|
| Q. | Your statement that the petroleum industry promoted ATC in Canada is based on a document from a single Defendant? |
| A. | That, plus information that I had in my discussions with particularly Ted Kingsbury, but other Canadian officials as well said that the industry as a whole supported the implementation of ATC. |
| Q. | You have no personal knowledge as to whether the petroleum industry promoted ATC in Canada, correct? |
| | * * * |
| A. | Again other than what I just said, I don't have any additional knowledge, no. |
| Q. | Your knowledge is based on reading some documents in the case and talking to people up in Canada? |
| A. | That's correct. |
| Q. | In the next paragraph you state "The real motivation for the industry's voluntary switch to ATC in Canada was the fact that they knew moving to ATC in a cold environment like Canada would increase their profits by giving consumers less gasoline for the same price": do you see that? |
| A. | Yes. |
| Q. | Who in the industry are you referring to here? |
| A. | Again, it was from some documents that I saw, inner agency documents that indicated what I described earlier that they were purchasing at one temperature and, in fact, we are selling it cooler and at the present time without ATC we would actually be standing to lose, but with ATC we actually would gain I think was the gist of the document. |
| Q. | This statement here is based on reading some documents you were given by the Plaintiffs' lawyers in the case? |
| A. | That's correct. |
| Q. | It's fair to say you have not spoken to a single Canadian gas company to find out why they decided to implement ATC at retail in Canada, correct? |

(continued...)

### III.     Opinion No. 4

Suiter's fourth opinion states as follows:

Retail motor fuel transactions must account for temperature in order to be consistent, transparent and fair to consumers.

<u>Suiter Report</u> at 8.[9]

Defendants contend that the relative consistency, transparency or fairness of one method of sale over another is one of personal opinion. Defendants contend that Suiter has no knowledge about how adopting ATC at retail would affect consumers and that he has done no economic or other analysis in that regard. Defendants argue that Suiter's opinion invades the province of the jury because whether ATC is consistent, transparent or fair is a lay determination for the jury to make.

Plaintiffs contend that Suiter's opinions are reliable because he bases them on considerable

---

[8](...continued)

A.     Not with that specific question in mind, no.

 * * *

Q.     But whether any Canadian gas company actually made more money by installing ATC at retail, you have no idea, correct?

A.     Whether or not they ultimately did would only be my opinion. I don't have anything that is – you know, any type of monetary document that would actually show that they did.

Deposition of Richard Suiter, Exhibit C to <u>Defendants' Motion</u> (Doc. #2645) 222:21-24:22, 225:13-19. Based on this testimony, it appears that Suiter's opinion is based on discussions with his weights and measures counterparts in Canada, as well as his review of documents in the case. The record does not support defendants' assertion that Suiter has no personal knowledge on the matter.

[9]     Plaintiffs plan to offer the fourth opinion to support (1) the third and fourth elements of their consumer protection claims, <u>i.e.</u> that defendants engaged in a deceptive or unconscionable practice and plaintiffs were aggrieved as a result; (2) the second and third elements of their unjust enrichment claims, <u>i.e.</u> that defendants appreciated or knew of the benefit and accepted or retained the benefit under unjust circumstances; (3) the fifth element of their civil conspiracy claims, <u>i.e.</u> that defendants' conduct caused injury to plaintiffs; and (4) their claims for injunctive and declaratory relief. <u>See</u> <u>Plaintiffs' Designations Of Expert Testimony By Phase Of Trial</u> (Doc. #3299) filed January 31, 2012.

17

technical expertise and experience as a weights and measures official. See Plaintiffs' Opposition (Doc. #3089) at 13. In support, plaintiffs submit a declaration by Suiter which states that during his career in the weights and measures field, he authored many proposals for changes to Handbook 44 codes which have subsequently been adopted by the NCWM and incorporated into relevant model regulations. With regard to such proposals, Suiter further states as follows:

> An underlying premise . . . was to create fairness and transparency in the marketplace, thereby providing for equity to all parties to any transaction conducted using a commercial weighing or measuring device. Equity in the marketplace is the motto of the NCWM and the driving purpose of the weights and measures field.

Suiter Declaration ¶ 23.

Plaintiffs also point to the report of Steven Malone, defendants' expert who worked for 35 years at the Nebraska Department of Agriculture, Division of Weights and Measures. See Report Of Steven Malone, attached as Exhibit E to Defendants' Reply (Doc. #3156) at 1. In his report, Malone makes the following statements:

> Equity is a primary goal, and Weights and Measures officials work to assure equity among buyers and sellers. The Weights and Measures system in the U.S. strives for the best possible measurement method (consistent and accurate) but does so in light of the burden, cost and effect on business.
> * * *
> State Weights and Measures agencies are consumer protection and service agencies charged with ensuring fairness in the marketplace.
> * * *
> Weights and Measures officials ensure that consumers get what they pay for.
> * * *
> The realm of Weights & Measures is to ensure the consumer's ability to make price and quantity comparisons, not value comparisons.
> * * *
> The mandated disclosure of temperature would therefore not be any more fair or more transparent than the current method of sale, because it wouldn't help consumers make accurate and meaningful comparisons[.]

Id. at 11-14.

18

Plaintiffs also point to the NIST website, which states that NIST's vision is to "be the world's leader in creating critical measurement solutions and promoting equitable standards." http://www.nist.gov/public_affairs/mission.cfm (last visited Feb. 6, 2012).

The Court finds that Suiter has specialized knowledge and experience in weights and measures which will assist the trier of fact in understanding the evidence and determining the relative consistency and transparency of accounting for temperature in retail motor fuel transactions.

Unlike consistency and transparency, fairness is primarily in the eye of the beholder. Determining what is more fair, less fair or unfair, requires subjective comparisons that are difficult to assess for reliability. See Daubert, 509 U.S. at 590. Although it appears that weights and measures officials strive to create "fairness" in the marketplace, the factfinder alone should assess whether temperature correction at retail would be more fair than the status quo. See Sims v. Great Am. Life Ins. Co., 469 F.3d 870, 889 (10th Cir. 2006); In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2012 WL 205893, at *3 (D. Kan. Jan. 19, 2012); Sawyer v. Sw. Airlines Co., 243 F. Supp.2d 1257, 1268 (D. Kan. 2003).

Suiter may therefore testify regarding the relative consistency and transparency of accounting for temperature in retail motor fuel transactions, but not fairness.

## IV.    Opinion No. 6

The sixth opinion in Suiter's report states as follows:

There are alternative methods that the petroleum industry could adopt to provide greater consistency, transparency and fairness to consumers.

Suiter Report at 12.[10]

––––––––––––––––––––

[10]    Plaintiffs plan to offer the sixth opinion to support (1) the third element of their consumer protection claims, i.e. that defendants engaged in a deceptive or unconscionable practice; (continued...)

In explaining this opinion, Suiter states that although ATC is the proven and accepted means to fully remedy lack of consistency, transparency and fairness to consumers, the following alternative methods of sale would increase consistency, transparency and fairness in retail motor fuel transactions: (1) rebates or price reductions when motor fuel temperature exceeds 60 degrees Fahrenheit;[11] (2) displaying motor fuel temperature;[12] (3) providing information as to the effect of temperatures different than 60 degrees Fahrenheit;[13] and (4) displaying motor fuel temperature and providing information as to the effect of temperatures different than 60 degrees Fahrenheit.[14] See Suiter Report at 12-14.

Defendants assert that Suiter's proposed alternatives to ATC are only speculative "options" and not real-world solutions. See Defendants' Motion (Doc. #2645) at 10. In support of this assertion, defendants cite deposition testimony by Suiter stating that the proposed options would not

---

[10](...continued)
(2) the third element of their unjust enrichment claims, i.e. that defendants accepted or retained the benefit under unjust circumstances; and (3) their claims for injunctive and declaratory relief. See Plaintiffs' Designations Of Expert Testimony By Phase Of Trial (Doc. #3299) filed January 31, 2012.

[11]     Suiter states that rebates or price reductions would increase consistency and fairness of retail motor fuel transactions but would not necessarily improve a consumer's ability to comparison shop for the best price values because he or she may not know the applicable discount or rebate until after the fuel is dispensed. See Suiter Report at 13 n.42.

[12]     Suiter states that displaying motor fuel temperature would improve consumer ability to comparison shop. See Suiter Report at 13.

[13]     Suiter states that providing information regarding how temperature affects motor fuel volume and energy content would bring greater transparency to retail transactions. See Suiter Report at 14.

[14]     Suiter states that displaying motor fuel temperature along with information about how temperature affects motor fuel would make retail transactions more transparent and increase consumer ability to comparison shop. See Suiter Report at 14.

necessarily be the best solution.  See id. (citing Suiter Depo. at 76:8-77:10, 261:9-17, 245:22-246:7).

This testimony is consistent with Suiter's statement in his report that "ATC is the proven and accepted means to fully remedy the lack of consistency, transparency, and fairness to consumers." The report goes on to state that the petroleum industry could nevertheless adopt other measures – short of implementing ATC – to increase transparency and fairness of retail motor fuel transactions. Suiter Report at 12.

Defendants assert that Suiter is not qualified to testify as to the relative consistency, transparency and fairness of alternative methods of retail motor fuel sales.  See Defendants' Memorandum (Doc. #2645) at 8-9.  For reasons stated above, the Court finds that Suiter may testify from a weights and measures perspective as to relative consistency and transparency of alternative methods of sale, but not to relative fairness.

Defendants assert that Suiter has not considered the feasibility or costs of his proposed alternative methods or the possibility that they could result in consumer confusion.  See Defendants' Memorandum (Doc. #2645) at 11.  Plaintiffs respond that defendants' arguments go to the weight of the evidence, not its admissibility, and that defendants do not cite legal authority which supports their position.[15]  But it is plaintiffs who bear the burden of establishing admissibility under Rule 702.

---

[15]      Defendants cite Smith v. Ford Motor Co., 215 F.3d 713 (7th Cir. 2000), United States v. Rice, 52 F.3d 843 (10th Cir. 1995) and Maguire v. Nat'l R.R. Passenger Corp., No. 99 C 3240, 2002 WL 472275 (N.D. Ill. March 28, 2002).
        In Smith, an automobile accident case, the court stated that an expert's hypothetical explanation of the possible or probable causes of an event must have "analytically sound bases" so that they are more than mere "speculation" by the expert.  215 F.3d at 718-19.
        In Rice, a criminal tax fraud case, the Tenth Circuit found that the district court properly excluded proposed expert testimony by a former prosecutor regarding whether he would have filed a case against defendant based on the evidence which the government had in its possession.  52 F.3d at 846-47.  The Tenth Circuit found that the proposed expert was not really called upon to supply specialized knowledge but to speculate and hypothesize.  Id. at 847.  The Tenth Circuit stated that
(continued...)

Ralston, 275 F.3d at 970 n.4.

On this record, the Court finds that to the extent Suiter proposes to testify whether alternative methods of sale would provide greater consistency and transparency regarding thermal expansion of motor fuel, such testimony appears to be reliably based on his specialized knowledge and experience in the field of weights and measures. In particular, Suiter has extensive experience in the field of weights and measures, which strives to achieve equity in the marketplace by using the best possible measurement method based on consistency and accuracy in light of the burden, cost and effect on business. See Report Of Steven Malone at 11. The record is less clear, however, as to whether Suiter has specialized knowledge in determining feasibility of the proposed alternative methods. Plaintiffs present no evidence in this regard. On this record, therefore, the Court agrees with defendant's argument. Before Suiter may express this opinion at trial, plaintiffs must show that he has specialized knowledge and experience in determining feasibility of the proposed alternative methods and that in reaching his opinion, he has in fact considered feasibility. On this record, it does not appear that he has done so, and to that extent the Court sustains defendants' motion in limine.

---

[15](...continued)
hypothesis may be an appropriate subject for expert testimony when it is based on conclusions from established evidentiary facts, but the proposed expert testimony there was based entirely on pure surmise. Id.

In Maguire, plaintiff, a train conductor who was assaulted by a rail passenger, alleged that the railroad negligently failed to provide a reasonably safe workplace. To support her claim, plaintiff presented expert testimony on premises security as to steps the railroad could have taken to prevent the assault. 2002 WL 472275, at *3-5. The district court found that the proposed testimony was not reliable because (1) the expert did not review all of the factual evidence available to him before reaching his conclusions; (2) the expert relied solely on personal experience in reaching his conclusions; (3) the expert gave no thought to the feasibility or cost of the proposed measures and did not attempt to test his conclusions or quantify the resulting improvement on safety; and (4) the expert did not reliably connect the railroad's failure to implement his suggested safety procedures with the assault on plaintiff. Id. at *5-6.

**IT IS THEREFORE ORDERED** that <u>Defendants' Motion In Limine To Exclude Portions Of The Expert Report And Testimony Of Richard Suiter</u> (Doc. #2643) filed November 1, 2011 be and hereby is **SUSTAINED in part**.

With regard to the second and third opinions, Suiter may not speculate as to (1) motivation behind the petroleum industry's efforts to resist or block efforts to temperature compensate retail motor fuel sales; and (2) motivation behind the petroleum industry's conduct in Canada.  To the extent that Suiter has personal knowledge of such motivation, his testimony is fair game.

With regard to the fourth and sixth opinions, Suiter may not testify regarding the relative "fairness" of ATC or other methods of accounting for temperature in retail motor fuel transactions.

With regard to the sixth opinion, Suiter may not testify at trial regarding the feasibility of alternative methods of sale unless plaintiffs show that he has specialized knowledge and experience in determining feasibility and that in reaching his opinion, he has in fact considered feasibility.

Defendants' motion is otherwise **OVERRULED.**

Dated this 6th day of February, 2012 at Kansas City, Kansas.

s/  Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

23