IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: MOTOR FUEL TEMPERATURE | ) | |
| SALES PRACTICES LITIGATION | ) | |
| | ) | MDL No: 1840 |
| (This Document Relates to All Cases) | ) | |
| | ) | No: 07-md-1840-KHV-JPO |

**ALKON OBJECTORS' OBJECTION TO AMENDED SETTLEMENT**

COME NOW Amy Alkon and Nicolas S. Martin ("Objectors"), members of the putative class, to object to the proposed settlement between Plaintiffs and Defendant Costco Wholesale Corp. ("Costco") and hereby give notice that they intend to appear at any Fairness Hearing through their counsel, Theodore H. Frank.

In further support hereof, Objectors provide the following memorandum and authorities.

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................3

I.   Prospective Injunctive Relief Fails To Compensate Class Members. .................................4

II.  The Injunctive Relief is Economically Worthless And Will Harm Class Members Who Must Subsidize The Cost Of Settlement. ..........................................................................8

III. Some Class Members Receive More Gas From Volumetric Gallons Than They Would With Automatic Temperature Compensation ("ATC") "Gallons." .................................13

IV.  The Class Representatives Are Self-Dealing. ....................................................................14

V.   Class Counsel Is Impermissibly Self-Dealing. .................................................................16

    A.   A District Court Must Protect Absent Class Members' Interests. .........................16

    B.   This Settlement Has Multiple Signs of *Bluetooth* Self-Dealing. ...........................18

VI.  Inferring Class Approval From a Small Number of Objections Is Inconsistent With Both Rule 23 and Good Public Policy. .......................................................................................22

CONCLUSION.......................................................................................................24

PROOF OF SERVICE.............................................................................................26

## INTRODUCTION

Class members Amy Alkon and Nicolas S. Martin renew their objection and oppose approval of the proposed amended settlement. In addition to the problems identified in their initial objection (Docket No. 1578), which they incorporate into this objection, the Alkon objectors submit additional evidence and argument against approval of this settlement, which gives the class nothing while rewarding class representatives who had nothing to do with the settlement $2,500 each, and the attorneys $10 million. This is the sort of abusive settlement that must be rejected if the Rule 23(e) concept of "fair, reasonable, and adequate" is to mean anything.[1]

*First*, as a matter of law, prospective injunctive relief is not a benefit to the class compensating the class for any alleged harm from consumer fraud. This settlement, based entirely on prospective injunctive relief, is thus impermissible. "The fairness of the settlement must be evaluated primarily based on how it compensates class members for these past injuries." *Synfuel Tech., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006) (Wood, J.).

*Second*, even if the court views prospective injunctive relief as a potential benefit to the class, the settling parties have failed to meet their burden proving that the injunctive relief is actually a benefit to the class. Their only evidence in support of this proposition, the declaration of

---

[1] As documented in their initial objection, Amy Alkon and Nicolas S. Martin are members of the class. Ms. Alkon (171 Pier Ave #280, Santa Monica, California 90405, (310) 306-6160) is a resident of California. Mr. Martin (7916 Meadowbrook Drive, Indianapolis, IN 46240-2659, (317) 683-0227.) is a resident of Indiana. Their signatures are available upon request. Both Ms. Alkon and Mr. Martin purchased gas from Costco on numerous occasions in the years prior to April 22, 2009. Ms. Alkon tends to purchase gasoline in the afternoon, and the average daytime temperature in Los Angeles is hotter than 60° F year-round, and so Ms. Alkon has almost certainly purchased gasoline above that temperature. The average daytime temperature in Indianapolis is hotter than 60° F from mid-April to October, so Mr. Martin has almost certainly purchased gasoline above that temperature. Mr. Martin prefers to purchase gasoline in the morning, when temperatures are cooler.

Dr. Andrew Safir, is inadmissible under *Daubert* because it relies upon speculation rather than sound economic analysis. *See* Declaration of Dr. David R. Henderson (Docket No. 1783-1). Moreover, the evidence is that the prospective injunctive relief will *not* be a benefit to the class. *Id.*

*Third*, the evidence is that the proposed injunctive relief will make some members of the class worse off. *Id.* ¶¶ 16-22. As such, the class is not cohesive and cannot be certified for purposes of injunctive relief.

*Fourth*, the proposed incentive awards to the representative plaintiffs are disproportionate and violate Rule 23.

*Fifth*, the settlement has impermissible indicia of self-dealing that demonstrate unfairness. *In re Bluetooth Prod. Liab. Lit.*, 654 F.3d 935 (9th Cir. 2011).

For these five independent reasons, in addition to the reasons given in the Alkon objectors' earlier objections, it would be reversible error to approve the amended settlement.

## I.      Prospective Injunctive Relief Fails To Compensate Class Members.

As an initial premise, let us agree that injunctive relief must be of material benefit to justify attorneys' fees under 28 U.S.C. § 1712(b). For example, a settlement that required the CEO of Costco to write "I will not defraud the class" a hundred times on a chalkboard is not the sort of injunctive relief that entitles attorneys to lodestar compensation.

But injunctive relief cannot just be free-flowing "good"; the fairness of a settlement is determined by the benefit ***to the class***—the putative clients of class counsel. One could conceive of a hypothetical settlement where, as part of the injunctive relief, Costco builds and endows a $200 million scholarship fund for impoverished children in Topeka. Certainly, the scholarship fund

---

is a social good; but it is not a benefit *to the class*. As such, it would be inappropriate to include it in the calculations of the fairness of the settlement *to the class*. A "district court ha[s] a fiduciary responsibility to the silent class members." *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2d Cir. 1987); *cf. also In re Washington Public Power Supply Sys. Lit.,* 19 F.3d 1291, 1302 (9th Cir. 1994). This Court has a "supervisory duty over class counsel while the class is still open . . . the district court must constantly scrutinize class counsel to determine if counsel is adequately protecting the interests *of the class*." *McNeil v. Guthrie,* 945 F.2d 1163, 1167 (10th Cir. 1991) (emphasis added); *cf. also Gottlieb v. Barry*, 43 F.3d 474, 490 (10th Cir. 1994) ("[T]he importance of safeguarding the class' interests cannot be underestimated."). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon*, 957 F.2d 697, 701 (9th Cir. 1992). *See also Diaz v. Trust Territory of Pacific Islands*, 876 F.2d 1401, 1408 (9th Cir. 1989) ("The district court must ensure that the representative plaintiff fulfills his fiduciary duty toward the absent class members"); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1308-09 (9th Cir. 1990) (charitable donation not tied to class is not a class benefit); *Mirfasihi*, 356 F.3d at 784 ("There is no indirect benefit to the class from the defendant's giving the money to someone else.").

So the fact that this settlement purports to provide benefits to future purchasers of Costco gasoline is not a benefit to the class. No changes in future Costco disclosures or sales practices will benefit consumers who were already misled by previous Costco statements. *True v. American*

*Honda,* 749 F. Supp. 2d 1052, 1077 (C.D. Cal. 2010) ("No changes to future advertising by Honda will benefit those who already were misled Honda's representations regarding fuel economy"). *Cf. also Figueroa,* 517 F. Supp. 2d at 1306, 1316, 1328-29 (rejecting coupon settlement despite settling parties' claim that prospective injunctive relief requiring changes in advertising would benefit the class). "The fairness of the settlement must be evaluated primarily based on how it compensates class members for these past injuries." *Synfuel,* 463 F.3d at 654.

Note that this is ***not*** an argument that injunctive relief is ***never*** a benefit to the class. There are class actions where a class can receive injunctive relief that addresses their past injuries. For example, *Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998), is an injunction-only settlement approved by the Ninth Circuit. *Hanlon* is not inconsistent with *Synfuel. Hanlon* was a case alleging a product defect, and class members received "a redesigned improved replacement latch to be installed free of charge." The class members here receive nothing—unless they happen by coincidence to overlap with future purchasers of Costco gasoline.

Here, there is no claim that the product is defective. The claim is that Costco is making misrepresentations. The proper analogy to this settlement would be if the *Hanlon* settlement, instead of installing a replacement latch, instead simply agreed that future vehicles would have a properly functioning latch (or, worse, agreed to disclose that the latch did not work). That hypothetical settlement, analogous to this one and the rejected settlements in *Synfuel, True,* and *Figueroa,* is both inferior to the one the Ninth Circuit approved in *Hanlon* and does not support a claim of benefit to the class.

A couple of other hypothetical consumer fraud class action settlements demonstrate the point. Imagine a settlement of *Seinfeld v. Kramer Non-Fat Yogurt,* where a class sues a shop selling "non-fat yogurt" that turns out to be full of fat. *Cf.* Larry David, "The Non-Fat Yogurt,"

---

*Seinfeld* (NBC Nov. 4, 1993). If the parties settled for injunctive relief whereby the defendant agreed to provide non-fat yogurt in the future, that would be of no benefit to the class for their ***previous*** injuries—even if, as here, there happened to be some overlap between the class members and the set of people who purchased non-fat yogurt in the future. The class members only benefit to the extent they make additional purchases from the defendant, and that benefit is presumably reflected in the price they pay for those new purchases.

Another example: imagine the hypothetical consumer fraud class action *Gatsby v. West Egg*, where the class sues over West Egg selling packages of a dozen eggs that only have ten eggs in them. If the parties settled with injunctive relief that required West Egg to include at least twelve eggs in every "dozen eggs" package, that again provides no benefit to the class for their ***previous*** injuries, even if, once again, there happened to be some overlap between the class members and the set of people who purchased West Eggs in the future. The lack of benefit becomes even more apparent if West raises its price for a "dozen" eggs from $2.00 to $2.40.

Note the problem of "leakiness" in both of these settlements that demonstrates the inherent illusory nature of prospective injunctive relief in a consumer class action. A defendant forced to change business practices by prospective injunctive relief can simply choose to pass along those additional costs to its customers: West Egg customers get 20% more eggs than before the settlement, but are paying 20% more for the package. There is no benefit even to future purchasers, much less the class. Similarly, here, the settlement requires Costco to change its business practices and that may mean that future customers get slightly more gasoline per "gallon" on average—but the settlement does not forbid Costco from raising prices to offset the additional marginal costs in its change in its business practices. Costco need only raise the price of gasoline a penny or three to transfer all of the additional benefit from the class back to itself. Because the

settlement does not prohibit such an offsetting price increase (or even a much higher price increase), the prospective injunctive relief in this settlement is inherently illusory to future customers as well as current ones.

The prospective injunctive relief cannot, as a matter of law, be considered a benefit to the class even if there were 100% overlap between beneficiaries and class members. This is an independent reason to reject the settlement.

## II.     The Injunctive Relief is Economically Worthless And Will Harm Class Members Who Must Subsidize The Cost Of Settlement.

The only evidence the settling parties present in support of the value of injunctive relief is the Declaration of Dr. Andrew Safir. On April 1, 2010, the morning of the fairness hearing, the plaintiffs presented the declaration of Dr. Andrew Safir, who presented calculations alleging that there were $100 million in benefits to the future Costco purchasers from injunctive relief.

But an examination of the Safir declaration shows that that there is nothing expert about his testimony: the only thing he does is *assume* that Costco will expand the size of the average gallon of gas it sells without raising the price at the pump for this additional expense, and then perform simple multiplication. But Safir gives no basis for this assumption—indeed, he contradicts it within the same declaration when he assumes that Costco will pass along to consumers the entire $2700/pump cost of reconfiguring gas stations to provide temperature-adjusted gasoline. Safir Declaration ¶ 13. Safir gives no economic reasoning to support his assumption of 0% pass-through of costs; he cites to no economic literature and performs no study showing that demand for gasoline is so elastic that vendors are at the mercy of their customers even when marginal costs rise.

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

Moreover, Safir admitted in deposition testimony that his theories were based entirely on speculation. Safir was asked under oath what price a retailer would charge if it began to sell fuel to consumers using ATC "net gallons" (or, as he put it, by selling in units of a "gallon plus") rather than a gallon. In response to that question, Dr. Safir admitted: "I have no idea what a retailer would or wouldn't do." Dep. of Andrew Safir, Ph.D. (Doc. No. 1309-1) at 88:24-25. Tellingly, in response to the Court's questioning at the preliminary approval hearing, Costco also declined to predict what would happen to its unit prices if it were to implement ATC. See April 1, 2010 Hr'g Tr. at 92:20-93:8 (Docket No. 1696).

Such a flimsy economic model would not pass muster in peer-reviewed economic literature, and, after *Daubert* and *Kumho Tire*, it does not pass muster in federal court, either. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993); *Kumho Tire v. Carmichael*, 526 U.S. 139 (1999); *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1079 (10th Cir. 2006); *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006) (excluding economic expert testimony calculating damages where entire calculation based on "underlying assumptions" without independent analysis of basis for assumptions); *First Savs. Bank, v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1084 (D. Kan. 2000) (excluding expert testimony on damages where expert "based his opinion on an assumption of the very fact that his report is intended to prove"); *In re Aluminum Phosphide Antitrust Litig.*, 893 F. Supp. 1497, 1504-07 (D. Kan. 1995).

An appeal to one's own authority coupled with an analysis-free conclusion is not sufficient: without the analysis that experts in the field would perform, the proposed evidence is inadmissible—even if the testifying expert is a Nobel Prize winner. *In re Brand Name Prescription Drugs Antitrust Litigation*, 1999 U.S. Dist. Lexis 550 (N.D. Ill. Jan. 19, 1999)

(excluding testimony of Nobel Prize-winning economist Robert Lucas when opinions not based on evidence), *aff'd on other grounds*, 186 F.3d 781 (7th Cir. 1999); *see generally Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert").

Expert testimony that is speculative is not competent proof and contributes "nothing to a 'legally sufficient evidentiary basis.'" *Weisgram v. Marley Co.*, 528 U.S. 440, 445, 454 (2000) (*citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993)). "Expert testimony is useful as a guide to interpreting market facts, but it is not a substitute for them." *Brooke Group Ltd.*, 509 U.S. at 242.

As the declaration of economic expert Dr. David R. Henderson shows, Dr. Safir's testimony is fraught with speculative premises and is not reliable. Henderson Decl. ¶¶ 7-15 (Docket No. 1783.1). His conclusions must be excluded from evidence.

The Declaration of Professor Klonoff (Docket No. 1820.1) does not change this analysis. Professor Klonoff *assumes*, without any evidence, that the injunctive relief is worth over $100 million. Klonoff Report ¶ 3. Professor Klonoff does not address the refutation of Dr. Henderson. Once the baseless premise that the injunctive relief in this case has any value to the class is removed from Professor Klonoff's report, as it must be, there is no basis for his conclusion. Alkon and Martin renew their motion to exclude Safir's testimony.

The proposed injunction is at best economically worthless because Costco can freely adjust the posted price of fuel to counteract any temperature correction. In the fast-moving market for the retail price of fuel, there's no reason to suppose that automatic temperature compensation will translate into *any* benefit to consumers, and the parties have provided no

evidence to the contrary, though the burden is on them to prove the fairness of the settlement. As economist David R. Henderson demonstrates, the change in the cost structure will be offset by changes in price; consumers will not be getting free gasoline, and will realize no benefit. Henderson Decl. ¶¶ 14-22. Any finding by the court that Costco would not pass on the additional marginal costs to consumers would be clearly erroneous.

Precisely for this reason, regulatory agencies have concluded that automatic temperature compensation ("ATC") would yield no economic benefit to consumers. The National Conference of Weights and Measures ("NCWM"), a group composed of state and local weights and measures officials, has rejected the use of ATC at retail. At its July 2009 National Conference, an NCWM committee withdrew two proposals that would have allowed or mandated ATC at retail. In reaching its decision, the committee reviewed reports and studies, as well as receiving public comments where an "overwhelming majority" were opposed to the measures. NCWM, *Addendum Sheet to the Interim Report of the Laws and Regulations Committee* (Docket No. 1343-18 at 3). The primary reasons for withdrawing the proposals "were conference consensus against ATC, economic cost factors, ***lack of benefit to consumers***, absence of uniformity in the marketplace, and the additional cost to Weights and Measures officials and service companies." *Id* (emphasis added). As part of its reasoning, the NCWM cited a thorough study by the state of California.

California regulators undertook a year-long cost-benefit analysis and concluded that automatic temperature compensation ("ATC") would result in no economic benefit, and that ATC would actually *harm* consumers because they would bear the costs of new equipment. In October 2007, the California legislature directed the California Energy Commission ("CEC"), in partnership with two other agencies, to complete a "comprehensive survey and cost benefit analysis" of temperature correction, including the utility of "[r]equiring the installation of

---

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

11

temperature correction or compensation equipment at the pump." Cal. Bus. & Prof. Code. § 13630. On March 11, 2009—20 days after the Settlement Agreement was signed—the five CEC Commissioners unanimously adopted its final 147-page report. The commission found that the "cost-benefit analysis concludes that the results are *negative or a net cost to society* under all the options examined." *Fuel Delivery Temperature Study* ("CEC Report")[2] at 1 (emphasis added). "It is also unlikely that there are any plausible circumstances consumers could receive a small net benefit with installed ATC devices at California's retail stations." *Id.*

The commission found that switching to ATC at retail would not result in savings, although the average size of "gallons" dispensed would increase. This is because "retail station owners will in fact raise their fuel prices to compensate for selling fewer units, all other things being equal." *Id.* at 105-6. Because gas retailers will adjust prices to maintain their profitability, "this potential benefit to consumers perceived by some stakeholders is not expected to materialize." *Id.* at 71. The installation of ATC at Costco is therefore economically worthless to the class.

Although the proposed settlement provides no benefit, class members who buy fuel from Costco will be forced to bear the costs of ATC. The CEC estimated the initial costs of installing ATC equipment at about $9,707–11,761 per station. *Id.* at 58. However, the costs would not be born by the retailers, but would instead be passed on to consumers; "the balance of evidence points to complete or near-complete pass-through of ATC-related costs from retail station owners to consumers." *Id.* at 106. Therefore, class members who continue to buy fuel from Costco will end up footing the bill for their own supposed injunctive relief.

---

[2] Cal. Energy Comm'n, *Fuel Delivery Temperature Study*, No. CEC-600-2009-002-CMF. Available online at http://www.energy.ca.gov/ transportation/fuel_delivery_temperature_study/documents/index.html

The proposed settlement is even worse than the CEC report estimates because class members will be forced to absorb the costs of the settlement itself, including attorneys' fees. Self-dealing settlements like those of Putative Class Counsel raise the costs to Costco of selling fuel, and raise prices to class members like Objectors without concomitant benefits. If attorneys' fees are awarded in a suit that makes consumers worse off, it creates the incentive for other attorneys to engage in socially wasteful class-action litigation that injures consumers.

The proposed settlement makes Costco members worse off than if the suit had never been brought, and such a settlement cannot imaginably be fair to the class, much less one entitling attorneys to fees. This is an independent reason to reject the settlement. Because class representatives are permitting this to happen, they do not meet the Rule 23(a)(4) standard for adequate representation. *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011); *see also Allen v. Dairy Farmers of America*, No. 09-cv-320, 2011 U.S. Dist. LEXIS 141898 (D. Vt. Dec. 9, 2011) (refusing to certify class where some class members will be made worse off by injunctive relief).

## III.   Some Class Members Receive More Gas From Volumetric Gallons Than They Would With Automatic Temperature Compensation ("ATC") "Gallons."

This Court cannot assume that class members would receive more fuel from ATC gallons than volumetric gallons. As Dr. Henderson's declaration demonstrates, the price of volumetric gallons adjusts to reflect average swellage. Thus the 50% of class members whose fuel purchases are at below-average fuel temperatures benefit from the *status quo* because they are cross-subsidized by the 50% of class members whose fuel purchases are at above-average fuel

temperatures; switching to ATC will make these class members worse off. Henderson Decl. ¶¶ 16-21.

In such a circumstance, the court cannot find the settlement adequate, or a benefit to the class: making some class members better off at the expense of other class members without increasing the total welfare of the class is not a class benefit. Moreover, it would be impermissible to certify such a class. *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (class certification is improper when the class definition included some members "who claim harm from the very same acts from which other members of the class have benefitted."); *Allen, supra*. "It is axiomatic that a plaintiff cannot maintain a class action when his interests are antagonistic to, or in conflict with, the interests of the persons he would seek to represent." *Albertson's, Inc. v. Amalgamated Sugar Co.*, 503 F.2d 459, 463 (10th Cir. 1974). The class is misdefined, and cannot be certified. This is an independent reason to reject the settlement.

## IV.    The Class Representatives Are Self-Dealing.

Though plaintiffs purport to represent and seek to bind thousands of absent class members, they have recovered cash for only for themselves and their attorneys. This insubstantial relief is striking because plaintiffs claimed that damages were on the order of "billions of dollars." Second Consolidated Amended Complaint (Docket No. 520-1 at ¶ 8). In other words, plaintiffs brought a multi-billion dollar lawsuit that they are settling for zero dollars, a 0% success rate.[3]

---

[3] Costco "sold more than $5 billion worth of gasoline in fiscal 2009." Costco, *FY 2009 Annual Report* at 4. This represents approximately 1% of the nation retail fuel market, so Costco's share of the "billions of dollars" of damages that plaintiffs alleged would be in the tens of millions of dollars.

Meanwhile, the representative class members receive $2,500 each and the attorneys are asking for $10 million.

In *Murray v. GMAC*, 434 F.3d 948, 952 (7th Cir. 2006), the Seventh Circuit held that a similar representative payment was "untenabl[y]" beyond the pale of approval:

> We treated the disproportion—$2,000 one class member, nothing for the rest—as proof that the class device had been used to obtain leverage for one person's benefit. [citations omitted]  Here the proposed award is $3,000 to the representative while other class members are frozen out. . . .
>
> Such a settlement is untenable. We don't mean by this that all class members must receive $100; risk that the class will lose should the suit go to judgment on the merits justifies a compromise that affords a lower award with certainty. [citation omitted]  But if the reason other class members get relief worth about 1% of the minimum statutory award is that the suit has only a 1% chance of success, then how could Murray personally accept 300% of the statutory maximum?  And, if the chance of success really is only 1%, shouldn't the suit be dismissed as frivolous and no one receive a penny?  If, however, the chance of success is materially greater than 1%, as the proposed payment to Murray implies, then the failure to afford effectual relief to any other class member makes the deal look like a sellout.

This settlement is even worse than the settlement criticized in *Murray* as "untenable."  In *Murray*, one class representative received $3,000, three times maximum possible statutory damages; here, there are five class representatives seeking $2,500 over an injury that optimistically amounts to a few dozen dollars. In *Murray*, the 1.2 million unnamed class members were entitled to split a fund of $947,000; here, an unknown number of millions of class members ended up with $0 in relief for their alleged past injuries. Here, the "success" of plaintiffs is an abysmal failure, greater than the failure criticized in Murray, and representative plaintiffs are seeking $2,500 in direct rewards after winning zero for all other class members. Many of the representative plaintiffs were recruited only for purposes of creating geographic subclasses in this amended settlement after Costco made it clear they would not contest the case, and faced no risk

of deposition or discovery. The $2,500 incentive payment is inappropriate when all these class members are doing is rubber-stamping what their attorneys want without input.

## V.  Class Counsel Is Impermissibly Self-Dealing.

When class counsel negotiates more monetary benefits for itself than for the class in a consumer class action over quantifiable pecuniary claims (as opposed to, for instance, class actions over civil rights), it must structure the settlement to permit the district court to potentially cure the self-dealing. Instead, class counsel negotiated a "kicker" clause in an attempt to shield their fee request: the fees would come from a separate pot of money, and any reversion would go to the defendant, rather than the class. This adversely affected the class's interests without any offsetting benefit: Costco was willing to put at risk $10 million in cash to settle the litigation. But this money is to be divided between Costco and class counsel, with no chance of it going to class counsel's putative clients. This is a breach of class counsel's fiduciary duty. "[F]unds generated through the aggregate prosecution of divisible claims are presumptively the property of the class members . . . ." American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.07 comment b. The class is unambiguously worse off from a provision that reverts fee-request denials to the defendant than to the class.

## A.  A District Court Must Protect Absent Class Members' Interests.

"The current case law on the criteria for evaluating settlements is in disarray." American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05 comment a at 205 (2010) ("*ALI Principles*").[4] The Tenth Circuit applies a four-factor test. *Rutter & Wilbanks Corp. v.*

---

[4] Appellate courts have previously endorsed reliance on Section 3 of the *ALI Principles* in evaluating class action settlements. *Klier v. Elf Atochem North America, Inc.*, 658 F.3d 468 (5th

*Shell Oil Co.*, 314 F.3d 1180 (10th Cir. 2002). But the factors it asks a court to evaluate are largely irrelevant: for example, one of the factors is whether "the judgment of the parties [is] that the settlement is fair and reasonable," but no settling party is going to badmouth their own settlement, no matter how unfair it is; another factor is "whether serious questions of law and fact exist," but, again, that's true for all cases whether or not the settlement is fair to unnamed class members. Alkon suggests that this Court formally adopt Section 3.05 of the *ALI Principles*. Section 3.05 is not inconsistent with *Rutter & Wilbanks*, but replaces the amorphous four-factor test with bright-line rules for settlement evaluation and approval that include evaluation of the sort of intra-class conflicts that the Tenth Circuit test ignores but that require reversal under Supreme Court precedent like *Amchem*.[5]

This Court has a "supervisory duty over class counsel while the class is still open . . . the district court must constantly scrutinize class counsel to determine if counsel is adequately

---

Cir. 2011); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2d Cir. 2007) (citing to Draft).

[5] Under § 3.05(a), there is first an initial four-part test that all settlements must meet: the court must consider whether

> (1) the class representatives and class counsel have been and currently are adequately representing the class;
>
> (2) the relief offered to the class… is fair and reasonable given the costs, risks, probability of success, and delays of trial and appeal;
>
> (3) class members are treated equitably (relative to each other) based on their facts and circumstances and are not disadvantaged by the settlement considered as a whole; and
>
> (4) the settlement was negotiated at arm's length and was not the product of collusion.

In addition to these four mandatory requirements, a "settlement may also be found to be unfair for any other significant reason that may arise from the facts and circumstances of the particular case." *Id.* § 3.05(b).

---

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

17

protecting the interests of the class." *McNeil v. Guthrie*, 945 F.2d 1163, 1167 (10th Cir. 1991)

Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs

that class counsel have allowed pursuit of their own self-interests … to infect the negotiations."

*Bluetooth*, 654 F.3d at 947 (*citing Staton v. Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003)).

Because of this fiduciary responsibility, it is inappropriate to create a "presumption of

fairness" for a settlement. Perhaps it might be appropriate to presume that class counsel is not

colluding with the defendant, but there is no reason to presume that class counsel is not

"allow[ing] pursuit of their own self-interests" to unfairly benefit themselves at the expense of the

class, given a court's "fiduciary responsibility to the silent class members." *Bluetooth*, 654 F.3d at

947; *Grant*, 823 F.2d at 23. "In reviewing a proposed settlement, a court should not apply any

presumption that the settlement is fair and reasonable." *ALI Principles* § 3.05(c). With or without

the presumption, however, this settlement cannot stand.

In short, it is not enough that the settlement happened to be at "arm's length" without

explicit collusion; the settlement must be objectively reasonable as well and avoid self-dealing by

the class counsel. "Because class actions are rife with potential conflicts of interest between class

counsel and class members, district judges presiding over such actions are expected to give careful

scrutiny to the terms of proposed settlements in order to make sure that class counsel are

behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.*, 356

F.3d 781, 785 (7th Cir. 2004) (Posner, J.).

**B.    This Settlement Has Multiple Signs of *Bluetooth* Self-Dealing.**

The concerns about the potential conflict of interest between class counsel and their clients

"warrant special attention when the record suggests that settlement is driven by fees; that is, when

counsel receive a disproportionate distribution of the settlement…" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998); *accord Bluetooth*, 654 F.3d at 947. "If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003); *accord Bluetooth*, 654 F.3d at 947.

There need not be explicit collusion to create the sort of self-dealing unfairness that benefits class counsel at the expense of their clients, only acquiescence: "a defendant is interested only in disposing of the total claim asserted against it" and "the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Staton*, 327 F.3d at 964 (*quoting In re General Motors Corp. Pickup Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 819-20 (3d Cir. 1995)); *accord Bluetooth*, 654 F.3d at 949; *Mirfasihi*, 356 F.3d at 785. Because of this, it is erroneous to conclude that once the prospect of express collusion is eliminated, the inquiry is therefore at an end: class counsel can achieve an impermissible self-dealing settlement simply through a defendant's indifference to the allocation. *Staton*, 327 F.3d at 964. Thus, courts judging the fairness of a settlement should not just simply ask whether a settlement was negotiated at arms' length, but whether the attorneys are unfairly pursuing their self-interest at the expense of the class. *Bluetooth*, 654 F.3d at 947; *id.* at 948 ("While the Rule 23(a) adequacy of representation inquiry is designed to foreclose class certification in the face of 'actual fraud, overreaching or collusion,' the Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations." (*quoting Staton,* 327 F.3d at 960)); *cf. also ALI Principles* § 3.05, *comment b* at 208 ("a proposed settlement in which the

class receives an insubstantial payment while the fees requested by counsel are substantial could raise fairness concerns").

*Bluetooth* suggests a nonexclusive list of three possible signs of self-dealing. *Bluetooth,* 654 F.3d at 947. Two of those signs of self-dealing are present here.

*First*, "counsel receive[d] a disproportionate distribution of the settlement." *Id.* (*quoting Hanlon*, 150 F.3d at 1021). Class counsel asks for $10 million for themselves, when the class received injunctive relief that should properly be valued at zero. As a practical matter, class counsel has requested the entire constructive common fund for itself. *GM Pick-Up*, 55 F.3d at 820 (3rd Cir. 1995) (severable fee structure "is, for practical purposes, a constructive common fund"); *id.* at 821 ("[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case."); *Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996) ("[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal."). "If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees" then "the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Manual for Complex Litigation* § 21.71 (4th ed. 2008).  "Even if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the negotiations." Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 266 (1985).[6]

---

[6] The fact that fees may not be negotiated until after the rest of the settlement makes no economic difference. The settling parties are rational economic actors. Even when the negotiations over

*Second*, the "parties arrange[d] for fees not awarded to revert to defendants rather than be added to the class fund." *Bluetooth,* 654 F.3d at 947. A "kicker arrangement reverting unpaid attorneys' fees to the defendant rather than to the class amplifies the danger" that is "already suggested by a clear sailing provision." *Id.* at 949. "[T]he kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.* The class is unambiguously worse off when any reduction in a fee award reverts to the defendant instead of the class. The only reason to negotiate that provision is for the self-serving effect of protecting class counsel by deterring scrutiny of the fee award. A court has less incentive to scrutinize a fee award, because the kicker combined with the clear sailing agreement means that any reversion will only go to the defendant that had already agreed to pay that amount. Charles Silver, *Due Process and the Lodestar Method*, 74 Tulane L. Rev. 1809, 1839 (2000) (such a fee arrangement is "a strategic effort to insulate a fee award from attack").

If "class counsel agreed to accept excessive fees and costs to the detriment of class plaintiffs, then class counsel breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal., Inc.,* 222 F.3d 1142, 1147 (9th Cir. 2000). Representatives whose attorneys that bring a class action solely for their own benefit at the expense of the class fail to meet the Rule

---

fees are severed, the parties know in advance that those negotiations are coming, that the defendants have a reservation price based on their internal valuation of the litigation, and that every dollar negotiated for the class reduces the amount the defendants are willing to pay class counsel; the defendants can further reasonably estimate in advance what plaintiffs will claim their lodestar to be from their own defense costs. Because these future fee negotiations are not an unexpected surprise, the overhang of the future fee negotiations necessarily infects the earlier settlement negotiations. This is invariably at the expense of the class when there is a separate fund for fees, because both class counsel and the defendants have an incentive to leave extra "space" for that future negotiation in a bifurcated negotiation that the parties do not need to have when it is simply negotiating for a single pot of money to go into a common fund. *Cf. Bluetooth,* 654 F.3d at 948 (neither presence of neutral mediator nor separation of fee negotiations from other settlement negotiations demonstrates that a settlement is fair).

23(a)(4) requirement that they adequately represent the class. *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748 (7th Cir. 2011) (Easterbrook, J.).

## VI.   Inferring Class Approval From a Small Number of Objections Is Inconsistent With Both Rule 23 and Good Public Policy.

The settling parties ask this court to look at the number of objectors and the number of class members who have not objected, and infer that the ones who did not object approve of the settlement. This is wrong.

Given the structure of class actions, the number of objectors will invariably be small relative to the size of the class. In a consumer class action, no class member has the financial incentive (or even the time, given short notice periods) to organize millions of class members to oppose an unfair settlement; any individual class member's objection will be relatively meaningless at the margin, meaning that individual class members will prefer to free ride off of those who do object. Any settlement, whether fair or unfair, will have a small number of objectors; the number of objectors by itself cannot provide meaningful information whether a settlement is fair.

"Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 73 (2007). It is a incorrect to argue that this understandable tendency to ignore notices or free-ride on the work of other objectors is best understood as acquiescence in or evidence of support for the settlement. Silence is simply *not*

consent. *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 447 (S.D. Iowa 2001) (*citing GM Pick-Up,* 55 F.3d at 789.). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979).

There is usually little hope that opt-outs can recover for their claims—the entire purpose of Rule 23 class actions is to aggregate claims that would be uneconomical to bring individually. "Almost by definition, most class members have too little at stake to warrant opting out of the class litigation and filing an individual lawsuit. Thus, opting out is probably not a viable option even though a proposed settlement is unfair or inadequate." Leslie, 59 Fla. L. Rev. at 109. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *GM Pick-Up*, 55 F.3d at 812 (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. 1981)); *Petruzzi's, Inc. v. Darling-Delaware Co.*, 880 F. Supp. 292, 297 (M.D. Pa. 1995). "[A] low number of objectors is almost guaranteed by an optout regime, especially one in which the putative class members receive notice of the action and notice of the settlement offer simultaneously." *Ellis v. Edward D. Jones & Co.*, 527 F. Supp. 2d 439, 446 (W.D. Pa. 2007). "[W]here notice of the class action is, again as in this case, sent simultaneously with the notice of the settlement itself, the class members are presented with what looks like a *fait accompli*." *Mars Steel Corp. v. Continental Illinois Nat'l Bank & Trust Co.*, 834 F.2d 677, 680-681 (7th Cir. 1987) (Posner, J.).

As such, the response from class members cannot be seen as something akin to an election or a public opinion poll. *See GM Pick-Up*, 55 F.3d at 813 (finding that "class reaction factor" does not weigh in favor of approval, even when there is low number of objectors in large class,

when "those who did object did so quite vociferously"); Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1532 (2004). A court must act as a guardian for *all* class members—whether or not they have formally entered the case by registering an objection. "[T]he absence or silence of class parties does not relieve the judge of his duty and, in fact, adds to his responsibility." *Amalgamated Meat Cutters & Butcher Workmen v. Safeway Stores, Inc.*, 52 F.R.D. 373, 375 (D. Kan. 1971).

Thus, in a low-dollar case like this where no class member has the economic incentive to object, the presence of *any* substantive good-faith objections is a remarkable event. The Court should draw no inference in favor of the settlement from the number of objections, especially given the vociferousness of the objectors. *GM Pick-Up*, 55 F.3d at 812–13; *ALI Principles* § 3.05, *comment a* at 206.

## CONCLUSION

There are five independent reasons to reject the settlement:

*First*, the settlement provides only prospective relief, which is, as a matter of law, insufficient recompense for consumer fraud allegations.

*Second*, according to the only valid economic expert testimony in the case, as well as research by expert regulatory agencies, the proposed injunctive relief will not benefit the class, and may actually harm the class by saddling them with costs for an economically useless technology.

*Third*, the proposed settlement harms as much as half of the class by increasing the price they pay for Costco gasoline. Because of this, there is a conflict of interest within the class, and certification is inappropriate.

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

*Fourth,* the settlement is "untenable" because of the exaggerated recovery for class representatives, including class representatives who have incurred no burden or threatened burden, and have added nothing to the settlement other than to permit class counsel to create subclasses in an effort to create approval of a self-dealing settlement.

*Fifth*, the "kicker" clause, combined with the excessive attorney-fee request, demonstrates impermissible self-dealing that requires settlement rejection.

This is a self-serving settlement to benefit attorneys at the expense of class members, and the Court should reject the settlement as failing to comply with the requirements of Rule 23(a)(4) and Rule 23(e).

Dated:  February 17, 2012

Respectfully submitted,

*/s/ Theodore H. Frank*
Theodore H. Frank (D.C. Bar No. 450318)
1718 M Street NW
No. 236
Washington, DC 20036
Telephone:  (703) 203-3848
Email:  tedfrank@gmail.com

Attorney for Objectors
Amy Alkon and Nicolas Martin

Objection of Amy Alkon and Nicolas Martin
No. 07-md-1840

**PROOF OF SERVICE**

I declare that:

I am over the age of 18 years and not party to the within action; my office address is 1718 M Street NW, No. 236, Washington DC 20036.

On February 17, 2012, I served the attached:

**ALKON OBJECTORS' OPPOSITION TO APPROVAL OF AMENDED SETTLEMENT**

  X    By First Class Mail in that I caused such envelope(s) to be delivered via USPS to the addressee(s) designated.

| | |
|---|---|
| Robert A. Horn<br>HORN AYLWARD BANDY<br>2600 Grand Boulevard, Suite 1100<br>Kansas City, MO 64108 | David F. McDowell<br>MORRISON & FOERSTER LLP<br>555 West Fifth Street, Suite 3500<br>Los Angeles, CA 90013-1024 |
| Clerk of the Court<br>United States District Court<br>500 State Ave.<br>259 U.S. Courthouse<br>Kansas City, KS  66101 | |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2012.


_/s/ Theodore H. Frank_____
Theodore H. Frank