# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE ) | |
| SALES PRACTICES LITIGATION ) | |
| ) | MDL No. 1840 |
| This Document Relates To: ) | Case No. 07-1840-KHV |
| ) | |
| <u>Wilson, et al. v. Ampride, Inc., et al.</u>, ) | |
|      Case No. 06-2582-KHV, ) | |
| ) | |
| and ) | |
| ) | |
| <u>American Fiber & Cabling, LLC, et al.</u> ) | |
| <u>v. BP Products North America Inc., et al.</u>, ) | |
|      Case No. 07-2053-KHV. ) | |
| ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on <u>Defendants' Motion In Limine To Exclude Expert Testimony And Report Of Constantine Cotsoradis</u> (Doc. #2634) filed November 1, 2011. Under Rule 702, Fed. R. Evid., and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) and its progeny, defendants move to exclude the expert testimony and report of plaintiffs' expert, Constantine Cotsoradis. For the following reasons, the Court overrules defendants' motion.

## Legal Standards

Federal Rule of Evidence 702 provides as follows:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under Fed. R. Evid. 702, the Court has a "gate-keeping obligation" to determine the admissibility of all expert testimony. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999) (citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993)). Expert testimony is admissible only if it is both relevant and reliable. Id. The touchstone of the Court's inquiry is whether the testimony helps the factfinder understand evidence or determine a fact in issue. BioCore, Inc. v. Khosrowshahi, 183 F.R.D. 695, 699 (D. Kan. 1998). Courts have broad discretion in deciding whether to admit expert testimony, but should resolve doubts in favor of admissibility. Id.; Kieffer v. Weston Land, Inc., 90 F.3d 1496, 1499 (10th Cir. 1996); see Fed. R. Evid. 702 advisory committee's note; Daubert, 509 U.S. at 588-89.

The Court must determine at the outset whether an expert will testify to scientific, technical or other specialized knowledge that will help the trier of fact understand or determine a fact in issue. Daubert, 509 U.S. at 592-93; see Fed. R. Evid. 104(a), 702. This requires a preliminary assessment of whether the reasoning or methodology underlying the testimony is valid and whether the expert can properly apply it to the facts in issue. Daubert, 509 U.S. at 592-93; see Fed. R. Evid. 104(a), 702. The purpose of this inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152. It is therefore important that the expert's opinion be testable, i.e. capable of being challenged in some objective sense, and not just a subjective opinion that cannot reasonably be assessed for reliability. Fed. R. Evid. 702 advisory committee's note; see Kumho Tire, 526 U.S. at 149-53; Daubert, 509 U.S. at 590.

Experience alone – or experience combined with other knowledge, skill, training or education – may provide a sufficient foundation for expert testimony. Fed. R. Evid. 702 advisory committee's notes. Indeed, "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Id. The Court's gate-keeping function, however, requires more than simply "taking the expert's word for it." Id. A witness relying solely or primarily on experience must give a sufficient explanation of how the experience leads to the conclusion reached. Id.; see United States v. Fredette, 315 F.3d 1235, 1240 (10th Cir. 2003).

An expert may offer an opinion even if it "embraces an ultimate issue to be determined by the trier of fact." Fed. R. Evid. 704. But an expert may not simply tell the jury what result it should reach. United States v. Simpson, 7 F.3d 186, 188 (10th Cir. 1993). An expert witness's personal belief as to the weight of evidence would invade the province of the jury. Lawrence v. Raymond Corp., No. 3:09 CV 1067, 2011 WL 3418324, at *4 (N.D. Ohio Aug. 4, 2011); Oxford Gene Tech. Ltd. v. Mergen Ltd., 345 F. Supp.2d 431, 435 (D. Del. 2004). Expert opinions that address matters which are equally within the competence of the factfinder to understand and decide are not helpful to the factfinder and therefore inadmissible. McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir. 1988) (citing Fed. R. Evid. 701-02); see Thompson v. State Farm Fire & Cas. Co., 34 F.3d 932, 941 (10th Cir. 1994).

The Court's gatekeeping function is not meant to supplant "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . [as] the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596 (citation omitted). As the proponents of expert testimony, plaintiffs bear the burden of

3

establishing admissibility under Rule 702. Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir. 2001).

## Background Information

In 1979, Constantine Cotsoradis graduated from Loyola College in Baltimore, Maryland with a bachelor's degree in English. Deposition of Constantine V. Cotsoradis ("Cotsoradis Depo."), Exhibit B to Plaintiffs' Memorandum In Opposition To Defendants' Motion To Exclude The Expert Report And Testimony Of Constantine Cotsoradis (Doc. #3092) filed December 7, 2011 at 11:10-23. Cotsoradis subsequently earned a master's degree in public administration from the University of Kansas.[1]

From 1982 to 1994, Cotsoradis worked for the Maryland Department of Agriculture. Id. at 11:3-9. He first worked as a field inspector.[2] In 1989, he became program manager of the scales regulatory program. Id. at 9:23-10:4. The scales regulatory program enforced all laws related to weights and measures and scales to ensure that scales are accurate. Id. at 10:7-10. It sent inspectors out to test scales and interpret and apply Handbook 44[3] and the regulations and statutes of Maryland.

---

[1] The record does not disclose when Cotsoradis earned that degree.

[2] The record does not disclose his duties as field inspector.

[3] Each year, the National Institute of Standards and Technology ("NIST") publishes Handbook 44: Specifications, Tolerances, and Other Technical Requirements for Weighing and Measuring Devices to provide technical requirements "to eliminate from use, weights and measures and weighing and measuring devices that give readings that are false, that are of such construction that they are faulty (that is, that are not reasonably permanent in their adjustment or will not repeat their indications correctly), or that facilitate the perpetration of fraud, without prejudice to apparatus that conforms as closely as practicable to the official standards." NIST Handbook 44 (2012 ed.) at 1.

Handbook 44 explains the source of its information as follows:

(continued...)

Id. at 10:11-13.

From 1994 to 1996, Cotsoradis worked as weights and measures coordinator for the Office of Weights and Measures ("OWM") of the National Institute of Standards and Technology ("NIST"), the federal agency responsible for promulgating Handbook 44 and Handbook 130.[4]  Id.

---

[3](...continued)
The specifications, tolerances and other technical requirements in this handbook comprise all of those adopted by the National Conference of Weights and Measures, Inc. (NCWM).  NCWM is supported by [NIST], which provides its Executive Secretary and publishes some of its documents.  NIST also develops technical publications for use by weights and measures agencies; these publications may subsequently be endorsed or adopted by NCWM.

The NCWM Committee on Specification and Tolerances (the Committee), acting at the request of the Conference or upon its own initiative, prepares with the technical assistance of the [NIST], proposed amendments or additions to the material adopted by NCWM . . . .  Such revisions, amendments, or additions are then presented to NCWM as a whole, where they are discussed by weights and measures officials and representatives of interested manufacturers, industries, consumer groups, and others.  Eventually the proposals of the Committee, which may have been amended from those originally presented, are voted upon by the weights and measures officials . . . .  A national consensus is required on all items adopted by the NCWM.  A specification, tolerance, or other technical requirement is adopted when a majority of the states' representatives, and other voting delegates favoring such adoption, vote for approval.

All of the specifications, tolerances, and other technical requirements given herein are recommended by NCWM for official promulgation in and use by the states in exercising their control of commercial weighing and measuring apparatus. A similar recommendation is made with respect to the local jurisdictions within a state in the absence of the promulgation of specifications, tolerances, and other technical requirements at the state level.

Id.

[4]    NIST is an agency of the U.S. Department of Commerce.  Regarding OWM, the NIST website states as follows:

[OWM] promotes uniformity in U.S. weights and measures laws, regulations, and standards to achieve equity between buyers and sellers in the marketplace.  This

(continued...)

5

> [4](...continued)
> enhances consumer confidence, enables U.S. businesses to compete fairly at home and abroad, and strengthens the U.S. economy.
>
> OWM partners with [NCWM], an organization of State and local weights and measures officials and representatives of business, industry, consumer groups, and Federal agencies, to develop U.S. standards in the form of uniform laws, regulations, and methods of practice. OWM serves as the U.S. representative to the International Organization of Legal Metrology . . . to bring efficiency and cost savings to U.S. manufacturers and other stakeholders doing business overseas, through the promotion of harmonized international standards and regulatory practices.
>
> OWM ensures traceability of state weights and measures standards to the SI [International System of Units, commonly known as the metric system]; develops procedures for legal metrology tests and inspections, and conducts training for laboratory metrologists and weights and measures officials. OWM provides guidance on the model weights and measures laws and regulations adopted by the NCWM and coordinates the development and publication of key NCWM publications.

http://www.nist.gov/pml/wmd/index.cfm (last visited Feb. 6, 2012).

NIST publishes Handbook 130, which compiles the latest uniform laws and regulations and related interpretations and guidelines adopted by NCWM. See NIST Handbook 130 (2012 ed.) at iii. Handbook 130 states that the purpose of the uniform laws and regulations is "to achieve, to the maximum extent possible, uniformity in weights and measures laws and regulations among the various states and local jurisdictions in order to facilitate trade between the states, permit fair competition among businesses, and provide uniform and sufficient protection to all consumers in commercial weights and measures practices." Regarding the source of its uniform laws and regulations, Handbook 130 states, in part, as follows:

> The NCWM Committee on Laws and Regulations (the Committee), acting at the request of NCWM or upon its own initiative, prepares with the technical assistance of [NIST], proposed amendments or additions to the material adopted by NCWM . . . . Such revisions, amendments, or additions are then presented to NCWM as a whole where they are discussed by weights and measures officials and representatives of interested manufacturers, industries, consumer groups, and others. Eventually the proposals of the Committee, which may have been amended from those originally presented, are voted upon by the weights and measures officials, following the voting procedures in the NCWM Bylaws. A national consensus is required on all items adopted by the NCWM. A Uniform Law or Regulation is adopted when a majority of the states' representatives, and other voting delegates

(continued...)

6

at 15:1-9. As weights and measures coordinator, Cotsoradis frequently researched and analyzed issues, questions and proposed changes relating to Handbook 44 to provide guidance to the NCWM Specifications and Tolerances ("S&T") Committee, the National Type Evaluation Program ("NTEP") weighing sector and working groups, weights and measures officials, NTEP laboratory evaluators and industry representatives.[5] See Cotsoradis Report at 1. He also provided regulatory and technical guidance to federal and state weights and measures agencies and industry, served as advisor to the NCWM S&T Committee and participated in the harmonization of weights and measures regulations between the United States and Canada. See id. at 10.

From 1996 to 2004, Cotsoradis worked for the Kansas Department of Agriculture as Director of the Division of Weights and Measures.[6] See Report Of Constantine Cotsoradis ("Cotsoradis Report") Exhibit A to Defendants' Memorandum In Support Of Their Motion To Exclude Expert Testimony And Report Of Constantine Cotsoradis (Doc. #2636) filed November 1, 2011 at 10. The

---

[4](...continued)
favoring such adoption, vote for approval.

All of the Uniform Laws and Regulations given herein are recommended by NCWM for adoption by states when reviewing or amending their official laws and regulations in the areas covered. A similar recommendation is made with regard to the local jurisdictions within a state in the absence of the promulgation of such laws and regulations at the state level.

NIST Handbook 130 (2012 ed.) at 1.

[5] According to the NCWM website, the NCWM issues an NTEP Certificate of Conformance following successful completion of an evaluation of a device. The Certificate indicates that the device is capable of meeting applicable requirements of Handbook 44. See http://www.ncwm.net/faq/ntep (last visited on 02/22/2012).

[6] During this time, Cotsoradis also served as director of the agricultural laboratory (1998-2004) and program manager of the Agricultural Commodities Assurance Program (2001-2004). See Cotsoradis Report at 10.

division of weights and measures is responsible for all motor fuel measurement devices in gas stations in the State of Kansas. From time to time, it sends employees out to inspect those devices. Cotsoradis Depo. at 46:7-16. As Director of the Division of Weights and Measures, Cotsoradis was aware of and became very familiar with Kansas statutes and regulations that define various parameters and guidelines regarding motor fuel measuring devices. Id. at 46:17-22.

From 2004 to 2010, Cotsoradis was the Deputy Secretary of Agriculture for the State of Kansas. Cotsoradis Report at 9-10. In this position, he managed internal operations and supervised senior staff and program managers; served as chief legislative spokesperson, testifying before legislative committees and speaking to industry groups on a variety of policy, political, organizational and leadership issues; managed legislative and regulatory initiatives; analyzed impacts, gathered data and prepared issue briefs, articles, testimony, regulatory comments and position papers; developed and provided oversight of the agency's $25 million annual budget; maintained relationships with state and federal policy leaders, businesses and other key stakeholders; initiated complete internal assessment of structure, policies and procedures for agency programs; implemented revisions to increase efficiency and set new goals for staff and programs; directed the agency's information technology program; and wrote articles for the agency newsletter and provided content for the agency's annual report. Id.

In 2010, Cotsoradis began working as a government affairs consultant in Lawrence, Kansas.[7] See Cotsoradis Report at 9. In this position, Cotsoradis provides clients with expertise in government relations, regulatory affairs, management processes, strategic planning, legislative

---

[7] Although the record is not clear on this point, Cotsoradis testified that in August of 2010, his position ended with the Department of Agriculture and he began looking for other work. Cotsoradis Depo. at 40:3-14.

affairs and association management.  Id.

## Analysis

In his expert report, Cotsoradis presents the following opinions:

1. The ability of the consumer to make a meaningful value comparison is a necessary element of a transparent, equitable transaction.

2. The NIST Handbook 44 does not prohibit the use of [automatic temperature compensation ("ATC")] at retail for petroleum products.

3. The NIST Handbook 130 does not prohibit the use of ATC at retail for petroleum products.

4. [T]he lack of National Type Evaluation Program type evaluation criteria for retail motor-fuel dispensers equipped with ATC does not otherwise prohibit the use of ATC at retail for petroleum products.[8]

Cotsoradis Report at 1-5.

Defendants assert that Cotsoradis's testimony and report are unreliable because he formed his opinions solely to testify in this case and his opinions are not supported by peer review or some other objective source.  Defendants' Memorandum (Doc. #2636) at 6-10; Defendants' Reply (Doc. #3160) at 3-7.

**I.  Opinion No. 1**

Cotsoradis's first opinion states as follows:

The ability of the consumer to make a meaningful value comparison is a necessary element of a transparent, equitable transaction.

---

[8]  The fourth opinion also states that "[t]he National Type Evaluation Program has issued a certificate of conformance for a retail motor-fuel dispenser with an ATC option." Cotsoradis Report at 5.  Cotsoradis has withdrawn this portion of his report.  See Plaintiffs' Response (Doc. #3092) at 20.  Defendants' motion regarding this portion of his opinion is therefore moot.  See Defendants' Memorandum (Doc. #2636) at 13.

9

Cotsoradis Report at 1.[9]

In explaining the opinion, Cotsoradis states, in part, as follows:

There is no doubt that temperature is an essential fact to a petroleum sale because the temperature affects the amount of actual motor fuel (energy) in any given gallon. . . . Providing temperature information to the consumer or correcting for temperature differences allows for meaningful, transparent price comparisons in retail motor-fuel and provides equity in the marketplace.

Id.

Defendants assert that Cotsoradis formed his opinion solely for purposes of this lawsuit. See Defendants' Memorandum (Doc. #2636) at 6-7. The record, however, does not support their assertion. Defendants point to testimony by Cotsoradis that he acquired a better understanding of the issues after March of 2011, when he began working on his research and expert report in this case. See Defendants' Memorandum (Doc. #2636) at 6-7; Cotsoradis Depo. at 157:10-159:13. Cotsoradis also testified that in 2007, when the issue surfaced at the national level, he formed an opinion that temperature is an essential fact to the sale of motor fuel. Cotsoradis Depo. at 99:23-100:20. Cotsoradis stated that after he recognized the issue, he began to educate himself and participate at the national level to find a solution to the problem. Id. at 106:18-23. Cotsoradis also stated that he informed the industry that a solution was needed and that it was permissible to use ATC in the State of Kansas. Id. On this record, defendants have not shown that Cotsoradis formed his opinion solely for purposes of this lawsuit.

---

[9] Plaintiffs plan to offer the first opinion to support (1) the third and fourth elements of their consumer protection claims, i.e. that defendants engaged in a deceptive or unconscionable practice and that the plaintiff class was aggrieved by defendants' acts or practices; (2) the fifth element of their civil conspiracy claims, i.e. that the alleged conspiracy caused injury to plaintiffs on a classwide basis; and (3) their claims for injunctive and declaratory relief. See Plaintiffs' Designations Of Expert Testimony By Phase Of Trial (Doc. #3299) filed January 31, 2012 at 1, 16, 21. Plaintiffs are no longer pursuing claims for unjust enrichment. See Proposed Amendment To Pretrial Order (Doc. #3734) filed February 15, 2012 at 2 n.1.

Defendants assert that as Director of the Kansas Division of Weights and Measures, Cotsoradis acted inconsistently with his opinions in this lawsuit. Specifically, defendants contend that Cotsoradis did not (1) take steps to require retail motor fuel stations to disclose temperature or facts regarding the impact temperature may have on fuel volume or energy content; (2) order his inspectors to reject motor fuel measuring devices that were not equipped with ATC; (3) take action against retailers for failing to use ATC or disclose temperature; or (4) attempt to change pertinent legislation. Defendants' Memorandum (Doc. #2636) at 6. These assertions go to the weight of the evidence and are subject to cross-examination on that basis. They do not disqualify Cotsoradis from testifying as an expert witness.

Defendants assert that the first opinion has not been subjected to peer review. Where, as here, the reliability of an expert's testimony depends heavily on the knowledge and experience of the expert as opposed to the methodology and theory behind it, peer review is not an applicable factor. See United States v. Garza, 566 F.3d 1194, 1199 (10th Cir. 2009); United States v. Nichols, 169 F.3d 1255, 1265 (10th Cir. 1999); see also Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1017 (9th Cir. 2004).

Defendants assert that Cotsoradis has not performed any survey, research or investigation on consumer expectations related to the purchase of retail motor fuel. See Defendants' Memorandum (Doc. #2636) at 8. The record demonstrates that Cotsoradis has extensive experience in the field of weights and measures, which strives to achieve equity in the marketplace by using the best possible measurement method based on consistency and accuracy in light of the burden, cost and effect on business. See In re Motor Fuel Temp. Sales Pract. Litig., No. 07-1840-KHV, 2012 WL 380159, at *8 (D. Kan. Feb. 6, 2012). On this record, the Court finds that Cotsoradis has specialized

11

knowledge and experience in weights and measures which will assist the trier of fact in understanding the evidence and determining whether accounting for temperature in retail motor fuel transactions is a necessary element of a transparent, equitable transaction.[10]

## II.     Opinion No. 2

Cotsoradis's second opinion states as follows:

The NIST Handbook 44 does not prohibit the use of ATC at retail for petroleum products.

Cotsoradis Report at 2.[11]

In explaining the opinion, Cotsoradis states, in part, as follows:

When determining if . . . products comply with packaging and labeling laws, one must determine not only if they meet the NIST Handbook 44 definition of a gallon, but if they meet that definition at a specified reference temperature.  Hence, despite the NIST Handbook 44 defining a gallon as 231 cubic inches exactly, a gallon of a packaged petroleum product would be out of compliance if it did not contain 231 cubic inches at 60 degrees Fahrenheit.  Similarly, a retail motor fuel dispenser can dispense a unit that is not 231 cubic inches but that unit can still be sold as a "gallon" if the unit sold is within the acceptable tolerances, despite the fact that it is not "231 cubic inches exactly."

Simply because the NIST Handbook 44 does not contain a section that relates specifically and exclusively to ATC equipment for retail motor-fuel sales does not mean that such equipment is prohibited. . . . [W]eights and measures officials have recognized that their lack of specific requirements must not be a barrier to innovation

---

[10]     Defendants assert that Cotsoradis is not qualified to say with any certainty as to what extent temperature affects the energy content of motor fuel and to what extent ATC or knowing the temperature of dispensed fuel would affect fuel pricing or consumer behavior.  Defendants' Reply (Doc. #3160) at 7-8.  The Court does not read Cotsoradis's report or testimony to express opinions on those matters.

[11]     Plaintiffs plan to offer the second opinion to support (1) the third and fourth elements of their consumer protection claims, i.e. that defendants engaged in a deceptive or unconscionable practice and that the plaintiff class was aggrieved by defendants' acts or practices; (2) the fourth element of their civil conspiracy claims, i.e. that defendants took one or more unlawful acts; and (3) their claims for injunctive and declaratory relief.  See Plaintiffs' Designations Of Expert Testimony By Phase Of Trial (Doc. #3299) filed January 31, 2012 at 2, 16, 21.

> and have allowed new technology and practices to continue while they develop specific requirements for it. Specifically, the NCWM and the NTEP recognize that device-specific regulations in Handbook 44 do not always keep pace with technology and therefore, NIST Handbook 44 Section G-A.3 enables these new weighing and measuring devices to be inspected by field inspectors and evaluated by NTEP laboratories. * * *
>
> With respect to retail motor-fuel dispensers equipped with ATC . . . the 2009 Annual Report of the S&T Committee [states as follows]:
>
>> The Committee also acknowledged that the General Code paragraph G-A.3 Special and Unclassified Equipment coupled with relevant provisions in existing code paragraphs can be used by jurisdictions to address equipment with ATC features in the meantime.
>
> Thus, simply because Handbook 44 does not contain a section that relates specifically and exclusively to ATC equipment for retail motor-fuel sales does not mean that such equipment is prohibited. Rather, the NIST Handbook 44 permits the use of ATC at retail for the sale of petroleum products. That is not simply my opinion; based on the 2007 survey conducted by the NIST, there is widespread agreement of this assessment (34 of the 50 responding weights and measures jurisdictions answered "yes" to the question of whether their jurisdiction permitted temperature compensation on engine fuel dispensers). During my tenure as Deputy Secretary of the Kansas Department of Agriculture, our agency responded affirmatively to the 2007 NIST survey; we answered we would permit the use of retail ATC in Kansas. That response was based on NIST Handbooks 44 and 130 and Kansas laws and policy. That was always the position of the State of Kansas during my entire tenure with the Department of Agriculture, through my departure in September, 2010.

Id. at 2-3.

Defendants assert that Cotsoradis formed his opinion solely for purposes of this lawsuit. See Defendants' Memorandum (Doc. #2636) at 6-7. The record does not support defendants' contention. Cotsoradis testified that in 2007, he reviewed Kansas statutes and regulations and handbook requirements and determined that under Kansas law, it was permissible to use ATC at retail. Cotsoradis Depo. at 49:1-9, 54:25-55:3. In addition, his report states that in 2007, based on NIST Handbooks 44 and 130 and Kansas laws and policy, the Department of Agriculture responded

13

"yes" to an NIST survey which asked whether Kansas law allowed ATC.

Defendants assert that the second opinion has not been subject to peer review. As noted, this factor does not apply where an expert's testimony depends heavily on specialized knowledge and experience. See Garza, 566 F.3d at 1199 (10th Cir. 2009); Nichols, 169 F.3d at 1265; Skycam, Inc. v. Bennett, No. 09-CV-294-GKF-FHM, 2011 WL 2551188, at *4 (N.D. Okla. June 27, 2011); Hangarter, 373 F.3d at 1017.

Defendants assert that Cotsoradis cannot point to any Handbook 44 provision which allows temperature regulation of retail motor fuel. See Defendants' Memorandum (Doc. #2636) at 8-9. This argument misses the mark. Cotsoradis states that just because Handbook 44 does not specifically address the issue does not mean that it prohibits it. See Cotsoradis Report at 2-4. The fact that he cannot point to a provision which specifically allows temperature regulation does not undermine the reliability of his opinion.

The Court finds that the second opinion is reliably based on Cotsoradis's specialized knowledge and experience in the field of weights and measures. In particular, he has extensive experience in the field of weights and measures and in interpreting and applying Handbook 44. See Cotsoradis Depo. at 10:11-13, 15:1-9, 46:7-22; Cotsoradis Report at 1. Cotsoradis may therefore testify as to the second opinion, i.e. that NIST Handbook 44 does not prohibit the use of ATC at retail.[12]

---

[12] Defendants do not challenge whether the second opinion improperly expresses a legal conclusion and the Court makes no ruling in this regard.

**III.     Opinion No. 3**

Cotsoradis's third opinion states as follows:

The NIST Handbook 130 does not prohibit the use of ATC at retail for petroleum products.

Cotsoradis Report at 5.[13]

In explaining the opinion, Cotsoradis states as follows:

The NIST Handbook 130 does not prohibit the use of ATC at retail for petroleum products. NIST Handbook 130 provides, among other items, model method of sale regulations. Simply because NIST Handbook 130 does not contain a method of sale that specifically addresses the use of ATC for retail motor-fuel sales, it does not mean that such sales are prohibited. Indeed, if that were the case, temperature correction would not be permitted at the motor-fuel wholesale (rack) level or on vehicle-tank meters because neither of those methods of sale are addressed or referenced in NIST Handbook 130.

Id.

Defendants assert that Cotsoradis formed his opinion solely for purposes of this lawsuit. See Defendants' Memorandum (Doc. #2636) at 6-7. The record does not support defendants' contention. Cotsoradis testified that in 2007, he reviewed Kansas statutes and regulations and handbook requirements and determined that under Kansas law, it was permissible to use ATC at retail. Id. at 49:1-9, 54:25-55:3. In addition, his report states that in 2007, based on NIST Handbooks 44 and 130 and Kansas laws and policy, the Department of Agriculture responded "yes" to an NIST survey which asked whether Kansas law allowed ATC.

Defendants assert that the third opinion has not been subject to peer review. As noted, this

---

[13]    Plaintiffs plan to offer the third opinion to support (1) the third and fourth elements of their consumer protection claims, i.e. that defendants engaged in a deceptive or unconscionable practice and that the plaintiff class was aggrieved by defendants' acts or practices; (2) the fourth element of their civil conspiracy claims, i.e. that defendants took one or more unlawful acts; and (3) their claims for injunctive and declaratory relief. See Plaintiffs' Designations Of Expert Testimony By Phase Of Trial (Doc. #3299) filed January 31, 2012 at 2, 16, 21.

15

factor does not apply where an expert's testimony depends heavily on specialized knowledge and experience. See Garza, 566 F.3d at 1199 (10th Cir. 2009); Nichols, 169 F.3d at 1265; Skycam, 2011 WL 2551188, at *4; Hangarter, 373 F.3d at 1017.

Defendants assert that Cotsoradis cannot point to any Handbook 130 provision which allows temperature regulation of retail motor fuel. See Defendants' Memorandum (Doc. #2636) at 8-9. This argument misses the mark. Cotsoradis states that just because Handbook 130 does not specifically address the issue does not mean that it prohibits it. See Cotsoradis Report at 2-4. The fact that he cannot point to a provision which specifically allows temperature regulation does not undermine the reliability of his opinion.

The Court finds that the third opinion is reliably based on Cotsoradis's specialized knowledge and experience in the field of weights and measures.  In particular, he has extensive experience in the field of weights and measures and in interpreting and applying Handbook 130. See Cotsoradis Depo. at 10:11-13, 15:1-9, 46:7-22; Cotsoradis Report at 1.  Cotsoradis may therefore testify as to the third opinion, i.e. that NIST Handbook 130 does not prohibit the use of ATC at retail.[14]

**IT IS THEREFORE ORDERED** that Defendants' Motion In Limine To Exclude Expert Testimony And Report Of Constantine Cotsoradis (Doc. #2634) filed November 1, 2011 be and hereby is **OVERRULED**.

Dated this 28th day of February, 2012 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[14] Defendants do not challenge whether the second opinion improperly expresses a legal conclusion and the Court makes no ruling in this regard.

16