**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE | ) |
| SALES PRACTICES LITIGATION | ) |
| | ) **MDL No: 1840** |
| (This Document Relates to All Cases) | ) |
| | ) **No: 07-md-1840-KHV-JPO** |

**PLAINTIFFS' RESPONSE TO ALKON OBJECTORS' OPPOSITION TO APPROVAL
OF AMENDED SETTLEMENT**

**I.      INTRODUCTION**

Yet again, objectors Amy Alkon and Nicolas S. Martin ("Alkon Objectors") protest the proposed settlement between Plaintiffs and Defendant Costco Wholesale Corp. ("Costco"). Through two separate objections filed a year apart,[1] they raise a myriad of claimed deficiencies in the Settlement including, among other things: the settlement is economically worthless and harms the class; the claims are worth billions and the class representatives are selling out to cheap; established class action settlement case is wrong; the class representatives are wholly new to the litigation and have done nothing, and the settlement is unfair because Costco and Class Counsel are splitting a $10 million fund.

The Alkon Objectors have misstated facts, invented facts, ignored well-established case law related to class action settlements and ignored this Court's August 13, 2010 Order in its entirety. Without doubt, the Alkon Objectors have the right as Class Members to voice their opposition to the Settlement. But the vociferousness of their Objection should not lend it more weight, and the Objectors' miscomprehension of the facts, and the dearth of authority for their allegations and conclusions, undermines the validity, sincerity and accuracy of their entire Objection.

---

[1] *See* Doc. # 1783, 3737.

1

## II.     LEGAL ANALYSIS OF OBJECTIONS

This Court's August 13, 2010 Memorandum and Order ("Order") identified curable structural issues with the prior Costco settlement. In the Order, the Court also ruled on objections, including objections advanced by these same Alkon Objectors.[2]  They protested then, as they do now, that the prospective injunctive relief does not benefit the class, that some members might be worse off, that proposed incentive payments to class representatives are undeserved, and that class counsel is guilty of self-dealing.  This Court addressed each of those objections in turn—overruling some, deferring others (related to fees and incentive awards) and concluding that no objection would prevent approval of the then-proposed settlement, absent the structural issues the Court identified related to adequacy.  (Doc. # 1707 at. pp. 46-61.)

Now, the Alkon Objectors serve up the same old fare, garnished this time with an "opinion" from an economist that suffers from the exact same characteristics that the Alkon Objectors faulted Plaintiffs' economist (Dr. Andrew Safir) for in their previous Objection. Their new economic opinion, of dubious merit and even more dubious relevance,[3] does nothing to undermine the validity of this Settlement. Indeed, that opinion is apparently only offered to controvert Dr. Safir's opinion, even though this Court previously held that Dr. Safir's opinion was not even necessary to find that the original Costco settlement was fair.[4]

In short, the parties paid close attention to this Court's Order, and they restructured the proposed settlement to meet the precise curative guidelines discussed in the Court's Order. As restructured, the revised Settlement will provide injunctive relief that will accomplish exactly

---

[2] Doc. # 1578, *and see* Docs. # 1645, 1664 and 1665, Alkon Objectors' response to Plaintiffs' Motion for Final Settlement Approval, Surreply and Motion to Strike Motion for Final Settlement Approval or, Alternatively, to Strike Dr. Safir's Affidavit, respectively.

[3] Unlike Dr. Safir, who has sifted an enormous amount of data in this litigation, including data specific to Costco, Mr. Henderson's opinions are based on a review of some docket entries and objections related to the first Costco Settlement. Declaration of David R. Henderson, attached to Doc. # 1783, pg. 2.

[4] Order, Doc. # 1707, pg. 24.

what Plaintiffs set out to do:  motor fuel will be sold on a temperature-adjusted basis in those states where conversion is to be implemented. The arguments advanced by the Alkon Objectors do not detract from the validity and fairness of this Settlement, and their Objection should be overruled.

      A.     *BENEFITS OF INJUNCTIVE RELIEF*

Alkon Objectors open their brief with hypotheticals that, while humorous, are incomplete. Costco's CEO is not proposing to write "I will not defraud the class" nor does Costco propose to establish a scholarship (Objection, page 4) nor even does Costco propose to short-sell eggs. *Id.* at 7.  Costco sells gasoline, which swells with temperature producing more volume but less energy per unit of volumetric measure, and that temperature gradient is neither disclosed nor accounted for in Costco's per-unit gasoline pricing (an egg, on the other hand, is always an egg). In 2008, Costco stepped forward to solve the swellage problem by proposing to voluntarily do what Plaintiffs' were suing to force them to do: install automatic temperature compensation ("ATC") equipment that adjusts retail sales to account for the value differential created by fluctuating temperature.

In addition, Costco attempted to solve the information deficit by informing its members that temperature has an impact on the energy of each gallon of motor fuel, and that it sold fuel on a purely volume basis:



This device dispenses gasoline solely by volume measured in standard gallons (231 cubic inches). It does not adjust for temperature or other factors which may affect the energy content of each gallon dispensed.

In 2007, the class began to enjoy the benefits of Costco's efforts to ensure that its members are treated with honesty by disclosing material facts. That forward-looking benefit is not illusory, as existing class members will be able to make purchasing decisions armed with better information.[5]

### 1.    Non-Monetary Relief Alone Can Constitute A Benefit

Alkon Objectors concede, as they must, that injunctive relief has a place in the law – hardly a novel concept as Fed. R. Civ. P. 23(b) contemplates injunctive remedies for an array of wrongs.[6]   And, the absence of direct monetary relief to a class does not render a settlement unfair.  *See e.g., Williams v. National Security Insurance Company,* 237 F.R.D. 685 (M.D. Ala.,

---

[5] In these and other ways, Costco's promises are vastly different from the Honda's meager promise to use less deceptive advertising in *True v. American Honda Motor Company*, 2010 WL 707338 (C.D. Cal. 2010).  The putative class members in *True* would not be influenced by that marketing because they already had bought cars.  In contrast, Costco members will achieve savings and will make more informed decisions every time they buy fuel.  And, because Costco's member renewal rate is almost 90%, the vast majority of people that have already been damaged by Costco's sales practices will also obtain the benefit of the future relief being provided by this Settlement. That is a key distinction between this case and *True*.

[6] *See, e.g. Commission Notes* to Rule 23 (1996 amendments) ("Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers . . .").  Plaintiffs acknowledge that certification is sought under Fed. R. Civ. P. 23(b)(3); the rationale for equitable relief applies with equal force here.

2006) (racially discriminatory insurance pricing fairly remedied by reinstatement and increased future policy benefits); *Francisco v. Numismatic Guaranty Corporation of America,* 2008 WL 649124 (S.D. Fla. 2008) (approving class settlement that funds public education about coins)[7] *and see  Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1311 (3d Cir.1993) (non-pecuniary benefits such as corporate structural changes may support class action settlement notwithstanding difficulties in measuring benefits.).[8]

### 2.    Past and Future Members

Alkon Objectors' claim that future Costco members would benefit, but past members might not, an argument that was made and rejected with the prior Costco settlement.  This Court explained:  "While individual circumstances may vary, it appears that all class members will have a right to purchase ATC fuel from Costco in conversion states."  (Doc. # 1707 at p. 47.) Costco demonstrated that its high rate of renewals (86%) and the open invitation to past members to rejoin results in a Settlement Class highly likely to enjoy the fruits of the settlement. (Doc. #1598 at. p. 14).  In concluding that the proposed restructured settlement offers relief that is fair, reasonable and adequate, the Court acknowledged those factors and also addressed litigation risk and uncertainty.  None of these factors have changed; the restructured settlement will afford the very benefit that was the goal of litigation in both present conversion states and future conversion states, and every Costco member may share in the relief.

---

[7]  *And see* Prof. Klonoff's Declaration, which describes precedent for the "going-forward remedy" embraced by the ALI project on which he reports, Principals of the Law of Aggregate Litigation, (Doc. # 1597-2 at ¶¶ 29 – 31.)

[8] *See also Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105 (E.D.Pa. 2005); *IKON Office Solutions, Inc. Sec. Litig.,* 209 F.R.D. 94, 108 (E.D.Pa. 2002) (non-pecuniary structural changes to benefit plan.  Litigation obstacles to monetary damages are a legitimate consideration in assessing the appropriateness of non-cash settlements); *Sommers v. Abraham Lincoln Fed. Sav. & Loan Ass'n,* 79 F.R.D. 571 (E.D.Pa. 1978).

B.        *THE SETTLEMENT PROVIDES ECONOMIC BENEFITS*

Alkon Objectors again assert that the relief provided by the Settlement is worthless, mainly because they say Class Members would subsidize the cost of upgraded dispensers and will pay more for temperature adjusted gallons—the "pass-through" arguments that were previously addressed by this Court.   (Doc. #1707, pp. 48–49).   This time, Alkon Objectors bolster their claims with a critique from David Henderson, who makes exactly the same arguments.

1.        *Validity and Qualifications Related to Professor Henderson*

Although Prof. Henderson may be an economist, his report suffers from a death of support.  Admittedly, the only materials he has reviewed to develop his opinions are a few docket entries from this litigation.[9]  He cites no economic journal, treatise or publication that supports his opinions, nor does he articulate where he obtained his deep insight into the inner workings of the metric used by gasoline retailers, not to mention "big box" wholesale clubs like Costco, to set gasoline prices or pass on acquisition costs.

For the April 1, 2010 fairness hearing related to the prior Costco settlement, Plaintiffs supplied an abbreviated declaration of Dr. Safir to identify some of the elements that might animate a future injunctive relief benefit analysis.  The Court has observed that it need not rely on the Safir affidavit.  (Doc. # 1707 p. 24.)  This is so because the benefits of the settlement are readily apparent, without expert quantification. Plaintiffs have now supplied substantially more information on which those same calculations can be performed.  Alkon Objectors and their expert supply no contrary evidence. In fact, Prof. Henderson's Declaration cites no evidence. It consists wholly of his opinions. But regardless, if the reasonableness of the Settlement can be evaluated without additional expert input from Dr. Safir, it also follows that nothing supplied by

---

[9] Henderson Dec., ¶ 6.

6

Prof. Henderson will assist the Court in this task. If so, his opinions, too, are irrelevant to the question of whether the Settlement is fair and reasonable.

And Dr. Henderson's opinions should be disregarded for other reasons, as he has misperceived the technical effect of temperature correction. An example of this is in his chart at page 6 of his declaration, (doc. # 1783-1.)   The point of temperature compensation is that the customer who buys at 60 degrees buys a petroleum industry gallon at a stated price, while another customer buying at a higher temperature receives the energy equivalent of that 60 degree gallon.  Both effectively buy the same petroleum industry gallons that the retailer purchased. Under no circumstance are "the two consumers [] technically paying 0.01% less for gasoline" as he claims.  (*Id.* at p. 6.)  Rather, both will pay for standard gallons.  Prof. Henderson also decries the evils of "cross-subsidization", a claim the Alkon Objectors made before.   Yet that is a phenomenon already in place—some customers today buy energy-dense cold fuel and others pay the same price for energy-thin hot fuel.  Only when all customers pay for the same gallons – and pay for the same gallons that the retailer bought – can equity, transparency and fairness be accomplished.

Finally, although this Court remarked that there is no requirement for expert valuation of settlement benefits related to the prior Settlement, Alkon Objectors could not resist a renewed attack on Dr. Safir by speculating that his opinions would not pass muster in peer-reviewed economic literature, as if that is a checklist requirement of reliability under *Daubert*.[10]  This is a curious argument indeed, as the Supreme Court in *Daubert* rejected then-existing expert-admissibility punchlists as unduly "rigid" and "austere,"[11] and thus naturally declined to set forth

---

[10] *Daubert v. Merrell Dow Pharms. Co.,* 509 U.S. 579 (1993).
[11] *Id.* at 588-89.

any new "definitive checklist or test" to govern the admissibility of expert opinions.[12]   Peer review is but one non-mandatory factor or consideration in the flexible approach.[13]   Ironically, the Alkon Objectors propose to substitute their own expert's un-peer-reviewed speculation about hypothetical markets and imaginary Costco conduct, for Dr. Safir's transparent opinions that are based on historical data and actual evidence produced in this case.

In summary, Prof. Henderson's criticism arrives in a vacuum; he assesses only a declaration that was one of several given by Dr. Safir.   Dr. Safir provided extensive opinions grounded in the science of econometrics, adopting the tools for the understanding of relationships between variables, a recognized technical discipline.[14]   Those opinions, derived from his extensive examination of the evidence, inform the much narrower subjects addressed in connection with the Costco settlement.   Prof. Henderson overlooks that complementary body of work. To be sure, judging from his *curriculum vitae* it appears that Prof. Henderson may be an expert economist.   But being an expert is not enough under *Daubert* and *Kumho*;[15] there is no basis to conclude that Prof. Henderson is *qualified* to render his particular opinions in this case. That is because his Declaration provides virtually no support for Prof. Henderson's opinions, other than his general economic background.

---

[12] *Id.* at 593.

[13] The Rule 702 inquiry is "a flexible one" so it bears emphasis that none of the factors identified in *Daubert* constitutes a necessary condition for admissibility.  *See* 509 U.S. at 594.  Thus, while publication of a theory or technique in a peer-reviewed journal is a "pertinent consideration," it is "not a sine qua non of admissibility; it does not necessarily correlate with reliability."  Id. at 593.  Valid scientific findings may not always make their way to the peer-reviewed literature for any number of reasons.  "Some propositions," for example, "are too particular, too new, or of too limited interest to be published." *Id.*

[14] *See, e.g.,* Federal Judicial Center REFERENCE MANUAL ON SCIENTIFIC EVIDENCE, "Reference Guide on Multiple Regression" and "Reference Guide on Statistics" (West Group, 2000)

[15] The Objectors know well the requirements of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *Kumho Tire v. Carmichael*, 526 U.S. 139 (1999); they filed a *Daubert* motion as to Dr. Safir, which this Court denied. *See* Motion, Doc. # 1665.

2.      *Pass-through*

Prof. Henderson's main premise is that Costco will punish its own members, passing through its costs (either Costco's increased capital costs related to ATC equipment or its lost profit from using ATC). He faults Dr. Safir for failing to see the theoretical light, denouncing Dr. Safir's logical and transparent calculations as "unreliable," mainly because they differ from Dr. Henderson's views.  Prof. Henderson neglects to explain the metrics that render his own opinions reliable; his pronouncement depends upon his own *ipse dixit*, and an assumption that Costco (*not a hypothetical retailer*) would always alter prices upward, acting in its own interest alone, without heed for its members.  He cites no evidence to support those assumptions, including those of a perfect market and perfect competition, both unproven and improbable concepts.[16]

The Court has *already* considered, and *already* rejected, this exact argument in considering the first Costco settlement.

> Some objectors contend that after installing ATC, Costco would simply adjust its fuel price to account for temperature variation, so class members would receive no economic benefit from the proposed injunctive relief. The proposed settlement does not limit Costco's ability to alter fuel price based on temperature. Nevertheless, the Court has no reason to believe that market pressures would allow it to do so. Class members would have a choice to purchase fuel from various vendors who do not adjust for fuel temperature. Costco would therefore need to keep fuel prices competitive to attract class members and other fuel purchasers. At the settlement fairness hearing, counsel for Costco stated that Costco is committed to selling at the low price in the market and that because Costco is not likely to change its pricing philosophy, it may be at a competitive disadvantage if it sells temperature adjusted fuel while its competitors do not. Thus, while objectors are correct that Costco would be free to adjust its prices to account for fuel temperature, it does not appear likely that it would do so. Even

---

[16] Prof. Henderson thus conveniently ignores the many real world influences on pricing, such as market conditions, market imperfections, information disparity and delay, real and artificial supply factors, competition, to name a few –things that influence pricing decisions apart from operating costs.  See, e.g., Duncan Kennedy, DISTRIBUTIVE AND PATERNALIST MOTIVES IN CONTRACT AND TORT LAW, WITH SPECIAL REFERENCE TO COMPULSORY TERMS AND UNEQUAL BARGAINING POWER, 41 Md. L. Rev. 563 (1982) (decisions underlying any cost-shifting vary in different contexts depending on the type of liability, market conditions, market imperfections, information problems, and other factors.) *See too* Chouinard, H. H. and Perloff, J.M., GASOLINE PRICE DIFFERENCES: TAXES, POLLUTION REGULATIONS, MERGERS, MARKET POWER AND MARKET CONDITIONS, Berkeley Electronic Press, 2007 (evaluating the variability of the many market factors that influence price of gasoline).

so, if it did, class members would be free to purchase fuel from other vendors. In the end, it appears that class members would benefit from the choice whether to buy temperature adjusted fuel from Costco or non-temperature adjusted fuel from other fuel vendors.[17]

The Court's prior order could not be more cogent and dispositive of this issue.  The Court has already been confronted with, considered, analyzed and rejected the very argument presented by Objectors in the context of the first Costco settlement.  This issue should be water under the bridge.

To the extent the Court left open the issue of conversion costs vis-à-vis potential higher gasoline prices,[18] that issue is clearly a non-issue.  As indicated in Plaintiffs' Renewed Motion for Final Approval (Doc. 1770),[19] the total cost for Costco to convert all of its motor fuel dispensers in the fourteen (14) Conversion States is ____redacted_____; the equivalent of roughly _____redacted_____ of Costco's total annual revenue from motor fuel sales *last year alone*.[20]  That ____redacted_____ conversion cost can be spread over five years, since the Settlement Agreement allows Costco a five year phase in period.   In 2010, Costco had ____redacted_____ separate motor fuel transactions (i.e., fill-ups) in the Conversion States. Assuming the number of fill-ups in the Conversion States remains static over the next five years,[21] Costco will have approximately ____redacted_____ separate gasoline fill-ups in the Conversion States during the five year ATC phase-in period of the settlement.  Spreading the total conversion costs ____redacted_____ across the number of fill-ups expected over the five

---

[17] Doc. 1707, pgs. 49-50.

[18] *See* Order, Doc. 1707, pg. 48.

[19] The detailed ATC cost and sales figures set forth in Plaintiffs' Renewed Motion for Final Approval were provided to Plaintiffs' counsel by Costco and filed under seal.

[20] Plaintiffs' Renewed Motion for Final Approval, Doc. 1770, pg. 6.  Costco's 2010 motor fuel revenue was ____redacted_____.

[21] This is a conservative assumption since Costco appears to continue to add new stores, and its sales appear to be continuously increasing in number, based upon a review of publicly available information.

year phase in period ____redacted_____ results in an estimated increase charge of 1.3¢ per fill-up.[22]

In other words, for an additional **one penny per fill-up**, Costco could install ATC in the Conversion States.  At today's gasoline prices in the Midwest (an average of $3.58 per gallon for 87 octane unleaded) and assuming an average fill-up of 15 gallons, that penny associated with the costs of installing ATC may result in an increase of **less than one-tenth of one cent ($.001) per gallon.**[23] That amount is so small it is not even captured or reflected in the displays on modern retail fuel dispensers. Characterizing this settlement as unfair to consumers when the projected capital costs might be as low as less than one-tenth of a cent per gallon is grossly misrepresentative.  The costs of installing ATC are a non-issue.

And as to the notion that Costco will somehow capture any lost profit associated from using ATC, that argument has been rejected by expert economists on both sides in this case—experts that, unlike Prof. Henderson, have actually reviewed information, documents and evidence related to this litigation. First, Dr. Safir has opined about the defendants' inability to pass-through all costs associated with ATC.[24] Dr. Safir's opinions were based upon his examination and consideration of a large amount of data generated by this litigation, not just a review of objections to the first Costco settlement.[25] Second, when asked whether a single company installing ATC could recapture any costs and lost profits, the *defendants*' retained expert economist *agreed* with the intuitive logic underlying the Court's prior Order[26]—that

---

[22] This number will be driven lower if Costco continues to add stores in the Conversion States, or its fuel sales continue to increase.  This also does not take into account pump depreciation or the fact that many of these dispensers would have to be replaced during this five year period as they pass their normal operational lifespan (approximately 6-8 years).
[23] And that is assuming that Costco is able to fully pass-through the conversion costs to consumers, which is disputed.
[24] *See* reports of Dr. Safir, attached to Doc. # 1309 and 1475.
[25] Henderson Dec., pg. 2.
[26] Order, Doc. 1707, pgs. 49-50.

market forces would prevent a single retailer from being able to recover all of its costs and lost

profits related to ATC:

Q.  Assuming that tomorrow 7-Eleven were to convert all of their pumps in Kansas to automatic temperature compensation at a cost of roughly a $100,000, what would you anticipate would be the effect on the price of 7-Eleven gas at those stations the next day?

A.  Now, they're the only ones who --

Q.  They're the only ones.

A.  They're the only ones.  If they were the only ones, then they would **probably not be able to pass through a whole lot of that because they'd be subject to competition from other retailers**.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

A.  If one particular station had more costs but he was competing with a bunch of other stations around him, **he can't necessarily raise his price** at least by the full amount of his costs because he has to still compete against those other stations.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Q.  And so if 7-Eleven put in automatic temperature compensation at their ten stations in Kansas, would you expect to see that they would raise the price of gas to recover that roughly $100,000 cost?

A.  Again, the presumption here is only they put it in?

Q.  Exactly.

A  I would say if only they were forced to put it in, **they would probably be not able to recover it in a higher price because competition in the marketplace would not be allow them to do that**.[27]

   This testimony, *from the economist hired by the oil companies*, is almost dispositive of

this issue—it completely undermines Prof. Henderson's unsupported opinions.

   Furthermore, Prof. Henderson's claim that a defendant would pass on the costs of a tort

liability to consumers is a claim that could be made of any settlement, by any defendant, in any

case.  To be sure, his argument could also be asserted were the case to proceed to trial and

---

[27] *See* Excerpts from the Depositon of Kevin Murphy, Vol. II, pg. 141:12-23; 144:15-19; 148:9-20, attached hereto as Exhibit 1 [emphasis added].

produce a large judgment – something to which Alkon Objectors must alternatively aspire, as they claim the settlement is both "worthless" and "fails to compensate class members."  (Doc. #3737, pp. 8, 4).  Were this pass-through argument worthy, then no case could pass muster under the fair-and-reasonable standard, much less a large class action settlement.  But, Rule 23 plainly contemplates that cases will be resolved and that those resolutions can be fair and reasonable – despite the market forces described by Prof. Henderson.  His error is to conflate economic concepts with legal ones –  his speculative *economic* prediction of what a market competitor would do in a perfect market is entirely distinct from *legal* realities of what settling litigants do for the distinct benefits of ending litigation.[28]

Even more importantly, Prof. Henderson simply ignored the real evidence that Costco would not simply "pass on the costs."  Punitive pricing is contrary to Costco's overall business strategy, as its business model calls for pricing at the low end of the market.  Prof. Henderson knows nothing at all about Costco's business model, and so he ignored it and the evidence contrary to his opinions.  Costco's representatives countered this same argument in oral proceedings on April 1, 2010:

> Costco is committed to being at the low price in the markets in which it serves in which it sells gasoline.  If Costco is selling gasoline at a temperature-adjusted basis in a market and we have to compete with people who are not, we're going to keep our price.  I don't see Costco changing its pricing philosophy on this point. We're going to keep our price lower, and as a result, the margin that it makes on gasoline would go down.
>
> * * *
>
> Can Costco simply raise the prices to cover all the ATCs?  It doesn't make any sense.  It's got to still compete in the market.  The competitive advantage is it's the low price provider in its markets.  Is it not going to recoup some of this money?  Again, it's all going to depend on the competitive market in which

---

[28] *See, too,* Prof. Robert Klonoff's discussion at Doc. # 1597-2, ¶ 35.

they're in and people's understanding of ATC.  And they're just simply at this point, being able to predict that either way is speculative.[29]

Prof. Henderson's unfounded pronouncement that both higher fuel and conversion costs will be borne by the class members is nothing more than guesswork and a second-hand threat, one that Costco itself rejects. Plaintiffs submitted evidence, not speculation, about the real cost of conversion, conservative estimates that in all likelihood underestimate rather than overestimate true costs, because they don't subtract eventual savings to Costco (tax savings, energy efficiency savings, security improvements, credits and ordinary capital replacement schedules and other business incentives are not included in the calculus). These sorts of operational savings, neglected by Prof. Henderson, further reduce the ultimate cost to Costco, and so reduce any cost of conversion to be borne by its shareholders and members, even if Costco were inclined to pass on the cost.  Alkon Objectors and Prof. Henderson also ignored the substantial savings to Costco of putting costly litigation behind it.

Nothing in Prof. Henderson's pronouncements or in the Alkon Objectors' renewed objections supplies a reason to conclude that market pressure would allow Costco to adjust its prices upwards to recover all of the costs and any lost profits associated with implementing ATC.

### 3.   The Role of the California Energy Commission

Alkon Objectors rely on the study undertaken by the California Energy Commission[30] ("CEC Report" or "Fuel Study") to bolster their assertion that ATC would not provide an economic benefit to consumers.[31] That reliance is woefully misplaced.

To an unwitting consumer, the CEC Report might appear to be authoritative. And many of the facts set forth in the Report appear to be sound, and premised on objective factors and

---

[29] Transcript of April 1, 2010 hearing, Doc #1696, pp. 57, 93.
[30] Available at: http://www.energy.ca.gov/2009publications/CEC-600-2009-002/CEC-600-2009-002-CMF.PDF.
[31] Objection at 11.

fact-finding.   But with respect to the ultimate cost-benefit *conclusions* set forth in the CEC Report, the CEC Report went awry.   Five years of litigation and discovery unearthed startling facts about the initiation, germination and development of those conclusions; facts that cast grave suspicion on the objectivity of the CEC's cost-benefit analysis.[32]

The objectivity of the CEC Report was doomed at the outset because the presiding Commissioner for the Report, James Boyd, suffered from an obvious conflict of interest—he is married to Cathy Reheis-Boyd, the President/lobbyist of the Western States Petroleum Association ("WSPA"), the oldest oil company trade association in the country.[33] WSPA members include such oil titans as Exxon, Shell, Conoco, Valero, Chevron and BP.[34]   Mrs. Reheis-Boyd's income from WSPA, funded by oil company dues, is considered jointly with Mr. Body's income according to tax records.   Documents obtained through third-party subpoenas indicate that WSPA actively lobbied the CEC related to the Fuel Study and retained an expert economist, Robert Topel, to secretly meet with CEC commissioners and staff members in order to present the industry's take on the ATC issue.[35] Mr. Topel appears to have given two separate presentations to the CEC in private meetings,[36] the presentations of which have never been disclosed to the public, unlike the other public comments the CEC received from third parties related to the Fuel Study.[37] When confronted by allegations that his wife's organization, WSPA, lobbied the CEC related to the Fuel Study that he was actively working on, Commissioner Boyd

---

[32] The legislative mandate behind the CEC Report did not grant that agency any regulatory powers, and required the CEC to consider only the alternates of a mandatory temperature compensation environment and the status quo, not permissive and voluntary adoption of ATC, such as is now proposed with this Settlement.   Nor did the CEC Report factor in the value of transparency and fairness associated with ATC. These are reasons enough to render the CEC's cost-benefit analysis irrelevant to the issues raised by this Settlement.

[33] *See* http://www.wspa.org/what-is-wspa.aspx.

[34] *See* http://www.wspa.org/member-list.aspx.

[35] Exhibits 2-4 hereto.

[36] *Id.* Interestingly, some of the off-the-record opinions given to the CEC by Mr. Topel are contrary to the on-the-record deposition testimony given in this case by Kevin Murphy, the defendants' retained economist and the business partner of Mr. Topel.

[37] *See* http://www.energy.ca.gov/transportation/fuel_delivery_temperature_study/documents/2008-12-09_workshop/comments/, public comments received by the CEC.

was indignant and denied the allegation.[38] But emails subpoenaed and obtained directly from WSPA show that Mrs. Reheis-Boyd was, in fact, in communication with the CEC Project Manager in charge of the Fuel Study, Gordon Schremp, asking for meetings, making telephone calls and inquiring about "revised drafts" of the Fuel Study at a time (October, 2008) when no draft of the Fuel Study had even been publicly circulated.[39]

In addition to that issue, the CEC Report suffered from a condition known to computer science as "garbage in, garbage out", a shorthand expression for the notion that if flawed information is fed into a problem-solving system, process or theory, the end result of that process will likewise be flawed. An example is the lengthy presentation and written report given to the CEC by Mike Flynn, an economist hired by several of the retailer trade associations, including the National Association of Convenience Stores ("NACS"), to give an "objective" analysis of the hot fuel issue. In December, 2008, Mr. Flynn gave a lengthy presentation to the CEC, arguing that consumers are not injured by the hot fuel issue and that retail ATC would be worthless.[40] Interestingly, documents subpoenaed from third parties have revealed that Mr. Flynn's opinions and "conclusions" were somehow contained in a "Proposal" to do an economic study that he submitted to NACS in the Spring of 2008, before he had been retained by NACS and well before he had performed his study of the hot fuel issue.[41] Had the opinions given to the CEC by Mr. Flynn been subjected to a *Daubert* analysis, he may have been hard-pressed to explain how he

---

[38] *See* partial transcript of March 11, 2009 Business Meeting of the CEC, pg. 117 ("WSPA is not a party to this proceeding in any way, shape or form. The record shows that. No testimony. No appearances. No written submittals. No one representing them or working for them appeared or participated . . .").

[39] Exhibit 6, collection of emails received from WSPA. The first draft of the Fuel Study, the Staff Report, was circulated in November, 2008.

[40] A copy of Mr. Flynn's December 9, 2008 presentation to the CEC is available at: http://www.energy.ca.gov/transportation/fuel_delivery_temperature_study/documents/2008-12-09_workshop/presentations/.

[41] Exhibit 7.

developed his opinions and conclusions on an issue before he had studied the issue. Yet, that sort of searching scrutiny was not performed by the CEC.

But the most troubling aspect of the Fuel Study is the fact that much of the final cost-benefit analysis appears to have come directly from the paid economist hired by the oil companies to advocate their position.  Mr. Topel and Mr. Murphy, two of the industry's paid economists, had a lengthy, detailed email dialogue with CEC Project Manager Gordon Schremp and CEC staffer Nick Janusch to assist them in preparing the final version of the CEC's Report.[42] Economists Topel and Murphy (the "Chicago professors" as Mr. Janusch refers to them) appear to have written, literally, part of the CEC's cost-benefit analysis. The familiar, cordial dialogue between the paid economists and the CEC staff members makes it clear that when the final version of the CEC Report was being completed in early 2009 (the final version was published on January 30, 2009 and adopted on March 11, 2009), any sense of objectivity was lost and the CEC staff was "strictly following" the methodology of the industry's paid experts.[43] That failure was compounded by the fact that the CEC appears to have done nothing to independently corroborate the economic analysis of Topel and Murphy,[44] even though they knew that the economists were there to advocate on behalf of the industry.

Plaintiffs do not fault the Alkon Objectors for not being aware of these issues related to the CEC Report—it is unclear whether any of this information has been previously made public. But, armed with this knowledge, they should now realize that in seeking support for their notion

---

[42] *See* Exhibit 8, a collection of emails obtained directly from CEC Project Manager Gordon Schremp by subpoena.
[43] *Id.* at 18.
[44] *See* excerpts from the Deposition of Gordon Schremp, Exhibit 9 hereto, pgs. 132:12-134:4.

that ATC is economically worthless, they will find no objective, reliable support in the CEC Report.[45]

### 4.  Members Who Purchase Cold Fuel

Alkon Objectors next protest that some purchasers in colder climates would pay more for fuel purchased at temperatures colder than 60 degrees, for part of the year.  The Court previously addressed that charge, concluding that those customers are under no obligation to buy from Costco, in those circumstances.  Moreover, since Costco is committed to its low pricing strategy, the overcharges in such circumstances are likely to be imaginary.  Costco will still price its fuel at the low end of the market, and its customers will, for the first time, be fully informed.

### C.   *CLASS REPRESENTATIVES SHOULD BE FAIRLY COMPENSATED*

Alkon Objectors protest any incentive payments, arguing that the class representatives are self-dealing and deserve nothing. First, the Objectors have misread the Settlement Agreement; the requested class representative incentive awards are $2,000 per class representative, not $2,500. Second, it is blatantly false for Objectors to state that, "many of the representative plaintiffs were recruited only for purposes of creating geographic subclasses in this amended settlement after Costco made it clear they would not contest the case, and faced no risk of deposition or discovery."[46] Each of the subclass representatives have been in this case, in one form or another, for years. Each of them have given a deposition, responded to hundreds of discovery requests, produced substantial documents and otherwise been actively engaged in this litigation. Kansas subclass representative Zach Wilson, for example, has produced thousands of documents, gave an 8 hour deposition and has attended hearings in this matter. So have the

---

[45] Unfortunately, the CEC may not have been the first California governmental agency to be tainted with the possibility of corporate influence. *See* Corporate Corruption of Science-The Case Of Chromium(VI), *International Journal of Occupational Environmental Health*, 2006, Vol. 12, pgs. 169-176 (a copy of which is attached hereto as Exhibit 10).

[46] Objection, pgs. 15-16.

California subclass representatives. The New Jersey subclass representative was one of the first individuals to file a "hot fuel" lawsuit. The notion that these subclass representatives are altogether new to this case and done nothing to deserve an incentive fee is without basis.

This Court previously remarked that it would determine whether the circumstances warrant an award to the class representatives.[47]  Plaintiffs will further address the basis for the requested incentive awards in their motion for final approval of the Settlement that will be filed prior to the March 22, 2012 fairness hearing and which they incorporate herein by reference. This Court will assess incentive payments, or not, on the strength of the evidence those representatives submit to quantify their efforts in achieving what must be regarded as a landmark, first-ever settlement.  The incentive awards sought for the class representatives are modest, and justified to induce individuals to act in an otherwise thankless capacity, to compensate them for personal risk and additional effort for the benefit of the Class they propose to represent.[48]

Because the proposed settlement leaves to this Court the discretion to award incentive fees if warranted, there is no reason to conclude the class representatives are acting contrary to the interests of the class, as this Court previously noted.[49] These representatives have ensured that Costco members will purchase motor fuel on a transparent and fair basis.  No other motor fuel retailer can say that in this country, and these representatives made that case.

> D.    *CLASS COUNSEL HAS SECURED BENEFITS FOR THE CLASS*

The Alkon Objectors next bootstrap a "no fees" argument to their "no benefit" conclusion and conclude that Class Counsel should not be compensated because the class allegedly will not

---

[47] Doc. # 1707, p. 55.
[48] *See, e.g., UFCW Local 880-Retail Food Employers Joint Pension Fund v. Newmont Mining Corp.*, No. 08-1423, 352 F3d. Appx. 232, 234 (10th Cir. Sept 11, 2009).
[49] *And see* Declaration of Robert Klonoff, Doc. # 1597 at  p. 23.

benefit, under Objectors' version of the facts.  This argument presumes that there will be no benefit to the class, a presumption that this Court has already considered and rejected. (Doc. # 1707 at p. 48-49.) Class members in conversion states like California will enjoy immediate benefits of transparency and price equity, those benefits have value, and the eventual attorneys' fees, which will be set by this Court, and not by agreement of the parties, will consider those benefits, along with the fuel price savings benefits that have been projected. As it was for class representative incentive fees, the proposed settlement here permits the request for fees and requires Costco to directly pay any sum awarded by the Court.

The Alkon Objectors ignore this Court's discussion of the effect of the Settlement Agreement and the Court's own role in exercising its discretion to award fees, in arguing that the Court should adopt new standards to replace the test in *Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180 (10th Cir. 2002).  Objectors deem those factors to be too subjective to accomplish the task, even though they've been deployed countless times, and they propose to substitute the ALI Principles of the Law of Aggregate Litigation, §305 in their place.  While these, too, are subjective guidelines, not the law, Objectors fail to explain how the "ALI Principles" (which by their own terms are a framework for law reform, not governing law) would change the outcome.

For instance, proposed guideline 1 would have the Court consider whether the class representatives and class counsel have been and currently are adequately representing the class. That is a task this Court has undertaken long ago, and has repeated the exercise at every turning. Guideline 2 calls for consideration of whether the relief offered "is fair and reasonable given the costs, risks, probability of success and delays of trial and appeal." These considerations are wholly subsumed in the factors this Court already weighed with care:

"(2) whether serious questions of law and fact exist, placing the ultimate outcome of

the litigation in doubt;

(3) whether the value of an immediate recovery outweighs the mere possibility of

future relief after protracted and expensive litigation"[50]

The *Rutter & Wilbanks* four-factor test remains the law in this Circuit, and it meets and exceeds any variant proposed by the ALI.

Nonetheless, Objectors contend, the negotiations that led to this settlement must be infected by collusion, apparently for the sole reason that a settlement was achieved that contemplates some payment of attorney fees. Objectors insist that conclusion of collusion necessarily follows from *In re Bluetooth Headset Products Liability Litigation,* 654 F.3d 935 (9th Cir. 2011), but *Bluetooth* says no such thing.  There, Defendants agreed to post acoustic safety information in their product manuals and websites and to pay for notice costs and attorneys' fees.  On review, the Court specifically declined to declare the fee award or the settlement itself to be unreasonable.  Rather, the Court instructed the District Court to determine whether the settlement constituted a common fund, and from there, to apply the prevailing methods in that Circuit for calculating a reasonable fee, with explicit calculations and comparisons.  *Id* at 945.  Because that hadn't been done, the reviewing court could not determine whether the settlement itself was fair.  *Id.*  The settlement contemplated fees disproportionate to the class benefits, a "clear sailing" provision and a reversion to defendants of unrewarded fees, and these factors warranted close scrutiny.

Objectors' interpretation of the Settlement Agreement, and their analysis of why *Bluetooth* is applicable, is mystifying. This Settlement contains no reversionary "kicker" because Costco has only agreed to pay fees which the Court deems reasonable, not $10 million regardless

---

[50] Memorandum and Order, Doc. # 1707, p. 8.

of the reasonableness determination.   Thus, there is no fund to revert. The Court made that particularly clear in the Order denying the prior Settlement.[51]

And Costco has clearly not granted a "clear sailing" provision as was the case in *Bluetooth*. In fact, Costco has vigorously opposed Class Counsel's fee application, and the attorney fee briefing has been both voluminous and contentious—just the opposite of the situation in *Bluetooth*.

The final *Bluetooth* concern, that of a disproportionate fee, may be answered in part by reference to Objector's own remarks:  they state that Costco sold $5 billion in gasoline in fiscal 2009 (n. 3).  As Dr. Safir opined in connection with the first Costco settlement, the savings to the Class will be very substantial. And as noted above, the defendants' paid economist agrees that Costco cannot nullify those savings by simply raising its street price. Thus, unlike the issue in Bluetooth, there is no potential for a disproportionate fee in this case.

E.      *REACTION OF THE CLASS SUPPORTS APPROVAL*

The Alkon Objectors finally argue that the favorable or even passive response of the class cannot be a gauge of adequacy.   Once again, Objectors swim against the current of law.   As one Court remarked:

> A certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members. *See In re Nasdaq Market-Makers Antitrust Lit.*, 187 F.R.D. at 478 ("In litigation involving a large class, it would be extremely unusual not to encounter objections."). If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement. *See id.* at 478-79; *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118-19 (3d Cir.1990) (29 objections out of 281 member class "strongly favors settlement"); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir.1981) (The fact that 7 out of 109 class members objected to the proposed settlement should be considered when determining fairness of settlement.); *Marisol A. v. Giuliani*, 185 F.R.D. 152, 162 (S.D.N.Y.1999) ("The Court views the small number of comments from a plaintiff class of over 100,000 children as evidence of the Settlement Agreements' fairness, reasonableness and

---
[51] Order, Doc. # 57.

22

adequacy."); *Boyd v. Bechtel Corp.*, 485 F.Supp. 610, 624 (N.D.Cal.1979) (The fact that only 16% of the class objected was deemed "persuasive" of the adequacy of the settlement.).

*In re Austrian and German Bank Holocaust Litigation*  80 F.Supp.2d 164, 175 (S.D.N.Y. 2000).

The objections to this settlement are few and far between.   Some, like the Alkon objections, come from professional objectors, of whom Courts are properly wary.[52]   And, while objections can play a valuable role in pointing out unseen flaws and in ensuring that the settlement is fair and adequate, the relative paucity of objections now adds confidence to the conclusion that this settlement is fair and adequate.

## III.   CONCLUSION

None of the objections raised by the Alkon Objectors undermine the fairness and reasonableness of this game-changing settlement.   This Court has already so concluded and the parties have restructured the settlement to cure the problems that the Court observed in the previous Settlement.   Plaintiffs respectfully request that the Court enter an order overruling the Alkon Objections and granting final approval to the Settlement.

---

[52] *See,* Rothstein, Barbara J. and Willging, Thomas E, Federal Judicial Center, MANAGING CLASS ACTION LITIGATION:  A POCKET GUIDE FOR JUDGES, at 11, 24 (2005).

Respectfully submitted this 5th day of March, 2012.

Respectfully submitted,

_____*s/ Robert A. Horn*_____

Robert A. Horn       KS Bar No. 70254
HORN AYLWARD & BANDY, LC
2600 Grand Boulevard, Suite 1100
Kansas City, MO 64108
Telephone 816-421-0700
Facsimile 816-421-0899
rhorn@hab-law.com

_____*s/ Thomas V. Girardi*_____

Thomas V. Girardi  CA Bar No. 36603
GIRARDI AND KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017-1904
Telephone: 213-977-0211
Facsimile: 213-481-1554
tgirardi@girardikeese.com

LEAD COUNSEL FOR PLAINTIFFS

_____*s/ Thomas V. Bender*_____

Thomas V. Bender     Ks. Bar #22860
WALTERS BENDER STROHBEHN
        & VAUGHAN, P.C.
2500 City Center Square
1100 Main Street
P.O. Box 26188
Kansas City, MO 64196
(816) 421-6620
(816) 421-4747 (Facsimile)
tbender@wbsvlaw.com

LIAISON COUNSEL FOR PLAINTIFFS

### CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all person registered for ECF as of that date.


_/s/ Joseph A. Kronawitter_