**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE ) | |
| SALES PRACTICES LITIGATION ) | |
| ) | MDL No. 1840 |
| This Document Relates To: ) | Case No. 07-1840-KHV |
| ) | |
| <u>Wilson, et al. v. Ampride, Inc., et al.</u>, ) | |
|      Case No. 06-2582-KHV, ) | |
| ) | |
| and ) | |
| ) | |
| <u>American Fiber & Cabling, LLC, et al.</u> ) | |
| <u>v. BP Products North America Inc., et al.</u>, ) | |
|      Case No. 07-2053-KHV. ) | |
| ) | |

**MEMORANDUM AND ORDER**

Plaintiffs in these consolidated cases bring class action claims against defendants for violation of the Kansas Consumer Protection Act, K.S.A. §§ 50–623 to 50–679a, and civil conspiracy. <u>Amended Pretrial Order</u> (Doc. #3809) filed March 20, 2012 at 3. Plaintiffs claim that because defendants advertise and sell motor fuel for a specified price per gallon without disclosing or adjusting for temperature expansion, they omit material facts related to the energy content and value of motor fuel, and engage in unfair and unconscionable sales practices. <u>See</u> <u>id.</u> at 6-8. This matter comes before the Court on <u>Defendants' Motion For Partial Summary Judgment Dismissing Plaintiffs' Conspiracy Claims</u> (Doc. #2711) filed November 1, 2011. Defendants BP Products North America Inc., Circle K Stores, Inc., ConocoPhillips Company, Flying J, Inc., Kum & Go, L.C., QuikTrip Corp. and Equilon Enterprises LLC d/b/a Shell Oil Products (collectively "defendants") seek summary judgment on plaintiffs' claims for civil conspiracy. For the following reasons, the Court sustains defendants' motion.

**Legal Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. Applied Genetics, 912 F.2d at 1241.

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment

in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

## Background Information[1]

The National Institute of Standards and Technology ("NIST") is an agency of the U.S. Department of Commerce. Regarding its Office of Weights and Measures ("OWM"), the NIST web site states as follows:

> [OWM] promotes uniformity in U.S. weights and measures laws, regulations, and standards to achieve equity between buyers and sellers in the marketplace. This enhances consumer confidence, enables U.S. businesses to compete fairly at home and abroad, and strengthens the U.S. economy.
>
> OWM partners with The National Conference on Weights and Measures, Inc. (NCWM), an organization of State and local weights and measures officials and representatives of business, industry, consumer groups, and Federal agencies, to develop U.S. standards in the form of uniform laws, regulations, and methods of practice. OWM serves as the U.S. representative to the International Organization of Legal Metrology . . . to bring efficiency and cost savings to U.S. manufacturers and other stakeholders doing business overseas, through the promotion of harmonized international standards and regulatory practices.
>
> OWM ensures traceability of state weights and measures standards to the SI [International System of Units, commonly known as the metric system]; develops procedures for legal metrology tests and inspections, and conducts training for laboratory metrologists and weights and measures officials. OWM provides guidance on the model weights and measures laws and regulations adopted by the NCWM and coordinates the development and publication of key NCWM

---

[1] The parties spend much effort disputing each other's asserted facts regarding the role and structure of the NSIT and NCWM. See Appendix to Defendants' Reply Brief In Support Of Their Motion For Summary Judgment On Plaintiffs' Conspiracy Claims (Doc. #3198) filed January 12, 2012 at 32-41. These facts are not material to the Court's ruling herein. Nevertheless, for background and informational purposes, the Court provides its own summary based on independent research.

publications.

Weights and Measures, http://www.nist.gov/pml/wmd/index.cfm (last visited March 22, 2012).

Each year, NIST publishes Handbook 44 to provide technical requirements "to eliminate from use, weights and measures and weighing and measuring devices that give readings that are false, that are of such construction that they are faulty (that is, that are not reasonably permanent in their adjustment or will not repeat their indications correctly), or that facilitate the perpetration of fraud, without prejudice to apparatus that conforms as closely as practicable to the official standards." NIST Handbook 44 (2012 ed.) at 1.

Handbook 44 explains the source of its information as follows:

The specifications, tolerances and other technical requirements in this handbook comprise all of those adopted by [NCWM]. NCWM is supported by [NIST], which provides its Executive Secretary and publishes some of its documents. NIST also develops technical publications for use by weights and measures agencies; these publications may subsequently be endorsed or adopted by NCWM.

The [NCWM S&T Committee], acting at the request of the Conference or upon its own initiative, prepares with the technical assistance of the [NIST], proposed amendments or additions to the material adopted by NCWM . . . . Such revisions, amendments, or additions are then presented to NCWM as a whole, where they are discussed by weights and measures officials and representatives of interested manufacturers, industries, consumer groups, and others. Eventually the proposals of the Committee, which may have been amended from those originally presented, are voted upon by the weights and measures officials . . . . A national consensus is required on all items adopted by the NCWM. A specification, tolerance, or other technical requirement is adopted when a majority of the states' representatives, and other voting delegates favoring such adoption, vote for approval.

All of the specifications, tolerances, and other technical requirements given herein are recommended by NCWM for official promulgation in and use by the states in exercising their control of commercial weighing and measuring apparatus. A similar recommendation is made with respect to the local jurisdictions within a state in the absence of the promulgation of specifications, tolerances, and other technical requirements at the state level.

Id.

NIST also publishes Handbook 130, which compiles the latest uniform laws and regulations and related interpretations and guidelines adopted by NCWM. <u>See</u> NIST Handbook 130 (2012 ed.) at iii. Handbook 130 states that the purpose of the uniform laws and regulations is "to achieve, to the maximum extent possible, uniformity in weights and measures laws and regulations among the various states and local jurisdictions in order to facilitate trade between the states, permit fair competition among businesses, and provide uniform and sufficient protection to all consumers in commercial weights and measures practices." Regarding the source of its uniform laws and regulations, Handbook 130 states, in part, as follows:

> The NCWM Committee on Laws and Regulations (the Committee), acting at the request of NCWM or upon its own initiative, prepares with the technical assistance of [NIST], proposed amendments or additions to the material adopted by NCWM . . . . Such revisions, amendments, or additions are then presented to NCWM as a whole where they are discussed by weights and measures officials and representatives of interested manufacturers, industries, consumer groups, and others. Eventually the proposals of the Committee, which may have been amended from those originally presented, are voted upon by the weights and measures officials, following the voting procedures in the NCWM Bylaws. A national consensus is required on all items adopted by the NCWM. A Uniform Law or Regulation is adopted when a majority of the states' representatives, and other voting delegates favoring such adoption, vote for approval.
>
> All of the Uniform Laws and Regulations given herein are recommended by NCWM for adoption by states when reviewing or amending their official laws and regulations in the areas covered. A similar recommendation is made with regard to the local jurisdictions within a state in the absence of the promulgation of such laws and regulations at the state level.

NIST Handbook 130 (2012 ed.) at 1.

**Facts**

The following facts are either undisputed or construed in the light most favorable to plaintiffs.[2]

Defendants are members of one or more trade associations including the American Petroleum Institute ("API"), Petroleum Marketers Association of America ("PMAA"), National Association of Truck Stop Operators ("NATSO"), National Association of Convenience Stores ("NACS"), Society of Independent Gasoline Marketers of America ("SIGMA"), California Independent Oil Marketers Association ("CIOMA") and Western States Petroleum Association ("WSPA") (collectively, "the trade associations").[3]

---

[2] The Court considers only those facts which the summary judgment record properly supports. Where the parties cite a document or exhibit with no pinpoint cite or other explanation, the Court has attempted to determine how the exhibit relates to the purported fact.

[3] The summary judgment record does not indicate which defendants are members of which trade associations.

API is a national trade association that represents about 400 companies in all aspects of the oil and natural gas industry in the United States.

NATSO is a national association that represents almost 1,200 members across the country. NATSO lobbies governmental, legal, and regulatory agencies on behalf of its members.

NACS is an international trade association that represents more than 2,100 retail and 1,500 supplier company members. NACS lobbies governmental, legal and regulatory agencies on a variety of issues important to the convenience store industry – including motor fuel, credit card fees, tobacco, labor and healthcare.

SIGMA is a national trade association that represents approximately 270 independent motor fuel marketers and chain retailers in the United States. SIGMA lobbies governmental, legal and regulatory agencies on every major regulatory issue facing motor fuel marketers.

WSPA is a regional trade association that represents companies involved in petroleum exploration, production, refining, transportation and marketing in Arizona, California, Hawaii, Nevada, Oregon and Washington. WSPA lobbies governmental, legal and regulatory agencies on a variety of issues important to the petroleum industry.

The summary judgment record does not describe PMAA. Its web site states that it is a federation of 48 state and regional trade associations representing approximately 8,000 independent petroleum marketers nationwide. See About PMAA, http://www.pmaa.org/aboutpmaa/ (last visited March 22, 2012).

(continued...)

The trade associations act on behalf of their members and are the voice and mouthpiece of their members.[4]  The employees of members hold positions in the trade associations including serving on committees and boards.[5]

The trade associations have opposed and attempted to prevent implementation of automatic temperature compensation ("ATC") for retail motor fuel sales.[6]  In particular, the trade associations have lobbied state and national standard-setting organizations, including officials of the NCWM and the California Division of Measurement Standards, to oppose and block ATC for retail motor fuel sales in the United States.[7]  Some trade associations have met and coordinated their efforts to oppose

---

[3](...continued)
The summary judgment record does not describe CIOMA.  Its web site states that it is a statewide trade association representing the needs of independent wholesale and retail marketers of gasoline, diesel, lubricating oils and other petroleum products.  See California Independent Oil Marketers Association, http://cioma.com/CIOMA/About_Us/CIOMA/About.aspx?hkey=53ee72b2-cf9c-4e9e-98cd-87bbac8bdc13 (last visited March 22, 2012).

[4]     Plaintiffs assert that the trade associations act at the direction, control and request of their members.  Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment Dismissing Plaintiffs' Conspiracy Claims ("Plaintiffs' Response") (Doc. #3155) filed December 27, 2011 at 3, ¶ 3.  The evidence which plaintiffs cite, however, does not support the assertion.  See id.  The cited evidence shows that trade associations act on behalf of their members and serve as their primary voice and that at least one association (WSPA) only takes positions that a majority of its members agree on and instruct it to take.  See Reheis-Boyd Depo. at 39:16-40; 39:16-40:3; 43:2-43:5; 66:4-69:18; 74:22-75:1, Plaintiffs' Exhibit 36.  The evidence does not show that these defendants have directed or controlled the actions of any trade associations.  See Plaintiffs' Response (Doc. #3155) at 3, ¶ 3.

[5]     Plaintiffs cite no evidence that any of defendants' employees served on trade association boards or committees.

[6]     Plaintiffs assert that defendants have opposed and attempted to prevent ATC at retail, and that defendants and their trade associations have been doing so since at least the 1970s.  See Plaintiffs' Response (Doc. #3155) at 5, ¶ 9.  The evidence which they cite does not support these assertions.  See id.

[7]     Plaintiffs assert that defendants have pressured and swayed "private" standard-setting
(continued...)

and block ATC for retail motor fuel sales in the United States.[8]

API, NACS, PMAA, SIGMA and NATSO participate in joint meetings on a regular basis – usually twice a year, in the spring and in the fall.[9] SIGMA has been participating in the meetings for over 20 years. The goal of the joint meetings is to unify the position of the trade associations on any given issue, if possible. See Boyett Depo. at 56:24- 60:3; 61:7-25, Plaintiffs' Exhibit 26. At joint meetings, the trade associations have discussed the issue of ATC.

Gilbarco Veeder-Root ("Gilbarco") is a global supplier of retail motor fuel dispensers. Gilbarco manufactures and sells ATC-equipped retail motor fuel dispensers outside the United States. In late 2006 or early 2007, Gilbarco submitted to the California Type Evaluation Program

---

[7](...continued)
organizations to oppose and block ATC for retail motor fuel sales in the United States. Plaintiffs' Response (Doc. #3155) at 7, ¶¶ 16-17. The evidence which plaintiffs cite does not show that the organizations are private or that defendants participated in such efforts. See id.

[8] Plaintiffs assert that defendants have met and coordinated their efforts to oppose and block ATC at retail. Plaintiffs' Response (Doc. #3155) at 5, ¶ 5. But the evidence which they cite does not show that defendants participated in any such efforts. See id.

Plaintiffs assert that defendants and their trade associations have disseminated false and misleading information related to (1) the costs to implement ATC for retail motor fuel sales in the United States; (2) the number of mechanical retail motor fuel dispensers that would require replacement in order to utilize ATC equipment; (3) whether selling motor fuel at retail without compensating for temperature harms consumers; (4) whether selling motor fuel at retail without compensating for temperature benefits retailers to the detriment of consumers; and (5) whether implementation of ATC for retail motor fuel sales in the United States would be borne mostly by small businesses. Plaintiffs' Response (Doc. #3155) at 6-7, ¶¶ 11-15. The evidence which they cite does not show that the information is false and misleading or that defendants played any role in disseminating it. See id.

[9] Plaintiffs assert that defendants participate in the joint meetings through their trade associations. Plaintiffs' Response at 5, ¶ 6. The evidence which they cite does not show that defendants participated in the meetings. See id.

8

("CTEP") an application for approval of an ATC-equipped retail motor fuel dispenser.[10]

On January 29, 2007, the petroleum industry news service, *Oil Express*, reported that California regulators had approved an ATC device for use in electronic Gilbarco dispensers. Plaintiffs' Exhibit 40 at 3. The article states that Gilbarco's move angers marketers, who believe that Gilbarco is laying the groundwork to force ATC upon retailers. Id. The article states as follows:

> There is major concern among marketers that some companies will install automatic temperature correction and then try to claim that their gasoline is somehow cheaper, better or produces more energy, than the fuel sold by marketers who are not temperature-correcting, leading to further customer confusion.

Id.

Thereafter, trade associations and others pressured Gilbarco not to pursue selling ATC-equipped retail dispensers in the United States.[11] On January 31, 2007, Dan Gilligan of PMAA

---

[10] The summary judgment record does not disclose when Gilbarco submitted the application.

CTEP is a laboratory authorized by the National Type Evaluation Program ("NTEP") and operated by the California Division of Measurement Standards to evaluate whether retail motor fuel dispensers meet the technical requirements of Handbook 44.

NTEP and participating state NTEP laboratories are responsible for conducting evaluations of prototype weighing and measuring devices submitted by manufacturers to ensure technical compliance with Handbook 44 prior to their introduction into the marketplace. See Memorandum And Order (Doc. #3618) at 8-9. The NCWM issues an NTEP Certificate of Conformance following successful completion of an evaluation of a device. The Certificate indicates that the device is capable of meeting applicable requirements of Handbook 44. See Frequently Asked Questions - NTEP, http://www.ncwm.net/faq/ntep (last visited March 22, 2012).

[11] Plaintiffs assert that defendants threatened, manipulated and coerced Gilbarco in an effort to force it to halt production and marketing of its ATC-equipped retail motor fuel dispensers in the United States. See Plaintiffs' Response at 8, ¶ 23. Plaintiffs cite no evidence that these defendants participated in such efforts. To support their assertion, plaintiffs cite 23 exhibits without any explanation describing the exhibits or how they support plaintiffs' assertions. The Court has painstakingly reviewed each exhibit. The only exhibit which appears to directly relate to any defendant is Exhibit 69. On January 30, 2007, regarding unidentified "Temperature Correction

(continued...)

emailed Carole Donoghue (unidentified) and Jay McKeeman of COIMA.[12]  Plaintiffs' Exhibit 46.

Gilligan reported that he told Richard Browne of Gilbarco that

> marketers are unhappy that Gilbarco believes it would be good for competing retailers to use differing measurements of the gallon. No one at any time has accused Gilbarco of seeking an ATC mandate. What we have accused Gilbarco of is putting their profits ahead of what is best for an entire national industry.

Id.

> On February 1, 2007, Gilligan emailed McKeeman and others as follows:
>
> It is important to clarify that Gilbarco is not neutral on permissive temp comp. Gilbarco has made it clear that they believe it would be good for retailer (A) using retail TC to compete with retailer (B) not using retail TC.
>
> PMAA believes it would be a nightmare for retailer (A) to be selling a short or long gallon for $2.35 per gallon and retailer (b) selling an exact gallon for $2.35. If the consumer does not know the temperature of the fuel at the nozzle at retailer (B), they will never be able to figure out if they are winning or losing.
>
> PMAA will continue to focus on opposing Gilbarco at the NCWM vote in July. Gilbarco needs to get 27 state WM delegates to show up and vote yes for permissive temp com. Considering only 30-35 usually show up and most of the northern officials are opposed to Gilbarco, I think we can win.

---

[11](...continued)
Articles," Jayme Cox, Manager of Government Affairs/Southwest for Shell Oil Company, wrote as follows:

> Very good ammunition. When you open this, you'll have to scroll down to see the article. If we buy any dispensers from Gilbarco, we need to have somebody call and tell them to back off if they want to sell anything to us. With all the recent changes in marketing, do we still have any company owned stores?

Plaintiffs' Exhibit 69. The summary judgment record does not identify the recipients. Based on email addresses, they appear to be internal Shell Oil personnel, e.g. Cox, Jayme SHLOIL-CA, Press, David L SHLOIL-CA, O'Donovan, Kevin M. SHLOIL-CA.

[12]     The summary judgment record does not identify Donoghue. Based on context, it appears that she may be affiliated with *Oil Express*. See Plaintiffs' Exhibit 46. The summary judgment record does not disclose Gilligan's position with PMAA or McKeeman's position with COIMA.

10

Plaintiffs' Exhibit 47.

In a follow-up email, Gilligan stated as follows:

I detect that Gilbarco is really in a crisis communications situation – with various parts of the company on different pages. I can tell you they are feeling the heat from our membership – would not want to be one of their sales people right now!

Id.

On February 2, 2007, Tom Robinson, president of Robinson Oil Company emailed Don Murashima of Gilbarco that the potential costs of ATC to a California marketer are "enormous." Robinson stated that marketers do not believe Gilbarco's claim that it is not promoting change and that it only applied for ATC certification at a customer's request. Robinson stated that Gilbarco will lose business and has a significant public relations hurdle to overcome. Plaintiffs' Exhibit 44.

On February 6, 2007, Dale Boyett, president of Boyett Petroleum, emailed McKeeman, Gilligan and others that Murashima told him that Gilbarco was not marketing the ATC product in California and that they needed to get approval at the national level of weights and measures at the June meeting. Plaintiffs' Exhibit 43. Boyett stated as follows:

If you start asking questions Weights and Measures may start looking for answers. [Temperature control] is not required. I think that we should be applying our pressure on Gilbarco to not market this product. If Weights and Measures wants to talk about the state mandating [temperature control] we want to be front and center on that issue. We don't want to help them figure out how to implement something that is not required.

Plaintiffs' Exhibit 43.

The next day, McKeeman responded to Boyett as follows:

Dale – Handbook 44 is silent on whether t-c is allowed at retail, so we need to know [what] the Division is thinking on this issue. Many claim silence = not allowed, others think differently. Since Gilbarco has a certified device, we must assume that they will market it. However, we need to advocate that Gilbarco stay off the lobbying on if it is allowed, or required. They have stated publicly that they are not

>lobbying on this issue, but that is not what is being seen by many industry observers. Push hard to make the point that Gilbarco needs to stay clearly "neutral", or else the market will perceive them as not being honest brokers.

Plaintiffs' Exhibit 43.

On February 8, 2007, Boyett reported to McKeeman that his meeting with Gilbarco "went pretty good" and "I honestly think they are going to change positions on this and not market this product in CA." Plaintiffs' Exhibit 43.

The same day, Lucy Sackett of Gilbarco emailed Donoghue that Gilbarco no longer believed there would be a demand for ATC retrofit kits and that Gilbarco had no current plans to pursue approvals. Plaintiffs' Exhibit 42. Donoghue forwarded the email to McKeeman who forwarded it to Boyett, who replied, "They are slowly backing down. Good work!!!" Id.

On February 9, 2007, McKeeman reported to Sarah Dodge of NATSO that "[t]he Gilbarco sales people have not had a happy week in our fine state." Plaintiffs' Exhibit 56.

The next day, Dodge emailed McKeeman that Gilbarco was aggressively pushing their equipment and "we are going to have our members blast them directly on this." Plaintiffs' Exhibit 41.

Internal emails at Gilbarco on March 7, 2007 indicate that their distributors had heard people talking about boycotting Gilbarco.

On May 17, 2007, CTEP issued a certificate of conformance for Gilbarco's Encore series, i.e. retail motor fuel dispensers with ATC equipment. See Exhibit 27 to Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment Dismissing Plaintiffs' Requests For Injunctive Relief (Doc. #3124) filed December 16, 2011.

On June 15, 2007, Martin Gafinowitz, President of Gilbarco, supplemented his testimony

to the House of Representatives subcommittee on the issue of hot fuel.[13] See Plaintiffs' Exhibit 54. Gafinowitz stated that Gilbarco had applied for the California certificate because it had received customer inquiries and one order for ATC product following news articles regarding hot fuel. Id. Gafinowitz stated that after Gilbarco received the California certification, it became clear that no demand existed for the ATC product. Specifically, Gafinowitz stated as follows:

> After we received certification from California, however, the industry's position was fairly widely stated: that the industry and a number of industry bodies are not in favor of installing this equipment. We did not feel "pressured," but we understood that our customers did not intend to buy ATC equipment. This negative market reaction confirmed an absence of demand that would justify taking the next steps to bring ATC to market. Under these circumstances, we decided that we did not need to take the final steps to develop the product until such time as we had actual customers ready to buy the equipment, and clarity of the regulations governing it.[14]

Id.

In early August of 2007, the California certificate of conformance for Gilbarco's Encore series was amended to remove the ATC option. Cotsoradis Depo. at 25:13-26:2, Exhibit B to Defendants' Memorandum In Support Of Their Motion To Exclude Expert Testimony And Report Of Constantine Cotsoradis (Doc. #2636) filed November 11, 2011.

In August of 2007, the trade associations, along with others, formed a coalition called the Partnership for Uniform Marketing Practices ("PUMP"). The sole purpose of the coalition was to

---

[13] The summary judgment record does not contain information regarding his initial testimony.

[14] Gilbarco understands that before it can sell the dispenser in California, a couple of regulatory technical issues would need to be resolved with the State of California. Specifically, California would need to (1) come up with regulations necessary to test the equipment, i.e inspection protocols and (2) develop regulations for consumer labeling and other disclosure issues. In addition, Gilbarco would need to change its hardware and software programs to comply with California laws requiring disclosures on receipts.

oppose and block ATC for retail motor fuel sales in the United States.[15]

Despite the fact that it had received multiple customer inquiries about purchasing ATC pumps and interest had increased in the years leading up to 2007, Gilbarco halted production and marketing of its ATC-equipped retail motor fuel dispensers in the United States. Gilbarco has not sold its CTEP-approved ATC fuel dispenser in California or elsewhere in the United States.

Dresser Wayne is a global supplier of retail motor fuel dispensers. Dresser Wayne manufactures and sells ATC-equipped retail motor fuel dispensers outside the United States. Dresser Wayne was aware that Gilbarco had submitted an ATC-equipped retail dispenser for approval in California in 2007. In February of 2007, the vice-president of Dresser Wayne wrote a letter to customers which stated that because Dresser Wayne was committed to its customers' continued profitability, it has not advocated the use of ATC in the United States. Plaintiffs' Exhibit 62. The letter stated that should NCWM develop a national standard, "please rest assured that we will be ready to provide you with compliant ATC systems for all electronic dispenser series, as well as retrofitted systems for select legacy models." Id.

## **Analysis**

Plaintiffs assert that defendants are members of one of more petroleum trade associations and that through these trade associations, defendants conspired to prevent adoption of ATC technology in the United States. To prove a claim for civil conspiracy, plaintiffs must show the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the

---

[15] Plaintiffs assert that defendants and their trade associations formed PUMP. Plaintiffs' Response at 5, ¶ 5. The evidence which they cite does not show that defendants participated in the efforts. See id.

proximate result thereof." Stoldt v. City of Toronto, 678 P.2d 153, 161 (Kan. 1984). Defendants assert that plaintiffs cannot show the third element, i.e. a meeting of the minds.[16]

Plaintiffs assert that defendants conspired to prevent temperature compensation for retail motor fuel sales in the United States. Plaintiffs contend that "substantial circumstantial evidence" shows that defendants had a meeting of the minds through the actions of trade associations which defendants "control and direct." Plaintiffs' Response (Doc. #3155) at 41. Specifically, plaintiffs assert that (1) defendants' trade associations had clear-cut policies to "kill" retail ATC; (2) defendants direct the policies and decision-making of their trade associations; and (3) the circumstances and timing of trade association policies related to ATC demonstrate a meeting of the minds. Id. at 41-42.

Plaintiffs' assertion is fundamentally flawed because no evidence suggests that defendants controlled or directed trade association activity. Plaintiffs have not established which defendants are members of which trade associations, let alone that defendants direct the policies and decision-making of those trade associations. Plaintiffs assert generally that "[m]ember employees hold positions in the trade associations, including service on committees and boards of the trade associations," "Defendants' trade associations act at the direction, control and request of their members" and "Defendants' trade associations are the voice and mouthpiece of their members." Id. at 3-4, ¶¶ 2-4. But plaintiffs cite no evidence that any employees of these defendants served on boards or in leadership capacities with any trade associations or that defendants directed, controlled, requested or even participated in trade association action in any other way. See id.

---

[16] Defendant also assert that plaintiffs cannot show the fourth element, i.e. one or more unlawful overt acts. Because the Court finds that plaintiffs have not presented evidence sufficient to establish a meeting of minds, it does not reach defendants' remaining arguments.

Without such evidence, plaintiffs cannot show that defendants conspired through the actions of their trade associations.  See In re Asbestos Sch. Litig., 46 F.3d 1284, 1289-90 (3d Cir. 1994) (member not liable for unlawful acts of trade group unless member specifically intended to further that activity); see also AD/SAT, Div. of Skylight, Inc. v. Assoc. Press, 181 F.3d 216, 234 (2d Cir. 1999) (antitrust) (every action by trade association not concerted action by members; plaintiff must show that members in individual capacities consciously committed themselves to common scheme designed to achieve unlawful objective); Moore v. Boating Indus. Ass'n, 819 F.2d 693, 712 (7th Cir. 1987) (antitrust) (mere membership and participation in trade association insufficient; must show actual knowledge and participation in illegal scheme); Wright v. Brooke Group Ltd, 652 N.W.2d 159, 173-74 (Iowa 2002) (mere membership in industry group does not make company liable for tortious acts of other group members).

On this record, plaintiffs have not shown a genuine issue of material fact whether defendants conspired to prevent temperature compensation for retail motor fuel sales in the United States. While plaintiffs need not show an express agreement, they must show specific facts which support the inference of an agreement.  See Vazirani & Assoc. Fin. LLC v. Heitz, No. 11-1032-MLB-KGS, 2011 WL 2295027, at *3 (D. Kan. June 8, 2011).  Plaintiffs have not done so.  Accordingly, defendants are entitled to summary judgment on plaintiffs' conspiracy claims.

**IT IS THEREFORE ORDERED** that Defendants' Motion For Partial Summary Judgment Dismissing Plaintiffs' Conspiracy Claims (Doc. #2711) filed November 1, 2011 be and hereby is **SUSTAINED.**  The Court grants summary judgment on plaintiffs' civil conspiracy claims in favor of BP Products North America Inc., Circle K Stores, Inc., ConocoPhillips Company, Flying J, Inc.,

Kum & Go, L.C., QuikTrip Corp. and Equilon Enterprises LLC d/b/a Shell Oil Products.

Dated this 22nd day of March, 2012 at Kansas City, Kansas.

                                            s/  Kathryn H. Vratil
                                            KATHRYN H. VRATIL
                                            United States District Judge