## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IN RE: MOTOR FUEL TEMPERATURE ) 
SALES PRACTICES LITIGATION ) 
                                 )     **MDL No. 1840** 
**This Document Relates To:** )     **Case No. 07-1840-KHV** 
                                 ) 
**Wilson, et al. v. Ampride, Inc., et al.,** ) 
      **Case No. 06-2582-KHV,** ) 
                                 ) 
**and** ) 
                                 ) 
**American Fiber & Cabling, LLC, et al. v. BP Products** ) 
**North America Inc., et al.,** ) 
      **Case No. 07-2053-KHV.** ) 
_____ )

## MEMORANDUM AND ORDER

This matter is before the Court on <u>Defendants' Motion For Summary Judgment On Plaintiffs' KCPA And Unjust Enrichment Claims</u> (Doc. #2705) filed November 1, 2011. Defendants argue that they are entitled to judgment as a matter of law because Kansas law specifically authorizes the sale of motor fuel without disclosing or adjusting for temperature and because Kansas law prohibits using automatic temperature compensation ("ATC") at retail. They also argue that the undisputed facts establish that defendants have not willfully concealed, suppressed or omitted any material information regarding the retail sale of motor fuel, and have not engaged in any unconscionable acts or practices under the Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-626(b)(3) and 50-627.[1] For the following reasons, the Court overrules defendants' motion.

---

[1]      On March 1, 2012, the Court sustained plaintiffs' motion to voluntarily dismiss their claims for material misrepresentation under the KCPA and unjust enrichment. <u>Order</u> (Doc. #3766). The Court also sustained the motion of Wonderland Miracle Carnival Company to dismiss all of its claims. As it relates to these claims, defendants' motion for summary judgment is moot. Defendants have requested oral argument on this motion. Because oral argument will not materially assist the determination of this motion, the Court denies the request. <u>See</u> D. Kan. Rule 7.2.

**Summary Judgment Standards**

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga</u>, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest on its pleadings but must set forth specific facts. <u>Applied Genetics</u>, 912 F.2d at 1241.

The Court views the record in the light most favorable to the nonmoving party. <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. <u>Liberty Lobby</u>, 477 U.S. at 250-51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment

in the mere hope that something will turn up at trial.  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52.

### Factual Background

Both parties' purported statements of fact are rife with legal arguments and conclusions, specifically with respect to the statutory and regulatory framework that governs the sale of motor fuel at retail in Kansas.  These are not "facts" for purposes of summary judgment.  Sprint Commc'ns Co. v. Vonage Holdings Corp., 500 F. Supp.2d 1290, 1303-04 (D. Kan. 2007) (attorney argument and commentary, legal conclusions not facts admissible in evidence under Rule 56(e), Fed. R. Civ. P.).  In its legal analysis below, the Court addresses the relevant statutes and regulations.  The Court disregards any fact that is immaterial or not properly supported by the record.  See Fed. R. Civ. P. 56(c), (e); D. Kan. Rule 56.1; Law v. Nat'l Collegiate Athletic Ass'n, 902 F. Supp. 1394, 1398 (D. Kan. 1995).

The following facts are either uncontroverted, deemed admitted or where controverted, viewed in the light most favorable to plaintiffs, the non-movants.

During the relevant time period, each defendant offered to sell motor fuel to plaintiffs and putative class members by the gallon, at a posted price per gallon.  As a unit, a gallon is defined by Kansas law and the common English dictionary to be 231 cubic inches.  Handbook 44, App. B at B-1; Webster's Third New International Dictionary 931 (1993) (unabridged).  A "gross gallon" is a specific volume of motor fuel at any temperature (231 cubic inches with no reference temperature).  A "net gallon" is a specific volume of motor fuel at an exact temperature (231 cubic inches at 60

3

degrees Fahrenheit).  A net gallon and gross gallon are each liquid measures of volume.

A gallon of motor fuel at a higher temperature has less mass, and thus less energy, than a gallon of the same motor fuel at a cooler temperature.  The volume of gasoline expands and contracts 1 per cent for every temperature change of 15 degrees Fahrenheit.  The volume of diesel fuel expands and contracts approximately 0.6 per cent for every temperature change of 15 degrees Fahrenheit.  The parties dispute whether temperature affects the value and quality of motor fuel.

The national standard reference temperature for petroleum products – 60 degrees Fahrenheit – was adopted to remedy inequities in wholesale motor fuel transactions by enabling the buyer and seller to calculate the exact number of net gallons involved in a motor fuel transaction, regardless of the temperature of the fuel at the time of sale.  Kansas has adopted the national standard reference temperature of 60 degrees Fahrenheit for temperature-adjusted motor fuel sales.  See Handbook 44, App. D at D-2.  When defendants buy motor fuel at wholesale, they account for temperature variations by using automatic temperature compensation ("ATC") equipment.  ATC equipment measures fuel in net gallons, i.e. 231 cubic inches at 60 degrees Fahrenheit.

The temperature of motor fuel that defendants sell at retail in Kansas varies.  Defendants understand that the temperature of motor fuel affects its energy content.  They know that fuel price and value are important to retail motor fuel consumers.  Plaintiffs' expert in social psychology, Steven L. Neuberg, Ph.D., has testified that consumers expect the same amount of energy from each gallon of motor fuel they purchase at retail and that by selling motor fuel without disclosing or adjusting for temperature, retailers contribute to this expectation.  Defendants disagree.

Defendants sell motor fuel at retail in Kansas without regard to temperature (i.e. by the gross gallon).  Defendants do not use ATC equipment in the retail sale of motor fuel, they do not disclose

4

the temperature of the motor fuel they sell at retail and they do not disclose the affect of temperature of the energy content of the motor fuel they sell at retail. Plaintiffs and putative class members are unable to determine the temperature of motor fuel at retail before purchasing it. One who purchases a gallon of motor fuel at a warmer temperature therefore unknowingly receives less energy from that gallon of fuel than someone who purchases a gallon of the same motor fuel at a cooler temperature. The parties dispute whether consumers have sufficient information to make informed decisions about the value they receive when they purchase motor fuel and whether they are able to fully compare the value of motor fuel between retailers.

Defendants' advertisements do not disclose that sales of motor fuel are not adjusted for temperature, that the quality of motor fuel is affected by temperature, that the energy content and fuel economy of their branded fuel is affected by temperature or that the quality of their fuel may vary from station to station in terms of energy content. Plaintiffs contend that defendants have represented to consumers that the motor fuel which they purchase is a fungible product of standard, uniform and consistent quality in terms of the amount energy in each gallon. Defendants contend that they have advertised motor fuel by the gallon and sold it by the gallon. The retail sale of motor fuel in volumetric gallons (i.e. without compensating for temperature) is consistent with longstanding custom and practice in the industry in the United States. The parties dispute, however, whether Kansas law authorizes, requires or prohibits the sale of motor fuel in this way.

In Canada, more than 90 per cent of retailers sell motor fuel at retail with ATC equipment. Initially, a pump manufacturer promoted ATC at retail in Canada but major oil companies led the conversion to ATC in the 1990s. The average temperature of motor fuel sold in Canada is below 60 degrees Fahrenheit. The petroleum industry supported the implementation of ATC in Canada.

5

In the United States, in contrast, defendants have not implemented ATC equipment in the sale of motor fuel at retail.  On June 7, 2007, a Staff Report of the Domestic Policy Subcommittee of the Oversight and Government Reform Committee of the House of Representatives calculated that consumers would pay a "hot fuel premium" in the summer of 2007 "in the range of $1.5 billion." Doc. #3147, Ex. 49.

In partnership with the National Institute of Standards and Technology ("NIST"), the National Conference on Weights and Measures ("NCWM"), has developed specifications, tolerances and other technical requirements for weighing and measuring devices, including retail motor fuel devices.  The NIST publishes these standards in Handbook 44.  Under Kansas law, the standards and requirements in Handbook 44 apply to commercial weighing and measuring devices in Kansas. Kan. Stat. Ann. § 83-202(a)(2)(A); Kan. Admin. Regs. § 99-25-1.  The parties dispute whether Kansas must specifically approve an ATC-equipped retail motor fuel dispenser before defendants could use it to sell motor fuel at retail in Kansas.  They also dispute whether an ATC device has received a certificate of conformance that would allow defendants to use it in Kansas.

The California Division of Measurement Standards operates the California Type Evaluation Program ("CTEP"), which is an authorized National Type Evaluation Program ("NTEP") laboratory. CTEP has issued a certificate of conformance (Certificate of Approval No. 5510(a)-07) for an ATC-equipped retail motor fuel dispenser developed by Gilbarco Veeder-Root.  The certificate states that the device complies with the applicable technical requirements of the California Code of Regulations for Weighing and Measuring Devices, which requires compliance with Handbook 44.[2]

---

[2]     Plaintiffs contend that this device could be used in Kansas.  Defendants contend that no ATC device has been approved for use in the sale of motor fuel at retail in Kansas because Kansas has not approved the device, because Gilbarco Veeder-Root has not sold the CTEP-approved
(continued...)

From 2004 to August of 2010, Constantine Cotsoradis was Assistant Secretary of Agriculture for the State of Kansas.  Timothy Tyson, director of the Kansas Division of Weights and Measures since December of 2004, reported directly to Cotsoradis.  Cotsoradis supported allowing ATC at retail and thought that Kansas law did not prohibit it.  Tyson disagreed.

In 2007, the NIST completed a 50-state survey on the issue of ATC.  At the direction of Cotsoradis, Tyson responded that ATC was permitted in Kansas.  At the NCWM meeting in 2007, Kansas voted in favor of permitting ATC at retail.  That same year, Tyson e-mailed the NIST that Kansas law did not prohibit temperature compensation at retail.  Some time after the NCWM vote and Tyson's e-mail, the Kansas Department of Agriculture and the Division of Weights and Measures changed its position regarding ATC, and began opposing the implementation of ATC at retail.  Tyson testified that the rationale for the change of position was the consumer cost of implementing ATC.  The Kansas weights and measures laws regarding ATC at retail have not changed since 2007.

At the NCWM meeting in 2009, state officials considered and rejected proposals to expressly permit or mandate ATC for retail motor fuel sales.  The Law and Regulations Committee of the NCWM recommended withdrawing the proposed amendments because the overwhelming majority of comments opposed ATC, and based on "economic cost factors, lack of benefit to consumers, absence of uniformity in the marketplace, and the additional cost to Weights and Measures officials and service companies."  Onwiler Aff. (Doc. #2710-14), Ex. C.  Kansas voted in favor of the

---

[2](...continued)
device to any gas station in the United States and because it could not sell the device in the United States before making certain modifications to it.  See Cotsoradis Depo. at 25-26.  Neither party, however, addresses the fact that the CTEP certificate of conformance has been amended to remove the ATC option.  See id. at 25.

committee recommendation to withdraw the proposals to permit or mandate ATC at retail.

Tyson testified that the Kansas Division of Weights and Measures does not consider it deceptive, misleading, unfair, unjust, improper or unlawful for retailers to sell motor fuel without adjusting either the volume or the price for temperature. The Division has allowed motor fuel to be sold at retail without the use of ATC devices.

### Analysis

Defendants argue as a matter of law that their conduct (i.e. selling motor fuel at retail without disclosing or adjusting for temperature) was not deceptive or unconscionable under the KCPA because Kansas law (1) authorizes the sale of motor fuel at retail without disclosing or adjusting for temperature and (2) prohibits the use of ATC at retail. Defendants also argue that no genuine issue of material fact exists with respect to whether they willfully concealed, suppressed or omitted any material information regarding the retail sale of motor fuel, or engaged in any unconscionable acts or practices under the KCPA, Kan. Stat. Ann. § 50-626(b)(3) and 50-627.

**I.     Regulation Of Motor Fuel Sales In Kansas**

Kansas has adopted the 2010 edition of the NIST Handbook 44, which provides the "specifications, tolerances, and other technical requirements for weighing and measuring devices." Kan. Stat. Ann. § 83-202(a)(2)(A); Kan. Admin. Regs. § 99-25-1.[3] These standards apply to "commercial, data-gathering, and weighing and measuring devices in the state." Kan. Admin. Regs. § 99-25-1.[4]

---

[3]     The parties cite, and attach to their briefs, the 2011 edition of Handbook 44. It appears that the 2010 and 2011 editions are substantially the same with respect to the relevant provisions. The Court, however, cites the 2010 edition.

[4]     Kansas has also adopted the following uniform regulations published in the 2009
(continued...)

Section 1.10 of Handbook 44 provides a "General Code," which "shall apply to all classes of devices as covered in the specific codes," but the "specific code requirements supersede the General Code requirements in all cases of conflict."  Handbook 44 § 1.10 at 1-3 (G-A.2.).  Section 3.30 of Handbook 44 governs "devices used for the measurement of liquids, including liquid fuels and lubricants."  It provides specifications, notes on testing, tolerances and user requirements.  With respect to the manner in which a liquid measuring device should indicate and record its deliveries, Section 3.30 provides as follows:

> **S.1.2. Units. –** A liquid-measuring device shall indicate, and record if the device is equipped to record, its deliveries in liters, gallons, quarts, pints, fluid ounces, or binary-submultiples or decimal subdivisions of the liter or gallon.
>
> > **S.1.2.1. Retail Motor-Fuel Devices.** – Deliveries shall be indicated and recorded, if the device is equipped to record, in liters or gallons and decimal subdivisions or fractional equivalents thereof.

Handbook 44 § 3.30 at 3-5.

Appendix B of Handbook 44, which provides the origin and development of units and systems of measurements, defines a "unit" as a "special quantity in terms of which other quantities are expressed."  It further provides that "[i]n general, a unit is fixed by definition and is independent of such physical conditions as temperature.  Examples: the meter, the liter, the gram, the yard, the pound, the gallon."  Handbook 44, App. B at B-1.  Appendix C defines a gallon as four quarts, or 231 cubic inches.  Id. App. C at C-3.  Appendix B defines a "standard" as "a physical realization or representation of a unit."  Id. App. B at B-1.  A standard, "[i]n general, is not entirely independent of physical conditions, and it is a representation of the unit only under specified conditions.  For

---

[4](...continued)
edition of the NIST Handbook 130: uniform packaging and labeling regulation, uniform regulation for the method of sale of commodities and uniform engine fuels and automotive lubricants regulation (with certain exceptions).   Kan. Stat. Ann. § 83-202(a)(2)(B); Kan. Admin. Regs. § 99-25-9.

example, a meter has a standard length of one meter when at some definite temperature and supported in a certain manner." Id.  Appendix B cautions that it is essential to keep in mind "the distinction between the terms 'units' and 'standards.'" Id.

Section 3.30 of Handbook 44 also provides specifications for "temperature determination" and "wholesale devices equipped with automatic temperature compensators." See, e.g., Handbook 44 § 3.30 at 3-13.  The ATC and temperature-related specifications, however, relate only to "wholesale devices" – not to "retail devices." See, e.g., id. at 3-13 (S.2.6, S.2.7, S.4.3); see also, e.g., id. at 3-16 (N.4.1.1), 3-22 (UR.3.6).  For example, Section 3.30 specifies marking requirements for both wholesale and retail devices.  With respect to wholesale devices, the marking requirements include both discharge rates and temperature compensation, whereas the marking requirements for retail devices include discharge rates but not temperature compensation.  Id. at 3-15 (compare S.4.3 with S.4.4).  Every time Section 3.30 mentions temperature compensation, it is in the context of wholesale devices.

Kan. Stat. Ann. § 83-219 enforces the regulations in Handbook 44.  Section 83-219 provides as follows:

> It shall be unlawful for any person:
>
> ***
>
> (2)    to use or possess a weight, measure or weighing or measuring device that is used for or intended to be used for commercial purposes which does not meet the tolerance and specifications required by Chapter 83 of the Kansas Statutes Annotated, . . . or that does not conform to the standard authorized by the secretary for determining the quantity of any commodity or article of merchandise, for the purpose of:
>
>> (A) Buying or selling any commodity or article of merchandise;
>
> ***

10

(19)   to fail to follow the standards and requirements established in K.S.A. 83-202, and amendments thereto, or any rules and regulations adopted thereunder . . . .

The implementing regulations provide that "[n]o person shall use a weighing or measuring device for commercial purposes within the state of Kansas unless a certificate of conformance has been obtained for the weighing or measuring device before its use for commercial purposes within the state of Kansas." Kan. Admin. Regs. § 99-25-3(a). A "certificate of conformance" is a "document issued by the national institute of standards and technology, national conference on weights and measures, or other authorized laboratory establishing that the weight or measure or weighing or measuring instrument or device meets the requirements of the national institute of standards and technology handbook 44." Id. § 99-25-3(b). Section 99-25-3(d) provides exceptions to the certificate of conformance requirement for a "a weighing or measuring device manufactured and installed in the state before May 1, 1986," and for "a one-of-a-kind device or type of weighing and measuring device for which there are no weighing and measuring devices that are traceable to a certificate of conformance if the weighing or measuring device complies with the applicable requirements" of Handbook 44. Id. § 99-25-3(d).

Defendants argue that by authorizing the use of gas pumps that do not disclose or adjust for temperature, Kansas law authorizes the sale of motor fuel by the volumetric gallon without disclosing or adjusting for temperature. In addition to Handbook 44, and the statutes and regulations cited above, defendants rely on the testimony of Timothy Tyson, Director of the Division of Weights and Measures of the Kansas Department of Agriculture. He testified that the Division does not consider it a violation of Kansas law or regulations to sell motor fuel at retail without adjusting or compensating for temperature. Tyson Depo. at 42-43.

11

Plaintiffs argue, however, that Handbook 44 does not expressly authorize the sale of motor fuel without disclosing or adjusting for temperature.  The parties' arguments hinge on the difference between a "unit" and a "standard."  As noted above, a unit is a "special quantity in terms of which other quantities are expressed," and, "[i]n general, . . . is fixed by definition and is independent of such physical conditions as temperature."  Handbook 44, App. B at B-1.  The "gallon" is an example of a unit.  Id.  A standard, on the other hand, is "a physical realization or representation of a unit," that, "[i]n general, it is not entirely independent of physical conditions."  Id.  In other words, "it is a representation of the unit only under specified conditions," for example, temperature.  Id. Plaintiffs argue that references to "gallon" in Section 3.30 of Handbook 44, which pertains to liquid-measuring devices, refers to a standard (i.e. 231 cubic inches of liquid at a certain temperature) – not a unit (i.e. 231 cubic inches of liquid).  Plaintiffs note that Handbook 44 does not expressly define the term "gallon" for purposes of Section 3.30.

Plaintiffs emphasize that a unit, such as the gallon, is only "[i]n general" independent of physical conditions such as temperature.  They also rely on Kan. Stat. Ann. § 83-203, which refers to "primary standards" and "secondary standards."  Kan. Stat. Ann. § 83-203 (emphasis added). Specifically, the statute refers to the NIST model rules that Kansas has adopted as "the state primary standards of weights and measures."  Id. (emphasis added).  The statute defines primary standards as "the physical standards of the state which serve as the legal reference from which all other standards and weights and measures are derived."  Id. § 83-201(d).  It defines secondary standards as the physical standards which are traceable to the primary standards through comparisons, using acceptable laboratory procedures, and used in the enforcement of weights and measures laws and rules and regulations."  Id. § 83-201(e).  Based on these definitions, plaintiffs argue that the

12

"standards" in Handbook 44 are not simply units without reference to physical conditions like temperature, and that the term "gallon" in Section 3.30 of Handbook 44 should be read to mean a temperature-adjusted gallon (i.e. 231 cubic inches at 60 degrees Fahrenheit).  Plaintiffs also rely on the testimony of Richard Suiter, former Weights and Measures Coordinator for the NIST and editor of Handbook 44, to support their argument that the reference to "gallon" in Section 3.30 of Handbook 44 implicitly means a temperature-adjusted gallon, as opposed to a simple unit (i.e. 231 cubic inches, irrespective of temperature).

    **A.**       **Whether Kansas Law Authorizes Retail Sale Of Fuel On Volumetric Basis**

The parties' arguments with respect to whether Kansas law authorizes the retail sale of motor fuel on a volumetric (i.e. gross) basis center on Section 3.30 of Handbook 44.  Plaintiffs correctly argue that Section 3.30 does not permit or prohibit a particular "method of sale," but it does provide the specifications for devices that must be used to dispense motor fuel in Kansas.  As such, it provides an indication whether motor fuel retailers in Kansas may sell motor fuel on a volumetric basis.

Handbook 44, Section 3.30, refers to liquid measuring devices that measure units, for example gallons.  See, e.g., Handbook 44 § 3.30 at 3-5, 3-7 through 3-9, 3-19, 3-21.  Under the subheadings "Units" (S.1.2.) and "Retail Motor-Fuel Devices" (S.1.2.1.), Section 3.30 states that "[d]eliveries shall be indicated and recorded, if the device is equipped to record, in liters or gallons and decimal subdivisions or fractional equivalents thereof."  Handbook 44 § 3.30 at 3-5.  Appendix B defines a "unit" as a "special quantity in terms of which other quantities are expressed," which "[i]n general" is independent of physical conditions, such as "the gallon."  Handbook 44, App. B at B-1.  As plaintiffs note, Appendix B does not purport to define terms used elsewhere in

Handbook 44; rather it provides a history and present status of units and systems of measurement. As such, however, Appendix B does provide a basis for interpreting the Handbook's provisions.

Appendix B stresses that "[i]t is essential that the distinction between the terms 'units' and 'standards' be established and kept in mind."  Handbook 44, App. B at B-1.  In Section 3.30, Handbook 44 uses the term "unit" or "gallon" to describe the specifications, tolerances and user requirements for retail motor fuel devices.  It does not use the term "standard" or refer to temperature-adjusted gallons in the retail context.  Although a unit is independent of temperature only "[i]n general," plaintiffs provide no convincing reason to construe the terms "unit" or "gallon" in Section 3.30 to mean "standard" or "temperature-adjusted gallon."

Section 83-202(b) provides that "[w]henever there exists an inconsistency between the provisions of chapter 83 of the Kansas Statutes Annotated, and amendments thereto, and any of the handbooks adopted by reference, the requirements of chapter 83 of the Kansas Statutes Annotated, and amendments thereto, shall control."  Kan. Stat. Ann. § 83-202(b).  Plaintiffs argue that various statutory provisions indicate that the Kansas legislature interpreted Handbook 44 to require the sale of motor fuel in temperature-adjusted or "standard" gallons.  They rely primarily on Section 83-203, a somewhat enigmatic provision.  It provides in part as follows:

> Weights and measures that are traceable to the United States prototype standards supplied by the federal government, or approved as being satisfactory by the national institute of standards and technology, shall be the state primary standards of weights and measures and shall be maintained in such calibration as prescribed by the national institute of standards and technology.

Kan. Stat. Ann. § 83-203.  The statute broadly defines "weights and measures" as "all commercial weights or measures of every kind, instruments and devices for weighing and measuring, and any appliance and accessories associated with any or all such instruments and devices and any

14

point-of-sale system." Id. § 83-2010(a).  And it defines "primary standards" as "the physical standards of the state which serve as the legal reference from which all other standards and weights and measures are derived." Id. § 83-201(d).  It is unclear how "instruments and devices for weighing and measuring" could be "physical standards" as plaintiffs construe the term; that is, a physical representation of a unit under specified conditions, "such as when adjusted based on a reference temperature." Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment Dismissing Plaintiffs' Requests For Injunctive Relief (Doc. #3150) filed December 22, 2011 at 28.[5]   Plaintiffs do not address the apparent incongruities in Section 83-203.  Instead they call it "plain and unambiguous." See id. at 29.  Plaintiffs argue that "the Kansas primary standards, by definition, are not simply units without reference to physical conditions like temperature," and that "a unit can only be 'traceable' to the Kansas primary standards of weights and measures when 'related to a reference' in some fashion." Id. at 31.  The Court is not convinced, however, that the Section 83-203 evinces intent to trump the plain language of the specifications in Handbook 44, Section 3.30, which require retail motor fuel dispensers to "indicate[] and record[], if the device is equipped to record," in liter or gallon units "and decimal subdivisions or fractional equivalents thereof."  Handbook 44 § 3.30 at 3-5 (S.1.2.1.).

Moreover, Section 83-202(a)(2), which adopts Handbook 44 by reference, does not mention "primary standards" or "physical standards."  Instead it refers to "standards and requirements" and the "standards of the national conference on weights and measures." Kan. Stat. Ann. § 83-202(a)(2).

---

[5]   Plaintiffs' response to defendants' motion for summary judgment on plaintiffs' KCPA claims incorporates by reference the arguments in Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment Dismissing Plaintiffs' Requests For Injunctive Relief (Doc. #3150). Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment On Plaintiffs' KCPA And Unjust Enrichment Claims (Doc. #3147) at 28 n.2.

15

This provision does not make a technical distinction between units and standards, primary standards or physical standards.  The statute does not define the term "standard," and in context, the most reasonable interpretation of the word "standards" in Section 83-202 is according to its ordinary meaning, which is "something that is established by authority, custom, or general consent as a model or example to be followed," (e.g. criterion, test or gauge).  Webster's Third New International Dictionary 2223 (1993) (unabridged); see McGuire v. Am. Family Mut. Ins. Co., 448 Fed. Appx. 801, 809 (when interpreting statutes, courts should give ordinary words their ordinary meaning) (citing  Fisher v. DeCarvalho, 45 Kan. App.2d 1133, 1138, 260 P.3d 1218, 1224 (2011)).[6] Section 83-202(a)(2)(A) should therefore be interpreted to provide: "The following [criteria] and requirements shall apply to commercial weighing and measuring devices . . . ."  See Webster's Third New International Dictionary 2223 (1993) (unabridged); Kan. Stat. Ann. § 83-202(a)(2)(A).

The same applies to Section 83-204, which provides in part as follows:

> All contracts, sales or purchases made for work to be done, or for anything to be sold or delivered or done by weight or measure within this state shall be taken and construed in terms of and according to the standards of weights and measures adopted under this act, except where parties have agreed upon any other calculations or measurement.

Kan. Stat. Ann. § 83-204.  The plain language of this provision requires that contracts, sales or

---

[6]        Plaintiffs rely on Kan. Stat. Ann. § 77-201 to argue that the Court should construe the term "standard" in the statute according to its technical meaning in metrology.  See Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment Dismissing Plaintiffs' Requests For Injunctive Relief (Doc. #3150) at 35.  Section 77-201 provides that "[w]ords and phrases shall be construed according to the context and the approved usage of the language, but technical words and phrases, and other words and phrases that have acquired a peculiar and appropriate meaning in law, shall be construed according to their peculiar and appropriate meanings." Kan. Stat. Ann. § 77-201 (emphasis added).  It therefore does not require the Court to construe terms according to their technical meaning in metrology.  Rather, where terms do not have specialized meaning in law, the Court must construe statutory provisions in context and based on their plain language.  See id.  The Court has done so here.

purchases for anything sold or delivered or done by weight or measure in Kansas should be construed in light of the criteria for commercial weights or measures of every kind, instruments or devices for weighing and measuring, et cetera, in Handbook 44 and others which Kansas has adopted.

Sections 83-202 and 83-204 are therefore not inconsistent with Handbook 44 and do not provide a basis for overriding the plain language of Handbook 44.  See Kan. Stat. Ann. § 83-201(a), 83-202, 83-204.  Plaintiffs' attempt to characterize Handbook 44 as referring to net gallons, as opposed to gross gallons, is therefore unconvincing.  The plain language of Handbook 44 indicates that unless it expressly provides otherwise, as it does with wholesale motor fuel devices, it authorizes the sale of motor fuel through devices that dispense gallons irrespective of temperature.[7]

This conclusion is also supported by the fact that Section 3.30 expressly distinguishes the specifications for retail motor fuel devices, which do not mention temperature adjustment, from the specifications for wholesale motor fuel devices, which do mention temperature adjusting devices.[8] Generally when a statute or regulation "includes a specific term in one provision . . ., but excludes it in another, it is presumed that the term does not govern the sections in which it is omitted."  Qwest Commc'ns Int'l, Inc. v. FCC, 398 F.3d 1222, 1232 (10th Cir. 2005).  Therefore the temperature

---

[7]     Motor fuel retailers in Kansas have long sold motor fuel by the gross gallon irrespective or temperature without facing regulatory action or sanctions by the Kansas Division of Weights and Measures.  See Tyson Depo. at 42.

[8]     Plaintiffs argue that construing the term "gallon" in Handbook 44, Section 3.30 as "gross gallon" would conflict with provisions in Section 3.30 that allow ATC-equipped wholesale motor fuel devices.  The provisions that address wholesale devices distinguish wholesale devices from retail devices and expressly permit ATC at wholesale.  ATC-equipped wholesale devices are thus required to meet different specifications than devices not equipped with ATC.  See Handbook 44 § 3.30 at 3-13 (S.2.7.).  The separate set of specifications thus alleviate the purported conflict which plaintiffs raise.

17

determination and compensation provisions in Section 3.30, which are limited to wholesale devices, do not require retail devices to determine temperature or compensate for changes in temperature. Even at wholesale, these specifications appear to simply permit – not require – ATC. <u>See</u> Handbook 44 § 3.30 at 3-13 (S.2.7.) (device "may" be quipped with ATC).  This is not to say, however, that Kansas law prohibits ATC at retail, but simply that it <u>authorizes</u> the sale of fuel in gross gallons.

### B.      Whether Kansas Law Prohibits ATC At Retail

Defendants argue that Kansas law prohibits the use of ATC in the sale of motor fuel at retail. Although Kansas law authorizes the sale of motor fuel at retail by the gross gallon, it is not clear whether Kansas law categorically prohibits the use of ATC.  To the extent that defendants argue that the use of ATC-equipped retail motor fuel dispensers is not allowed in Kansas because no such device has received a certificate of conformance that would allow it to be used in Kansas, defendants can make these arguments to a jury.  To the extent that defendants argue that no ATC-equipped retail motor fuel device could receive a certificate of conformance that would allow it to be used in Kansas, the Court need not reach this issue.  As discussed below, defendants do not explain why they would be entitled to judgment as a matter of law even if Kansas law does prohibit the use of ATC at retail.

## II.      Kansas Regulatory Framework Does Not Absolutely Shield Defendants From Liability Under The KCPA

### A.      Authorization Of Retail Sale Of Motor Fuel Does Not Entitle Defendants To Judgment As A Matter Of Law

Defendants argue that as a matter of law, because Kansas law authorizes the retail sale of motor fuel without disclosing or adjusting for temperature, they cannot be liable under the KCPA for doing so.  Defendants rely primarily on <u>Gonzales v. Associates Financial Service Co. of Kansas,</u>

18

266 Kan. 141, 967 P.2d 312 (1998), for the proposition that an act authorized by statute or regulation cannot constitute a violation of the KCPA.[9]

In Gonzales, a consumer loan borrower sued his lender under the KCPA for charging origination fees on second and third refinancings based on the entire amount financed rather than on the smaller amount of new money the lender loaned him. 266 Kan. at 142, 967 P.2d at 315. The lender argued that its conduct could not be deceptive because it complied with the requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., as incorporated into the Kansas Uniform Commercial Credit Code ("UCCC") by Kan. Ann. Regs. § 75-6-26(c) and Kan. State Ann. §§ 16a-3-206, 16a-6-117. Id. at 166, 967 P.2d at 328. The borrower argued that complying with the TILA by making all required disclosures did not insulate the lender's deception from the KCPA. Id. at 165, 967 P.2d at 327. The Kansas Supreme Court noted the parties' arguments and found "no showing in the record that [the lender] either purposefully withheld relevant information or misstated facts with the intention of deceiving" the borrower. Id. at 166, 967 P.2d at 328. It did not, however, directly address the parties' arguments.

In dicta, the Kansas Supreme Court stated that the lender's "finance charges, disclosures, and practices, which appear to mirror other lenders in the Kansas consumer loan industry, may not seem fair to some who walk and work on Main Street, Kansas; however, [the lender's] conduct under the facts here, violates neither statute nor case law. Relief lies with the legislature." Id. Defendants interpret Gonzales to hold that because the lender complied with the TILA disclosure requirements, its failure to disclose certain terms could not be deceptive as a matter of law. The Court disagrees. The Kansas Supreme Court expended great effort in interpreting the requirements of the UCCC and

---

[9]     Defendants also rely on Tufts v. Newmar Corp., 53 F. Supp.2d 1171 (D. Kan. 1999), but as plaintiffs noted in their response, its relevance is unclear.

the TILA, and finding that the lender's disclosures tracked the disclosure requirements.  See id. at 149-58, 967 P.2d at 319-23.  If it wanted to hold that compliance with the TILA disclosure requirements, per se, absolutely shielded the lender from the borrower's KCPA claim, it could have said so.  But it did not.  Instead it rested its holding on an independent finding that the record contained no evidence of intent to deceive.  Therefore, even if Kansas law authorizes defendants to sell fuel without disclosing or adjusting for temperature, compliance with the regulations is not by itself enough to shield defendants from liability under the KCPA.

### B.     Even If Kansas Law Prohibits ATC At Retail, It Does Not Entitle Defendants To Judgment As A Matter Of Law

Defendants argue that as a matter of law they "cannot . . . violate the KCPA by failing to install ATC devices on retail motor fuel dispensers because it would be illegal in Kansas to use such devices."  Memorandum In Support Of Defendants' Motion For Summary Judgment On Plaintiffs' KCPA And Unjust Enrichment Claims (Doc. #2710) filed on November 1, 2011 at 13.  Defendants do not explain, however, why this argument would entitle them to judgment as a matter of law.  Plaintiffs claim that defendants willfully omitted material information (i.e. temperature and/or the affect of temperature) in the sale of motor fuel at retail, and that defendants' acts and/or practices are unconscionable under the KCPA.  They assert that implementing ATC at retail would enhance the fairness and transparency of purchasing fuel at retail, but plaintiffs' claims do not hinge on whether defendants could legally install ATC motor fuel dispensers.  Even if it was illegal for defendants to install ATC-equipped motor fuel devices at retail, they could have disclosed the temperature of the fuel or the affect of temperature on fuel without using ATC.  See Tyson Depo. at 269-99.

The question, then, is whether genuine issues of material fact exist as to whether defendants

have willfully omitted material information in selling motor fuel to consumers and whether their acts and/or practices are unconscionable in violation of the KCPA.

**III.    Genuine Issues Of Material Fact Exist As To Whether Defendants Have Violated The KCPA**

Plaintiffs bring two KCPA claims against defendants, one for willfully concealing, suppressing, omitting or failing to state a material fact in connection with a consumer transaction, Kan. Stat. Ann. § 50-626(b)(3), and another for unconscionable acts and/or practices, id. § 50-627.

**A.    Willful Omission Claim**

To prevail on their willful omission claim, plaintiffs must show that (1) plaintiffs were consumers under the KCPA, (2) defendants were suppliers under the KCPA, (3) defendants willfully failed to state a material fact, or willfully concealed, suppressed or omitted a material fact in the sale of motor fuel to plaintiffs and (4) plaintiffs and the class members have been aggrieved by defendants' willful failure to disclose a material fact, or by defendants' willful concealment, suppression or omission of a material fact in the sale of motor fuel.  Amended Pretrial Order (Doc. #3809) filed March 20, 2012 at 16-17.

Defendants' motion for summary judgment addresses only the third element, i.e. whether defendants willfully failed to state a material fact, or willfully concealed, suppressed or omitted a material fact in the sale of motor fuel to plaintiffs.  They argue that plaintiffs have not raised a genuine issue of material fact with respect to (1) whether they have a duty under the KCPA to disclose the temperature of, or the affect of temperature on, the motor fuel they sell and (2) whether their alleged omissions were "willful" under the KCPA.  Id.

**1.    Duty To Disclose Temperature**

To satisfy the third element of their willful omission claim, plaintiffs must first show that

defendants had a duty to disclose the material fact. <u>Williamson v. Amrani</u>, 283 Kan. 227, 246, 152 P.3d 60, 73 (2007), <u>superseded by statute on other grounds as noted in</u> <u>Kelly v. VinZant</u>, 287 Kan. 509, 521, 197 P.3d 803, 811 (2008) (duty to disclose prerequisite to willful nondisclosure, concealment, suppression or omission under KCPA, Kan. Stat. Ann. 50-626(b)(3)). Under the KCPA, a supplier has a duty to disclose a material fact if the supplier knows that the consumer is entering into a transaction under a mistake as to the material fact, and the consumer would reasonably expect disclosure of such material fact based on the relationship between the consumer and the supplier, the customs and trade or other objective circumstances. <u>Williamson</u>, 283 Kan. at 246, 152 P.3d at 73 (citing <u>OMI Holdings, Inc. v. Howell</u>, 260 Kan. 305,347, 918 P.2d 1274, 1300-01 (1996); <u>Boegel v. Colo. Nat'l Bank of Denver</u>, 18 Kan. App.2d 546, 550-51, 857 P.2d 1362, 1365 (1993), <u>rev. denied</u> 253 Kan. 566).

Defendants argue that a duty to disclose only arises when the parties have unequal bargaining power or expertise, or where the parties have a fiduciary relationship. They also argue that an ordinary consumer transaction does not create a duty to disclose. To support their position, defendants rely on cases involving common law fraud claims – not KCPA claims. <u>Memorandum In Support Of Defendants' Motion For Summary Judgment On Plaintiffs' KCPA And Unjust Enrichment Claims</u> (Doc. #2710) at 12-13 (citing <u>Boegel</u>, 18 Kan. App.2d at 550-51, 857 P.2d at 1365; <u>Burton v. R.J. Reynolds Tobacco Co.</u>, 397 F.3d 906, 910-14 (10th Cir. 2005); <u>Ritchie Enters. v. Honeywell Bull, Inc.</u>, 730 F. Supp. 1041, 1053-54 (D. Kan. 1990)); <u>see also</u> <u>Williamson</u>, 283 Kan. at 242, 246, 152 P.3d at 71, 73 (common law fraud claims and KCPA claims not one and same).

Defendants primarily rely on <u>Burton</u>. That case involved whether Kansas common law recognized a consumer's claim for fraudulent concealment based on a cigarette manufacturer's

failure to warn of known product dangers. Burton argued that the manufacturer owed him a fiduciary duty, which it breached by its failure to warn. The Tenth Circuit held that

> [i]n light of the cautionary approach to fiduciary relationships mandated by the Kansas courts, and in light of the weight of core authority holding that the relationship between a product buyer and seller is not fiduciary in nature, we conclude that ordinary transactions for the sale of cigarettes do not, as a matter of Kansas law, create such fiduciary relationships.

397 F.3d at 912-13.

Although Kansas courts have looked to case law on common law fraud claims for guidance in determining whether a seller owes a consumer a duty under the KCPA, see Williamson, 283 Kan. at 246, 152 P.3d at 73, defendants cite no case where a Kansas court has held that a consumer transaction cannot create a duty to disclose under the KCPA. Moreover, Burton focuses only on whether the cigarette manufacturer owed Burton a fiduciary duty, and not whether "other objective circumstances" would lead the plaintiff to "reasonably expect disclosure of such facts." Id. at 911-13. Williamson, on the other hand, broadly defined the duty to disclose under the KCPA as requiring a seller to disclose material facts if it knows that the consumer is entering a transaction under a mistake as to the facts and because of the relationship between consumer and seller, the customs in trade or other objective circumstances, the consumer would reasonably expect disclosure of such facts. Id. Although Williamson involved a KCPA claim by a patient against a doctor – which is very different than an ordinary consumer transaction – its broad definition of the duty to disclose is consistent with the admonition of the Kansas legislature to liberally construe the provisions of KCPA so as to "protect consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. Ann. § 50-623(b). The Court therefore declines to adopt a narrower definition of the duty to disclose.

Defendants also argue that because the Kansas Division of Weights and Measures – a consumer protection agency – has determined that the implementation of ATC is not in the best interest of Kansas consumers, they had no duty to disclose fuel temperature information to plaintiffs. Even if this is true, however, defendants provide no support for their argument that such determination as a matter of law vitiates or satisfies their duty to disclose.  Moreover, construing the facts in the light most favorable to plaintiffs and drawing every reasonable inference in their favor, the record reveals a genuine issue of material fact whether plaintiffs purchased motor fuel from defendants under a mistake as to the facts regarding the motor fuel and whether, based on objective circumstances, plaintiffs would reasonably expect disclosure of such facts.

Defendants agree that a gallon of motor fuel at a higher temperature has less mass, and thus less energy, than a gallon of the same motor fuel at a cooler temperature.  They also agree that plaintiffs had no way of knowing the temperature of the motor fuel which they purchased.  And the facts permit an inference that plaintiffs would reasonably expect defendants to disclose the temperature of motor fuel sold at retail.  Summary judgment is therefore inappropriate, and a jury should decide whether defendants owed plaintiffs a duty to disclose the temperature of, or the affect of temperature on, the motor fuel plaintiffs purchased at retail.

### 2.    "Willful" Omission Or Concealment

The KCPA prohibits the "willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."  Kan. Stat. Ann. § 50-626(b)(3).  Defendants argue that for plaintiffs to prevail on their claim for willful omission or willful failure to disclose under the KCPA, they must prove intent to defraud.  Memorandum In Support Of Defendants' Motion For Summary Judgment On Plaintiffs' KCPA And Unjust Enrichment Claims (Doc. #2710) at 18 (citing

Crandall v. Grbic, 36 Kan. App.2d 179, 195-97, 138 P.3d 365, 378 (2006); Mortg. Elec. Registration Sys., Inc. v. Graham, 44 Kan. App.2d 547, 557-58, 229 P.3d 420 (Table), 2010 WL 1873567, at *7 (2010)).  The cases on which defendants rely, however, do not support such a strict reading of the term "willful" in the KCPA.

Kansas courts have repeatedly held that an act or omission is willful if a person "performed [it] with a designed purpose or intent . . . to do wrong or to cause injury to another."  Unruh v. Purina Mills, LLC, 289 Kan. 1185, 1194, 221 P.3d 1130, 1139 (2009) (per curiam) (citing PIK civ. 4th 103.04); Maberry v. Said, 911 F. Supp. 1393, 1401 (D. Kan. 1995) (citing Folks v. Kan. Power & Light Co., 243 Kan. 57, 74, 755 P.2d 1319, 1333 (1988)).  Ordinarily, whether an act or omission is deceptive under Section 50-626 of the KCPA is a question of fact for the jury.  See Farrell v. Gen. Motors Corp., 249 Kan. 231, 243, 815 P.2d 538, 547 (1991); Griffin v. Sec. Pac. Auto. Fin. Servs. Corp., 33 F. Supp.2d 926, 931 (D. Kan. 1998).  Courts grant summary judgment only "if there is no evidence of deceptive conduct."  Gonzales, 266 Kan. 141, 166, 967 P.2d 312, 328 (1998); see also Bomhoff v. Nelnet Loan Servs., Inc., 279 Kan. 415, 424, 109 P.3d 1241, 1248 (2005); Udell v. Kan. Counselors, Inc., 313 F. Supp.2d 1135, 1145 (D. Kan. 2004).

Defendants argue that the facts show only a misunderstanding about motor fuel sold at retail.  Plaintiffs argue that four sets of facts preclude summary judgment: (1) defendants use ATC when purchasing motor fuel at wholesale to protect their financial interests, (2) defendants do not use ATC when selling motor fuel at retail because defendants financially benefit from doing so, (3) defendants have lobbied against the implementation of ATC in the United States to protect their financial interests at the expense of consumers and (4) defendants pushed for ATC to be used at retail in Canada because it financially benefitted them to implement it there.  Plaintiffs have not produced

25

evidence to support their contention that defendants' decision not to use ATC at retail in the United States was motivated by financial gain, that defendants lobbied against the implementation of ATC to protect their financial interests or that they pushed for ATC at retail in Canada because it was in their financial interest to implement it there.  Plaintiffs make general averments regarding lobbying activities of "Defendants and their trade associations," and the activities of the "petroleum industry" and "retailers" in Canada, but do not specify what if any role the particular defendants in the Kansas cases played in these activities.  See Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment On Plaintiffs' KCPA And Unjust Enrichment Claims (Doc. #3147) ¶¶ 79-84.

The facts do show, however, that even though defendants knew that a gallon of warmer motor fuel contains less energy than a cooler gallon of the same motor fuel and that the energy content of fuel is important to consumers, defendants purchased temperature-adjusted motor fuel at wholesale but sold motor fuel at retail without disclosing the temperature or affect of temperature. Although plaintiffs have not produced direct evidence that defendants had a profit motive in doing so, a jury could reasonably infer that defendants sold motor fuel at retail without disclosing or adjusting for temperature with a designed purpose or intent to do wrong or to cause injury to plaintiffs.  See, e.g., Unruh, 289 Kan. at 1195-97, 221 P.3d at 1139-41 (sufficient evidence supported jury finding of violation of Kan. Stat. Ann. § 50-626(b)(3) where defendant failed to disclose that it varied the ingredients in dietary supplement products for cattle based on cost); Maberry, 911 F. Supp. at 1401 (genuine issue of material fact whether bank that financed sale of truck willfully failed to disclose odometer rollover where facts permitted inference that bank knew true mileage of truck but did not disclose it because of longstanding relationship with seller of truck).

26

**B.**     **Unconscionable Acts And/Or Practices Claim**

Section 50-627(a) of the KCPA provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction."  To prevail on their unconscionable acts and/or practices claim, plaintiffs must show that (1) plaintiffs were consumers under the KCPA, (2) defendants were suppliers under the KCPA, (3) defendants committed unconscionable acts or practices and (4) plaintiffs and class members were aggrieved by defendants' unconscionable acts and/or practices.  Amended Pretrial Order (Doc. 3809) at 17-19.

The KCPA does not specifically define what constitutes an unconscionable act or practice, but it does provide substantial guidance.  See State ex rel. Stovall v. DVM Enters., Inc., 275 Kan. 243, 249-50, 62 P.3d 653, 657 (2003).  It provides that courts shall liberally construe the KCPA to promote the policy of protecting consumers from suppliers who commit deceptive and unconscionable practices.  Kan. Stat. Ann. § 50-623(b).  It also states that in determining whether an act or practice is unconscionable, courts must consider circumstances of which defendants knew or had reason to know, including but not limited to the following:

(1)     The supplier took advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmity, ignorance, illiteracy, inability to understand the language of an agreement or similar factor;

(2)     when the consumer transaction was entered into, the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers;

(3)     the consumer was unable to receive a material benefit from the subject of the transaction;

(4)     when the consumer transaction was entered into, there was no reasonable probability of payment of the obligation in full by the consumer;

(5)     the transaction the supplier induced the consumer to enter into was excessively onesided in favor of the supplier;

(6)     the supplier made a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment; and

(7)     except as provided by K.S.A. 50-639, and amendments thereto, the supplier

> excluded, modified or otherwise attempted to limit either the implied
> warranties of merchantability and fitness for a particular purpose or any
> remedy provided by law for a breach of those warranties.

Id. § 50-627(b); see also Stovall, 275 Kan. at 249-50, 62 P.3d at 657 (listing additional factors to consider).

Defendants state that selling motor fuel without disclosing or adjusting for temperature is not unconscionable, but they do not address any of the considerations listed in Section 50-627(b) or case law.  Defendants generally argue that they represented to plaintiffs that they could purchase motor fuel at a price per gallon, which is defined by Kansas law and the common English dictionary to be 231 cubic inches without reference to temperature.  They argue that this sales practice is common knowledge and consistent with longstanding practice, and therefore is not actionable under the KCPA.  Defendants do not address the fact that temperature affects the energy content in motor fuel, that the energy content of motor fuel is important information, that they sold plaintiffs motor fuel without disclosing or adjusting for temperature and that they did not disclose affect of temperature on the energy content of the motor fuel they sold.  Without more, the Court cannot grant summary judgment for defendants.

For the reasons stated above, defendants are not entitled to judgment as a matter of law on the grounds that Kansas law authorizes the sale of motor fuel at retail by the gross gallon or that Kansas law prohibits ATC at retail.  Genuine issues of material fact exist with respect to whether defendants willfully concealed, suppressed, omitted or failed to disclose a material fact.  Genuine issues of material fact also exist with respect to whether defendants' act and/or practice of selling motor fuel at retail without disclosing or adjusting for temperature, and without disclosing the affect of temperature on motor fuel, is unconscionable.

28

**IT IS THEREFORE ORDERED** that Defendants' Motion For Summary Judgment On Plaintiffs' KCPA And Unjust Enrichment Claims (Doc. #2705) filed November 1, 2011 be and hereby is **OVERRULED**.

Dated this 2nd day of April, 2012 at Kansas City, Kansas.

s/  Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

29