# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE SALES PRACTICE LITIGATION | MDL NO. 1840 |
| | CASE NO. 07-MD-1840-KHV |
| This Document Relates to: | |
| ***Wilson, et al. v. Ampride, Inc., et al.,*** <br> ***Case No. 06-cv-2582-KHV*** | |
| And | |
| ***American Fiber and Cabling, LLC, et al. v. BP Products North America Inc., et al.,*** <br> ***Case No. 07-cv-2053-KHV*** | |

## MEMORANDUM IN SUPPORT OF
## MOTION FOR RECONSIDERATION OF
## MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
## OR, ALTERNATIVELY, FOR JUDGMENT ON THE PLEADINGS

SHOOK, HARDY & BACON L.L.P.

Tristan L. Duncan, D. Kan. #70481
A. Bradley Bodamer, D. Kan. #11468
2555 Grand Blvd.
Kansas City, MO 64108
(816) 559-2040
tlduncan@shb.com

OF COUNSEL:

Laurence H. Tribe
420 Hauser Hall
1575 Massachusetts Ave.
Cambridge, MA 02138
tribe@law.harvard.edu

Jonathan S. Massey
1325 G Street, N.W., Suite 500
Washington, D.C. 20005
JMassey@masseygail.com

ATTORNEYS FOR DEFENDANTS QUIKTRIP CORPORATION, 7-ELEVEN, INC., KUM AND GO, L.C., AND CIRCLE K STORES, INC.

**MEMORANDUM IN SUPPORT OF
MOTION FOR RECONSIDERATION OF
MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION
OR, ALTERNATIVELY, FOR JUDGMENT ON THE PLEADINGS**

Pursuant to Rules 12(b), 12(c), and 54(b), 7-Eleven, Inc., QuikTrip Corp., Kum & Go, and Circle K Stores, Inc. submit this Memorandum in Support of their Motion for Reconsideration of Motion to Dismiss for Lack of Subject Matter Jurisdiction or, Alternatively, for Judgment on the Pleadings.

**SUMMARY OF ARGUMENT**

Defendants respectfully ask this Court to reconsider its subject matter jurisdiction. Consistent with the Court's instructions at the April 13, 2012 status conference, Defendants prepared this Motion as expeditiously as possible and now seek expedited consideration before trial. The Court denied Defendants' Motion to Dismiss on **December 3, 2009**—over two years ago. Defendants had no intention of seeking reconsideration. But circumstances changed within the past five weeks that now bring the jurisdictional and constitutional issues into focus in a way that was not possible before.

On **March 26, 2012**, for example, the Supreme Court sharpened its analysis of the political question doctrine. *Zivotofsky v. Clinton*, 132 S. Ct. 1421 (2012). This Court deserves the opportunity to consider that new law in ruling on an issue as fundamental as subject matter jurisdiction. *See American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514-16 (4th Cir. 2003) (finding that a district court abused its discretion by refusing to reconsider its subject matter jurisdiction).

But more than anything else, the Court's own rulings crystallized the issues and unmasked just how extreme and unconstitutional Plaintiffs' legal theories are. Most importantly, on **April 2, 2012**, this Court ruled that "[t]he plain language of Handbook 44 indicates that … it

1

authorizes the sale of motor fuel through devices that dispense gallons *irrespective of temperature*." Doc. 4228 at 17 (emphasis added). Two days later, on **April 4, 2012**, this Court emphasized that "Kansas law authorizes the sale of motor fuel at retail in gross gallons, that is, without *accounting* for temperature." Doc. 4231 (emphasis added). The Court's choice of words was critical. The dictionary definition of "irrespective" is "without regard to something else." RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2d ed. 2001). These rulings thus established that Defendants' sale of retail fuel "without regard to" temperature has been *completely* lawful.

Those rulings about the import of Handbook 44 did not come in isolation. Just weeks earlier, on **February 6, 2012** and **March 22, 2012**, this Court had authoritatively explained the role of the federal government in creating Handbook 44. Doc. 3618 at 5-6 n.1 & 8 n.2; Doc. 3816 at 3-5. The Court first recognized NIST's role in "promot[ing] uniformity in U.S. weights and measures laws, regulations, and standards to achieve equity between buyers and sellers in the marketplace." Doc. 3816 at 3. NIST "is an agency of the U.S. Department of Commerce." *Id*. To achieve uniformity, NIST "partners with [NCWM] … to develop U.S. standards in the form of uniform laws, regulations, and methods of practice." *Id*. As to Handbook 44 itself, this Court recognized that "[e]ach year, NIST publishes Handbook 44 to provide technical requirements 'to eliminate from use, weights and measures and weighing and measuring devices that give readings that are false ….'" Doc 3816 at 4. The Court also described the cooperation between NIST and NCWM in creating Handbook 44. *See id*.

The upshot of all these new Orders is that *federal* law, working *with* Kansas law, permits the sale of retail motor fuel without reference to temperature. Defendants' three constitutional arguments flow from that premise. First, as to the political question doctrine, if the political

2

branches have legitimately exercised their authority to permit sales without respect to temperature, what authority does a court have to call those decisions into question by challenging those sales as illegal or even deceptive?  The sale of retail fuel "irrespective of temperature"— cannot simultaneously be both legal and illegal.

Second, as to preemption, the question is similar:  if federal law *permits* sales "irrespective of temperature," how can state law *prohibit* those sales or declare them "deceptive"?  It cannot.  *Cf. McMullen v. Medtronic, Inc.*, 421 F.3d 482, 489 (7th Cir. 2005) ("Where a federal requirement permits a course of conduct and the state makes it obligatory, the state's requirement is in addition to the federal requirement and thus is preempted.") (interpreting 21 U.S.C. § 360k(a)).  Significantly, the federal statute that created the Weights and Measures system commands NIST to achieve uniform standards through "**consensus**" and "**cooperation**." 15 U.S.C. § 272(b)(10) (emphasis added); *see also* 15 U.S.C. § 272(c)(4).  Lawsuits are the opposite of a cooperative, consensus based system.  By turning to adversarial, *ad hoc* lawsuits to attack the lawful metric for motor fuel sales, Plaintiffs effectively ask the Court to write "uniformity," "cooperation," and "consensus" out of the federal statute.

Third, this Court's **April 2** and **April 4** Orders also demonstrate that Plaintiffs seek to impose *retroactive* liability—*i.e.*, to find Defendants liable for conduct that was *completely* legal at the time.  The Constitution fundamentally disapproves of retroactive liability.  Thus Plaintiffs' claims would violate Defendants' due process rights and their rights under the Takings Clause. Moreover, these constitutional violations occur immediately during the liability phase of the trial—regardless of the potential remedy—because that is when the jury decides *whether* to punish Defendants retroactively.  In the remedy phase, the jury merely determines *how* to punish that conduct.

5022694 v2

There is one additional recent development that also brings these constitutional issues into focus. On **March 20, 2012**, the Court issued the Amended Pre-Trial Order, superseding the prior pleadings and at last finalizing Plaintiffs' theories of recovery. *See* Doc. 3809 at 1 & 23 n.10. Plaintiffs now assert only KCPA claims that would declare sales without temperature disclosures "deceptive." *See id*. at 16-21 & 23 n.10. Those disclosure claims violate Handbook 44 every bit as much as claims seeking an injunction to force Defendants to compensate for temperature. Temperature disclosure is merely the flip side of temperature compensation. Sales with the disclosures that Plaintiffs propose would be the opposite of sales "irrespective of temperature."

In fact, the Court has made it clear that Plaintiffs' injunction claims are now the most prominent. *See* Doc. No. 1675 at 31 (indicating that damage claims are not subject to class treatment); Doc. No. 2558 at 72-73 (same); Doc. No. 3208 at 15-16, 28 (same). This is critical because the Court denied Defendants' Motion to Dismiss, in part, by concluding that it could avoid the political question doctrine simply by declining to enter an injunction. Doc. No. 1444 at 5. By their nature, injunction claims implicate the political question doctrine because the Court would be taking its place alongside NIST and NCWM in deciding how retail motor fuel should be sold.

In fact, the lawsuit is completely different now than it was in 2009. Plaintiffs are no longer asserting breach of contract, affirmative misrepresentations, unjust enrichment, or conspiracy. The only thing that Plaintiffs urge the Court to do is to hold that Defendants should have *disclosed* the fuel temperature and the effect of temperature on motor fuel. *See* Doc. 3809 at 16-21. This Court should not be in the business of deciding how retailers should sell motor fuel. Under federal law, "NIST provides *the central* basis within the United States for a

4

*complete* and consistent system of measurement." 15 C.F.R. § 200.100(b) (emphasis added).

While the above developments provide the immediate impetus for this Motion, three new opinions since 2009 also justify reconsideration. First, the Supreme Court issued a new opinion in 2011 that powerfully emphasizes how much federal courts should defer to regulatory agencies. *See Am. Elec. Power Co., Inc. v. Connecticut*, 131 S. Ct. 2527 (2011) ("*AEP*"). In 2010, a plurality of the Supreme Court held that the Takings Clause applies to judicial decisions. *See Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection*, 130 S. Ct. 2592 (2010). Finally, in 2010, the Fourth Circuit issued a persuasive opinion explaining why preemption is appropriate in a congressional system in which the federal government decides to work extensively with the states, as Congress did in enacting the Weights and Measures regime. *See North Carolina, ex rel. Cooper v. Tennessee Valley Authority*, 615 F.3d 291, 296 (4th Cir. 2010) ("*TVA*").

There are hardly any tasks more significant for a federal court than ensuring that it properly exercises subject matter jurisdiction and that it protects constitutional rights and principles. Plaintiffs will not suffer any prejudice from an expedited review of these basic issues. Plaintiffs already "ably" addressed the political question doctrine. *See* Doc. 1444 at 4. The parties also extensively briefed the constitutional issues in the non-Kansas cases over the past few months. *See*, *e.g.*, Doc. 2720 (memorandum in support of summary judgment); Doc. 4067 (reply brief supporting summary judgment).[1] There is no surprise because Defendants raised these issues in their Answers, the Pretrial Order, and the Amended Pretrial Order.[2]

_____

[1] Defendants filed the following summary judgment briefing on these constitutional issues: Doc. Nos. 2615, 2628, 2720, 2718, 2728, 2738, 2731, 2745, 2746, 2752, 2763, 2761, 2769, 2772, 2778, 2785, 2796, 2806, 2804, 2810, 2814, 2817, 2821, 2822, 4094, 4082, 4067, 4076, 4085, 4057, 4088, 4093, 4058, 4091, 4061, 4099, 4086, 4065, 4068, 4098, 4089, 4073, 4070, 4088, 4064, 4067 and 4087.

[2] *See*, *e.g.*, Doc. 32 at 18 ¶ 10 (political question); *Id.* at 18-19 ¶ 11 (preemption); *Id.* at 20 ¶ 17 (other constitutional defenses, including due process); Doc. 3809 at 4-5, 24 ¶ 6, 29-31 ¶ I & 46 ¶ 1 (political question); *Id.*

Finally, this Court has the authority to reconsider its prior order. *See* Fed. R. Civ. P. 54(b) ("[A]ny [interlocutory] order…may be revised at any time before the entry of judgment…."); *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 (1983) (same); *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1296 (11th Cir. 2009) (affirming dismissal based on the political question doctrine at the close of discovery when the district court had denied earlier motion to dismiss).

The time to decide whether Plaintiffs' remaining claims are fundamentally improper is *now*, before subjecting Defendants to the publicity, improper settlement pressure, and sheer cost of trying unconstitutional claims with stakes as high as this. *See* Fed. R. Civ. P. 1 (indicating that the Rules "should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."); *cf.* Fed. R. Civ. P. 50(a)(2) ("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury."). The comment to Rule 50 confirms that a court may "enter judgment as a matter of law at any time during the trial, as soon as it is apparent that either party is unable to carry a burden of proof that is essential to that party's case." *Id.* cmt. Additionally, the Court recently announced on **April 13, 2012** that it may export its rulings to the non-Kansas cases. That makes it even more urgent for this Court to fully consider its subject matter jurisdiction and the constitutionality of Plaintiffs' theories.

## ARGUMENT

I. **Reconsideration of the Court's 2009 Ruling on the Political Question Doctrine Is Necessary to Prevent a Trial When the Court Lacks Subject Matter Jurisdiction.**

Defendants seek reconsideration of the Court's **December 3, 2009** denial of their Motion

---

at 24 ¶ 5 & 29 ¶ h (preemption); *Id.* at 24 ¶ 7 & 31-33 ¶ j (due process & takings); Doc. 2558 at 5, 30 ¶ 6, 44-46 ¶ k & 55 ¶ m (political question); *Id.* at 30 ¶ 5, 43-44 ¶ j, 64 ¶ 6 (preemption).

to Dismiss based on several developments—many in the past several weeks.  These developments bring the issues into focus in a way that was not possible before.

**Development #1:**  On **March 20, 2012**, the Court issued the Amended Pre-Trial Order, superseding the prior pleadings and at last finalizing Plaintiffs' theories of recovery.  *See* Doc. 3809 at 1 & 23 n.10.  Plaintiffs now assert only statutory consumer claims under the KCPA that would declare sales without temperature disclosures "deceptive."  *See id*. at 16-21 & 23 n.10.  But Plaintiffs assert something entirely different from a traditional misrepresentation claim.  Their remaining claims turn on proving that the unit of measurement governing fuel sales—the gallon—is inherently misleading.  Indeed, under Plaintiffs' theories, the supposed "deception" is worked not by any affirmative misrepresentation, but by the metric politically chosen to measure the product sold absent additional disclosure.  Any judicial remedy for that phenomenon inherently entails a judgment about the wisdom of the *metric itself*.

This allegation goes to the heart of the political question doctrine because the Constitution delegates authority over Weights and Measures to Congress.  U.S. CONST. art. I § 8, cl. 5.  It is hard to overstate the importance of an explicit constitutional grant of power.  *See Gilligan v. Morgan*, 413 U.S. 1, 6-7 (1973) (chiding the Second Circuit for disregarding a similar grant of power).  Thus, this Court should decline to adjudicate Plaintiffs' challenge to the *metric* that the regulators have chosen for the sale of motor fuel at retail—the gallon.

**Development #2:**  On **March 26, 2012**, the Supreme Court decided *Zivotofsky*.  It stands for the proposition that the political question doctrine prevents federal courts from making a decision that is textually committed to the political branches when that decision would be "unmoored" because those political branches have not yet resolved the issue.  *See Zivotofsky*, 132 S. Ct. at 1427.

*Zivotofsky* addressed *express* constitutional powers of the Executive Branch—*e.g.*, the authority of the Executive Branch to "receive Ambassadors and other public Ministers." U.S. CONST., art. II, § 3. This case is similarly premised on the *express* constitutional power of the Legislative Branch over Weights and Measures. *See* U.S. CONST. art. I § 8, cl. 5. The Court held that it was able to decide questions of pure statutory interpretation and constitutional construction because "[t]he federal courts are not being asked to supplant a … policy decision of the political branches with the courts' own *unmoored* determination of what … policy … should be." *Zivotofsky*, 132 S. Ct. at 1427 (emphasis added). However, the Court warned that the political question doctrine would bar a court from usurping decisions reserved to the political branches. *See id*. at 1428.

As Justice Sotomayor, joined by Justice Breyer, explained, "The [political question] doctrine is 'essentially a function of the separation of powers,' which recognizes the limits that Article III imposes upon courts and accords appropriate respect to the other branches' exercise of their own constitutional powers." *Id.* at 1431 (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). "Th[e] traditional role [for courts] involves the application of some manageable and cognizable standard within the competence of the Judiciary to ascertain and employ to the facts of a concrete case. When a court is given no standard by which to adjudicate a dispute, or cannot resolve a dispute in the absence of a yet-unmade policy determination charged to a political branch, resolution of the suit is beyond the judicial role envisioned by Article III." *Id*. at 1432.

This case raises the very political question concerns that *Zivotofsky* cautioned were off-limits to the judicial branch. The Weights and Measures Clause commits to Congress the selection of the appropriate metric for the sale of retail fuel. Plaintiffs invoke vague and open-ended KCPA standards, however, to challenge that political judgment and second-guess a

statutorily authorized business practice—*i.e.*, the sale of retail motor fuel by the gallon "independent of temperature." These claims (and the expected jury instructions for them) are so malleable that, for all practical purposes, the jury will be sitting in judgment of the lawful metric with only the jury's own "unmoored" value judgment as the criteria. That is precisely what *Zivotofsky* prohibits.

**Development #3:** On **June 20, 2011**, the Supreme Court decided *AEP*, one of many developments that directly call into question this Court's December 2009 ruling. Most obviously, *AEP* reversed a decision that the Court cited in its ruling. *See* Doc. 1444 at 5.

But more importantly, *AEP* emphasized the degree to which federal courts must defer to regulatory agencies like NIST. Specifically, it emphasized why a federal court could not entertain common law claims relating to climate change: "Judges may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and-comment procedures inviting input by any interested person, or seek the counsel of regulators in the States …." *Id*. at 2540. An "expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions." *Id*. at 2539. Here, just as in *AEP*, Plaintiffs likewise call on courts to second-guess how the political branches have addressed a policy question. By conferring authority on NIST to devise national uniform weights and measures standards, Congress chose regulatory expertise, not case-by-case adjudication, as the appropriate policymaking vehicle. *See* 15 U.S.C. § 272(b)(2) & (c)(4).

Plaintiffs have insisted that *AEP* was a displacement case, not a political question decision. True, but irrelevant. The foundation of *AEP*'s displacement analysis speaks to the core question of political question cases: what must Congress do to demonstrate that an issue is legislative in nature and not fit for judicial resolution? *See AEP*, 131 S. Ct. at 2538-40; James R.

9

May, AEP v. Connecticut *and the Future of the Political Question Doctrine*, 121 YALE L.J. ONLINE 127, 132 (2011) ("[T]he Court's reasoning … might apply with congruent force to the political question doctrine."); Monty Cooper, AEP v. Connecticut—*Global Warming Litigation and Beyond*, 41 ENVTL. L. REP. NEWS & ANALYSIS 10996 (2011) (noting that "*regardless of doctrine*, the Court's strong language in support of the CAA's process of relying on the judgment of expert agencies over federal judges when creating public policy" may have broader implications going forward) (emphasis added).

In the process of explaining the deference that federal courts owe to regulatory agencies, *AEP* also calls into question this Court's conclusion that the federal regulators at NIST and NCWM "*have taken no action*." Doc. 1444 at 5 (citing the now-overturned Second Circuit opinion in *AEP*) (emphasis added). The Plaintiffs in *AEP* had similarly argued that Congress' delegation to the EPA did not displace common law "until EPA actually exercises its regulatory authority, *i.e.*, until it sets standards governing emissions from the defendants' plants." *AEP*, 131 S. Ct. at 2538. The Supreme Court flatly rejected that argument: "The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions from power plants…." *Id*. at 2538-39 (citations omitted). The same reasoning applies here.

**Development #4:** This Court's **April 2** and **April 4** rulings are the next development. By confirming that the *federal* scheme allows sales "irrespective of temperature," the Orders crystallize the Court's lack of subject matter jurisdiction under the political question doctrine. They prove that Plaintiffs are attacking a political decision made by the very branch of government that is authorized to make these decisions per the Constitution.

Put another way, by publishing Handbook 44, the regulators have not created any duty on the part of retailers to "determine" temperature, or "compensate" or "adjust[]" for temperature.

10

*See* Doc. 4228 at 17-18. Thus, the only way for Plaintiff's claims to be viable is if this Court recognized a *duty* to either compensate for temperature or to disclose temperature—despite the actions of the regulators rejecting those precise duties. In one of the classic political question cases, the Supreme Court found a political question and dismissed the claims for lack of subject matter jurisdiction when facing a similar legal task. *See Luther v. Borden*, 48 U.S. (7 How.) 1 (1849). *Luther* dismissed common law claims for lack of subject matter jurisdiction because to rule for plaintiffs, the court would have needed to devise a duty of care. And *that* determination—creating a standard of conduct—would require judicial interference with a judgment textually committed to Congress. In an analysis remarkably similar to *AEP*, *Luther* concluded that a political question was inextricable from the predicate to common law liability. *Luther*, 48 U.S. at 42, cited with approval in *Zivotofsky*, 132 S. Ct. at 1433-34 (Sotomayor, J., concurring), reaffirming *Luther's* continuing validity. Thus, *Luther* similarly mandates dismissal here.

This Court's **April 2, 2012** and **April 4, 2012** Orders also call into question the Court's specific conclusion that Plaintiffs' claims do not require the Court "to formulate national policies." Doc. 1444 at 5. At the very least, Plaintiffs are asking this Court to impose a local burden on a national policy as expressed in a NIST handbook. But, in fact, Plaintiffs are striking at the heart of the regulators' task because the statute obligates the regulators to pursue *uniformity*. 15 U.S.C. § 272(c)(4).

These rulings also demonstrate the extent to which Plaintiffs seek to disregard the decisions of the political branches. Plaintiffs invite the Court and jury to rewrite the statutory deal according to "unmoored" value judgments—not on the basis of the law—in this way: Handbook 44 defines the material terms of the bargain, *i.e.*, price per gallon of ASTM fuel, not

11

price per "energy content." Yet Plaintiffs are trying to add terms *by implication* that do not appear in Handbook 44—"energy content" and "temperature." That is the opposite of this Court's conclusion. *See* Doc. 4228 at 17-18. This Court's interpretation of the "plain meaning" of the statutory terms of the fuel transaction necessarily preclude a jury construing the meaning of "materiality" or "importance" under the KCPA to read "energy" or "temperature" into this statutorily defined transaction, which the regulators already rejected.

These same Orders also defeat any effort by Plaintiffs to side-step federal law by strategically limiting their claims to failure to disclose under the KCPA. Specifically, the disclosure claims attack what this Court ruled Handbook 44 allows: the lawful sale of fuel "independent of temperature" or "irrespective of temperature." It is fundamentally inconsistent with the Court's holding that these sales are legal under federal law to allow a jury to declare these sales to be "deceptive."

In fact, the reasoning of this Court's **April 2, 2012** decision that Handbook 44 permits retail sales "irrespective of temperature" also compels a specific finding that Handbook 44 authorizes sales without the need for any disclosure about temperature. In particular, to conclude that Handbook 44 permits retail sales irrespective of temperature, the Court emphasized that Handbook 44 expressly provides for ATC for wholesale sales—but not for retail sales. *See* Doc. 4228 at 10 & 17-18. The same logic applies to disclosures. Other provisions of Handbook 44 that are relevant to temperature disclosures likewise apply only to wholesale sales but not to retail sales: "Section 3.30 of Handbook 44 also provides specifications for "*temperature determination*".... The ... *temperature-related specifications, however, relate only to 'wholesale devices'—not retail devices*." Doc. 4228 at 10 (emphasis added). These include "marking requirements." *Id.* Marking requirements necessarily encompass labeling requirements or

12

*temperature-related* disclosures.  *Id.*

In any event, there can be no deception under this Court's interpretation of Handbook 44. The purported deception relates to a contract whose one crucial term (the metric by which gasoline is measured) was authoritatively defined by the political branches.  Doc. 4228 at 17-18. Thus there can be no mistake of fact—both seller and buyer were subject to the identical political process, which unmistakably provided that a gallon is measured without respect to temperature. Nor can there be any "*deception*"—the sellers sold what was advertised and priced under the terms set by the political branches.

Indeed, Kansas law makes it explicit that there can be no "deception" based on any purported confusion about the *metric itself*.  By statute, all parties to the transaction are *deemed* to be fully aware of the "standards of weights and measures":

> All contracts, sales or purchases … for anything to be sold or delivered or done by weight or measure within this state shall be taken and construed in terms of and according to the standards of weights and measures adopted under this act ….  All statements and representations of any kind referring to the weights or measures of commodities sold or purchased, or exposed for sale, **shall be understood in terms of the standards of weights and measures adopted under this act**.

K.S.A. 83-204 (emphasis added).  By its plain terms, this provision applies to retail sales of motor fuel.  *Id.*; *see also* K.S.A. 84-2-102 (contracts for the sale of goods are subject to chapter 2 of the U.C.C.).

Reduced to their essence, Plaintiffs' remaining KCPA claims are nothing more than an invitation to the jury to *require* Defendants to sell fuel "with respect to temperature"—the opposite of this Court's holding that the "plain language" of NIST Handbook 44 *permits* the sale of retail fuel "irrespective of temperature."  Doc. 4228 at 17.  Plaintiffs' claims put the Court in the position of second-guessing the political branches, which violates the political question doctrine.

13

**Development #5:**     On **April 10, 2012**, Plaintiffs submitted their proposed jury instructions that confirm that Plaintiffs are asking the jury to usurp not only the role of this Court to declare what the law is but also a legislative function to set the criteria by which retail fuel is sold.   In particular, Plaintiffs' do not provide a manageable "standard" under the political question doctrine.   Plaintiffs propose to instruct the jury that "[a] matter is 'material' when a reasonable person *would attach importance to it* in determining how to act regarding a particular transaction."  Ex. A (emphasis added).

That instruction is so broad that it gives the jury free rein to substitute its value choices for those that NCWM selected in adopting Handbook 44 pursuant to the congressional Weights and Measures scheme.   Handbook 44 carries the imprimatur of both NIST *and* Kansas.   A jury should not be allowed to nullify Handbook 44 under the guise of interpreting the meaning of "materiality" in the KCPA.

With these proposed instructions, Plaintiffs seek to have the jury make law, not apply preexisting "criteria" governing lawful conduct to a discrete and particularized set of facts.   That is precisely the distinction that the Supreme Court emphasized in the new *Zivotofsky* opinion— courts should refrain from imposing "unmoored" value judgments on controversies.   That job belongs to the political branches.   The Tenth Circuit has repeatedly enforced the rule that the jury may not decide what the law is or should be.   *See Poindexter v. Atchison, Topeka and Santa Fe Ry. Co.*, 168 F.3d 1228, 1232 (10th Cir. 1999) (reversing decision where the trial court had erroneously submitted a legal question to the jury); *Driggins v. Oklahoma City*, 954 F.2d 1511, 1513 (10th Cir. 1992) (same).

Ultimately, the jury would serve as a super legislature that would *de facto* decide the appropriate method of selling retail motor fuel.   In particular, *in this context*, these jury

14

instructions do not merely seek to apply settled tort law.  They seek to ask six to ten unelected jurors to change a statutorily authorized, 100-year old business practice that the NCWM thoroughly considered in 2007 and 2009 and declined to change.  *See* Doc. 4228 at 7 (indicating that at NCWM's 2009 annual meeting "state officials considered and rejected proposals to expressly permit or mandate ATC for retail motor fuel sales.").[3]

In fact, these jury instructions ask the jury to do a job that federal law assigns to state regulators.  Specifically, Kansas has adopted critical provisions from Handbook 130's *Uniform Weights and Measures Law*, through statutes that mirror and incorporate Handbook 130's language.  *See*, *e.g.*, K.S.A. § 83-205 (compare *Unif. W & M Law* § 11); K.S.A. § 83-206 (compare *Unif. W & M Law* § 12); K.S.A. § 83-207 (compare *Unif. W & M Law* § 12(n)); K.S.A. § 83-212 (compare *Unif. W & M Law* § 18); *cf.* Doc. 4231 at 5 ("The Kansas Division of Weights and Measures is charged with enforcing Kansas weights and measures laws, which govern the retail sale of motor fuel in Kansas.  This includes the provisions of the [NIST] Handbooks 44 and 130, to the extent that Kansas has adopted them by statute or regulation.").

Under these uniform statutes, the purpose of the weights and measures regulatory scheme is to prevent non-deception in the sale of commodities, including the sale of retail motor fuel.  K.S.A. 83-205(b) ("The weights and measures inspection program shall perform the following functions … (2) *prevent* unfair or *deceptive dealing* by weight or measure in any commodity … advertised … sold or purchased within this state … (4) *promote uniformity* … between weights and measures requirements of this state and those of other states and federal agencies…."); *see also* K.S.A. 83-207 ("The secretary of agriculture shall prescribe by rules or regulations the

---

[3] The Court can take judicial notice of facts like this one, especially those based on this Court's orders.  *See* FED. R. EVID. 201.  A court can take judicial notice "at any stage of the proceeding."  FED. R. EVID. 201(d); *see Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (judicial notice is appropriate for Rule 12(b)(6) motion to dismiss).

appropriate *term* or unit of weight or measure *to be used whenever the secretary determines* in the case of a specific commodity that *an existing practice of declaring the quantity* by weight, measure … or combination thereof, *does not facilitate value comparisons by consumers*, or that such practice offers an opportunity for *consumer confusion*").

By statute, these duties to police fraud are entrusted to state government officials: "Violations of the provisions of K.S.A. 83-219, and amendments thereto, may be enforced **by the secretary** under the administrative provisions of chapter 83 of the Kansas statutes annotated, … **or by the attorney general** … **under the Kansas consumer protection act**." K.S.A. 83-219(d) (emphasis added). The upshot of this provision, when read *in pari materia* with the above provisions, is that it is the Secretary of Agriculture who determines whether the sale of retail fuel in "gross gallons" is deceptive absent a disclosure regarding "fuel temperature" or the "effect of temperature on energy, value or quality."[4]

Yet by submitting broad and "unmoored" jury instructions asking whether an established business practice is inherently deceptive, Plaintiffs would give that job to unelected jurors. *Zivotofsky*, 132 S. Ct. at 1427; *cf. AEP*, 131 S. Ct. at 2539 ("The Clean Air Act entrusts such complex balancing to EPA in the first instance, in combination with state regulators."). Plaintiffs would have a jury find that the "value" of the fuel purchase should be understood in terms of a "gallon," having reference to temperature. But that conclusion would contradict the decision of the regulators (as interpreted by *this* Court on April 2). Indeed, what Plaintiffs would have a jury conclude would itself "tend[] to mislead and deceive" a buyer because the temperature disclosures the Plaintiffs seek would contradict the law. Because this Court has now ruled—

---

[4] The Secretary also has the duty to "[a]llow reasonable variations from the stated quantity of contents, which shall include those caused by loss or gain of moisture during the course of good distribution practice." K.S.A. 83-206. Again, Plaintiffs' claims directly challenge the policy choices made by the political branches.

under NIST Handbook 44, a "gallon" is a "unit" that is "independent of temperature"—the logical implication is that the "value" of the fuel transaction is determined "irrespective of temperature."

## II.    Plaintiffs' Claims Are Preempted.

Even if this Court has subject matter jurisdiction, the above developments—plus an additional one—also demonstrate that Plaintiffs' claims are preempted. In short, the Court should not allow Plaintiffs' claims to disrupt the elaborate *federal* regulatory system that created Handbook 44. Indeed, the ambitious goal of that system was nothing less than achieving "uniformity in weights and measures" across the country. 15 U.S.C. § 272(c)(4).

**Development #6**:      On **July 26, 2010**, the Fourth Circuit decided *TVA*, which rejected one more aspect of this Court's December 2009 decision. *See* Doc. 1444 at 4 ("[T]his case creates a clash between the Court and *state* regulators.") (emphasis in original). *TVA* held that a different "*cooperative* federal-state framework that Congress [created]" preempted state claims. *See TVA*, 615 F.3d at 298 (emphasis added).

*TVA* addressed the Clean Air Act ("CAA"), which provides that air pollution "is the primary responsibility of States and local governments." 42 U.S.C.A. § 7401(a)(3). The CAA's regulatory scheme relies extensively on the states. *TVA*, 615 F.3d at 299. Nevertheless, the Court held that the federal nature of the plan *as a whole* preempted state nuisance claims: "Where Congress has chosen to grant states an extensive role in the [CAA's] regulatory regime … preemption principles caution … against according states a wholly different role and allowing state nuisance law to contradict joint federal-state rules so meticulously drafted." *Id.* at 303.

The national system of weights and measures has the same characteristics as the CAA. The goal of the system is to achieve "uniformity in weights and measures laws" and to do so by

17

*cooperating* with the states.  15 U.S.C. § 272(c)(4); 15 U.S.C. § 272(b)(10).  In fact, the statute commands the federal regulators to achieve uniform standards through "**consensus**" and "**cooperation**."  15 U.S.C. § 272(b)(10) (emphasis added); *see also* 15 U.S.C. § 272(c)(4).  Denying the federal character of this system because of the state involvement ignores that Congress itself demanded this cooperation.

Thus, in light of *TVA*, state-by-state enactment of NIST Handbook 44 does not detract from its preemptive effect.  That is how Congress and the Department of Commerce chose to exercise Congress' Weights and Measures power.  *See* U.S. CONST. art. I § 8, cl. 5; 15 U.S.C. § 272(c)(4); 15 C.F.R. § 200.100.

**A.     Plaintiffs' State Claims Interfere with Congress' Decision About How to Exercise the Weights and Measures Power.**

Plaintiffs' claims are preempted.  Under the doctrine of conflict preemption, state law is preempted (i) when compliance with federal and state requirements is impossible or (ii) when state law "stands as an obstacle to the accomplishment and execution of the *full purposes* and objectives of Congress"—*i.e.*, when it interferes with the *goals* of Congress.  *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (emphasis added); *see also Williams v. United Parcel Serv., Inc.*, 527 F.3d 1135, 1143 (10th Cir. 2008).

Under these standards, Plaintiffs' claims are preempted for three reasons:

(1)     It would be impossible for retailers to comply with both the federal weights and measures standards (Handbook 44 and 21 U.S.C. § 272) and Plaintiffs' proposed state KCPA standards;

(2)     Plaintiffs' claims would interfere with the goals of Congress, particularly because case-by-case adjudication of weights and measures standards would destroy both uniformity *and* the cooperative, consensus-based system of Weights and Measures that Congress mandated by statute; and

(3)     Plaintiffs' claims would interfere with federal regulatory decisions that balance the interests of various stakeholders.

18

1.       **Plaintiffs' Claims Would Make it Impossible for Retailers to Comply with Both State and Federal Standards.**

The first type of conflict is the most direct conflict possible—impossibility. *See PLIVA, Inc. v. Mensing*, 131 S.Ct. 2567, 2577 (2011). Here, the conflict is as straightforward and direct as possible: Plaintiffs seek to declare a practice allowed by federal law as "deceptive" under state law.

The KCPA disclosure claims represent an intolerable affront to federal law. They would effectively tell customers that the metric that the federal government has selected—the gallon—is not only inadequate but works a fraud. As both the Ninth Circuit and the Western District of Missouri have held, a state *disclosure* requirement that attacks a federal requirement creates a conflict subject to preemption. *See Alvarez v. Chevron Corp.*, 656 F.3d 925, 935 (9th Cir. 2011) (finding express preemption when the proposed state disclosure requirements "would have the effect of challenging the accuracy and undermining the uniformity of federal octane labeling regulations promulgated by the FTC."); *Johnson v. MFA Petroleum*, No. 11-0981-CV-W-DGK, 2012 WL 511475, at *6 (W.D. Mo. Feb. 15, 2012) (same).

2.       **Plaintiffs' Claims Pose an Obstacle to the Goals of Congress.**

Even if the Court were to find that there is not a direct conflict, Plaintiffs' claims are nevertheless preempted because anything that merely frustrates federal goals is preempted. *See Hines*, 312 U.S. at 67. Here, Plaintiffs' claims undermine the overriding goal of uniformity. Congress has charged NIST with "securing uniformity." 15 U.S.C. § 272(c)(4). In fact, the need for uniformity is at its zenith here because the mandate comes from *both* a federal statute and the Constitution. U.S. CONST. art. I § 8, cl. 5; 15 U.S.C. § 272(c)(4); *cf. Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988); *In re Universal Serv. Fund Tel. Billing Practice Litig.*, 619 F.3d 1188, 1198 (10th Cir. 2010). Uniformity concerns are always relevant to preemption.

19

*See, e.g., Mayo v. United States*, 319 U.S. 441, 445 (1943); *United Mine Workers of Am. v. Rag Am. Coal Co*., 392 F.3d 1233, 1243 (10th Cir. 2004). This is especially so in contexts in which "exclusive federal regulation [is essential] in order to achieve uniformity vital to national interests." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 143-44 (1963).

Indeed, a presumption in favor of preemption exists because the subject matter at issue is quintessentially federal. The Constitution directs Congress to "fix the Standard of Weights and Measures." U.S. CONST. art. I § 8, cl. 5. The basic structure of the Constitution requires uniform instruments of commerce, including a uniform currency and uniform weights and measures standards. *See id*. *AEP* clarified that there is a uniquely federal interest in "'[1] subjects within national legislative power where Congress has so directed' or [2] where the basic scheme of the Constitution so demands." 131 S. Ct. at 2535 (citations omitted). The inherently "federal character" of these fields comes from "**constitutional** or valid congressional command." *United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 307 (1947) (emphasis added). Such subjects "so vitally affect[] interests, powers and relations of the Federal Government **as to require uniform national disposition** rather than diversified state rulings." *Id*. (emphasis added).

When the Constitution expressly envisions the establishment of a federal scheme like this, state actions that have a "disruptive effect" on that scheme are presumptively displaced. *See Sperry v. State of Florida ex rel. Fla. Bar*, 373 U.S. 379, 385, 401-03 (1963); *see also Don't Tear It Down, Inc. v. Penn. Ave. Dev. Corp.*, 642 F.2d 527, 534-35 (D.C. Cir. 1980); *Mount Olivet Cemetery Ass'n v. Salt Lake City*, 164 F.3d 480, 486 (10th Cir. 1998).[5]

---

[5] Although a presumption *against* preemption may be applicable in certain kinds of cases, it does not apply in fields that have been "reserved for federal regulation." *United States v. Locke*, 529 U.S. 89, 108, 111 (2000); *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 341 (2001); *Boyle v. United Technologies Corp.*, 487 U.S. 500, 507-08 (1988) (holding that for "an area of uniquely federal interest," "[t]he conflict with federal policy need not be as sharp as that which must exist for ordinary pre-emption."); *see also American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419 n.11 (2003).

Here, Plaintiffs' claims do not just interfere with the goal of uniformity. They constitute a frontal assault it. Litigation poses a particularly severe threat to uniformity. Individual state-law tort actions carry the mind-boggling potential for courts and juries across the country to second-guess federally approved units of measure. *Cf. AEP*, 131 S. Ct. at 2539 ("The expert agency is surely better equipped to do the job than individual district judges … issuing ad hoc, case-by-case injunctions."). These claims raise the specter of "a balkanization of … regulations and a confused patchwork of standards to the detriment of industry and the environment alike …." *TVA*, 615 F.3d at 296. For this reason, state participation in NCWM is the exclusive means for creating and revising the weights and measures standards. **If anything, the federal scheme assures the states a seat at the table and thus eliminates any conceivable need for state-law lawsuits.**

In addition to the global goal of uniformity, conflict preemption under *Hines* also protects the more specific goals of Handbook 44 itself. In light of this Court's **April 2** and **April 4, 2012** Orders, Plaintiffs' claims would frustrate the federal policy choice of allowing sales of motor fuel at retail without reference to temperature. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 531 & 540-43 (1977) (finding conflict preemption when federal regulations permitted "reasonable variations" in weight of flour while California law eliminated *part* of that flexibility by making no provision "for loss of weight resulting from moisture loss during the course of good distribution practice"). Nor do Plaintiffs avoid this conflict by asserting only disclosure claims. The upshot of those claims is to invite the jury to punish Defendants for failure to "disclose" temperature as if sales without reference to temperature were *illegal*!

### 3. Plaintiffs' Claims Should Not Interfere with Regulatory Decisions that Balance the Interests of Various Stakeholders.

Preemption is particularly appropriate when the federal regulatory system formulates

21

policy by carefully balancing competing values, such as when the regulators here balance the costs of temperature compensation against its purported benefits. *Farina v. Nokia Inc.*, 625 F.3d 97, 123 (3d Cir. 2010) ("When Congress charges an agency with balancing competing objectives, it intends the agency to use its reasoned judgment to weigh the relevant considerations and determine how best to prioritize between these objectives."). Allowing parties to bring state claims like this would encourage anyone dissatisfied with a federal regulatory decision to file a lawsuit as a collateral attack on that decision. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 497 (1987) ("It would be extraordinary for Congress, after devising an elaborate permit system that sets clear standards, to tolerate common-law suits that have the potential to undermine this regulatory structure.").

## III.    Plaintiffs' Retroactive Claims Would Violate the Due Process and Takings Clauses.

The Constitution's fundamental disapproval of retroactive liability also bars Plaintiffs' claims. *See Standard Oil*, 332 U.S. at 316 (describing the fundamental unfairness of creating a new basis for liability against parties who were merely following "settled contrary practice"). The Supreme Court has enforced this prohibition through both the Due Process and Takings Clauses.

### A.    Retroactive Liability Violates Due Process.

As for Due Process, Plaintiffs base their claims on conduct that occurred years in the past, when Defendants operated in full compliance with the law and longstanding custom. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive *fair notice* not only *of conduct that will subject him to punishment*, but also of the severity of the penalty." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996) (emphasis added); *see also Gall v. Am. Heritage Life Ins. Co.*, 3 F. Supp. 2d 1344, 1350 (S.D. Ala. 1998)

22

("serious due process concerns" were raised by judicial ruling that "a business practice that has been accepted as a legitimate method of accounting for credit life insurance in at least 42 states of this country and approved in their statutes and by their regulatory agencies" constituted a fraud).

This Court's finding that state regulators had repeatedly approved this conduct is critical to this analysis. *See* Doc. 4228 at 17 n.7; Doc. 4231 at 6. In short, the regulators' actions have created reliance interests that the law should respect. *TVA*, 615 F.3d at 301, 306 (a federal court should not "set aside a congressionally sanctioned scheme for many years' duration—a scheme … that has set in motion *reliance interests and expectations* on the part of those states and enterprises that have complied with its requirements"—and instead "impose a different set of standards" under nebulous common law rules) (emphasis added); *City of Milwaukee v. Ill. and Mich.*, 451 U.S. 304, 326 (1981) ("It would be quite inconsistent with [the statutory scheme] if … courts were … to 'write their own ticket' under the guise of federal common law after permits have already been issued and permittees have been planning and operating *in reliance on them*.").

The proper method for fairly changing weights and measures standards would have been prospective instead of retroactive—through compliance with the NIST/NCWM process that Congress created. In fact, following the 2009 NCWM vote, Defendants effectively received notice that they could *not* adopt temperature compensation. *See* Doc. 4228 at 7. Plaintiffs would have had the Defendants openly defy NCWM.

The disclosure claims are just as retroactive and create the same fundamental unfairness as Plaintiffs' other claims. According to Plaintiffs, Defendants were not allowed to rely on both Handbook 44 (Doc. 4228 at 17-18) and the Kansas regulators' repeated approval of their pumps

23

(Doc. 4228 at 17 n.7 & Doc. 4231 at 6) but instead should have disclosed that their sales were supposedly inappropriate and even "deceptive." Kansas law contains no such contradiction.

## B. Retroactive Liability Also Constitutes a Judicial Taking.

The Takings Clause prohibits the same retroactivity and fundamental unfairness. *See E. Enterprises v. Apfel*, 524 U.S. 498, 528-38 (1998) (holding that a statute retroactively imposing large, unanticipated and disproportionate liability violates the Constitution) (plurality opinion). *Apfel* involved the imposition of retirement liability on a company. *Apfel*, 524 U.S. at 530. The four-vote plurality held that legislation "might be unconstitutional if it imposes *severe retroactive liability* on a limited class of parties that could not have anticipated the liability, and the extent of that liability is substantially disproportionate to the parties' experience." *Id*. at 528-29 (emphasis added). After examining the traditional factors for finding a taking— "[1] economic impact of the regulation, [2] its interference with reasonable investment backed expectations, and [3] the character of the governmental action"—the plurality found that the retroactive liability constituted a taking. *See id*. at 523-24 & 528-38.

In light of the "severe retroactive liability" standard for the Takings Clause established by the *Apfel* plurality, the large and disproportionate liability at issue here would amount to a judicial taking. *Apfel*, 524 U.S. at 528-29. Indeed, the *Apfel* Court noted more generally that "[r]etroactivity is generally disfavored in the law, in accordance with 'fundamental notions of justice' that have been recognized throughout history." *Id*. at 532, 547 (citations omitted).

More recently a plurality of the Supreme Court addressed how the takings analysis applies to state judicial decisions. *See Stop the Beach*, 130 S. Ct. at 2601 (plurality opinion). Justice Scalia explained that, when evaluating a taking, there is no meaningful distinction

24

between state legislative and judicial actions.  *Id.* at 2601-02 ("It would be absurd to allow a State to do by judicial decree what the Taking Clause forbids it to do by legislative fiat.").

Thus, the liability and relief Plaintiffs seek to impose for lawful conduct is unconstitutional under the Takings Clause.  Regardless of whether Plaintiffs seek (i) injunctive relief to force Defendants to implement ATC, (ii) injunctive relief to implement temperature disclosures, or (iii) statutory penalties, the outcome remains the same.  Where a judicial order impairs an established property right for a public purpose without compensation, the order constitutes an unconstitutional judicial taking.  In light of the prior, "settled contrary practice," this large and disproportionate liability would amount to a clear judicial taking under the plurality's logic in both *Apfel* and *Stop the Beach*.  *See Standard Oil*, 332 U.S. at 316; *Apfel*, 524 U.S. at 528-29; *Stop the Beach*, 130 S. Ct. at 2601-02.

## CONCLUSION

Defendants' Motion should be granted.

## REQUEST FOR ORAL ARGUMENT

Defendants hereby respectfully request oral argument on this Motion.

5022694 v2

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.                    OF COUNSEL:

___/s/ *Tristan L. Duncan*_____      Laurence H. Tribe
                                                420 Hauser Hall
Tristan L. Duncan, D. Kan. #70481               1575 Massachusetts Ave.
A. Bradley Bodamer, D. Kan. #11468              Cambridge, MA 02138
2555 Grand Blvd.                                Tel: (617) 495-1767
Kansas City, MO 64108                           Email: tribe@law.harvard.edu
Tel: (816) 559-2040
Email:  tlduncan@shb.com

                                                MASSEY & GAIL, LLP

                                                Jonathan S. Massey

                                                1325 G Street, N.W., Suite 500
                                                Washington, D.C. 20005
                                                Tel: (202) 652-4511
                                                Fax: (312) 379-0467
                                                Email:  jmassey@masseygail.com


ATTORNEYS FOR DEFENDANTS 7-ELEVEN, INC., CIRCLE K STORES, INC., KUM &
GO, L.C. AND QUIKTRIP CORPORATION

5022694 v2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document was filed electronically with the U.S. District Court for the District of Kansas, with notice of case activity to be generated and sent electronically by the Clerk of the Court to all designated persons on this 23rd day of April, 2012.

___/s/ *Tristan L. Duncan*_____

ATTORNEY FOR DEFENDANTS

5022694 v2