# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE<br>SALES PRACTICES LITIGATION<br><br>(This Document Relates to All Cases) | )<br>)<br>) MDL No: 1840<br>)<br>) No: 07-md-1840-KHV-JPO |

---

### UNOPPOSED MOTION OF PLAINTIFFS FOR ORDER CONDITIONALLY CERTIFYING SETTLEMENT CLASSES, PRELIMINARILY APPROVING CLASS ACTION SETTLEMENTS, DIRECTING AND APPROVING DISTRIBUTION OF CLASS NOTICE, SETTING HEARING FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENTS AND APPOINTING CLASS COUNSEL

Pursuant to the Court's June 5, 2012, order (Docket No. 4325), the Plaintiffs listed on Exhibit 1 hereto (hereinafter collectively referred to as the "Class Plaintiffs") move the Court for an order granting preliminary approval to the settlements with Defendants Motiva Enterprises LLC and Equilon Enterprises LLC d/b/a Shell Oil Products US (collectively, "Shell"), BP Products North America Inc. and BP West Coast Products LLC (collectively, "BP"), ConocoPhillips Company ("ConocoPhillips"), Exxon Mobil Corporation, Esso Virgin Islands, Inc. and Mobil Oil Guam, Inc. (collectively, "ExxonMobil"), CITGO Petroleum Corporation ("CITGO"), Sinclair Oil Corporation ("Sinclair") (together, the "Refiner Settling Defendants"); Casey's General Stores, Inc., ("Casey's"), Sam's Club ("Sam's"), Dansk Investment Group, Inc. ("Dansk"), formerly known as USA Petroleum Corporation, and Valero Energy Corporation and affiliates ("Valero") (together with the Refiner Settling Defendants, the "Settling Defendants"), in accordance with the Settlement agreements described below and filed herewith with the Court.

The Settling Defendants do not oppose the instant Motion.

In further support hereof, Class Plaintiffs provide the following memorandum and authorities.

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................1

II.     LEGAL BACKGROUND ......................................................................2

III.    STATEMENT OF THE CASE................................................................3

    A.      Background Facts ……………………………………………..………..3

    B.      Procedural History……………………………………………..…….…... 5

    C.      Representation ……………………………………………….………..  6

    D.      Discovery ………………………………………………..…………..7

    E.      Settlement Negotiations …………………………………..……….....8

IV.     SUMMARY OF THE SETTLEMENTS ..................................................8

    A.      Settlements Involving the Refiner Settling Defendants ………………………..8

        1.      Basic Summary …………………………………………………..8

        2.      Allocation of the Net Settlement Fund to the States at Issue …………10

        3.      Process for Disbursement of Net Settlement Fund………………………11

        4.      Attorneys' Fees, Litigation Expenses, and Costs of Notice and Settlement Administration………………………………………………………...12

        5.      Releases…………………………………………………………  13

        6.      The Settlement Administrator…………………………………………13

    B.      The Sam's, Casey's and Dansk Settlements…………………………………  15

        1.      Consideration: Conversion to ATC and Posted Disclosures  …………..15

        2.      Release by Class Members …………………………………………...17

        3.      Amounts for Notice and Attorneys' Fees and Costs  ………………...18

    C.      The Valero Settlement       ……………………………………………19

    D.      The Notice Plan ……………………………………………………20

        1.      Summary of the Notice Plan ……………………………………………21

             a.      Newspaper Publication – *Parade Magazine* ……………………21

             b.      Internet Outreach – Banner Ads on Websites Visited by Class Members……………………………………………………………22

             c.      Settlement Website ……………………………………………23

             d.      Widely Disseminated Press Release …………………………23

        2.      Opt-Out Procedures …………………………………………………24

        3.      Objection Procedures…………………………………………………25

V.      CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASS ................25

   A.     The Settlement Classes ……………………………………………26

   B.     The Settlements Satisfy Rule 23(a) …………………………………………28

        1.      Numerosity ……………………………………………………28

        2.      Commonality …………………………………………………… 29

        3.      Typicality ……………………………………………………… 30

        4.      Adequate Representation ………………………………………31

   C.     Rule 23(b)(3) Standards Are Satisfied …………………………………......32

VI.     PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE …… .33

   A.     The Terms of the Proposed Settlements Are Fair...……………………….......33

   B.     Plaintiffs' Counsel Have a Sufficient Factual Basis for the Settlements ...…........34

   C.     The Notice Plan is Appropriate …………………………………………….......35

   D.     CAFA Notice ……………………………………………………….………......39

VII.    ESTABLISHMENT OF A FINAL APPROVAL AND FAIRNESSS HEARING…39

VIII.   APPOINTMENT OF SETTLEMENT CLASS COUNSEL …………..………......40

IX.    CONCLUSION ……………………………………………….…………....... 41

<u>**TABLE OF AUTHORITIES**</u>

**CASE LAW**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ............................................................ 32

*Am. Fin. Sys., Inc. v. Harlow*, 65 F.R.D. 94, (D. Md.1974) ......................................................29

*Ark. Ed. Ass'n v. Bd. of Educ. of the Portland School Dist.,* 446 F.2d 763 (8th Cir.1971). ....28, 29

*Boyd v. Bechtel Corp.*, 485 F. Supp. 610 (N.D. Cal. 1979) ........................................................40

*Churchill Village, L.L.C. v. General Elec.*, 361 F.3d 566 (9th Cir. 2004) ...................................40

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ..............................................40

*DeJulius v. New England Health Care Employees Pension Plan*,
429 F.3d 935 (10th Cir. 2005) .......................................................................................35, 36

*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ...............................................................3

*Edgington v. R.G. Dickinson and Co.,*139 F.R.D. 183 (D. Kan. 1991) .......................................30

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S. Ct. 2140 (1974)......................................35, 38

*Gen. Tel. Co. of Southwest. v. Falcon*, 457 U.S. 147 (1982).......................................................30

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1988) ........................................................34

*In re Integra Realty Resources, Inc.*, 262 F.3d 1089 (10th Cir. 2001) ........................................35

*In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57 (S.D.N.Y. 1993) ..............................38

*In re Motor Fuel Temperature Sales Practices Litig.* 271 F.R.D. 221 (D. Kan. 2010)................31

*In re Plastic Cutlery Antitrust Litig.*, No. 96–CV–728, 1998 WL 314655,
(E.D. Pa. 1998 June 15, 1998) ....................................................................................2

*In re Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008) ...........................................28, 35

*Marcus v. State of Kansas, Dept. of Revenue*, 209 F.Supp.2d 1179 (D. Kan. 2002)....................34

*McGee v. Continental Tire N. Am., Inc.*, 2009 WL 539893 (D.N.J. Mar. 4, 2009).....................31

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F. 3d 781 (7th Cir. 2004) ..................................................36

iv

*Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306 (1950)........................................35, 36

*New England Health Care Employees Pension Fund v. Woodruff*, 520 F.3d 1255 (10th Cir. 2008)..................................................................................................40

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001)................30

*Officers for Justice v. Civil Serv. Comm'n*, 689 F.2d 615 (9th Cir. 1982) ...............................3, 40

*Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432 (10th Cir. 1978)............................................28

*Riordan v. Smith Barney,* 113 F.R.D. 60 (N.D. Ill. 1986)..................................................29

*Sala v. Nat'l RR Passenger Corp.,* 120 F.R.D. 494 (E.D. Pa. 1988) ................................................29

*Schering-Plough Corp. v. FTC*, 402 F.3d 1056 (11th Cir. 2005)..................................................40

*Schreiber v. Nat'l Collegiate Athletic Ass'n*, 167 F.R.D. 169 (D. Kan. 1996).............................31

*Swanson v. American Consumer Industries,* 415 F.2d 648 (4th Cir. 1967)...................................29

*Swisher v. U.S.,* 189 F.R.D. 638 (D. Kan. 1999) ..........................................................................30

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993)....................................................38

*Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181 (11th Cir. 2003) ...................................31

*Wyandotte Nation v. City of Kansas City*, *Kansas*, 214 F.R.D. 656 (D. Kan. 2003)....................35

**FEDERAL STATUTES**

28 U.S.C. § 1407...............................................................................................................................5

28 U.S.C. §1715 *et seq*....................................................................................................................39

Federal Rule of Civil Procedure Rule 23.................................................................................*Passim*

Fed. R .Civ. P. 23, Advisory Committee's Note, 1966 Amendments............................................35

**OTHER AUTHORITIES**

Federal Judicial Center Notice Checklist.......................................................................................35

*Manual for Complex Litigation*, (3d ed. 2000) ........................................................2, 3, 40

*Moore's Federal Practice* ¶ 23.80[2-1] (2d ed. 1993) ......................................................3

*Newberg on Class Actions* (3d. ed. 1992) §11.41 ........................................................2, 31, 34, 40

# I.    INTRODUCTION

Class Plaintiffs seek preliminary approval of class-action settlements (the "Settlements") that resolve all claims against the Settling Defendants in this MDL proceeding, subject to final Court approval. The Settlements provide different routes to modify a method of retail sale for motor fuel that Class Plaintiffs have alleged violate state consumer protection and other laws— the sale of motor fuel at retail without accounting for temperature or disclosing to the consumer meaningful information about the effects of temperature on motor fuel. First, the six Settlements involving the Refiner Settling Defendants provide financial resources (i) to retailers and wholesalers to help defray the costs of installing automatic temperature compensation equipment ("ATC") or making meaningful disclosures to consumers at retail stations, and (ii) to state weights and measures departments to assist them in inspecting and regulating ATC pumps and disclosures. Second, the Sam's, Casey's and Dansk Settlements principally involve the gradual conversion to ATC for motor fuel dispensers at their retail stations. Third, the Valero Settlement requires Valero to post the actual temperature of the motor fuel in its underground storage tanks, and to convert to ATC when certain market conditions are present. Individually and together, the Settlements provide significant relief to the Class Members to prevent future damage to the Class Members. Copies of the Settlement Agreements with BP, Casey's, CITGO, ConocoPhillips, Dansk, ExxonMobil, Sam's, Shell, Sinclair and Valero are attached hereto as Exhibits 2 through 11, respectively.[1]

---

[1] Exhibit 2-BP Settlement Agreement; Exhibit 3-Casey's Settlement Agreement; Exhibit 4-CITGO Settlement Agreement; Exhibit 5-ConocoPhillips Settlement Agreement; Exhibit 6- Dansk Settlement Agreement; Exhibit 7-ExxonMobil Settlement Agreement; Exhibit 8-Sam's Settlement Agreement; Exhibit 9-Shell Settlement Agreement; Exhibit 10-Sinclair Settlement Agreement. Plaintiffs and Valero have entered into a binding, written settlement term sheet and have exchanged a detailed settlement agreement that they anticipate filing next week as a fully-executed agreement. That document will be filed as Exhibit 11 to this Motion.

Each of the Settlements were entered into after extensive arms-length negotiations by experienced counsel. The Settlements bear a reasonable relationship to the claims alleged by Class Plaintiffs and the Class Members, and to the litigation risks of Plaintiffs and the Settling Defendants. Class Plaintiffs submit that the Settlements are sufficiently within the range of possible final approval to warrant an order granting preliminary approval and directing the provision of notice to the Class Members.

Accordingly, Class Plaintiffs respectfully request an Order: (1) conditionally certifying Settlement classes and subclasses as set forth below; (2) preliminarily approving the proposed Settlements; (3) directing distribution of notice to the Settlement classes pursuant to the proposed notice plan set forth below; and (4) setting a final hearing for approval of the Settlements.

## II.   LEGAL BACKGROUND

The approval procedure for a proposed settlement of a class action has three steps. The first step is submission of the proposed settlement to the court for preliminary approval.[2] The second step is dissemination of notice of the settlement to all class members. And the third step is a hearing for final settlement approval.[3]

This motion focuses on the first step—preliminary approval. The question presented on a motion for preliminary approval of a proposed class-action settlement is whether the proposed settlement is "within the range of possible approval."[4] Preliminary approval is merely the prerequisite to giving notice so that the class may be "given the opportunity to address the court as to the reasons the proposed settlement is unfair or inadequate."[5]

---

[2] 2 H.Newberg & A. Conte, *Newberg on Class Actions* (3d. ed. 1992) at §11.41, pp.11-87.
[3] *Manual for Complex Litigation*, (3d ed. 2000) at §30.41.
[4] *Manual for Complex Litigation*, (3d ed. 2000) at §30.41, p. 273.
[5] *In re Plastic Cutlery Antitrust Litig.*, No. 96–CV–728, 1998 WL 314655, at *6 (E.D. Pa. 1998 June 15, 1998).

In considering a potential settlement for preliminary approval purposes, the trial court does not have to reach any ultimate conclusions on the issues of fact and law that underlie the merits of the dispute, and need not engage in a trial on the merits.[6] The Manual for Complex Litigation characterizes the preliminary approval stage as an "initial evaluation" of the fairness of the proposed settlement made by the court on the basis of written submissions and informal presentation from the settling parties.[7]

Preliminary approval does not require the trial court to answer the ultimate question of whether a proposed settlement is fair, reasonable, and adequate. That determination is made at the third step, the final approval hearing, only after notice of the settlement has been given to the members of the class and after they have been given an opportunity to voice their views of the settlement or be excluded from the class.[8]

## III.   STATEMENT OF THE CASE

### A.  Background Facts

This MDL proceeding arises from the Defendants' alleged practice of selling fuel in twenty-nine states and jurisdictions (the "Region")[9] at retail without correcting for the effects of temperature on the quality, quantity and value of motor fuel, or disclosing those effects to consumers.

Specifically, the Class Plaintiffs and Class Members have alleged that Defendants, including the Settling Defendants, do not adjust the volume or price of such motor fuel (or the amount of fuel excise tax recoupment passed on to consumers) to compensate for the effect of

---

[6] *Detroit v. Grinnell Corp.*, 495 F.2d 448, 456 (2d Cir. 1974); *Officers for Justice v. Civil Serv. Comm'n*, 689 F.2d 615 (9th Cir. 1982), *cert. denied*, 459 U.S. 1217 (1983).
[7] *Manual for Complex Litig.*, § 21.632. (3d. ed. 2004).
[8] *See, e.g.*, 3B J. Moore, *Moore's Federal Practice* ¶ 23.80[2-1], at 23-479 (2d ed. 1993).
[9] The Region consists of Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Guam, the Virgin Islands, and Washington, D.C. (each state and jurisdiction in the Region is a "State at Issue").

temperature expansion, which affects both the quality and quantity of motor fuel sold on a volumetric basis. In addition, Class Plaintiffs allege that Defendants have sold motor fuel to retail consumers without disclosing the temperature of fuel or meaningful information about the effects of temperature on motor fuel. Class Plaintiffs allege that Defendants' conduct is particularly egregious because Defendants: (1) have known about the effects of thermal expansion on motor fuel for decades; (2) compensate for temperature in their upstream transactions in order to minimize the detrimental effects of purchasing hot fuel; (3) compensate for temperature in their retail sales in Canada, for those Defendants that have retail operations in Canada, because it inures to their benefit; and (4) have actively resisted the marketing or implementation of ATC equipment in certain regions in the United States because the use of ATC would inure to the benefit of the consumer.

As a result, Class Plaintiffs brought suit on behalf of themselves and all other similarly situated individuals and entities in the Region that purchased motor fuel at retail, alleging multiple common law and statutory causes of action, including unjust enrichment and consumer-protection violations.

Settling Defendants have denied all factual allegations and legal claims of Class Plaintiffs, and contend that the retail motor fuel practices and methods of sale are proper, legal and do not violate any law or regulation. The Refiner Settling Defendants also contend that they are not responsible for the retail motor fuel sales by retail locations that carry their brand names but which they do not own or control.

## B.    Procedural History

Between December 2006 and December 2008, fifty-one "hot fuel" lawsuits were filed in United States District Courts across the Region.[10]

On June 18, 2007, the Judicial Panel on Multi District Litigation consolidated these suits pursuant to 28 U.S.C. § 1407, transferring all such cases and subsequent tag-alongs to the Honorable Kathryn Vratil for coordinated and consolidated pretrial discovery and preparation.[11]

Subsequent to consolidation and transfer, pretrial discovery was stayed pending briefing and a ruling on Defendants' dispositive motion.[12] There has been extensive written discovery and document production and the parties have taken extensive deposition discovery of plaintiffs, the defendants' personnel and corporate representatives, and experts for both sides. Plaintiffs filed motions for class certification on June 1, 2009. On May 28, 2010, the Court certified a class under Federal Rule of Civil Procedure 23(b)(2) for the Kansas actions, and deferred ruling on the remaining class-certification motions.[13] On January 19, 2012, the Court denied Defendants' motion to decertify the Kansas class and modified the original class-certification ruling in the Kansas action by certifying the liability aspects of a Rule 23(b)(3) damages class pursuant to Rule 23(c)(4).[14] Motions for summary judgment have been filed and fully briefed in the Kansas action and in the other pending MDL actions. The Court has ruled on several of the motions for summary judgment in the Kansas action. The Kansas action is scheduled to commence trial on August 27, 2012. For Settling Defendants named in the Kansas actions, the Court has severed the claims against those Defendants from the upcoming trial upon notice to the Court that the parties

---

[10] One or more of the Settling Defendants have been named in the lawsuits listed on Exhibit 18.
[11] Twelve cases were transferred by the JPML's original order (D.E. 1). Thirty-nine other actions were subsequently transferred as tag-along actions (D.E. 1, 2, 3, 96, 132, 146, 188, 189, 191, 192, 201, 598).
[12] *See* Motion to Dismiss filed October 22, 2007 (D.E. 196) (overruled by Order dated Feb. 21, 2008, D.E. 284).
[13] D.E. 1675.
[14] D.E. 3208.

had reached binding agreements to settle all of the class claims in all the actions against the Settling Defendants.[15]

## C.    Representation

The Litigation has been competently and vigorously prosecuted and defended. Class Plaintiffs in the Litigation are represented by Co-Lead Plaintiffs' Counsel Robert A. Horn of the law firm Horn Aylward & Bandy, LLC, 2600 Grand Blvd., Ste. 1100, Kansas City, MO 64108 and Thomas V. Girardi of the law firm Girardi & Keese, 1126 Wilshire Boulevard, Los Angeles, California 90017, George A. Zelcs of the law firm Korein Tillery, LLC, 205 N. Michigan Plaza, Suite 1950, Chicago, IL 60601 and Plaintiffs' Liaison Counsel Thomas V. Bender of the law firm Walters Bender Strohbehn & Vaughan, PC, 2500 City Center Square, 1100 Main Street, Kansas City, MO 64196 (collectively referred to as "Class Counsel").

The Settling Defendants are represented by the following counsel ("Defense Counsel"):

*Counsel for BP*:
Sean Morris
Arnold & Porter LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844

*Counsel for Casey's*:
Martin M. Loring
Husch Blackwell, LLP
4801 Main, Suite 1000
Kansas City, MO 64112

*Counsel for CITGO*:
Nate Eimer
Eimer Stahl LLP
224 South Michigan Ave., Suite 1100
Chicago, IL 60604

*Counsel for ConocoPhillips*:
Joseph W. Bell
Zelle Hofmann Voelbel & Mason LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104

*Counsel forExxonMobil*:
David Lender
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

*Counsel for Sam's*:
Brian L. Duffy
Greenberg Traurig, LLP
1200 17th Street, Suite 2400
Denver, CO 80202

*Counsel for Shell*:
David Harris
Greensfelder, Hemker, & Gale, P.C.

*Counsel for Sinclair*:
William Ford
Lathrop & Gage

---

[15] D.E. 4230, 4234, 4238, 4240.

10 South Broadway, Suite 2000          2345 Grand Boulevard
St. Louis, MO 63102                    Kansas City, MO 64108

*Counsel for Valero*:                  *Counsel for Dansk:*
James F. Bennett                       Craig J. De Recat
Dowd Bennett, LLP                      Manatt, Phelps & Phillips, LLP
7733 Forsyth Blvd., Suite 1410         11355 W. Olympic Blvd.
St. Louis, MO 63105                    Los Angeles, CA 90064

Class Plaintiffs and Settling Defendants are represented by counsel with extensive experience in complex and class-action litigation.

### D.    Discovery

Throughout the course of the Litigation, the parties in the MDL have taken and defended many depositions, produced and inspected voluminous documents, completed several rounds of written discovery and retained numerous expert witnesses not yet designated. In total, the parties have conducted more than 400 depositions of fact witnesses, and 25 depositions of experts, totaling almost one and one-half years of deposition days. In addition, thousands of pages of documents have been produced by plaintiffs, and almost a terabyte[16] of documents and information have been produced by defendants and third parties and reviewed by plaintiffs' counsel.

In pursuing the claims of the Class Members, and in evaluating the merits of the Settlements, Class Counsel have reviewed data and documents, conducted witness interviews, taken depositions, held meetings and conferences between representatives of the parties, extensively briefed factual and legal issues, participated in conferences and hearings with the Court and investigated the applicable law and facts regarding the claims of the Class Members, the potential defenses thereto, and the harms borne by the Class Members.

---

[16] For perspective, one terabyte of computer space can hold 1,000 copies of the Encyclopedia Britannica. Ten terabytes could hold the printed collection of the Library of Congress.

### E. Settlement Negotiations

Settling Defendants expressly deny all allegations of wrongdoing made in the Litigation, and contend that they have not had any significant operation or control over retail sales of motor fuel, and that, to the extent they have engaged in such sales, the method of sale utilized was proper, appropriate and authorized under the applicable laws of the various states. Nevertheless, in an effort to reach a comprehensive settlement of the Litigation, Class Counsel have from time to time since at least 2008 engaged in arms-length settlement negotiations with various Defense Counsel. At times, these negotiations were intense. For certain of the Settling Defendants, the negotiations included the use of mediation. For all Settling Defendants, the negotiations were extensive, leading to the most recent intensive settlement negotiations beginning in early 2012, which led to the instant settlement agreements. Through this process, and throughout this period, the Parties were fully and adequately informed of all facts necessary to evaluate the case for settlement.

## IV. SUMMARY OF THE SETTLEMENTS

The Settlements are intended to resolve, inter alia, the Class Members' claims against the Settling Defendants arising out of the sale of gasoline and diesel fuel at stations owned, operated, branded or controlled by Settling Defendants within the Region from January 1, 2001, through the date of preliminary approval of the Settlements. Summaries of the ten Settlements are as follows:

### A. Settlements Involving the Refiner Settling Defendants

#### 1. Basic Summary

The six Settlements with the Refiner Settling Defendants provide in general that, ten days after the Court issues final approval of the Settlements, each of the Settling Defendants will pay

a specified amount into an interest-bearing settlement escrow fund (each a "Settlement Fund") to be administered for two related purposes. First, two-thirds of the Net Settlement Fund (defined below) for each Refiner Settling Defendant may be used to reimburse retailers or wholesalers selling the branded motor fuel of that Refiner Settling Defendant at retail for the expense of (i) installing ATC equipment or (ii) making disclosures of the temperature of motor fuel and the effect of the temperature on the energy content of motor fuel. Second, one-third of the Net Settlement Fund for each of the Settling Defendants may be used to make contributions to state weights and measures agencies to defray any added costs associated with the implementation, inspection or regulation of retail ATC equipment.

The amount of the Settlement Fund for each of the Refiner Settling Defendants is as follows:

- BP                  $   5,000,000
- CITGO               $     800,000
- ConocoPhillips      $   5,000,000
- ExxonMobil          $   5,000,000
- Shell               $   5,000,000
- Sinclair            $     800,000

**Aggregate Amount:        $   21,6000,000**

In exchange for the consideration provided by the Refiner Settling Defendants, including payment of the Settlement Amounts, Class Plaintiffs will dismiss and release all claims against

the Refiner Settling Defendants arising out of or relating to the subject matter of the MDL Actions, as described below and in the attached Settlement Agreements.[17]

### 2. Allocation of the Net Settlement Fund to the States at Issue

The net proceeds of the Settlement Fund for each Settling Defendant, after deducting attorneys' fees, litigation costs, and costs of notice and settlement administration (with respect to each Settling Defendant, the "Net Settlement Fund") will be allocated across the States at Issue in which a Settling Defendant has been sued in these MDL actions. For each Refiner Settling Defendant's Net Settlement Fund, the percentage of the Net Settlement Fund allocated to each State at Issue will be based principally on the following factors: the volume of motor fuel sold in each such state, the average temperature of motor fuel in each state, and the maximum number of retail stations in the States at Issue selling the branded fuel of the Settling Defendant between January 1, 2004, and the present.[18] For each Settlement, the parties modified the percentages to ensure that no State at Issue receives less than 1% of the Net Settlement Fund, and to account for the fact that certain States at Issue should receive allocations smaller than their motor-fuel sales volume would suggest due to factors such as: (1) the Settling Defendant had a small presence in that state; (2) retailers in that State generally buy motor fuel on a non-temperature adjusted basis, and (3) the average fuel temperature in the state is close to (or even below) the industry's 60° F. reference temperature.[19]

---

[17] In certain cases in the Region, the Settling Defendants were previously dismissed without prejudice, or were not named in actions in states where they have sold branded fuel during the Class Period. For the sole purpose of obtaining certification of a settlement class and approval of the Settlements, the Settlements provide that Class Plaintiffs will amend certain complaints, or re-file actions previously dismissed without prejudice, to ensure that each Refiner Settling Defendant is an active defendant in cases in all of the States at Issue covered by its Settlement.

[18] The first factor was presumptively weighted twice as heavily as the second and third factors.

[19] Indiana, New Jersey, and Pennsylvania are examples of States at Issue that the Class Plaintiffs and Refiner Settling Defendants agree should receive comparatively small allocations based upon these factors.

### 3. Process for Disbursement of Net Settlement Fund

The amounts allocated to each State at Issue will be available for the reimbursement of retailers or wholesalers, or for contributions to state weights and measures agencies located in that state, for the purposes set forth above. To receive payments, a retailer or wholesaler must submit a written statement to the Settlement Administrator that: (i) lists the State(s) at Issue where the retailer or wholesaler will install ATC equipment and/or make disclosures about the temperature of motor fuel, or its effect on energy content; (ii) describes the costs involved in implementing ATC and/or making disclosures, describes the substance and proposed text of any such disclosure, and states the amount of reimbursement requested; and (iii) where the applicant intends to install ATC, explains the authorization from each applicable State's department of weights and measures, or other agency responsible for regulating retail motor fuel dispensers in the State, permitting the use of the system that the retailer or wholesaler has implemented. Similarly, a weights and measures department seeking payment from the Net Settlement Fund must submit to the Settlement Administrator a written statement that: (i) explains that the State at Issue has adopted, authorized or allowed the use of ATC for retail sales of motor fuel; and (ii) describes how the State would use a portion of the Settlement Fund to assist in that implementation, inspection or regulation.

Upon receiving such written documentation, including proof of incurred expenditures by retailers or wholesalers, the Settlement Administrator will disburse to the eligible applicant the requested funds or a portion thereof. To ensure that settlement funds are available to eligible parties later in the settlement period, the Settlements provide that in each of the first two years, the Settlement Administrator may not disburse more than 25% of the Net Settlement Fund.[20]

---

[20] The ExxonMobil Settlement additionally provides that, for planned disbursements over a threshold amount—either from an individual application or across multiple requests—the Settlement Administrator will notify

For each of the Refiner Settling Defendants except ExxonMobil, the Settlements provide that after five years, any remaining portion of the Net Settlement Fund will be pooled for a sixth and final year and available for disbursement to a qualifying retailer, wholesaler, or weights and measures department from any of the States at Issue, even if the amount allocated to that applicant's State at Issue has been exhausted. Any amounts that have not been disbursed from each of the Net Settlement Fund at the end of the sixth year will be paid to governmental entities or non-profit organizations for the benefit of members of the Settlement Classes in a manner agreed to by the Settling Defendants and Class Counsel and approved by the Court.[21]

Twice a year, Class Counsel will file with the Court (and serve on the relevant Refiner Settling Defendant) a report summarizing activity in each Settlement Fund, accounting for payments made from such Fund and deposits into the Fund.

4.      **Attorneys' Fees, Litigation Expenses, and Costs of Notice and Settlement Administration**

Under the Settlements for the Refiner Settling Defendants, the Plaintiffs may apply to the Court to recover attorneys' fees, litigation costs, notice expenses, the costs of administering the settlement, and modest incentive awards to the Class Representatives. The recovery for attorneys' fees, litigation costs, and incentive awards are capped at 30% of the Settlement Fund for each Refiner Settling Defendant.[22] The costs of notice and settlement administration will be reimbursed out of the Settlement Funds, and the Settlements provide a formula for allocating notice and settlement administration costs across the Settlement Funds of the Refiner Settling Defendants. In

---

ExxonMobil counsel and Class Counsel of the request. ExxonMobil will have ten days to register an objection, after which the parties will attempt in good faith to resolve the issue or submit it to an independent third party, jointly selected by the Settlement Administrator and ExxonMobil, for decision.
[21] ExxonMobil will choose the charity to receive the portion of the Net Settlement Fund that remains undisbursed after five years, subject to objections by Class Counsel.
[22] For example, for BP, Conoco, ExxonMobil and Shell, each of which will create a Settlement Fund of $5 million, attorneys' fees, litigation costs, and plaintiff incentive awards may total no more than $1.5 million from each such Settlement Fund.

addition, the Refiner Settling Defendants are making certain advance payments prior to any final approval hearing, but only subsequent to entry of an order preliminarily approving the Settlements, for purposes of defraying the costs associated with implementing the Notice Plan set forth below.[23]

### 5.    Releases

In return for the settlement consideration described above, the Settling Defendants will receive releases, as described more fully in the attached Settlement Agreement, of all claims arising out of or relating in any way to the claims alleged in the MDL Actions, any representation or failure to disclose the temperature or energy content of motor fuel, any alleged over-collection of state and federal motor fuel excise taxes from consumers based on the number of gallons dispensed without adjustment for the effect of temperature, and the alleged participation in any conspiracy to preclude the use of ATC equipment in the States at Issue.

### 6.    The Settlement Administrator

The Parties ask that the Court approve a settlement administrator ("Settlement Administrator") to review and process requests of retailers, wholesalers, and weights and measures departments for payments from the Settlement Funds. The expenses associated with settlement administration will be reimbursed from the Settlement Fund for each Settling Defendant, with general administration expenses allocated across the Settlement Funds according to that Refiner Settling Defendant's share of the combined amount of money in all of the Settlement Funds.

---

[23] The gross Settlement Funds being paid by the Refiner Settling Defendants are inclusive of these advance payments.

The Class Plaintiffs request that the Court approve and appoint Horn Aylward & Bandy, LLC ("HAB"), to be the Settlement Administrator for the Settlements involving the Refiner Settling Defendants.[24] The Settlement Administrator's evaluation of applications from retailers, wholesalers, or weights and measures departments, and the decision about the size of the payment to make, will benefit from substantive knowledge and understanding of the subject matter. In this respect, administration of these Refiner Settling Defendant Settlements differs from "typical" claims-processing activities and responsibilities.[25] As one of the Class Counsel and lead counsel for the Class Plaintiffs throughout this litigation, HAB has significant understanding of temperature correction and of the technical, legal, and regulatory issues in this case, and is well positioned to administer the Settlement Funds efficiently for the purposes set out in the Settlements. HAB is committed to the Settlement Funds being used in a way that most benefits retail consumers. If selected as Settlement Administrator, HAB intends to seek reimbursement from the Settlement Funds only for its costs and expenses in performing its responsibilities, and will not seek reimbursement of fees for time spent. Thus, HAB's proposed service as Settlement Administrator at cost is not intended to be, and will not be, a way for HAB to obtain additional attorneys' fees and, in fact, will only increase the amount in each Net Settlement Fund that is available for use in the manner set forth above.

In the alternative, Class Plaintiffs request that the Court appoint Dahl Administration, LLC ("Dahl"), to serve as the Settlement Administrator. The Parties also seek appointment of Dahl as the Notice Administrator. Dahl has almost twenty years of experience in settlement

[24] Defendants reserve the right to object to the appointment of HAB as the Settlement Administrator.
[25] In identifying HAB as a choice to provide the settlement administration services required by these particular Settlements, Plaintiffs do not disparage in any way the critical and exceptional efforts of settlement administrators who oversee significant claims processing and payment operations for so many class-action cases.

administration and has administered more than three hundred class-action settlements. Dahl's background and experience are described at greater length in the discussion of the Notice Plan, *infra*.

Regardless of whom the Court appoints as the Settlement Administrator, the Court will retain continuing jurisdiction to enforce the Settlements and any final judgment entered on the Settlements.

### B. The Sam's, Casey's and Dansk Settlements

Three of the Settlements—for Sam's, Casey's and Dansk—provide for phased conversion to ATC equipment at the retail stations owned or operated by those defendants in certain states in the Region. These three Settlements are structured similarly to the Class Plaintiffs' settlement with Costco, to which this Court granted final approval on April 24, 2012.[26]

### 1. Consideration: Conversion to ATC and Posted Disclosures

Under its Settlement, Sam's agrees to convert all of the motor fuel dispensers to ATC at its existing owned and operated retail locations in states where it currently purchases fuel at wholesale on a temperature-adjusted basis and sells the fuel at its owned and operated retail stations on a non-temperature-corrected basis: Alabama, Arizona, Arkansas, California, , Florida, Georgia, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Virginia (the "Conversion States"). (Sam's ¶ 4.2). Sam's obligation to install or convert to ATC is subject to appropriate regulatory approval in each State at Issue in the Sam's Settlement. (Sam's ¶ 4.6).

Under the Casey's Settlement, Casey's will do the same in Arkansas, Indiana, Kansas, Missouri, and Oklahoma (the "Casey's Settlement States"), and the obligation to convert to or

---

[26] D.E. 4248.

install ATC in a Casey's Settlement State shall be suspended if Casey's purchases a majority of its fuel in that state on a non-temperature-adjusted basis within a fiscal year (Casey's ¶ 4.2). Casey's obligation to install or convert to ATC is subject to appropriate regulatory approval in each State at Issue in the Casey's Settlement. (Casey's ¶ 4.6).

Under the Dansk Settlement, Dansk will also phase-in ATC devices at the retail stations it owns in California over a three year period. (Dansk ¶ 4). Dansk's obligation to install or convert to ATC is subject to appropriate regulatory approval in California. (Dansk ¶ 4.6).

For new retail stations built by Sam's in the Conversion States, by Casey's in the Casey's Settlement States or by Dansk in California, those Settling Defendants agree to install ATC dispensers. (Sam's, Casey's, Dansk ¶ 4.3). In addition, to the extent Sam's begins to purchase motor fuel on a temperature-adjusted basis consistently in the states of Indiana, Maryland, New Jersey, Pennsylvania or Utah (the "Non-Conversion States") after the Effective Date of the Agreement, Sam's agrees to convert all of the motor fuel dispensers in those States as well. However, for each of the Settlements, Sam's, Casey's and Dansk's respective obligation to convert to and install ATC is contingent on the relevant State's authorities, laws and regulations permitting such conversion and installation. (Sam's, Casey's, Dansk ¶¶ 4.4, 4.6)

Essentially, Sam's, Casey's and Dansk will convert to and install ATC on a phased basis. Sam's conversion and installation will occur under a phased implementation period during the five-year period after the Effective Date of the Agreement (Sam's ¶ 4.4), subject to exceptions, for regulatory or supplier delays or denials. (Sam's ¶¶ 4.4, 4.5, 4.6, 4.8). Casey's conversion and installation in each Casey's Settlement State will occur over a five-year period beginning on the "Implementation Date," which for each such state is the later of the date that the Casey's Settlement could first become effective and the date that final regulatory approval to use

ATC is obtained in that state. (Casey's ¶ 4.4). Dansk's conversion and installation will occur over a three-year period after the Effective Date of the Agreement (Dansk ¶ 4.4), subject to exceptions for regulatory or supplier delays or denials. (Dansk ¶¶ 4.5, 4.6, 5, 11). Each will provide semiannual reports to Class Counsel regarding their respective compliance with the ATC phase-in timeline set forth in the Agreement. (Sam's and Casey's ¶ 8.2, Dansk ¶ 10.2). The Court has continuing jurisdiction to enforce the Settlements and any final judgment entered approving the Settlements. (Sam's and Casey's ¶ 8.1, Dansk ¶ 10.1).

In addition, for the five years that the Settlement is in effect, Sam's and Casey's agree to place stickers on their existing pumps at retail stations in all States at Issue—within 60 days (Sam's) or 240 days (Casey's) after the Settlements' effective date—that disclose information about the effects of temperature on the volume and energy content of motor fuel that is meaningful to the consumer in making purchasing decisions. Class Counsel and Sam's will agree upon the language of such stickers (Sam's ¶ 4.9); Casey's will control the specific content, style, and placement of its disclosure stickers (Casey's ¶ 4.7). The obligation to affix such stickers ends for a particular Sam's retail station when Sam's has converted to or installed ATC on all pumps at that retail station.

### 2. Release by Class Members

In exchange for the above-described consideration, the Class Members are granting Sam's, Casey's and Dansk a release from all claims relating to the subject matter of the complaints. The Class Members also agree to a prohibition on future suits relating to the any matters covered by the release. The Sam's and Casey's Settlements also have termination and "most favored nation" clauses that allow either defendant to terminate its Settlement in certain circumstances, such as if it believes that any other settlement agreement that the Class Members

enter with another defendant is "materially more advantageous" to that defendant than the Sam's or Casey's Settlement is to that respective defendant.

### 3. Amounts for Notice and Attorneys' Fees and Costs

To assist the provision of notice to the Class Members pursuant to the publication-based Notice Plan described *infra*, Sam's will pay $200,000, and Casey's will pay $100,000, to an account controlled by Class Counsel within ten business days after preliminary approval by this Court of the Sam's Settlement.[27] Dansk is paying all costs associated with the separate Dansk notice plan set forth in ¶ 3 of the Dansk Settlement, and is therefore not contributing any funds towards the cost of the nationwide notice campaign.

Sam's will not object to reasonable attorneys' fees and litigation costs up to $3 million, as approved by the Court. Casey's will not object to reasonable attorneys' fees and litigation costs up to $700,000, as approved by the Court. Dansk will not object to reasonable attorney's fees and litigation costs up to $58,000, subject to Court approval.

The Settlements provide that, should the Court not preliminarily approve the Settlements or not grant final approval, the Settlements will be construed as having no force or effect and the parties will resort to their respective positions immediately prior to execution of the Settlements. (Sam's and Casey's ¶ 2.2, Dansk ¶ 2.3). The Settlements advance the interests of the Class Members and are the product of substantial, informed and non-collusive negotiations in which the Parties were represented by experienced counsel who approved and recommended the Settlements. They are fair and reasonable, and fall within the range of proper approval by the Court.

---

[27] In the event that the Court requires Sam's to provide individualized mailed notice to Class Members, Sam's will bear the additional cost of such notice, but also retains the right to terminate the Settlement if such mailed notice is required.

### C.        The Valero Settlement

The relief that the Class Plaintiffs will receive through the Settlement with Valero differs from any of the other Settlements addressed in this motion.

Like the other Settling Defendants, Valero denies Class Plaintiffs' factual allegations and denies that it is liable on any and all of the Class Plaintiffs' claims. However, to settle all of Class Plaintiffs' claims against Valero, Valero has agreed to post the actual temperature of the motor fuel in each of the underground storage tanks, or a reasonable average of such temperatures, at retail stations that it owns directly or indirectly in twenty-four states in the Region: Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia (the "Valero Settlement States"). Valero will accompany the temperature posting with notices disclosing the effects of temperature on the energy content of motor fuel. This posting of actual motor fuel temperature applies to all storage tanks with the automatic gauge equipment that allows the automatic transmission of temperature, and to any tanks on which such equipment is installed within three years of the Settlement becoming effective. (Valero ¶ 4.2). At Valero stations where the storage tanks do not have gauges that allow automatic transmission of temperature, Valero will post the informational sticker on its dispensers.

Such posting must be in a reasonably accessible and conspicuous location at each station and must be visible to consumers who enter the station area from their cars. The temperature postings and disclosure notices will provide valuable information to consumers at the point of sale, when they are deciding whether to purchase fuel from Valero.

If a Valero Settlement State permits retail ATC, Valero will install ATC at its owned retail stations if a sufficient majority of Valero's peer companies install ATC at their pumps such that it becomes industry standard. Conversely, like the other Settlements the Valero Settlement relieves Valero of its obligations under the Settlement where such obligations would conflict with local, state, or federal statutes, regulations, or rules.

In addition, Valero will pay up to $200,000 to contribute to the costs of carrying out the Notice Plan and administering the Settlement, as the bills for such become due and owing. Valero will also pay up to $4.5 million in attorneys' fees and litigation costs, as approved by the Court.

In exchange for the consideration provided by Valero, Class Plaintiffs will release Valero and its affiliated entities from claims arising out of Class Plaintiffs' allegations, or any other claim that Class Plaintiffs could have asserted relating to the temperature of retail motor fuel. (Valero ¶ 6).

The Valero Settlement also contains "most favored nation" and termination provisions that are similar to the Sam's and Casey's Settlements. The Court will have continuing jurisdiction to enforce the Valero Settlement and any final judgment entered approving the Settlements. (Valero ¶ 7).

### D.      The Notice Plan

The Class Plaintiffs seek the Court's approval for a Notice Plan developed to efficiently notify Class Members about all of the Settlements. The Notice Plan is supported by the Affidavits of Jeffrey Dahl of Dahl Administration, LLC ("Dahl"), and John Grudnowski, President and CEO of FRWD Corp., attached hereto as Exhibits 12 and 13, respectively. Plaintiffs propose that the Court appoint Dahl to serve as the Notice Administrator.[28]

---

[28] If the Court does not select Horn Aylward & Bandy, LLC, as Settlement Administrator, Plaintiffs propose that the Court also approve Dahl to serve as the Settlement Administrator.

In this case, where the Settlement Classes are so broad – they essentially consist of all persons who have purchased retail motor fuel in the Region since 2001 – individualized notice to all of the Class Members is impracticable, infeasible, and cost prohibitive. Plaintiffs do not have ready access to contact information for the Class Members that would provide the ability to send individualized notice via regular mail or e-mail. Accordingly, the Plaintiffs propose a Notice Plan that relies upon both print and Internet publication.

### 1. Summary of the Notice Plan

The Notice Plan has five components: (1) print publication in *Parade*, a national magazine distributed to approximately 30 million homes each week; (2) extensive, targeted banner advertising using the most current strategies for effective digital advertising; (3) an Internet website to support the print and online outreach; (4) an informational press release distributed electronically via PR Newswire to thousands of news outlets and websites around the United States; and (5) a toll-free telephone hotline by which English and Spanish-language callers can obtain additional information about the Settlements. The use of multiple media formats, including both print and Internet-based notice, will provide an effective way to reach and inform the Class Members. Plaintiffs estimate that the Notice Plan will reach over 80% of the Class Members with a frequency—the measure of the number of times each Class Member is exposed to the notice—of approximately 1.2.

### a. Newspaper Publication – *Parade Magazine*

The print component of the Notice Plan will include a two-fifths page Summary Notice inserted once into *Parade Magazine. Parade Magazine* is circulated with more than 600 Sunday newspapers reaching every major media market in the country. Dahl Aff. ¶ 19.[29] *Parade*

---

[29] A complete list of the newspapers that will carry the *Parade* print notice, their respective circulations, and primary distribution locations is attached as Exhibit 5 to the Dahl Affidavit.

has a total national circulation of approximately 33,000,000. *Id.* The circulation in the Settlement States is 21,500,000 with an estimated readership of approximately 48,000,000. *Id.* The estimated overall reach for the *Parade* Notice in the Settlement States is 28.3% of adults, age 18 and over. *Id.* Since the *Parade* Notice will run in all fifty states, it will provide a mechanism to reach Class Members who purchased motor fuel in a Settlement State but do not reside there, have moved from the Settlement States, find themselves in a non-Settlement State at the time the Notice appears or do not avail themselves of online media. A copy of the proposed Summary Notice is attached hereto as Exhibit 14.

  **b.**  **Internet Outreach – Banner Ads on Websites Visited by Class Members**

   Plaintiffs will augment the *Parade* print notice with a web-based campaign utilizing banner-style notices with a link to the Settlement website. Notices will appear on a group of websites known as the "comScore 2000," a group of the 2,000 highest trafficked websites on the Internet.[30] An estimated 94.6% of online users visit some subgroup of this set of websites each month. Grudnowski Aff. ¶ 35. Spanish-language banner ads will be displayed on Spanish language websites. Copies of the proposed banner ads are attached hereto as Exhibits 15.

   According to eMarketer, a leading publisher of data and analysis on digital marketing and commerce, 79% of adults living in the Region have online access. Dahl Aff. ¶ 21. The web-based notice has been designed to reach at least 65% of these users in order to bring the combined reach of more than 80% with an overall frequency of 1.2 exposures. In carrying out the Notice Plan, the Plaintiffs will be able to reliably measure the delivery of the web-based notice because the technologies allow the Plaintiffs (i) to target the delivery of the notice geographically to

---

[30] The comScore 2000 list is derived from data gathered from 2 million internet users who have consented to having all of their online activity tracked. Examples of websites on the comScore 2000 list are cbs.com, cnn.com, msn.com, msnbc.com, fox.com and youtube.com. Dahl Aff. ¶ 30.

online users in the Region, and (ii) to record when a notice banner has been displayed to a particular user (through tracking of IP addresses and "cookies"[31]), and thus, as the program progresses, to display the notice banner only to online users who have not already been exposed to it. Dahl Aff. ¶¶ 20-22; Grudnowski Aff. ¶¶ 35, 40.

### c. Settlement Website

The third component of the Notice Plan is an Internet website. All of the other components of the Notice Plan will include the website address, www.hotfuellitigation.com. The website will provide Class Members with general information about the Settlements, a mechanism to register requests for exclusion ("opt-outs") from the Settlements, answers to frequently asked questions, important date and deadline information, a summary of Settlement benefits, a means by which to review and print copies of certain Settlement documents including the Long Form Notice,[32] and a link to contact the Settlement Administrator via e-mail. Construction and content of the website will be overseen by Plaintiffs' notice expert, Jeffrey Dahl, and the website will be published in both English and Spanish. Dahl Aff. ¶¶ 31-32.

### d. Widely Disseminated Press Release

Concurrent with the launch of the print and online Notices, Dahl will release a national press release via PR Newswire that provides basic information about the settlement and informs readers where to go for additional information.[33] The press release will be distributed by PR Newswire to 5,815 newspapers, television stations, radio stations and magazines. In addition, PR Newswire will send the press release to approximately 5,400 websites and online databases,

---

[31] A "cookie" is a small piece of data sent from a website and stored in a user's web browser while a user is browsing a website. Cookies enable the browser to remember the activity a user has taken in the past, such as setting a password. Grudnowski Aff. ¶ 23.
[32] Exhibit 16 hereto.
[33] A copy of the text of the proposed press release is attached as Exhibit 7 to the Dahl Affidavit.

including all major search engines. Dahl Aff. ¶ 27. A copy of the text of the proposed press release is attached as Exhibit 17.

### e. Toll-free Information Helpline

Prior to the launch of the print and web-based media campaigns, Dahl will also establish a toll-free Settlement helpline to assist potential Class Members and any other persons seeking information about the Settlement. The helpline will be fully automated and operate 24 hours per day, seven days per week and available in both English and Spanish. *Id.* ¶ 28. The helpline will include a voice response system that allows callers to listen to general information about the Settlement, listen to responses to frequently asked questions ("FAQs"), request a Notice, or leave a message for the Settlement Administrator. *Id.*

### 2. Opt-Out Procedures

Under the terms of the Settlements, Class Members may elect to opt out of one or more of the Settlements. As contemplated by the Notice Plan, opt-outs may be registered either through the website or in writing to the Notice Administrator. The opt-out requests must contain certain basic information and must be signed—if done electronically, by noting an "/s/" followed by the name of the Class Member requesting exclusion. Opt-out requests must be submitted electronically or postmarked no later than ninety days following entry of a preliminary approval order. With the exception of the Valero and Dansk Settlements,[34] if 1% of the Class Members for a particular Settlement validly request exclusion of the Settlement, the Settling Defendants have the right to terminate the Settlements. For BP, ConocoPhillips, Exxon, and Shell, the opt-out threshold is the lesser of 1% of Class Members or 250,000 Class Members.[35] For Sam's, the

---

[34] The Dansk Settlement does not allow Dansk the right to terminate the Settlement based upon the number of opt-outs.

[35] In order to establish the 1% threshold contemplated by this paragraph, the size of the Settlement Classes will be determined using the total estimated number of adult drivers (population 18 years and over) in the States at Issue, as

threshold is 2,500. If the number of opt-outs exceeds the set threshold, and Settling Defendants exercise their right to terminate the Settlements, the Parties will resort to their respective positions immediately prior to execution of that respective Settlement.

### 3. Objection Procedures

Class Members also have the right to object to the Settlement. Subject to approval of the Court, Plaintiffs propose that any objections must be filed with the Court and served on Class Counsel and counsel for the Settling Defendants no later than ninety days following entry of a preliminary approval order.

The Settlement advances the interests of the Class Members and is the product of substantial, informed and non-collusive negotiations in which the Parties were represented by experienced counsel who approved and recommended the Settlement. It is fair and reasonable and falls within the range of proper approval by the Court.

## V. CONDITIONAL CERTIFICATION OF THE SETTLEMENT CLASS

Class Plaintiffs request certification of ten separate settlement classes (the "Settlement Classes") for purposes of obtaining final approval of each of the Settlements. Certification of the settlement classes is appropriate under Rule 23 for the reasons set forth below. The Settling Defendants do not oppose class certification of a settlement class under the agreed terms, and for settlement purposes only.

---

reported in the most recent data available from the U.S. Census Bureau at the time Class Counsel serves the above-mentioned list of requests for exclusion.

## A.    The Settlement Classes

For the purposes of preliminary approval of the Settlements, Plaintiffs request that the Court certify a Settlement Class for each of the Settlements. With the exception of Dansk,[36] each Settlement Class consists of state subclasses (the "Settlement Subclasses") that correspond to the States at Issue for that particular Settlement. Each Settlement Subclass has a class representative.[37]

For the six Settlements involving the Refiner Settling Defendants, the Settlement Subclasses are defined as: "All persons and entities who, at any time during the period from January 1, 2001 to the date of preliminary approval of the settlement agreement in this action, purchased motor fuel in the [State at Issue] from a retail motor fuel station. Excluded from the class is any judicial officer presiding over this action and the members of his/her immediate family."

For the Sam's and Casey's Settlements, the Settlement Subclasses are defined as: "All persons who, between January 1, 2001 and the date of this Agreement, purchased motor fuel from [Sam's or Casey's] in the [State at Issue], excluding: (a) officers and employees of [Sam's or Casey's] or its affiliates; and (b) the Court, and members of the Court's immediate family."

For the Dansk Settlement, there is only a single Settlement Class defined as: "All persons who, between January 1, 2001 and the date of this agreement, purchased motor fuel from Dansk in the State of California, excluding: (a) officers and employees of Dansk or its affiliates, and (b) the Court, and members of the Court's immediate family."

---

[36] Dansk only operates in the State of California.
[37] The class representative for a particular state may be different depending upon who the Settling Defendant is. For some States at Issue, the class representative is the same for all Settlements covering that State at Issue. The Class Representatives are listed on Exhibit A hereto.

The Valero Settlement defines the Settlement Subclasses as: "All persons and entities who, at any time during the period from January 1, 2001 to the date of preliminary approval of the Agreement, purchased Retail Motor Fuel in a State at Issue from a retail motor fuel Station that is or was owned, operated or branded by Valero, excluding officers and employees of Valero or its affiliates; and the Court, and members of the Court's immediate family."

The States at Issue for each Settlement are:

| Settling Defendant | States at Issue |
|---|---|
| BP (25 states) | Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington, D.C. |
| Casey's (5 states) | Arkansas, Indiana, Kansas, Missouri, and Oklahoma |
| CITGO (27 states) | Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, and Washington, D.C. |
| ConocoPhillips (28 states) | Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, D.C., and Guam |
| Dansk (1 state) | California |
| Exxon (28 states) | Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, Washington, D.C., Guam, and the U.S. Virgin Islands |

| | |
|---|---|
| Sam's (25 states) | Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, and Virginia |
| Shell (27 states) | Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia and Washington, D.C. |
| Sinclair (11 states) | Arizona, Arkansas, Kansas, Mississippi, Missouri, Nevada, New Mexico, Oklahoma, Oregon, Texas and Utah |
| Valero (24 states) | Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, and Virginia |

**B.      The Settlements Satisfy Rule 23(a)**

Under Rule 23(a), a settlement class must meet four requirements: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation.[38] The proposed Settlement Classes satisfy all four requirements.

**1.      Numerosity**

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." There is no exact numerical formula for determining whether a class is

---

[38] *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 633 (D. Kan. 2008).

sufficiently numerous, but it is a determination that must be made by the district court "in light of the particular circumstances of the case . . . ."[39]

Here, the proposed Settlement Classes consist of millions of individuals and entities that purchased motor fuel from one or more of the Settling Defendants. Thus, joinder is impracticable and the numerosity requirement is satisfied.[40]

### 2. Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."[41]

In this case, numerous questions of law and fact are common to the Settlement Classes and, thus, satisfy the requirement of "commonality." The method of sale with respect to all Class Members was essentially uniform because none of the Settling Defendants has accounted for temperature in the sale of motor fuel at retail during the class period. This uniformity gives rise to the Class Members' claims for unjust enrichment, breach of contract and other theories. Similarly, the Settling Defendants did not inform the Class Members that such sales were not compensated for temperature, or advise the Class Members of the effect that thermal expansion has on the quality and quantity of motor fuel. This uniform conduct gives rise to the Class Members' claims based on misrepresentation, consumer protection, and other theories.

Simply put, Class Plaintiffs and the Class Members stand in virtually identical shoes with respect to non-temperature corrected motor-fuel purchases from the Settling Defendants and the

---

[39] *Ark. Ed. Ass'n v. Bd. of Educ. of the Portland, Ark. School Dist.,* 446 F.2d 763, 765 (8th Cir.1971); *see also Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978).

[40] Class actions have been routinely certified even where the class amounts to less than one hundred members. *See, e.g., Ark. Educ. Ass'n v. Bd. of Educ.,* 446 F.2d 763, 756-66 (8th Cir.1971) (20 class members sufficient); *Swanson v. American Consumer Industries,* 415 F2d 648, 653 (4th Cir. 1967) (18 class members sufficient); *Riordan v. Smith Barney,* 113 F.R.D. 60 (N.D. Ill. 1986) (10–29 class members sufficient); *Sala v. Nat'l RR Passenger Corp.,* 120 F.R.D. 494, 497 (E.D. Pa. 1988) (40–50 class members sufficient).

[41] *See Am. Fin. Sys., Inc. v. Harlow,* 65 F.R.D. 94, 107 (D. Md.1974), *cert. denied,* 460 U.S. 1083 (1983) (commonality is not required on every question raised in a class action; rather, Rule 23 is satisfied when the legal question "linking the class members is substantially related to the resolution of the litigation.").

claims arising therefrom. The virtually identical nature of the Settlement Class' claims is sufficient to satisfy the "commonality" requirement of Rule 23(a)(2).

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties (be) typical of the claims or defenses of the class."[42] Courts in this District have held:

> This requirement does not mandate . . . that the claims of the representative plaintiffs be identical to those of the other class members. Rather, the Court should look to whether the claims of the representative plaintiff are antagonistic to the claims of the proposed class. "Typicality insures that the class representative's claims resemble the class's claims to an extent that adequate representation can be expected."[43]

Under this standard, the claims of the Class Plaintiffs are not antagonistic to the claims of the Class Members.

The "typicality" of the Class Plaintiffs' claims in this case exists also because each Class Member, including each Class Plaintiff, was treated the same by the Settling Defendants—that is, each Class Member received, and was only offered, motor fuel that was not adjusted in volume or price for the effects of temperature.[44] Although the Settling Defendants dispute that their method of sale was improper, they do not dispute that their sale of non-temperature-adjusted fuel and the alleged failure to inform the Class Members of material facts is the conduct that give rise to the Class Members' claims. Thus, each Class Member, including each Class Plaintiff, holds the same claims. The "typicality" requirement of Rule 23(a)(3) is satisfied.

---

[42] The "typicality" requirement, as customarily applied, tends to merge with "commonality." *Gen. Tel. Co. of Southwest. v. Falcon*, 457 U.S. 147, n.13 (1982).

[43] *Swisher v. U.S.*, 189 F.R.D. 638, 640-641 (D. Kan. 1999) (citations omitted), quoting *Edgington v. R.G. Dickinson and Co.*, 139 F.R.D. 183, 189 (D. Kan. 1991).

[44] *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183-84 (3d Cir. 2001) ("If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences.").

### 4.    Adequate Representation

The final requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class."[45] To establish that they will fairly and adequately protect the interests of the class, the representative plaintiffs must show that: (1) they are able to prosecute the action vigorously through qualified counsel and (2) there is no conflict between their interests and those of the class members.[46] The potential for disagreement or opposition from certain members of a class is not enough to establish that the representation of the class by the class representative is inadequate.[47] Only where the conflict is "fundamental" and goes to "specific issues in controversy" does a concern about adequacy of representation arise.[48]

With respect to the proposed Settlement Classes, both components of Rule 23(a)(4) are satisfied. First, Class Counsel have substantial experience in the arena of complex and class-action litigation, and are qualified, experienced and have vigorously pursued this Litigation.[49] Second, there is no evidence or indication of a conflict between the interests of the Class Plaintiffs and the Class Members. For example, all Class Members, as retail purchasers of motor fuel, will benefit from the disclosure of information about the temperature of the fuel and about the effect of temperature on the energy content of motor fuel, because they will have more information available to them when making motor fuel purchasing decisions. On the common issues and relief obtained, Class Members stand to gain as much as the Class Plaintiffs, and the Class Plaintiffs have advocated as vigorously for the Class Members as they have for

---

[45] Fed. R. Civ. P. 23(a)(4).
[46] *Schreiber v. Nat'l Collegiate Athletic Ass'n*, 167 F.R.D. 169, 175 (D. Kan. 1996); s*ee also* 1 Newberg, *Class Actions*, § 3.22 at 198.
[47] *In re Motor Fuel Temperature Sales Practices Litig.* 271 F.R.D. 221 (D. Kan. 2010).
[48] *Id.* (citing *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)).
[49] *See* Declarations of Co-Lead Counsel and Liaison Counsel previously submitted to the Court, resulting in this Court's orders of appointment (D.E. 138, 145, and 179) which are incorporated herein by reference. If additional declarations or support for this Motion are required by the Court, the undersigned will promptly submit the same upon request.

themselves.[50] Since the Class Plaintiffs and Class Members are alleged to have suffered the same injury, and the relief obtained through the Settlements will apply equally to all Class Members, including the Class Plaintiffs, the requirements of Rule 23(a) are met with respect to the proposed Settlement Classes.[51]

### C. Rule 23(b)(3) Standards Are Satisfied

The proposed Settlements also meet the requirements of Rule 23(b)(3), which allows class certification where common questions of law and fact predominate over individual questions and class treatment is superior to individual litigation.[52] When assessing predominance and superiority, the Court may consider that the class will be certified for settlement purposes only, and that a showing of manageability at trial is not required.[53] The test is "whether proposed classes are sufficiently cohesive to warrant adjudication by representation."[54]

Here, the proposed Settlement Classes are sufficiently cohesive. As described above, the Class Plaintiffs and all Class Members seek redress for claims arising out of the same allegedly unlawful conduct. Thus, common questions predominate over individual questions for each of the Class Member Categories. Moreover, as Plaintiff seeks conditional certification of the Settlement Classes only to effectuate the Settlements, the Court need not consider whether trial in the absence of class certification would be unmanageable.[55] Therefore, the proposed Settlement Class is particularly appropriate for certification for settlement purposes.

---

[50] *See, e.g., McGee v. Continental Tire N. Am., Inc.*, 2009 WL 539893 (D.N.J. Mar. 4, 2009) (finding Rule 23(a)(4) satisfied where the named plaintiffs advocated as vigorously for absent class members as for themselves).

[51] The uniformity of the proposed Settlement Classes here stands in contrast to cases where courts have refused to certify classes under Rule 23(a)(4) because of significant differences among the interests of class members. *See, e.g., Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (affirming Third Circuit determination that currently injured and exposure-only members of a proposed asbestos class had divergent interests in structure of settlement fund and thus could not be adequately represented in a single class).

[52] *See* Fed. R. Civ. P. 23(b)(3).

[53] *See Amchem*, 521 U.S. at 619-20.

[54] *Id.* at 623.

[55] *See Anchem*, 521 U.S. at 620.

Class resolution is superior to other available methods for the fair and efficient adjudication of this controversy. The Class Members' claims could prove uneconomical for individual action because litigation costs could dwarf potential recovery.[56]

In summary, certification of the proposed Settlement Class is appropriate under Rule 23. Accordingly, the Class Plaintiffs respectfully request that the Court conditionally certify the proposed Settlement Class.

## VI.   PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

Class Plaintiffs respectfully submit that the Settlements are "within the range of possible approval" and thus, preliminary approval of the Settlements is warranted. The terms of the Settlements are fair and provide a complete plan for notice to the Settlement Class, for Class Members to "opt out" of the Settlements, for Class Member objections, for implementation of the Settlement consideration, for oversight of the Settlement process, and for final certification of compliance with the terms of the Settlements. The terms of the Settlements also provide that, if for any reason the Settlements do not become final, the Parties will revert to their positions prior to the execution of the Settlement Agreements and the Litigation will continue as if this motion and accompanying documents were never filed.

### A.    The Terms of the Proposed Settlements Are Fair

A preliminary review of the terms of the proposed Settlements confirms that they are fair. Indeed, the proposed Settlements come to this Court with a presumption of fairness because the Plaintiffs can show

> (1) That the settlement has been arrived at by arm's-length bargaining; (2) That sufficient discovery has been taken or investigation completed to enable counsel and the court to act

---

[56] While that pursuit of claims by an individual may be economically inefficient and cost-prohibitive, the opt-out procedures provide a mechanism for Class Members who are dissatisfied with the Settlements to preserve and pursue individual claims that they may have.

> intelligently; [and] (3) That the proponents of the settlement are counsel experienced in similar litigation….[57]

Furthermore, courts are to give "proper deference to the private consensual decision of the parties," since "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and the settlement, taken as a whole, is fair, reasonable and adequate to all concerned."[58]

Here, it is the judgment of the proposed Class Counsel that, in consideration of all factors, the Settlements are beneficial to the Class Members and in their best interests at this stage of the Litigation. Extensive investigation and discovery has allowed Class Counsel and Defense Counsel for each Settling Defendant – who are experienced class action attorneys – to assess the strengths and weaknesses of the claims against the Settling Defendants and the benefits of each respective Settlement under the circumstances of this case.

### B. Plaintiffs' Counsel Have a Sufficient Factual Basis for the Settlements

Class Counsel have already conducted substantial investigation and discovery, and engaged in arm's-length discussions in this Litigation. As noted, Plaintiffs' counsel served numerous discovery requests and received millions of documents that required extensive review and statistical analyses by Class Counsel and their experts. In addition, Class Counsel have taken several hundred depositions; defended scores of plaintiff depositions; responded to scores of discovery requests; examined and produced thousands of documents; investigated, briefed and

---

[57] 4 Newberg, § 11.41. A fourth factor supporting a presumption of fairness – "That the number of objectors or interests they represent is not large when compared to the class as a whole" – cannot yet be assessed because notice has not yet gone out to the Class Members.

[58] *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1988); *see also, Marcus v. State of Kansas, Dept. of Revenue*, 209 F.Supp.2d 1179 (D. Kan. 2002) ("When settlement is reached by experienced counsel after negotiations in adversarial setting, there is initial presumption that settlement is fair and reasonable.").

successfully opposed a detailed dispositive motion by defendants; investigated and prepared numerous, detailed discovery motions and met and conferred with the Settling Defendants (and other defendants) over various discovery disputes for several years. Thus, Class Counsel negotiated the Settlements with ample knowledge of the strengths and weaknesses of Plaintiffs' case. The efforts of the Parties' counsel to resolve this case have resulted in fair and comprehensive settlements that provide meaningful, substantial benefits for the Class Members.

### C.      The Notice Plan Is Appropriate

The second step in the class-action settlement process is providing the class with notice of the settlement. Rule 23(c)(2) requires the Court to direct to class members the "best notice practicable" under the circumstances, including "individual notice to all members who can be identified through reasonable effort."[59] To comport with due process, notice must be fashioned to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.[60] The Federal Judicial Center considers notice reaching 70%-95% of the class to be reasonable.[61] Here, the Notice Plan will reach more than 80% of the Class Members in the Region, and expose those Class Members to the notice an average of 1.2 times.

In deciding whether a class action settlement notice is adequate, the Tenth Circuit has stated that "the legal standards for satisfying Rule 23(c)(2)(B) and the constitutional guarantee of procedural due process are coextensive and substantially similar."[62] The Due Process Clause "does not require *actual* notice to each party intended to be bound by the adjudication of a

---

[59] *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S. Ct. 2140 (1974); *In re Urethane Antitrust Litig.*, 251 F.R.D. 629, 645 (D. Kan. 2008).

[60] *Wyandotte Nation v. City of Kansas City, Kansas*, 214 F.R.D. 656, 664 (D. Kan. 2003).

[61] *See* Federal Judicial Center Notice Checklist, available at: http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf.

[62] *DeJulius v. New England Health Care Employees Pension Plan*, 429 F.3d 935 (10th Cir. 2005) (*citing In re Integra Realty Resources, Inc.*, 262 F.3d 1089, 1110 (10th Cir. 2001) (quotation omitted)); *see also* Advisory Committee's Note, 1966 Amendments, Fed. R .Civ. P. 23 ("This mandatory notice pursuant to subdivision (c)(2) ... is designed to fulfill requirements of due process to which the class action procedure is of course subject.").

representative action."[63] Rather, where individualized notice is neither practical nor feasible, a notice plan that relies on targeted publication to reach the class members and expose them to a notice that provides the essential information about the proposed settlement satisfies Rule 23 and constitutional due process.[64]

First, the Parties' proposed Notice Plan, described *supra*, meets the standards of Rule 23 and due process because it recognizes an undeniable fact—the public's shift towards online usage, particularly in the realm of news and media consumption. Judge Posner recognized that fact eight years ago:

> [I]n this age of electronic communications, newspaper notice alone is not always an adequate alternative to individual notice. [citation omitted]. The World Wide Web is an increasingly important method of communication, and, of particular pertinence here, an increasingly important substitute for newspapers.[65]

The shift to online information consumption, and away from newspapers, has not just continued in the eight years since Judge Posner wrote those words in *Mirfasihi,* it has increased exponentially. *See* Grudnowski Aff. ¶¶ 14-17. That growth is particularly prominent in the segment of the population that comprises the Classes—persons over the typical driving age of 16.[66] That group of people now spends significantly more time consuming information on the Internet than through print publications than it did just a few years ago. *Id.* ¶¶ 14-17. Accordingly, advertisers and media firms have responded to the shift toward online media

---

[63] *DeJulius*, 429 F.3d at 944 (*quoting Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 313-314 (1950) ("A construction of the Due Process Clause which would place impossible or impracticable obstacles in the way could not be justified.").

[64] *See, e.g., Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 316 (1950); *Mirfasihi v. Fleet Mortg. Corp.*, 356 F. 3d 781, 786 (7th Cir. 2004) (approving notice by publication in a national weekly newspaper plus supporting website where class consisted of 1.4 million members).

[65] *Mirfasihi* 356 F. 3d at 786 (Posner, J.).

[66] All persons in the Region aged 16 and above are a very good proxy for the Class Members here: purchasers of retail motor fuel. Grudnowski Aff. ¶¶ 29-30.

consumption both by concentrating their resources in the online space and by developing advanced tools that enable them to target and track their marketing communications. *Id.*

As evidenced by the Dahl and Grudnowski Affidavits, Class Plaintiffs' proposed Notice Plan was developed in recognition of, and to take advantage of, this dramatic shift in the forum and media where individuals seek and obtain information. Dahl Aff. ¶¶ 5-10; Grudnowski Aff. ¶¶ 6-8, 10. The publication plan described above is designed to effectively reach more than 80% of the Class Members through print notice and extensive, targeted Internet outreach. The online component of this Notice Plan takes advantage of these capacities, including reach and frequency monitoring, frequency capping (through use of "cookies"), domain selection, and geo-location. *Id.* ¶¶ 22-38. The result is that, through this Notice Plan, the Plaintiffs will be able to (i) place the banner ads about the Settlements on the websites that Class Member visit most frequently; (ii) track when an Internet user in the Region has been exposed to the notice, through the use of cookies; and (iii) as the campaign progresses, focus placement of the banners only on those users in the Region who have not yet been exposed to the banner. *Id.* And to reach those Class members that may not take advantage of online media, the Notice Plan has a substantial print media component. *See* Dahl Aff., ¶ 19. Such an approach enables Plaintiffs to satisfy the due process interests inherent in the notice requirement, while preserving resources in the Settlement Funds to be put toward uses that will benefit consumers.[67]

Second, the content of the notice itself is clear and comprehensible to Class Members. The notice to be run in *Parade* briefly summarizes the subject matter of the suits, communicates effectively that there are multiple Settlements at issue, outlines the structure of the Settlements,

---

[67] A more traditional print-only notice plan with the same reach and frequency is estimated to be almost twice the cost of the notice plan suggested herein. If the Court approves the reimbursement of notice costs from the Settlement Funds, that additional cost, of course, would only reduce the amount of each Settlement that inures to the benefit of the Classes.

and explains to Class Members their opt-out and objection rights and how to obtain more information. [68] The banner ads direct viewers to the same notice through clear, concise messages.[69] The notice, along with the telephone helpline, will include an address to which Class Members can submit requests for copies of the detailed notice and by which Class Members can contact the Notice Administrator.

Third, the opt-out and objection procedures proposed here satisfy Rule 23 and due process requirements. The website will provide a user-friendly mechanism for Class Members to opt out of the Settlements and instructions about how to participate in the settlement proceedings, including the fairness hearing on final approval. This Court previously approved a similarly structured approach to opt-outs and objections in this case in connection with the Costco Settlement and in connection with the notice provided to the Kansas Class.[70] After completion of the Notice program, Class Members will have thirty days to opt out of the Settlements or file objections to one or more of the Settlements with the Court.[71]

In short, the Parties' Notice Plan is the "best notice practicable" and satisfies the requirements of Rule 23 and due process. At least 75% of the Class Members in each of the States at Issue will be exposed to the notice through print publication or the Internet, both of which are appropriate and approved forms of providing class notice.[72] The Notice will direct interested persons to the website that will be maintained throughout the relevant period. The website will contain a long-form notice that describes this settlement in further detail, and which will be

---

[68] *See, e.g., In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (Class notice "need only describe the terms of the settlement generally").

[69] Copies of the proposed banner ads are attached to the Affidavit of Jeffery Dahl as Exhibit 7.

[70] *See* Doc No. 4248 (Apr. 24, 2012) (order sustaining motion for final approval of Costco Settlement) (describing Costco notice plan requiring notice by January 17, 2012 and submission of opt-outs or objections by February 17, 2012).

[71] *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993) (approving notice sent thirty-one days before the deadline for objections and forty-five days before the hearing).

[72] *Eisen*, 417 U.S. 156.

available for downloading or printing. In addition, the Website will contain other documents and pleadings from this case for the benefit of the Classes, such as copies of relevant pleadings and executed settlement agreements.

### D. CAFA Notice

One element of the Class Action Fairness Act of 2005 ("CAFA") is a requirement that within ten days after a proposed class-action settlement is filed with the Court, the settling defendant provide appropriate state and federal officials with notice of the proposed settlement, along with particular documents and information.[73] Here, the Settling Defendants will provide CAFA notices for their respective Settlement to the United States Attorney General and the attorneys general in each State as appropriate for their Settlement, as well as the head or director of the weights and measures department in such jurisdiction. If the Court grants preliminary approval to the Settlements, Plaintiffs will provide proof of CAFA compliance with their motion for final approval of the Settlements prior to any final fairness hearing.

## VII. ESTABLISHMENT OF A FINAL APPROVAL AND FAIRNESS HEARING

The third step in the class action settlement process is the fairness hearing, by which the Court may evaluate and grant final approval to the proposed Settlements. At the fairness hearing, proponents of the Settlements may explain and describe the Settlements' terms and conditions and offer argument in support of Settlement approval; Class Members and/or their counsel may be heard in support of or in opposition to one or more of the Settlements.

The parties propose the following schedule for final approval of the Settlements:

| Day 0 | The Court grants Preliminary Approval |
| 60 days after Preliminary Approval | Execution of Notice Plan ends |

---

[73] 28 U.S.C. §1715 *et seq.*

| 90 days after Preliminary Approval | Last day for Class Members to opt-out of one or more Settlements |
|---|---|
| 90 days after Preliminary Approval | Last day for Class Members to file objections to one or more Settlements |
| 120 days or more after Preliminary Approval | Final fairness hearing |

## VIII.  APPOINTMENT OF SETTLEMENT CLASS COUNSEL

Pursuant to the requirements of Rule 23(g), a Court certifying a case as a class action "must appoint class counsel." Plaintiffs respectfully request that the Court appoint the undersigned Co-Lead Counsel and Liaison Counsel as counsel for the Class Members. Undersigned Co-Lead and Liaison Counsel have previously been appointed by the Court as Settlement Class Counsel, and have also been appointed as Class Counsel in these MDL Actions. The experience and qualifications of the proposed class counsel have been established, and the proposed class counsel will zealously prosecute the claims of the Class Members.

## IX.  CONCLUSION

The law favors and prefers the compromise and settlement of class-action suits,[74] and settlement is particularly appropriate in complex litigation like this one.[75]

Class Plaintiffs submit that the instant Settlements are fair, reasonable and fall within the range of possible approval."[76] Accordingly, Class Plaintiffs request the Court enter an order conditionally certifying the Settlement Classes, preliminarily approving the Settlements,

---

[74] *See, Schering-Plough Corp. v. FTC*, 402 F.3d 1056 (11th Cir. 2005); 4 Newberg, *Class Actions* § 11.41 (and cases cited therein); *see also New England Health Care Employees Pension Fund v. Woodruff*, 520 F.3d 1255, 1258 (10th Cir. 2008).

[75] As this Court is aware, as a matter of sound policy, settlement of disputed claims is encouraged. *Officers for Justice v. Civil Service Commission of City and County of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 617 (N.D. Cal. 1979); *Churchill Village, L.L.C. v. General Elec.*, 361 F.3d 566, 576 (9th Cir. 2004) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992)).

[76] *Manual for Complex Litig.*, §30.41 at 273.

approving and ordering completion of the Parties' Notice Plan, scheduling a final fairness hearing and appointing the undersigned as Settlement Class Counsel. The Parties' proposed order granting preliminary approval is attached hereto as Exhibit 19.

WHEREFORE, Class Plaintiffs respectfully move the Court for an Order consistent with the foregoing, and for such other relief the Court deems proper.

Respectfully submitted this 15th day of June 2012.

Respectfully submitted,

_____s/ Robert A. Horn_____
Robert A. Horn    KS Bar No. 70254
HORN AYLWARD & BANDY, LC
2600 Grand Boulevard, Suite 1100
Kansas City, MO 64108
Telephone 816-421-0700
Facsimile 816-421-0899
rhorn@hab-law.com

_____s/ Thomas V. Girardi_____
Thomas V. Girardi CA Bar No. 36603
GIRARDI AND KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017-1904
Telephone: 213-977-0211
Facsimile: 213-481-1554
tgirardi@girardikeese.com

_____s/ George A. Zelcs_____
George A. Zelcs  IL Bar No. 3123738
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com

_____s/ Thomas V. Bender_____
Thomas V. Bender     Ks. Bar #22860
WALTERS BENDER STROHBEHN
        & VAUGHAN, P.C.
2500 City Center Square
1100 Main Street
P.O. Box 26188
Kansas City, MO 64196
(816) 421-6620
(816) 421-4747 (Facsimile)
tbender@wbsvlaw.com

**PROPOSED CLASS COUNSEL**

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all person registered for ECF as of that date.

*/s/ Joseph A. Kronawitter*