# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: MOTOR FUEL TEMPERATURE | ) | |
| SALES PRACTICES LITIGATION | ) | |
| | ) | **MDL No. 1840** |
| (This Document Relates to All Cases) | ) | **Case No. 07-MD-1840-KHV** |
| _____ | ) | |

### MEMORANDUM AND ORDER

Plaintiffs bring putative class action claims for damages and injunctive relief against motor fuel retailers in 26 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia), the District of Columbia, Puerto Rico and Guam.  Second Consolidated Amended Complaint (Doc. #652) filed December 1, 2008 ¶ 11.  Plaintiffs claim that because defendants sell motor fuel for a specified price per gallon without disclosing or adjusting for temperature expansion, they are liable under state law theories including breach of contract, breach of warranty, fraud and consumer protection.  Following a transfer order of the Judicial Panel on Multidistrict Litigation ("JPML"), the Court has jurisdiction over consolidated pretrial proceedings in these actions.  See 28 U.S.C. § 1407; Doc. #1 filed June 22, 2007.  This matter comes before the Court on the Unopposed Motion Of Plaintiffs For Order Conditionally Certifying Settlement Classes, Preliminarily Approving Class Action Settlements, Directing And Approving Distribution Of Class Notice, Setting Hearing For Final Approval Of Class Action Settlements And Appointing Class Counsel ("Plaintiffs' Motion For Preliminary Approval") (Doc. #4328) filed June 15, 2012.  Plaintiffs seek conditional class certification and preliminary approval of ten settlement agreements.  For reasons stated below, the Court sustains plaintiffs' motion in part.

## I.     Legal Standards

### A.     Class Certification

The determination of class certification is committed to the broad discretion of the trial court. See Shook v. El Paso Cnty., 386 F.3d 963, 967 (10th Cir. 2004). In deciding whether to certify, the Court performs a "rigorous analysis" to determine whether the proposed class satisfies the requirements of Rule 23, Fed. R. Civ. P. Wal-Mart Stores, Inc. v. Dukes, — U.S. —, 131 S. Ct. 2541, 2251 (2011); Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 155 (1982); see also Nat'l Union Fire Ins. Co. v. Midland Bancor, Inc., 158 F.R.D. 681, 685 (D. Kan. 1994). As the parties seeking class certification, plaintiffs have the burden to demonstrate "under a strict burden of proof" that the requirements of Rule 23 are clearly satisfied. Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006). In so doing, plaintiffs first must satisfy the prerequisites of Rule 23(a), that is, they must demonstrate that (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact are common to the class, (3) the claims of the representative parties are typical of the claims of the class and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). After meeting these requirements, plaintiffs must demonstrate that the proposed class action fits within one of the categories described in Rule 23(b).

Plaintiffs seek to proceed under Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class predominate over any questions affecting individual members," and that a class action "is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). In determining predominance and superiority under Rule 23(b)(3), the Court considers the following factors:

(A)     the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)     the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)     the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  In deciding whether to certify a settlement class, the Court need not inquire whether the case, if tried, would present difficult management problems under Rule 23(b)(3)(D). Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997).  All of the other requirements apply, however, and demand even heightened attention in the settlement context.  Id.  Such attention is vital because in the settlement context, the Court generally lacks an opportunity to adjust the class as it becomes informed by the proceedings as they unfold.  Id.

**B.     Preliminary Approval Of Settlement**

Under Rule 23(e), Fed. R. Civ. P., once a class is certified, the action may not be settled, dismissed or compromised without Court approval.[1]  Preliminary approval of a proposed settlement

---

[1]     Rule 23(e) provides as follows:

(e) SETTLEMENT, VOLUNTARY DISMISSAL, OR COMPROMISE.  The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval.  The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
          (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
          (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
          (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
          (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
          (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the

(continued...)

is the first of two steps required before a class action may be settled.  See Am. Med. Ass'n v. United Healthcare Corp., No. 00 Civ. 2800(LMM), 2009 WL1437819, at *3 (S.D.N.Y. May 19, 2009).  If the Court grants preliminary approval, it directs notice to class members and sets a hearing at which it will make a final determination on the fairness of the class settlement.  See id.; In re Wireless Facilities, Inc. Sec. Litig., 253 F.R.D. 630, 634 (S.D. Cal. 2008).

At the preliminary approval stage, the Court makes a preliminary evaluation of the fairness of the proposed settlement and determines whether it has any reason to not notify the class members of the proposed settlement or to not hold a fairness hearing.  See Am. Med. Ass'n, 2009 WL1437819 at *3; Gautreaux v. Pierce, 690 F.2d 616, 621 n.3 (7th Cir. 1982).  The Court will ordinarily grant preliminary approval where the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval."  Am. Med. Ass'n, 2009 WL1437819 at *3.  The standards for preliminary approval of a class settlement are not as stringent as those applied for final approval.  See Karvaly v. eBay Inc., 245 F.R.D. 71, 86 (E.D.N.Y. 2007).  The Court is mindful, however, that a higher degree of scrutiny applies when determining the fairness of a settlement which is negotiated before class certification.  See D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001).

In deciding whether to approve a proposed settlement, the Court assesses the reasonableness of the compromise, taking into account the context in which the parties reached settlement.  See

---

[1](...continued)
court's approval.

Fed. R. Civ. P. 23(e).

-4-

Nat'l Treasury Emp. Union v. United States, 54 Fed. Cl. 791, 797 (2002).  Although the Court must assess the strength of plaintiffs' claims, it should "not decide the merits of the case or resolve unsettled legal questions."  Id. (quoting Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14 (1981)).

## II.      Overview Of Settlements

Plaintiffs seek preliminary approval of ten settlement agreements.  Six settlement agreements involve the following so-called "refiner" defendants: (1) BP Products North America Inc. and BP West Coast Products LLC (collectively, "BP"); (2) CITGO Petroleum Company; (3) ConocoPhillips Company; (4) Exxon Mobil Corporation, Esso Virgin Island, Inc. and Mobil Oil Guam, Inc. (collectively, "ExxonMobil"); (5) Motiva Enterprises LLC and Equilon Enterprises LLC d/b/a Shell Oil Products US (collectively, "Shell"); and (6) Sinclair Oil Corporation and its corporate affiliates (collectively, "Sinclair").   The remaining four settlement agreements involve the following defendants: (1) Casey's General Stores, Inc.; (2) Dansk Investment Group, Inc. (formerly known as USA Petroleum Corporation) ("Dansk"); (3) Sam's Club, Sam's East, Inc., Sam's West, Inc., Wal-Mart Stores, Inc. Wal-Mart Stores East, LLP. (collectively, "Sam's"); and (4) Valero Marketing and Supply Company.

### A.      Refiner Settlements

As noted, the refiner settlements are with BP, CITGO, ConocoPhillips, ExxonMobil, Shell and Sinclair.  In general, the refiner defendants agree to pay certain amounts into settlement funds to (1) reimburse retailers or wholesalers selling retail motor fuel for expenses incurred in installing automatic temperature compensation ("ATC") at retail or making disclosures about the temperature of motor fuel or its effect on energy content; and/or (2) contribute to state departments of weights and measures or other agencies responsible for regulating retail motor fuel dispensers to defray some

state costs of implementing ATC at retail.  In addition, the settlement funds will pay plaintiffs'

attorney's fees, litigation costs, class notice expenses and costs of settlement and/or claims

admiration.  Specifically, each refiner defendant will pay the following amounts:

|  | Settlement Fund | Class Notice Fund |
|---|---|---|
| BP | $ 4,900,000 | $100,000 |
| CITGO | $   800,000 | $100,000 |
| ConocoPhillips | $ 4,900,000 | $100,000 |
| ExxonMobil | $ 5,000,000 | n/a[2] |
| Shell | $ 4,900,000 | $100,000 |
| Sinclair | $   700,000 | $100,000 |
| TOTAL | $21,200,000 | $500,000 |

## 1.    BP Settlement

Under the BP Settlement, plaintiffs seek conditional certification of subclasses for

24 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas,

Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, North Carolina,

Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia) and the District of

Columbia.  BP Settlement Agreement ¶¶ 3(a)-(y), Exhibit 2 to Plaintiffs' Motion For Preliminary

Approval (Doc. #4328).  The subclasses are defined as follows:

> All persons and entities who, at anytime during the period from January 1, 2001 to
> the date of preliminary approval of the settlement agreement in this action, purchased
> motor fuel in [the state or district] from a retail motor fuel station.  Excluded from
> the class is any judicial officer presiding over this action and the members of his/her
> immediate family.

Id.[3]  Each subclass has its own class representative.  Id.

---

[2]    The ExxonMobil Settlement does not provide funds up front for class notice.
Nevertheless, the agreement provides that ExxonMobil will not object to settlement administration
expenses – including cost of class notice – to be paid out of the settlement fund.  ExxonMobil
Settlement Agreement ¶ 18, Exhibit 7 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).

[3]    As noted below, the other refiner defendants define their proposed settlement
(continued...)

In exchange for a full release of class member claims relating to the underlying lawsuits, BP will pay $4,900,000 into a settlement fund.  Id. ¶¶ 7, 32-35.  In addition, BP will pay $100,000 into an account to be administered by class counsel for class notice.  Id. ¶ 8.  After deducting attorney's fees, litigation costs, notice expenses and costs of settlement or claims administration, the remaining proceeds of the settlement fund, i.e. the net proceeds, shall be allocated pro rata among the settlement states based principally on the following factors: (1) the highest number of retail motor fuel stations that sold BP brand motor fuels in the state since January 1, 2004; (2) the volume of motor fuel sold at retail in each state since January 1, 2004, as reported by the Energy Information Administration, U.S. Department of Energy; and (3) the average temperature of motor fuel in each state as reported by the National Institute of Standards and Technology ("NIST") in its study entitled "State Charts for Temperature of Gasoline in Filling Station Holding Tanks."  Id. ¶ 13.

Of the net settlement fund allocated to each state, two-thirds may be used to reimburse retailers or wholesalers selling retail motor fuel under any of BP's current brands for expenses incurred in installing ATC or making disclosures about the temperature of motor fuel or its effect on energy content.  Id. ¶ 14(a).  To receive payment, an eligible retailer or wholesaler must provide the following information: (1) the states in which it will install ATC or disclose temperature information; (2) the costs of implementing ATC and/or making disclosures, describing the substance and proposed text of any such disclosure, and the amount of reimbursement requested; and (3) with respect to ATC, an explanation of the authorization from each applicable state's regulatory agency

---

[3](...continued)

subclasses in the same way.  The parties do not explain why the proposed settlement subclasses include all persons who purchased motor fuel at *any* retail station in the state, as opposed to persons who purchased motor fuel from retail stations which sold the refiner defendants' branded fuel in the state.

permitting use of the system that it has implemented. Id. ¶14(b). Upon receiving such information, provided that net settlement funds are available, the settlement administrator will approve payment of the amount (or at his discretion, a portion of the amount). Id. ¶14(c). The settlement administrator may decline payment approval if he concludes that a disclosure fails to provide meaningful information for the consumer to select which motor fuel to purchase. Id. By way of illustration, a disclosure that describes only the fact that the volume of motor fuel expands as temperature increases may be ineligible for reimbursement unless it is accompanied by additional meaningful information. Id. In each of the first two years, the settlement administrator shall not make payments to eligible retailers or wholesalers that total more than 25 per cent of the portion of the total amount of the net settlement fund reserved for such retailers or wholesalers in a particular state. Id. ¶ 14(e).

The remaining one-third of net settlement funds allocated to each state may be used for contributions to the department of weights and measures or other agency responsible for regulating retail motor fuel dispensers to defray some state costs of implementing ATC at retail. Id. ¶ 14(f). To receive payment, an eligible state agency must provide a written statement that (1) explains that the state has adopted ATC at retail and (2) describes how the state would use a portion of the settlement fund to assist in that implementation. Id. ¶ 14(g). To the extent funds are available, the settlement administrator will pay the amount (or in his discretion a portion of the amount) pro rata from net settlement funds of settling refiners in that state. Id. ¶ 14(h). In each of the first two years, the settlement administrator shall not make payments to state agencies that total more than 25 per cent of the portion of the total amount of the net settlement fund reserved for payments to such agencies in a particular state. Id. ¶ 14(i).

After five years, any sums remaining in the net settlement fund shall become available for disbursement either to (1) retailers or wholesalers or (2) weights and measures departments, regardless whether the application for disbursement comes from a state whose allocation of the net settlement fund is exhausted.  Id. ¶ 14(j).

After six years, any sums remaining in the net settlement fund shall be contributed to a governmental or charitable purpose to be decided by plaintiffs and BP, subject to Court approval. Id. ¶ 14(k).

Every six months, until the settlement fund is exhausted, class counsel shall file a report accounting for each deposit into the escrow account, interest accrued and payments made.  Id. ¶ 15.

Within seven years, administration of the settlement fund shall conclude.  Id. ¶ 16.

BP will not oppose attorney's fees and litigation costs up to $1.5 million (30 per cent of settlement amount).  Id. ¶ 19.  In addition, BP will not oppose payment of settlement administration expenses – including class notice costs – out of the settlement fund.  Id.  Class notice and settlement administration costs are not capped and are not included in the 30 per cent allocated for attorney's fees.  Id.

BP will not oppose incentive fees of $2,000 to each subclass representative (to come out of the $1.5 million allocated for attorney's fees), provided that no one class representative receives more than $4,000 from all settlements.  Id. ¶ 20.

## 2.     CITGO Settlement

Under the CITGO Settlement, plaintiffs seek conditional certification of subclasses for 24 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico,

North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas and Virginia) and the District of Columbia.  CITGO Settlement Agreement ¶¶ 3(a)-(y), Exhibit 4 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).  The subclass definitions are identical to the BP Settlement and each subclass has its own class representative.  Id.

The CITGO settlement differs from the BP settlement with respect to the amount paid into the settlement fund and how the fund will be used.  In exchange for a full release of class member claims relating to the underlying lawsuits, CITGO will pay $800,000 into a settlement fund with net proceeds to be allocated pro rata to the settlement states.  Id. ¶¶ 7, 13, 32-35.  In addition, CITGO will pay $100,000 into an account administered by class counsel for class notice.  Id. ¶ 7.  Unlike the BP Settlement, net proceeds of the CITGO settlement fund shall be used solely for contributions to departments of weights and measures or other agencies responsible for regulating retail motor fuel dispensers to defray some state costs of implementing ATC at retail.[4]  Id. ¶ 14(a).  The CITGO Settlement provides no funds for retailers/wholesalers to install ATC or to make disclosures regarding the temperature of motor fuel or its effect on energy content.

The remaining terms of the CITGO Settlement are similar to the BP Settlement.  In each of the first two years, the settlement administrator shall not make payments to eligible departments or agencies which total more than 25 per cent of the portion of the total amount of the net settlement fund reserved for such payments.  Id. ¶ 14(d).  After five years, any remaining sums shall become

---

[4]    The CITGO Settlement provides that settlement funds will be distributed pro rata among the states and district based principally on the following factors: (1) the volume of motor fuel sold at retail in each state since January 1, 2004, as reported by the Energy Information Administration, U.S. Department of Energy; and (2) the average temperature of motor fuel in each state as reported by NIST in its study entitled "State Charts for Temperature of Gasoline in Filling Station Holding Tanks."  Id.  Unlike the BP Settlement, the CITGO Settlement does not factor in the highest number of retail motor fuel stations that sold its branded motor fuels.  Compare BP Settlement ¶ 13 with CITGO Settlement ¶ 13.

available for disbursement regardless whether the application for disbursement comes from a state whose allocation of the net settlement fund is exhausted. Id. ¶ 14(d). After six years, any remaining sums in the net settlement fund shall be contributed to a governmental or charitable purpose to be decided by plaintiffs and CITGO, subject to Court approval. Id. ¶ 14(e). CITGO will not oppose attorney's fees and litigation costs up to $240,000 (30 per cent of settlement fund, not including class notice fund). Id. ¶ 19. In addition, CITGO will not oppose settlement administration expenses, including cost of class notice, to be paid out of the settlement fund. Id.

### 3. ConocoPhillips Settlement

Under the ConocoPhillips Settlement, plaintiffs seek conditional certification of subclasses for 26 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia), Guam and the District of Columbia. ConocoPhillips Settlement Agreement ¶¶ 3(a)-(bb), Exhibit 5 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328). The subclass definitions are identical to the BP Settlement and each subclass has its own class representative. Id.

The terms of the ConocoPhillips Settlement are substantially similar to the BP Settlement. In exchange for a full release of class member claims relating to the underlying lawsuits, ConocoPhillips will pay $4,900,000 into a settlement fund with net proceeds allocated pro rata to the settlement states. Id. ¶¶ 7, 13, 32-35. In addition, ConocoPhillips will pay $100,000 into an account administered by class counsel for class notice. Id. ¶ 8. Two-thirds of net settlement funds are to reimburse ConocoPhillips retailers or wholesalers for costs incurred in installing ATC or making disclosures regarding the temperature of motor fuel or its effect on energy content. Id.

¶ 14(a).  One-third of net settlement funds are for state and government agencies to defray some costs of implementing ATC at retail.  Id. ¶ 14(f).  In each of the first two years, the settlement administrator shall not pay out more than 25 per cent of net settlement funds.  Id. ¶¶ 14(e) and (i).  After five years, net settlement funds are available to retailers/wholesalers and state agencies regardless whether funds allocated to their state have been exhausted.  Id. ¶ 14(j).  After six years, net settlement funds shall be contributed to a governmental or charitable purpose to be decided by plaintiffs and ConocoPhillips, subject to Court approval.  Id. ¶ 14(k).

ConocoPhillips will not oppose attorney's fees and litigation costs up to $1,500,000 (30 per cent of settlement amount).  Id. ¶ 19.  In addition, ConocoPhillips will not oppose settlement administration expenses, including cost of class notice, to be paid out of the settlement fund.  Id.

### 4.    ExxonMobil Settlement

Under the ExxonMobil Settlement, plaintiffs seek conditional certification of subclasses for 25 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia), Guam, the Virgin Islands and the District of Columbia.  ExxonMobil Settlement Agreement ¶¶ 3(a)-(bb), Exhibit 7 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).  The subclass definitions are identical to the BP Settlement and each subclass has its own class representative.  Id.

The ExxonMobil Settlement is similar to the BP Settlement as follows:  In exchange for a full release of class member claims relating to the underlying lawsuits, ExxonMobil will pay

-12-

$5,000,000 into a settlement fund with net proceeds to be allocated pro rata to the settlement states.[5] Id. ¶¶ 7, 13, 32-35.  Two-thirds of net settlement funds will reimburse ExxonMobil retailers or wholesalers for costs incurred in installing ATC or making disclosures regarding the temperature of motor fuel or its effect on energy content.  Id. ¶ 14(a).  One-third of net settlement funds will go to state and government agencies to defray costs of implementing ATC at retail.  Id. ¶ 14(f).  In each of the first two years, the settlement administrator shall not pay out more than 25 per cent of net settlement funds.  Id. ¶¶ 14(e) and (i).  After five years, any remaining net settlement funds shall be contributed to a governmental or charitable purpose to be decided by ExxonMobil, subject to Court approval and subject to objection by class counsel on grounds that the entity to receive the contribution does not serve a bona fide governmental or charitable purpose.  Id. ¶ 14(k).  ExxonMobil will not oppose attorney's fees and litigation costs up to $1,500,000 (30 per cent of settlement fund).  Id. ¶ 18.  In addition, ExxonMobil will not oppose settlement administration expenses, including cost of class notice, to be paid out of the settlement fund.  Id.

The ExxonMobil Settlement differs from the BP Settlement as follows: Before the settlement administrator can pay $10,000 or more to a retailer, wholesaler or weights and measures department, he or she must notify ExxonMobil and class counsel and provide documentation regarding the request for payment.  Id. ¶ 14(j).  If ExxonMobil objects, the settlement administrator and ExxonMobil shall attempt in good faith to resolve the objection.  Id.  If they are unable to resolve it, they will submit the matter for decision by an independent third party to be jointly selected by the settlement administrator and ExxonMobil.  Id.

---

[5]        Unlike the BP Settlement, the ExxonMobil Settlement does not allocate specific funds to be used for class notice.

### 5.    Shell Settlement

Under the Shell Settlement, plaintiffs seek conditional certification of subclasses for 26 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia) and the District of Columbia.  Shell Settlement Agreement ¶¶ 3(a)-(aa), Exhibit 9 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).  The subclass definitions are identical to the BP Settlement and each subclass has its own class representative.  Id.

The terms of the Shell Settlement are substantially similar to the BP Settlement.  In exchange for a full release of class member claims relating to the underlying lawsuits, Shell will pay $4,900,000 into a settlement fund with net proceeds to be allocated pro rata to the settlement states.  Id. ¶¶ 7, 13, 32-35.  In addition, Shell will pay $100,000 into an account administered by class counsel for class notice.  Id. ¶ 8.  Two-thirds of net settlement funds will reimburse Shell retailers or wholesalers for costs incurred in installing ATC or making disclosures regarding the temperature of motor fuel or its effect on energy content.  Id. ¶ 14(a).  One-third of net settlement funds will go to state and government agencies to defray costs of implementing ATC.  Id. ¶ 14(f).  In each of the first two years, the settlement administrator shall not pay out more than 25 per cent of net settlement funds.  Id. ¶¶ 14(e) and (i).  After five years, net settlement funds are available to retailers/wholesalers and state agencies regardless whether funds allocated to their state have been exhausted.  Id. ¶ 14(j). After six years, net settlement funds shall be contributed to a governmental or charitable purpose to be decided by plaintiffs and Shell subject to Court approval.  Id. ¶ 14(k).  Shell will not oppose attorney's fees and litigation costs up to $1,500,000 (30 percent of settlement

amount).  Id. ¶ 19.  In addition, Shell will not oppose settlement administration expenses, including cost of class notice, to be paid out of the settlement fund.  Id.

### 6.    Sinclair Settlement

Under the Sinclair Settlement, plaintiffs seek conditional certification of subclasses for 11 states (Arizona, Arkansas, Kansas, Mississippi, Missouri, Nevada, New Mexico, Oklahoma, Oregon, Texas and Utah).  Sinclair Settlement Agreement ¶¶ 3(a)-(k), Exhibit 10 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).  The subclass definitions are identical to the BP Settlement and each subclass has its own class representative.  Id.

In exchange for a full release of class member claims relating to the underlying lawsuits, Sinclair will pay $700,000 into a settlement fund with net proceeds to be allocated pro rata to the settlement states.  Id. ¶¶ 7, 13, 32-35.  In addition, Sinclair will pay $100,000 into an account administered by class counsel for class notice.  Id. ¶ 8.

The remaining terms are substantially similar to the BP Settlement: Two-thirds of net settlement funds will reimburse Sinclair retailers or wholesalers for costs incurred in installing ATC or making disclosures regarding the temperature of motor fuel or its effect on energy content.  Id. ¶ 14(a).  One-third of net settlement funds will go to state and government agencies to defray costs of implementing ATC.  Id. ¶ 14(f).  In each of the first two years, the settlement administrator shall not pay out more than 25 per cent of net settlement funds.  Id. ¶¶ 14(e) and (i).  After five years, net settlement funds are available to retailers/wholesalers and state agencies regardless whether funds allocated to their state have been exhausted.  Id. ¶ 14(j).  After six years, net settlement funds shall be contributed to a governmental or charitable purpose to be decided by plaintiffs and Shell subject to Court approval.  Id. ¶ 14(k).  Sinclair will not oppose attorney's fees and litigation costs up to

-15-

$240,000 (30 per cent of settlement amount).  Id. ¶ 19.  In addition, Sinclair will not object to settlement administration expenses, including cost of class notice, all to be paid out of the settlement fund.  Id. ¶ 19.

### B.    Remaining Settlements

As noted, the remaining settling defendants are Casey's, Dansk, Sam's and Valero.  Under the settlements, Casey's, Dansk and Sam's agree to install ATC at retail in certain settlement states.  Valero agrees to post fuel temperature at its retail stations in certain settlement states.

### 1.    Casey's Settlement

Under the Casey's Settlement, plaintiffs seek conditional certification of subclasses for five states (Arkansas, Indiana, Kansas, Missouri and Oklahoma).  Casey's Settlement Agreement ¶¶ 2.1(a)-(e), Exhibit 3 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).  The subclasses are defined as follows:

> All persons and entities who, at anytime during the period from January 1, 2001 to the date of preliminary approval of this Settlement Agreement, purchased motor fuel from Casey's in the [settlement state], excluding: (a) officers and employees of Casey's or its affiliates; and (b) the Court, and members of the Court's immediate family.

Id.  Each subclass has its own class representative.  Id.

In exchange for a full release of class member claims relating to the underlying lawsuits, over the next five years in the settlement states, subject to regulatory approval, Casey's will convert to ATC its existing retail motor fuel dispensers and will install ATC at any new retail station opened during the agreement term, i.e. five years from the effective date of the settlement agreement.[6]  Id.

---

[6]    Within the first two years, Casey's will convert to ATC at least ten per cent of its retail motor fuel dispensers in each state.  Id. ¶ 4.4.1.  Within three years, Casey's will convert at least 40 per cent of its retail motor fuel dispensers in each state.  Id. ¶ 4.4.2.  Within four years, (continued...)

¶¶ 1.9, 1.18, 4.2-4.4, 4.6, 6.2.  However, if the standard practice in any of the settlement states changes such that sales of motor fuel to a material number of retailers are made on a non-temperature-corrected, i.e. gross, basis and if the majority of Casey's wholesale purchases for sale in that state are made on a non-temperature corrected basis within any fiscal year during the agreement term, the requirement that Casey's convert to or install ATC in that state shall cease until such time that Casey's purchases a majority of its wholesale purchases in that state on a net basis within any fiscal year.  Id. ¶¶ 4.2-4.3.

During the five-year phase-in period, Casey's will install stickers on existing pumps at retail stations in the settlement states.  Id. ¶ 4.7.  The stickers shall generally disclose (1) whether the motor fuel being sold is adjusted for temperature; (2) the potential effect of temperature on the volume and energy content of motor fuel and (3) such other information as Casey's chooses to include with respect to the energy content or other aspects of the motor fuel being sold.  Id.  Casey's will control the specific content, style and placement of its disclosure stickers.  Id.

Casey's will pay class counsel $100,000 towards the cost of class notice.  Id. ¶¶ 3.2.

Casey's will pay class counsel $700,000 in attorney's fees, subject to Court approval, in accordance with any payment schedule set by the Court.  Id. ¶¶ 7.1, 7.3.

Class counsel will ask the Court to award an incentive fee of $2,500 for each class representative, to be deducted from the attorney's fee award.  Id. ¶ 7.4.

Every six months, Casey's will provide class counsel a status report describing its compliance with the ATC phase-in time line.  Id. ¶ 8.2.

---

[6](...continued)
Casey's will convert at least 70 per cent of its retail motor fuel dispensers in each state.  Id. ¶ 4.4.3. Within five years, Casey's will convert 100 per cent of its retail motor fuel dispensers to ATC.  Id. ¶ 4.4.4.

To the extent that any local, state, or federal legislative or regulatory body or agency has adopted or adopts legislation, regulations, or rules or policies that conflict with or impose requirements substantially similar to the terms of the settlement agreement, then compliance by Casey's with any such legislation, regulations, or rules or policies shall be deemed to constitute satisfaction of the terms of the Settlement Agreement.  Id. ¶ 9.

## 2. Dansk Settlement

Under the Dansk Settlement, plaintiffs seek conditional certification of a the following class:

> All persons who, between January 1, 2001 and the date of this Agreement, purchased motor fuel from Dansk in the State of California, excluding: (a) officers and employees of Dansk or its affiliates; and (b) the Court, and members of the Court's immediate family.

Dank Settlement Agreement ¶ 2.1, Exhibit 6 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).

In exchange for a full release of class member claims relating to the underlying lawsuits, within three years from the effective date of the settlement agreement, subject to regulatory approval, Dansk will convert to ATC its existing retail motor fuel dispensers in the State of California and will install ATC at any new retail station opened in California during the agreement term.[7]  Id. ¶¶ 4.2-4.3, 4.6, 7.1-7.3.  If as a direct or indirect result of the settlement, Dansk loses a

---

[7]       Within the first year, Dansk will convert to ATC the lesser of (a) 33 per cent of its motor fuel dispensers; or (b) all of the motor fuel dispensers where it can lawfully do so in light of regulatory approvals required and received as of six months after the effective date of the settlement agreement.  Id. ¶ 4.4.1.  By the end of the second year, Dansk will have converted the lesser of (a) 66 per cent of its motor fuel dispensers; or (b) all of the motor fuel dispensers where it can lawfully do so in light of regulatory approvals required and received as of eighteen months after the effective date of the settlement agreement.  Id. ¶ 4.4.2.  By the end of the third year, Dansk will have converted to ATC the lesser of (a) 100 per cent of its motor fuel dispensers; or (b) all of the motor

(continued...)

commercially material amount of its current motor fuel supply and/or experiences commercially material increases in the price of motor fuel in California and/or experiences a commercially material decrease in retail fuel sales, Dansk (with reasonably sufficient evidence to establish good cause for exercising the option) may elect to be excused from its obligation to convert or install ATC at a particular retail station.  Id. ¶ 5.

Dansk will pay all costs associated with a separate Dansk notice plan.  See Plaintiffs' Motion For Preliminary Approval (Doc. #4328) at 18.

Dansk will not object to reasonable attorney's fees and costs up to $58,000, as approved by the Court.  Id. ¶ 8.  In addition, Dansk will not object to paying incentive fees of $1,000 to class representatives Phyllis Lerner and Herb Glazer, if approved by the Court.  Id. ¶ 8.4.

Every six months, Dansk will provide class counsel and file with the Court a declaration describing its compliance with the ATC phase-in time line.  Id. ¶ 10.2.

### 3.    Sam's Settlement

Under the Sam's Settlement, plaintiffs seek conditional certification of subclasses for 25 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia). Sam's Settlement Agreement ¶¶ 2.1(a)-(y), Exhibit 8 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).  The subclasses are defined as follows:

> All persons and entities who, at anytime during the period from January 1, 2001 to the date of preliminary approval of this Settlement Agreement, purchased motor fuel

---

[7](...continued)
fuel dispensers where it can lawfully do so in light of regulatory approvals required and received as of two and one-half years after the effective date of the settlement agreement.  Id. ¶ 4.4.3.

from Sam's in the [settlement state], excluding: (a) officers and employees of Sam's or its affiliates; and (b) the Court, and members of the Court's immediate family.

Id. Each subclass has its own class representative. Id.

In exchange for a full release of class member claims relating to the underlying lawsuits, in the states of Alabama, Arizona, Arkansas, California, Florida, Georgia, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, and Virginia (collectively, "conversion states"), over the next five years subject to regulatory approval, Sam's will convert to ATC its existing retail motor fuel dispensers and will install ATC at any new retail station opened during the agreement term.[8] Id. ¶¶ 1.7, 1.21, 4.2-4.4, 4.6, 6.1-6.2. However, if during the term of the settlement agreement Sam's standard practice in any of the conversion states changes such that Sam's begins to consistently purchase a majority of its motor fuel on a non-temperature-adjusted basis, the requirement that Sam's convert to and/or install ATC in that state shall cease until such time that, during the term of the settlement, Sam's begins purchasing a majority of its motor fuel in that state on a temperature-adjusted basis. Id. ¶¶ 4.2-4.3.

With regard to the remaining states, i.e. Delaware, Indiana, Maryland, New Jersey, Pennsylvania and Utah (collectively, "non-conversion states"), if during the term of the settlement agreement Sam's begins to consistently purchase motor fuel on a temperature-adjusted basis for sale at retail in any non-conversion state, Sam's will convert to and/or install ATC at its retail stations in that state in accordance with the five-year phase-in period. Id. ¶¶ 1.12, 4.2-4.3.

In the settlement states, Sam's will place on its retail fuel dispensers stickers which shall

---

[8]     With regard to each conversion state, within the first two years, Sam's will convert to ATC at least ten per cent of its retail motor fuel dispensers. Id. ¶ 4.4.1. Within three years, Sam's will convert at least 40 per cent of its retail motor fuel dispensers. Id. ¶ 4.4.2. Within four years, Sam's will convert at least 70 per cent of its retail motor fuel dispensers. Id. ¶ 4.4.3. Within five years, Sam's will convert 100 per cent of its retail motor fuel dispensers to ATC. Id. ¶ 4.4.4.

generally disclose information regarding the effects of temperature on the volume and energy content of motor fuel that is meaningful to consumers in making purchasing decisions.  Id. ¶ 4.9.  The parties shall agree on the language of the stickers.  Id.  With regard to a particular retail station, Sam's obligation to post the stickers ceases when it implements ATC at that station.  Id.

To the extent that any local, state, or federal legislative or regulatory body or agency has adopted or adopts legislation, regulations, rules or policies that conflict with or impose requirements substantially similar to the terms of the settlement agreement, Sam's compliance therewith shall constitute satisfaction of the terms of the Settlement Agreement.  Id. ¶ 9.

If as a direct or indirect result of the settlement (determined solely in Sam's good faith, subjective judgment), Sam's loses a commercially material amount of its current motor fuel supply and/or experiences commercially material increases in the price of motor fuel in a settlement state, Sam's may elect to rescind, cancel and annul the settlement agreement as applied to that state if it has not installed and operated ATC equipment with requisite public notice in the majority of retail locations in that state for at least one year.  Id. ¶ 4.8.

Sam's will pay class counsel $200,000 to be used toward the cost of class notice.  Id. ¶¶ 3.2.

Sam's will pay class counsel $3,000,000 in attorney's fees, subject to Court approval.  Id. ¶ 7.1.  Any attorney's fee award shall be payable within 14 days after the effective date of the settlement agreement.  Id. ¶ 7.3.

Class counsel will ask the Court to award an incentive fee of $2,000 for each class representative, to be deducted from the attorney's fee award.  Id. ¶ 7.4.

Every six months, Sam's will provide class counsel a status report describing its compliance with the ATC phase-in time line.  Id. ¶ 8.2.

###     4.     Valero Settlement

Under the Valero Settlement, plaintiffs seek conditional certification of subclasses for 24 states: (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas and Virginia).  Valero Settlement Agreement ¶¶ 1.28, 2.1, Exhibit 11 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).  The subclasses are defined as follows:

> All persons and entities who, at anytime during the period from January 1, 2001 to the date of Approval of the Agreement, purchased Retail Motor Fuel in a State at Issue from a retail motor fuel Station that is or was owned, operated or branded by Valero Releasees, excluding: [a] officers and employees of Valero or its affiliates; and [b] the Court, and members of the Court's immediate family.

Id. ¶ 2.1.  Each subclass has its own class representative.  Id. ¶ 1.7.

In exchange for a full release of class member claims relating to the underlying lawsuits, Valero will post the temperature reading of diesel and regular unleaded gasoline, as reflected on the automatic tank gauge system, at all stations owned, directly or indirectly by Valero in the settlement states.  Id. ¶¶ 4.1, 6.1-6.6.  The posted temperature will display the currently reported results of temperature or a reasonable average of such temperatures to avoid transient technological/transmission errors associated with an actual real-time display.  Id. ¶ 4.1.  The posting will include language, chosen solely by Valero, which is similar to existing Valero labels that educate consumers regarding the effect of temperature on fuel content.  Id. ¶ 4.1.1.  The posting shall be in a reasonably accessible and reasonably conspicuous location and, at a minimum, shall be visible such that a consumer need not leave his or her vehicle to observe the temperature.  Id. ¶ 4.1.2.

At any station where the underground storage tanks do not have automatic tank gauge

equipment, Valero is not required to post fuel temperature so long as such stations post a label on each dispenser.[9] Id. 4.2.1. If within three years after the settlement, any such station subsequently installs automatic tank gauge equipment, it will comply with the temperature posting requirement. Id.

At any station where ATC is installed, Valero is not required to post fuel temperature. Id. ¶ 4.2.2.

Valero will permit its distributors to use incentive funds to obtain temperature displays or ATC equipment.[10] Id. ¶ 4.5. For three years after the effective date of the settlement, any distributor or branded dealer who complies with these terms will be included in the release of claims under the settlement. Id.

If a settlement state where any Valero station is located permits ATC at retail, Valero agrees to install ATC at stations which it owns if a sufficient majority of its peer companies install ATC dispensers such that it becomes the industry standard. Id. ¶ 4.6.

Valero will abstain from any regulatory, legislative, lobbying or trade association activity involving ATC and agrees not to oppose ATC. Id. ¶ 4.7.

Valero will contribute $200,000 toward the cost of providing class notice. Id. ¶ 4.9.

Valero will pay up to $4,500,00 in attorney's fees and litigation expenses and/or costs. Id. ¶ 4.8.

---

[9] The record contains no information regarding the number of stations which fall in this category.

[10] The record contains no information regarding the amount of incentive funds available to distributors.

### III.    Analysis

Plaintiffs seek an order which (1) conditionally certifies the proposed settlement classes; (2) preliminarily approves the proposed settlements; (3) directs and approves notice to the proposed settlement classes; (4) sets a final hearing for approval of the proposed class settlements; and (5) appoints counsel for the proposed settlement classes.[11]  To preliminarily approve the proposed settlements, the Court determines whether class certification appears appropriate under Rule 23(a) and (b)(3) and whether the proposed settlements appear fair, reasonable and adequate under Rule 23(e)(2).

### A.    Conditional Class Certification

As noted, plaintiffs seek conditional certification of various settlement classes and subclasses of motor fuel purchasers in certain settlement states.  The proposed settlement classes for Casey's, Dansk, Sam's and Valero are similar to those which the Court approved regarding the settlement with Costco Wholesale Corporation.[12]  See In re Motor Fuel Temp. Sales Pract. Litig., No. 07-1840,

---

[11]    No parties have opposed plaintiffs' motion.  Lesley Duke, a named plaintiff in Rushing v. Chevron USA, Inc., No. 07-2300, has written a letter to the Clerk stating that the proposed settlements are unacceptable to him.  See Doc. #4362 filed July 19, 2012.  Specifically, Duke states that (1) the refiner defendants should pay more; (2) the government should investigate defendants for federal criminal wrongdoing; and (3) his attorneys changed his contract against his best interests.  Id.  If the Court preliminarily approves the proposed settlements, class members will have an opportunity to object thereto.

[12]    With regard to the Costco settlement, the Court certified subclasses defined as follows:

> All residents of the [settlement state] who, between January 1, 2001 and the date of [the settlement agreement], purchased motor fuel from Costco at a temperature above 60 degrees Fahrenheit, excluding (a) officers and employees of Costco or its affiliates; and (b) the Court, and members of the Court's immediate family.

In re Motor Fuel, 2012 WL 1415508 at *9.

(continued...)

-24-

2012 WL 1415508, at *4 n.9, 9 (D. Kan. April 24, 2012).  For the same reasons, the Court finds that conditional certification of the proposed settlement classes for Casey's, Dansk, Sam's and Valero is appropriate.  Specifically, the Court finds that proposed settlement class and subclass definitions are adequate to identify the persons (1) entitled to relief, (2) bound by a final judgment and (3) entitled under Rule 23(c)(2) to the best notice practicable in a Rule23(b)(3) action.  See id. at *9.  In addition, it appears that plaintiffs can satisfy the numerosity, commonality, typicality and adequate representation requirements of Rule 23(a)(1),(2), (3) and (4).  See id. at *9-10.  Further, it appears that plaintiffs can meet the requirements of Rule 23(b)(3), i.e. that questions of law or fact common to members of the subclasses predominate over any questions affecting individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Id. at 11 (quoting Fed. R. Civ. P. 23(b)(3)).  Accordingly, the Court will conditionally certify the proposed settlement classes for Casey's, Dansk, Sam's and Valero subject to plaintiffs demonstrating at the final approval hearing – "under a strict burden of proof" – that the requirements of Rule 23(a) and (b)(3) are clearly satisfied.

## B.    Preliminary Approval Of Settlement

Plaintiffs ask the Court to preliminarily approve the proposed settlements.  In determining whether a proposed settlement is fair, reasonable and adequate, the Court considers the following factors :

---

[12](...continued)
    As noted, the refiner settlements propose settlement subclasses which includes all persons who purchased motor fuel at *any* retail station in the state, as opposed to persons who purchased motor fuel from retail stations which sold the refiner defendants' branded fuel in the state.  In this way, the proposed refiner settlement subclasses differ from the Costco settlement subclasses.  As discussed below, the Court declines to preliminarily approve the proposed refiner settlements.  At this time, the Court makes no ruling regarding preliminary certification of the proposed refiner settlement classes.

(1)     whether the proposed settlement was fairly and honestly negotiated;

(2)     whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;

(3)     whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and

(4)     the judgment of the parties that the settlement is fair and reasonable.

Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1188 (10th Cir. 2002).  While the Court will consider these factors in depth at the final approval hearing, they are a useful guide at the preliminary approval stage as well.  See Lucas v. Kmart Corp., 234 F.R.D. 688, 693 (D. Colo. 2006); Am. Med. Ass'n, 2009 WL 1437819 at *3.

Regarding all of the proposed settlements, the first, second and fourth factors weigh in favor of granting preliminary approval.  As to the first factor, the Court has no reason to believe that the proposed settlements were not fairly and honestly negotiated.  As to the second factor, the settlements were negotiated in the month before the first scheduled trial date in the Kansas cases, at a time when serious questions of law and fact placed the ultimate outcome of the litigation in doubt.[13]  As to the fourth factor, the settling parties obviously believe that the proposed settlements are fair and reasonable.

_____

[13]     Six of the settling defendants, i.e. BP Products North America Inc., Casey's General Stores, Inc., ConocoPhillips Company, Sam's West, Inc., Equilon Enterprises LLC d/b/a Shell Oil Products US and Valero Marketing and Supply Company are defendants in the Kansas cases, which the Court originally planned to try beginning May 7, 2012.  See Scheduling Order (Doc. #1729) filed November 17, 2012 at 9, 12; Amended Pretrial Order (Doc. #3809) filed March 20, 2012 at 2.  In April of 2012, the settling parties informed the Court that they had reached enforceable settlement agreements with plaintiffs.  See Doc. #4230 filed April 4, 2012 (BP, ConocoPhillips and Shell); Doc. #4234 filed April 6, 2012 (Casey's); Doc. #4238 filed April 16, 2012 (Valero); Doc. #4240 filed April 18, 2012 (Sam's).  The Court thereafter severed plaintiffs' claims against the settling defendants in the Kansas cases.  Id.

The Court subsequently continued trial in the Kansas cases to September 5, 2012.  See Doc. #4263 filed April 27, 2012 (continuing trial to August 27, 2012); Doc. #4394 filed August 24, 2012 (continuing trial to September 5, 2012).  On September 24, 2012, the jury returned a verdict in favor of defendants.  See Doc. #4422 filed September 25, 2012.

Regarding the third factor, because terms of the proposed settlements vary, the Court must evaluate separately the value of an immediate recovery under each proposed settlement. In so doing, the Court looks to whether the value of an immediate recovery under the proposed settlement outweighs the mere possibility of future relief after protracted and expensive litigation. In particular, the Court examines how class members would benefit under each proposed settlement.

### 1.    Value Of Recovery Under BP Settlement

As noted, BP proposes to pay $4,900,000 into a settlement fund and $100,000 into an account to pay for class notice. BP Settlement Agreement ¶¶ 7, 8. After deducting attorney's fees, litigation costs, notice expenses and costs of settlement or claims administration, the proceeds of the settlement fund will be allocated among 24 states and the District of Columbia. Id. ¶ 13. Two-thirds of the settlement fund may be used to reimburse retailers or wholesalers for expenses incurred in installing ATC or making disclosures about the temperature or its effect on energy content of motor fuel. Id. ¶ 14(a). The remaining one-third may be given to departments of weights and measures or other agencies responsible for regulating retail motor fuel dispensers to defray some of the settlement states' costs of implementing ATC. Id. ¶ 14(f).

To the extent the proposed settlement fund provides funds to facilitate the implementation of ATC at motor fuel stations, class members would benefit. The Court has found that providing class members an opportunity to purchase ATC fuel allows them an opportunity to achieve accuracy and consistency of fuel measurement for their fuel dollar, regardless of fuel temperature at the time of pumping. See In re Motor Fuel, 2012 WL 141558, at *14 (approving Costco settlement). Thus, to the extent that the BP settlement provides funds to reimburse retailers and state regulators for expenses incurred in installing ATC, it appears that the third factor, i.e. the value of an immediate

-27-

recovery, weighs in favor of approving the proposed settlement.

To the extent that the BP settlement provides funds to facilitate disclosures about temperature or its effect on the energy content, however, it is unclear how much class members would benefit. Without contemporaneous and accurate information regarding dispensed fuel temperature, class members might not benefit from disclosures regarding the effect of temperature on energy content of motor fuel.  Before the Court would preliminarily approve that portion of the proposed settlement, the parties must provide specific information which demonstrates what information the proposed disclosures would provide and how said disclosures would benefit class members.

Also, the parties do not explain why the settlement agreement limits the administrator's ability to pay out more than 25 per cent of net settlement funds in each of the first two years.  See id. ¶¶ 14(e) and (i).[14]  To delay disbursing funds to encourage retailers and state regulators to implement ATC at retail appears to diminish the value of the settlement to class members.  Without more explanation, the Court will not preliminarily approve this provision of the proposed settlement. In addition, the Court would like information regarding the number of pumps that could be converted to ATC with the proposed settlement fund.

Finally, the parties have not shown how class members will benefit from the *cy pres* clause, i.e. the provision which provides that after six years any remaining net settlement sums will be given to a governmental or charitable purpose which the parties decide and the Court approves.[15]  See

---

[14]      The settlement agreement requires BP to pay the entire settlement amount into an escrow account within ten business days after the date of final approval of the settlement.  Id. ¶ 8.

[15]      *Cy pres* is shorthand for the equitable doctrine "cy près comme possible," i.e. French for "as near as possible."  Dennis v. Kellogg Co., — F.3d —, 2012 WL 3800230, at *6 (9th Cir. Sept. 4, 2012).  The doctrine originated in the area of wills as a way to effectuate a testator's intent in making charitable gifts, but federal courts now apply it in class action settlements "where the
(continued...)

id. ¶ 14(k).  Under the *cy pres* doctrine, some courts have allowed class action settlements to distribute unclaimed or non-distributable portions of a class action settlement fund to the "next best" class of beneficiaries.  Nachshin v. AOL, LLC, 663 F.3d 1034, 1036 (9th Cir. 2011).  To the extent *cy pres* distributions are allowed, they must be carefully chosen to account for the nature of the lawsuit, the objectives of underlying statutes and the interests of silent class members, including their geographic diversity.  Nachshin, 663 F.3d at 1039; see also In re Lupron Mktg. & Sales Pract. Litig., 677 F.3d 21, 33 (1st Cir. 2012) (when feasible, interests of *cy pres* recipients should reasonably approximate those being pursued by class); In re Airline Ticket Comm'n Antitrust Litig., 307 F.3d 679, 682 (8th Cir. 2002).  Here, the proposed settlement provides no information regarding the proposed *cy pres* recipient.  It provides only that plaintiffs and BP will choose the beneficiary, subject to Court approval.  When the selection of *cy pres* beneficiaries is not tethered to the nature of the lawsuit and the interests of silent class members, the selection process may answer to the whims and self-interests of the parties, counsel or the Court.  See Nachshin, 663 F.3d at 1039.  By not identifying the proposed *cy pres* recipient, the parties have restricted the Court's ability to conduct the searching inquiry required to approve such a distribution.  See Dennis, — F.3d —, 2012 WL 3800230 at *7.  In addition, the failure to designate a proposed *cy pres* recipient deprives class members of notice and the ability to object thereto.  Accordingly, the Court will not preliminarily approve the proposed *cy pres* clause.[16]

---

[15](...continued)
proof of individual claims would be burdensome or distribution of damages costly."  Id. (quoting Nachshin v. AOL, LLC, 663 F.3d 1034, 1038 (9th Cir. 2011)).

[16]    Some courts and legal commentators have doubted whether *cy pres* awards are appropriate in the class-action setting.  See, e.g., In re Thornburg Mortg., Inc. Sec. Litig., — F. Supp.2d —, 2012 WL 3150408, at *9-12 (D.N.M. July 24, 2012) (*cy pres* awards inject third party (continued...)

For the foregoing reasons, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, weighs against preliminary approval of the BP Settlement. Specifically, the record does not show that the proposed settlement provides sufficient value or benefit to class members to justify releasing their class action claims against BP. Accordingly, the Court declines to preliminarily approve the BP Settlement.

### 2. Value Of Recovery Under CITGO Settlement

CITGO proposes to pay $800,000 into a settlement fund to be allocated pro rata among 24 states and the District of Columbia, plus $100,000 for class notice. CITGO Settlement Agreement ¶ 7. The parties propose to use the CITGO settlement fund solely for contributions to weights and measures departments or other agencies responsible for regulating retail motor fuel dispensers to defray some of the states' costs of implementing ATC. Id. ¶ 14(a).

As an initial matter, the parties provide no information regarding why the CITGO Settlement provides much less money than the BP Settlement and why it does not provide funds to CITGO retailers and wholesalers to implement ATC. It is not clear that class members would benefit solely from contributions to state agencies. In addition, with regard to provisions which are similar to the BP Settlement, the Court shares the same concerns that (1) limiting the settlement administrator's ability to pay out more than 25 per cent of the net settlement fund in each of the first two years diminishes the value of the settlement to class members, see id. ¶ 14(d); and (2) the Court and class

---

[16](...continued)
into litigation, do not adequately reflect best interests of absent class members, create appearance of impropriety and are not best use of court's time and resources). The Tenth Circuit apparently has not addressed the issue. See id. at *9. Here, the Court does not address whether *cy pres* awards are ever appropriate. It only notes that if it were to allow a *cy pres* distribution, the proposed settlement must identify the proposed recipient.

members cannot determine whether the *cy pres* clause is adequate because the agreement does not identify the *cy pres* recipient.

On this record, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, weighs against preliminary approval of the CITGO Settlement. Specifically, plaintiffs have not shown that the proposed settlement provides sufficient value or benefit to class members to justify releasing their class action claims against CITGO. Accordingly, the Court declines to preliminarily approve the CITGO Settlement.

### 3.    Value Of Recovery Under ConocoPhillips Settlement

ConocoPhillips proposes to pay $4,900,000 into a settlement fund to be allocated pro rata among 26 states, Guam and the District of Columbia, plus $100,000 for class notice. ConocoPhillips Settlement Agreement ¶¶ 7-8. Similar to the BP Settlement, two-thirds of net settlement funds will reimburse ConocoPhillips retailers or wholesalers for costs incurred in installing ATC and/or making disclosures regarding the temperature of motor fuel or its effect on energy content. Id. ¶ 14(a). One-third will go to state and local government agencies to defray costs of implementing ATC. Id. ¶ 14(f).

For reasons similar to the BP Settlement, the Court is concerned that (1) class members would not benefit from the proposed reimbursements for disclosures about temperature or its effect on the energy content alone; (2) limiting the administrator's ability to pay out more than 25 per cent of the net settlement fund in each of the first two years diminishes the value of the settlement to class members, see id. ¶¶ 14(e) and (i); and (3) the Court and class members cannot determine whether the *cy pres* clause is adequate because the agreement does not identify the *cy pres* recipient. In

addition, the Court would like information regarding the number of pumps that could be converted to ATC with the proposed settlement fund.

On this record, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, weighs against preliminary approval of the ConocoPhillips Settlement. Specifically, the record does not demonstrate that the proposed settlement provides sufficient value or benefit to class members to justify releasing their class action claims against ConocoPhillips. Accordingly, the Court declines to preliminarily approve the ConocoPhillips Settlement.

### 4.    Value Of Recovery Under ExxonMobil Settlement

ExxonMobil proposes to pay $5,000,000 into a settlement fund with net proceeds to be allocated pro rata among 25 states, Guam, the Virgin Islands and the District of Columbia. ExxonMobil Settlement Agreement ¶¶ 7, 13.  In many respects, the ExxonMobil Settlement is similar to the BP Settlement.  Regarding provisions similar to the BP Settlement, the Court shares the same concerns that (1) class members would not benefit from the proposed reimbursements for disclosures about temperature or its effect on the energy content alone; (2) limiting the administrator's ability to pay out more than 25 per cent of the net settlement fund in each of the first two years diminishes the value of the settlement to class members, see id. ¶¶ 14(e) and (i); and (3) the Court and class members cannot determine whether the *cy pres* clause is adequate because the parties have not identified the *cy pres* recipient.  Also, the Court would like information regarding the number of pumps that could be converted to ATC with the proposed settlement fund.

In addition, the ExxonMobil Settlement appears to be more restrictive than the BP Settlement.  In particular, the ExxonMobil Settlement gives ExxonMobil the right to object to any

payment of $10,000 or more to a retailer, wholesaler or weights and measures department.  See id. ¶ 14(j).  On its face, it appears that this provision would deter retailers, wholesalers and weights and measures departments from requesting more than $10,000 from the settlement fund which, in turn, may discourage them from taking steps to implement ATC.  The parties do not explain why the agreement gives ExxonMobil an ability to object or for that matter, on what grounds ExxonMobil might rightfully object.  This provision appears to diminish the value of the settlement to class members.

On this record, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, weighs against preliminary approval of the ExxonMobil Settlement.  Specifically, the record does not demonstrate that the proposed settlement provides sufficient value or benefit to class members to justify releasing their class action claims against ExxonMobil.  Accordingly, the Court declines to preliminarily approve the ExxonMobil  Settlement.

### 5.    Value Of Recovery Under Shell Settlement

Shell proposes to pay $4,900,000 into a settlement fund to be allocated pro rata among 26 states and the District of Columbia, plus $100,000 for class notice.  Shell Settlement Agreement ¶¶ 7-8.  As discussed, the Shell Settlement is substantially similar to the BP Settlement. For the same reasons, the Court is concerned that (1) class members would not benefit from the proposed reimbursements for disclosures about temperature or its effect on the energy content alone; (2) limiting the settlement administrator's ability to pay out more than 25 per cent of the net settlement fund in each of the first two years diminishes the value of the settlement to class members, see id. ¶¶ 14(e) and (i); and (3) the Court and class members cannot determine whether

-33-

the *cy pres* clause is adequate because the parties have not identified the *cy pres* recipient. In addition, the Court would like information regarding the number of pumps that could be converted to ATC with the proposed settlement fund.

On this record, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, weighs against preliminary approval of the Shell Settlement. Specifically, the record does not demonstrate that the proposed settlement provides sufficient value or benefit to class members to justify releasing their class action claims against Shell. Accordingly, the Court declines to preliminarily approve the Shell Settlement.

### 6.  Value Of Recovery Under Sinclair Settlement

Sinclair proposes to pay $700,000 into a settlement fund with net proceeds to be allocated pro rata among 12 states, plus $100,000 for class notice. Sinclair Settlement Agreement ¶ 8. As an initial matter, the parties provide no information regarding why the Sinclair Settlement provides significantly less money than the BP Settlement. Before the Court would preliminarily approve the proposed Sinclair Settlement, the parties would need to provide specific information which justifies the lower amount.

The remaining terms of the Sinclair Settlement are substantially similar to the BP Settlement. For reasons discussed, the Court is concerned that (1) class members would benefit not from the proposed reimbursements for disclosures about temperature or its effect on the energy content alone; (2) limiting the settlement administrator's ability to pay out more than 25 per cent of the net settlement fund in each of the first two years diminishes the value of the settlement to class members, see id. ¶¶ 14(e) and (i); and (3) the Court and class members cannot determine whether

-34-

the *cy pres* clause is adequate because the parties have not identified the *cy pres* recipient. In addition, the Court would like information regarding the number of pumps that could be converted to ATC with the proposed settlement fund.

On this record, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, weighs against preliminary approval of the Sinclair Settlement. Specifically, the record does not show that the proposed settlement provides sufficient value or benefit to class members to justify releasing their class action claims against Sinclair. Accordingly, the Court declines to preliminarily approve the Sinclair Settlement.

### 7.     Value Of Recovery Under Casey's Settlement

Over the next five years in five states, Casey's agrees to convert to ATC its existing retail motor fuel dispensers and install ATC at any new retail station. Casey's Settlement Agreement ¶¶ 4.2-4.3. In addition, Casey's will pay $100,000 for class notice. Id. ¶¶ 3.2. During the five-year phase-in period, Casey's will install stickers on existing pumps which will disclose (1) whether the motor fuel being sold is adjusted for temperature; (2) the potential effect of temperature on the volume and energy content of motor fuel and (3) such other information as Casey's chooses to include with respect to the energy content or other aspects of the motor fuel being sold. Id. ¶ 4.7.

As discussed, the Casey's Settlement in similar to the Costco settlement which the Court approved. For similar reasons, it appears that class members would benefit under the Casey's Settlement by obtaining an opportunity to purchase ATC fuel. See In re Motor Fuel, 2012 WL 141558, at *14 (Costco settlement class members will benefit by obtaining opportunity to achieve accuracy and consistency of fuel measurement for fuel dollar regardless of fuel temperature at time

-35-

of pumping). The Court notes, however, that the Casey's Settlement does not contain a reporting provision which would allow class members to monitor compliance with the settlement. The Casey's Settlement provides that every six months, Casey's will provide class counsel a status report describing its compliance with the ATC phase-in time line. Id. ¶ 8.2. If the parties modified that provision to require Casey's to file regular status reports with the Court, the Court would preliminarily approve the Casey's Settlement. See, e.g., In re Motor Fuel Temp. Sales Pract. Litig., 271 F.R.D. 263, 292 (D. Kan. 2010) (restructured Costco settlement should require regular compliance reports filed with Court).[17]

Subject to slight modification in reporting requirements, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, would weigh in favor of preliminary approval of the Casey's Settlement. On or before **October 5, 2012,** the parties shall inform the Court whether they agree to modify the reporting requirements to require Casey's to file regular status reports with the Court.

### 8.    Value Of Recovery Under Dansk Settlement

Over the next three years in the State of California, Dansk agrees to convert to ATC its existing retail motor fuel dispensers and install ATC at any new retail station. Dank Settlement Agreement ¶¶ 4.2-4.3. In addition, Dansk will pay all costs associated with a separate Dansk notice plan. See Plaintiffs' Motion For Preliminary Approval (Doc. #4328) at 18.

For reasons similar to the Costco settlement, it appears that class members would benefit under the Dansk Settlement by obtaining an opportunity to purchase ATC fuel. See In re Motor

---

[17]    The Court rejected the first settlement with Costco because it did not assure adequate representation of class members. See In re Motor Fuel, 271 F.R.D. at 283 (D. Kan. 2010). The Casey's Settlement does not appear to present similar concerns.

Fuel, 2012 WL 141558, at *14.  In light of this apparent benefit to class members, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, weighs in favor of preliminary approval of the Dansk Settlement.[18]  Therefore, the Court preliminarily approves the Dansk Settlement.

### 9.    Value Of Recovery Under Sam's Settlement

Over the next five years in 19 conversion states, Sam's agrees to convert to ATC its existing retail motor fuel dispensers and install ATC at any new retail station.  Sam's Settlement Agreement ¶¶ 4.2-4.3.  In addition, with regard to six non-conversion states, if Sam's begins to consistently purchase motor fuel on a temperature-adjusted basis for sale at retail, it will convert to and/or install ATC at its retail stations in that state.  Id. ¶¶ 1.12, 4.2-4.3.  Sam's will also place stickers on the fuel dispensers at retail stations in the settlement states.  Id. ¶ 4.9.  The stickers shall generally disclose information regarding the effects of temperature on the volume and energy content of motor fuel that is meaningful to consumers in making purchasing decisions.  Id.  Sam's will also pay class counsel $200,000 for the cost of class notice.  Id. ¶ 3.2.

For reasons similar to the Costco settlement, it appears that class members in conversion states would benefit under the Sam's Settlement by obtaining an opportunity to purchase ATC fuel.  See In re Motor Fuel, 2012 WL 141558, at *14.  In addition, with regard to non-conversion states, it appears that class members would benefit by obtaining a possibility that Sam's will convert its pumps to ATC if it begins consistently purchasing fuel on a temperature-adjusted basis.  See, e.g.,

---

[18]    Unlike the Casey's Settlement, the Dansk Settlement provides that every six months, Dansk will provide class counsel and file with the Court a declaration describing its compliance with the ATC phase-in time line.  Id. ¶ 10.2.

In re Motor Fuel, 2012 WL 141558, at *12.[19]

Similar to the Casey's Settlement, the Sam's Settlement does not contain a provision that would allow class members to monitor compliance with the settlement. See Sam's Settlement ¶ 8.2 (every six months Sam's will provide class counsel status report). If the parties modified that provision to require Sam's to file regular status reports with the Court, the Court would preliminarily approve the settlement. Subject to this modification, the Court finds that the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, would weigh in favor of preliminary approval of the Sam's Settlement. On or before **October 5, 2012,** the parties shall inform the Court whether they agree to modify the reporting requirements to require Sam's to file regular status reports with the Court.

### 10. Value Of Recovery Under Valero Settlement

In 24 states, Valero agrees to post the temperature reading of diesel and regular unleaded gasoline, as reflected on the automatic tank gauge system. Valero Settlement Agreement ¶¶ 1.28, 4.1.[20] The temperature posting will include language chosen solely by Valero to educate

---

[19]    With regard to the Costco settlement, the Court found that as to non-conversion states, i.e. states in which Costco purchased fuel on a non-temperature-adjusted basis and agreed to install ATC dispensers if it begins to purchase motor fuel on a temperature-adjusted basis, the Court found it unlikely that plaintiffs could prove liability because in those states Costco does not benefit from buying fuel one way and selling it another. See In re Motor Fuel, 2012 WL 141558, at *12. The Court found that although the value of injunctive relief in non-conversion states seemed low – i.e. the possibility that Costco will convert its pumps to ATC if it begins purchasing fuel on a temperature-adjusted basis – it was reasonable under the circumstances. Id. The same reasoning applies here.

[20]    The parties do not describe the automatic tank gauge system. During trial of the Kansas cases, witnesses described it as equipment to track environmental data which includes temperature probes in underground tanks that monitor temperature for leak detection and other items. See Testimony of Jose Rios-Cortes, Transcript of Jury Trial on September 12, 2012, Vol. 10 at 891:15-893:24 Testimony of Timothy Tyson, Transcript of Jury Trial on September 18, 2012, (continued...)

-38-

consumers

regarding the effect of temperature on fuel content.  Id.  At stations which do not have automatic

tank gauge equipment, Valero will not post fuel temperature information but will post on each

dispenser a label to educate consumers regarding the effect of temperature on fuel content. Id. 4.2.1.

Valero will also permit its distributors to use incentive funds to obtain temperature displays or ATC

equipment.  Id. ¶ 4.5.  For three years after the effective date of the settlement, any distributor or

branded dealer who complies with these terms will be included in the release of claims under the

settlement.  Id.

Without more information, the Court cannot determine whether class members would

benefit under the Valero Settlement.  Specifically, the parties would need to make a prima facie

showing that class members would benefit from disclosures of underground tank temperatures.

Throughout this MDL litigation, defendants have contended that underground tank temperatures can

differ materially from dispensed fuel temperatures.  See, e.g., Defendants' Response To Plaintiffs'

Motion In Limine (Doc. #4294) filed May 14, 2012 at 27 (defendants' expert Steve Malone to testify

how disclosure or tank temperature could be misleading if consumers assumed disclosed tank

temperature was same as dispensed temperature because dispensed temperatures differ from tank

temperatures); Reply Memorandum Of Law In Support Of Motion To Exclude Testimony Of

Andrew Safir (Doc. #1568) filed January 22, 2010 at 2 (defendants' expert Dr. Harri Kytomaa

established that tank temperatures vary sometimes radically from dispensed fuel temperatures).

Before the Court would preliminarily approve the Valero Settlement, the parties would need to make

a prima facie showing that class members would benefit from disclosure of underground tank

---

[20](...continued)
Vol. 11 at 999:2:12.

temperatures.  In addition, the parties would need to provide information regarding (1) how many stations do not have automatic tank gauge equipment and are therefore exempt from temperature reporting requirements; (2) what the temperature posting will say to educate consumers regarding the effect of temperature on fuel content; and (3) how much incentive funds will be available for distributors to obtain temperature displays or ATC equipment, see id. ¶ 4.5.

On this record, the parties have not shown that class members will benefit from relief provided under the Valero Settlement.  Although the costs of continued litigation are high and it is possible that plaintiffs could receive little or no pecuniary relief, the record does not demonstrate that class members will receive sufficient value under the proposed settlement to justify releasing their class claims against Valero.  Accordingly, the third factor weighs against preliminary approval of the Valero Settlement.

## IV.    Conclusion

Regarding Dansk, the Court preliminarily approves the proposed settlement.  Plaintiffs ask the Court to appoint Robert A. Horn, Thomas V. Girardi and George A. Zelcs as lead counsel and Thomas V. Bender as liaison counsel for the proposed settlement class.  The Court has already appointed these counsel to serve in such positions with respect to the MDL proceedings and the Costco settlement.[21]  Accordingly, the Court will grant plaintiffs' request.  On or before **October 12, 2012,** the parties shall file a proposed notice plan regarding the Dansk Settlement.

Regarding Casey's and Sam's, the Court would preliminarily approve the proposed settlements subject to slight modification regarding the reporting requirements to allow class

---

[21]    See Doc. #2118 filed September 22, 2011 at 24; Doc. #179 filed September 19, 2007; Doc. #150 filed September 12, 2007;  Doc. #148 filed September 11, 2007; Doc. #145 filed September 7, 2007.

members to monitor defendants' compliance with the settlements.  On or before **October 5, 2012,** the parties shall notify the Court whether they agree to modify the reporting requirements under the proposed settlements.  If so, on or before **October 12, 2012,** the parties shall file a proposed notice plan regarding the settlements.

Regarding BP, CITGO, ConocoPhillips, Exxon, Shell, Sinclair and Valero, for reasons discussed, the Court declines to preliminarily approve the proposed settlements.  Plaintiffs' claims in the Kansas cases against those defendants who were severed from trial, i.e. BP, ConocoPhillips, Shell and Valero, are set for trial on **January 7, 2013.**[22]

**IT IS THEREFORE ORDERED** that the Unopposed Motion Of Plaintiffs For Order Conditionally Certifying Settlement Classes, Preliminarily Approving Class Action Settlements, Directing And Approving Distribution Of Class Notice, Setting Hearing For Final Approval Of Class Action Settlements And Appointing Class Counsel (Doc. #4328) filed June 15, 2012 be and hereby is **SUSTAINED in part**.  The Court orders as follows:

Regarding the settlement with Dansk Investment Group, Inc. (formerly known as USA Petroleum Corporation), the Court preliminarily certifies the proposed settlement class, subject to plaintiffs demonstrating at the final approval hearing "under a strict burden of proof" that the requirements of Rule 23(a) and (b)(3) are clearly satisfied.  The Court preliminarily approves the proposed settlement and appoints Robert A. Horn, Thomas V. Girardi and George A. Zelcs as lead counsel and Thomas V. Bender as liaison counsel for the proposed settlement class.  On or before **October 12, 2012,** the parties shall submit a proposed notice plan which complies with the

---

[22]     If Casey's and Sam's do not agree to modify their settlement reporting requirements, plaintiffs' claims against them in the Kansas cases will also be set for trial on January 7, 2013.

requirements of Rule 23(c)(2)(B) and (e).  In addition, the parties should inform the Court of the earliest date for a final approval hearing.

Regarding the settlements with Casey's General Stores, Inc., Sam's Club, Sam's East, Inc., Sam's West, Inc., Wal-Mart Stores, Inc. Wal-Mart Stores East, LLP., on or before **October 5, 2012,** the parties shall notify the Court whether they agree to modify the reporting requirements to require the settling defendants to file regular compliance reports with the Court.  If so, on or before **October 12, 2012,** the parties shall submit a proposed notice plan which complies with the requirements of Rule 23(c)(2)(B) and (e).  In addition, the parties should inform the Court of the earliest date for a final approval hearing.

Plaintiffs' motion is otherwise **OVERRULED.**

**IT IS FURTHER ORDERED** that plaintiffs' claims against BP Products North America Inc., ConocoPhillips Company, Sam's West, Inc., Equilon Enterprises LLC d/b/a Shell Oil Products US and Valero Marketing and Supply Company in the Kansas cases, i.e. Wilson v. Ampride, Inc., 06-2582-KHV and American Fiber & Cabling, LLC v. PB Prods. N. Am., Inc., 07-2053-KHV, are hereby set for **jury trial on January 7, 2013 at 8:00 a.m. in Courtroom 476.**  The pretrial filing deadlines set for the in Amended Pretrial Order (Doc. #3809) shall apply except that motions in limine are due **November 5, 2012.**

Dated this 28th day of September, 2012 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge