IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| IN RE: MOTOR FUEL TEMPERATURE<br>SALES PRACTICES LITIGATION<br><br>(This Document Relates to All Cases) | )<br>)<br>) MDL No: 1840<br>)<br>) No: 07-md-1840-KHV-JPO |

**RENEWED MOTION OF PLAINTIFFS FOR ORDER CONDITIONALLY
CERTIFYING SETTLEMENT CLASSES, PRELIMINARILY APPROVING CLASS
ACTION SETTLEMENTS, DIRECTING AND APPROVING DISTRIBUTION OF
CLASS NOTICE, SETTING HEARING FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENTS AND APPOINTING CLASS COUNSEL**

Class Plaintiffs[1] hereby renew their motion for an order granting preliminary approval to amended settlements with Defendants Motiva Enterprises LLC and Equilon Enterprises LLC d/b/a Shell Oil Products US (collectively, "Shell"), BP Products North America Inc. and BP West Coast Products LLC (collectively, "BP"), ConocoPhillips Company ("ConocoPhillips"), Exxon Mobil Corporation, Esso Virgin Islands, Inc. and Mobil Oil Guam, Inc. (collectively, "ExxonMobil"), CITGO Petroleum Corporation ("CITGO"), Sinclair Oil Corporation ("Sinclair") (together, the "Refiner Settling Defendants"); Casey's General Stores, Inc., ("Casey's") and Sam's Club ("Sam's")[2] (together with the Refiner Settling Defendants, the "Settling Defendants"). The settlements proposed herein have been amended to address the concerns expressed by the Court in the September 28, 2012 Memorandum and Order ("Order") denying preliminary approval to prior versions of these settlements.

---

[1] The proposed class representatives for each of the proposed settlement subclasses are set forth in Exhibit 1 hereto.
[2] In its September 28, 2012 Order denying preliminary approval to certain settlements, the Court approved Plaintiffs' settlement with Defendant Dansk Investment Group, Inc. ("Dansk"), formerly known as USA Petroleum Corporation. Therefore, this renewed motion does not address the Dansk settlement. The Court's September 28 Order also denied preliminary approval to the Plaintiffs' settlement with Valero Energy Corporation and affiliates ("Valero"). Plaintiffs and Valero are actively negotiating the terms of that agreement and anticipate submission of an amended settlement agreement in the near future that takes into account the concerns expressed in the Court's Order.

1

The Settling Defendants do not oppose the instant Motion.

**AUTHORITIES AND ANALYSIS OF RULE 23 AND STANDARD RELATED TO PRELIMINARY APPROVAL**

In their prior motion for preliminary approval of these settlements, Plaintiffs provided ample legal authorities and analysis related to preliminary approval, and why the parties' earlier settlement agreements warranted preliminary approval.[3] As to the settlements with Casey's and Sam's, the Court agreed that conditional certification of the proposed settlement classes was appropriate,[4] but denied preliminary approval unless specific changes were made to the requirement of compliance reporting. As to the settlements with BP, CITGO, ConocoPhillips, ExxonMobil, Shell and Sinclair, the Court took issue with specific aspects of each settlement and whether the proposed settlements provided sufficient value or benefit to the classmembers. Because the Court concluded that preliminary approval was not yet appropriate for these six settlements, the Court did not reach Plaintiffs' request for conditional certification of the settlement classes for these settlements.[5]

In the interests of brevity, Plaintiffs incorporate by reference their prior motion, legal authorities, legal analysis and proposed class notice plan as if fully set forth herein. This renewed motion for preliminary approval addresses only the specific issues and concerns raised by the Court in the Order.

**AMENDED SETTLEMENTS WITH CASEY'S AND SAM'S**

Plaintiffs and Casey's have amended the Casey's settlement agreement to reflect the proposed modification referenced in the Order related to the public filing of regular compliance

---

[3] Doc. # 4328.
[4] Order, pg. 25.
[5] *See, e.g.*, Order, pg. 28-30.

repots.[6] The amended Casey's settlement agreement is attached hereto as Exhibit 2.[7] It is the understanding of Plaintiffs, and Casey's, that there are no further impediments to preliminary approval of the Casey's settlement.

Plaintiffs and Sam's have amended the Sam's settlement agreement to reflect the proposed modification referenced in the Order related to the public filing of regular compliance reports.[8] The amended Sam's settlement agreement is attached hereto as Exhibit 3.[9] It is the understanding of Plaintiffs, and Sam's, that there are no further impediments to preliminary approval of the Sam's settlement.

Plaintiffs, Casey's and Sam's submit that the earliest date for a final approval hearing of their respective settlements should be no fewer than one hundred four (104) days after the Court approves a notice plan for the Casey's and Sam's settlements.

As indicated in their original Motion for Preliminary Approval,[10] and in the Status Report filed October 5, 2012,[11] the notice plan proposed by Plaintiffs is an integrated plan designed to provide notice for all six (6) of the proposed Refiner settlements, as well as the settlements with Casey's, Sam's and Valero, at the same time. Combining notice for all nine (9) settlements into one plan will reduce the overall cost of each individual settlement's notice plan because of the economy of scale. This efficient approach will benefit class members because it will leave more of the common funds established by the Refiner settlements to be used for the ATC-related activities set out in the settlements. Casey's, Sam's, and Valero will also pay amounts directly to defray notice costs.

---

[6] *See* Order, pgs. 40-41.
[7] *See* Section 8.2 (providing that semi-annual compliance reports be filed publicly with the Court, beginning six months after the Effective Date of the Casey's settlement).
[8] *See* Order, pgs. 40-41.
[9] *See* Section 8.2 (providing that semi-annual compliance reports be filed publicly with the Court, beginning six months after the Effective Date of the Sam's settlement).
[10] *See* Doc. # 4328, Ex. 12 (Affidavit of Jeffrey D. Dahl).
[11] *See* Doc. # 4433.

Accordingly, Plaintiffs request that the Court defer implementation of any notice plan for the Casey's and Sam's settlements until the Court has ruled on preliminary approval for the amended Refiner settlements referenced below, and the anticipated amended settlement with Valero. Should the Court not grant preliminary approval to the amended settlements with Valero and the Refiner Settling Defendants, Plaintiffs request that proposed notice plans for the Casey's and Sam's settlements be submitted within ten (10) days of the order denying preliminary approval to the amended Valero and Refiner Settling Defendant settlements.

**AMENDED REFINER SETTLEMENTS -- BP, CITGO, CONOCOPHILLIPS, EXXONMOBIL, SHELL AND SINCLAIR**

In the Order denying preliminary approval to the proposed Refiner settlements, the Court expressed concerns about specific terms of the Refiner agreements, and requested additional information or explanation about other aspects of the settlements.

*Amended Terms Of The Agreements*

Plaintiffs and BP, CITGO, ConocoPhillips, ExxonMobil, Shell and Sinclair have amended their settlement agreements to address the issues referenced in the Court's Order. Those amended settlement agreements are attached hereto as Exhibits 4 through 9, respectively.

*Providing Fund Proceeds To Pay For Disclosures*

The Court expressed concerns about using proceeds from the Refiner settlement funds to defray the costs of providing only informational disclosures to the public about temperature and/or the effect of temperature on motor fuel.[12] Under the amended settlements, retail stations selling branded fuel of the Refiner Settling Defendants may use settlement proceeds to defray

---

[12] Order, pg. 28 (as to BP, for example).

costs associated with ATC dispensers, but will not be eligible for reimbursement of mere disclosures.[13]

*Annual Cap On Administrator Payments*

The Court expressed concerns about a provision that capped the amount of settlement funds that the Settlement Administrator could pay out to retailers or weights and measures departments in the first two years.[14] Plaintiffs and the Refiners have eliminated that provision. The amended settlement agreements impose no limitation on the amount of settlement funds the Settlement Administrator can pay in any given year of the settlements.[15]

*Cy Pres Recipient*

The Court expressed concern that it could not determine whether classmembers would benefit from the reversion of unused settlement funds to a *cy pres* recipient without knowing the specifics of the recipient.[16] Plaintiffs and the Refiners have amended the settlement agreements to provide detail about the *cy pres* recipient and reversion mechanism that will apply to any unused settlement funds.[17] As an example, paragraph 15(i) of the amended BP settlement agreement provides that if any portion of the settlement proceeds allocated to a particular state remains unused after six years, those remaining funds will escheat to that particular state. The amended settlement agreements with Citgo, ConocoPhillips, Sinclair and Shell contain identical *cy pres* provisions.

With respect to the amended settlement with ExxonMobil, the proposed *cy pres* recipient is the National Math and Science Initiative ("NMSI"). NMSI is a non-profit which works to improve K-12 math and science education by finding existing programs with a proven track

---

[13] *See, e.g.*, BP amended settlement agreement, Ex. 4, ¶ 14(a)-(b).
[14] Order, pg. 28 (as to BP, for example).
[15] *See, e.g.*, BP amended settlement agreement, Ex. 4, ¶ 14 (omitting former subparagraph 14(e)).
[16] Order, pg. 28-29 (as to BP, for example).
[17] *See, e.g.*, BP amended settlement agreement, Ex. 4, ¶ 15(i).

record of success, such as the UTeach program,[18] and scaling them to a wider reach. NMSI began in response to a report requested by the Senate Committee on Energy and Natural Resources, and commissioned by the National Academies, which concluded that U.S. advantages in science and technology are rapidly eroding and that this erosion is undermining the nation's ability to, among other things, satisfy its need for "clean, affordable and reliable energy."[19] The report recommended that the highest priority must be improving K-12 science and mathematical education to increase the nation's talent pool, and that any additional investment in education will be modest relative to the magnitude of the expected long-term benefits, including long-term solutions to the nation's energy needs.[20]

In light of the Court's "broad discretionary powers" to shape a decree for the use of unclaimed class action funds,[21] designating NMSI as a *cy pres* recipient "reasonably approximates"[22] the interests of the class members here. First, under the amended ExxonMobil settlement agreement, NMSI must use any undistributed funds from the amount allocated to a State at Issue to improve science and math education in that State at Issue.[23] Moreover, as reflected in the National Academies' report, improved science and math education will provide a

---

[18] The UTeach program, which was developed at The University of Texas at Austin, recruits and trains math and science majors in universities and aspires to produce teachers that are confident and competent in their subject matter.

[19] Committee on Prospering in the Global Economy of the 21st Century: An Agenda for American Science and Technology, National Academy of Sciences, National Academy of Engineering, Institute of Medicine, "Rising Above the Gathering Storm: Energizing and Employing America for a Brighter Economic Future" (2007), http://www/nap.edu/catalog/11463.html (last visited Oct. 17, 2012).

[20] *Id.*

[21] *See, e.g., Six (6) Mexican Workers v. Az. Citrus Growers,* 904 F.2d 1301, 1307 (9th Cir. 1990) (citing *Van Gemert v. Boeing Co.,* 739 F.2d 730, 737 (2d Cir. 1984)).

[22] In the First Circuit case cited by the Court in its Order, at 29, *In re Lupron Mktg. & Sales Pract. Litig.*, 677 F.3d 21, 33 (1st Cir. 2012), the court noted that "when feasible, the recipients should be those 'whose interests reasonably approximate those being pursued by the class.'" The court further stated that "[i]f no recipients 'whose interests reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.'" *In re Lupron*, 677 F.3d 21 at 33 (approving *cy pres* distributions of unclaimed funds to cancer center that promoted research into diseases treatable by drug for which consumers were overcharged).

[23] *See, e.g.*, ExxonMobil amended settlement agreement, Ex. 7, ¶ 14.

general benefit to all class members and relates to the long-term ability to solve consumers' need for clean and affordable energy.

*Additional Information And Explanation*

*BP*

The Court requested information related to the number of pumps that could be converted to ATC with the proposed BP settlement. As an initial matter, Plaintiffs and BP understood at the time they agreed to settle Plaintiffs' claims that the settlement amount would not and could not completely offset the expense of installing ATC at all pumps at all BP-branded stations. Rather, the settlement fund is designed to help initiate the market transition to ATC by rewarding early movers through reimbursement (in whole or part) of costs incurred by such transition to ATC. The amount to be paid by BP was a compromise, given a totality of facts including the status of BP, this Court's prior orders and the claims asserted.[24] Importantly, the BP settlement *does not* release the thousands of entities that do own and operate the BP-branded stations in the Region; the settlement only releases the refiner entity and related corporate affiliates.

BP believes that, as of June 1, 2012, there were approximately seven thousand and forty (7,040) gas stations selling BP-branded fuel in the States at Issue. Because those gas stations are operated by third parties, BP does not have detailed information about the number of actual dispensers at each individual BP-branded gas station.

---

[24] As reflected in the agreements and explained in the initial motion for preliminary approval (Doc. # 4328), the Refiner Settling Defendants no longer own and operate gas stations in the Region. Rather, the stations in the Region selling branded fuel of the Refiner Settling Defendants are owned by third parties that enter into contractual relationships with the Refiner Settling Defendants or jobbers with a contractual relationship with a Refiner Settling Defendant which allows those third parties to use trade dress and marks. Although the Refiner Settling Defendants did own and operate a limited number of gas stations in the Region during the class period, the Court has not granted Plaintiffs' request to certify a Rule 23(b)(3) damage class in order to hold the Refiner Settling Defendants liable for sales made by gas stations owned or operated by these parties. Although the Court did certify a Rule 23(b)(2) class against the Refiner Settling Defendants in Kansas, Plaintiffs' ability to obtain meaningful injunctive relief with respect to Refiner-branded retail stations is uncertain, given that the Refiner Settling Defendants do not own or operate the stations selling their branded fuel. The settlements between Plaintiffs and Refiner Settling Defendants account for these factors.

As to the potential cost of ATC dispensers, the California Energy Commission has suggested that the per-pump costs to convert to ATC may range between $1,422 and $2,426.[25] Those estimates are applicable to BP as well as the other Refiners referenced below.

*CITGO*

In its Order, the Court questioned why the CITGO settlement provides less money than the other Refiner settlements, and why it does not make such funds available to CITGO stations for the purchase of ATC equipment. Unlike the other Refiner Settling Defendants, CITGO maintains that it has never owned or operated any of the CITGO-branded gas stations in the Region.[26] As evidenced in CITGO's dispositive motions related to this issue, CITGO has franchise relationships with other individuals and entities that do own gas stations, and CITGO allows those parties to utilize the CITGO trade dress and marks under written agreements.[27] CITGO has maintained that it is not liable for how those parties sell motor fuel to the public.[28] CITGO also maintains that it has no ability through its contractual relationships with its franchisees to influence or impact how those parties sell motor fuel, or the types of fuel dispensers that they utilize in relation to their motor fuel sales to the public.[29]

The amount of the CITGO settlement constitutes a compromise of Plaintiffs' claims against CITGO, given the specifics of CITGO's franchise relationships and the terms of CITGO's written contracts with the parties that operate CITGO-branded stations. There are unresolved questions of law and fact related to Plaintiffs' claim that CITGO is liable for the

---

[25] *See* California Energy Commission Fuel Delivery Temperature Study, pg. 62, *available at*, http://www.energy.ca.gov/transportation/fuel_delivery_temperature_study/.
[26] Plaintiffs have discovered no evidence that CITGO has actually owned any of the CITGO-branded gas stations in the Region.
[27] Motion for Summary Judgment, Doc. # 1740.
[28] *Id.* at 8-20.
[29] *Id.*

8

motor fuel sales of its franchisees,[30] and the CITGO settlement reflects that uncertainty. Due to CITGO's position that it is a franchisor only and has no involvement with the actual retail operations of the CITGO-branded stations operated by its franchisees, the CITGO settlement fund is not designed to dispense proceeds directly to CITGO-branded stations for the purchase of ATC dispensers. Rather, the CITGO settlement funds are earmarked to benefit state weights and measures agencies in their efforts to begin implementation and regulation of retail ATC dispensers, which would provide a direct benefit to class members.

### *CONOCOPHILLIPS*

The facts and analysis set forth above with respect to BP are equally applicable to the amended settlement agreement between Plaintiffs and Defendant ConocoPhillips. ConocoPhillips believes that, as of June 1, 2012, there were approximately five thousand five hundred (5,500) gas stations selling ConocoPhillips-branded fuel in the States at Issue. Because those gas stations are owned by third parties, ConocoPhillips does not have detailed information about the number of actual dispensers at each individual ConocoPhillips-branded gas station.

### *EXXONMOBIL*

The facts and analysis set forth above with respect to BP are equally applicable to the amended settlement agreement between Plaintiffs and Defendant ExxonMobil. ExxonMobil believes that, as of June 1, 2012, there were approximately six thousand four hundred fifty (6,450) gas stations selling ExxonMobil-branded fuel in the States at Issue. Because those gas stations are owned by third parties, ExxonMobil does not have detailed information about the number of actual dispensers at each individual ExxonMobil-branded gas station.

---

[30] Although this Court has not ruled on this issue in the specific context of CITGO, it recently ruled in a defendant's favor on a somewhat related issue with respect to Plaintiffs' claims against Circle K in Kansas. *See* Memorandum and Order granting summary judgment, Doc. # 4269.

In its Order, the Court questioned why the ExxonMobil settlement agreement retains a right in ExxonMobil to object to settlement payments in excess of ten thousand dollars ($10,000).[31] In light of the fact that Plaintiffs have proposed the law firm Horn Aylward & Bandy, LLC to serve as the claims administrator, ExxonMobil reserved the right to object to disbursements of $10,000 or more on the limited basis that the funds would not be used consistent with the limited purposes set forth in the ExxonMobil settlement agreement. ExxonMobil contends that such an objection process serves the class because it provides a check against both the misappropriation of funds and the appearance of misappropriation of funds. Further, ExxonMobil contends that its right to object is so narrow that there is little risk that a franchisee or governmental agency will be deterred from requesting disbursement from the settlement funds.[32]

*SHELL*

The facts and analysis set forth above with respect to BP are equally applicable to the amended settlement agreement between Plaintiffs and Defendant Shell. Shell believes that, as of June 1, 2012, there were approximately eleven thousand five hundred sixty (11,560) gas stations selling Shell-branded fuel in the States at Issue. Because those gas stations are owned by third parties, Shell does not have detailed information about the number of actual dispensers at each individual Shell-branded gas station.

*SINCLAIR*

The facts and analysis set forth above with respect to BP are equally applicable to the amended settlement agreement between Plaintiffs and Defendant Sinclair. Sinclair believes that,

---

[31] Order, pg. 32-33. The statements set forth herein related to this specific issue (i.e., the rationale for the settlement provision allowing ExxonMobil to object to disbursements over $10,000) are the statements of ExxonMobil, not Plaintiffs. Plaintiffs take no position on the propriety of ExxonMobil's objection provision.

[32] $10,000 was chosen as the objection threshold because of Plaintiffs' concern that objections to disbursements below that amount could create administrative delays.

as of June 1, 2012, there were only approximately 700 to 800 gas stations selling Sinclair-branded fuel in the States at Issue. Because those gas stations are owned by third parties, Sinclair does not have detailed information about the number of actual dispensers at each individual Sinclair-branded gas station.

In addition, in its Order the Court noted that the "parties provide no information why the Sinclair Settlement provides significantly less money than the BP Settlement" and stated it would need "specific information which justifies the lower amount" before the Court would preliminarily approve it.[33] Using the BP settlement as a reference point as suggested by the Court, the lower Sinclair settlement is justified because Sinclair is being sued in many fewer pending cases than BP or the other Refiners, the Sinclair settlement covers fewer jurisdictions, and there are far fewer Sinclair-branded stations than the Refiner Defendants who have agreed to pay $5,000,000.

While the Sinclair settlement pertains to eleven states in which Sinclair sold branded fuel during the relevant time period, Sinclair is currently a defendant in only four cases, one each in Arizona, Mississippi, Oklahoma, and Utah. In those states, there is a total of only approximately four hundred fifty (450) independently owned and operated stations currently selling Sinclair-branded fuel. In all eleven states covered by the Sinclair settlement, there are only between seven and eight hundred (700-800) stations selling Sinclair-branded fuel.

In contrast, BP has thousands of independently owned and operated stations selling BP-branded fuel in the twenty-five jurisdictions covered by the BP settlement. In other words, while BP's contribution to the settlement fund is approximately six times larger than Sinclair's, there are approximately ten times as many BP-branded stations in the states at issue. Similarly, as noted above, the other Refiner Settling Defendants who settled for the same total amount as BP –

---

[33] Doc. 4424 at 34.

ConocoPhillips (28 jurisdictions), ExxonMobil (28), and Shell (27) – have several thousand independent stations selling their branded fuel.

The smaller Sinclair Settlement is also based on the fact that Sinclair has no branded stations and therefore was not sued in, and is not settling claims in, several of the warmest, most populous states. Sinclair has no branded presence in states like California, Texas, and Florida, so unlike BP and other larger refiners, the Sinclair settlement does not cover those warm, populous states. The amount being paid by Sinclair is reflective of all of these and other facts and issues, and the continuing existence of fact and legal questions that place into doubt the ultimate outcome of Plaintiffs' claims against Sinclair.

*Scope Of Settlement Subclasses*

In the Order, the Court raised a question about why the class definitions used for those settlements encompassed "any" purchaser of retail fuel during the relevant time period, as opposed to classes limited to purchasers of fuel from one of the Refiner Settling Defendants' branded stations.[34] The answer lies in the claims asserted and theories pursued against the Refiner Settling Defendants.

In this litigation, Plaintiffs alleged that certain of the Refiner Settling Defendants individually and jointly as part of a conspiracy wrongfully influenced (a) government regulators (at the National Conference of Weights and Measures and state levels) to preclude adoption of ATC for retail use and (b) sellers of ATC equipment to stop offering such devices. This wrongful conduct, Plaintiffs have alleged, prevented *all* consumers from being permitted to purchase temperature adjusted fuel from *any* retailer.[35] In 2010, the Court certified the Kansas

---

[34] Order, pg. 6, n. 3; pg. 24, n. 12.
[35] *See*, *e.g.*, Class Action Complaint (*Am. Fiber & Cabling v. BP*, 07-cv-02053-KHV-JPO), Doc. 1, ¶ 78 (defendants allegedly committed acts in furtherance of "their concerted attempts to obstruct and/or restrict implementation and installment of temperature-adjustment devices on Motor Fuel pumps through the State of Kansas and the country

Plaintiffs' conspiracy claim.[36] While the Refiner Settling Defendants deny these allegations and dispute that they did anything improper to preclude implementation of ATC, they nevertheless seek to resolve the issue through these settlements. Thus, the settlement classes include any consumers who purchased fuel within the relevant jurisdictions (since any consumer might assert that they have been injured by the Refiner Settling Defendants' allegedly improper acts to restrict implementation of ATC throughout the States at Issue). Correspondingly, the settlements release any claim such consumers might have against the Refiner Settling Defendants – and, importantly, *only* the Refiner Settling Defendants – based on "the alleged participation in a conspiracy to preclude the use of ATC Equipment in the States at Issue."[37]

Respectfully submitted this 19th day of October, 2012.

Respectfully submitted,

   *s/ Robert A. Horn*
Robert A. Horn   KS Bar No. 70254
HORN AYLWARD & BANDY, LC
2600 Grand Boulevard, Suite 1100
Kansas City, MO 64108
Telephone 816-421-0700
Facsimile 816-421-0899
rhorn@hab-law.com

   *s/ Thomas V. Girardi*
Thomas V. Girardi CA Bar No. 36603
GIRARDI AND KEESE
1126 Wilshire Boulevard
Los Angeles, California 90017-1904
Telephone: 213-977-0211
Facsimile: 213-481-1554
tgirardi@girardikeese.com

---

and sell consumers non-temperature corrected Motor Fuel, such acts being unlawful, and did unlawfully deprive Plaintiffs and the Class of their rights").
[36] *See* Doc. # 1675 at 34-35.
[37] *E.g.*, Ex. 4, BP Settlement Agreement, ¶ 32. That this class might include people who did not purchase from one of the Refiner Defendants does not matter, since those consumers could still have standing to bring such a conspiracy allegation, as the Court noted in its class certification ruling. *See* Doc. # 1675 at 14-15 (a plaintiff has standing to bring a conspiracy claim or theory against a defendant, even if that plaintiff had "no previous contact with" a particular defendant's brand).

                *s/ George A. Zelcs*
George A. Zelcs  IL Bar No. 3123738
KOREIN TILLERY LLC
205 North Michigan Plaza
Suite 1950
Chicago, Illinois 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com

                *s/ Thomas V. Bender*
Thomas V. Bender     Ks. Bar #22860
WALTERS BENDER STROHBEHN
      & VAUGHAN, P.C.
2500 City Center Square
1100 Main Street
P.O. Box 26188
Kansas City, MO 64196
(816) 421-6620
(816) 421-4747 (Facsimile)
tbender@wbsvlaw.com

**PROPOSED CLASS COUNSEL**


**CERTIFICATE OF SERVICE**

    I hereby certify that on October 19, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all person registered for ECF as of that date.

                                        */s/ Joseph A. Kronawitter*