**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

IN RE: MOTOR FUEL TEMPERATURE   )
SALES PRACTICES LITIGATION   )
   )   **MDL No. 1840**
(This Document Relates to All Cases)   )   **Case No. 07-MD-1840-KHV**
————————————————————)

**MEMORANDUM AND ORDER**

Plaintiffs bring putative class action claims for damages and injunctive relief against motor fuel retailers in 26 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia), the District of Columbia, Puerto Rico and Guam. Second Consolidated Amended Complaint (Doc. #652) filed December 1, 2008 ¶ 11. Plaintiffs claim that because defendants sell motor fuel for a specified price per gallon without disclosing or adjusting for temperature expansion, they are liable under state law theories including breach of contract, breach of warranty, fraud and consumer protection.[1] On September 28, 2012, the Court overruled plaintiffs' motion for preliminary approval of nine proposed settlement agreements. See Memorandum And Order (Doc. #4424).[2] This matter comes before the Court on the Renewed Motion Of Plaintiffs For Order Conditionally Certifying Settlement Classes, Preliminarily Approving Class Action Settlements, Directing And Approving Distribution Of Class Notice, Setting Hearing For Final Approval Of Class Action Settlements And Appointing Class Counsel ("Plaintiffs' Renewed Motion For

---

[1] Following a transfer order of the Judicial Panel on Multidistrict Litigation, the Court has jurisdiction over consolidated pretrial proceedings in these actions. See 28 U.S.C. § 1407; Doc. #1 filed June 22, 2007.

[2] In the same order, the Court granted preliminary approval of a proposed settlement between plaintiffs and Dansk Investment Group, Inc.

Preliminary Approval") (Doc. #4447) filed October 19, 2012 and Plaintiffs' Amended Motion For

Preliminary Approval Of Their Settlement Agreement With Valero ("Plaintiffs' Amended Motion

Regarding Valero Settlement") (Doc. #4456) filed November 7, 2012.  For reasons stated below,

the Court sustains the motions as to seven amended settlements and overrules the motions as to two

settlements.

I.      **Legal Standards**

        A.      **Class Certification**

        The determination of class certification is committed to the broad discretion of the trial court.

See Shook v. El Paso Cnty., 386 F.3d 963, 967 (10th Cir. 2004).  In deciding whether to certify, the

Court performs a "rigorous analysis" to determine whether the proposed class satisfies the

requirements of Rule 23, Fed. R. Civ. P.  Wal-Mart Stores, Inc. v. Dukes, — U.S. —, 131 S. Ct.

2541, 2251 (2011); Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 155 (1982); see also Nat'l Union

Fire Ins. Co. v. Midland Bancor, Inc., 158 F.R.D. 681, 685 (D. Kan. 1994).  As the parties seeking

class certification, plaintiffs have the burden to demonstrate "under a strict burden of proof" that the

requirements of Rule 23 are clearly satisfied.  Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir.

2006).  In so doing, plaintiffs first must satisfy the prerequisites of Rule 23(a), that is, they must

demonstrate that (1) the class is so numerous that joinder of all members is impracticable,

(2) questions of law or fact are common to the class, (3) the claims of the representative parties are

typical of the claims of the class and (4) the representative parties will fairly and adequately protect

the interests of the class.  Fed. R. Civ. P. 23(a).  After meeting these requirements, plaintiffs must

demonstrate that the proposed class action fits within one of the categories described in Rule 23(b).

        Plaintiffs seek to proceed under Rule 23(b)(3), which requires that "questions of law or fact

common to the members of the class predominate over any questions affecting individual members,"

and that a class action "is superior to other available methods for the fair and efficient adjudication

of the controversy." Fed. R. Civ. P. 23(b)(3).  In determining predominance and superiority under

Rule 23(b)(3), the Court considers the following factors:

> (A)    the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D)    the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).  In deciding whether to certify a settlement class, the Court need not inquire

whether the case, if tried, would present difficult management problems under Rule 23(b)(3)(D).

Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997).  All of the other requirements apply,

however, and demand even heightened attention in the settlement context. Id. Such attention is vital

because in the settlement context, the Court generally lacks an opportunity to adjust the class as it

becomes informed by the proceedings as they unfold.  Id.

## B.    Preliminary Approval Of Settlement

Under Rule 23(e), Fed. R. Civ. P., once a class is certified, the action may not be settled,

dismissed or compromised without Court approval.[3] Preliminary approval of a proposed settlement

---

[3]      Rule 23(e) provides as follows:

(e) SETTLEMENT, VOLUNTARY DISMISSAL, OR COMPROMISE.  The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval.  The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

(continued...)

is the first of two steps required before a class action may be settled.  See Am. Med. Ass'n v. United Healthcare Corp., No. 00 Civ. 2800(LMM), 2009 WL 1437819, at *3 (S.D.N.Y. May 19, 2009).  If the Court grants preliminary approval, it directs notice to class members and sets a hearing at which it will make a final determination on the fairness of the class settlement.  See id.; In re Wireless Facilities, Inc. Sec. Litig., 253 F.R.D. 630, 634 (S.D. Cal. 2008).

At the preliminary approval stage, the Court makes a preliminary evaluation of the fairness of the proposed settlement and determines whether it has any reason not to notify the class members of the proposed settlement or not to hold a fairness hearing.  See Am. Med. Ass'n, 2009 WL1437819 at *3; Gautreaux v. Pierce, 690 F.2d 616, 621 n.3 (7th Cir. 1982).  The Court will ordinarily grant preliminary approval where the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval."  Am. Med. Ass'n, 2009 WL 1437819 at *3.  The standards for preliminary approval of a class settlement are not as stringent as those applied for final approval.  See Karvaly v. eBay Inc.,

---

[3](...continued)
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
> (4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
> (5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).

245 F.R.D. 71, 86 (E.D.N.Y. 2007). The Court is mindful, however, that a higher degree of scrutiny applies when determining the fairness of a settlement which is negotiated before class certification. See D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001).

In deciding whether to approve a proposed settlement, the Court assesses the reasonableness of the compromise, taking into account the context in which the parties reached settlement. See Nat'l Treasury Emp. Union v. United States, 54 Fed. Cl. 791, 797 (2002). Although the Court must assess the strength of plaintiffs' claims, it should "not decide the merits of the case or resolve unsettled legal questions." Id. (quoting Carson v. Am. Brands, Inc., 450 U.S. 79, 88 n.14 (1981)).

## II.   Analysis

Plaintiffs seek preliminary approval of nine amended settlement agreements. Six amended agreements involve the following so-called "refiner" defendants: (1) BP Products North America Inc. and BP West Coast Products LLC (collectively, "BP"); (2) CITGO Petroleum Company; (3) ConocoPhillips Company; (4) Exxon Mobil Corporation, Esso Virgin Islands, Inc. and Mobil Oil Guam, Inc. (collectively, "ExxonMobil"); (5) Motiva Enterprises LLC and Equilon Enterprises LLC d/b/a Shell Oil Products US (collectively, "Shell"); and (6) Sinclair Oil Corporation and its corporate affiliates (collectively, "Sinclair"). The remaining amended agreements involve the following defendants: (1) Casey's General Stores, Inc.; (2) Sam's Club, Sam's East, Inc., Sam's West, Inc., Wal-Mart Stores, Inc. Wal-Mart Stores East, LLP. (collectively, "Sam's"); and (3) Valero Marketing and Supply Company and Valero Energy Corporation (collectively, "Valero").[4]

---

[4]   For a description of the original settlement agreements, see the Court's Memorandum And Order (Doc. #4424) at 5-23. Plaintiffs have not submitted an amended agreement with Valero but the parties have agreed to additional terms regarding that settlement. See Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456).

**A.      Refiner Amended Settlements**

As noted, the refiner settlements are with BP, CITGO, ConocoPhillips, ExxonMobil, Shell and Sinclair.  Under the original settlements, these defendants agreed to pay certain amounts to (1) reimburse retailers or wholesalers selling retail motor fuel for expenses incurred in installing automatic temperature compensation ("ATC") at retail or making disclosures about the temperature of motor fuel or its effect on energy content; and/or (2) contribute to state departments of weights and measures or other agencies responsible for regulating retail motor fuel dispensers to defray some state costs of implementing ATC at retail.  See Memorandum And Order (Doc. #4424) at 5-6. Specifically, each refiner defendant agreed to pay the following amounts:

|  | Settlement Fund | Class Notice Fund |
|---|---|---|
| BP | $ 4,900,000 | $100,000 |
| CITGO | $    800,000 | $100,000 |
| ConocoPhillips | $ 4,900,000 | $100,000 |
| ExxonMobil | $ 5,000,000 | n/a[5] |
| Shell | $ 4,900,000 | $100,000 |
| Sinclair | $    700,000 | $100,000 |
| TOTAL | $21,200,000 | $500,000 |

Except as noted below, the proposed amended settlement agreements with the refiner defendants appear to be substantially similar to the original settlement agreements.

**1.      Conditional Class Certification**

Under the proposed amended refiner settlements, plaintiffs seek conditional certification of subclasses for the settlement states defined as follows:

All persons and entities who, at anytime during the period from January 1, 2001 to the date of preliminary approval of the settlement agreement in this action, purchased

---

[5]      The ExxonMobil settlement does not provide funds up front for class notice. Nevertheless, the agreement provides that ExxonMobil will not object to settlement administration expenses – including cost of class notice – to be paid out of the settlement fund.  See ExxonMobil Settlement Agreement ¶ 18, Exhibit 7 to Plaintiffs' Motion For Preliminary Approval (Doc. #4328).

> motor fuel in [the state or district] from a retail motor fuel station.  Excluded from the class is any judicial officer presiding over this action and the members of his/her immediate family.

Memorandum And Order (Doc. #4424) at 6, 10-12, 14-15.[6]

The Court finds that conditional certification of the proposed refiner settlement classes is appropriate.  Specifically, the proposed refiner settlement class and subclass definitions are adequate to identify the persons (1) entitled to relief, (2) bound by a final judgment and (3) entitled under Rule 23(c)(2) to the best notice practicable in a Rule 23(b)(3) action.  See In re Motor Fuel Temp. Sales Pract. Litig., No. 07-1840, 2012 WL 1415508, at *9 (D. Kan. April 24, 2012).  In addition, it appears that plaintiffs can satisfy the numerosity, commonality, typicality and adequate representation requirements of Rule 23(a)(1), (2), (3) and (4).  See id. at *9-10.  It appears that plaintiffs can also meet the requirements of Rule 23(b)(3), i.e. that questions of law or fact common to members of the subclasses predominate over any questions affecting individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  Id. at 11 (quoting Fed. R. Civ. P. 23(b)(3)).  Accordingly, the Court will conditionally certify the proposed settlement classes as to the refiner defendants subject to plaintiffs demonstrating

---

[6]      In the previous order, the Court noted that the proposed refiner subclasses differed from those approved in the Costco settlement in that the refiner subclasses include all persons who purchased motor fuel at *any* retail station in the state, as opposed to merely persons who purchased motor fuel from retail stations which sold defendants' branded fuel in the state.  See id. at 24-25 n.12.  In their renewed motion, plaintiffs state that the refiner settlement classes are defined differently to account for conspiracy claims against the refiner defendants.  Plaintiffs state that they claim that the refiner defendants conspired to wrongfully influence government regulators to preclude adoption of ATC at retail and to stop sellers of ATC equipment from offering such devices.  See Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 12-13.  Plaintiffs explain that under these theories, defendants' alleged conduct would have harmed all motor fuel consumers by making ATC unavailable at retail.  Id.  Plaintiffs asserted conspiracy claims in the cases which involved Costco.  See 271 F.R.D. at 267 n.2.  The record is unclear, however, whether plaintiffs asserted conspiracy claims against Costco in those cases.

at the final approval hearing – "under a strict burden of proof" – that the requirements of Rule 23(a) and (b)(3) are clearly satisfied.

## 2.    Preliminary Approval

In determining whether a proposed settlement is fair, reasonable and adequate, the Court considers the following factors :

(1)    whether the proposed settlement was fairly and honestly negotiated;
(2)    whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
(3)    whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
(4)    the judgment of the parties that the settlement is fair and reasonable.

Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1188 (10th Cir. 2002).

In its previous order, the Court found that the first, second and fourth factors weighed in favor of granting preliminary approval of the refiner settlements.  See Memorandum And Order (Doc. #4424) at 26.  For the same reasons, these factors weigh in favor of preliminary approval of the amended refiner settlements.

As to the third factor, i.e. whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation, the Court previously found that as to each refiner defendant, the record did not show that the proposed settlement provided sufficient value or benefit to class members to justify releasing their class action claims against the refiner defendants.  See id. at 27-35.  The Court now evaluates how class members would benefit under each proposed amended settlement.

### a.    BP Amended Settlement

Regarding the original settlement with BP, the Court found that class members would benefit from funds to facilitate the implementation of ATC at retail motor fuel

stations, but that it was unclear whether class members would benefit from funds to facilitate disclosures about temperature or its effect on the energy content of retail motor fuel. See id. at 27-28. The Court stated that before it would preliminarily approve the proposed settlement, the parties must provide specific information which demonstrated what information the proposed disclosures would provide and how said disclosures would benefit class members. Id. The amended settlement with BP does not provide funds for temperature disclosures. See Amended BP Settlement ¶ 14(a). Accordingly, the Court's previous concerns in this regard no longer apply.

Regarding the original settlement, the Court found that limiting the administrator's ability to pay out more than 25 per cent of net settlement funds in each of the first two years appeared to diminish the value of the settlement to class members. See Memorandum And Order (Doc. #4424) at 28. The amended settlement eliminates that provision. See Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 5. Accordingly, the Court's previous concerns in this regard no longer apply.

Regarding the original settlement, the Court stated that it would like information regarding the number of pumps that could be converted to ATC with the proposed settlement fund. Memorandum And Order (Doc. #4424) at 28. In their renewed motion, plaintiffs state that in the settlement states, approximately 7,040 gas stations sell BP-branded fuel and that the cost to convert to ATC would be between $1,422 and $2,426 per pump.[7] See Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 6-7. By the Court's calculations, based on a conversion cost of $2,000 per pump, approximately 1,143 pumps in 24 states could be converted with the proposed

---

[7]       Plaintiffs state that BP does not have detailed information about the number of actual pumps at each station. See Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 7.

BP settlement fund.[8]  While this is small compared to the total number of pumps that dispense BP-branded fuel, it will still provide value to the class.  The settlement fund is designed to help initiate the market transition to ATC by rewarding early movers through reimbursement of costs incurred by the transition.  See Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 7.  Combined with the other refiner settlement funds and settlements in which other defendants will install ATC (i.e. Costco, Dansk, Casey's and Sam's), it appears that the BP amended settlement will help to facilitate a transition to ATC in the marketplace, and thus benefit class members.[9]

The original settlement provided that after six years, undistributed funds would go a governmental or charitable purpose which the parties would decide subject to Court approval.  See Memorandum And Order (Doc. #4424) at 28.  The Court found that because the agreement did not identify the proposed *cy pres* recipient, it restricted the Court's ability to conduct the searching inquiry required to approve such a distribution, id. at 29 (citing Dennis v. Kellogg Co., — F.3d —, 2012 WL 3800230, at *7 (9th Cir. Sept. 4, 2012)), and also deprived class members of notice and the ability to object thereto, Memorandum And Order (Doc. #4424) at 29.  The amended settlement provides that after six years, any portion of the amount of the net settlement fund which was originally allocated to facilitate ATC in a particular state shall be contributed to that state.

---

[8]      After deducting 30 per cent of the $4,900,000 settlement fund for attorney's fees, litigations costs, notice expenses and costs of settlement or claims administration, $3,430,000 would remain to reimburse retailers or wholesalers and state agencies ($4,900,000 x .30 = $1,470,000. $4,900,00 - $1,470,000 = $3,430,000.).  One-third of that amount, or $1,143,333, would go state weights and measures agencies ($3,430,00/3 = $1,143,333).  Two-thirds, or $2,286,667, would remain to reimburse retailers or wholesalers for expenses incurred in installing ATC ($1,143,333 x 2 = $2,286.667).  At an estimated cost of $2,000 per pump, approximately 1,143 pumps could be converted to ATC ($2,286,667/$2000 = 1,143.3)

[9]      The Court notes that the BP settlement does not release the thousands of entities that own and operate the BP-branded stations; it releases only the refiner entity and related corporate affiliates.  Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 7.

BP Amended Settlement Agreement ¶ 14(i).

To the extent *cy pres* distributions are allowed, they must be carefully chosen to account for (1) the nature of the lawsuit, (2) the objectives of underlying statutes and (3) the interests of silent class members, including their geographic diversity.  See Memorandum And Order (Doc. #4424) at 29 (citing Nachshin v. AOL, LLC, 663 F.3d 1034, 1039 (9th Cir. 2011); In re Lupron Mktg. & Sales Pract. Litig., 677 F.3d 21, 33 (1st Cir. 2012); In re Airline Ticket Comm'n Antitrust Litig.,307 F.3d 679, 682 (8th Cir. 2002)).  The American Law Institute's Principles of the Law of Aggregate Litigation ("ALI Principles") provide additional guidance in this regard.[10]  See Am. Law Inst., Principles of the Law of Aggregate Litigation § 3.07 (2010).  Those principles instruct that in determining whether a *cy pres* award is appropriate, a court should apply the following criteria:

> (a) If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.
> (b) If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.
> (c) If the court finds that individual distributions are not viable based upon the criteria set forth in subsections (a) and (b), the settlement may utilize a cy pres approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interests reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.

---

[10]    Many courts have looked to the ALI Principles for guidance on distributing *cy pres* funds.  See, e.g., In re Lupron Mktg. & Sales Pract. Litig., 677 F.3d 21, 32-33 (1st Cir. 2012); Klier v. Elf Atochem N. Am., Inc., 658 F.3d 468, 475 (5th Cir. 2011); Perkins v. Am. Nat'l Ins. Co., No. 3:05-CV-100 (CDL), 2012 WL 2839788, at *2 (M.D. Ga. July 10, 2012);

Id.

Here, individual distributions to class members are not feasible because individual class members cannot be identified through reasonable effort, individual damages would be difficult if not impossible to calculate and individual distributions would be too small to be economically viable. Thus, under subsection (c), the Court may utilize a *cy pres* approach. Subsection (c) instructs that when feasible, the Court should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. Here, the parties have not been able to identify a beneficiary whose interests reasonably approximate those being pursued by the class.[11] It thus appears that allowing undistributed funds to escheat to the state is a viable alternative. In particular, it appears that the vast majority of settlement class members are residents of, and tax payers in, the state in which they bought gas. As such, they would benefit directly from the proposed distribution. The Court notes that the first course of distribution, i.e. to reimburse retailers and state weights and measures agencies to help facilitate the implementation of ATC, is specifically directed at promoting interests pursued by class members in these lawsuits. The *cy pres* provision kicks in only if retailers and state agencies do not fully utilize the funds for that intended purpose. Moreover, allowing unused funds to escheat to the states will help serve the deterrence and enforcement goals of the underlying state statutes. See, e.g., Six (6) Mexican Workers v. Ariz.

---

[11] At an informal status conference with the settling parties on October 10, 2012, counsel informed the Court that they were having a difficult time identifying a *cy pres* beneficiary whose interests reasonably approximate those being pursued by the class. At the parties' suggestion, the Court indicated that if they could not identify an appropriate beneficiary, a possible solution would be to escheat any leftover funds to the states. Because the parties have now proposed that option, the Court assumes that they have not been able to identify a *cy pres* beneficiary that would account for the particular nature of this lawsuit and the interests of silent class members in this regard. The Court notes that through the notice and objection process, class members will have an opportunity to suggest a more appropriate beneficiary, if one exists.

Citrus Growers, 904 F.2d 1301, 1308 (9th Cir. 1990).  On this record, the Court will preliminarily approve the proposed amended settlement with BP.

### b.      CITGO Amended Settlement

In its previous order, the Court questioned why the CITGO settlement provided less money than the BP settlement and why the CITGO settlement did not provide funds to CITGO retailers and wholesalers to implement ATC.[12]  See Memorandum And Order (Doc. #4424) at 30.  Plaintiffs respond that unlike the other refiner defendants, CITGO maintains that it has never owned or operated any CITGO-branded gas stations in the settlement states.[13]  See Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 8.  Plaintiffs assert that the amount of the CITGO settlement reflects a compromise of plaintiffs' claims in light of unresolved legal and factual issues as to whether CITGO is liable for motor fuel sales of its franchisees; the CITGO settlement funds do not go to retailers in light of CITGO's position that it has no involvement in the retail operations of its franchisees.  See id. at 8-9.  In light of this explanation, it appears that the CITGO settlement is a fair and reasonable compromise of plaintiffs' claims.

The Court's remaining concerns regarding the CITGO settlement mirrored those which it expressed with regard to the BP settlement.  See Memorandum And Order (Doc. #4424) at 30-31.  Similar to BP, the amended agreement with CITGO alleviates those concerns.  Specifically, the CITGO amended agreement eliminates the provision which would limit the administrator's ability to pay out more than 25 per cent of net settlement funds in each of the first two years and provides

---

[12]      The original CITGO settlement provided a settlement fund of $800,000 to be used for contributions to state agencies responsible for regulating retail motor fuel dispensers to defray some state costs of implementing ATC.

[13]      CITGO has filed motions for summary judgment on this issue, which the Court has not yet resolved.

for undistributed funds to go to the state for which particular funds were originally allocated to facilitate ATC.  See CITGO Amended Settlement ¶ 14, Exhibit 5 to Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447).  In light of these amendments, the Court will preliminarily approve the proposed amended settlement with CITGO.

### c. ConocoPhillips Amended Settlement

The terms of the ConocoPhillips settlement are substantially similar to the BP settlement.  See Memorandum And Order (Doc. #4424) at 11-12.  Similar to BP, the parties have amended the ConocoPhillips agreement to (1) omit funds for temperature disclosures; (2) omit the provision which would limit the administrator's ability to pay out more than 25 per cent of net settlement funds in each of the first two years; and (3) provide for undistributed funds to go to the state for which particular funds were originally allocated to facilitate ATC.  See ConocoPhillips Amended Settlement ¶ 14, Exhibit 6 to Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447).  In light of these amendments, the Court will preliminarily approve the proposed amended settlement with ConocoPhillips.

### d. ExxonMobil Amended Settlement

In many respects, the ExxonMobil settlement is similar to the BP settlement.  See Memorandum And Oder (Doc.#4424) at 32.  In that regard, the parties have amended the ExxonMobil agreement to (1) omit funds for temperature disclosures and (2) omit the provision which would limit the administrator's ability to pay out more than 25 per cent of net settlement funds in each of the first two years.  See ExxonMobil Amended Settlement ¶ 14, Exhibit 7 to Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447).

Unlike the BP settlement, the ExxonMobil settlement gives ExxonMobil the right to object

to any settlement fund payment of $10,000 or more.  See Memorandum And Order (Doc. #4424) at 13; ExxonMobil Amended Settlement ¶ 14 (h).  In its previous order, the Court expressed concern that this provision could deter retailers, wholesalers and weights and measures departments from requesting more than $10,000, which may discourage them from taking steps to implement ATC. Memorandum And Order (Doc.#4424) at 33.  In their renewed motion for preliminary approval, plaintiffs state as follows:

> In light of the fact that Plaintiffs have proposed the law firm Horn Aylward & Bandy, LLC to serve as the claims administrator, ExxonMobil reserved the right to object to disbursements of $10,000 or more on the limited basis that the funds would not be used consistent with the limited purposes set forth in the ExxonMobil settlement agreement.  ExxonMobil contends that such an objection process serves the class because it provides a check against both the misappropriation of funds and the appearance of misappropriation of funds.  Further, ExxonMobil contends that its right to object is so narrow that there is little risk that a franchisee or governmental agency will be deterred from requesting disbursement from the settlement funds.

Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 10 (footnote omitted).

The Court finds that the fact that the law firm of Horn Alward & Bandy might serve as the claims administrator does not warrant ExxonMobil reserving the right to object to the disbursement of settlement funds.  Like the other refiner settlements, the ExxonMobil agreement requires that semi-annually, class counsel file with the Court and serve on the settling defendant a report which accounts for, inter alia, each payment from the settlement fund, including the date on which each payment was made and to whom, and confirming that amounts in the settlement fund were distributed in the manner provided in the settlement and approved by the Court.  See ExxonMobil Amended Settlement ¶ 15.  It appears that this provision would adequately serve the class and protect against any misappropriation of funds.[14]  ExxonMobil contends that its right to object is "so

---

[14]      In their original motion for preliminary approval, plaintiffs asserted that the Court
(continued...)

-15-

narrow" that there is little risk of deterrence.  See Plaintiffs' Renewed Motion For Preliminary

Approval (Doc. #4447) at 10.  ExxonMobil does not explain, however, what factors purportedly

narrow its right to object.  On this record, the Court will not preliminarily approve the amended

agreement in its current form.

Also, the Court will not preliminarily approve the proposed *cy pres* recipient.  With regard

to undistributed funds allocated to a particular state, the amended ExxonMobil agreement provides

that such funds will be distributed to the National Math and Science Initiative ("NMSI") for use in

that state.  See id. ¶ 14(i).  Plaintiffs explain that NMSI is a non-profit which works to improve K-12

math and science education by finding existing programs with a proven track record of success.  See

Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 5-6.[15]  The amended

agreement states that "the Settling Parties believe [that NMSI is] a bona fide charity and that

reversion to NMSI would benefit the class members."  Id.  In their renewed motion for preliminary

approval, plaintiffs state that providing funds to NMSI for improved math and science education

---

[14](...continued)
would retain jurisdiction to enforce the settlements.  See Unopposed Motion Of Plaintiffs For Order
Conditionally Certifying Settlement Classes, Preliminarily Approving Class Action Settlements,
Directing And Approving Distribution Of Class Notice, Setting Hearing For Final Approval Of
Class Action Settlements And Appointing Class Counsel (Doc. #4328) at 15.  Thus, it appears that
ExxonMobil could seek recourse if the Settlement Administrator made improper payments from the
settlement fund.

[15]    According to plaintiffs, the NMSI began in response to a report requested by the
Senate Committee on Energy and Natural Resources and commissioned by the National Academies.
The report concluded that American advantages in science and technology are rapidly eroding and
that this erosion is undermining the nation's ability to satisfy its need for "clean, affordable and
reliable energy."  Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 6.
(footnotes and citations omitted).  The report recommended that the highest priority must be
improving K-12 science and mathematical education to increase the nation's talent pool, and that
any additional investment in education will be modest relative to the magnitude of the expected
long-term benefits, including long-term solutions to the nation's energy needs.  See id.

"will provide a general benefit to all class members and relates to the long-term ability to solve consumers' need for clean and affordable energy." Id. at 6-7.

As evidenced in ExxonMobil's recent supplemental brief, NMSI is a worthy charity. See Exxon Mobil Corporation's Supplemental Submission Regarding The Selection Of The National Math And Science Initiative As A Propose *Cy Pres* Recipient (Doc. #4463) filed November 15, 2012 at 1-4. And ExxonMobil's support of NMSI is certainly laudable.[16] Nevertheless, the Court finds that NMSI should not be a *cy pres* beneficiary in this settlement, because its interests do not reasonably approximate those pursued by the class. These lawsuits involve alleged harm to consumers caused by defendants' practice of selling motor fuel for a specified price per gallon without disclosing or adjusting for temperature expansion. ExxonMobil asserts that NMSI would agree to use the settlement funds to develop a curriculum to teach high school students about the impact of thermal expansion on consumer products, including motor fuel, as well as reasons for the variation of energy content in a given gallon of motor fuel. Id. at 6. While the subject matter of thermal expansion is involved in this litigation, educating high school students on the subject would not further the interests pursued by the class.[17] Under the claims pursued in this case, even if consumers know about the effects of thermal expansion on motor fuel, they would not be able to make meaningful purchasing decisions if defendants continue to sell motor fuel for a specified price per gallon without disclosing or adjusting for temperature expansion.

---

[16]    In 2007, ExxonMobil became a founding sponsor of NMSI with a $125 million commitment to the non-profit organization. See ExxonMobil website, Community & Development, National Math and Science Initiative, http://exxonmobil.com/Corporate/community_math_nmsi.aspx (last visited on November 16, 2012).

[17]    Ironically, at the trial of the Kansas cases, defendants insisted that the impact of thermal expansion on motor fuel is already common knowledge among high school students.

Under these circumstances, the Court will not approve NMSI as a *cy pres* beneficiary for this settlement. Although the Court is confident that NMSI does wonderful work, its selection would not serve the interests of silent class members or the deterrence goals of underlying state consumer protection statutes. See, e.g., Nachshin, 663 F.3d at 1039 (when selection of *cy pres* beneficiary not tethered to nature of litigation and interests of silent class members, selection process may answer to whims and self interests of parties, counsel or court). In its current form, the Court cannot preliminarily approve the proposed amended settlement with ExxonMobil.

### e.        Shell Amended Settlement

The terms of the Shell settlement are substantially similar to the BP settlement. See Memorandum And Order (Doc. #4424) at 14-15. Similar to BP, the parties have amended the Shell agreement to (1) omit funds for temperature disclosures; (2) omit the provision which would limit the administrator's ability to pay out more than 25 per cent of net settlement funds in each of the first two years; and (3) provide for undistributed funds to go to the state for which particular funds were originally allocated to facilitate ATC. See Shell Amended Settlement ¶ 14, Exhibit 8 to Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447). In light of these amendments, the Court will preliminarily approve the proposed amended settlement with Shell.

### f.        Sinclair Amended Settlement

The terms of the Sinclair settlement are substantially similar to the BP settlement, except that Sinclair will pay only $700,000 into its settlement fund. See Memorandum And Order (Doc. #4424) at 15-16. In its previous order, the Court questioned why the Sinclair settlement provides significantly less money than the BP settlement. See id. at 34. In

-18-

their renewed motion, plaintiffs state that the Sinclair settlement involves fewer states and fewer retail stations than the BP settlement, and that Sinclair has no branded stations in the warmest states. See Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447) at 11-12.  In light of this explanation, it appears that the Sinclair settlement is a fair and reasonable compromise of plaintiffs' claims.

The Court's remaining concerns regarding the Sinclair settlement mirrored those expressed with regard to the original BP settlement.  See Memorandum And Order (Doc. #4424) at 30-31. Similar to BP, the parties have amended the Sinclair agreement to (1) omit funds for temperature disclosures; (2) omit the provision which would limit the administrator's ability to pay out more than 25 per cent of net settlement funds in each of the first two years; and (3) provide for undistributed funds to go to the state for which particular funds were originally allocated to facilitate ATC.  See Sinclair Amended Settlement ¶ 14, Exhibit 9 to Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447).  In light of these amendments, the Court will preliminarily approve the proposed amended settlement with Sinclair.

## B.    Remaining Amended Settlements

Under the original settlement agreements, Casey's and Sam's agreed to install ATC at retail in certain settlement states.  See Memorandum And Order (Doc. #4424) at 16-18, 19-21.  Valero agreed to post the temperature reading of diesel and regular unleaded gasoline, as reflected on the automatic tank gauge system.  See id. at 22-23.  Except as noted below, the proposed amended settlements appear to be substantially similar to the original agreements.[18]

---

[18]     As noted, Valero has not amended its settlement but agrees to new terms as stated in Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456).

### 1.      Conditional Class Certification

In its previous order, the Court found that conditional certification of the proposed settlement classes for Casey's, Sam's and Valero is appropriate.  Id. at 24-25.  The proposed settlement classes are substantially similar under the amended agreements.  See Casey's Amended Settlement Agreement ¶ 2.1, Exhibit 2 to Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447); Sam's Amended Settlement Agreement ¶ 2.1, Exhibit 3 to Plaintiffs' Renewed Motion For Preliminary Approval (Doc. #4447).  For reasons previously stated, see Memorandum And Order (Doc. #4424) at 24-25, the Court finds it appropriate to conditionally certify the proposed settlement classes under the amended agreements with Casey's, Sam's and Valero.

### 2.      Preliminary Approval – Casey's And Sam's Amended Settlements

In its previous order, the Court found that it would preliminarily approve the proposed settlements with Casey's and Sam's if the parties modified the agreements to require defendants to file regular status reports with the Court.  Id. at 36, 38.  The proposed amended settlement agreements require that every six months, Casey's and Sam's file with the Court a status report describing their compliance with ATC implementation requirements under the settlements. See Casey's Amended Settlement Agreement ¶ 8.2; Sam's Amended Settlement Agreement ¶ 8.2. With these modifications, the Court will preliminarily approve the proposed amended settlement agreements with Casey's and Sam's.

### 3.      Preliminary Approval – Valero Settlement

As noted, the proposed settlement with Valero requires it to post the temperature reading of diesel and regular unleaded gasoline, as reflected on its automatic tank gauge system. In its previous order, the Court found that to determine whether class members would benefit under

-20-

the proposed settlement, it needed more information.  See Memorandum And Order (Doc. #4424) at 39-40.  Specifically, the Court stated that before it would approve the proposed settlement, the parties would need to make a prima facie showing that class members would benefit from the proposed disclosure of underground tank temperatures.  See id.  In addition, the Court stated that it would need information regarding what the temperature posting would say to educate consumers regarding the effect of temperature on fuel content.  See id. at 40.[19]

In their amended motion for preliminary approval of the Valero settlement, plaintiffs assert that fuel pumps will display the following notice:

> Fuel sold at this station is not adjusted for temperature.  Please see the posting for the current tank temperature.  Temperature affects the energy content of fuel.  Hotter fuel can reduce how far you can drive on a tank of gas.  Fuel sold at a temperature higher than 60 degrees may have lower energy content than fuel sold at a temperature of 60 degrees or below.  Visit www.valero.com for details about the effect of temperature on gas mileage and other information.

Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456) at 5.  The notice references a website that will provide additional information that specifically describes what factors can affect the temperature of fuel and how the temperature of fuel can affect the energy content of fuel.  Id. The website will also include general tips on how consumers can get better gas mileage.  Id. at 5. Regarding potential variation between tank temperature and dispensed temperature, the website will state as follows: "Tank temperature is often close to the temperature of the dispensed temperature.

---

[19]      The Court also stated that it would require information regarding (1) how many stations do not have automatic tank gauge equipment and are therefore exempt from temperature reporting requirements; and (2) how much incentive funds would be available for distributors to obtain temperature displays or ATC equipment.  See id. at 40.  In their amended motion for preliminary approval of the Valero settlement, plaintiffs state that only four of 1,028 Valero stations do not have automatic tank gauge equipment and would therefore fall under the reporting exemption. See Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456) at 4.  Plaintiffs also state that approximately $4 million would be available to its distributors to obtain the temperature displays or temperature equipment.  See id.

However, the outside air temperature, the timing of deliveries to the station, and the frequency of use of the dispensers can affect this." Id. at 7.

Plaintiffs assert that the proposed posting of tank temperature and related notices would benefit class members because (1) tank temperature closely approximates dispensed temperature; (2) even where differences exist between tank temperature and dispensed temperature, information regarding tank temperature is helpful; and (3) the educational benefit of posting tank temperature provides value to the class. See id. at 5-6. The evidence which plaintiffs submit, however, suggests that the postings would confer little to no benefit to class members.

Plaintiffs assert that class members would benefit from the posting of tank temperature because the tank temperature of motor fuel closely approximates dispensed temperature. Id. at 6. Specifically, plaintiffs assert that a study by the California Energy Commission ("CEC") demonstrates that the majority of tank temperatures are in close range to dispensed fuel temperatures. See id. at 6 (citing Fuel Delivery Temperature Study, March 2009 ("CEC Report"), Exhibit C thereto). In examining factors – other than ambient temperature – which influence fuel temperature, the CEC report cited an analysis of temperature information from several states by the National Conference on Weights and Measures ATC Committee. CEC Report at 31. According to that analysis, the tank temperature and dispensed temperature of motor fuel can vary by as much as 15 to 20 degrees Fahrenheit. Id. at 32. The CEC analyzed the data and determined that with respect to regular grade gasoline, more than 70 per cent of the time, the difference in temperature was within plus or minus 3 degrees Fahrenheit. Id. at 33. Almost 95 per cent of the time, the difference was within plus or minus 7 degrees Fahrenheit.[20] Id. This information suggests that if a consumer knows

---

[20]     Plaintiffs state that the CEC Report is consistent with Valero's own data which shows
(continued...)

the tank temperature of motor fuel, he or she would have a 95 per cent chance of receiving dispensed fuel temperature which is somewhere within a 14-degree window around that temperature. The disclosures which Valero proposes to give to consumers do not purport to explain these statistical variances. Even if they did, it seems unlikely that an average consumer could use the information to enhance his or her fuel-purchasing decisions.

Plaintiffs assert that even where differences exist between tank temperature and dispensed temperature, information regarding tank temperature would still help consumers. Specifically, plaintiffs cite evidence which suggests that a correlation exists between tank temperature, ambient temperature and dispensed temperature. Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456) at 6. According to this evidence, if both ambient temperature and tank temperature are above 60 degrees Fahrenheit, dispensed fuel temperature will also exceed 60 degrees Fahrenheit. Id. Conversely, if both ambient and tank temperatures are below 60 degrees Fahrenheit, dispensed fuel temperature will be below 60 degrees Fahrenheit. Id. at 7. The result is more confusing, however, if one temperature is above 60 degrees and the other temperature is below 60 degrees.[21] The proposed disclosures do not purport to explain these correlations. Moreover, even if they did,

---

[20](...continued)
that dispensed temperature and tank temperature "do have a correlation and are often less than 5 [degrees] different and, in some instances, less than 2 [degrees] different." Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456) at 6. It is unclear whether the evidence which plaintiffs cite supports this proposition. See Affidavit of John Willrodt and exhibits thereto (purporting to compare tank temperature and dispensed temperature but showing data for only tank temperature and ambient temperature), Exhibit D to Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456).

[21]     Plaintiffs assert that "[e]ven if the tank temperature is below 60 [degrees] but the ambient air temperature exceeds 60 [degrees], in 98.5% of the instances sampled, dispensed fuel exceeded 60 [degrees]. Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456) at 7 (citing Safir Affidavit (no pin cite), Exhibit E thereto).

merely knowing whether dispensed fuel temperature is above or below 60 degrees Fahrenheit seems unlikely to aid an average consumer in his or her fuel-purchasing decisions.

Plaintiffs assert that the educational benefit of posting tank temperatures would provide value to the class. See Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456) at 7. To make use of the proposed tank temperature disclosures, however, class members would need to account for statistical probabilities in the variation between tank temperature and dispensed temperature and then mathematically calculate a volume adjustment based on the likely dispensed temperature. In essence, the proposed settlement contemplates disclosing information regarding fuel temperature with no framework for consumers to make sense out of it.

After careful consideration, the Court concludes that the proposed disclosures would provide little to no benefit to class members, and that any benefit would be outweighed by the potential of confusion to class members. In its current form, the Court cannot preliminarily approve the proposed settlement with Valero.[22]

**IT IS THEREFORE ORDERED** that the Renewed Motion Of Plaintiffs For Order Conditionally Certifying Settlement Classes, Preliminarily Approving Class Action Settlements, Directing And Approving Distribution Of Class Notice, Setting Hearing For Final Approval Of Class Action Settlements And Appointing Class Counsel (Doc. #4447) filed October 19, 2012 be and hereby is **SUSTAINED in part**. The Court orders as follows:

---

[22]     Plaintiffs assert that the proposed settlement provides additional benefits to the class in that Valero will (1) provide $200,000 to cost of class notice and up to $4,500,000 in attorney's fees, litigation expenses and costs; (2) abstain from any lobbying activity involving ATC; and (3) install ATC within three years of it becoming industry standard in a particular state. See Plaintiffs' Amended Motion Regarding Valero Settlement (Doc. #4456) at 9. Standing alone, these concessions do not confer sufficient benefit to the class to justify releasing the class claims against Valero.

Regarding the amended settlements with (1) BP Products North America Inc. and BP West Coast Products LLC; (2) CITGO Petroleum Company; (3) ConocoPhillips Company; (4) Motiva Enterprises LLC and Equilon Enterprises LLC d/b/a Shell Oil Products US; (5) Sinclair Oil Corporation and its corporate affiliates; (6) Casey's General Stores, Inc.; and (7) Sam's Club, Sam's East, Inc., Sam's West, Inc., Wal-Mart Stores, Inc. and Wal-Mart Stores East, LLP., the Court preliminarily certifies the proposed settlement classes, subject to plaintiffs demonstrating at the final approval hearing "under a strict burden of proof" that the requirements of Rule 23(a) and (b)(3) are clearly satisfied.  The Court preliminarily approves the proposed amended settlements and appoints Robert A. Horn, Thomas V. Girardi and George A. Zelcs as lead counsel and Thomas V. Bender as liaison counsel for the proposed settlement classes.

Regarding the amended settlement with Exxon Mobil Corporation, Esso Virgin Islands, Inc. and Mobil Oil Guam, Inc., plaintiffs' motion is **OVERRULED**.  If plaintiffs and ExxonMobil seek to amend their settlement and join in consolidated notice proceedings with the other settlements, they must file a renewed motion for preliminary approval on or before **December 3, 2012**.

**IT IS FURTHER ORDERED** that Plaintiffs' Amended Motion For Preliminary Approval Of Their Settlement Agreement With Valero (Doc. #4456) filed November 7, 2012 be and hereby is **OVERRULED**.  If plaintiffs and Valero seek to amend their settlement and join in consolidated notice proceedings with the other settlements, they must file a renewed motion for preliminary approval on or before **December 3, 2012**.

Dated this 20th day of November, 2012 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge

-25-