# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

IN RE: MOTOR FUEL TEMPERATURE )
SALES PRACTICES LITIGATION )
) **MDL No. 1840**
**This Document Relates To:** ) **Case No. 07-1840-KHV**
)
<u>Rushing, et al. v. Alon USA, Inc., et al.,</u> )
    **D. Kan. Case No. 07-2300-KHV,** )
    **N.D. Cal. Case No. 06-7621-PJH,** )
)
<u>Lerner, et al. v. Costco Wholesale Corp., et al.,</u> )
    **D. Kan. Case No. 07-2405-KHV,** )
    **C.D. Cal. Case No. 07-1216-GHK-FMO,** )
)
**and** )
)
<u>Wyatt, et al. v. B.P. Am. Corp., et al.,</u> )
    **D. Kan. Case No. 07-2507-KHV,** )
    **S.D. Cal. Case No. 07-1754-BTM-JMA.** )
_____)

## <u>MEMORANDUM AND ORDER</u>

In these class actions, which are part of larger multidistrict litigation, plaintiffs have sued numerous motor fuel retailers and refiners for selling motor fuel without disclosing or adjusting for temperature, without disclosing that temperature affects the energy content of the fuel they sell and overcharging plaintiffs for motor fuel excise taxes. Plaintiffs claim violations of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 <u>et seq.</u>, violations of the California Consumers Legal Remedy Act ("CLRA"), Cal. Civ. Code § 1750 <u>et seq.</u>, breach of the implied covenant of good faith and fair dealing and unjust enrichment. Three California cases – <u>Rushing v. Alon USA, Inc.</u>, D. Kan. Case No. 07-2300-KHV, N.D. Cal. Case No. 06-7621-PJH, <u>Lerner v. Costco Wholesale Corp.</u>, D. Kan. Case No. 07-2405-KHV, C.D. Cal. Case No. 07-1216-GHK-FMO, and <u>Wyatt v. B.P. Am. Corp.</u>, D. Kan. Case No. 07-2507-KHV, S.D. Cal. Case No. 07-1754-BTM-JMA – are before the Court on <u>Defendants' Joint Notice Of Motion For</u>

Summary Judgment On Plaintiffs' California Unfair Competition Law, Consumer Legal Remedies Act, Florida Deceptive Trade Practices Act And Breach Of Contract (Doc. #2584) filed November 1, 2011 (<u>Rushing</u>), Defendants' Joint Notice Of Motion For Partial Summary Judgment On Plaintiffs' Duty Of Good Faith And Fair Dealing, Unfair Competition Law And Unjust Enrichment Claims (Doc. #2302) filed October 30, 2011 (<u>Lerner</u>), and Defendants' Joint Notice Of Motion For Summary Judgment On Plaintiffs' Unfair Competition Law And Unjust Enrichment Claims (Doc. #2298) filed October 30, 2011 (<u>Wyatt</u>).

The Court has severed plaintiffs' claims against Chevron, certified the claims for class treatment under Rule 23, Fed. R. Civ. P., conformed plaintiffs' claims against Chevron in <u>Rushing</u>, <u>Lerner</u> and <u>Wyatt</u>, and stayed proceedings as to the other non-settling defendants in these cases. <u>Memorandum And Order</u> (Doc. #4575) filed May 6, 2013 at 2-3, 15; <u>Memorandum And Order</u> (Doc. #4539) filed April 5, 2013; <u>Order</u> (Doc. #4535) filed March 27, 2013. It takes up these motions only to the extent that they relate to plaintiffs' claims against Chevron. For the reasons stated below, as to Chevron, the Court sustains the motions for summary judgment.

### Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Hill v. Allstate Ins. Co.</u>, 479 F.3d 735, 740 (10th Cir. 2007); <u>Rosenbaum v. Washoe Cnty.</u>, 663 F.3d 1071, 1075 (9th Cir. 2011). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of

evidence in support of a party's position. Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Nahno-Lopez v. Houser, 625 F.3d 1279, 1283 (10th Cir. 2010); In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which it carries the burden of proof. Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); In re Barboza, 545 F.3d 702, 707 (9th Cir. 2008); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). To carry its burden, the nonmoving party may not rest on its pleadings but must instead set forth specific facts supported by competent evidence. Nahno-Lopez, 625 F.3d at 1283; In re Barboza, 545 F.3d at 707.

The Court views the record in the light most favorable to the nonmoving party. Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991); Scribner v. Worldcom, Inc., 249 F.3d 902, 907 (9th Cir. 2001). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. Liberty Lobby, 477 U.S. at 250-51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988); Olympic Club v. Those Interested Underwriters at Lloyd's London, 991 F.2d 497, 503 (9th Cir. 1993). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

**Factual Background**

Both parties' purported statements of fact contain more legal arguments and legal conclusions than actual facts, specifically with respect to the statutory and regulatory framework that governs the sale of motor fuel in California. These are not "facts" for purposes of summary judgment. Sprint Commc'ns Co. v. Vonage Holdings Corp., 500 F. Supp.2d 1290, 1303-04 (D. Kan. 2007) (attorney argument, commentary and legal conclusions not facts admissible in evidence under Rule 56(e), Fed. R. Civ. P.). In its legal analysis below, the Court addresses the relevant statutes and regulations. The Court disregards any fact that constitutes legal argument, is immaterial or is not properly supported by the record. See Fed. R. Civ. P. 56(c), (e); D. Kan. Rule 56.1; Law v. Nat'l Collegiate Athletic Ass'n, 902 F. Supp. 1394, 1398 (D. Kan. 1995). The following facts are either uncontroverted, deemed admitted or where controverted, viewed in the light most favorable to plaintiffs, the non-movants.

During the relevant time period, each defendant offered to sell motor fuel by the gallon at a posted price per gallon to plaintiffs and putative class members. As a unit, a gallon is defined by California law and the common English dictionary to be 231 cubic inches. See infra Parts. I.A., I.C.; Webster's Third New International Dictionary 931 (1993) (unabridged). A "gross gallon" is a specific volume of motor fuel at any temperature (231 cubic inches with no reference temperature). A "net gallon" is a specific volume of motor fuel at an exact temperature (231 cubic inches at 60 degrees Fahrenheit). Both are liquid measures of volume.

A gallon of motor fuel at a higher temperature has less mass, and thus less energy, than a gallon of the same motor fuel at a cooler temperature. The volume of gasoline expands and contracts one per cent for every change in temperature of 15 degrees Fahrenheit. The volume of

diesel fuel expands and contracts approximately 0.6 per cent for every change in temperature of 15 degrees Fahrenheit. The parties dispute whether temperature affects the value and quality of motor fuel.

The national standard reference temperature for petroleum products – 60 degrees Fahrenheit – was adopted to remedy inequities in wholesale motor fuel transactions by enabling the buyer and seller to calculate the exact number of net gallons involved in a motor fuel transaction, regardless of the fuel temperature at the time of sale. California has adopted the national standard reference temperature of 60 degrees Fahrenheit for temperature-adjusted motor fuel sales. See Handbook 44, App. D at D-2. Although Chevron sells motor fuel at retail on a gross gallon basis, it accounts for temperature variations in its wholesale and intra-company transfers of motor fuel by dealing in net gallons. It also pays motor fuel excise taxes based on net gallons. Automatic temperature compensation ("ATC") equipment measures fuel in net gallons, i.e. 231 cubic inches at 60 degrees Fahrenheit.

The temperature of motor fuel that Chevron sells at retail in California varies. The average temperature of motor fuel sold in California is warmer than 60 degrees Fahrenheit. The temperature of gasoline in storage tanks in California has averaged 74.7 degrees Fahrenheit. The annual statewide temperature of regular grade gasoline from the dispenser has averaged 71.1 degrees Fahrenheit. Chevron understands that the temperature of motor fuel affects its energy content and therefore fuel mileage, though it emphasizes that temperature is just one of several factors that can affect the energy content of motor fuel. Chevron knows that fuel price and value are important to retail motor fuel consumers. Plaintiffs' expert in social psychology, Steven L. Neuberg, Ph.D., has testified that consumers expect the same amount of energy from each gallon of motor fuel they

purchase and that by selling motor fuel without disclosing or adjusting for temperature, retailers contribute to this expectation. Chevron disagrees.

Chevron sells motor fuel at retail in California without regard to temperature (i.e. by the gross gallon). At retail, it does not use ATC equipment, does not disclose the temperature of the motor fuel it sells and does not disclose the effect of temperature on the energy content of the motor fuel it sells. Although some plaintiffs admit that when they purchased motor fuel, they understood the general principle that liquids expand when warmed, plaintiffs and putative class members cannot determine the temperature of motor fuel at retail before purchasing it. Therefore, one who purchases a gallon of motor fuel at a warmer temperature unknowingly receives less energy from than someone who purchases a gallon of the same motor fuel at a cooler temperature. The parties dispute whether consumers have sufficient information to make informed decisions about the value they receive when they purchase motor fuel and whether they are able to fully compare the value of motor fuel between retailers.

To the extent that Chevron advertises its motor fuel in California, it does not disclose that sales of motor fuel are not adjusted for temperature, that temperature affects the quality of motor fuel, that temperature affects the energy content and fuel economy of its branded fuel and that the energy content of Chevron fuel may vary from station to station. Indeed, Chevron disputes these contentions. Based on Chevron's failure to disclose these things, however, plaintiffs contend that Chevron has represented to consumers that motor fuel is a fungible product of standard, uniform and consistent quality in terms of the amount of energy in each gallon. Chevron counters that it has advertised motor fuel by the gallon and sold it by the gallon. The retail sale of motor fuel in volumetric gallons (i.e. without compensating for temperature) is consistent with longstanding

custom and practice in the industry in the United States. The parties dispute, however, whether California law authorizes, requires or prohibits the sale of motor fuel in this way.

In partnership with the National Institute of Standards and Technology ("NIST"), the National Conference on Weights and Measures ("NCWM"), has developed specifications, tolerances and other technical requirements for weighing and measuring devices, including retail motor fuel devices. The NIST publishes these standards in Handbook 44. Under California law, the standards and requirements in Handbook 44 apply to commercial weighing and measuring devices in California. Cal. Bus. & Prof. Code § 12107; Cal. Code Regs. tit. 4, § 4000.

The California Division of Measurement Standards ("DMS") operates the California Type Evaluation Program ("CTEP"), which is a laboratory that the National Type Evaluation Program authorizes to evaluate, test and approve devices for use in California. CTEP has issued a certificate of conformance for an ATC-equipped retail motor fuel dispenser developed by Gilbarco Veeder-Root. Certificate of Approval No. 5510(a)-07 (Doc. #3416-5). The certificate states that the device complies with the applicable technical requirements of the California Code of Regulations for Weighing and Measuring Devices, which requires compliance with Handbook 44. Nevertheless, the parties dispute whether an ATC device could meet the requirements of Handbook 44.

In 2007, the NIST completed a 50-state survey on the issue of ATC. Dennis Johannes, then-Director of the California Division of Measurement Standards, responded that California permitted ATC at retail. In 2008, Edmund E. Williams, then-Director of the California Division of Measurement Standards, wrote a letter stating that under the General Code of Handbook 44, California law permitted ATC at retail.

At the NCWM meeting in 2009, state officials considered and rejected proposals to expressly

permit or mandate ATC for retail motor fuel sales. The Law and Regulations Committee of the NCWM recommended withdrawing the proposed amendments because of economic cost factors, lack of benefit to consumers, absence of uniformity in the marketplace, the additional cost to weights and measures officials and service companies, and because the overwhelming majority of comments opposed ATC.

In 2007, the California legislature commissioned a study by the California Energy Commission ("CEC"), to analyze the "various options relative to temperature corrected gallon temperatures." Bus. & Prof. Code § 13630. The Commission does not regulate retail motor fuel sales. The legislature did not grant it any regulatory power and its mandate did not extend to reviewing alternative means of informing consumers about the effect of temperature on motor fuel, such as notice to consumers. The CEC study valued the "reduced gallons" – the difference between the number of gross gallons actually sold and the number of net gallons that would have been sold had ATC been in place during the one-year study period – at $437 million. See California Energy Commission, Fuel Delivery Temperature Study (2009) at 70-71 (CEC-600-2009-002-CMF) [hereinafter "CEC Rpt."].

The CEC Study discussed "information asymmetry" in motor fuel transactions, noting that "sellers have more knowledge of the temperature of the fuel than motorists" and "[a]bsent this temperature information consumers may overvalue or under-value fuel depending on the temperature of fuel." Id. at 71, 138. Not knowing "fuel temperature at the time of a transaction creates a problem because retail fuel consumers cannot adequately compare the benefits or value of fuel prices advertised by two competing retail stations." Id. at 71. As a result, "[i]f consumers seek the lowest priced fuel and if temperature variation is not taken into account in the advertised price per gallon,

a consumer could potentially buy a higher priced gallon when [he or she] could have received a better value if [he or she] had knowledge of the net price of that gallon." Id. The report valued this "information asymmetry" at "a little more than $250,000 per year," but did not quantify the "increased fairness for motorists . . . due to the variable nature of this possible consumer benefit." Id. at 71-72.

The CEC study concluded, however, that temperature compensation for retail sales of gasoline and diesel fuels in California would result in a small "net cost to society," when quantified by cents per gallon. Id. at 1. It stated that the "estimated total annual recurring net costs to society, if completely passed through to consumers, could amount to between eight hundredths (8/100) and 18 hundredths (18/100) of a cent per gallon." Id.

## Analysis

Chevron argues that it is entitled to summary judgment because (1) plaintiffs lack Article III standing to bring claims based on their theory of overpayment of motor fuel excise taxes, (2) plaintiffs lack statutory standing to bring UCL and CLRA claims, (3) California law authorizes them to sell motor fuel without disclosing or adjusting for temperature and therefore provides a safe harbor from plaintiffs' UCL and CLRA claims, (4) plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails as a matter of law because plaintiffs received what they bargained for (231 cubic inches of motor fuel at the posted price) and (5) plaintiffs cannot maintain their unjust enrichment claim because contracts govern each sale of motor fuel at retail. The Court finds that plaintiffs have standing, but otherwise sustains Chevron's motion for summary judgment.

## I.     Regulation Of Motor Fuel Sales In California

The California Secretary of Food and Agriculture, acting through the DMS, has the duty of

enforcing and carrying out California's weights and measures laws and regulations. <u>See</u> Cal. Bus. & Prof. Code § 13590. The DMS (1) ensures the accuracy of commercial weighing and measuring devices, (2) verifies the quantity of bulk and packaged commodities and (3) enforces the quality, advertising and labeling standards for most petroleum products. It works closely with county sealers of weights and measures who, under the supervision and direction of the Secretary of Food and Agriculture, carry out the vast majority of weights and measures enforcement activities at the local level. The DMS issues instructions and makes recommendations to county sealers regarding statewide weights and measures enforcement. <u>See</u> Cal. Bus. & Prof. Code § 12104.

With a few exceptions not relevant here, California requires all commercial weighing and measuring devices to conform to the most recent requirements of NIST Handbook 44.[1] Handbook 44 provides specifications, tolerances and other technical requirements for weighing and measuring devices, including motor fuel dispensers. Cal. Bus. & Prof. Code §§ 12107, 12313; Cal. Code Regs. tit. 4, § 4000.

## A.    Regulation Of Retail Motor Fuel Sales

Section 1.10 of Handbook 44 provides a "General Code" which "shall apply to all classes of devices as covered in the specific codes." Handbook 44 § 1.10, ¶ G-A.2., at 1-3. The specific code requirements supersede the General Code requirements in all cases of conflict. <u>Id.</u> Section 3.30 of Handbook 44 governs "devices used for the measurement of liquids, including liquid fuels and lubricants." <u>Id.</u> § 3.30, ¶ A.1., at 3-5. It provides specifications, notes on testing, tolerances and user requirements. Section 3.30 requires liquid measuring devices (including retail motor fuel dispensers)

---

[1]      The 2013 edition is the most recent version of Handbook 44. The parties cite, and attach to their briefs, the 2010 edition of Handbook 44. It appears that the 2013 and 2010 editions are substantially the same with respect to the relevant provisions. The Court cites the 2010 edition.

to indicate and record deliveries as follows:

> **S.1.2. Units. –** A liquid-measuring device shall indicate, and record if the device is equipped to record, its deliveries in liters, gallons, quarts, pints, fluid ounces, or binary-submultiples or decimal subdivisions of the liter or gallon.

>> **S.1.2.1. Retail Motor-Fuel Devices.** – Deliveries shall be indicated and recorded, if the device is equipped to record, in liters or gallons and decimal subdivisions or fractional equivalents thereof.

Id. § 3.30, ¶¶ S.1.2., S.1.2.1., at 3-5.

Appendix B of Handbook 44 provides the origin and development of units and systems of measurements. Id. App. B at B-1. It defines a "unit" as a "special quantity in terms of which other quantities are expressed." Id. It further provides that "[i]n general, a unit is fixed by definition and is independent of such physical conditions as temperature. Examples: the meter, the liter, the gram, the yard, the pound, the gallon." Id. Appendix C defines a gallon as four quarts, or "231 cubic inches (exactly)." Id. App. C at C-3,C-15; see also id. App. B at B-6. Appendix B defines a "standard" as "a physical realization or representation of a unit." Id. App. B at B-1. A standard, "[i]n general, is not entirely independent of physical conditions, and it is a representation of the unit only under specified conditions. For example, a meter has a standard length of one meter when at some definite temperature and supported in a certain manner." Id. Appendix B cautions that it is essential to keep in mind "the distinction between the terms 'units' and 'standards.'" Id.

## B.    Regulation Of Wholesale Motor Fuel Sales

In 1975, California enacted Cal. Bus. & Prof. Code § 13520, which governs sales of 5,000 or more gallons of gasoline or diesel fuel in a single delivery to a single location. In such sales the distributor or broker must "offer[] to invoice the purchaser for such gasoline or diesel fuel on the basis of temperature-corrected gallonage to 60 degrees Fahrenheit for all such deliveries to the

purchaser over a period of twelve (12) consecutive months and settle[] his accounts with the purchaser on the same basis." Cal. Bus. & Prof. Code § 13520.

Section 3.30 of Handbook 44 also provides specifications for "temperature determination" and "wholesale devices equipped with automatic temperature compensators." See, e.g., Handbook 44 § 3.30, ¶ S.2.7. et seq., at 3-13. The ATC and temperature-related specifications, however, relate only to wholesale devices – not to retail devices. See, e.g., id. § 3.30, ¶¶ S.2.6., S.2.7., S.4.3., at 3-13; see also, e.g., id. § 3.30, ¶ N.4.1.1., at 3-16; id. § 3.30, ¶ UR.3.6., at 3-22. Section 3.30 specifies marking requirements for both wholesale and retail devices. With respect to wholesale devices, the marking requirements include both discharge rates and temperature compensation, whereas the marking requirements for retail devices include discharge rates but not temperature compensation. Compare id. § 3.30, ¶ S.4.3. et seq., at 3-15 (wholesale devices) with § 3.30, ¶ S.4.4. et seq., at 3-15 (retail devices). Every time Section 3.30 mentions temperature compensation, it is in the context of wholesale devices.

## C. Enforcement Of Regulations

California Business and Professions Code § 12107 gives teeth to the requirements of Handbook 44, providing that it is "unlawful for any person to violate any of the rules, regulations, tolerances, specifications, or standards" in Handbook 44, as adopted by the Secretary of the California Department of Food and Agriculture. Under Section 12505, state sealers examine weight or measure, or weighing, measuring or counting instruments used for commercial purposes. If the sealer finds that an instrument is correct, he or she shall seal or mark the weight, measure or instrument with an appropriate device approved by the department. Cal. Bus. & Prof. Code § 12505. An instrument is "correct" if it "meet[s] all of the tolerance and specification requirements established by the director pursuant to Section 12107." Cal. Bus. & Prof. Code § 12500(c).

In addition, it is unlawful to sell or use for commercial purposes any weight or measure, or any weighing, measuring, or counting instrument or device, of a type or design that has not first been approved by the Department of Food and Agriculture. Cal. Bus. & Prof. Code § 12500.5. The Secretary of the Department of Food and Agriculture "shall issue certificates of approval of such types or designs as he or she shall find to meet the requirements of this code and the tolerances and specifications thereunder." Id. DMS and county sealers enforce the regulations governing posting of prices, product labels, inspection protocols, method of sale, advertising and device specifications, which are meant to ensure fair competition for industry and accurate value comparison for consumers. See Cal. Bus. & Prof. Code §§ 13470-90.

According to David Lazier, Assistant Director of the DMS, the DMS recommends that county inspectors annually check the seals, totalizer and audit trail on motor fuel dispensers, and perform a five gallon initial and special test draw on each dispenser to ensure that it is dispensing fuel in gallon-sized units within the tolerances set by Handbook 44. He also states that inspectors check the price computation on the retail motor fuel dispenser and compare it to the posted price per gallon to ensure that the posted prices match the prices charged. If a sealer determines that a weighing or measuring device is correct, he must seal or mark it as approved by the California Department of Food and Agriculture. Cal. Bus. & Prof. Code § 12505. If a sealer determines that a weighing or measuring device is incorrect and can be repaired, he must mark the device as "Out of order." Cal. Bus. & Prof. Code § 12506. If the device cannot be repaired, he must condemn, seize and/or destroy it. Id.

### D. Motor Fuel Excise Taxes

In addition to the foregoing requirements, motor fuel retailers must "display[] on the dispensing apparatus in a conspicuous place at least one sign or price indicator showing the actual

-13-

total price per gallon or liter of all motor fuel sold therefrom," which "shall include fuel taxes and all sales taxes." Cal. Bus. & Prof. Code § 13470. Every service station in California "shall display, at a conspicuous place on, at, or near the dispensing apparatus or at or near the point of sale, at least one clearly visible sign showing a list of applicable state and federal fuel taxes per gallon of motor vehicle fuel sold from the dispensing apparatus." The sign may display the federal excise tax rate as "up to $.184." Cal. Bus. & Prof. Code § 13651(c). A motor fuel dispensing system shall not permit a change to the unit price during delivery of product. Handbook 44 § 3.30, ¶ S.1.6.5.4., at 3-9.

A federal fuel excise tax applies to all "taxable fuel" (which includes gasoline and diesel fuel) upon removal from a refinery or terminal. 26 U.S.C. §§ 4081(a)(1), 4083(a)(1). The person liable for the tax is the position holder with respect to the fuel, i.e. the person that has a "a contractual agreement with the terminal operator for the use of storage facilities and terminaling services at a terminal with respect to the taxable fuel." 26 C.F.R. §§ 48.4081-1, 48.4081-2. Under federal law, "[v]olumes of taxable fuel may be measured on the basis of actual volumetric gallons or gallons adjusted to 60 degrees Fahrenheit." 26 C.F.R. § 48.4081-8(a). Similarly, California law imposes a tax on every position holder upon "removal of motor vehicle fuel . . . from a terminal if the motor vehicle fuel is removed at the rack." Cal. Rev. & Tax Code §§ 7362, 7368; see also Cal. Code Regs. Tit. 18 § 1123(b)(3)(a). Under California law, "'[t]ax-paid fuel' or 'tax paid' means the gallons of motor vehicle fuel acquired on either a temperature-corrected or volumetric basis on which the tax in Section 7360 has been imposed at the time of or prior to the acquisition by the supplier or person." Cal. Rev. & Tax Code § 7345. For purposes of the California Motor Vehicle Fuel Tax Law, "'[g]allon' means the United States gallon of 231 cubic inches or the volumetric gallon adjusted to 60 degrees Fahrenheit when the invoice and settlement is made on the temperature corrected

gallonage." Cal. Rev. & Tax Code § 7315.

## II. Plaintiffs' Article III Standing To Bring Claims Based On Over-Collection Of Motor Fuel Excise Taxes

Article III of the Constitution confines the judicial power of federal courts to deciding actual cases or controversies. U.S. Const. art. III, § 2. One essential aspect of this requirement is that any person invoking the power of a federal court must demonstrate standing to do so. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Litigants must prove that they have suffered a concrete and particularized injury that is fairly traceable to the challenged conduct and is likely to be redressed by a favorable judicial decision. Id.

Chevron's arguments regarding plaintiffs' Article III standing focus on plaintiffs' tax theory – that Chevron paid taxes on net gallons yet passed through taxes through to consumers based on gross gallons.[2] Chevron treats plaintiffs' tax theory as though plaintiffs were seeking a tax refund from the government. Having made this leap, Chevron contends that plaintiffs lack standing to bring a claim based on over-collection of fuel taxes because Chevron does not "collect" and consumers do not "pay" motor fuel excise taxes. But plaintiffs do not argue that they are entitled to a tax refund from Chevron as from the government. They argue that Chevron padded its pockets by paying taxes on net gallons and over-recouping those taxes from retail consumers by selling warm fuel on a gross gallon basis. Plaintiffs contend that this practice is an overcharge in disguise. They do not seek a tax refund, but damages and injunctive relief based on a practice that overcharges consumers and

---

[2]     Other non-settling defendants in these cases have raised additional arguments regarding plaintiffs' Article III standing in other motions. See, e.g., Certain Defendants' Supplemental Omnibus Brief Concerning Plaintiffs' Lack Of Standing (Doc. #4500) filed February 1, 2013; Defendant's Motion For Summary Judgment On The Grounds That Plaintiff Lacks Standing (Doc. #2683) filed November 1, 2011; Defendant Tesoro Refining And Marketing Company's Motion To Dismiss Based On Lack Of Standing (Doc. #2603) filed November 1, 2011. Chevron did not join these motions and the Court need not address the additional arguments here.

calls the overcharge a tax. See Wyatt Plaintiffs' Response In Opposition To Defendants' Joint Motion For Summary Judgment On Plaintiffs' Unfair Competition Law And Unjust Enrichment Claims (Doc. #3416) filed February 1, 2012 at 46 [hereinafter "Wyatt Plaintiffs' Response"]; Lerner Plaintiffs' Response In Opposition To Defendants' Motion For Summary Judgment On Plaintiffs' Duty Of Good Faith And Fair Dealing, Unfair Competition And Unjust Enrichment Claims (Doc. #3364) filed February 1, 2012 at 45 [hereinafter "Lerner Plaintiffs' Response"]; cf. Gurley v. Rhoden, 421 U.S. 200, 206-10 (1975) (determining legal incidence of tax based on whom statute imposes tax burden). Viewed in this light, plaintiffs certainly have Article III standing to seek redress against Chevron for the alleged overcharge.

## III.    Plaintiffs' Statutory Standing To Bring UCL And CLRA Claims

Chevron argues that plaintiffs lack standing under the UCL and CLRA because they "received the benefit of their bargain." To establish standing under the UCL, a plaintiff must show that he or she "suffered injury in fact" and "lost money or property as a result of the unfair competition." Cal Bus. & Prof. Code § 17204. Under the CLRA, a plaintiff must show that he or she "suffer[ed] damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful" under the CLRA. Cal. Civ. Code § 1780(a). The parties agree that Kwikset Corp. v. Superior Court, 246 P.3d 877, 885, 51 Cal.4th 310, 322 (2011), provides the appropriate test for determining standing under both the UCL and CLRA.[3] Under Kwikset, to

---

[3]    The parties address statutory standing under the UCL and CLRA together, and seem to agree that the tests of standing under the UCL and CLRA are the same. See Plaintiffs' Response In Opposition To Defendants' Joint Motion For Summary Judgment On Plaintiffs' California Unfair Competition Law, Consumer Legal Remedies Act, Florida Deceptive Trade Practices Act, And Breach Of Contract Claims (Doc. #3741) filed February 17, 2012 at 54-55 (Rushing) [hereinafter "Rushing Plaintiffs' Response"]; Memorandum In Support Of Defendants' Joint Motion For Summary Judgment On Plaintiffs' California Unfair Competition Law, Consumer Legal Remedies (continued...)

establish standing, plaintiffs must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., <u>economic injury</u>, and (2) show that that economic injury was the result of, i.e., <u>caused by</u>, the unfair business practice or false advertising that is the gravamen of the claim." 51 Cal.4th at 322, 246 P.3d at 885 (emphasis in original).

Chevron argues that plaintiffs received the benefit of their bargain, <u>i.e.</u> that plaintiffs were not injured, because they received 231-cubic-inch gallons of motor fuel the specified prices per gallon.[4] Plaintiffs argue that they suffered economic injury because they unwittingly purchased fuel that was effectively diluted because of its warm temperature. As a result, plaintiffs contend, they paid for more gallons motor fuel than they otherwise would have if the fuel was sold in temperature-adjusted gallons, and over-reimbursed Chevron for taxes on "phantom gallons." The record reveals a genuine issue of material fact regarding whether plaintiffs "surrender[ed] in a transaction more, or acquire[d] in a transaction less, than [they] otherwise would have." <u>Kwikset</u>, 51 Cal.4th at 323, 246 P.3d at 885 (listing "innumerable ways" in which plaintiffs may show "economic injury from unfair competition"); <u>see</u> <u>Aron v. U-Haul Co. of Cal.</u>, 49 Cal. Rptr.3d 555, 559, 143 Cal. App.4th 796, 802-03 (2006); <u>see also</u> <u>Klein v. Chevron</u>, 137 Cal. Rptr.3d 293, 320, 202 Cal.App.4th 1342, 1375 (2012) (plaintiffs in nearly identical case had standing under UCL and CLRA).[5] Plaintiffs therefore have

---

[3](...continued)
<u>Act, Florida Deceptive Trade Practices Act And Breach Of Contract Claims</u> (Doc. #2586) filed November 1, 2011 at 28 (<u>Rushing</u>).

[4]     Chevron does not address whether its practice of selling motor fuel by the gallon without disclosing or adjusting for temperature and without disclosing the effects of temperature caused plaintiffs' alleged injury.

[5]     <u>Compare</u> <u>Kwikset</u>, 51 Cal.4th at 328-30, 246 P.3d at 889-91 (original purchasing decision shows that consumer valued product as labeled more than money he parted with; complaint shows that consumer valued money he parted with more than product as it actually is; and
(continued...)

standing to bring claims under the UCL and CLRA.

## IV.    Plaintiffs' UCL Claims

The California UCL prohibits "unfair competition," which it defines as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Because the UCL is written in the disjunctive, it establishes three varieties of unfair competition – acts or practices which are unlawful, or unfair or fraudulent. Cel-Tech Commcn's, Inc. v. Los Angeles Cellular Tel. Co., 973 P.2d 527, 540, 20 Cal.4th 163, 180 (1999); see Cal. Bus. & Prof. Code § 17200. A practice is prohibited as "unfair" or "deceptive" even if not "unlawful" and vice versa. Cel-Tech, 973 P.2d at 540, 20 Cal.4th at 180.

Unfair or fraudulent business practices may run the gamut of human ingenuity and chicanery. Id. at 540, 20 Cal.4th at 181. The law casts a wide net "to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur." Id. (internal quotation marks omitted). Although the scope of the UCL "is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair." Id. at 541, 20 Cal.4th at 182. By specific legislation the legislature may limit the courts' power to declare conduct unfair. Id.

---

[5](...continued)
combination shows that defendant allegedly made consumer part with more money than he otherwise would have been willing to expend; that increment – the extra money paid, is economic injury that gives consumer standing to sue) with Peterson v. Cellco P'ship, 80 Cal. Rptr.3d 316, 321-23, 164 Cal. App.4th 1583, 1591-92 (2008) (no UCL standing where plaintiffs did not allege dissatisfaction with insurance or that they were uninformed of its price); Hall v. Time Inc., 70 Cal. Rptr.3d 466, 469-71, 158 Cal. App.4th 847, 852-55 (2008) (no UCL injury where plaintiff did not allege that he did not want product, or that product was unsatisfactory or was worth less than what he paid for it); Medina v. Safe-Guard Prods., Int'l, Inc., 78 Cal. Rptr.3d 672, 678, 164 Cal. App.4th 105, 114 (2008) (no UCL injury in fact where plaintiff did not allege that he relied on defendant having a license required by vehicle service contract statutes or that defendant's unlicensed status caused him to part with money he paid for contract). This case is more like Kwikset.

**A.    Chevron's Sale Of Motor Fuel Without Disclosing Or Adjusting For Temperature**

Plaintiffs claim that Chevron's method of selling motor fuel by the gallon without disclosing or adjusting for temperature violates the UCL.  Chevron argues that California law bars plaintiffs' claims because it specifically authorizes the sale of motor fuel by the gallon without disclosing or adjusting for temperature.  They contend that (1) in specifying liquid-measuring devices and defining a "unit" of weight and measure, Handbook 44 specifically authorizes current practice; (2) when the California legislature allowed temperature adjustment in motor fuel transactions that exceed 5,000 gallons, it implicitly rejected temperature adjustment in transactions involving smaller quantities at retail; and (3) Chevron would be subject to statutory fines if it attempted to dispense anything other than 231-cubic-inch gallons, or failed to advertise its prices on the basis of anything except the price per gallon excluding taxes.  Plaintiffs counter that California law does not specifically authorize the sale of motor fuel at retail without disclosing or adjusting for temperature and does not prohibit the sale of temperature-adjusted motor fuel at retail.

Where the legislature has "permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination."  Cel-Tech, 973 P.2d at 541, 20 Cal.4th at 182.  When "specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor."  Id.; see also Arizona v. Inter Tribal Council of Ariz., Inc., 133 S. Ct. 2247, 2266 (2013) (in statutory construction, specific governs general).  The rule does not, however, prohibit an action under the UCL "merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct."  Cel-Tech, 973 P.2d at 541, 20 Cal.4th at 182.  To trigger the safe harbor, a statute must actually bar the action or clearly permit the conduct.  Id.  In other words, "[a]cts that the Legislature has determined to be

lawful may not form the basis for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision." Id. Under this safe harbor rule, plaintiffs are in the difficult position of arguing that California law does not authorize the manner in which Chevron sells motor fuel in California (which is the same way every motor fuel retailer has sold motor fuel throughout the United States for more than a century). Plaintiffs' arguments are ultimately unconvincing.

As noted above, with a few exceptions not relevant here, California has adopted Handbook 44, which provides specifications, tolerances and other technical requirements for weighing and measuring devices including motor fuel dispensers. Cal. Bus. & Prof. Code §§ 12107, 12313; Cal. Code Regs. tit. 4, § 4000. Chevron argues that through Handbook 44, California law specifically authorizes it to sell motor fuel without disclosing or adjusting for temperature. Plaintiffs disagree. They contend that when Handbook 44 uses the term "gallon" it should be interpreted to mean a "standard" or "temperature-adjusted" gallon. They also argue that Handbook 44 simply sets tolerances and specifications, but does not approve or disapprove any particular method of sale.

Handbook 44, Section 3.30, refers to liquid measuring devices that measure "units," for example "gallons." See, e.g., Handbook 44 § 3.30, ¶¶ S.1.2., S.1.2.1.; see generally Handbook 44 at 3-5, 3-7 through 3-9, 3-19, 3-21. Under the subheadings "Units" (¶ S.1.2.) and "Retail Motor-Fuel Devices" (¶ S.1.2.1.), Section 3.30 states that "[d]eliveries shall be indicated and recorded, if the device is equipped to record, in liters or gallons and decimal subdivisions or fractional equivalents thereof." Id. § 3.30, ¶ S.1.2.1., at 3-5. Appendix B defines a "unit," such as "the gallon," as a "special quantity in terms of which other quantities are expressed," which "[i]n general" is independent of physical conditions. Id. App. B at B-1. As plaintiffs note, Appendix B does not

-20-

purport to define terms used elsewhere in Handbook 44. It provides a history and present status of units and systems of measurement. As such, however, Appendix B provides a basis for interpreting the Handbook's provisions.

Appendix B stresses that "[i]t is essential that the distinction between the terms 'units' and 'standards' be established and kept in mind." Id. In Section 3.30, Handbook 44 uses the term "unit" or "gallon" to describe the specifications, tolerances and user requirements for retail motor fuel devices. It does not use the term "standard" or refer to temperature-adjusted gallons in the retail context. Although a unit is independent of temperature only "[i]n general," plaintiffs provide no convincing reason to construe the terms "unit" or "gallon" in Section 3.30 to mean only "standard" or "temperature-adjusted gallon."[6]

This conclusion is also supported by the fact that Section 3.30 expressly distinguishes the specifications for retail motor fuel devices, which do not mention temperature adjustment, from the specifications for wholesale motor fuel devices, which do mention temperature adjusting devices. See, e.g., Handbook 44 § 3.30, ¶¶ S.2.6., S.2.7., S.4.3., at 3-13; see also, e.g., id. § 3.30, ¶ N.4.1.1., at 3-16; id. § 3.30, ¶ UR.3.6., at 3-22. Compare id. § 3.30, ¶ S.4.3., at 3-15 (wholesale devices) with id. § 3.30, ¶ S.4.4., at 3-15 (retail devices). Cal. Bus. & Prof. Code § 13520 does the same. It singles out sales of 5,000 or more gallons of motor fuel in a single delivery to a single station, and requires the distributor or broker to offer to invoice the purchaser on a temperature-adjusted basis. Cal. Bus. & Prof. Code § 13520.

On their own, the provisions regarding wholesale motor fuel transactions do not specifically

---

[6]    Motor fuel retailers in California have long sold motor fuel by the gross gallon without disclosing or adjusting for temperature without facing regulatory action or sanctions by the DMS. See CEC Rpt. at 1-2 ("no retail owner has chosen to install and operate ATC-ready dispensers in California"); id. at 7-8 (same).

provide a safe harbor to Chevron's current method of selling motor fuel. See Klein, 137 Cal. Rptr.3d at 323-24, 202 Cal. App.4th at 1379 (inferring authorization from Cal. Bus. & Prof. Code regarding wholesale transactions directly contrary to Cel-Tech). But they inform the Court's interpretation of whether California's regulatory framework as a whole does so. When a statute or regulation "includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Sebelius v. Cloer, 133 S. Ct. 1886, 1894 (2013); Qwest Commc'ns Int'l, Inc. v. FCC, 398 F.3d 1222, 1232 (10th Cir. 2005); Silvers v. Sony Pictures Entm't, Inc., 402 F.3d 881, 885 (9th Cir. 2005). But see Marx v. Gen. Revenue Corp., 133 S. Ct. 1166, 1175 (2013) (expressio unius canon can be overcome by contrary indications that adopting a particular rule or statute was probably not meant to signal any exclusion, and it does not apply unless it is fair to suppose that legislature considered unnamed possibility and meant to say no to it). The Court sees no reason to disturb this canon of statutory interpretation in this case. The temperature determination and compensation provisions in Section 3.30 are limited to wholesale devices. They do not require retail devices to determine temperature, compensate for changes in temperature or deliver anything other than a gallon – 231 cubic inches – of motor fuel without disclosing or adjusting for temperature.

Chevron argues that it would be subject to statutory fines if it dispensed anything other than gross gallons. It cites statutory provisions that require commercial motor fuel dispensers to comply with tolerances and specifications adopted by California law, and provide civil penalties for commercial motor fuel dispensers that the DMS has not approved or that are "incorrect." See Cal. Bus & Prof. Code §§ 12500.5, 12015, 12015.3, 12017, 12020, 12107 and 13470.

The parties dispute whether California has approved an ATC-equipped retail motor fuel dispenser. CTEP has issued a certificate of conformance for an ATC-equipped retail motor fuel

dispenser developed by Gilbarco Veeder-Root. Certificate of Approval No. 5510(a)-07 (Doc. #3416-5). The certificate states that the device complies with the applicable technical requirements of the California Code of Regulations for Weighing and Measuring Devices, which requires compliance with Handbook 44. Chevron contends that the ATC-equipped dispenser cannot be used in California without further regulatory changes. The effect of the CTEP certificate is not fully developed on this record. The effect of the certificate also implicates the more difficult question whether California law prohibits the use of ATC at retail, as opposed to authorizing sales without it. The Court need not reach this question. It is sufficient to find that the DMS has sealed Chevron's motor fuel dispensers as "correct" and approved them for commercial use. Indeed, plaintiffs do not dispute this. Instead they argue that Chevron's current practice is nevertheless deceptive, misleading and fraudulent, that California law allows ATC at retail and that Handbook 44 does not regulate sales practices.

Through Handbook 44 and other provisions of California law enforcing Handbook 44, the legislature has approved the use of "correct" weight or measure or weighing, measuring or counting instruments, i.e. those that "meet all of the tolerance and specification requirements" of Handbook 44 and other California law. See Cal. Bus. & Prof. Code § 12505. Although Handbook 44 speaks in terms of tolerances and specifications, California law uses Handbook 44 as the basis for its regulatory scheme that authorizes the use of certain motor fuel dispensers (those that meet Handbook 44 requirements), and prohibits the use of others (those that do not). See Cal. Bus. & Prof. Code §§ 12505, 12506. To "earn the mandatory seal of approval from DMS, weighing and measuring devices sold or used commercially in California must conform to Handbook 44." Alvarez v. Chevron Corp., 656 F.3d 925, 933 (9th Cir. 2011).

For the reasons discussed above, California law clearly permits Chevron's sale of motor fuel

by the gross gallon without adjusting for temperature. The legislature has considered Chevron's practice of selling motor fuel by the gross gallon without disclosing or adjusting for temperature, and approved the instruments it uses. Plaintiffs "may not override that determination under the guise of the unfair competition law." Cel-Tech, 973 P.2d at 542, 20 Cal.4th at 183; see Alvarez, 656 F.3d at 933 (Handbook 44 provides safe harbor against UCL and CLRA claims based on residual fuel resulting from DMS-certified dispenser design); Lopez v. Nissan N. Am., Inc., 135 Cal. Rptr.3d 116, 132-33, 201 Cal. App.4th 572, 591-92 (2012) (safe harbor against UCL and CLRA claims regarding odometers that over-register where odometer were within four per cent tolerance set in Handbook 44). Chevron is therefore entitled to safe harbor from liability under the UCL for this practice. See Alvarez, 656 F.3d at 934; McCann v. Lucky Money, Inc., 29 Cal. Rptr.3d 437, 446-47, 129 Cal. App.4th 1382, 1395 (2005) (citing Cel-Tech, 973 P.2d at 541, 20 Cal.4th at 182) (fact that comprehensive regulation of defendants' practices does not label challenged practices unfair is further defense to plaintiffs' claims).

The Court's previous decisions and Klein are not to the contrary. In opposition to Chevron's motion for summary judgment, plaintiffs cite the court order overruling Chevron's motion to dismiss. Plaintiffs' rely on the Court's statement that "Handbook 44 . . . does not expressly prohibit a retailer from adjusting the size or price of a gallon to equal 231 cubic inches at a standardized temperature." In re Motor Fuel Temp. Sales Practices Litig., 534 F.Supp.2d 1214, 1224 (D. Kan. 2008). The Court stands by this statement, but whether Handbook 44 "expressly prohibit[s]" ATC at retail does not change the Court's finding that Handbook 44 expressly authorizes the sale of gross gallons of motor fuel without adjusting for temperature.[7] In other words, Handbook 44 expressly authorizes Chevron

---

[7] This conclusion is also consistent with the Court's order overruling Kansas (continued...)

to sell motor fuel without disclosing or adjusting for temperature but does not necessarily prohibit the sale of motor fuel at retail using ATC. The two are not mutually exclusive.

Klein is also distinguishable. In Klein, the California Court of Appeals assessed whether defendants were entitled to a safe harbor from plaintiffs' claims under Cal. Bus. & Prof. Code § 13520, which permits ATC for transactions involving 5,000 or more gallons of motor fuel. Here, however, Chevron relies on much more than just Section 13520 to establish a safe harbor. As discussed above, Chevron marshals Handbook 44 and provisions of California law that implement and enforce Handbook 44 to show that California law clearly authorizes its practice of selling motor fuel by the gross gallon without disclosing or adjusting for temperature.

The Court's finding that Chevron is entitled to a safe harbor from plaintiffs' claims with respect to the manner in which Chevron dispenses motor fuel in retail transactions does not end plaintiffs' UCL claims against Chevron. Plaintiffs argue that even if California law expressly authorizes Chevron's method of sale, their claims would remain with regard to Chevron's failure to disclose the effect of temperature on motor fuel and the passing on of excise taxes. In essence, plaintiffs argue that these practices are independent unfair and fraudulent practices that the safe harbor does not cover.

---

[7](...continued)
defendants' motions for summary judgment on plaintiffs' Kansas Consumer Protection Act claims in the Kansas cases. In those cases, the Court overruled defendants' motions for summary judgment because defendants had not shown that Kansas law provides a "safe harbor" as California law does. The Court held as follows: "[E]ven if Kansas law authorizes defendants to sell fuel without disclosing or adjusting for temperature, compliance with the regulations is not by itself enough to shield defendants from liability under the KCPA." In re Motor Fuel Temp. Sales Practices Litig., 867 F. Supp.2d 1124, 1137-38 (D. Kan. 2012). The reason for the different outcome in this case is the difference between Kansas and California law.

**B.    Failure To Disclose Effects Of Temperature On Motor Fuel**

Plaintiffs contend that Chevron's failure to disclose the effect of temperature on motor fuel violates the UCL.  They rely on <u>Schnall v. Hertz Corp.</u>, 93 Cal. Rptr.2d 439, 78 Cal. App.4th 1144 (2000), in which a class of car renters sued Hertz over its fuel service charges.  Plaintiffs alleged multiple UCL violations, including that Hertz's fuel service charge violated the UCL and that Hertz misled customers by deceptively concealing or obscuring the amount of its fuel service charge.  Hertz argued that the safe harbor rule barred plaintiffs' claims because Cal. Civil Code § 1963(m)(2) permitted rental car companies to impose avoidable charges for optional services.  The California Court of Appeals agreed that the safe harbor rule barred plaintiffs' challenge to the fuel service charge policy.  But it found that the safe harbor rule did not bar plaintiffs' claim that Hertz misled customers by burying the amount of its fuel service charge in an incomprehensible "rental record."  The California Court of Appeals held that a statute which authorized rental car companies to impose avoidable charges for optional services, "hardly amounts to permission to mislead customers about such charges."  <u>Schnall</u>, 93 Cal. Rptr.2d at 454, 78 Cal. App.4th at 1163.  "[D]eception calculated to induce customers to subject themselves to an avoidable charge," the Court of Appeals held, "is inimical to the very concept of avoidability."  <u>Id.</u> at 454, 78 Cal. App.4th at 1164.

Chevron, on the other hand, relies on <u>Lopez</u>.  In that case the California Court of Appeals rejected an argument similar to the one which the same court accepted in <u>Schnall</u>.  In <u>Lopez</u>, a class of car owners in California sued Nissan.  They alleged that Nissan violated the UCL and the CLRA by purposefully designing and calibrating odometers to overregister mileage by at least two per cent, which was well within the plus-or-minus four per cent tolerance allowed under Handbook 44.  <u>Lopez</u> distinguished <u>Schnall</u>, finding that the safe harbor in <u>Schnall</u> was narrow because it turned on the "avoidability of the refueling charges."  The safe harbor in <u>Lopez</u> was much broader, "aiming to

provide a small amount of leeway for manufacturers of measuring and weighing instruments that are inherently imprecise to some degree." Lopez, 135 Cal. Rptr.3d at 134, 201 Cal. App.4th at 594. It thus held as follows:

> In protecting manufacturers of "correct" odometers from UCL liability regarding the accuracy of such instruments, section 12500, subdivision (c) also necessarily insulates them from claims that manufacturers should have disclosed potential overregistering by "correct" odometers within the tolerance permitted by California law. In sum, Nissan is not subject to liability under the UCL.

Id.

This case is more like Lopez. Handbook 44 and the California statutory and regulatory framework authorize commercial retail sale of motor fuel in gallon "units," i.e. without disclosing or adjusting for temperature. California law insulates from UCL liability motor fuel retailers that sell "units" of motor fuel using "correct" weight or measure or weighing, measuring or counting instruments. See Cal Bus. & Prof. Code § 12500 et seq.; supra Part IV.A. Under Lopez, California law shields Chevron from claims that it should have disclosed the fact that the temperature of "units" that their "correct" instruments dispense might vary. See Lopez, 135 Cal. Rptr.3d at 134, 201 Cal. App.4th at 594.

## C. Plaintiffs' Tax Overcharge Claims

As noted, plaintiffs claim that Chevron violated the UCL by paying taxes on net gallons and passing on the taxes to consumers based on gross gallons. These claims are likewise barred by a statutory and regulatory safe harbor. As discussed above, California's statutory and regulatory framework specifically authorizes Chevron's practice of selling motor fuel by the gross gallon without disclosing or adjusting for temperature. See supra Part 4.A.-B. In addition, California and federal law impose taxes on "position holders" when they remove motor fuel from a refiner, terminal or "rack." See 26 U.S.C. §§ 4081(a)(1), 4083(a)(1); 26 C.F.R. § 48.4081-1; 26 C.F.R. § 48.4081-2;

Cal. Rev. & Tax Code §§ 7362, 7368; see also Cal. Code Regs. Tit. 18 § 1123(b)(3)(a). Both California and federal law allow a position holder to pay these taxes based on gross or net gallons. See 26 C.F.R. § 48.4081-8(a); Cal. Rev. & Tax Code § 7345; Cal. Rev. & Tax Code § 7315.

California requires that motor fuel retailers "display[] on the dispensing apparatus in a conspicuous place at least one sign or price indicator showing the actual total price per gallon or liter of all motor fuel sold therefrom." Cal. Bus. & Prof. Code § 13470. The actual total price per gallon "shall include fuel taxes and all sales taxes." Id. In addition, every service station in California "shall display, at a conspicuous place on, at, or near the dispensing apparatus or at or near the point of sale, at least one clearly visible sign showing a list of applicable state and federal fuel taxes per gallon of motor vehicle fuel sold from the dispensing apparatus," which may "display the federal excise tax rate as 'up to $.184'." Cal. Bus. & Prof. Code § 13651(c).

In sum, California law authorizes Chevron to sell motor fuel by the gross gallon, allows Chevron to pay taxes on net gallons and requires Chevron to post applicable taxes. Plaintiffs do not contest that Chevron complies with California and federal law. Under California's safe harbor rule, plaintiffs cannot hold Chevron liable for complying with the regulations. Cel-Tech, 973 P.2d at 541, 20 Cal.4th at 182.

Plaintiffs note that in other similar contexts, plaintiffs have maintained UCL claims where a reasonable consumer would be misled by disclosure of a charge. See McKell v. Wash. Mut., Inc., 49 Cal. Rptr.3d 227, 142 Cal. App.4th 1457 (2006) (Washington Mutual practice of charging more than actual cost of services without disclosure to customers may violate UCL because reasonable consumer likely would believe that fees bore some correlation to services rendered); People v. Dollar Rent-A-Car Sys., Inc., 259 Cal. Rptr. 191, 211 Cal. App.3d 119 (1989) (plaintiffs stated UCL violation where Dollar Rent-A-Car charged more than actual wholesale repair cost and charged

"retail rental rate" that was higher than average or actual rental rates).

Plaintiffs argue that Chevron's disclosure of applicable tax rates is misleading because it does not tell the whole story – that in California, on average, Chevron sells more gross gallons of fuel than it purchases and consumers therefore reimburse Chevron for taxes that it never has to pay. But Dollar did not involve a safe harbor, see 259 Cal. Rptr. 191, 211 Cal. App.3d 119, and in McKell, Washington Mutual cited no statutes specifically permitting its challenged practices. 49 Cal. Rptr.3d 227, 142 Cal. App.4th 1457. Here, the California legal and regulatory framework, and federal law, specifically authorize Chevron to pay and disclose motor fuel taxes as it does.

That Chevron "is able to sell heat-expanded fuel, collect the tax on that expansion from [its] customers, yet not have to remit the tax on that expansion to the state" has been litigated and debated for decades, but "the resolution of this problem lies not with this court but with the Legislature." Al-Sal Oil Co. v. State Bd. of Equalization, 283 Cal. Rptr. 843, 856, 232 Cal. App.3d 969, 988 (1991); see also CEC Rpt. at 1-2, 7-9.

California's statutory and regulatory framework provides Chevron a safe harbor from plaintiffs' UCL claims. Because it specifically authorizes the challenged conduct, the Court need not determine whether plaintiffs' claims otherwise raise genuine issues of material fact. As discussed above, Chevron is entitled to judgment as a matter of law on these claims.

## V.     Plaintiffs' CLRA Claims

Plaintiffs' CLRA claims are similar to their UCL claims. They claim that Chevron's method of selling motor fuel by the gallon without disclosing or adjusting for temperature violates the CLRA. The California CLRA prohibits certain "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

Plaintiffs specifically rely on four subsections of Section 1770(a) which prohibit "[r]epresenting that goods or services have . . . characteristics, ingredients, uses, benefits, or quantities which they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade, . . . if they are of another," "[a]dvertising goods or services with intent not to sell them as advertised" and "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Cal. Civ. Code § 1770(a)(5), (7), (9), (16).

Like UCL claims, claims under the CLRA may be barred under the "safe harbor" doctrine. Lopez, 135 Cal. Rptr.3d at 134, 201 Cal. App.4th at 594. The CLRA is a "generic consumer protection statute." Bourgi v. West Covina Motors, Inc., 83 Cal. Rptr.3d 758, 764, 166 Cal. App.4th 1649, 1658 (2008). By contrast, "the California regulatory framework creates specific requirements for retail gasoline dispensing that may not be trumped by the general prohibitions of the CLRA." Alvarez, 656 F.3d at 934 (citing Bourgi, 83 Cal. Rptr.3d at 764-66, 166 Cal. App.4th at 1658-60). The safe harbor doctrine applies to CLRA claims in the same way that it applies to UCL claims. See Lopez, 135 Cal. Rptr.3d at 134, 201 Cal. App.4th at 594; see also Alvarez, 656 F.3d at 933-34; Bourgi, 83 Cal. Rptr.3d at 764-67, 166 Cal. App.4th at 1658-61. So for the reasons discussed above, the California statutory and regulatory framework insulates Chevron from liability on plaintiffs' claims under the CLRA.

## VI. Plaintiffs' Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing

To prevail on their claim for breach of the implied covenant of good faith and fair dealing, plaintiffs have the burden of proving that (1) plaintiffs and Chevron entered into a contract; (2) plaintiffs did all or substantially all of the significant things that the contract required; (3) all conditions required for Chevron's performance had occurred; (4) Chevron unfairly interfered with

plaintiffs' right to receive the benefits of the contract; and (5) plaintiffs suffered harm. Judicial Council of California Civil Jury Instructions (2013), CACI No. 325. The parties seem to agree that each motor fuel transaction constitutes a contract; they even agree on the basic terms: Chevron offered to sell gallons of motor fuel at an advertised price per gallon, including taxes.[8] See Lerner Plaintiffs' Response (Doc. #3364) at 50; Memorandum In Support Of Defendants' Joint Motion For Summary Judgment On Plaintiffs' Duty Of Good Faith And Fair Dealing, Unfair Competition Law And Unjust Enrichment Claims (Doc. #2303) filed October 30, 2011at 44 (Lerner); see also Amended Pretrial Order (Doc. #4576) at 44 (Lerner); Defendants' Reply To Plaintiffs' Response To Defendants' Statement Of Uncontroverted Material Facts And Responses To Plaintiffs' Statement Of Additional Uncontroverted Facts (Doc. #3866-2) filed March 25, 2012 ¶ 28, at 25-27 (Lerner).

The parties disagree, however, about what "gallons" and "including taxes" mean.[9] Plaintiffs argue that reasonable consumers understand Chevron's use of the term "gallon" to refer to net gallons, rather than gross gallons, so that Chevron's offer was to sell 231 cubic inches of motor fuel at a temperature of 60 degrees Fahrenheit. Thus they contend that Chevron interfered with plaintiffs' right to receive "equivalent or fungible energy" in every gallon of motor fuel "whenever and wherever sold." Lerner Plaintiffs' Response (Doc. #3364) at 50. According to plaintiffs, "[w]hen

---

[8]     Plaintiffs state that the "purchase of motor fuel at retail may constitute a contract, but if so, the contract is also undisputedly silent on the salient term of how a 'gallon' is measured." Lerner Plaintiffs' Response (Doc. #3364) ¶ 28, at 17. They argue that defendants breached their contracts because when plaintiffs purchased fuel that was warmer than 60 degrees Fahrenheit, they did not get what they bargained for, i.e. the energy of a gallon of gas at 60 degrees Fahrenheit. Defendants argue that plaintiffs accepted their offers to sell fuel at posted prices per gallon by dispensing the motor fuel and agreeing to pay and paying the posted prices per gallon multiplied by the gallons dispensed. Notwithstanding plaintiffs' self-serving equivocation with respect to the existence of contracts, it appears the parties agree that contracts existed, though they dispute the terms of the agreements.

[9]     See infra Part VI.B. for discussion of specific excise tax disclosure language.

-31-

Defendants sell motor fuel, they covenant to supply the energy that fuel represents, and when they short the consumer by selling energy-thin gallons, they breach that covenant." Id.; see also Klein, 137 Cal. Rptr.3d at 303-04, 327, 202 Cal. App.4th at 1354, 1384. Plaintiffs also say that reasonable consumers understand "including taxes" as a promise to collect as taxes the same amount that Chevron pays to government authorities. Plaintiffs contend that Chevron collects more than it pays because it pays taxes on a net gallon basis and passes the taxes on to consumers on a gross gallon basis, and the average temperature of the fuel that it sells in California is warmer than 60 degrees Fahrenheit.

On the other hand, Chevron argues that it is entitled to summary judgment on plaintiffs' good faith and fair dealing claim because (1) California law defines a "gallon" as 231 cubic inches irrespective of temperature, (2) the excise tax disclosures required by law are not promissory in nature and even if they were, they are not supported by consideration, and (3) plaintiffs did not provide pre-suit notice as the California Commercial Code requires.

The "implied covenant of good faith and fair dealing rests upon the existence of some specific contractual obligation." Racine & Laramie, Ltd. v. Dept. of Parks & Recreation, 14 Cal. Rptr.2d 335, 338, 11 Cal. App.4th 1026, 1031 (1992) (citing Foley v. Interactive Data Corp., 765 P.2d 373, 389-90, 393-94, 47 Cal.3d 654, 683-84, 689-90 (1988)); see also Guz v. Bechtel Nat'l Inc., 8 P.3d 1089, 1110, 24 Cal.4th 317, 349 (2000) (implied covenant of good faith and fair dealing cannot be endowed with existence independent of contractual underpinnings and cannot impose limits on contracting parties beyond those incorporated in specific terms of agreement). The covenant of good faith is read into contracts to "protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose." Foley, 765 P.2d at 394, 47 Cal.3d at 690.

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. See Cal. Civ. Code § 1636; Bank of the West v. Superior Court, 833 P.2d 545, 552, 2 Cal.4th 1254, 1265 (1992); Klein, 137 Cal. Rptr.3d at 328, 202 Cal. App.4th at 1385. The Court interprets the parties' intent based on objective, rather than subjective, criteria. Klein, 137 Cal. Rptr.3d at 328, 202 Cal. App.4th at 1385; Wolf v. Walt Disney Pictures and Television, 76 Cal. Rptr.3d 585, 601-02, 162 Cal. App.4th 1107, 1125-26 (2008). The Court construes the words of a contract according to their ordinary and popular sense. Cal. Civ. Code § 1644; Klein, 137 Cal. Rptr.3d at 328, 202 Cal. App.4th at 1385; see AIU Ins. Co. v. Superior Court, 799 P.2d 1253, 1264, 51 Cal.3d 807, 821-22 (1990). When the words of a contract are clear, the language of the agreement controls. Cal. Civ. Code § 1638; Cardio Diagnostic Imaging, Inc. v. Farmers Ins. Exch., 150 Cal. Rptr.3d 798, 801, 212 Cal. App.4th 69, 73-74 (2012); Klein, 137 Cal. Rptr.3d at 328, 202 Cal. App.4th at 1385. In addition, as a "general rule, all applicable laws in existence when an agreement is made, which laws the parties are presumed to know and to have had in mind, necessarily enter into the contract and form a part of it, without any stipulation to that effect, as if they were expressly referred to and incorporated." Edwards v. Arthur Anderson LLP, 189 P.3d 285, 297, 44 Cal.4th 937, 954 (2008).

### A. Definition Of "Gallon"

In the context of ordinary retail sales of motor fuel in California, plaintiffs' attempt to construe the term "gallon" to mean temperature-adjusted gallon is both contrary to California law, see Klein, 137 Cal. Rptr.3d at 328-29, 202 Cal. App.4th at 1385-86; see also supra Parts I.A., IV.A., and facially unreasonable, see Klein, 137 Cal. Rptr.3d at 328-29, 202 Cal. App.4th at 1385-86; see also Hopkins v. BP Oil, Inc., 81 F.3d 1070, 1074 (11th Cir. 1996) (district court erred in permitting jury to determine meaning of "gallons" in contracts between BP and dealers because "gallon" is not

ambiguous, it refers to "gross gallon of gasoline"). California law defines a "gallon" as a volume of liquid – 231 cubic inches to be exact – regardless of temperature. <u>Klein</u>, 137 Cal. Rptr.3d at 328-29, 202 Cal. App.4th at 1385-86; <u>see also</u> <u>supra</u> Parts I.A., IV.A. A reasonable person purchasing motor fuel from Chevron at retail in California would so understand. <u>Klein</u>, 137 Cal. Rptr.3d at 328-29, 202 Cal. App.4th at 1385-86.

### B. Excise Tax Disclosures

Chevron places on its retail pumps a notice stating that its prices include taxes.[10] Plaintiffs argue that this disclosure, which California and federal law require, is a promise by Chevron to pass on only the taxes that it must pay. Like plaintiffs' interpretation of "gallon," their interpretation of Chevron's notice regarding excise taxes is contrary to California and federal law and is also unreasonable.

California law requires motor fuel retailers to display the actual total price per gallon, which "shall include fuel taxes and all sales taxes." Cal. Bus. & Prof. Code § 13470. Every service station in California shall display "a list of applicable state and federal fuel taxes per gallon of motor vehicle fuel sold from the dispensing apparatus," and may "display the federal excise tax rate as 'up to $.184.'" Cal. Bus. & Prof. Code § 13651(c). As discussed above, California and federal law allow position holders to pay taxes based on net gallons. <u>See</u> <u>supra</u> Parts I.D., IV.C. No reasonable consumer who is deemed to know all applicable laws could interpret Chevron's excise tax disclosure, whether it be "$ per gallon including taxes," <u>Klein</u>, 137 Cal. Rptr.3d at 329-30, 202 Cal. App.4th at

---

[10] Plaintiffs state that Chevron informs its customers that "Prices Include the Following Taxes in Cents Per Gallon." Although they quote this phrase they offer no evidence that the notice on Chevron's pumps actually includes this language. <u>See</u> <u>Lerner Plaintiffs' Response</u> (Doc. #3364) ¶ 105, at 31. Chevron does not deny that it informs its customers that prices include taxes, but the actual language of the notices is not before the Court.

1386-87, "prices include the following taxes," <u>Wyatt Plaintiffs' Response</u> (Doc. #3416) ¶ 105, at 32, or "Motor Vehicle Fuel Prices Include the Following Taxes in Cents Per Gallon," <u>id.</u>, as a promise that the enumerated tax is the exact amount that Chevron paid upon removing the motor fuel from a refinery, terminal or rack.

For these reasons, Chevron is entitled to summary judgment on plaintiffs' claim for breach of the covenant of good faith and fair dealing. The Court need not reach Chevron's claim that plaintiffs failed to provide pre-suit notice.

## VII. Plaintiffs' Unjust Enrichment Claims

To prevail on their unjust enrichment claims, plaintiffs must show that (1) plaintiffs conferred a benefit on Chevron, (2) which Chevron knowingly accepted, (3) under circumstances that make it inequitable for Chevron to retain the benefit without paying for its value. <u>See</u> <u>Hernandez v. Lopez</u>, 103 Cal. Rptr.3d 376, 380, 180 Cal. App.4th 932, 938 (2009) (citing <u>Dunkin v. Boskey</u>, 98 Cal. Rptr.2d 44, 60-61, 82 Cal. App.4th 171, 195 (2000)). Plaintiffs must also show that they did not have enforceable contracts with Chevron covering the retail motor fuel transactions in question. <u>See</u> <u>Paracor Fin. v. Gen. Elec. Capital Corp.</u>, 96 F.3d 1151, 1167 (9th Cir. 1996).

Chevron argues that it is entitled to judgment as a matter of law on plaintiffs' unjust enrichment claim because plaintiffs' motor fuel purchases constitute express sales contracts. It also argues that plaintiffs have an adequate remedy at law and that it did not act inequitably or receive an unfair benefit by complying with California law. Plaintiffs respond that "no one can point to an express contract, remedies or other rights and obligations," "[d]efendants have not proven the terms of their alleged contract" and the "fact that Plaintiffs have pled the existence of covenants proves nothing." <u>Lerner Plaintiffs' Response</u> (Doc. #3364) at 54.

A claim for unjust enrichment is a "quasi-contract" theory which does not lie when an enforceable, binding agreement defines the rights of the parties. Paracor, 96 F.3d at 1167; see also Total Coverage, Inc. v. Cendant Settlement Servs. Grp., Inc., 252 Fed. Appx. 123, 125-27 (9th Cir. 2007); McBride v. Boughton, Cal. Rptr.3d 115, 121-22, 123 Cal. App.4th 379, 387-88 (2004); Hedging Concepts, Inc. v. First Alliance Mortg. Co., 49 Cal. Rptr.2d 191, 41 Cal. App.4th 1410, 1419-20 (1996). Although Rule 8, Fed. R. Civ. P., allows alternative or inconsistent pleading in the same case, this liberal pleading policy has its limits. Total Coverage, 252 Fed. Appx. at 126. A pleader "may assert contradictory statements of fact only when legitimately in doubt about the facts in question." Id. (citing Am. Int'l Adjustment Co. v. Galvin, 86 F.3d 1455, 1461 (7th Cir. 1996); 5 Wright and Miller, Federal Practice and Procedure § 1285 (3d ed. 2004)).

Here, plaintiffs have not alleged a breach of contract. They have, however, alleged a breach of the implied covenant of good faith and fair dealing. As discussed above, a valid, enforceable contract is a necessary element of that claim. See supra Part VI. Indeed, the parties seem to agree that retail motor fuel transactions constitute sales contracts; they simply disagree on the terms of the contracts. Under these circumstances, plaintiffs "cannot plead alternative theories that necessarily fail where an express contract defines the rights of the parties." Total Coverage, 252 Fed. Appx. at 126.[11] Chevron is therefore entitled to summary judgment on plaintiffs' unjust enrichment claim.

---

[11]     In 2008, in overruling defendants' motion to dismiss, the Court held that at that stage of the proceedings plaintiffs could plead inconsistent claims for relief. On that record, defendants had not shown as a matter of law that plaintiffs did not state claims for unjust enrichment. In re Motor Fuel Temp. Sales Practices Litig., 534 F. Supp.2d 1214, 1235-36 (D. Kan. 2008). Now, more than five years later, the proceedings have obviously progressed and plaintiffs have whittled down their claims against Chevron. Moreover, on the motion to dismiss, the Court did not address California law. This ruling is therefore consistent with the Court's previous order on defendants' motion to dismiss.

## VIII.  Other Pending Motions

In light of this order, the Court overrules as moot Chevron's remaining dispositive motions. Chevron filed all but one of these motions jointly with other defendants.  The Court overrules them as moot only as to Chevron.

**IT IS THEREFORE ORDERED** that Defendants' Joint Notice Of Motion For Summary Judgment On Plaintiffs' California Unfair Competition Law, Consumer Legal Remedies Act, Florida Deceptive Trade Practices Act And Breach Of Contract (Doc. #2584) filed November 1, 2011 (Rushing), Defendants' Joint Notice Of Motion For Partial Summary Judgment On Plaintiffs' Duty Of Good Faith And Fair Dealing, Unfair Competition Law And Unjust Enrichment Claims (Doc. #2302) filed October 30, 2011 (Lerner), and Defendants' Joint Notice Of Motion For Summary Judgment On Plaintiffs' Unfair Competition Law And Unjust Enrichment Claims (Doc. #2298) filed October 30, 2011 (Wyatt) be and hereby are **SUSTAINED** as to Chevron.

**IT IS FURTHER ORDERED** that Defendants' Joint Notice Of Motion For Partial Summary Judgment Dismissing Plaintiffs' Request For Injunctive Relief (Doc. #2289) filed October 30, 2011; Refiner Defendants' Joint Notice Of Motion For Partial Summary Judgment (Doc. #2292) filed October 30, 2011; Defendants' Joint Notice Of Motion For Partial Summary Judgment On Plaintiffs' Civil Conspiracy Claims (Doc. #2305) filed October 30, 2011; Defendant Chevron U.S.A. Inc.'s Notice Of Motion For Partial Summary Judgment (Doc. #2310) filed October 30, 2011; Defendants' Motion For Partial Summary Judgment Dismissing Plaintiffs' Requests For Injunctive Relief (Doc. #2593) filed November 1, 2011; and Refiner Defendants Joint Notice Of Motion For Partial Summary Judgment (Doc. #2602) filed November 1, 2011 be and hereby are **OVERRULED as moot** as to Chevron.

Dated this 19th day of July, 2013 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge