**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

IN RE: MOTOR FUEL TEMPERATURE )
SALES PRACTICES LITIGATION )
) **MDL No. 1840**
(This Document Relates to All Cases) ) **Case No. 07-MD-1840-KHV**
)
_____ )

## MEMORANDUM AND ORDER

The Court has conditionally certified and preliminarily approved 28 settlements between

plaintiffs and various defendants.[1] On June 9, 2015, the Court held a hearing regarding final

settlement approval. This matter comes before the Court on Plaintiffs' Motion And Memorandum

In Support Of Final Approval Of Class Action Settlements (Doc. #4834) filed June 8, 2015. For

reasons stated below, the Court sustains plaintiffs' motion.

**I.   Legal Standards**

　　**A.   Class Certification**

Class certification is committed to the broad discretion of the trial court. See Shook v. El

Paso Cnty., 386 F.3d 963, 967 (10th Cir. 2004). In determining the propriety of a class action, the

question is not whether plaintiffs have stated a cause of action or will prevail on the merits, but

whether they meet the requirements of Rule 23, Fed. R. Civ. P. See id. at 971 (quoting Anderson

v. City of Albuquerque, 690 F.2d 796, 799 (10th Cir. 1982)). In deciding whether the proposed class

---

[1]　　See In re Motor Fuel Temp. Sales Practices Litig., 286 F.R.D. 488 (D. Kan.
Sept. 28, 2012) (Dansk); In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2012
WL 5876558 (D. Kan. Nov. 20, 2012) (Casey's, Sam's, BP, CITGO, ConocoPhillips, Shell,
Sinclair); In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2012 WL 6115085 (D.
Kan. Dec. 10, 2012) (ExxonMobil, Valero); In re Motor Fuel Temp. Sales Practices Litig., No. 07-
1840-KHV, 2012 WL 5431133 (D. Kan. Oct. 27, 2014) (B-B Oil, Chevron, Coulson Oil, Diamond
State, Flash Market, G & M Oil, J&P Flash, M.M. Fowler, Magness Oil, Port Cities, Thorntons,
United El Segundo, W.R. Hess, World Oil); Memorandum And Order (Doc. #4786) filed
December 10, 2014 (E-Z Mart, Love's, Sunoco, Tesoro).

meets the requirements of Rule 23, though it need not blindly rely on conclusory allegations, the Court accepts plaintiffs' substantive allegations as true. Id. at 968 (quoting J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1290 n.7 (10th Cir. 1999)); see also Vallario v. Vandehey, 554 F.3d 1259, 1265 (10th Cir. 2009). The Court must conduct a "rigorous analysis" to ensure that Rule 23 requirements are met, but should not pass judgment on the merits of the case. DG ex rel. Stricklin v. Devaughn, 594 F.3d 1188, 1194 (10th Cir. 2010).

As the parties seeking class certification, plaintiffs have the burden to prove that Rule 23 requirements are satisfied. Shook, 386 F.3d at 968; D. Kan. Rule 23.1(d).[2] Plaintiffs must first satisfy the prerequisites of Rule 23(a). To do so, they must demonstrate that (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact are common to the class, (3) the claims of the representative parties are typical of the claims of the class and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).[3] After meeting these requirements, plaintiffs must demonstrate that the

---

[2]        D. Kan. Rule 23.1(d) states in part as follows:

(d) Burden of Proof; Notice. Any party seeking to maintain a case as a class action bears the burden of presenting an evidentiary basis to the court showing that the action is properly maintainable as such.

D. Kan. Rule 23.1(d).

[3]        Rule 23(a) states as follows:

(a) Prerequisites. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
        (1) the class is so numerous that joinder of all members is impracticable;
        (2) there are questions of law or fact common to the class;
        (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(continued...)

proposed class action fits within one of the categories described in Rule 23(b), Fed. R. Civ. P.[4]

Here, plaintiffs seek to proceed under Rule 23(b)(3).  Under that provision, plaintiffs must show that "questions of law or fact common to the members of the class predominate over any questions affecting individual members" and that a class action "is superior to other available

---

[3](...continued)
>        (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

[4]        Rule 23(b) states as follows:

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:
>        (1) prosecuting separate actions by or against individual class members would create a risk of:
>>        (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>        (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>        (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>        (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>>        (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>        (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>        (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>        (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  In

determining predominance and superiority under Rule 23(b)(3), the Court considers the following:

> (A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B)   the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D)   the likely difficulties in managing a class action.

Id.  In deciding whether to certify a settlement class, the Court need not inquire whether the case

would present difficult management problems under Rule 23(b)(3)(D), if tried.  Amchem Prods., Inc.

v. Windsor, 521 U.S. 591, 620 (1997).  All of the other requirements apply, however, and demand

heightened attention in the settlement context.  Id.  Such scrutiny is vital because in the settlement

context, the Court generally lacks an opportunity to adjust the class as it becomes informed by the

proceedings as they unfold.  Id.

### B.    Settlement Fairness

Under Rule 23(e), claims of a certified class may be settled, compromised or dismissed only

with court approval.  Fed. R. Civ. P. 23(e).[5]  The Court may approve a settlement upon finding that

---

[5]      Rule 23(e) states as follows:

(e) Settlement, Voluntary Dismissal, or Compromise.  The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval.  The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
> (1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
> (2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
> (3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(continued...)

it is fair, reasonable and adequate.  See Fed. R. Civ. P. 23(e)(2).   In evaluating a proposed

settlement, the Court's main concern is to ensure that the rights of passive class members are not

jeopardized.  See 7B Charles Alan Wright, et al., Federal Practice & Procedure § 1797. 1, at 79

(3d ed. 2005); see also Amchem Prods., 521 U.S. at 623 (Rule 23(e) inquiry protects unnamed class

members from unjust or unfair settlements when representatives become fainthearted before action

adjudicated or secure satisfaction of individual claims by compromise).  It is generally accepted that

when examining the fairness of the proposed settlement before class certification, district courts

must be "even more scrupulous than usual."  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516,

534 (3d Cir. 2004); accord Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998); see also

Manual for Complex Litigation, Fourth § 21.612, at 313 (2004).

In determining whether the settlement is fair, reasonable and adequate, the Court should

consider the following factors:

> (1) whether the proposed settlement was fairly and honestly negotiated;
> (2) whether serious questions of law and fact exist, placing the ultimate outcome of
> the litigation in doubt;
> (3) whether the value of an immediate recovery outweighs the mere possibility of
> future relief after protracted and expensive litigation; and
> (4) the judgment of the parties that the settlement is fair and reasonable.

Rutter & Wilbanks Corp. v. Shell Oil Co., 314 F.3d 1180, 1188 (10th Cir. 2002); Jones v. Nuclear

---

[5](...continued)

> (4) If the class action was previously certified under Rule 23(b)(3), the court
> may refuse to approve a settlement unless it affords a new opportunity to
> request exclusion to individual class members who had an earlier opportunity
> to request exclusion but did not do so.
> (5) Any class member may object to the proposal if it requires court approval
> under this subdivision (e); the objection may be withdrawn only with the
> court's approval.

Fed. R. Civ. P. 23(e).

Pharmacy, Inc., 741 F.2d 322, 324 (10th Cir. 1984). The proponents of the settlement must provide sufficient evidence to support a conclusion that the settlement is fair. See Gottlieb v. Wiles, 11 F.3d 1004, 1015 (10th Cir. 1993), overruled in part on other grounds, Devlin v. Scardelletti, 536 U.S. 1 (2002); In re Sprint Corp. ERISA Litig., 443 F. Supp.2d 1249, 1256 (D. Kan. 2006).

## II.      Procedural And Factual Background

On June 18, 2007, the Judicial Panel on Multidistrict Litigation ("MDL Panel") designated this Court as the transferee court for federal cases challenging sales practices of motor fuel retailers and refiners with regard to motor fuel temperature. The cases challenge defendants' practice of selling motor fuel by the gallon without disclosing or adjusting for temperature and without disclosing the effect of temperature on motor fuel in 26 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia), the District of Columbia, Puerto Rico and Guam. Second Consolidated Amended Complaint (Doc. # 652) filed December 1, 2008 ¶ 11. With respect to all pending cases, the Court has completed consolidated discovery. In addition, the Court has ruled on numerous dispositive and key evidentiary and legal matters. For an overview of the Court's rulings, see Suggestion Of Remand And Final MDL Pretrial Order For Remanded Cases (Doc. #4671) filed November 15, 2013 at 13-23.

### A.      Costco Settlement

In April of 2009, plaintiffs agreed to settle class claims against Costco Wholesale Corporation, a defendant in 19 of the MDL cases. See In re Motor Fuel Temp. Sales Prac. Litig., 271 F.R.D. 263, 270-71 (D. Kan. 2010). Under the proposed settlement, in 14 states in which it

purchased fuel on a temperature-adjusted basis, Costco agreed over the next five years to convert its existing motor fuel dispensers to automatic temperature compensation ("ATC") dispensers and install ATC dispensers at any new retail stations. In addition, in seven states in which it purchased fuel on a non-temperature-adjusted basis, Costco agreed to convert its motor fuel dispensers to ATC dispensers if it began to purchase motor fuel on a temperature-adjusted basis.[6] On August 13, 2009, the Court conditionally certified the proposed settlement class and granted preliminary approval of the settlement. Id. at 272.

Following a hearing on April 1, 2010, the Court declined final class certification and final settlement approval. It found that the structure of the proposed settlement did not assure that the named representatives operated under a proper understanding of their representational responsibilities to distinct subgroups and that plaintiffs had not shown that a representative from one state could adequately represent the interests of class members who resided in different states. Id. at 281-84. The Court concluded that plaintiffs had not shown that the named representatives were adequate representatives under Rule 23(a)(4), Fed. R. Civ. P., but that the parties could

---

[6]     The original Costco settlement agreement proposed the following settlement class:

All residents of [Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Virginia, the District of Columbia and Guam] who, between January 1, 2001 and [April 22, 2009], purchased motor fuel from Costco at a temperature above 60 degrees Fahrenheit, excluding (a) officers and employees of Costco or its affiliates; and (b) the Court, and members of the Court's immediate family.

In re Motor Fuel, 271 F.R.D. at 271.

restructure the agreement to try to remedy the problem.[7]  Id.

On January 3, 2011, plaintiffs and Costco entered into an amended settlement agreement. See Exhibit A to Doc. #1769.  The terms of the amended settlement mirrored those of the original settlement, except that the amended agreement created subclasses of persons who purchased fuel in each state and appointed a representative from each state to represent each subclass.  See In re Motor Fuel, 271 F.R.D. at 270-72.  Following notice to class members, the Court held a hearing and granted final approval of the amended settlement.  In re Motor Fuel Temp. Sales Prac. Litig., No. 07-1840-KHV, 2012 WL 1415508 (D. Kan. April 24, 2012).  Specifically, the Court found that class members would benefit from an opportunity to purchase fuel at ATC because it would allow them an opportunity to achieve accuracy and consistency of fuel measurement for their fuel dollar, regardless of temperature at the time of pumping.  See id. at *14.[8]

**B.   Kansas Cases**

On May 28, 2010, the Court certified classes under Rule 23(b)(2) as to the liability and injunctive relief aspects of plaintiffs' claims in two Kansas cases.[9]  See In re Motor Fuel Temp. Sales Practices Litig., 271 F.R.D. 221 (D. Kan. 2010).  On January 12, 2012, the Court declined to decertify the classes and certified additional classes under Rules 23(b)(3) and (c)(4) as to the liability

---

[7]     Specifically, the Court noted that the parties could restructure the proposed settlement to (1) assure that representatives from conversion states represented class members from conversion states and representatives from non-conversion states represented class members from non-conversion states; and (2) create subclasses to account for material differences in state laws. In re Motor Fuel, 271 F.R.D. at 271.

[8]     With regard to the Costco settlement, issues regarding attorney's fees, expenses and class representative incentive awards remain pending.  See Docs. #1820, 2084.

[9]     The Kansas cases were Wilson v. Ampride, Inc., Case No. 06–2582 and American Fiber & Cabling, LLC v. BP West Coast Products, LLC, Case No. 07–2053.

and injunctive relief aspects of the Kansas claims.[10]  See In re Motor Fuel Temp. Sales Practices Litig., 279 F.R.D. 598, 614-17 (D. Kan. 2012).

In April of 2012, the Court overruled defendants' motions for summary judgment on plaintiffs' claims that defendants' sales practices constituted willful omissions and/or unconscionable acts or practices under the Kansas Consumer Protection Act ("KCPA"), K.S.A. §§ 50-626(b)(3) and 50-627.  See In re Motor Fuel Temp. Sales Practices Litig., 867 F. Supp.2d 1124, 1137-42 (D. Kan. April 4, 2012).  Defendants asserted that they were entitled to judgment as a matter of law because Kansas law specifically authorized the sale of motor fuel without disclosing or adjusting for temperature and because Kansas law prohibited using ATC at retail.  The Court found that although Kansas law authorized the sale of retail motor fuel in gross gallons, i.e. 231 cubic inches with no reference to temperature, that fact standing alone did not shield defendants from liability on plaintiffs' claims.  Id. at 1133-38.  The Court declined to find as a matter of law that Kansas law categorically prohibited the use of retail motor fuel devices equipped with ATC.[11]  Id. at 1138.

In September of 2012, the Court held a jury trial on plaintiffs' class action claims under the KCPA.[12]  Plaintiffs tried the willful omission claims to a jury and the unconscionability claims to the Court.  The jury found that defendants did not willfully fail to state, conceal, suppress or omit

---

[10]     On February 13, 2013, the Court approved plaintiffs' proposed notice plan regarding the Kansas classes.  See Order (Doc. #3729).

[11]     In overruling defendants' motions for summary judgment on plaintiffs' Kansas claims for injunctive relief, the Court found that under Burford v. Sun Oil Co., 319 U.S. 315 (1943), adjudicating plaintiffs' claims did not require it to interfere with the proceedings or orders of state administrative agencies.  See Memorandum And Order (Doc. #4231) filed April 4, 2012 at 12-14.

[12]     The defendants in the Kansas trial were 7-Eleven, Inc., Kum & Go, L.C. and QuikTrip Corp.  See Verdict (Doc. #4422) filed September 24, 2012.

the fact that temperature affects the energy content and therefore the value of motor fuel and/or the temperature of motor fuel.  See Verdict (Doc. #4422) filed September 24, 2012.  The Court found that on the evidence presented at trial, defendants' practice of selling motor fuel by the gallon without disclosing temperature, disclosing the effect of temperature or adjusting for temperature was not unconscionable.  See In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2012 WL 4794355, at *2-3 (D. Kan. Oct. 3, 2012).

### C.    Ten Settlements

In the summer of 2012, before the Kansas trial, plaintiffs negotiated ten settlements with the following defendants: (1) BP Products North America Inc. and BP West Coast Products LLC (collectively, "BP"); (2) CITGO Petroleum Company; (3) ConocoPhillips Company; (4) Exxon Mobil Corporation, Esso Virgin Island, Inc. and Mobil Oil Guam, Inc. (collectively, "ExxonMobil"); (5) Motiva Enterprises LLC and Equilon Enterprises LLC d/b/a Shell Oil Products US (collectively, "Shell"); (6) Sinclair Oil Corporation and its corporate affiliates (collectively, "Sinclair"), (7) Casey's General Stores, Inc.; (8) Dansk Investment Group, Inc. (formerly known as USA Petroleum Corporation) ("Dansk"); (9) Sam's Club, Sam's East, Inc., Sam's West, Inc., Wal-Mart Stores, Inc. and Wal-Mart Stores East, LLP (collectively, "Sam's"); and (10) Valero Marketing and Supply Company.

In late 2012, the Court conditionally certified and preliminarily approved the ten settlements. See In re Motor Fuel Temp. Sales Practices Litig., 286 F.R.D. 488 (D. Kan. Sept. 28, 2012) (Dansk); In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2012 WL 5876558 (D. Kan. Nov. 20, 2012) (Casey's, Sam's, BP, CITGO, ConocoPhillips, Shell, Sinclair); In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2012 WL 6115085 (D. Kan.

Dec. 10, 2012) (ExxonMobil, Valero).  After several modifications to the proposed notice plan, on September 20, 2013, the Court approved a notice plan regarding the proposed settlements.[13]  See Memorandum And Order (Doc. #4648).

### D.    California Cases

In April of 2013, the Court certified classes under Rule 23(b)(2) and (3) against non-settling defendants in three California cases.[14]  See In re Motor Fuel Temp. Sales Pract. Litig., 292 F.R.D. 652 (D. Kan. April 5, 2013); Order (Doc. #4544) filed April 9, 2013.  On July 19, 2013, the Court entered summary judgment in favor of those defendants.  See In re Motor Fuel Temp. Sales Practices Litig., 07-1840-KHV, 2013 WL 3795206 (D. Kan. July 19, 2013); In re Motor Fuel Temp. Sales Practices Litig., 07-1840-KHV, 2013 WL 4411092 (D. Kan. Aug. 14, 2013). Specifically, the Court found that under California law, because Handbook 44[15] expressly authorizes the sale of gross gallons of motor fuel without adjusting for temperature, defendants were entitled to a safe harbor from liability for their sales practices.[16]  See 2013 WL 3795206, at 14-18.

---

[13]    The Court ordered plaintiffs to provide class notice by November 29, 2013 and scheduled a final approval hearing for February 20, 2014.  Order (Doc. #4652) filed September 26, 2013.

[14]    The three California cases are Rushing v. Ambest, Inc., No. 06-7621-PJH (N.D. Cal.), Lerner v. Costco Wholesale Corp., No. 07-1216-GHK-FMO (C.D. Cal.) and Wyatt v. B.P. America Corp., No. 07-1754-BTM-JMA (S.D. Cal.).

[15]    In partnership with the National Institute of Standards and Technology ("NIST"), the National Conference on Weights and Measures ("NCWM") has developed specifications, tolerances and other technical requirements for weighing and measuring devices, including retail motor fuel devices. The NIST publishes these standards in Handbook 44.  Each state must independently decide whether to adopt all or part of Handbook 44 and how to interpret the handbook under its law.  See, e.g., Memorandum And Order (Doc. #4369) filed August 15, 2012 at 12 (Handbook 44 is not law; it simply contains model rules for states to adopt if they choose).

[16]    The Court found that its holding, i.e. that Handbook 44 expressly authorized the sale
(continued...)

In light of the summary judgment rulings in the California cases, the Court found that it would not require plaintiffs to give class notice regarding claims against the non-settling defendants in the California cases.  See In re Motor Fuel Temp. Sales Practices Litig., 07-1840-KHV, 2013 WL 4411092, at *4 (D. Kan. Aug. 14, 2013).[17]

### E.    Suggestion Of Remand

On August 14, 2013, the Court suggested that as to the California cases, the MDL Panel remand to the transferor courts plaintiffs' California-law claims against the non-settling defendants. See Suggestion Of Remand (Doc. #4617) filed August 14, 2013.  The MDL Panel agreed.  See Separation Of Claims And Conditional Remand Order (Doc. #4643) filed September 13, 2013.

On November 15, 2013, the Court suggested that the MDL Panel remand to transferor courts all claims against the non-settling defendants.[18]  See Suggestions Of Remand And Final MDL

---

[16](...continued)
of gross gallons without adjusting for temperature, did not conflict with its previous holding in the Kansas cases, i.e. that Handbook 44 did not expressly prohibit a retailer from adjusting the size or price of a gallon to equal 231 cubic inches at a standardized temperature.  See 2013 WL 3795206, at *14.  In other words, the Court found that Handbook 44 expressly authorized defendants to sell motor fuel without disclosing or adjusting for temperature but did not necessarily prohibit the sale of motor fuel at retail using ATC.  Id.  The Court also found that its summary judgment ruling in the California cases (that defendants were entitled to a safe harbor under California law) was not inconsistent with its summary judgment rulings in the Kansas cases because in the Kansas cases, defendants did not show that Kansas law provided a "safe harbor" as California law did.  Id. at *14 n.4.

[17]      The Court found that to give notice after the summary judgment rulings would circumvent the purposes behind Rule 23(c)(3), i.e. to give class members notice and an opportunity to opt out before the Court rules on the merits of the case.  In re Motor Fuel, 2013 WL 4411092, at *4 (citing Schwarzschild v. Tse, 69 F.3d 293 (9th Cir. 1995)).

[18]      In one case, Rushing v. Ambest, Inc. (N.D. Cal. No. 06-7621-PJH; D. Kan. No. 07-2300-KHV), the Court did not suggest remand of the remaining claims of one plaintiff, Lesley Duke. See Suggestions Of Remand And Final MDL Pretrial Order For Remanded Cases (Doc. #4671) at 3 n.5.  Those claims have since been remanded.  See Separation Of Claims And Conditional Remand
(continued...)

Pretrial Order For Remanded Cases (Doc. #4671).  Following the suggestion of remand, as discussed below, plaintiffs entered into 18 new settlement agreements.  In light of the new settlements, the Court supplemented its suggestion of remand and recommended that it retain jurisdiction over claims against the newly-settled defendants to complete settlement approval and class notice and resolve issues regarding attorney's fees.  See Supplement To Suggestion Of Remand (Doc. #4732) filed March 23, 2014.

On April 8, 2014, the MDL Panel remanded unsettled claims in one case, Craft v. The Kroger Co., (E.D. Tex. No. 07-00271; D. Kan. No. 07-2360).  See Order Lifting Stay Of Separation Of Claims And Conditional Remand Order (Doc. #4751).

### F.    18 New Settlements

Following the Court's suggestion of remand on November 15, 2013, plaintiffs entered into 18 settlement agreements with the following defendants: (1) B-B Oil Company, Inc., (2) Chevron U.S.A. Inc., (3) Coulson Oil Company, Inc., (4) Diamond State Oil, LLC, (5) E-Z Mart Stores, Inc., (6) Flash Market, Inc., (7) G&M Oil Company, Inc. and G&M Oil Co., LLC (collectively, "G&M Oil"), (8) J&P Flash, Inc., (9) Love's Travel Stops & Country Stores, Inc., (10) M.M. Fowler, Inc., (11) Magness Oil Company, (12) Port Cities Oil, LLC, (13) Sunoco, Inc., (14) Tesoro Refining and Marketing Company LLC, (15) Thorntons Inc., (16) United El Segundo, Inc., (17) W. R. Hess and (18) World Oil Corp.

In light of the new settlements, to give plaintiffs an opportunity to obtain preliminary approval and include them in the combined notice plan, the Court agreed to vacate deadlines for completing the notice and objection period regarding the previous ten settlements.  See Order

---

[18](...continued)
Order (Doc. #4800) filed February 19, 2015.

(Doc. #4679) filed November 21, 2013; Motion To Vacate Settlement-Related Deadlines (Doc. #4673) filed November 18, 2013.

In late 2014, the Court conditionally certified and preliminarily approved the 18 new settlements. See In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2014 WL 5431133 (D. Kan. Oct. 27, 2014) (B-B Oil, Chevron, Coulson Oil, Diamond State, Flash Market, G & M Oil, J&P Flash, M.M. Fowler, Magness Oil, Port Cities, Thorntons, United El Segundo, W.R. Hess, World Oil); Memorandum And Order (Doc. #4786) filed December 10, 2014 (E-Z Mart, Love's, Sunoco, Tesoro). In addition, the Court approved plaintiffs' proposal to include the 18 new settlements in the class notice plan which the Court had previously approved for the ten earlier settlements. See In re Motor Fuel, 2014 WL 5431133, at *16.[19] The Court ordered plaintiffs to provide notice to settlement class members by February 20, 2015, and set March 23, 2015 as the last day for class members to opt out or object to the settlements. See Order (Doc. #4786) filed December 10, 2014.

### III.  Settlement Terms, Class Notice And Objections

#### A.  Terms Of Ten Settlements

As discussed, in the summer of 2012, before the Kansas trial, plaintiffs negotiated settlement agreements with ten defendants. Specific details regarding the terms of the settlements are set forth in the Court's orders granting preliminary approval. See In re Motor Fuel Temp. Sales Practices Litig., 286 F.R.D. 488 (D. Kan. Sept. 28, 2012) (Dansk); In re Motor Fuel Temp. Sales Practices

---

[19]    See also Motion Of Plaintiffs For Order Conditionally Certifying Settlement Classes, Preliminarily Approving Eighteen (18) Class Action Settlements, Directing And Approving Distribution Of Class Notice, Setting Hearing For Final Approval Of Class Action Settlements And Appointing Class Counsel (Doc. #4724) filed March, 15, 2014 at 14-15, 25-25; Notice Of Revised Class Settlement Notice Forms (Doc. #4749) filed March 26, 2014 and exhibits thereto.

Litig., No. 07-1840-KHV, 2012 WL 5876558 (D. Kan. Nov. 20, 2012) (Casey's, Sam's, BP, CITGO, ConocoPhillips, Shell, Sinclair); In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2012 WL 6115085 (D. Kan. Dec. 10, 2012) (ExxonMobil, Valero); see also Exhibits 2-11 to Motion For Final Settlement Approval (Doc. #4834).

**1.     Refiner Settlements – BP, CITGO, ConocoPhillips, ExxonMobil, Shell And Sinclair**

Briefly summarized, six settlements involve so-called "refiner" defendants, i.e. BP, CITGO, ConocoPhillips, ExxonMobil, Shell and Sinclair. Under these settlements, defendants agree to pay the following amounts:

|  | Settlement Fund | Class Notice Fund |
|---|---|---|
| BP[20] | $ 4,900,000 | $100,000 |
| CITGO[21] | $ 800,000 | $100,000 |
| ConocoPhillips[22] | $ 4,900,000 | $100,000 |

---

[20]     The BP Settlement includes subclasses of persons and entities who purchased retail motor fuel in 24 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, North Carolina, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia) and the District of Columbia. BP Settlement ¶¶ 3(a)-(y), Exhibit 3 to Motion For Final Settlement Approval (Doc. #4834).

[21]     The CITGO Settlement includes subclasses of persons and entities who purchased retail motor fuel in 24 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas and Virginia) and the District of Columbia. CITGO Settlement ¶¶ 3(a)-(y), Exhibit 4 to Motion For Final Settlement Approval (Doc. #4834).

[22]     The ConocoPhillips Settlement includes subclasses of persons and entities who purchased retail motor fuel in 26 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia), Guam and the District of Columbia. ConocoPhillips Settlement ¶¶ 3(a)-(bb), Exhibit 5 to Motion For Final Settlement Approval (Doc. #4834).

| | | |
|---|---|---|
| ExxonMobil[23] | $ 5,000,000 | n/a |
| Shell[24] | $ 4,900,000 | $100,000 |
| Sinclair[25] | $ 700,000 | $100,000 |
| TOTAL | $21,200,000 | $500,000 |

After deducting attorney's fees, litigation costs, notice expenses and costs of settlement or claims administration, the remaining proceeds of the settlement fund, i.e. the net proceeds, shall be allocated pro rata among the settlement states.[26] Of the net settlement funds allocated to each state, two-thirds may be used to reimburse retailers or wholesalers selling retail motor fuel under defendant's brand for expenses incurred in installing ATC.[27] The remaining one-third of net

---

[23] The ExxonMobil Settlement includes subclasses of persons and entities who purchased retail motor fuel in 25 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia), Guam, the Virgin Islands and the District of Columbia. ExxonMobil Settlement ¶¶ 3(a)-(bb), Exhibit 10 to Motion For Final Settlement Approval (Doc. #4834).

[24] The Shell Settlement includes subclasses of persons and entities who purchased retail motor fuel in 26 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia) and the District of Columbia. Shell Settlement ¶¶ 3(a)-(aa), Exhibit 7 to Motion For Final Settlement Approval (Doc. #4834).

[25] The Sinclair Settlement includes subclasses of persons and entities who purchased retail motor fuel in 11 states (Arizona, Arkansas, Kansas, Mississippi, Nevada, New Mexico, Oklahoma, Oregon, Texas and Utah). Sinclair Settlement ¶¶ 3(a)-(k), Exhibit 8 to Motion For Final Settlement Approval (Doc. #4834).

[26] The refiner defendants agree that they will not oppose incentive fees to subclass representatives, attorney's fees and litigation costs up to 30 per cent of the settlement amounts.

[27] The CITGO settlement provides funds only to state regulators and not to retailers or wholesalers. In the preliminary approval process, plaintiffs explained that the reason for the difference is that unlike the other refiner defendants, CITGO maintains that it has never owned or operated any CITGO-branded gas stations in the settlements states. See In re Motor Fuel, 2012 WL 5876558, at *7. Plaintiffs asserted that they agreed to a lower settlement amount for CITGO in light of unresolved legal and factual issues regarding whether CITGO is liable for motor fuel sales of its

(continued...)

settlement funds allocated to each state may be used by the state's department of weights and measures or other agency responsible for regulating retail motor fuel dispensers to defray some state costs of implementing ATC at retail.[28]  After five years, any sums remaining in the net settlement fund shall become available for disbursement either to (1) retailers or wholesalers or (2) weights and measures departments, regardless whether the application for disbursement comes from a state whose allocation of the net settlement fund is exhausted.  After six years, any portion of the amount of the net settlement fund which was originally allocated to facilitate ATC in a particular state shall be contributed to that state.[29]

### 2.    ATC Settlements – Casey's, Dansk, Sam's And Valero

The settlements with Casey's, Dansk, Sam's and Valero (the "ATC Settlements") are similar to those of the amended Costco settlement which the Court has already approved.  Under the ATC Settlements, over a three to five-year phase-in period, defendants agree to install ATC at retail motor fuel pumps in certain settlement states.[30]  Also, each defendant agrees to pay specified

---

[27](...continued)
franchises.  See id.

[28]      To receive payment, an eligible state agency must provide a written statement that (1) explains that the state has adopted ATC at retail and (2) describes how the state would use a portion of the settlement fund to assist in that implementation.

[29]      The ExxonMobil Settlement provides that after five years, any portion of the amount of the net settlement fund which was originally allocated to facilitate ATC in a particular state shall be contributed to that state.  ExxonMobil Settlement ¶ 14(h), Exhibit 10 to Motion For Final Settlement Approval (Doc. #4834).

[30]      The Casey's Settlement includes subclasses of persons and entities who purchased motor fuel from Casey's in five states (Arkansas, Indiana, Kansas, Missouri and Oklahoma). Casey's Settlement ¶¶ 2.1(a)-(e), Exhibit 9 to Motion For Final Settlement Approval (Doc. #4834).

The Dansk settlement class includes persons who purchased motor fuel from Dansk in (continued...)

amounts for class notice and plaintiffs' attorney's fees, subject to Court approval.[31]

### B.   Terms Of 18 New Settlements

As discussed, following the Court's suggestion of remand on November 15, 2013, plaintiffs entered into 18 new settlement agreements.  Specific details regarding the terms of these settlements are set forth in the Court's orders granting preliminary approval.  See In re Motor Fuel Temp. Sales Practices Litig., No. 07-1840-KHV, 2014 WL 5431133 (D. Kan. Oct. 27, 2014) (B-B Oil, Chevron, Coulson Oil, Diamond State, Flash Market, G & M Oil, J&P Flash, M.M. Fowler,

---

[30](...continued)
California.   Dansk Settlement ¶ 2.1, Exhibit 2 to Motion For Final Settlement Approval (Doc. #4834).

The Sam's Settlement includes subclasses of persons and entities who purchased motor fuel from Sam's in 25 states (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah and Virginia).   Sam's Settlement ¶¶ 2.1(a)-(y), Exhibit 6 to Motion For Final Settlement Approval (Doc. #4834).  Similar to Costco, Sam's agrees to install ATC in the settlement states where it purchases motor fuel on temperature-adjusted basis.  See id. ¶¶ 1.7, 1.21, 4.2-4.4, 4.6, 6.1-6.2.

The Valero Settlement includes subclasses of persons and entities who purchased motor fuel from Valero in 24 states: (Alabama, Arizona, Arkansas, California, Delaware, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Jersey, New Mexico, North Carolina, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas and Virginia).  Valero Settlement ¶¶ 1.28, 2.1, Exhibit 11 to Motion For Final Settlement Approval (Doc. #4834).

[31]      Casey's agrees to pay $100,000 for class notice and $700,000 for attorney's fees. Casey's Settlement ¶¶ 3.2, 7.1.

Dansk agrees to pay all costs associated with its notice plan and $58,000 for attorney's fees. Dansk Settlement ¶ 8.

Sam's agrees to pay $200,000 for class notice and $3,000,000 for attorney's fees.  Sam's Settlement ¶¶ 3.2, 7.1.

Valero agrees to pay $50,000 for class notice and $4,000,000 for attorney's fees.  Valero Settlement ¶¶ 4.11-12.

Magness Oil, Port Cities, Thorntons, United El Segundo, W.R. Hess, World Oil); <u>Memorandum And Order</u> (Doc. #4786) filed December 10, 2014 (E-Z Mart, Love's, Sunoco, Tesoro); <u>see also</u> Exhibits 12-29 to <u>Motion For Final Settlement Approval</u> (Doc. #4834).

### 1. Chevron Settlement

Briefly summarized, Chevron agrees to pay $2,000,000 into a settlement fund and $125,000 for class notice expenses.[32] <u>Id.</u> ¶¶ 1(s), (ii), (ll), 7-9.  The remaining terms of the Chevron settlement are similar to the refiner settlements discussed above.[33]

### 2. 17 Remaining Settlements

Under the 17 remaining settlements, defendants agree to pay various amounts into settlement funds which state departments of weights and measures, or other agencies responsible for regulating retail motor fuel dispensers, can use to defray state costs of implementing ATC at retail.  In addition, the settlement funds will pay for plaintiffs' attorney's fees, litigation costs and class notice expenses.  Specifically, defendants agree to pay the following amounts:

---

[32]     The Chevron Settlement includes subclasses of persons who purchased retail motor fuel in 23 states (Alabama, Arizona, California, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, South Carolina, Tennessee, Texas,  Utah and Virginia) and the U.S. Virgin Islands.  Chevron Settlement at 15-18, Exhibit 12 to <u>Motion For Final Settlement Approval</u> (Doc. #4834).

[33]     Of the net settlement funds allocated to each state, two thirds may be used to reimburse retailers or wholesalers for expenses incurred in installing ATC equipment and the remaining one third may be used to defray state costs of rule making, regulation, inspection or oversight related to implementing ATC at retail. Chevron Settlement Agreement ¶ 14(a), (b). After six years, any sums remaining in the net settlement fund shall be contributed to the state.  <u>Id.</u> ¶ 14(c)(i).  Chevron will not oppose attorney's fees and litigation costs up to $600,000, <u>i.e.</u> 30 per cent of the settlement fund. <u>Id.</u> ¶ 26.

|                        | Settlement Fund | Class Notice Fund |
|------------------------|-----------------|-------------------|
| BB Oil[34]             | $ 20,000        | $ 1,000           |
| Coulson Oil            | $ 20,000        | $ 1,000           |
| Diamond State          | $ 20,000        | $ 1,000           |
| Flash Market           | $ 20,000        | $ 1,000           |
| J&P Flash              | $ 20,000        | $ 1,000           |
| Magness Oil            | $ 20,000        | $ 1,000           |
| Port Cities Oil        | $ 20,000        | $ 1,000           |
| W.H. Hess              | $ 20,000        | $ 1,000           |
| G&M Oil[35]            | $ 40,000        | n/a               |
| World Oil              | $ 40,000        | n/a               |
| United El Segundo      | $ 40,000        | n/a               |
| E-Z Mart[36]           | $ 90,000        | n/a               |

---

[34]     The settlements with BB Oil, Coulson Oil, Diamond State, Flash Market, J&P Flash, Magness Oil, Port Cities and W.H. Hess include persons and entities who purchased retail motor fuel in Arkansas from a station owned, leased, operated or controlled by a settling defendant. BB Oil Settlement at 5-6, Coulson Oil Settlement at 5-6; Diamond State Settlement at 5-6; Flash Market Settlement at 5-6; J&P Flash Settlement at 5-6; Magness Oil Settlement at 5-6; Port Cities Settlement at 5-6; W.H. Hess Settlement at 5, Exhibits 13-20 to Motion For Final Settlement Approval (Doc. #4834). Defendants will not oppose attorney's fees and litigation costs up to 30 per cent of the settlement amount and after three years, any sums remaining in the net settlement fund shall escheat to the general fund of the state. BB Oil Settlement at 8-9; Coulson Oil Settlement at 8-9; Diamond State Settlement at 8-9; Flash Market Settlement at 8-9; J&P Flash Settlement at 8-9; Magness Oil Settlement at 8-9; Port Cities Settlement at 8-9; W.H. Hess Settlement at 8-9.

[35]     The settlements with G&M Oil, United El Segundo and World Oil include persons who purchased retail motor fuel in California from a station owned or operated by a settling defendant. G&M Oil Settlement at 13; United Settlement at 13; World Oil Settlement at 13, Exhibits 21-23 to Motion For Final Settlement Approval (Doc. #4834). Defendants will not oppose attorney's fees and litigations costs up to 30 per cent of the settlement amount and after six years, any sums remaining in the net settlement fund shall be contributed to the state's general fund. G&M Oil Settlement at 16; United Settlement at 16-17; World Oil Settlement at 16-17.

[36]     The E-Z Mart Settlement includes subclasses of persons and entities who purchased retail motor fuel in Oklahoma and Arkansas from a station owned, operated or controlled by defendant. E-Z Mart Settlement at 6, Exhibit 26 to Motion For Final Settlement Approval (Doc. #4834). After two years, any remaining funds shall become available to the weights and measures departments of either state under the settlement and after three years, any remaining funds shall be contributed to the state at issue. Id. at 9-10. E-Z Mart will not oppose attorney's fees and litigation costs up to 30 per cent of the settlement amount. Id. at 7.

| | | |
|---|---|---|
| Love's[37] | $100,000 | $ 5,000 |
| MM Fowler[38] | $ 22,500 | $ 1,000 |
| Sunoco[39] | $ 60,000 | $ 1,000 |
| Tesoro[40] | $ 50,000 | n/a |
| Thorntons[41] | $ 60,000 | n/a |
| TOTAL | $662,500 | $15,000 |

---

[37]  The Love's Settlement includes subclasses of persons and entities who purchased retail motor fuel in Oklahoma and Georgia from a station owned, operated or controlled by defendant.  Love's Settlement at 6, Exhibit 27 to Motion For Final Settlement Approval (Doc. #4834).  After two years, any remaining funds shall become available to the weights and measures departments of either state under the settlement and after three years, any remaining funds shall be contributed to the state at issue.  Id. at 9-10.  Love's will not oppose attorney's fees and litigation costs up to 30 per cent of the settlement amount.  Id. at 7.

[38]  The MM Fowler Settlement includes persons and entities who purchased retail motor fuel in North Carolina from a station owned, leased, operated or controlled by defendant.  MM Fowler Settlement at 5, Exhibit 24 to Motion For Final Settlement Approval (Doc. #4834).  After three years, any sums remaining in the net settlement fund shall escheat to the state's general fund. Id. at 9.  MM Fowler will not oppose attorney's fees up to 30 per cent of the settlement amount.  Id. at 7.

[39]  The Sunoco Settlement includes subclasses of persons and entities who purchased retail motor fuel in Indiana, Maryland, New Jersey, Pennsylvania, South Carolina and Virginia from a station owned, operated or controlled by defendant.  Sunoco Settlement at 6-7, Exhibit 28 to Motion For Final Settlement Approval (Doc. #4834).  After two years, any remaining funds shall become available to the weights and measures departments of any of the states under the settlement and after three years, any remaining funds shall be contributed to the state at issue.  Id. at 11-12. Sunoco will not oppose attorney's fees up to 30 per cent of the settlement amount.  Id. at 8.

[40]  The Tesoro Settlement includes subclasses of persons and entities who purchased retail motor fuel in Nevada and Utah from a station owned, operated or controlled by defendant. Tesoro Settlement at 6, Exhibit 29 to Motion For Final Settlement Approval (Doc. #4834).  After two years, any remaining funds shall become available to the weights and measures departments of either state under the settlement and after three years, any remaining funds shall be contributed to the state at issue.  Id. at 10.  Tesoro will not oppose attorney's fees up to 30 per cent of the settlement amount.  Id. at 7.

[41]  The Thornton Settlement includes persons who purchased retail motor fuel in Kentucky from a station owned, leased, operated or controlled by defendant.  Thorntons Settlement at 5, Exhibit 25 to Motion For Final Settlement Approval (Doc. #4834).  After three years, any remaining funds shall escheat to the state's general fund.  Id. at 8.  Thorntons will not oppose attorney's fees up to 30 per cent of the settlement amount.  Id. at 7.

-21-

### C.    Class Notice

With respect to all settlements, the Court approved a nationwide notice plan designed to obtain more than 75 per cent net reach in settlement and non-settlement states.  See Affidavit Of Jeffrey D.  Dahl Regarding Execution Of The Approved Notice Plan ("Dahl Affidavit") ¶ 6, Exhibit 30 to Motion For Final Settlement Approval") (Doc. #4834).  Specifically, the notice plan included the following components: (1) web-based notice using paid banner ads with links to the settlement website; (2) targeted supplemental radio broadcast notices; (3) targeted supplemental published notices; and (4) additional notice via a dedicated settlement website, web-based "keyword search" ads, a press release and a toll-free help line.  Id.

Plaintiffs submit evidence which demonstrates that the notice campaign successfully reached at least 75 per cent of class members in settlement and non-settlement states.  Id. ¶ 7.  In all, plaintiffs estimate that the notice campaign reached over 194 million class members.  Affidavit Of John Grudnowkski Regarding Execution Of The Approved Notice Plan ¶ 6, Exhibit 31 to Motion For Final Settlement Approval (Doc. #4834).  The notice campaign resulted in more than 308,000 visits and 18,000 pdf downloads from the settlement website.  Id. ¶ 5.  In addition, the notice administrator responded to 777 emails and 29 pieces of written correspondence related to the settlements.  Dahl Affidavit ¶ 30.  Some 104 persons asked to be excluded from one or more settlement class.  Id. ¶ 31 and Exhibit 7 thereto.

### D.    Objections

Two groups and one individual filed objections to the proposed settlements.  See Objection To Proposed Settlements ("Frank Objection") (Doc. #4808) filed March 23, 2015; Objection To Proposed Settlements By QuikTrip Corporation, 7-Eleven Inc., Circle K Stores, Inc., Kum & Go,

L.C., Marathon Petroleum Company LP, Murphy Oil USA, Inc., Pilot Travel Centers, LLC, Flying J, Inc., PTCAA Texas, LP, Racetrac Petroleum, Inc., Sheetz, Inc., Speedway LLC, The Pantry, Inc., and Wawa, Inc. ("QuikTrip Objection") (Doc. #4809) filed March 23, 2015; and Objection (letter) by Jeff Long (individual Kansas class member ) (Doc. #4798) filed February 11, 2015.

### 1.    Frank Objectors

Theodore H. Frank, Melissa Holyoak and Adam Schulman (the "Frank Objectors") object to the settlements with BP, Chevron, CITGO, ConocoPhillips, ExxonMobil, Shell, Sinclair, Sunoco and Valero.[42]   Specifically, the Frank Objectors assert that the Court cannot certify settlement classes because (1) an intra-class conflict exists among settlement class members; (2) contributions to state weights and measures departments constitute compelled political speech; (3) a class action is not "superior" because it cannot provide individual redress to class members; (4) the separation of powers doctrine counsels against certification; (5) Burford v. Sun Oil, 319 U.S. 315 (1943), mandates abstention; and (6) the settlement class representatives are not loyal to class members.  In addition, the Frank Objectors assert that the settlements are unfair because (1) they do not benefit class members; (2) they allow excessive attorney's fees; and (3) the Valero settlement contains a most-favored-nations clause.

### 2.    QuikTrip Objectors

Non-settling and former defendants, QuikTrip Corporation, 7-Eleven Inc., Circle K Stores, Inc., Kum & Go, L.C., Marathon Petroleum Company LP, Murphy Oil USA, Inc., Pilot Travel Centers, LLC, Flying J, Inc., PTCAA Texas, LP, Racetrac Petroleum, Inc., Sheetz, Inc.,

---

[42]      The Frank Objectors assert that they are putative members of these settlement classes. See Exhibits 1-3 to Frank Objection (Doc. #4808).  Plaintiffs do not challenge their standing to object.

Speedway LLC, The Pantry, Inc., and Wawa, Inc. (the "QuikTrip Objectors")[43] assert that the proposed settlements (1) violate Article III of the United States Constitution; (2) violate the First Amendment; (3) create an appearance of quid pro quo corruption; and (4) usurp the prerogatives of federal and state regulators and violate the separation of powers doctrine. Plaintiffs challenge whether the QuikTrip Objectors have standing to object.

### 3.    Individual Objector – Jeff Long

Jeff Long, a resident of Lawrence, Kansas, objects to any settlement which gives money to the State of Kansas, on grounds that it will not properly manage the money. See Doc. #4798.

### E.    Fairness Hearing

On June 9, 2015, the Court heard oral argument from counsel for plaintiffs, settling defendants, the Frank Objectors and the QuikTrip Objectors. See Doc. #4838.

## IV.    Analysis

Plaintiffs seek final approval of 28 settlements. To approve the settlements, the Court must find that class certification is appropriate under Rule 23(a) and (b)(3) and that the proposed settlements are fair, reasonable and adequate under Rule 23(e)(2).

### A.    Class Certification

To obtain class certification, plaintiffs must show that the prerequisites of Rule 23(a) are satisfied and demonstrate that the proposed class action fits within one of the categories described in Rule 23(b). Here, plaintiffs seek to certify a class under Rule 23(b)(3).

---

[43]    As noted, as to Kansas claims, QuikTrip, 7-Eleven and Kum & Go obtained a jury verdict in their favor. See Verdict (Doc. #4422) filed September 24, 2012. As to all other claims, plaintiffs have dismissed with prejudice their claims against the QuikTrip Objectors. See Stipulation Of Dismissal With Prejudice (Doc. #4711).

### 1.    Rule 23(a) Prerequisites

To satisfy the prerequisites of Rule 23(a), plaintiffs must demonstrate that (1) the class is so numerous that joinder of all members is impracticable, (2) questions of law or fact are common to the subclass, (3) the claims of the representative parties are typical of the claims of the subclass and (4) the representative parties will fairly and adequately protect the interests of the subclass.  See Fed. R. Civ. P. 23(a).

### a.    Numerosity

Rule 23(a)(1) requires plaintiffs to show that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1); see also Trevizo v. Adams, 455 F.3d 1155, 1162 (10th Cir. 2006).  To satisfy this requirement, plaintiffs must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved.  See Rex v. Owens ex rel. State of Okla., 585 F.2d 432, 436 (10th Cir. 1978).  The Court has no set formula for determining whether plaintiffs meet this requirement.  Id.  Here, the parties estimate that the proposed settlement classes exceed 100 million members.  See attachments to Notice Of Filing Proof Of Service Of Notice Of Class Action Settlement Served Pursuant To U.S.C. § 1715 (Doc. #4338) filed June 26, 2012.  On this record, the Court finds that the proposed settlement classes are so numerous that joinder of all members would be impracticable.  Accordingly, plaintiffs have satisfied the numerosity requirement of Rule 23(a)(1).

### b.    Commonality

Rule 23(a)(2) requires plaintiffs to show that "questions of law or fact are common to the class."  Fed. R. Civ. P. 23(a)(2).  This inquiry requires the Court to find only whether common questions of law or fact exist; unlike Rule 23(b)(3), such questions need not predominate

under this element.  <u>See</u> <u>Olenhouse v. Commodity Credit Corp.</u>, 136 F.R.D. 672, 679 (D. Kan. 1991).  Here, plaintiffs assert that defendants engaged in the same conduct with respect to all settlement class members, <u>i.e.</u> they did not compensate retail motor fuel sales for temperature and did not inform class members of the detrimental effect that thermal expansion has on quality of motor fuel.  On this record, the Court finds that questions of law or fact are common to the class.  Accordingly, plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).

### c.      Typicality

Rule 23(a)(3) requires plaintiffs to show that their claims are typical of the claims of the class which they seek to represent.  <u>See</u> Fed. R. Civ. P. 23(a)(3); <u>DG ex rel. Stricklin v. Devaughn</u>, 594 F.3d 1188, 1198 (10th Cir. 2010).  The interests and claims of the representative plaintiffs and class members need not be identical to satisfy typicality.  <u>See</u> <u>Stricklin</u>, 594 F.3d at 1198 (citing <u>Anderson</u>, 690 F.2d at 800).  If the claims of the representatives and class members are based on the same legal or remedial theory, differing fact situations of class members do not defeat typicality.  <u>See</u> <u>id.</u> at 1198-99 (citing <u>Adamson v. Bowen</u>, 855 F.2d 668, 676 (10th Cir. 1988)); <u>Jamieson v. Vatterott Educ. Ctrs., Inc.</u>, 259 F.R.D. 520, 547 (D. Kan. 2009).  Here, the claims of the representative plaintiffs and class members are based on the same legal and remedial theories and arise from the same pattern of conduct by defendants: all of them allegedly suffered injury on account of the sale of motor fuel for specified prices per gallon without disclosing or adjusting for temperature expansion.  On this record, the Court finds that plaintiffs' claims are typical of the claims of the class which they seek to represent.  Thus, plaintiffs have satisfied the typicality requirement of Rule 23(a)(3).

### d.   Adequacy Of Representation

Rule 23(a)(4) requires plaintiffs to show that they will fairly and adequately protect the interests of the class.  To meet this requirement, representative plaintiffs must be members of the class which they seek to represent and show that (1) their interests do not conflict with those of other class members and (2) they will be able to prosecute the action vigorously through qualified counsel.  See E. Tex. Motor Freight Sys., Inc., v. Rodriguez, 431 U.S. 395, 403 (1977); Rutter & Wilbanks, 314 F.3d at 1187-88; Olenhouse, 136 F.R.D. at 680.  Minor conflicts among class members do not defeat class certification; to defeat class certification, a conflict must be "fundamental" and go to specific issues in controversy.  Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1189 (11th Cir. 2003).  Here, similar to the Costco amended settlement, the proposed settlements create classes or subclasses with a named representative for each state.  Under this structure, it appears that the interests of each named representative are aligned with the interests of the members of their class or subclass, i.e. their claims involve the same state law and they receive the same relief under the settlement.  See In re Motor Fuel, 2012 WL 1415508 at *10 (approving Costco amended settlement).  For these reasons, and for reasons discussed below with regard to the Frank Objections, the Court finds that plaintiffs have satisfied the adequacy of representation requirement of Rule 23(a)(4).[44]

### 2.   Rule 23(b) Requirements

In addition to meeting the requirements of Rule 23(a), plaintiffs must show that the settlement classes comply with one of three qualifying tests under Rule 23(b).  Here, plaintiffs seek to certify classes and subclasses under subsection (b)(3).  Under that provision, plaintiffs must show

---

[44]   Based on the history of this case, the Court finds that plaintiffs also satisfy the second requirement – they have prosecuted the action vigorously through qualified counsel.

that questions of law or fact common to the members of the class or subclass predominate over any questions affecting individual members and that a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In determining predominance and superiority under Rule 23(b)(3), the Court considers the following non-exhaustive factors:

> (A)   the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B)   the extent and nature of any litigation concerning the controversy already begun by or against class members; [and]
>
> (C)   the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D)   the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The fourth factor, i.e. the likely difficulty of managing a class action, does not apply in the context of a settlement class. Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620 (1997). All of the other requirements apply, however, and demand heightened attention in the settlement context. Id.

Similar to the Court's previous rulings regarding class certification in the Costco settlement and Kansas and California cases, the Court finds that plaintiffs have met the requirements of predominance and superiority. See In re Motor Fuel, 2012 WL 1415508 at *11 (Costco settlement); In re Motor Fuel, 279 F.R.D. at 613 (Kansas cases); In re Motor Fuel, 292 F.R.D. at 674 (California cases). Specifically, the Court finds that common questions predominate over individual questions as to whether defendants are liable to class members for selling motor fuel for a specified price per gallon without disclosing or adjusting for temperature expansion. Moreover, in light of the limited size of any potential financial recovery for any particular class member and the possibility of

inconsistent results, a class action is a far superior method of resolving the claims compared to individual suits. See Amchem Prods., 521 U.S. at 625 (predominance test readily met in certain cases alleging consumer fraud). On this record, the Court finds that plaintiffs have met the predominance and superiority requirements of Rule 23(b)(3). Accordingly, the Court finds that class certification is appropriate under Rule 23(b)(3).

> ### B.     Fairness Of Proposed Settlements

Under Rule 23(e), the Court may approve a class action settlement upon finding that it is fair, reasonable and adequate. See Fed. R. Civ. P. 23(e)(2). To determine whether the proposed settlements are fair, reasonable and adequate, the Court considers the following factors:

> (1) whether the proposed settlement was fairly and honestly negotiated;
>
> (2) whether serious questions of law and fact exist, placing the ultimate outcome of the litigation in doubt;
>
> (3) whether the value of an immediate recovery outweighs the mere possibility of future relief after protracted and expensive litigation; and
>
> (4) the judgment of the parties that the settlement is fair and reasonable.

Rutter & Wilbanks, 314 F.3d at 1188.

Regarding the first factor, as to all settlements, the Court has no doubt that the parties reached the proposed settlement through fair and honest negotiations. The settling parties are represented by top-notch lawyers who have vigorously litigated the cases for more than seven years. This factor weighs in favor of approving the proposed settlements.

Regarding the second factor, as to all settlements, the cases present serious questions of law and fact which place the ultimate outcome of litigation in doubt. Defendants have hotly contested liability and defeated plaintiffs' claims at trial in the Kansas cases and on summary judgment in the

California cases.  Plaintiffs could perhaps obtain a different outcome on appeal or under the laws of other states; plaintiffs chances of prevailing seem slim, however, placing the ultimate outcome of the litigation in doubt.

Regarding the third factor, as set forth below, the Court will evaluate separately the value of an immediate recovery based on the three types of relief provided under the settlements: (1) installing ATC; (2) providing optional funds for retailers and state regulators to facilitate installing ATC; and (3) providing optional funds for state regulators to facilitate installing ATC.

Regarding the fourth factor, as to all settlements, the settling defendants and named plaintiffs believe that the proposed settlements are fair and reasonable.  This factor weighs in favor of approving the proposed settlements.

### 1.    Value Of Recovery Under Settlements Which Install ATC

As discussed, the proposed settlements with Casey's, Dansk, Sam's and Valero provide that over a three to five-year period, defendants will install ATC at retail motor fuel pumps in certain settlement states.  The terms of these settlements are substantially similar to the amended Costco settlement which the Court has already approved.  As with Costco, the Court finds that as to the conversion states, i.e. states in which defendants agree to install ATC motor fuel dispensers, the proposed relief fairly responds to plaintiffs' claims and provides the same relief which plaintiffs might obtain if they ultimately prevailed at trial.  See In re Motor Fuel, 2012 WL 1415508, at *12. In particular, the Court finds that class members would benefit from an opportunity to purchase fuel at ATC because it would give them the ability to achieve accuracy and consistency of fuel measurement for their fuel dollar, regardless of fuel temperature at the time of pumping. See id. at *14.  As to non-conversion states, i.e. states in which defendants purchase fuel on a non-

-30-

temperature-adjusted basis and agree to install ATC dispensers if they begin to purchase motor fuel on a temperature-adjusted basis, the Court finds that plaintiffs probably cannot establish liability because defendants in those states do not benefit from buying fuel one way and selling it another. See id. Although the value of injunctive relief in non-conversion states seems low, it is reasonable under the circumstances. Accordingly, for reasons stated in the Court's previous orders regarding the amended Costo settlement, the Court finds that the third factor weighs in favor of approving the proposed settlements with Casey's, Dansk, Sam's and Valero. See id.; In re Motor Fuel, 271 F.R.D. at 285-87.

2.      **Value Of Recovery Under Settlements Which Provide Optional Funds For Retailers To Install ATC And State Regulators To Implement ATC**

As discussed, under the proposed settlements with BP, ConocoPhillips, ExxonMobil, Shell, Sinclair and Chevron, defendants agree to pay certain amounts which will be allocated to each settlement state. Of the net settlement funds allocated to each state, two-thirds may be used to reimburse retailers or wholesalers selling retail motor fuel under defendant's brand for expenses incurred in installing ATC. The remaining one-third of net settlement funds allocated to each state may be used by the state's department of weights and measures or other agency responsible for regulating retail motor fuel dispensers to defray some state costs of implementing ATC at retail. In preliminarily approving the proposed settlements, the Court found that class members would benefit from funds designed to facilitate the implementation of ATC at retail. See In re Motor Fuel, 286 F.R.D. at 503. Under these settlements, defendants do not agree to install ATC; rather, they agree to provide funds for optional ATC installation by retailers and optional ATC implementation by state regulators. As such, these settlements provide less value to class members than the ATC Settlements, i.e. the settlements under which retailers agree to install ATC. Whether these

-31-

settlements will provide class members increased opportunities to purchase ATC fuel will depend on whether retailers and state regulators take independent steps to implement ATC. Moreover, even if retailers choose to install ATC, the settlements provide enough funds to convert only a small fraction of the total number of pumps in the settlement states.[45] See In Re Motor Fuel, 2012 WL 5876558, at *5. Nevertheless, considered together with the ATC Settlements, these settlements are reasonably calculated to help initiate a market transition to ATC by rewarding early movers through reimbursement of costs incurred by the transition. In light of plaintiffs' losses in the Kansas and California cases and their overall prospects of ultimately prevailing in litigation, the Court finds that the proposed settlements are a reasonable compromise of plaintiffs' claims.[46] Accordingly, the Court finds that the third factor weighs in favor of approving the proposed settlements with BP, ConocoPhillips, ExxonMobil, Shell, Sinclair and Chevron.

### 3. Value Of Recovery Under Settlements Which Provide Optional Funds For State Regulators To Implement ATC

As discussed, under the proposed settlements with CITGO, BB Oil, Coulson Oil, Diamond State, Flash Market, J&P Flash, Magness Oil, Port Cities Oil, W.H. Hess, G&M Oil,

---

[45]     See footnote 51, infra.

[46]     As noted, after five years, any sums remaining in the net settlement fund shall become available for disbursement either to (1) retailers or wholesalers or (2) weights and measures departments, regardless whether the application for disbursement comes from a state whose allocation of the net settlement fund is exhausted. The Court finds that allowing unused funds to be used for ATC in other states furthers the purpose of this litigation, i.e. to change the way the industry operates and facilitate a market transition to ATC. See Order (Doc. #4786) filed December 10, 2014 at 1. In addition, for reasons previously stated with regard to preliminary approval of the settlements, the Court finds that allowing unused funds to escheat to the state is reasonable under the circumstances. See In re Motor Fuel, 2012 WL 5876558, at *6.

World Oil, United El Segundo, E-Z Mart, Love's, MM Fowler, Sunoco, Tesoro and Thorntons, defendants agree to pay certain amounts which will be available to each settlement state to defray regulatory costs of implementing ATC at retail.  Under these settlements, defendants do not agree to install ATC or provide funds for retailers to install ATC.  As such, these settlements provide the least value to class members.  Whether the settlement will provide class members increased opportunities to purchase ATC fuel will depend on whether state regulators take independent steps to implement ATC in their states.  If they do not, after a specified period of time, the states may use remaining funds for any purpose.  Individually, the value of these settlements to class members is quite small.  Considered with the other settlements, however, it appears that these settlements could help further plaintiffs' goal of facilitating a market transition to ATC.  In particular, to the extent that state regulatory costs may impede the ability of retailers to install ATC, it appears that these settlements may help clear the hurdle.[47]  In light of plaintiffs' losses in the Kansas and California cases and their overall prospects of ultimately prevailing on their claims, the Court finds that the proposed settlements are a reasonable compromise of plaintiffs' claims.  Accordingly, the Court finds that the third factor weighs in favor of approving the proposed settlements with CITGO, BB Oil, Coulson Oil, Diamond State, Flash Market, J&P Flash, Magness Oil, Port Cities Oil, W.H. Hess, G&M Oil, World Oil, United El Segundo, E-Z Mart, Love's, MM Fowler, Sunoco, Tesoro and

---

[47]    Some state regulators have stated that permitting ATC at retail would result in increased regulatory expenses for developing standards for equipment approval, certification testing, compliance enforcement and consumer labeling.  See Plaintiffs' Response To Objections Of QuikTrip Corporation, 7-Eleven Inc., Circle K Stores, Inc., Kum & Go, L.C., Marathon Petroleum Company LP, Murphy Oil USA, Inc., Pilot Travel Centers, LLC, Flying J, Inc., PTCAA Texas, LP, Racetrac Petroleum, Inc., Sheetz, Inc., Speedway LLC, The Pantry, Inc., and Wawa, Inc. ("Plaintiffs' Response To QuikTrip Objection") (Doc. #4817) at 14; Plaintiffs' Response To Frank Objectors' Opposition To Approval Of Settlement (Doc. #4816) at 3.

Thorntons.

### C.    Objections

As noted, two groups (the Frank and QuikTrip Objectors) and one individual (Long) filed objections to the proposed settlements.

#### 1.    Frank Objections

The Frank Objectors object to the proposed settlements with BP, Chevron, CITGO, ConocoPhillips, ExxonMobil, Shell, Sinclair, Sunoco and Valero.[48]  More specifically, the Frank Objectors assert that class certification is improper because (1) an intra-class conflict exists among settlement class members; (2) contributions to state weights and measures departments constitute compelled political speech which violates the First Amendment; (3) a class action is not "superior" because it cannot provide individual redress to class members; (4) the separation of powers doctrine counsels against certification; (5) Burford mandates abstention; and (6) the settlement class representatives are not loyal to class members.  In addition, the Frank Objectors assert that the settlements are unfair because (1) they do not benefit class members; (2) they allow excessive attorney's fees; and (3) the Valero settlement contains a most-favored-nations clause.

##### a.    Class Certification

###### i.    Intra-Class Conflict

The Frank Objectors assert that an intra-class conflict exists between named plaintiffs and class members who routinely purchase gas at below-average temperatures. Frank Objection (Doc. #4808) at 8-12. Specifically, the Frank Objectors contend that class members

---

[48]    As discussed, the settlements with BP, Chevron, ConocoPhillips, ExxonMobil, Shell and Sinclair provide optional funds for retailers to install ATC and state regulators to implement ATC; the settlements with CITGO and Sunoco provide optional funds only for state regulators to implement ATC; the Valero settlement requires Valero to implement ATC.

who routinely purchase fuel at below-average temperatures benefit from the status quo – i.e. from purchasing non-ATC motor fuel – and that implementing ATC will harm their economic interests. With regard to the Costco settlement, the Court rejected a similar objection.[49]  See In re Motor Fuel, 271 F.R.D. at 290.  There, the Court found that the objection was hypothetical, i.e. the objectors had not shown that they or anyone they knew frequently bought gas at cooler temperatures.  Id.  The Court also found that if any class members believed that they would be worse off purchasing ATC fuel from Costco, they would be free to purchases non-ATC fuel from other vendors.  Id.

The Frank Objectors assert that the Costco analysis does not apply here because Frank has submitted an affidavit which states that to avoid long lines, he tends to purchase fuel late at night or early in the morning and that he believes that ATC will result in higher prices for purchasers like him.  Id at 10-11;  Declaration Of Theodore H. Frank In Support Of Objection ¶ 8, attachment 1 thereto.  Regarding the Costco settlement, the Court found that without an ATC option, class members have no way to determine the temperature of the fuel which they purchase.  See re Motor Fuel, 2012 WL 1415508 at *14.  Thus, even if Frank routinely purchases fuel in the morning or evening, i.e. when the ambient temperature is presumably cooler than in the middle of the day, he has no way to know the temperature of the fuel which he receives unless he manually measures fuel temperature at the time of purchase.  See, e.g., attachment to Affidavit of John Willrodt, Exhibit D to Plaintiffs' Amended Motion For Preliminary Approval Of Their Settlement Agreement With Valero ("Valero Settlement Motion") (Doc. #4456) filed November 7, 2012 (showing sample measurements of ambient and dispensed fuel temperatures at Valero station in San Antonio,

---

[49]     Frank represented the objectors to the Costco settlement.

Texas).[50]  Ambient temperature alone does not indicate the temperature of dispensed fuel.  Other factors such as underground storage tank temperature, timings of deliveries to the station and how frequently the dispensers are used can also affect dispensed fuel temperature.  See Valero Settlement Motion (Doc. #4456) at 7.  Thus, even if the Frank Objectors could identify class members who routinely purchase fuel in cooler ambient temperatures, they have not shown that those class members would be worse off with an ATC fuel option.

The Frank Objectors assert that the Costco analysis does not apply here because if the current settlements are approved, they include the majority of branded gas stations and cold weather purchasers will have no way to avoid purchasing ATC fuel.  See Motion For Final Settlement Approval (Doc. #4834) at 11.  The settlements alone, however, will not eliminate a class member's ability to purchase non-ATC fuel.  Although the settlements are designed to help initiate a market transition to ATC, they provide funds to convert only a very small number of gas pumps.[51]  Whether

---

[50]     Previously, plaintiffs proposed a settlement which required Valero to post the underground tank temperature of motor fuel.  In an attempt to support the settlement, Valero took sample measurements of ambient temperature and dispensed fuel temperature over the course of a couple days at one station.  See Willrodt Affidavit  ¶ 5-6.  The sample measurements show that ambient temperature alone does not necessarily indicate the temperature of dispensed fuel.  For example, on October 16, 2012, around 10:00 a.m., the ambient temperature was 67 degrees and pump #2 dispensed fuel at 68.8 degrees and pump #15 dispensed fuel at 76.4 degrees.  See Exhibit 1 to Willrodt Affidavit.  The next morning around 11:00 a.m., the ambient temperature was 71 degrees and pump #5 dispensed fuel at 69.1 degrees and pump #15 dispensed fuel at 74.3 degrees.  See id.

The Court rejected the settlement, finding that the proposed disclosures would provide little to no benefit to class members.  See In re Motor Fuel, 2012 WL 5876558, at *13.  Specifically, the Court found that to make use of the proposed tank temperature disclosures, "class members would need to account for statistical probabilities in the variation between tank temperature and dispensed temperature and then mathematically calculate a volume adjustment based on the likely dispensed temperature.  Id. at *12.

[51]     For instance, the BP Settlement provides funds to convert approximately 1,143 pumps in 24 settlement states.  See In re Motor Fuel, 2012 WL 5876558, at *5.  In those states,

(continued...)

they will ultimately achieve that goal depends on forces outside the scope of the settlements and/or matters before this Court.  Individual states remain free to allow or disallow ATC at retail.  Other than five retailers which have agreed to install ATC, other retailers at most will have an option to seek reimbursement from a limited fund for costs associated with implementing ATC if they choose to do so.  To the extent that a market transition actually occurs, it will be the result of objective, well-reasoned decisions by state law makers and competitive market forces driven by individual consumer choice.  The Court overrules the Frank Objection on this ground.

### ii.        Compelled Political Speech

The Frank Objectors assert that the proposed settlements violate the First Amendment because they compel class members to make political donations.  Frank Objection (Doc. #4808) at 12-15.  As an initial matter, the Court notes that class members had an opportunity to opt out of the settlements and retain the value of their claims against defendants.  Thus, they have not been required to contribute money to state agencies.  Moreover, the settlement funds are not political in nature.  The settlements aim to provide class members an increased opportunity to purchase ATC fuel.  They do not fund a political candidate or lobby for a particular political view. The settlements merely provide funds to reimburse states for regulatory costs incurred in implementing ATC at retail, if they choose to do so.  If the state chooses not to implement ATC at

---

[51](...continued)
approximately 7,040 stations sell BP-branded fuel.  See id.  The Court does not have information regarding the average number of pumps at each station.  If each station has 5 pumps, the BP Settlement would fund ATC conversion for about 3 per cent of the total number of pumps selling BP-branded fuel in the settlement states (7,040 stations x 5 pumps = 35,200 total pumps. 1,143 ATC pumps/35,200 total pumps =.0325).  Moreover, many fuel sellers adamantly oppose selling ATC fuel and appear to be committed to their current method of sale, i.e. non-ATC fuel.  See QuikTrip Objection (Doc. #4809).  Therefore, for any foreseeable future, it appears that consumers will be able to purchase fuel on a non-ATC basis.

retail, the money will revert to the state's general fund.[52]   The Court is confident that state lawmakers and regulators will independently and objectively determine whether to implement ATC at retail in their respective states.[53]   The Court overrules the Frank Objection on this ground.

### iii.      Superiority

The Frank Objectors assert that because the settlements do not provide individual redress to class members, a class action is not superior to other means of adjudication. Frank Objection (Doc. #4808) at 16-18.   The Court disagrees.   As discussed, the proposed settlements provide value and benefit to class members.   Moreover, the Frank Objectors have not shown that class members can feasibly pursue individual claims.   Any individual damages are exceedingly small relative to the cost of maintaining separate actions, and plaintiffs' losses in the Kansas and California cases suggest dim prospects of prevailing in individual actions.   The Court overrules the Frank Objection on this ground.

### iv.      Separation Of Powers

The Frank Objectors assert that by approving the proposed settlements, the Court will improperly entice or encourage lawmakers to change state law and/or establish state regulations in violation of the separation of powers doctrine set forth in the United States Constitution.[54]   Frank Objection (Doc. #4808) at 18-21.   The Frank Objectors are

---

[52]      Under some settlements, the money would become available to other states for one year before reverting to the state's general fund.

[53]      The Court notes that plaintiffs have served notice of the settlements on more than 125 state and federal officials and none have objected.   See Plaintiffs' Response To QuikTrip Objection (Doc. #4817) filed April 22, 2015.

[54]      The separation of powers doctrine derives from the structure of our government and the body of the Constitution.   The Constitution establishes a system of checks and balances in which

(continued...)

mistaken.  The settlements cannot and do not require states to allow ATC at retail, nor do they

unduly coerce or influence state decision making in that regard.  Whether to allow ATC at retail

remains exclusively in the control of state lawmakers and agencies.  In finding that the proposed

settlements are a fair and reasonable compromise of plaintiffs' claims, the Court is in no way

directing state lawmakers and/or agencies to allow ATC at retail.  The issue before this Court is

whether the proposed settlements confer a fair benefit to class members in exchange for a release

of their claims.  The Court cannot and does not address all factors which state lawmakers and

regulatory agencies must consider in deciding policies for weights and measures in particular states.

To the extent that a particular state may permit ATC at retail, the settlements merely provide funds

which the state can use to defray regulatory costs incurred as a result of its implementation.  The

Court overrules the Frank Objection on this ground.

### v.  **Burford** Abstention

The Frank Objectors assert that under Burford v. Sun Oil, 319 U.S.

315 (1943), the Court should abstain from approving the proposed settlements because they unduly

interfere with state policymaking.  Frank Objection (Doc. #4808) at 21.  The Court again disagrees.

Burford "is concerned with protecting complex state administrative processes from undue federal

---

[54](...continued)

no one branch can have more power than another.  See Stern v. Marshall, — U.S.. —, 131 S. Ct.
2594, 2608 (2011) ("'[T]he judicial Power of the United States . . . can no more be shared' with
another branch than 'the Chief Executive, for example, can share with the Judiciary the veto power,
or the Congress share with the Judiciary the power to override a Presidential veto.'") (quoting
United States v. Nixon, 418 U.S. 683, 704 (1974)).  Article III defines the judiciary's power and also
protects its independence.  Id.  When the Framers established the system of divided power in our
Constitution, it was essential that "the judiciary remain[ ] truly distinct from both the legislature and
the executive."  Id. (quoting The Federalist No. 78, p. 466 (C. Rossiter ed. 1961) (A. Hamilton).
While Congress has a duty to create the nation's laws, it is the judiciary's duty to state what the law
is.  Nixon, 418 U.S. at 703 (quoting Marbury v. Madison, 5 U.S. 137, 177 (1803)).

interference." <u>New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)</u>, 491 U.S. 350, 362 (1989). More specifically, <u>Burford</u> instructs that "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." <u>Id.</u> at 361 (internal quotation marks omitted); <u>see also</u> <u>Western Ins. Co. v. A & H Ins., Inc.</u>, 784 F.3d 725, 727 (10th Cir. 2015).

Here, the proposed settlements in no way interfere with state administrative processes. As discussed, whether to allow ATC at retail remains exclusively in the control of state lawmakers and agencies. Accordingly, <u>Burford</u> does not apply. The Court overrules the Frank Objection on this ground.

### vi.        Loyalty Of Class Representatives

The Frank Objectors assert that class certification is improper because class counsel picked the class representatives solely to approve settlements and that as a result, the class representatives are beholden to class counsel and their incentive payments and are unfairly motivated to accept settlements which do not benefit the class. <u>Frank Objection</u> (Doc. #4808) at 35-36. The record proves otherwise. Plaintiffs have filed more than 100 affidavits by named representatives which state that with respect to each settlement class or subclass, the named representative understands his or her duties and representational responsibilities and believes that the proposed settlement is in the best interests of the class or subclass which he or she represents.

See Exhibit 39 to Motion For Final Settlement Approval (Doc. #4834).  The vast majority of the named representatives have been involved in this litigation since 2007.  See id.  Most of them have spent 30 to 50 hours on the litigation, with many spending more than 100 hours.  See id.  On this record, the Court finds that the named representatives have operated with a proper understanding of their representational responsibilities to the settlement classes.  The Court overrules the Frank Objection on this ground.

### b.    Settlement Fairness

The Frank Objectors assert that the settlements are unfair because (1) they do not benefit class members; (2) they allow excessive attorney's fees; and (3) the Valero settlement contains a most-favored-nations clause.

### i.    No Benefit To Class Members

The Frank Objectors assert that the settlements do not benefit class members because (1) they confer the same prospective benefit on all fuel purchasers regardless of class membership; and (2) ATC will not economically benefit fuel purchasers.  Frank Objection (Doc. #4808) at 22-28.  As to the first argument, the fact that non-class members will also benefit from an opportunity to purchase ATC fuel does not diminish the fairness of the settlements.  As discussed, the settlement classes exceed 100 million members whose claims for individual damages are exceedingly small relative to the cost of maintaining separate actions, and plaintiffs' losses in the Kansas and California cases suggest dim prospects of prevailing in individual actions.  Under these circumstances, the fact that the settlements do not confer individual benefits unique to class members does not make them unfair.  As discussed, the settlements are designed to increase opportunities for class members to purchase fuel at ATC, i.e. to achieve accuracy and consistency

of fuel measurement for their fuel dollar, regardless of temperature at the time of pumping. Under

the circumstances, the benefits received are a fair settlement of class member claims.

The Frank Objectors assert that ATC will not benefit class members because defendants can

choose to pass along additional costs to their customers.[55]   Frank Objection (Doc. #4808) at 24-25.

---

[55]      In an attempt to show that ATC would not benefit class members, the Frank Objectors point to a cost-benefit study which the California Energy Commission ("CEC") conducted in 2007 at the direction of the California legislature. See Frank Objection (Doc. #4808) at 26-27. The CEC Report attempted to quantify the benefits and costs associated with temperature compensation for retail sales of motor fuel in California. See CEC Report (Doc. #4835-27) at 1, Exhibit 45 to Plaintiffs' Motion (Doc. #4834).

On the benefit side, the CEC Report found that if ATC were mandated for use at retail stations, consumers could expect a slight benefit due to increased price transparency. Id. at 2. The Report noted that "[p]rices posted by two retail stations at an intersection showing identical prices may appear to be equivalent in value by the consumer, but if the fuel temperature at one station is higher than the other, the motorist would want to select the station with the cooler fuel temperature." Id.

On the cost side, the CEC Report found that retail station owners would experience additional expenses to retrofit equipment for ATC and slightly higher inspection fees. Id. It estimated that mandating ATC at retail would cost between $10,704 to $13,135 per retail outlet, for a total cost of $103.8 to $127.4 million. Id. In addition, retailers would incur increased costs for recurring maintenance and inspection fees. Id. If retailers passed through all additional expenses over a ten to 15-year time period, it estimated that requiring ATC at retail in California would cost between eight hundredths (8/100) to 18 hundredths (18/100) of a cent per gallon. Id.

The CEC Report concluded that if the only criterion for assessing merit is a net benefit to consumers, the legislature should not mandate ATC at retail because the cost-benefit analysis showed a net cost for consumers. The Report recommended, however, that the legislature "also consider whether the possible value of increased fairness, accuracy, and consistency of fuel measurement . . . justify mandating ATC at California retail stations." Id. at 3.

Here, the settlements do not mandate ATC at retail; they merely seek to facilitate voluntary ATC implementation by some retailers. Although the Frank Objectors contend that the CEC Report shows that ATC at retail would not benefit class members, it apparently has not stopped the director of California's division of measurement standards from finding that ATC at retail is permitted under California law. See letter dated September 13, 2011 from Kristin J. Macey, Ex. 46 to Motion For Final Settlement Approval (Doc. #4834). To the extent that the Frank Objectors assert that the settlements will cause the settling defendants to increase fuel prices, they do not address what effect

(continued...)

-42-

The Court rejected similar objections with regard to the Costco settlement.  See In re Motor Fuel, 2012 WL 1415508, at *14.  There, the Court found that the retail motor fuel market is a competitive one, that competition will determine whether Costco can raise prices and if so by how much, and that competitive pressures are particularly strong since not all retailers propose to change to ATC.  See id.  The same analysis applies here.  As discussed, other than five retailers which have agreed to install ATC, other retailers at most will have an option to seek reimbursement from a limited fund for costs associated with implementing ATC.  Many retailers seem to adamantly oppose ATC and presumably will continue to sell on volumetric basis without regard to fuel temperature.  As such, competitive market forces will determine the prices which the settling defendants can charge.  The Court overrules the Frank Objection on this ground.

### ii.      Excessive Attorney's Fees

The Frank Objectors assert that the proposed settlements are unfair because they allow class counsel excessive fees while conferring little to no benefit on class members.  See Frank Objection (Doc. #4808) at 28-35.  As discussed, the settlements confer a fair benefit to class members.  As with the amended Costco settlement, the proposed settlements leave the Court discretion to award the appropriate amount of attorney's fees, if warranted.  Under the circumstances, the Court is confident that any fee award can be fair and reasonable.  See In re Motor Fuel, 2012 WL 1415508, at *15 (citing Gottlieb v. Barry, 43 F.3d 474, 482 n.4 (10th Cir. 1994)).  The Court overrules the Frank Objection on this ground.

---

[55](...continued)
continued litigation would have on fuel prices.  See Frank Objection (Doc. #4808) at 27.  Also, they do not address whether competitive market forces will allow the settling defendants to raise fuel prices when not all retailers are implementing ATC.

### iii.       Valero Settlement – Most-Favored-Nations Clause

The Frank Objectors assert that the Valero Settlement is unfair because it contains a so-called "most-favored-nations clause" ("MFN clause") which permits Valero to retroactively modify the settlement if another defendant agrees to a more favorable deal.  See Frank Objection (Doc. #4808) at 35.

Section 4.8 of the Valero Settlement states as follows:

> If at any time prior to the completion of conversion and installation of ATC, Class Counsel and Class Representatives agree to enter into any agreement with any person or company to resolve any action or any other pending or threatened claim concerning ATC that is materially more favorable to that person or company than this [Settlement Agreement] is to Valero (including, without limitation, calling for a lower conversion percentage, slower rate of conversion to ATC, or for completion of conversion to ATC at a later date than required by Paragraph 4.3), Class Counsel and Class Representatives agree to notify Valero promptly of the terms of such agreement. At Valero's sole discretion, it may adopt the materially more favorable terms in any such agreement in place of its obligations under Paragraph 4.4.  Valero agrees to notify Class Counsel and Class Representatives in writing of any such election. The parties agree Paragraph 4.8 does not apply to Valero's obligations pursuant to Paragraphs 4.11 and 4.12 below.  The parties agree that any change in Valero's obligations under Paragraph 4.3 as a result of any such election that is not a change that is materially adverse to the Settlement Class does not require additional notice to the class.

Valero Settlement ¶ 4.8, Ex. 11 to Motion For Final Settlement Approval (Doc. #4834).

The provision is virtually identical to the MFN clause in the amended Costco settlement, which the Court has approved.  See Costco Amended Settlement Agreement, § 4.7, Exhibit B to Defendant Costco Wholesale Corporation's Notice To Invoke Rights Under Section 4.7 Of The Settlement (Doc. #4729) filed March 20, 2014.  As with the amended Costco settlement, the provision applies only to agreements which contain more favorable terms regarding Valero's obligations under Paragraph 4.4 regarding the timetable for implementing ATC.  See Memorandum And Order (Doc. #4793) filed January 23, 2015 at 12.  It does not relieve Valero of obligations

-44-

contained elsewhere in the agreement, i.e. to convert existing stores to ATC under Paragraph 4.1 and to install ATC at to stores under Paragraph 4.2.  See id.  Under these circumstances, the Court finds that the MFN clause is not unfair to class members.   The Court overrules the Frank Objection on this ground.

For reasons discussed, the Court finds that all Frank Objections are without merit.

## 2.    QuikTrip Objections

The QuikTrip Objectors assert that the proposed settlements (1) violate Article III; (2) violate the First Amendment; (3) create an appearance of quid pro quo corruption; and (4) usurp the prerogatives of federal and state regulators and violate separation of powers.  Plaintiffs assert that the QuikTrip Objectors do not have standing to object to the settlements.   The Court will first address the issue of standing.

As a preliminary matter, the Court notes that the QuikTrip arguments are based on a faulty premise, i.e. that ATC at retail is illegal in all settlement states.  See QuikTrip Objection (Doc. #4809) at 11, 25. The QuikTrip Objectors assert that "**all states** currently prohibit ATC," that "every jurisdiction at issue in this case has rejected ATC," and that "the law **must** change in order for Plaintiffs to receive **any** relief" under the proposed settlements.  QuikTrip Objection (Doc. #4809) at 11, 25; QuikTrip Reply (Doc. #4819) at 11 (emphasis in originals).  The QuikTrip Objectors provide no support for these assertions,[56] and they are untrue.

_____

[56]    To support the assertion that all states prohibit ATC, the QuikTrip Objectors cite language in the settlements with Casey's and Valero which states that the settling defendants take the position that the settlement states do not currently approve the use of ATC at retail.  See QuikTrip Objection (Doc. #4809) at 11 (citing Casey's Settlement ¶ 4.6, Ex. 9 to Motion For Final Settlement Approval (Doc. #4834) and Valero Settlement ¶ 4.5, Ex. 11 to Motion For Final Settlement Approval (Doc. #4834)).  The fact that a settling defendant takes a position does not establish the merit of that position.  Moreover, the fact that a state does not have regulations which

(continued...)

In 2011, the director of California's division of measurement standards wrote a letter to plaintiffs' counsel regarding the Costco settlement. The letter states as follows: (1) California law and regulations provide sufficient authority for the division to address the evaluation, inspection and testing of ATC retail dispensers; (2) although the installation and use of ATC retail dispensers will require the state to develop procedures for evaluation, inspection and testing, the changes are not onerous; (3) one manufacturer has already received a California certificate of approval for an ATC retail dispenser; and (4) in anticipation of Costco's request to install ATC, the division has already drafted regulations which address ATC retail dispensers. See letter dated September 13, 2011 from Kristin J. Macey, Ex. 46 to Motion For Final Settlement Approval (Doc. #4834).

Also in 2011, the director of weights and measures in New Mexico testified that New Mexico allows ATC at retail. See Deposition of Joe Gomez at 51-52, 139, Exhibit 47 to Motion For Final Settlement Approval (Doc. #4834).

In addition, according to the CEC Report, the State of Hawaii has expressly adopted temperature compensation at retail by allowing existing retail dispensers to be modified to distribute an additional quantity of fuel (as measured in cubic inches) to compensate for warmer fuel.[57] See CEC Report at 1.

The QuikTrip Objectors make much ado over the fact that in 2009, at a meeting of the National Conference on Weights and Measures ("NCWM"), state officials considered and rejected

---

[56](...continued)
affirmatively authorize ATC does not necessarily mean that it prohibits it. A more pertinent question would be how a state would respond to a request to install ATC. Based on the evidence in this case, it appears that to date, no retailer has requested leave to install ATC. That question is unresolved and its likely outcome is hotly disputed.

[57]      Claims under Hawaiian law are not at issue in this case.

proposals to amend Handbook 44 to expressly permit or mandate ATC for retail motor fuel sales. The fact that the NCWM declined to amend the handbook does not establish that the handbook prohibits ATC at retail. In 2007, <u>i.e.</u> before the NCWM declined to amend the handbook, at least 34 state officials indicated that ATC at retail was legal in their respective states.[58]

This Court has repeatedly found that the handbook is silent on the issue and does not expressly prohibit ATC. <u>See</u> <u>In re Motor Fuel</u>, 2013 WL 3795206, at *14; <u>In re Motor Fuel Temp. Sales Prac. Litig.</u>, No. 07-1840-KHV, 2012 WL 645997, at ** 5-7 (D. Kan. Feb. 28, 2012); <u>In re Motor Fuel Temp. Sales Prac. Litig.</u>, 534 F. Supp.2d 1214, 1224 (D. Kan. 2008); <u>see also</u> <u>Report Of Constantine V. Cotsoradis</u> at 2-4, Exhibit 35 to <u>Motion For Final Settlement Approval</u> (Doc. #4834). Moreover, the handbook does not establish state weights and measures law: each state must independently decide whether to adopt all or part of Handbook 44 and how to interpret the handbook under its law. <u>See, e.g.</u>, <u>Memorandum And Order</u> (Doc. #4369) filed August 15, 2012 at 12 (Handbook 44 not law; simply contains model rules for states to adopt if they choose).

On this record, the Court must reject QuikTrip's underlying argument that ATC is illegal in every state and that the law must change before plaintiffs can obtain any relief under the proposed settlements.

---

[58]    In 2007, the National Institute of Standards and Technology ("NIST") conducted a survey of 50 states and Washington, D.C. Thirty-four officials responded that ATC at retail was legal in their respective states or jurisdictions. <u>See</u> Exhibit 42 to <u>Motion For Final Settlement Approval</u> (Doc. #4834) (Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, Washington, D.C., Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, Texas, Utah, Washington, West Virginia and Wisconsin). Sixteen officials responded that ATC at retail was not legal in their state or jurisdiction. <u>Id.</u> (Connecticut, Indiana, Iowa, Massachusetts, Michigan, Minnesota, Montana, Nebraska, New York, Ohio, Pennsylvania, South Dakota, Tennessee, Vermont, Virginia and Wyoming). Officials from the State of Florida declined to answer the question, stating that Florida law did not expressly prohibit or allow ATC at retail. <u>Id.</u> at 2.

### a.       Standing

As noted, the QuikTrip Objectors are non-settling and former defendants.[59] Plaintiffs assert that the QuikTrip Objectors do not have standing to object to the settlements. Whether a party has standing is a legal question.  See Lippoldt v. Cole, 468 F.3d 1204, 1216 (10th Cir. 2006).  Under Article III of the United States Constitution, federal courts may only hear actual "cases" or "controversies."[60]  U.S. Const. art. III, § 2, cl.1.  To show Article III standing, a party must show that (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action; and (3) it is likely, as opposed to merely speculative, that a favorable decision will redress the injury.  New Eng. Health Care Emp. Pension Fund v. Woodruff, 512 F.3d 1283, 1288 (10th Cir. 2008) (citing Bronson v. Swensen, 500 F.3d 1099, 1106 (10th Cir. 2007)).

Ordinarily, a non-settling party lacks standing to complain about a class action settlement because it has suffered no "injury in fact" and has no legally protected interest in the settlement.[61] See In re Integra Realty Res., Inc., 262 F.3d 1089, 1102 (10th Cir. 2001).  Courts recognize a limited

---

[59]       As noted, as to Kansas claims, 7-Eleven, Inc., Kum & Go, L.C. and QuikTrip Corp. obtained a jury verdict in their favor.  See Verdict (Doc. #4422) filed September 24, 2012.  As to all other claims, plaintiffs have dismissed the QuikTrip Objectors as defendants with prejudice.  See Stipulation Of Dismissal With Prejudice (Doc. #4711).

[60]       The question of standing is a "threshold determinant[ ] of the propriety of judicial intervention."  Warth v. Seldin, 422 U.S. 490, 518 (1975); see Bhatia v. Piedrahita, 756 F.3d 211, 217 (2nd Cir. 2014).  The standing requirements ensure that judicial resources are "devoted to those disputes in which the parties have a concrete stake."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 191 (2000).

[61]       Generally, only class members have standing to object to a class settlement.  See, e.g., Feder v. Elec. Data Sys. Corp., No. 06-40735,  248 Fed. Appx. 579, 580 (5th Cir. Sept. 25, 2007); In re Drexel Burnham Lambert Grp., Inc., 130 B. R. 910, 923 (S.D.N.Y. 1991), aff'd, 960 F.2d 285 (2d Cir. 1992).

-48-

exception to this rule where a non-settling party can demonstrate that it will suffer "plain legal prejudice" as a result of the settlement.  Plain legal prejudice includes "any interference with a party's contract rights or a party's ability to seek contribution or indemnification."  Id.; see Agretti v. ANR Freight Sys., 982 F.2d 242, 247 (7th Cir. 1992).  "A party also suffers plain legal prejudice if the settlement strips the party of a legal claim or cause of action, such as a cross claim or the right to present relevant evidence at trial."  Woodruff, 512 F.3d at 1288 (quoting In re Integra, 262 F.3d at 1102-03).  In practice, courts find such prejudice only "in rare circumstances."  Allen v. Dairy Farmers of Am., No. 5:09-cv-230, 2011 WL 1706778, at *4 (D. Vt. May 4, 2011); see In re Integra, 262 F.3d at 1102 (not sufficient for non-settling party to show mere loss of practical or strategic advantage in litigating case): Agretti 982 F.2d at 247 ("mere allegations of injury in fact or tactical disadvantage as a result of a settlement simply do not rise to the level of plain legal prejudice").

The QuikTrip Objectors assert that they have standing to object because (1) they will suffer plain legal prejudice if the Court approves the settlements; and (2) Murphy Oil and Speedway are putative members of some settlement classes.

### i.    Legal Prejudice

The QuikTrip Objectors assert that they have standing to object because they will suffer legal prejudice if the settlements are approved.  Specifically, the QuikTrip Objectors assert that the settlements will cause injury to their business interests and First Amendment rights.

#### *Injury To Business Interests*

The QuikTrip Objectors assert that the proposed settlements will prejudice their legal right to conduct business as they have historically done and are authorized to

-49-

do under current law, i.e. to sell fuel volumetrically without regard to fuel temperature. QuikTrip Objection (Doc. #4809) at 15. The QuikTrip Objectors assert that the entire thrust of the settlements is to change the regulatory environment in which they do business and that a permissive system of ATC implementation will effectively force all retailers to adopt ATC. QuikTrip Reply (Doc. #4819) at 7-9. Essentially, the QuikTrip Objectors argue that under the settlements, some retailers and states will move toward implementing voluntary ATC and that states might possibly decide to mandate ATC at retail, and that all this may result in market and/or regulatory forces requiring all retailers to implement ATC – which will harm them financially. See id.

The QuikTrip Objectors assert that plaintiffs' ultimate goal is to obtain mandatory ATC at retail. If so, the proposed settlements fall woefully short of that goal. The proposed settlements reflect voluntary agreements between private parties to install ATC and/or provide funds to retailers and state weights and measures agencies to facilitate the voluntary implementation of ATC at retail to the extent it is permitted by law. The settlements do not in any way require the QuikTrip Objectors or any other non-settling party to install ATC at retail. As discussed, whether to allow ATC at retail – or mandate ATC at retail – remains exclusively in the control of state lawmakers and agencies. At most, the QuikTrip Objectors assert that the settlements will move plaintiffs one step closer to their goal, i.e. that voluntary implementation of ATC by some retailers may potentially cause a market shift which will result in mandatory ATC at retail. Such speculative potential business harm does not amount to an "injury in fact" sufficient to convey standing. In other words, it does not interfere with legal rights sufficiently to rise to the level of "plain legal prejudice." See Woodruff, 512 F.3d at 1288. The QuikTrip Objectors lack standing to object to the settlements based on alleged injury to business interests.

### *Injury To First Amendment Rights*

The QuikTrip Objectors assert that the proposed settlements injure their First Amendment rights because they create a judicially-approved subsidy which their political rivals can use to influence government decision-making. QuikTrip Objection (Doc. #4809) at 15-17. In support of the argument, the QuikTrip Objectors cite Arizona Free Enterprise Club's Freedom Club PAC v. Bennett, — U.S. —, 131 S. Ct. 2806 (2011). In Bennett, the Supreme Court held that a state cannot  subsidize the speech of one political candidate because to do so effectively dilutes the speech of the other candidate. See id. at 2814 (striking down state law that allowed candidates to obtain state funding to match spending of self-funded candidate). The QuikTrip Objectors assert that Bennett applies here because the settlements will fund an opposing political voice and effectively dilute their own political voice. See QuikTrip Objection (Doc. #4809) at 16-17. In essence, the QuikTrip Objectors assert that in the past, the settling defendants sided with the QuikTrip Objectors and opposed ATC and now, under the settlements, the settling defendants have agreed to change their position, i.e. to either support ATC or to abstain from taking a position regarding ATC, which will diminish the effectiveness of the QuikTrip Objectors' speech and weaken their political influence. See id.

As a preliminary matter, the QuikTrip Objectors mischaracterize the nature of the proposed settlements. They do not establish a government subsidy. As discussed, the settlements reflect voluntary agreements between private parties. That the Court approves the settlements as fair, reasonable and adequate under Rule 23(e)(2) does not mean that the federal government is subsidizing political speech or taking political action.[62] The settling defendants are free to switch

---

[62]     For similar reasons, the Court rejects the QuikTrip assertion that the settlement
(continued...)

sides in the ATC debate, and their decision to do so does not violate the First Amendment rights of the QuikTrip Objectors. On this record, the QuikTrip Objectors have not shown that they will suffer plain legal prejudice as a result of the settlements. See Woodruff, 512 F.3d at 1288. The QuikTrip Objectors therefore lack standing to object to the settlements based on alleged injury to First Amendment rights.

### ii.    Class Membership

The QuikTrip Objectors assert that some of them have standing to object based on class membership. See QuikTrip Objection (Doc. #4809) at 17-18; QuikTrip Reply (Doc. #4819) at 3-6. Plaintiffs assert that the QuikTrip Objectors have not timely identified and/or proven the settlement classes to which they belong. See Plaintiffs' Response To QuikTrip Objection (Doc. #4817) at 4; Plaintiffs' Surreply To QuikTrip Objection (Doc. #4833) at 4-5.

The notice to class members provided the following procedure for objecting to the settlements:

> To object, you must send a letter via first class mail stating which Settlement(s) you object to and why. Be sure to include your name, address, telephone number and signature. You must mail the objection to [the Clerk of the Court, class counsel and defense counsel] no later than March 23, 2015.

Legal Notice By Order Of The United States District Court For The District Of Kansas at 13, attached as Exhibit A.

On March 23, 2015, the QuikTrip Objectors filed their initial objection which asserted that "some" of them are members of some settlement classes. See QuikTrip Objection (Doc. #4809) at 17. To support the assertion, the QuikTrip Objectors provided a declaration by Marathon Petroleum

---

[62](...continued)
agreements constitute a "court-endorsed campaign to change existing law." QuikTrip Reply (Doc. #4819) at 9-10.

employee Tonya J. Hunter which states that from 2001 to 2012, she purchased fuel in Kansas and Missouri on behalf of the company. QuikTrip Objection (Doc. #4809) at 17-18 and Exhibit A thereto. The affidavit does not identify from which retailers Hunter purchased fuel, and the QuikTrip Objectors did not identify which settlement agreements they objected to based on class membership. See id. Plaintiffs responded that the QuikTrip Objectors had not sufficiently shown that Marathon was a member of any settlement class. See Plaintiffs' Response To QuikTrip Objection (Doc. #4817) at 4. In reply, the QuikTrip Objectors "substituted" the Hunter declaration with declarations by Speedway employee Frank Crilley and Murphy Oil employees Rickey Burnell and Matthew Burton. QuikTrip Reply (Doc. #4819) at 5 n.2. The new declarations state that on behalf of Speedway, Crilley purchased gas in Texas from Valero, Love's and Chevron[63] and on behalf of Murphy Oil, Burnell purchased gas in Louisiana from Valero and Burton purchased gas in Arkansas from Exxon. See QuikTrip Reply (Doc. #4819) at 5 and exhibits thereto.

Plaintiffs assert that the QuikTrip Objectors did not timely identify who was objecting based on class membership and to which settlements they objected. The Court agrees. The deadline for submitting objections was March 23, 2015. On or before that date, class members were required to state the settlements to which they objected and the reason for any objection. See Legal Notice at 13, Exhibit A hereto. On March 23, 2015, the QuikTrip Objectors filed an objection which asserted that Marathon was a settlement class member based on unspecified fuel purchases in Kansas and Missouri. More than six weeks later, on May 6, 2015, the QuikTrip Objectors "substituted" that objection with one based on class membership by Speedway and Murphy Oil. The QuikTrip

---

[63]    The Crilley declaration also states that he purchased gas from Stripes and Buc-ee's, see Exhibit 1 to QuikTrip Objection (Doc. #4809), but those retailers are not defendants in these MDL proceedings.

Objectors did not obtain leave of Court to file objections based on new class membership. As such, the objections based on class membership by Speedway and Murphy Oil are untimely and not properly before the Court.

For these reasons, the QuikTrip Objectors lack standing to object to the proposed settlements. Nevertheless, even if the Court considered the merits, it would overrule the QuikTrip Objections.

### b.    Merits Of QuikTrip Objections

As noted, the QuikTrip Objectors assert that the settlements (1) violate Article III; (2) violate the First Amendment; (3) create an appearance of quid pro quo corruption; and (4) usurp the prerogatives of federal and state regulators and violate separation of powers.

### i.    Article III

The QuikTrip Objectors assert that the proposed settlements violate Article III because they seek only to change future law and do not redress an injury caused by a legal violation. See QuikTrip Objection (Doc. #4809) at 18-22. The QuikTrip Objectors misconstrue the settlements and the facts. Plaintiffs have presented a live controversy, i.e. whether defendants' current method of sale violates state consumer protection laws. Although defendants prevailed in the Kansas trial and on summary judgment in the California cases, judgment has not been entered and plaintiffs retain the right to appeal. Moreover, plaintiffs' claims in states other than Kansas and California have not been decided. Although it appears that plaintiffs' chances of ultimately prevailing are slim, plaintiffs are releasing live claims in exchange for the settlements. Moreover, although the settlements may ultimately seek to change some law, or to change the regulatory environment, the overall aim of the settlements is to provide increased opportunities for class

members to obtain transparent and consistent fuel measurement for their fuel dollars regardless of fuel temperature at the time of pumping.

### ii.        First Amendment

The QuikTrip Objectors assert that the proposed settlements violate the First Amendment because they (1) compel class members to make political donations; and (2) silence the political speech of two settling defendants, i.e. Dansk and Valero.   See QuikTrip Objection (Doc. #4809) at 22-27.

#### *Compelled Speech*

The QuikTrip Objectors assert that the settlements require class members to make political donations to state agencies.  See QuikTrip Objection (Doc. #4809) at 22-25.  For reasons discussed with respect to the Frank Objection, the Court disagrees.  Class members had an opportunity to opt out of the settlements and thus are not required to make involuntary contributions to state agencies.  Moreover, the settlement funds are not political in nature; they merely provide optional funds to reimburse states for regulatory costs incurred in implementing ATC at retail to the extent permitted by state law.  As discussed, state lawmakers and regulators will independently and objectively determine whether to implement ATC at retail.

#### *Silence Political Speech*

The QuikTrip Objectors assert that the settlements with Dansk and Valero improperly silence political speech.  See QuikTrip Objection (Doc. #4809) at 26-27.  Specifically, the QuikTrip Objectors point to the following settlement language:

> Dansk agrees it will not impede or obstruct any legally permissible effort by Class Counsel related to the implementation, amendment or adoption of regulations related to retail ATC equipment.

> Valero agrees to abstain from any regulatory, legislative, lobbying or trade association activity involving ATC and agrees not to oppose ATC.

Id. at 26 (quoting Dansk and Valero settlement agreements).

Again, the QuikTrip Objectors misconstrue the facts.  The settlements reflect voluntary agreements between private parties, and any agreement not to speak is voluntary on behalf of the settling defendant.  By approving the settlements, the Court is not violating First Amendment rights of the settling defendants or, by extension, the QuikTrip Objectors.

### iii.    Appearance Of Quid Pro Quo Corruption

The QuikTrip Objectors assert that the proposed settlements appear to have "hallmarks of corruption" because they  provide  "unseemly" payments to entice state regulators to change state law regarding ATC.  QuikTrip Objection (Doc. #4809) at 27-29.  For reasons already stated, the Court disagrees.  The settlement funds will not benefit state lawmakers and administrators personally.  To the extent that a particular state may permit ATC at retail, the settlements provide funds which a state can use to defray regulatory costs incurred as a result of its implementation.   If the state chooses not to implement ATC at retail, the money will revert to the state's general fund.[64]  The Court is confident that state officials will independently and objectively exercise their lawmaking and regulatory duties, and that the payments in question will not corrupt them.

### iv.    Separation Of Powers

The Quiktrip Objectors assert that the proposed settlements usurp the prerogatives of federal and state regulators and violate the doctrine of separation of powers.

---

[64]    Under some settlements, the money would become available to other states for one year before reverting to the state's general fund.

QuikTrip Objection (Doc. #4809) at 29-31.  Specifically, the QuikTrip Objectors assert that it is improper for the Court to create and fund a "judicially enforceable lobbying campaign aimed at changing the decisions of the legislative and regulatory bodies responsible for uniformity and consumer protection."  Id. at 30.  The QuikTrip Objectors assert that regulators have already considered the interests of all stakeholders and decided against ATC at retail.  Id.  They argue that the settlements will in effect "override the deliberative processes of our democratic system in order to manufacture an important public policy determination enshrined in a judicially-enforceable settlement agreement."  Id. at 31.

For reasons discussed, the Court rejects these assertions.  The settlements do not require states to allow ATC at retail and do not unduly coerce or influence state decision making in that regard.  In approving the proposed settlements, the Court is not directing state lawmakers or agencies to allow ATC at retail.  Whether to allow ATC at retail remains exclusively in the control of independent, objective state lawmakers and agencies.

For these reasons, even if the QuikTrip Objectors had standing to object to the settlements, the Court would overrule their objections on all grounds.

### 3.    Long Objection

Long objects to any settlement which gives money to the State of Kansas, on grounds that it will not properly manage the money.[65]  See Doc. #4798.  As previously stated, with regard

---

[65]    Specifically, Long states as follows:

They have shown themselves to be incapable of proper money management and any money given would be a complete waste of settlement funds and would likely be squandered on something completely unrelated to this case, thus producing no actual benefits to the consumer.

(continued...)

to the settlement funds, the Court has utmost confidence in the ability of state lawmakers and regulators to independently and objectively make decisions that are in the best interests of the citizens of their respective states. The fact that one citizen of one state expresses a different opinion does not change the Court's position in this regard. The Court therefore overrules the Long Objection.

### D.    Conclusion

For reasons stated above, the Court finds that class certification is appropriate under Rule 23(a) and (b)(3) and that the proposed settlements are fair, reasonable and adequate under Rule 23(e)(2). Accordingly, the Court approves the 28 proposed settlements. The Court finds that the class members listed on Exhibit 7 to the <u>Dahl Affidavit</u> ¶ 31, Exhibit 30 to <u>Motion For Final Settlement Approval</u> (Doc. #4834) have opted out of the settlement.

### E.    Attorney's Fees

This memorandum and order does not address the <u>Second Motion For Award Of Attorneys' Fees, Expenses, And Class Representative Incentive Awards and Memorandum In Support</u> ("<u>Second Motion For Attorney's Fees</u>") (Doc. #4827) filed May 29, 2015. At the final settlement approval hearing, the Frank Objectors asserted that under Rule 23(h), Fed. R. Civ. P., class members did not receive sufficient notice of the fee request and an opportunity to object thereto.[66] See

---

[65](...continued)
Doc. #4798.

[66]    Rule 23(h) states as follows:

In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

(1) A claim for an award must be made by motion under Rule 54(d)(2),

(continued...)

Transcript Of Final Settlement Approval Hearing (Doc. #4840) at 54-55. Specifically, the Frank Objectors assert that under Rule 23(h), the Court must allow class members an opportunity to object to class counsel's fee motion and supporting documents. See Response In Opposition To Motion For Leave To File Supplemental Briefing On Motion For Approval Of Attorneys' Fees ("Frank Response") (Doc. #4842) filed July 2, 2015 at 1-2.[67]

In support of their argument, the Frank Objectors cite In re Mercury Interactive Corp. Sec. Litig., 618 F.3d 988 (9th Cir. 2010). There, the Ninth Circuit found that the plain text of Rule 23(h) requires a district court to set the deadline for class members to object to counsel's fee request on a date after the motion and supporting documents have been filed and allow class members an opportunity to object to the fee motion itself and not merely to the preliminary notice that such a motion will be filed.[68] See id. at 992-93.

---

[66](...continued)
> subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.
> (2) A class member, or a party from whom payment is sought, may object to the motion.
> (3) The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).
> (4) The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

Rule 23(h), Fed. R. Civ. P.

[67]    The Frank Objectors also assert that the fee request does not satisfy Rule 23(h) because it does not provide a basis for lodestar claims, i.e. that it does not (1) identify timekeepers and billing rates, (2) detail expenses or (3) include affidavits from lead attorneys summarizing work performed. See Frank Response (Doc. #4842) at 3. The Court will consider these arguments when it addresses the merits of the fee request.

[68]    In Mercury, the district court awarded attorney's fees under a securities class action settlement. See Mercury, 618 F.3d at 988, 990-91 (9th Cir. 2010). The class received notice that
(continued...)

Not all courts have followed Mercury.[69]  To the contrary, in circumstances similar to this case, many courts have rejected Mercury and found that the class received reasonable notice and an opportunity to object under Rule 23(h).  See, e.g., Cassese v. Williams, 503 Fed. Appx. 55, 57-58 (2d Cir. Nov. 20, 2012) (declining to follow Mercury; notice of fee request reasonable under circumstances where objectors had two weeks before fairness hearing to crystalize objections and request further information); Saccoccio v. JP Morgan Chase Bank, N.A., 297 F.R.D. 683, 699 (S.D. Fla. 2014) (same); In re CertainTeed Fiber Cement Siding Litig., 303 F.R.D. 199, 221-22 (E.D. Pa. 2014) (declining to follow Mercury; notice of fee request reasonable even though motion filed after objections due); Gascho v. Global Fitness Holdings, LLC, No. 2:11-cv-436, 2014 WL 1350509, at *32 (S.D. Ohio April 4, 2014) (class notice provided information regarding potential for attorney's fees and opportunity to object and appear and fairness hearing).

---

[68](...continued)
class counsel would request 25 per cent of the settlement fund.  Objections were due September 4, 2008.  The New York State Teachers' Retirement System ("TRS") objected on grounds that attorney's fees should not exceed 18 per cent.  Two weeks later, on September 18, 2008, class counsel filed their motion for fees which included detailed information regarding the total number of hours spent and summaries of the type of work done by each firm.  One week later, on September 25, 2008, the district court held a hearing on settlement fairness and attorney's fees and approved both.  Regarding attorney's fees, the district court noted that TRS asserted that the fee award should be 18 per cent, but it did not object to any line item of work performed.  See id. at 991.  TRS appealed, arguing that the district court erred by setting the deadline for filing objections before the deadline for filing the fee motion and then partially basing its decision on the failure of TRS to object to any line item of work that counsel performed.  See id.  The Ninth Circuit agreed and found that by setting the class member objection deadline before the deadline for counsel to file their fee motion, the district court abused its discretion and erred as a matter of law.  Id. at 992.

[69]      At least one other circuit court appears to have followed the Ninth Circuit decision in this regard.  See Redman v. RadioShack Corp., 768 F.3d 622, 637-38 (7th Cir. 2014) (reversing settlement approval for various reasons including "irregular" and "unlawful" procedure where class counsel did not file fee motion until after objection deadline expired; finding that objectors were handicapped because they did not have hour and expense details and did not know rationale for fee request, particularly where counsel invoked administrative costs as factor warranting increased fees).

Here, the notice to class members stated that class counsel planned to request court approval of attorney's fees and litigation costs of up to 30 per cent of the settlement funds and attorney's fees and litigation costs in the amounts of $700,000, $58,000, $3 million and $4 million from Casey's, Dansk, Sam's Club and Valero, respectively.  See Legal Notice at 14-15, Exhibit A hereto.  The notice set a deadline of March 23, 2015 for class members to object and stated that the Court would hold a fairness hearing on June 9, 2015 and consider objections at that time.  Id. at 13-14, 16.  The Court did not set a deadline for class counsel to file a motion for attorney's fees.  Two months after objections were due and 11 days before the settlement fairness hearing – on May 29, 2015 – class counsel filed its fee request.  See Second Motion For Attorney's Fees (Doc. #4827).

On these facts, the Court finds that the general notice to class members provided sufficient information regarding attorney's fees to allow class members a fair opportunity to lodge general objections to the settlements and fee request.  Nevertheless, class members did not receive a chance to specifically respond or object to the actual fee motion filed by class counsel.

In response to the Frank Objection, plaintiffs suggest that the Court allow objectors additional time to address the fee motion.  See Supplemental Briefing On Motion For Approval Of Attorneys' Fees (Doc. #4844) filed July 7, 2015.  Under the circumstances, for those class members who objected to the settlements, the Court will allow additional notice and time to respond and/or object to the fee request as follows:[70]

(1)    On or before **August 26, 2015**, plaintiffs shall post on the settlement class website

---

[70]    Because the notice to class members provided sufficient information regarding attorney's fees to allow class members a fair opportunity to generally object to the settlements and fee request, only those class members who timely objected to the settlements may respond and/or object to the fee motion.  Moreover, any additional filings may address only particular information contained in the fee requests and supporting documents.

a copy of this order and all fee applications and supporting documents.[71]  See id. at 2-3.

(2)     On or before **August 28, 2015**, to those class members who objected to the 28 settlements, plaintiffs shall mail copies of this order via first class mail.[72]  The mailings shall include a cover letter which explains this portion of the Court's ruling and the deadlines set forth herein.  In addition, the cover letter shall provide instructions on how class members can find detailed information regarding the fee request on the settlement class website.

(3)     On or before **October 2, 2015**, class members may file objections to class counsel's fee request.  Said objections may address only particular information contained in the fee applications and supporting documents.

(4)     On **November 19, 2015 at 9:30 a.m.** in Courtroom 476, the Court will hold a hearing regarding the Second Motion For Attorneys' Fees (Doc. #4827) and the Motion For Award Of Attorneys' Fees, Expenses, And Class Representative Incentive Awards And Memorandum In Support Thereof (Doc. #1820) filed March 23, 2011.

As a final matter, the Court notes that in their reply regarding supplemental briefing on attorney's fees, plaintiffs cite "recently discovered information" which plaintiffs contend casts doubt on the motivations of objector Theodore H. Frank.  See Plaintiffs' Reply To Frank Objectors' Opposition To Plaintiffs' Supplemental Briefing On Motion For Approval Of Attorneys' Fees (Doc. #4847) filed July 21, 2015 at 11-13.  The Frank Objectors seek leave to file a surreply. See Motion For Leave To File Surreply Re Plaintiffs' Supplemental Briefing On Motion For Approval Of Attorneys' Fees And Enjoin Objectors From Settling Objections Without Court

---

[71]     In addition, the Court will post this order and the fee applications on its website.

[72]     Plaintiffs shall include Lesley Duke in their mailings.  See Motion (Doc. #4841) filed June 23, 2015.

Approval (Doc. #4848) filed August 4, 2015.  Although the Court finds that the "recently discovered information" is not material to the matters at hand, and does not affect the Court's ruling on the Frank Objections, it will allow the Frank Objectors leave to file their surreply.

**IT IS THEREFORE ORDERED** that <u>Plaintiffs' Motion And Memorandum In Support Of Final Approval Of Class Action Settlements</u> (Doc. #4834) filed June 8, 2015 be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** as follows:

(1)    On or before **August 26, 2015**, plaintiffs shall post on the settlement class website a copy of this order and all fee applications and supporting documents.  <u>See id.</u> at 2-3.

(2)    On or before **August 28, 2015**, to those class members who objected to the 28 settlements, plaintiffs shall mail copies of this order via first class mail.  The mailings shall include a cover letter which explains this portion of the Court's ruling and the deadlines set forth herein.  In addition, the cover letter shall provide instructions on how class members can find detailed information regarding the fee request on the settlement class website.

(3)    On or before **October 2, 2015**, class members may file objections to class counsel's fee request.  Said objections may address only particular information contained in the fee applications and supporting documents.

(4)    On **November 19, 2015 at 9:30 a.m.** in Courtroom 476, the Court will hold a hearing regarding the <u>Second Motion For Attorney's Fees</u> (Doc. #4827) and the <u>Motion For Award Of Attorneys' Fees, Expenses, And Class Representative Incentive Awards And Memorandum In Support Thereof</u> (Doc. #1820) filed March 23, 2011.

**IT IS FURTHER ORDERED** that the <u>Motion For Leave To File Surreply Re Plaintiffs'</u>

<u>Supplemental Briefing On Motion For Approval Of Attorneys' Fees And Enjoin Objectors From</u>

<u>Settling Objections Without Court Approval</u> (Doc. #4848) filed August 4, 2015 be and hereby is

**SUSTAINED in part**.  The Court grants the Frank Objectors leave to file their surreply.

Dated this 21st day of August, 2015 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge
